**DOLL AMIR & ELEY LLP**
Gregory Doll (SBN 193205)
Michael M. Amir (SBN 204491)
Ronald St. Marie (SBN 101398)
1888 Century Park East
Suite 1106
Los Angeles, California 90067
Telephone: (310) 557-9100
Facsimile: (310) 557-9101

Attorneys for Defendants
VERITY, INC., and THE VERITY INC.
CHANGE IN CONTROL AND
SEVERANCE BENEFIT PLAN

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGO SLUIMER<br><br>               Plaintiff,<br><br>vs.<br><br>VERITY, INC., a corporation, and THE VERITY INC. CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN,<br><br>               Defendants. | CASE NO. CV 08-1220 SI<br><br>**DECLARATION OF ANDREW M. KANTER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(B)(6), OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT UNDER RULE 56**<br><br><br>DATE:       July 18, 2008<br>TIME:       9:00 am<br>COURTROOM:  10 |

1.    I am Chief Operating Officer and General Counsel of Autonomy Corporation plc ("Autonomy"), the parent company of the Autonomy group of companies.  Autonomy acquired defendant Verity, Inc. ("Verity") by virtue of a merger transaction that closed on December 29, 2005.  Pursuant to that transaction, Verity became a wholly owned subsidiary of Autonomy, and I became one of two corporate directors of Verity, and, later, the Plan Administrator for the Verity, Inc. Change in Control and Severance Benefit Plan.  The facts set forth herein below are personally known to me; if called upon to do so, I could and would testify competently thereto under oath.  I am submitting this declaration in support of Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6), Or, Alternatively, Summary Judgment or Partial Summary Judgment Under Rule 56.

2.    In my capacity as Chief Operating Officer and General Counsel of Autonomy, I supervised all legal activities related to Autonomy's acquisition of Verity, both before and after the transaction closed.  As such, I was part of the core team making decisions regarding the integration of the entities.  Concurrent with the closing of the transaction, the outgoing board of Verity resigned (as is normal in these transactions) and was replaced by two senior officers of Autonomy as part of standard internal controls:  namely, Sushovan Hussain and myself.  As group Chief Operating Officer I also became ultimately responsible for Human Resources at Verity, with Verity's Head of Human Resources, Jack Landers, reporting directly to me.

### Verity's Change in Control and Severance Benefit Plan

3.    Several months prior to the acquisition by Autonomy, Verity created an ERISA welfare benefits plan (the "Plan") pursuant to a document entitled "Change in Control and Severance Benefit Plan" (the "Plan Document").  A true and correct copy of the Plan, which is dated April 5, 2005, is attached hereto as Exhibit A.

4.    The stated purpose of the Plan was to "provide for payment of severance benefits to certain employees of Verity, Inc. . . . in the event that such employees are subject to qualifying employment terminations in connection with a Change in Control."  In other words, the Plan was designed to provide severance benefits to certain specified employees in the event

that Verity was (i) acquired by another company and (ii) the individual is otherwise eligible under the plan (commonly known in the industry as a "double trigger"). When a dispute with plaintiff Hugo Sluimer described below arose, I was authorized to administer the Plan. This occurred because Autonomy has (and has had since I joined the company) a strict policy of limiting communication between the company and adverse litigants to certain individuals (to protect the company from inadvertent issues arising in the litigation), and, because I was group Chief Operating Officer and General Counsel, it was best that I act as Plan Administrator while the dispute with Sluimer was pending. Thus, on or about May 1, 2006, I took over the duties of Plan Administrator, as identified in Section 2(l) of the Plan Document.

5.    Sluimer was an employee of the Verity group of companies at the time the Plan was created and became a participant under the Plan. At the time of becoming a participant under the Plan, Sluimer waived any right to cash severance benefits under the Plan in favor of seeking any such benefits available to him under Dutch law. The waiver, however, did not address the other types of benefits available under the Plan. A true and correct copy of Sluimer's Participation Notice, which brought him within the scope of the Plan but also waived any claim to cash severance benefits, is attached hereto as Exhibit B.

### *After The Merger Transaction Is Completed, Autonomy Identifies Potentially Redundant Positions*

6.    When the merger transaction closed, a two stage redundancy review process was initiated in jurisdictions where required (such as the UK and the Netherlands), whereby: (a) all positions were reviewed as to whether the role was possibly redundant and; and (b) later, if found redundant, whether there were any alternative positions within the company. Employees whose positions were identified as potentially redundant were notified as soon as possible about this situation. Management then commenced a review and consultation process for such employees in order to determine if there were any available alternate positions, all in accordance with applicable local laws.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Sluimer's Position Is Identified as Potentially Redundant,*

*And He Is Placed on Garden Leave with Full Pay*

7.    Sluimer was one of those employees whose position was identified as having a risk of redundancy.  Thus, Verity sent Sluimer a letter dated December 29, 2005, notifying him that his position had been identified as one that might require elimination.  A true and correct copy of that letter is attached hereto as Exhibit C.

8.    At that time, Sluimer was placed on "garden leave," which meant that he was not required to perform his job duties (a normal process in these situations in Europe).  However, until the redundancy process was complete Sluimer would continued to be paid on precisely the same terms as before, including his base salary, commissions, car allowance and share option vesting.  Sluimer does not dispute that he received full salary, benefits and share option vesting while on garden leave.  Moreover, the commissions awarded to him were based on exactly the same calculations as before.

*Autonomy Offers Sluimer Immediate Reemployment, Which He Rejects*

9.    On March 23, 2006, I sent Sluimer a letter offering him a position with Autonomy's Neurodynamics division.  I believed that this position was comparable to Sluimer's position with Verity.  A true and correct copy of that letter is attached hereto as Exhibit D.  The salary and benefits offered by Autonomy, including stock option rights, medical benefits and potential commissions under a sales commission plan, were the same as those received by Sluimer in his position as Senior Vice President of Verity.

10.    On April 25, 2006, Sluimer rejected Autonomy's offer of reemployment with no lapse in pay.  Instead of accepting Autonomy's offer, Sluimer proactively sought to terminate his contract (although Autonomy wanted him to continue with the company in an executive capacity) by filing a lawsuit in the Netherlands (the "Dutch Lawsuit").  Sluimer's decision to file a lawsuit in the Netherlands was curious given that he is a resident of Monaco.  To my knowledge, in the year prior to filing the Dutch lawsuit, Sluimer spent less than 20 taxable days

1  in the Netherlands. Autonomy continued paying Sluimer until the final resolution of the Dutch
2  lawsuit.

3  ### *Sluimer's Inquires about Whether He Is*
4  ### *Entitled to Benefits Under the Plan*

5      11.    On May 1, 2006, Sluimer sent a letter to Jack Landers, then Vice President of
6  Human Resources of Verity, inquiring about whether he was entitled to benefits under the Plan.
7  Mr. Landers immediately forwarded the letter to me to handle as Plan Administrator because of
8  the ongoing Dutch legal matter. A true and correct copy of Sluimer's May 1, 2006 letter is
9  attached hereto as Exhibit E. The letter was quite unclear as to what Sluimer was requested, and
10 thus did not appear to be an application for benefits.

11     12.    Despite the vague nature of Sluimer's letter, I carefully analyzed the
12 circumstances surrounding Sluimer's departure from Verity in order to determine whether or not
13 he was entitled to benefits. I concluded that for a number of reasons, set forth below, Sluimer
14 was not entitled to any benefits under the Plan.

15     13.    First, I determined that Sluimer was excluded from the Plan by Section 3(b)(iii),
16 which provides that any employee who is offered immediate reemployment following an
17 acquisition is automatically excluded from the Plan. In reaching this determination, I noted that
18 the Section 3(b)(iii) of the Plan adopts a specific and narrow definition of "immediate
19 reemployment": "immediate reemployment means that the employee's employment with the
20 successor to the Company . . . results in uninterrupted employment such that the employee does
21 not suffer a lapse in pay . . ." Thus, the only criteria I was to consider in determining whether
22 Sluimer had been offered "immediate reemployment" was whether he suffered a lapse in pay.
23 As set forth above in paragraphs 8 and 10, Sluimer never suffered any lapse in pay, and
24 therefore I concluded that he was excluded from the Plan based on Section 3(b)(iii).

25     14.    My second basis for concluding that Sluimer was not entitled to benefits under the
26 Plan was premised on the fact that Sluimer had failed to execute a general release, which was a
27 condition precedent to participation in the Plan as set forth in Section 7. The Plan included three
28

DECLARATION OF ANDREW M. KANTER

1  different releases, each of which applied to a different group of employees based on their age.

2  The releases were attached to the Plan and provided to the employees at the time they received

3  the Plan.  The releases also were (and remain) available on the Internet as part of the company's

4  public filings with the U.S. Securities and Exchange Commission.  All employees who

5  participated in the Plan were required, as a condition precedent to receiving benefits, to execute

6  a release as required by the Plan within the timeframe specified on the release applicable to that

7  employee.  Sluimer had not provided the required release, and therefore he was not entitled to

8  benefits under the Plan.

9      15.    The third basis for my conclusion that Sluimer was not entitled to benefits under

10  the Plan was that he had not provided written confirmation that he agreed to be subject to

11  Verity's Confidentiality and Non-Competition Agreements.  Under Section 3(b)(iv) of the Plan,

12  Sluimer was required to have provided that written confirmation as a condition to his eligibility

13  for benefits under the Plan.  He never did so, and thus he was not entitled to benefits under the

14  Plan.

15      16.    Thus, on May 3, 2006, I responded to Sluimer's inquiry.  In that letter, I explained

16  to Sluimer the bases for my decision:

17          *First, because in Section 3(b)(iii), an employee offered immediate*
18          *reemployment is an express exception to severance benefits described in*
            *the Plan Entitlement Section 3(b)(iv).  In any event your employment*
19          *has been continuous with continued payment of salary, commission and*
20          *other benefits such as stock option vesting.*

21          *Secondly, section 3(b)(iv) provides that an employee will not receive*
            *benefits under the Plan if the employee does not confirm in writing that*
22          *he or she shall be subject to the Company's Confidentiality Agreement*
23          *and Non Compete Agreement, which we have not received.*

24          *Thirdly, Section 7 further provides that in order to be eligible for*
25          *benefits under the Plan, the employee must execute a waiver and release*
            *generally releasing the Company from any and all claims and liabilities.*
26          *In view of the pending litigation between yourself and the Company,*
            *obviously this criterion has not been fulfilled thereby making you*
27          *ineligible for the stated benefits.*

28

1  A true and correct copy of my May 3, 2006 letter to Sluimer is attached hereto as Exhibit F.

2  Sluimer never requested a review of my decision set forth in the foregoing letter, even though he

3  was required under the Plan to request such a review within 60 days.

4  ### *The Dutch Court's June 7, 2006 Judgment*

5      17.    On June 7, 2006, the Dutch court reached a judgment that Sluimer was entitled to

6  certain severance benefits under Dutch law. A true and correct copy of a certified translation of

7  the judgment is attached hereto as Exhibit G. As set forth in Exhibit G, the Dutch court held that

8  although Sluimer was entitled to certain benefits, he failed to accept the position offered by

9  Verity, and thus a "neutral" formula (as opposed to a formula that assigned blame to Verity)

10  would be used in calculating those benefits. The Court calculated €1,081,842 in accrued

11  benefits under Dutch law, reflecting the length of Sluimer's tenure with Verity and his senior

12  position at the company. The Dutch Lawsuit made no determination on any matter other than

13  Dutch employment matters – that is, it did not purport to determine whether Sluimer was

14  entitled to ERISA benefits under the Plan.

15  ### *My Additional Written Explanations to Sluimer as to Why*

16  ### *He Is Not Entitled To Benefits Under the Plan*

17      18.    Because I was uncertain whether Sluimer's May 1 letter was in fact an application

18  for benefits, I again wrote to Sluimer on July 6, 2006 to provide him with a more detailed letter

19  setting forth the reasons why he was not entitled to benefits. A true and correct copy of my July

20  6, 2006 letter is attached hereto as Exhibit H. In that letter, I informed Sluimer that his initial

21  May 1 communication did not technically constitute an "application" for benefits because of its

22  informality (and thus failure to state the grounds of his application as required by the Plan).

23  However, in the interest of clarity, I reiterated the grounds for denying benefits under the Plan

24  Document, as set forth in detail in my May 3, 2006 letter.

25      19.    By letter dated July 13, 2006, which I properly received on August 1, 2006,

26  Sluimer requested a review of the decision denying him benefits under the Plan. Sluimer also

27  attempted to include in that letter a "Constructive Termination Notice," although, as set forth

28

below, such notice was untimely.  A true and correct copy of Sluimer's July 13, 2006 letter is attached hereto as Exhibit I.

20.    I thereafter wrote to Sluimer on September 29, 2006 in order to confirm the denial of his request for benefits under the Plan.  A true and correct copy of my September 29, 2006 letter is attached hereto as Exhibit J.  I once again identified the three bases for my original decision and provided a comprehensive recital of the facts underlying that decision.  I also addressed Sluimer's belated effort to characterize his departure from Verity as a "constructive termination" as defined by the Plan.  In particular, Section 2(f) the Plan required that Sluimer give notice of any purported constructive termination with in three months of the date of that event, and an opportunity to cure.  Although Sluimer did not specify the purported constructive termination or provide an opportunity to cure, if the constructive termination was Sluimer's new role, then this commenced on March 23, 2006, and thus he was required to give notice under Section 2(f) on or before June 23, 2006 to be eligible for benefits based on a "constructive termination" under the Plan.  I explained to Sluimer that his failure to provide proper or timely notice meant that he could not seek benefits based on any alleged "constructive termination":

> *Your request is also denied as a result of your failure to comply with the last clause of Section 2(f) which states the precedent actions required to claim Constructive Termination under Section 2(f).  You have not provided the Company with the required written notice, either in substance or in accordance with the notice procedures under Section 15(a).*

21.    I understand that Sluimer claims that I am biased against him or that I had a conflict of interest that adversely affected my judgment in considering his request for benefits and request for review.  I do not believe that Sluimer has any facts to support this conclusion.  I first met Sluimer in January 2006.  Each of my discussions with him since that time has been cordial and without rancor.  I do not have a financial interest in the outcome of the determination of Sluimer's request for benefits from the Plan, and believe that he is entitled to be treated fairly on any employment matter at all times.  At no time has this ever been personal with Mr. Sluimer; it is simply a question of whether he is entitled to receive benefits under the Plan

1    Document, and it is my conclusion that he is not. I was not sued personally in the Dutch

2    Lawsuit, nor did I take any personal offense at the lawsuit against the company.

3        22.    During the course of my communications with Sluimer, on each occasion that he

4    requested information from me or Verity, I or a designee provided such information to him. I

5    am not aware of any relevant instance when he requested documents from me or from Verity or

6    the Plan where such documents were not provided.

7        I declare under penalty of perjury under the laws of the United States that the foregoing is

8    true and correct.

9        Executed this 22nd day of April, 2008 at Cambridge, England.

10

11

12                                             _____

13                                             Andrew M. Kanter

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ANDREW M. KANTER

# EXHIBIT A

EX-10.3 2 dex103.htm CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

**Exhibit 10.3**

## VERITY, INC.

## CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

**SECTION 1. INTRODUCTION.**

The Verity, Inc. Change in Control and Severance Benefit Plan (the *"Plan"*) is hereby established effective April 6, 2005 (the *"Effective Date"*). The purpose of the Plan is to provide for the payment of severance benefits to certain eligible employees of Verity, Inc. and its wholly owned subsidiaries (the *"Company"*) in the event that such employees are subject to qualifying employment terminations in connection with a Change in Control. This Plan shall supersede any severance benefit plan, policy or practice previously maintained by the Company, other than an individually negotiated contract or agreement with the Company relating to severance or change in control benefits that is in effect on an employee's termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan. This document also is the Summary Plan Description for the Plan.

**SECTION 2. DEFINITIONS.**

For purposes of the Plan, the following terms are defined as follows:

**(a)** *"Base Salary"* means the Participant's annual base pay (excluding incentive pay, premium pay, commissions, overtime, bonuses and other forms of variable compensation), at the rate in effect during the last regularly scheduled payroll period immediately preceding the date of the Participant's Covered Termination.

**(b)** *"Board"* means the Board of Directors of Verity, Inc.

**(c)** *"Change in Control"* means one of the following events or a series of more than one of the following events that are related, wherein the stockholders of the Company immediately before the transaction do not retain immediately after the transaction, in substantially the same proportions as their ownership of shares of the Company's voting stock immediately before the transaction, direct or indirect beneficial ownership of more than fifty percent (50%) of the total combined voting power of the outstanding voting stock of the Company, the resulting entity in a merger or, in the case of an asset sale, the corporation or corporations to which the assets of the Company were transferred (the "Transferee Corporation(s)"), as the case may be:

**(i)** the direct or indirect sale or exchange in a single or series of related transactions by the stockholders of the Company of more than fifty percent (50%) of the voting stock of the Company;

**(ii)** a merger or consolidation in which the Company is a party;

1.

**(iii)** the sale, exchange, or transfer of all or substantially all of the assets of the Company; or

**(iv)** a liquidation or dissolution of the Company.

For purposes of this Section 2(c), indirect beneficial ownership shall include, without limitation, an interest resulting from ownership of the voting stock of one or more corporations, which as a result of the transaction, own the Company, the resulting entity or the Transferee Corporation(s), as the case may be, either directly or through one or more subsidiary corporations. The Board shall have the right to determine whether multiple sales or exchanges of the voting stock of the Company or more than one of the following events are related, and its determination shall be final, binding and conclusive.

**(d)** *"Code"* means the Internal Revenue Code of 1986, as amended.

**(e)** *"Company"* means Verity, Inc. and its wholly owned subsidiaries or, following a Change in Control, the surviving entity resulting from such transaction.

**(f)** *"Constructive Termination"* means a voluntary termination of employment by a Participant after one of the following is undertaken without the Participant's express written consent:

**(i)** a substantial reduction in the Participant's duties or responsibilities (and not simply a change in title or reporting relationships) in effect immediately prior to the effective date of the Change in Control; *provided, however,* that it shall not be a "Constructive Termination" if, following the effective date of the Change in Control, either (a) the Company is retained as a separate legal entity or business unit and the Participant holds the same position in such legal entity or business unit as the Participant held before such effective date, or (b) the Participant holds a position with duties and responsibilities comparable (though not necessarily identical, in view of the relative sizes of the Company and the entity involved in the Change in Control) to the duties and responsibilities of the Participant prior to the effective date of the Change in Control;

**(ii)** a reduction in the Participant's base salary (except for salary decreases generally applicable to the Company's other similarly situated employees);

**(iii)** a change in the Participant's business location of more than 20 miles from the business location prior to such change, except for required travel for the Company's business to an extent substantially consistent with Participant's prior business travel obligations;

**(iv)** a material breach by the Company of any provisions of the Plan or any enforceable written agreement between the Company and the Participant; or

**(v)** any failure by the Company to obtain assumption of the Plan by any successor or assign of the Company.

Notwithstanding the foregoing, a voluntary termination shall not be deemed a Constructive Termination unless (x) the Participant provides the Company with written notice (the

2.

"Constructive Termination Notice") that the Participant believes that an event described in this Section 2(f) has occurred, (y) the Constructive Termination Notice is given within three (3) months of the date the event occurred, and (z) the Company does not rescind or cure the conduct giving rise to the event described in this Section 2(f) within fifteen (15) days of receipt by the Company of the Constructive Termination Notice.

(g) *"Covered Termination"* means an Involuntary Termination Without Cause or a Constructive Termination, either of which occurs within one (1) month prior to or within eighteen (18) months following the effective date of a Change in Control. Termination of employment of a Participant due to death or disability shall not constitute a Covered Termination unless a voluntary termination of employment by the Participant immediately prior to the Participant's death or disability would have qualified as a Constructive Termination.

(h) *"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

(i) *"Involuntary Termination Without Cause"* means an involuntary termination of employment by the Company other than for one of the following reasons:

(i) the Participant's violation of any material provision of the Company's standard agreement relating to proprietary rights;

(ii) the Participant participates in any act of theft or dishonesty; or

(iii) the Participant participates in any immoral or illegal act which has had or could reasonably be expected to have or had a detrimental effect on the business or reputation of the Company; or

(iv) any material failure by the Participant to use reasonable efforts to perform reasonably requested tasks after written notice and a reasonable opportunity to comply with such notice.

(j) *"Participant"* means an individual who is employed by the Company as its Executive Chairman of the Board, Chief Executive Officer, as a senior vice president, or as a vice president (other than any individual who is a vice president on sales commission, as determined by the Company in its sole discretion); *provided, however,* that if the Board shall make an affirmative determination that an employee serving in any such capacity shall not be a Participant, then such employee shall not be deemed a Participant. The determination of whether an employee is a Participant shall be made by the Company, in its sole discretion, and such determination shall be binding and conclusive on all persons.

(k) *"Participation Notice"* means the latest notice delivered by the Company to a Participant informing the employee that the employee is a Participant in the Plan, substantially in the form of **Exhibit A** hereto.

(l) *"Plan Administrator"* means the Board or any committee duly authorized by the Board to administer the Plan. The Plan Administrator may, but is not required to be, the Compensation Committee of the Board. The Board may at any time administer the Plan, in whole or in part, notwithstanding that the Board has previously appointed a committee to act as the Plan Administrator.

3.

**SECTION 3. ELIGIBILITY FOR BENEFITS.**

(a) **General Rules.** Subject to the provisions set forth in this Section and Section 7, in the event of a Covered Termination, the Company will provide the severance benefits described in Section 4 of the Plan to the affected Participant. Promptly upon an employee becoming a Participant, the Company shall deliver to the Participant a Participation Notice.

(b) **Exceptions to Benefit Entitlement.** An employee, including an employee who otherwise is a Participant, will not receive benefits under the Plan (or will receive reduced benefits under the Plan) in the following circumstances, as determined by the Company in its sole discretion:

(i) The employee has executed an individually negotiated employment contract or agreement with the Company relating to severance or change in control benefits that is in effect on his or her termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan.

(ii) The employee voluntarily terminates employment with the Company in order to accept employment with another entity that is controlled (directly or indirectly) by the Company or is otherwise an affiliate of the Company.

(iii) The employee is offered immediate reemployment by a successor to the Company or by a purchaser of its assets, as the case may be, following a change in ownership of the Company or a sale of all or substantially all the assets of a division or business unit of the Company. For purposes of the foregoing, "immediate reemployment" means that the employee's employment with the successor to the Company or the purchaser of its assets, as the case may be, results in uninterrupted employment such that the employee does not suffer a lapse in pay as a result of the change in ownership of the Company or the sale of its assets.

(iv) The employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non-Compete Agreement.

(c) **Termination of Benefits.** A Participant's right to receive the payment of benefits under this Plan shall terminate immediately if, at any time prior to or during the period for which the Participant is receiving benefits hereunder, the Participant, without the prior written approval of the Company:

(i) willfully breaches a material provision of the Participant's proprietary information or confidentiality agreement with the Company, as referenced in Section 3(b)(iv);

(ii) owns, manages, operates, joins, controls or participates in the ownership, management, operation or control of, is employed by or connected in any manner with, any person, enterprise or entity which is engaged in any business competitive with that of the

4.

Company; *provided, however,* that such restriction will not apply to any passive investment representing an interest of less than two percent (2%) of an outstanding class of publicly-traded securities of any corporation or other entity or enterprise;

**(iii)** encourages or solicits any of the Company's then current employees to leave the Company's employ for any reason or interferes in any other manner with employment relationships at the time existing between the Company and its then current employees; or

**(iv)** induces any of the Company's then current clients, customers, suppliers, vendors, distributors, licensors, licensees or other third party to terminate their existing business relationship with the Company or interferes in any other manner with any existing business relationship between the Company and any then current client, customer, supplier, vendor, distributor, licensor, licensee or other third party.

**SECTION 4. AMOUNT OF BENEFITS.**

**(a) Cash Severance Benefits.** Each Participant who incurs a Covered Termination and was employed by the Company at the position or level set forth below within one (1) month immediately prior to such Covered Termination shall be entitled to receive a cash severance benefit equal to the number of months of Base Salary set forth below. Any cash severance benefits provided under this Section 4(a) shall be paid pursuant to the provisions of Section 5.

| Position or Level | Amount of Cash Severance Benefit |
|---|---|
| Executive Chairman of the Board | 24 months |
| Chief Executive Officer | 24 months |
| Senior Vice President | 18 months |
| Vice President (Except Vice Presidents on sales commissions) | 12 months |

**(b) Accelerated Stock Award Vesting and Extended Exercisability of Stock Options.** If a Participant incurs a Covered Termination, then effective as of the date of the Participant's Covered Termination, (i) the vesting and exercisability of all outstanding options to purchase the Company's common stock that are held by the Participant on such date shall be accelerated in full, and (ii) any reacquisition or repurchase rights held by the Company in respect of common stock issued pursuant to any other stock award granted to the Participant by the Company shall lapse.

In addition, the post-termination of employment exercise period of any outstanding option held by the Participant on the date of his or her Covered Termination shall be extended, if necessary, such that the post-termination of employment exercise period shall not terminate prior to the later of (i) the date twelve (12) months after the effective date of the Covered Termination or (ii) the post-termination exercise period provided for in such option; *provided, however*, that

5.

such option shall not be exercisable after the expiration of its maximum term; *provided, further, however*, that in the event that any extended exercisability of an option pursuant to this Section 4(b) would adversely affect a Participant's option or other stock award (including, without limitation, its status as an incentive stock option under Section 422 of the Code or result in an option that would not otherwise be deemed to be a nonqualified deferred compensation plan or arrangement for the purposes of Section 409A of the Code to be deemed to be such a nonqualified deferred compensation plan or arrangement), such extended exercisability shall be deemed null and void unless the affected Participant consents in writing to such extended exercisability within thirty (30) days after becoming a Participant in the Plan.

**(c) Continued Medical Benefits**. If a Participant incurs a Covered Termination and the Participant was enrolled in a health, dental, or vision plan sponsored by the Company immediately prior to such Covered Termination, the Participant may be eligible to continue coverage under such health, dental, or vision plan (or to convert to an individual policy), at the time of the Participant's termination of employment, under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The Company will notify the Participant of any such right to continue such coverage at the time of termination pursuant to COBRA. No provision of this Plan will affect the continuation coverage rules under COBRA, except that the Company's payment, if any, of applicable insurance premiums will be credited as payment by the Participant for purposes of the Participant's payment required under COBRA. Therefore, the period during which a Participant may elect to continue the Company's health, dental, or vision plan coverage at his or her own expense under COBRA, the length of time during which COBRA coverage will be made available to the Participant, and all other rights and obligations of the Participant under COBRA (except the obligation to pay insurance premiums that the Company pays, if any) will be applied in the same manner that such rules would apply in the absence of this Plan.

If a Participant timely elects continued coverage under COBRA, the Company shall pay the full amount of the Participant's COBRA premiums on behalf of the Participant for the Participant's continued coverage under the Company's health, dental and vision plans, including coverage for the Participant's eligible dependents, during the number of months of Base Salary in respect of which the amount paid to the Participant under Section 4(a) was calculated (the "Severance Period"); *provided, however,* that if the Severance Period exceeds the length of time that the Participant is entitled to coverage under COBRA (including any additional period under analogous provisions of state law), the resulting or acquiring entity or Transferee Corporation involved in the Change in Control, as applicable, shall be required to provide health, dental and vision insurance coverage for the Participant and his or her eligible dependents for any portion of the Severance Period that exceeds the length of time that the Participant is entitled to coverage under COBRA (including any additional period under analogous provisions of state law), at a level of coverage that is substantially similar to the continued coverage that the Participant and his or her eligible dependents received under the Company's health, dental and vision plans; *provided, further, however,* that no such premium payments (or any other payments for medical, dental or vision coverage by the Company) shall be made following the Participant's death or the effective date of the Participant's coverage by a medical, dental or vision insurance plan of a subsequent employer. Each Participant shall be required to notify the Company immediately if the Participant becomes covered by a medical, dental or vision insurance plan of a subsequent employer. Upon the conclusion of such period of insurance premium payments made by the Company, the Participant will be responsible for the entire payment of premiums required under COBRA for the duration of the COBRA period.

6.

For purposes of this Section 4(c), (i) references to COBRA shall be deemed to refer also to analogous provisions of state law and (ii) any applicable insurance premiums that are paid by the Company shall not include any amounts payable by the Participant under an Internal Revenue Code Section 125 health care reimbursement plan, which amounts, if any, are the sole responsibility of the Participant.

**(d) Other Employee Benefits.** All other benefits (such as life insurance, disability coverage, and 401(k) plan coverage) shall terminate as of the Participant's termination date (except to the extent that a conversion privilege may be available thereunder).

**(e) Additional Benefits.** Notwithstanding the foregoing, the Company may, in its sole discretion, provide benefits in addition to those pursuant to Sections 4(a), 4(b) and 4(c) to Participants or employees who are not Participants ("Non-Participants") chosen by the Company, in its sole discretion, and the provision of any such benefits to a Participant or a Non-Participant shall in no way obligate the Company to provide such benefits to any other Participant or to any other Non-Participant, even if similarly situated. If benefits under the Plan are provided to a Non-Participant, references in the Plan to "Participant" (with the exception of Sections 4(a), 4(b) and 4(c)) shall be deemed to refer to such Non- Participants.

**SECTION 5. TIME AND FORM OF SEVERANCE PAYMENTS.**

**(a) General Rules.** Subject to Section 5(b), any cash severance benefit provided under Section 4(a) shall be paid in installments pursuant to the Company's regularly scheduled payroll periods commencing as soon as practicable following the effective date of a Participant's Covered Termination and shall be subject to all applicable withholding for federal, state and local taxes. In the event of a Participant's death prior to receiving all installment payments of his or her cash severance benefit under Section 4(a), any remaining installment payments shall be made to the Participant's estate on the same payment schedule as would have occurred absent the Participant's death. In no event shall payment of any Plan benefit be made prior to the effective date of the Participant's Covered Termination or prior to the effective date of the release described in Section 7(a).

**(b) Application of Section 409A.** In the event that any cash severance benefit provided under Section 4(a) or continued medical benefit under Section 4(c) shall fail to satisfy the distribution requirement of Section 409A(a)(2)(A) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, the payment of such benefit shall be accelerated to the minimum extent necessary so that the benefit is not subject to the provisions of Section 409A(a)(1) of the Code. (The payment schedule as revised after the application of the preceding sentence shall be referred to as the *"Revised Payment Schedule."*) In the event the payment of benefits pursuant to the Revised Payment Schedule would be subject to Section 409A(a)(1) of the Code, the payment of such benefits shall not be paid pursuant to the Revised Payment Schedule and instead the payment of such benefits shall be delayed to the minimum extent necessary so that such benefits are not subject to the provisions of Section 409A(a)(1) of the Code. The Board may attach conditions to or adjust the amounts paid pursuant to this Section 5(b) to preserve, as closely as possible, the economic consequences that would have applied in the absence of this Section 5(b); *provided, however*, that no such condition or adjustment shall result in the payments being subject to Section 409A(a)(1) of the Code.

7.

**SECTION 6. REEMPLOYMENT.**

In the event of a Participant's reemployment by the Company during the period of time in respect of which severance benefits pursuant to Section 4(a) or 4(e) have been paid, the Company, in its sole and absolute discretion, may require such Participant to repay to the Company all or a portion of such severance benefits as a condition of reemployment.

**SECTION 7. LIMITATIONS ON BENEFITS.**

**(a) Release.** In order to be eligible to receive benefits under the Plan, a Participant also must execute a general waiver and release in substantially the form attached hereto as Exhibit B, Exhibit C or Exhibit D, as appropriate, and such release must become effective in accordance with its terms. For purposes of the preceding sentence, with respect to any outstanding option held by the Participant, the receipt of benefits shall be deemed to be the exercise of such option pursuant to the extended exercisability of such option under Section 4(b), rather than the acceleration or extension of such option's exercisability. The Company, in its sole discretion, may modify the form of the required release to comply with applicable law and shall determine the form of the required release, which may be incorporated into a termination agreement or other agreement with the Participant.

**(b) Certain Reductions.** The Company, in its sole discretion, shall have the authority to reduce a Participant's severance benefits, in whole or in part, by any other severance benefits, pay in lieu of notice, or other similar benefits payable to the Participant by the Company that become payable in connection with the Participant's termination of employment pursuant to (i) any applicable legal requirement, including, without limitation, the Worker Adjustment and Retraining Notification Act (the "WARN Act"), (ii) a written employment or severance agreement with the Company, or (iii) any Company policy or practice providing for the Participant to remain on the payroll for a limited period of time after being given notice of the termination of the Participant's employment. The benefits provided under this Plan are intended to satisfy, in whole or in part, any and all statutory obligations and other contractual obligations of the Company that may arise out of a Participant's termination of employment, and the Plan Administrator shall so construe and implement the terms of the Plan. The Company's decision to apply such reductions to the severance benefits of one Participant and the amount of such reductions shall in no way obligate the Company to apply the same reductions in the same amounts to the severance benefits of any other Participant, even if similarly situated. In the Company's sole discretion, such reductions may be applied on a retroactive basis, with severance benefits previously paid being recharacterized as payments pursuant to the Company's statutory or other contractual obligations.

**(c) Mitigation.** Except as otherwise specifically provided herein, a Participant shall not be required to mitigate damages or the amount of any payment provided under this Plan by seeking other employment or otherwise, nor shall the amount of any payment provided for under this Plan be reduced by any compensation earned by a Participant as a result of employment by another employer or any retirement benefits received by such Participant after the date of the Participant's termination of employment with the Company.

8.

**(d) Non-Duplication of Benefits.** Except as otherwise specifically provided for herein, no Participant is eligible to receive benefits under this Plan or pursuant to other contractual obligations more than one time. This Plan is designed to provide certain severance pay and change in control benefits to Participants pursuant to the terms and conditions set forth in this Plan. The payments pursuant to this Plan are in addition to, and not in lieu of, any unpaid salary, bonuses or benefits to which a Participant may be entitled for the period ending with the Participant's Covered Termination.

**(e) Indebtedness of Participants.** If a Participant is indebted to the Company on the effective date of his or her Covered Termination, the Company reserves the right to offset any severance payments under the Plan by the amount of such indebtedness.

## SECTION 8. RIGHT TO INTERPRET PLAN; AMENDMENT AND TERMINATION.

**(a) Exclusive Discretion.** The Plan Administrator shall have the exclusive discretion and authority to establish rules, forms, and procedures for the administration of the Plan and to construe and interpret the Plan and to decide any and all questions of fact, interpretation, definition, computation or administration arising in connection with the operation of the Plan, including, but not limited to, the eligibility to participate in the Plan and amount of benefits paid under the Plan. The rules, interpretations, computations and other actions of the Plan Administrator shall be binding and conclusive on all persons.

**(b) Amendment or Termination.** The Company reserves the right to amend or terminate this Plan or the benefits provided hereunder at any time; *provided, however,* that no such amendment or termination shall occur following (i) the date one (1) month prior to a Change in Control or (ii) a Covered Termination as to any Participant who would be adversely affected by such amendment or termination unless such Participant consents in writing to such amendment or termination. Any action amending or terminating the Plan shall be in writing and executed by a duly authorized officer of the Company. Unless otherwise required by law, no approval of the shareholders of the Company shall be required for any amendment or termination including any amendment that increases the benefits provided under any option or other stock award.

## SECTION 9. NO IMPLIED EMPLOYMENT CONTRACT.

The Plan shall not be deemed (i) to give any employee or other person any right to be retained in the employ of the Company or (ii) to interfere with the right of the Company to discharge any employee or other person at any time, with or without cause, which right is hereby reserved.

## SECTION 10. LEGAL CONSTRUCTION.

This Plan shall be governed by and construed under the laws of the State of California (without regard to principles of conflict of laws), except to the extent preempted by ERISA.

9.

**SECTION 11. CLAIMS, INQUIRIES AND APPEALS.**

**(a) Applications for Benefits and Inquiries.** Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Plan Administrator in writing by an applicant (or his or her authorized representative). The Plan Administrator is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

**(b) Denial of Claims.** In the event that any application for benefits is denied in whole or in part, the Plan Administrator must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor. The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

    **(1)** the specific reason or reasons for the denial;

    **(2)** references to the specific Plan provisions upon which the denial is based;

    **(3)** a description of any additional information or material that the Plan Administrator needs to complete the review and an explanation of why such information or material is necessary; and

    **(4)** an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under Section 502(a) of ERISA following a denial on review of the claim, as described in Section 11(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Plan Administrator receives the application, unless special circumstances require an extension of time, in which case, the Plan Administrator has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the application.

**(c) Request for a Review.** Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Plan Administrator within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

10.

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his or her representative) shall have the opportunity to submit (or the Plan Administrator may require the applicant to submit) written comments, documents, records, and other information relating to his or her claim. The applicant (or his or her representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his or her representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

**(d) Decision on Review.** The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the review. The Plan Administrator will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Plan Administrator confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

    **(1)**   the specific reason or reasons for the denial;

    **(2)**   references to the specific Plan provisions upon which the denial is based;

    **(3)**   a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim; and

    **(4)**   a statement of the applicant's right to bring a civil action under Section 502(a) of ERISA.

**(e) Rules and Procedures.** The Plan Administrator will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Plan Administrator may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

11.

**(f) Exhaustion of Remedies.** No legal action for benefits under the Plan may be brought until the applicant (i) has submitted a written application for benefits in accordance with the procedures described by Section 11(a) above, (ii) has been notified by the Plan Administrator that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 11(c) above, and (iv) has been notified that the Plan Administrator has denied the appeal. Notwithstanding the foregoing, if the Plan Administrator does not respond to an applicant's claim or appeal within the relevant time limits specified in this Section 11, the applicant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

**SECTION 12. BASIS OF PAYMENTS TO AND FROM PLAN.**

All benefits under the Plan shall be paid by the Company. The Plan shall be unfunded, and benefits hereunder shall be paid only from the general assets of the Company.

**SECTION 13. OTHER PLAN INFORMATION.**

**(a) Employer and Plan Identification Numbers.** The Employer Identification Number assigned to the Company (which is the "Plan Sponsor" as that term is used in ERISA) by the Internal Revenue Service is 77-0182779. The Plan Number assigned to the Plan by the Plan Sponsor pursuant to the instructions of the Internal Revenue Service is 520.

**(b) Ending Date for Plan's Fiscal Year.** The date of the end of the fiscal year for the purpose of maintaining the Plan's records is May 31.

**(c) Agent for the Service of Legal Process**. The agent for the service of legal process with respect to the Plan is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

**(d) Plan Sponsor and Administrator.** The "Plan Sponsor" and the "Plan Administrator" of the Plan is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

The Plan Sponsor's and Plan Administrator's telephone number is (408) 541-1500. The Plan Administrator is the named fiduciary charged with the responsibility for administering the Plan.

**SECTION 14. STATEMENT OF ERISA RIGHTS.**

Participants in this Plan (which is a welfare benefit plan sponsored by Verity, Inc.) are entitled to certain rights and protections under ERISA. If you are a Participant, you are

12.

considered a participant in the Plan for the purposes of this Section 14 and, under ERISA, you are entitled to:

**Receive Information About Your Plan and Benefits**

(a) Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites, all documents governing the Plan and a copy of the latest annual report (Form 5500 Series), if applicable, filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration;

(b) Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan and copies of the latest annual report (Form 5500 Series), if applicable, and an updated (as necessary) Summary Plan Description. The Administrator may make a reasonable charge for the copies; and

(c) Receive a summary of the Plan's annual financial report, if applicable. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

**Prudent Actions By Plan Fiduciaries**

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a Plan benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a Plan benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan, if applicable, and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court.

If you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

13.

**Assistance With Your Questions**

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

**SECTION 15. GENERAL PROVISIONS.**

**(a) Notices.** Any notice, demand or request required or permitted to be given by either the Company or a Participant pursuant to the terms of this Plan shall be in writing and shall be deemed given when delivered personally or deposited in the U.S. mail, First Class with postage prepaid, and addressed to the parties, in the case of the Company, at the address set forth in Section 11(a) and, in the case of a Participant, at the address as set forth in the Company's employment file maintained for the Participant as previously furnished by the Participant or such other address as a party may request by notifying the other in writing.

**(b) Transfer and Assignment.** The rights and obligations of a Participant under this Plan may not be transferred or assigned without the prior written consent of the Company. This Plan shall be binding upon any surviving entity resulting from a Change in Control and upon any other person who is a successor by merger, acquisition, consolidation or otherwise to the business formerly carried on by the Company without regard to whether or not such person or entity actively assumes the obligations hereunder.

**(c) Waiver.** Any Party's failure to enforce any provision or provisions of this Plan shall not in any way be construed as a waiver of any such provision or provisions, nor prevent any Party from thereafter enforcing each and every other provision of this Plan. The rights granted the Parties herein are cumulative and shall not constitute a waiver of any Party's right to assert all other legal remedies available to it under the circumstances.

**(d) Severability.** Should any provision of this Plan be declared or determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

**(e) Section Headings.** Section headings in this Plan are included for convenience of reference only and shall not be considered part of this Plan for any other purpose.

14.

**SECTION 16. EXECUTION.**

To record the adoption of the Plan as set forth herein, Verity, Inc. has caused its duly authorized officer to execute the same as of the Effective Date.

VERITY, INC.

By:  /s/  STEVEN R. SPRINGSTEEL

Title: Senior Vice President of Finance and Administration and Chief Financial Officer

15.

15.

EXHIBIT A

## VERITY, INC.

### CHANGE IN CONTROL AND SEVERENCE BENEFIT PLAN

### PARTICIPATION NOTICE

**To**:_____

**Date**:_____

Verity, Inc. (the "***Company***") has adopted the Verity, Inc. Change in Control and Severance Benefit Plan (the "***Plan***"). The Company is providing you with this Participation Notice to inform you that, given your position at the Company, you qualify as a participant in the Plan. A copy of the Plan document, which also constitutes a summary plan description, is attached to this Participation Notice. The terms and conditions of your participation in the Plan are as set forth in the Plan, and in the event of any conflict between this Participation Notice and the Plan, the terms of the Plan shall prevail. Subject to the provisions of the Plan, the details of your Plan benefits, as described in Section 4 of the Plan, are as follows:

**Cash Severance Benefit:** __ months.

**Accelerated Vesting of Options:** Full.

**Extended Exercisability of Options:** Later of 12 months or the post-termination exercise period of the option; provided, however, that such extended exercisability shall not extend beyond the term of the option.

**Continued medical benefits:** __ months, or such earlier date as you shall secure subsequent employment that shall provide you with similar medical benefits.

Please retain a copy of this Participation Notice, along with the Plan document, for your records.

VERITY, INC.

By:  _____

Its:  _____

16.

### ACKNOWLEDGEMENT

The undersigned Participant hereby acknowledges receipt of the foregoing Participation Notice. In the event the undersigned holds outstanding stock options as of the date of this Participation Notice, the undersigned hereby:

☐   accepts

☐   rejects

the extended exercisability provisions for such stock options set forth above.* The undersigned acknowledges that the undersigned has been advised to obtain tax and financial advice regarding the consequences of this election including the effect, if any, on the status of the stock options for tax purposes under Sections 409A and 422 of the Internal Revenue Code.

_____

_____

Print name

_____

* Please check one box; failure to check a box will be deemed a rejection of the extended exercisability provisions as they relate to such stock options.

17.

17.

## Exhibit B

## RELEASE AGREEMENT

**I understand and agree completely to the terms set forth in the Verity, Inc. Change in Control and Severance Benefit Plan (the "Plan").**

I understand that this Release, together with the Plan, constitutes the complete, final and exclusive embodiment of the entire agreement between the Company and me with regard to the subject matter hereof. I am not relying on any promise or representation by the Company that is not expressly stated therein. Certain capitalized terms used in this Release are defined in the Plan.

I hereby confirm my obligations under the Company's proprietary information and inventions agreement.

Except as otherwise set forth in this Release, I hereby generally and completely release the Company and its parents, subsidiaries, successors, predecessors, affiliates and assigns, and its and their current and former partners, members, directors, officers, employees, shareholders, agents, attorneys, accountants, insurers, affiliates and assigns, from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring at any time prior to and including the date I sign this Release. This general release includes, but is not limited to: (a) all claims arising out of or in any way related to my employment with the Company or the termination of that employment; (b) all claims related to my compensation or benefits, including salary, bonuses, commissions, vacation pay, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (c) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (d) all tort claims, including claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (e) all federal, state, and local statutory claims, including claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990 (as amended), the federal Age Discrimination in Employment Act (as amended) ("ADEA"), the federal Employee Retirement Income Security Act of 1974 (as amended), and the California Fair Employment and Housing Act (as amended); *provided, however,* that nothing in this paragraph shall be construed in any way to release the Company from its obligation to indemnify me pursuant to agreement or applicable law.

I acknowledge that I am knowingly and voluntarily waiving and releasing any rights I may have under the ADEA, and that the consideration given under the Plan for the waiver and release in the preceding paragraph hereof is in addition to anything of value to which I was already entitled. I further acknowledge that I have been advised by this writing, as required by the ADEA, that: (a) my waiver and release do not apply to any rights or claims that may arise after the date I sign this Release; (b) I should consult with an attorney prior to signing this Release (although I may choose voluntarily not do so); (c) I have twenty-one (21) days to consider this Release (although I may choose voluntarily to sign this Release earlier); (d) I have

1.

seven (7) days following the date I sign this Release to revoke the Release by providing written notice to an officer of the Company; and (e) this Release shall not be effective until the date upon which the revocation period has expired, which shall be the eighth day after I sign this Release.

I acknowledge that I have read and understand Section 1542 of the California Civil Code which reads as follows: **"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."** I hereby expressly waive and relinquish all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to my release of any claims hereunder.

I acknowledge that to become effective, I must sign and return this Release to the Company so that it is received not later than twenty-one (21) days following the date it is provided to me.

**EMPLOYEE**

Name:

Date:

2.

For Employees Age 40 or Older<br>Group Termination

EXHIBIT C

**RELEASE AGREEMENT**

**I understand and agree completely to the terms set forth in the Verity, Inc. Change in Control and Severance Benefit Plan (the "Plan").**

I understand that this Release, together with the Plan, constitutes the complete, final and exclusive embodiment of the entire agreement between the Company and me with regard to the subject matter hereof. I am not relying on any promise or representation by the Company that is not expressly stated therein. Certain capitalized terms used in this Release are defined in the Plan.

I hereby confirm my obligations under the Company's proprietary information and inventions agreement.

Except as otherwise set forth in this Release, I hereby generally and completely release the Company and its parents, subsidiaries, successors, predecessors, affiliates and assigns, and its and their current and former partners, members, directors, officers, employees, shareholders, agents, attorneys, accountants, insurers, affiliates and assigns, from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring at any time prior to and including the date I sign this Release. This general release includes, but is not limited to: (a) all claims arising out of or in any way related to my employment with the Company or the termination of that employment; (b) all claims related to my compensation or benefits, including salary, bonuses, commissions, vacation pay, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (c) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (d) all tort claims, including claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (e) all federal, state, and local statutory claims, including claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990 (as amended), the federal Age Discrimination in Employment Act (as amended) ("ADEA"), the federal Employee Retirement Income Security Act of 1974 (as amended), and the California Fair Employment and Housing Act (as amended); *provided, however,* that nothing in this paragraph shall be construed in any way to release the Company from its obligation to indemnify me pursuant to agreement or applicable law.

I acknowledge that I am knowingly and voluntarily waiving and releasing any rights I may have under the ADEA, and that the consideration given under the Plan for the waiver and release in the preceding paragraph hereof is in addition to anything of value to which I was already entitled. I further acknowledge that I have been advised by this writing, as required by the ADEA, that: (a) my waiver and release do not apply to any rights or claims that may arise after the date I sign this Release; (b) I should consult with an attorney prior to signing this Release (although I may choose voluntarily not to do so); (c) I have forty-five (45) days to consider this Release (although I may choose voluntarily to sign this Release earlier); (d) I have

1.

seven (7) days following the date I sign this Release to revoke the Release by providing written notice to an office of the Company; (e) this Release shall not be effective until the date upon which the revocation period has expired, which shall be the eighth day after I sign this Release; and (f) I have received with this Release a detailed list of the job titles and ages of all employees who were terminated in this group termination and the ages of all employees of the Company in the same job classification or organizational unit who were not terminated.

I acknowledge that I have read and understand Section 1542 of the California Civil Code which reads as follows: **"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."** I hereby expressly waive and relinquish all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to my release of any claims hereunder.

I acknowledge that to become effective, I must sign and return this Release to the Company so that it is received not later than forty-five (45) days following the date it is provided to me.

**EMPLOYEE**

Name: _____

Date: _____

2.

### Exhibit D

### RELEASE AGREEMENT

**I understand and agree completely to the terms set forth in the Verity, Inc. Change in Control and Severance Benefit Plan (the "Plan").**

I understand that this Release, together with the Plan, constitutes the complete, final and exclusive embodiment of the entire agreement between the Company and me with regard to the subject matter hereof. I am not relying on any promise or representation by the Company that is not expressly stated therein. Certain capitalized terms used in this Release are defined in the Plan.

I hereby confirm my obligations under the Company's proprietary information and inventions agreement.

Except as otherwise set forth in this Release, I hereby generally and completely release the Company and its parents, subsidiaries, successors, predecessors, affiliates and assigns, and its and their current and former partners, members, directors, officers, employees, shareholders, agents, attorneys, accountants, insurers, affiliates and assigns, from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring at any time prior to and including the date I sign this Release. This general release includes, but is not limited to: (a) all claims arising out of or in any way related to my employment with the Company or the termination of that employment; (b) all claims related to my compensation or benefits, including salary, bonuses, commissions, vacation pay, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (c) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (d) all tort claims, including claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (e) all federal, state, and local statutory claims, including claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990 (as amended), the federal Age Discrimination in Employment Act (as amended), the federal Employee Retirement Income Security Act of 1974 (as amended), and the California Fair Employment and Housing Act (as amended); *provided, however,* that nothing in this paragraph shall be construed in any way to release the Company from its obligation to indemnify me pursuant to agreement or applicable law.

I acknowledge that I have read and understand Section 1542 of the California Civil Code which reads as follows: **"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."** I hereby expressly waive and relinquish all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to my release of any claims hereunder.

1.

I acknowledge that to become effective, I must sign and return this Release to the Company so that it is received not later than fourteen (14) days following the date it is provided to me.

**EMPLOYEE**

Name: _____

Date: _____

2.

23.

# EXHIBIT B

# VERITY, INC.

## CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

## PARTICIPATION NOTICE

**To**: Hugo Sluimer

**Date**: May 4, 2005

Verity, Inc. (the "**Company**") has adopted the Verity, Inc. Change in Control and Severance Benefit Plan (the "**Plan**"). The Company is providing you with this Participation Notice to inform you that, given your position at the Company, you qualify as a participant in the Plan. A copy of the Plan document, which also constitutes a summary plan description, is attached to this Participation Notice. The terms and conditions of your participation in the Plan are as set forth in the Plan, and in the event of any conflict between this Participation Notice and the Plan, the terms of the Plan shall prevail except with respect to the cash severance, which you have declined as set forth below. Subject to the provisions of the Plan, the details of your Plan benefits, as described in Section 4 of the Plan (except with respect to the cash severance, which you have declined), are as follows:

**Cash Severance Benefit:** You have declined to accept any cash severance benefit under the Plan. Consequently, you will be entitled to no cash severance benefit under the terms of the Plan, and any cash benefit to which you shall be entitled shall be determined under Dutch law without reference to the Plan.

**Accelerated Vesting of Options:** Full.

**Extended Exercisability of Options:** Later of 12 months or the post-termination exercise period of the option; provided, however, that such extended exercisability shall not extend beyond the term of the option.

**Continued medical benefits:** _____18_____ months, or such earlier date as you shall secure subsequent employment that shall provide you with similar medical benefits.

Please retain a copy of this Participation Notice, along with the Plan document, for your records.

VERITY, INC.

By: _____
STEVEN R. SPRINGSTEEL
Its: _____
SENIOR VP AND CFO

524052 v1/HN

## ACKNOWLEDGEMENT

The undersigned Participant hereby acknowledges receipt of the foregoing Participation Notice. In the event the undersigned holds outstanding stock options as of the date of this Participation Notice, the undersigned hereby:

☒    accepts
☐    rejects

the extended exercisability provisions for such stock options set forth above.* The undersigned acknowledges that the undersigned has been advised to obtain tax and financial advice regarding the consequences of this election including the effect, if any, on the status of the stock options for tax purposes under Sections 409A and 422 of the Internal Revenue Code.

May 4. 06

HUGO SEUIMEN

Print name

\*    Please check one box; failure to check a box will be deemed a rejection of the extended exercisability provisions as they relate to such stock options.

# EXHIBIT C

29 December 2005

VIA FEDEX DELIVERY

Hugo Sluimer
c/o Verity GB Limited
The Pavillions
Kiln Park Business Centre
Kiln Lane
Epsom KT17 1JG

**Re:    Warning of Possible Redundancy – Acquisition of Verity, Inc. by Autonomy
        Corporation plc**

Dear Hugo:

As you are aware, Verity, Inc., the ultimate parent company of Verity GB Ltd (the **"Company"**) has entered into an agreement to be acquired by Autonomy Corporation plc. A copy of the announcement of the transaction was recently forwarded to you. The acquisition will strengthen the future of the Verity group of companies as the combined group of companies will have substantially increased scale and diversified revenue streams, enabling the combined group to provide a significantly enhanced product offering to both companies' clients, whilst continuing to lead innovation in the industry.

The acquisition is transformational for the Verity group of companies as Verity will become a subsidiary of Autonomy Corporation plc and will, therefore, no longer maintain many of the functions that are required of an independent US-based public company. As a result, it is currently anticipated that there may be a number of redundancies throughout the Verity group and within the Company. As the requirement for the Company's branch to remain open has diminished, as has the requirement for employees to perform your job, we are, therefore, writing to warn you that your position has been identified as at risk of redundancy.

The Company is committed to avoiding terminating your employment by reason of redundancy if it can do so. To this end we invite you to a consultation meeting on January 11, 2006 to discuss your position, the transaction and consult with your regarding any suitable alternative positions within the Company during he consultation period. You will have an opportunity to discuss this further at a second consultation meeting. If, however, a suitable alternative position is not identified, the Company may proceed to terminate your employment by reason of redundancy. During the consultation period you will not be required to attend the companies offices, however you will be afforded reasonable access should it be required to conduct required company business. 12 weeks notice is hereby given in accordance with the applicable Regulations and will run concurrently with the consultation period. Please note, however, that notice may be withdrawn at any time depending on the results of the consultation.
so..

UK

Please feel free to contact Erik Weenink at any time prior to the meeting should you wish to discuss the transaction or any of its anticipated impact.

Sincerely,

Verity GB Ltd

UK

# EXHIBIT D

Autonomy

VIA EMAIL AND REGISTERED DELIVERY

23 March 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genêts
MC 98000 MONACO

**Re:    Notice of Cessation of Redundancy Proceedings and Appointment as Senior Vice President, EMEA and APAC Operations for Neurodynamics**

Dear Hugo:

I refer to the letter dated 29 December 2005 from Verity GB Limited warning you of the possibility of redundancy due to the acquisition and reorganisation of the Verity Group and our subsequent discussions.

As discussed on 22 March 2006 by phone, following extensive management meetings and review of all the group's post-merger positions, I regret to inform you that your position as Senior Vice President, EMEA and APAC Operations will lapse. However as discussed, I am very pleased to inform you that based on our internal consultations we have a found a suitable alternative opportunity within the group.

As you may know, Neurodynamics now forms a part of Virage, a division of Autonomy. Virage is Autonomy's leading provider of rich media communication and content management software. The two suites of technology, together with the core Autonomy technology with which you're familiar, offer a highly sophisticated security solution applicable for security, defence, legal and manufacturing markets worldwide, key sectors for historic Verity sales. The Neurodynamics product range is marketed under the Virage Security and Surveillance brand.

Other participants in the market include Verint, which is a billion dollar company. Autonomy senior management has reviewed the Verint offering and believes the Neurodynamics products are extremely competitive and in many cases lead the market.

This division is one of the fastest growing in the group and capitalizes on immediate market needs, with strong growth forecast across Europe and APAC. This role is specifically suitable for you, combining your existing responsibilities with a different business unit, allowing us to best utilise your leadership and management qualities.

Your compensation in the aggregate will be unchanged. Your salary will remain the same, and your commission plan will be restructured so that you are eligible for analogous benefits upon commensurate growth of the unit.

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

Autonomy

In this role you will work directly with David Humphires, Managing Director of the Neurodynamics division, and [jointly] report to the [group CEO/Mr. Humphries]. As the division is based in Cambridge you will be expected to attend the offices on a regular basis, although this should comport with your previous role which required significant travel to the UK and as your time is virtually all assigned to Verity GB Limited.

Please feel free to contact me to discuss this new assignment. We sincerely thank you for your patience and understanding during this transitional period which we hope will be as smooth as possible.

Sincerely,

Andrew M Kanter
Company Secretary

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

**EXHIBIT E**

| | | |
|---|---|---|
| **COMPANY** | : | **VERITY, INC.** |
| **ATT.** | : | **MR. JACK LANDERS** |
| **FAX NUMBER** | : | **+1 408 541 1600** |
| **FROM** | : | **HUGO SLUIMER** |
| **DATE** | : | **MAY 1ST, 2006** |
| **RE** | : | **CHANGE IN CONTROL** |
| **# PAGES** | : | **2** |

Dear Jack,
Please find my request wrt the Change in Control enclosed.
I've also send this letter per registered mail.

I trust to hear from you soon and remain,

With kind regards,

Hugo

Verity, Inc
Attn. Vice President Human Resources
894 Ross Drive
Sunnyvale CA 94089
California, USA

Date: May 1st, 2006

Dear mr. Jack Landers,

Being a participant in Verity's Change in Control and Severance Benefits Plan
(the Plan), I draw your attention to the following.

In my opinion the acquisition of Verity by Autonomy results in a Change in
Control according to the Plan. This leads to the conclusion, that, according to
the applicable Participation Notice, I am entitled to not only cash severance
benefits, but also to accelerated vesting of options and continued medical
benefits.

Can you confirm to me that I am entitled to the accelerated vesting of options
and continued medical benefits?

If you need more information, please do not hesitate to call me.

Kind regards,

Hugo Sluimer

Apt. Le Millefiori, 27F
1, rue des Genets
MC 98000 Monte Carlo
MONACO

# EXHIBIT F



VIA EMAIL AND REGISTERED DELIVERY

3 May 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genêts
MC 98000 MONACO

**Re:     Fax dated 1 May 2006 to Mr Jack Landers**

Dear Hugo:

I write on behalf of Verity, Inc. I refer to the fax dated 1 May 2006 which was addressed to Mr. Jack Landers. Mr. Landers has forwarded this document to me as you are currently in a legal dispute with Verity, Inc. regarding your employment and thus I am responsible for all communications.

On the basis of the terms of the Change in Control and Severance Benefit Plan (the "Plan"), we do not consider you to be entitled to the accelerated vesting of options and continued medical benefits. Firstly, in Section 3(b)(iii), an employee offered immediate reemployment is an express exception to severance benefits described in the Plan Entitlement Section 3(b)(iv). In any event your employment has been continuous, with continued payment of salary, commission and other benefits such as stock option vesting. Secondly, section 3(b)(iv) provides that an employee will not receive benefits under the Plan if the employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non Compete Agreement, which we have not received. Thirdly, Section 7 further provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities. In view of the pending litigation between yourself and the Company, obviously this criterion has not been fulfilled thereby making you ineligible for the stated benefits.

I reiterate my request of 27 April 2006 that as this is now a legal matter, any matters relating to employment process and continued employment must be directed to me, or to our attorneys, Mr. J. de Roos and Mr. M. Ritmeester (P.O. Box 7113, 1007 JC Amsterdam ,The Netherlands). Any contact with other employees within Autonomy relating to your employment will not be accepted.

Sincerely,

Andrew M Kanter
Company Secretary

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

# EXHIBIT G

# decision

**THE COURT AT UTRECHT**

Sector: District

Location: Utrecht

Case number: 466781 EJ VERZ 06-1375

decision dated June 7, 2006

in the matter of

**HUGO SLUIMER,**
residing in Monaco,
further to be mentioned as Sluimer
plaintiff,
attorney: J. van der Pijl, Esq. attorney in Amsterdam,

v.

**VERITY BENELUX B.V.,** a private limited company,
established at De Meern and having an office in Nieuwegein,
further to be mentioned as Verity,
defendant,
attorneys: M. Ritmeester, Esq., and J.A. de Roos, Esq., attorneys in Amsterdam.


**Course of legal proceedings**

Sluimer filed a petition on April 19, 2006.
Verity has submitted a written defense.
The petition was heard during the session of May 30, 2006. An account of this hearing has been recorded.
What follows is the determination for judgment.

Reasons given in judgment

In this case, the following facts have been established.

    a.   Sluimer, born on June 19, 1953, joined Verity Inc. as Sales Manager Benelux. Verity Inc is an American purveyor of research technology. Shortly thereafter, Verity Inc.'s activities, among which was the employment contract between Sluimer and Verity Inc., were brought under Verity.

    b.   Sluimer was recently employed on the basis of an "assignment agreement" on behalf of Verity GB Ltd as a Senior Vice President, EMEA and APAC Operations. His region, EMEA/APAC included Europe, the Middle East, Asia, and the so-called Asian-Pacific Region. Sluimer was responsible for sales of USD 50 million and led a team of more than 100 employees.

    c.   The last gross income was €45.076,00 a month, including vacation bonus and other structural wage components.

    d.  On December 29, 2005, Verity Inc., including all its subsidiaries (among which was Verity), was taken over by Autonomy, a British search engine supplier.

    e.  Due to this takeover, the workplace (among others) of Sluimer came to be defunct. His duties were taken over by Sushovan Hussain, Autonomy's CFO. Sluimer no longer performed his duties after the last mentioned date.

    f.  At the end of March 2006, Sluimer was told that a suitable alternative position had been found for him at Neurodynamics, an enterprise under VerityAutonomy's authority.

    g.  Subsequently, Sluimer performed work on behalf of Neurodynamics, but did not accept the intended position.

2.
Sluimer requests dissolution of his employment contract with Verity because of changes in the circumstances. He considers the represented position at Neurodynamics not suitable. Furthermore, he argues that in the meantime, a breach in trust has occurred and that Verity is to be blamed for it. After his workplace had become defunct due to the takeover of Verity by Autonomy, he was put on non-active status, and the relationship between the parties has been seriously upset by Verity's doings. Sluimer requests the district judge to award him a compensation from Verity which is to be calculated by means of the formula of the district judge with C-factor 1.5.

3.
Verity does not object to the dissolution of the employment contract. They agree with Sluimer that a fruitful cooperation between the parties is no longer possible. But according to Verity, Sluimer is to be blamed for this. Verity argues that Sluimer was not open to a new position at any time, that because of his wish to stop working with a considerable compensation for being released, he sabotaged the discussions for the "other position," that Verity offered him an alternative position at the level of his previous position, and that he unjustly declined the position. So they do not think a compensation for termination is appropriate.

4.
It did not appear to the district judge that the request for dissolution was connected with the prohibition of termination.

5.
On the basis of what was argued, the district judge feels that Sluimer was sufficiently reasonable with the position offered at Neurodynamics, taking into account the type and gravity of the position as well as the extent of the workforce at Neurodynamics, which from a viewpoint pertaining to industrial law cannot be considered as a suitable position for Sluimer. The situation that this position would not bring a change in the work conditions under which Sluimer was accustomed to working and that there were/are possibilities for growth within the position, does not settle the aforementioned. Since it does not appear at this time that an appropriate short-term position would be available within Verity's organization and that in this manner Verity cannot give a new meaning in the near future to a work relationship with Sluimer, the district judge feels that Sluimer cannot be expected to continue the work relationship with Verity. The district judge will therefore dissolve the employment contract.

6.
So this case dissolves the employment contract because of the choice of Verity/Autonomy to drop Sluimer's workplace after the takeover on December 29, 2005, and because of the absence of another suitable position for Sluimer with Verity/Autonomy. Along with this, the basis of the dissolution lies in the sphere of risk for Verity. In cases such as this one, it is customary to consider reasonable a compensation calculated by applying the so-called neutral formula of the district judge (with C-factor 1). The district judge sees no reason to award Sluimer a higher compensation at Verity's expense than the application of an intended neutral formula calculated compensation. The district judge does not consider it relevant that after December 29, 2005, irritations originated between the parties and that the relationship between them was disrupted now that such results from the fact that there is no suitable workplace for Sluimer with Verity/Autonomy.

7.
Taking into account the aforementioned, the district judge determines that Sluimer is entitled to a compensation calculated with the applicable neutral formula of the district judge at Verity's expense. Sluimer will be granted a period of time to withdraw the petition.

8.
The expenses of the legal proceedings, considering the nature of the disagreement, will be compensated, except for when Sluimer withdraws the petition. In that case, Sluimer will have to pay the expenses of the legal proceedings Verity incurred.

**Decision**

The district judge:

offers Sluimer the opportunity to withdraw his petition at the latest on June 22, 2006;

and in case the petition is not withdrawn in a timely manner:

the employment contract will be dissolved between the parties starting on June 23, 2006;

awards Sluimer a compensation of €1.081.824,00 gross at Verity's expense and sentences Verity to pay this compensation to Sluimer;

the expenses of the legal proceedings will be compensated in the sense that each party will incur its own costs;

and in case the petition is withdrawn in a timely manner:

sentences Sluimer to pay Verity's expenses for the legal proceedings up to the rendering of this decision estimated at €500,00 to the wage earner.

This decision is rendered by G.C. van Gelein Vitringa-Boudewijse, Esq., district judge, and was publicly read in the presence of the court clerk on June 7, 2006.

/signature/                          /signature/                          /signature/
                                     The court clerk at the court of
                                     Utrecht.

## AFFIDAVIT OF TRANSLATOR

I, the undersigned, say: I am an official interpreter and translator for the Superior Court in and for all Counties in the State of California; I am familiar with the Dutch and English languages; I have translated the attached document, a copy of a Decision rendered in the Court of Utrecht on June 7, 2006, in the case of Hugo Sluimer v. Verity Benelux B.B., consisting of three pages from Dutch into English. The foregoing is a true and correct translation of same.

I certify (or declare) under penalty of perjury, that the foregoing is true and correct.

Executed on April 22, 2008, at Valencia, California.

Myriam-Rose Kohn
Registration No. 700069
Judicial Council, State of California

# beschikking

**RECHTBANK UTRECHT**

Sector kanton

Locatie Utrecht

zaaknummer: 466781 EJ VERZ 06-1375

**beschikking d.d. 7 juni 2006**

inzake

**HUGO SLUIMER,**
wonende te Monaco,
verder ook te noemen Sluimer,
verzoekende partij,
gemachtigde: mr. J. van der Pijl, advocaat te Amsterdam,

tegen:

de besloten vennootschap **VERITY BENELUX B.V.,**
gevestigd te De Meern en kantoorhoudende te Nieuwegein,
verder ook te noemen Verity,
verwerende partij,
gemachtigden: mr. M. Ritmeester en mr. J.A. de Roos, advocaten te Amsterdam.

### Verloop van de procedure

Sluimer heeft op 19 april 2006 een verzoekschrift ingediend.
Verity heeft een verweerschrift ingediend.
Het verzoek is ter zitting van 30 mei 2006 behandeld. Daarvan is aantekening gehouden.
Hierna is uitspraak bepaald.

### Motivering

In deze zaak staan de volgende feiten tussen partijen vast.
a.  Sluimer, geboren op 19 juni 1953, is op 1 juni 1990 als Sales Manager Benelux in dienst
    getreden van Verity Inc., een Amerikaanse leverancier van zoektechnologie. Kort daarop
    zijn de activiteiten van Verity Inc., waaronder de arbeidsovereenkomst tussen Sluimer en
    Verity Inc., ondergebracht in Verity.
b.  Sluimer is laatstelijk op basis van een 'assignment agreement' werkzaam geweest ten
    behoeve van Verity GB Ltd en wel in de functie van Senior Vice President, EMEA en
    APAC Operations. Zijn regio, EMEA/APAC betrof de regio Europa, het Midden-
    Oosten, Azië en de zogeheten Asian-Pacific Regio. Sluimer was verantwoordelijk voor
    een omzet van 50 miljoen USD en leidde een team van meer dan 100 medewerkers.
c.  Het laatstgenoten brutoloon bedraagt € 45.076,00 per maand, inclusief vakantietoeslag
    en overige structurele looncomponenten.

Zaaknummer: 466781 EJ VERZ 06-1375                                              blad 2

d. Op 29 december 2005 is Verity Inc, inclusief al haar dochterondernemingen (waaronder Verity), overgenomen door Autonomy, een Britse zoekmachineleverancier.
e. Door deze overname is (onder meer) de arbeidsplaats van Sluimer komen te vervallen. Zijn taken zijn overgenomen door Sushovan Hussain, de CFO van Autonomy. Sluimer heeft zijn werkzaamheden na laatstgenoemde datum niet meer verricht.
f. Eind maart 2006 is aan Sluimer meegedeeld dat er een voor hem geschikte alternatieve functie was gevonden binnen Neurodynamics, een onderneming binnen het gezagsbereik van VerityAutonomy.
g. Sluimer heeft vervolgens ten behoeve van Neurodynamics werkzaamheden verricht, maar heeft bedoelde functie niet aanvaard.

2.
Sluimer vraagt ontbinding van de arbeidsovereenkomst met Verity wegens veranderingen in de omstandigheden. Hij acht de hem voorgehouden functie binnen Neurodynamics niet passend. Voorts stelt hij dat tussen partijen inmiddels een vertrouwensbreuk is ontstaan en dat zulks aan Verity te wijten is. Nadat zijn arbeidsplaats door de overname van Verity door Autonomy was komen te vervallen en hij op non-actief was gesteld, zijn de verhoudingen tussen partijen door toedoen van Verity ernstig verstoord geraakt. Sluimer verzoekt de kantonrechter om hem ten laste van Verity een vergoeding toe te kennen die is berekend aan de hand van de kantonrechtersformule met C-factor 1.5.

3
Verity verzet zich niet tegen de ontbinding van de arbeidsovereenkomst. Zij is met Sluimer van mening dat een vruchtbare samenwerking tussen partijen niet meer tot de mogelijkheden behoort. Dit is volgens Verity echter aan Sluimer te wijten. Verity stelt dat Sluimer geen moment heeft opengestaan voor een nieuwe functie, dat hij vanwege zijn wens om met een flinke ontslagvergoeding op te houden met werken de 'andere functie' discussie heeft gesaboteerd, dat Verity hem een passende alternatieve functie op het niveau van zijn vroegere functie heeft aangeboden en dat hij die functie ten onrechte heeft afgewezen. Een ontbindingsvergoeding acht zij dan ook niet op zijn plaats.

4.
De kantonrechter is niet gebleken dat het ontbindingsverzoek verband houdt met enig opzegverbod.

5.
Op grond van hetgeen over en weer is aangevoerd is de kantonrechter van oordeel dat Sluimer voldoende aannemelijk heeft gemaakt dat de aangeboden functie bij Neurodynamics, gelet op de aard en zwaarte van die functie alsmede de omvang van het personeelsbestand van Neurodynamics, vanuit arbeidsrechtelijk oogpunt niet als een voor Sluimer passende alternatieve functie kan worden aangemerkt. De omstandigheid dat die functie geen wijziging zou brengen in de arbeidsvoorwaarden waaronder Sluimer gewoon was te werken en dat er binnen die functie groeimogelijkheden waren/zijn, doet aan het vorenstaande niet af. Nu niet is gebleken dat binnen de organisatie van Verity op korte termijn een passende functie voor Sluimer beschikbaar komt en dat Verity op die wijze in de nabije toekomst aan de arbeidsrelatie met Sluimer inhoud kan geven, kan naar het oordeel van de kantonrechter van Sluimer niet worden verlangd dat hij de arbeidsrelatie met Verity voortzet. De kantonrechter zal de arbeidsovereenkomst daarom ontbinden.

Zaaknummer: 466781 EJ VERZ 06-1375                                                              blad 3

6.
Aldus is sprake van een ontbinding van de arbeidsovereenkomst vanwege de keuze van
Verity/Autonomy om de arbeidsplaats van Sluimer na de overname per 29 december 2005 te
laten vervallen en vanwege de afwezigheid van een andere passende functie voor Sluimer bij
Verity/Autonomy. Hiermee is gegeven dat de ontbindingsgrond in de risicosfeer van Verity
ligt. In gevallen als het onderhavige wordt in de regel een vergoeding die is berekend met
toepassing van de zogeheten neutrale kantonrechtersformule (met C-factor 1) billijk geacht.
De kantonrechter ziet geen aanleiding om in dit geval ten laste van Verity aan Sluimer een
hogere vergoeding toe te kennen dan een met toepassing van bedoelde neutrale formule
berekende vergoeding. Dat na 29 december 2005 tussen partijen over en weer irritaties zijn
ontstaan en de verhoudingen tussen hen wat verstoord zijn geraakt, acht de kantonrechter in
dit kader niet relevant, nu zulks voortvloeit uit het feit dat er voor Sluimer bij Verity/
Autonomy geen passende arbeidsplaats aanwezig is.

7.
Gelet op het vorenstaande zal de kantonrechter bepalen dat Sluimer ten laste van Verity een
met toepassing van de neutrale kantonrechtersformule berekende vergoeding toekomt.
Aan Sluimer zal een termijn worden gegund het verzoek in te trekken.

8.
De proceskosten zullen gezien de aard van het geschil worden gecompenseerd, behalve
wanneer Sluimer het verzoek intrekt. In dat geval zal Sluimer in de proceskosten van Verity
worden veroordeeld.

**Beslissing**

De kantonrechter:

stelt Sluimer in de gelegenheid uiterlijk 22 juni 2006 het verzoek in te trekken;

en voor het geval het verzoek niet tijdig wordt ingetrokken:

ontbindt de arbeidsovereenkomst tussen partijen met ingang van 23 juni 2006;

kent aan Sluimer ten laste van Verity een vergoeding toe van € 1.081.824,00 bruto en
veroordeelt Verity tot betaling van deze vergoeding aan Sluimer;

compenseert de proceskosten in die zin, dat partijen de eigen kosten dragen;

en voor het geval het verzoek tijdig wordt ingetrokken:

veroordeelt Sluimer in de proceskosten aan de zijde van Verity, tot de uitspraak van deze
beschikking begroot op € 500,00 aan salaris gemachtigde.

Deze beschikking is gegeven door mr. G.C. van Gelein Vitringa-Boudewijnse,
kantonrechter, en is in aanwezigheid van de griffier in het openbaar uitgesproken op 7 juni
2006.

DE GRIFFIER VAN DE RECHTBANK
UTRECHT

**EXHIBIT H**



VIA REGISTERED DELIVERY


6 July 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

**Re:    Fax dated 1 May 2006 to Mr Jack Landers**

Dear Mr Sluimer:

I write on behalf of Verity, Inc. and further to my letter dated 3 May 2006.

Your letter dated 1 May 2006 seeks additional information related to the terms of the Change in Control and Severance Benefit Plan (the "Plan") ("can you confirm to me...?")  As such it does not constitute an application within the meaning of the Plan.

Notwithstanding the foregoing, to the extent that your letter is deemed to be an application for benefits, we hereby notify pursuant to Section 11(b)(1) and (2) of the Plan you that your application is denied in whole.  Firstly, in Section 3(b)(iii), an employee offered immediate reemployment is an express exception to the receipt of severance benefits under.  You have been offered such employment, and your employment has been continuous with payment of salary, commission and other benefits such as stock option vesting.  You have not suffered a "Constructive Termination" within the meaning of Section 2(f) the Plan.  Also section 3(b)(iv) provides that an employee will not receive benefits under the Plan if the employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non Compete Agreement.  Finally, Section 7 provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities.

This notice is provided under Section 11(b) of the Plan within the time periods allotted therein.  Under Section 11(b)(4) of the Plan, you are hereby notified that you are permitted to request a review of this notice.  You may do so by submitting a request for a review directly to me within sixty (60) days of the date of this letter.  Your request must be submitted in writing and shall be addressed to:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089
USA

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that you feel are pertinent.  You (or your representative)

Page 1



shall have the opportunity to submit (or the Plan Administrator may require you to submit) written comments, documents, records, and other information relating to your claim. You (or your representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. The review shall take into account all comments, documents, records and other information submitted by you (or your representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, as set forth in the Plan. You have a right to bring a civil action under Section 502(a) of ERISA following a denial on review of any claim.

Sincerely,


Andrew M Kanter
Company Secretary

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

# EXHIBIT I

VIA EMAIL AND REGISTERED DELIVERY

13 July 2006

Verity, Inc.
Attn. Vice President, Human Resources
894 Ross Drive
Sunnyvale CA 94089
California, USA

**Re: Request for review**

Dear Mrs/Mr,
With reference to your letters dated 3 May 2006 and 6 July 2006, I hereby confirm that
my letter dated 1 May 2006 was mend to be an application for benefits under the Change
in Control and Severance Benefit Plan (the "Plan"), so in case this was not clear to you, I
hereby repeat my application for benefits under the Plan.

In accordance to section 11 (c) of the Plan, I hereby request review, based on the
following grounds:
1. as you are aware, the Cantonal Court in The Netherlands ruled on 7 July 2006 that
   the offered position by Verity/Autonomy (Sr. VP Neurodynamics), is not
   comparable with the prior position the Participant hold at Verity, Inc. Therefore I
   claim, per section 2 (f) "Constructive Termination" (i) due to a substantial
   reduction in the Participant's duties and responsibilities.
2. I disagree with your opinion that I was offered immediate reemployment, per
   section 3 (b) (iii) of the Plan. I was given half payment during a 3 months period
   (3 months in the software industry are comparable with at least 1 year in a
   traditional industry), so the offered reemployment was by far not immediate. I
   also believe that Verity/Autonomy's call for section 3 (b) (iii) under the Plan is
   not relevant, simply because a comparable position was never offered, so
   "Constructive Termination" applies.
3. I also disagree with Verity/Autonomy's other arguments (referring to 3 (b) (iv)
   and section 7), to not consider me entitled to the benefits under the Plan, because I
   signed a "Proprietary Rights" Agreement when I joined Verity, Inc. (this
   agreement is comparable with Autonomy's "Confidentiality Agreement"). What's
   even more important is that such arguments have nothing to do with the
   core/spirit of the Plan. It is common business practice (as performed by
   Verity/Autonomy in other settlements under the Plan with former Verity
   Executives) that such 'sub-agreements' are part of a final 'Separation Agreement'
   between Verity/Autonomy and the Participant.


Sincerely,

Hugo Sluimer

**EXHIBIT J**



VIA REGISTERED DELIVERY


28 September 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

**Re:     Letter dated 13 July 2006**

Dear Mr Sluimer:

I write on behalf of Verity, Inc. with regards to your letter dated 13 July 2006. Your letter was addressed to the Vice President, Human Resources of Verity, Inc. That position reported to my office, which has global responsibility for group human resources matters. Jack Landers, the previous Vice President, Human Resources of Verity, Inc., has recently left the company, and as such I have assumed his duties as the Plan Administrator within the meaning of the Change in Control and Severance Benefit Plan (the "Plan"), the topic of your letter.

Your letter dated is a request for review under Section 11(c) of the Plan, and was received by Verity on 1 August 2006. This letter is a notification of decision on review under Section 11(d) of the Plan. Pursuant to Section 11(d), this decision is being provided within 60 days of receipt of your request.

I regret to inform you that upon further review Verity has confirmed the denial of the application for benefits in whole. The specific reasons follow.

In this regard we draw your attention against to Section 3(b)(iii) of the Plan, which provides that an employee offered immediate reemployment is an express exception to the receipt of severance benefits under the Plan. You were offered but rejected such employment, instead seeking to voluntarily terminate your contract. Your employment with the company prior to your voluntary termination was in fact continuous, with uninterrupted payment of salary, commission and other benefits such as stock option vesting. Your statement that you were paid "half payment" is simply untrue as your commission plan continued to be calculated exactly the same as prior to the acquisition, indeed for most of the time by the same finance personnel using exactly the same systems as pre-acquisition.

Further, you did not suffer a "Constructive Termination" within the meaning of Section 2(f)(i) of the Plan. As you are aware, it is the company's position that you did not suffer a substantial reduction in your duties or responsibilities in effect immediately prior to the effective date of the Change in Control.

It was and remains the company's conclusion that rather than suffer a "Constructive Termination" you sought to avoid your employment duties whilst engaging with the company solely to establish a position for compensation in the Dutch courts. In contrast, the company

Page 1



actively pursued your continued employment by finding an alternative position within the group with the same terms, analogous compensation and growth potential. You reference the 7 July 2006 decision of the Cantonal Court in the Netherlands as evidence. Section 10 of the Plan clearly states that the Plan is governed by the laws of the State of California. There are of course very substantial differences between Dutch and California employment law, such as the applicable rules and regulations, factors considered by the Cantonal Court and standards of evidence. Thus whilst the Cantonal Court decision has been considered in reaching this decision, it is neither binding on the Company for purposes of the Plan nor persuasive in reaching this decision. Finally, at the Cantonal Court hearing your position was clear at that your petition did not address the Plan.

Your request is also denied as a result of your failure to comply with the last clause of Section 2(f) which states the precedent actions required to claim Constructive Termination under Section 2(f). You have not provided the Company with the required written notice, either in substance or in accordance with the notice procedures under Section 15(a).

With regards to Section 3(b)(iv), the Plan is clear that it is within the Company's discretion to deny benefits should you not confirm in writing that you are subject to the Company's Confidentiality Agreement and Non-Compete Agreement. You have not provided any such confirmation. The Proprietary Rights Agreement you reference (in fact the "Employee Inventions and Proprietary Rights Assignment Agreement", dated 9 June 1993) is not equivalent to a confidentiality and non-compete agreement. The Proprietary Rights Agreement is a standard document that governs the rights between the company and its employees with respect to intellectual property generated before and during their employment.[1] A confidentiality agreement protects a much wider scope of key commercial information, and a non-competition agreement of course relates to post-employment competitive obligations. Acknowledgement in writing of these obligations is basic consideration for the receipt of benefits under the Plan, and is integral to the purpose and spirit of the Plan.

Finally, Section 7 provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities, which you have not agreed to.

This notice is provided under Section 11(b) of the Plan within the time periods allotted therein. Under Section 11(b)(3) of the Plan, you are hereby notified that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. Under Section 11(b)(4) of the Plan, you are hereby notified that you have a right to bring a civil action under Section 502(a) of ERISA.

Sincerely,


Andrew M Kanter
Company Secretary

_____

[1] Your employment file does not contain the full text of the agreement, but only the first and last pages, however other agreements entered into at a similar time reflect this position.

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

Autonomy

VIA REGISTERED DELIVERY

29 September 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

**Re:    Letter dated 13 July 2006**

Dear Mr Sluimer:

I write on behalf of Verity, Inc. with regards to your letter dated 13 July 2006. Your letter was addressed to the Vice President, Human Resources of Verity, Inc. That position reported to my office, which has global responsibility for group human resources matters. Jack Landers, the previous Vice President, Human Resources of Verity, Inc., has recently left the company, and as such I have assumed his duties as the Plan Administrator within the meaning of the Change in Control and Severance Benefit Plan (the "Plan"), the topic of your letter.

Your letter dated is a request for review under Section 11(c) of the Plan, and was received by Verity on 1 August 2006. This letter is a notification of decision on review under Section 11(d) of the Plan. Pursuant to Section 11(d), this decision is being provided within 60 days of receipt of your request.

I regret to inform you that upon re-review Verity has confirmed the denial of the application for benefits in whole. The specific reasons follow.

We draw your attention again to Section 3(b)(iii) of the Plan, which provides that an employee offered immediate reemployment is an express exception to the receipt of severance benefits under the Plan. You were offered but rejected such employment, instead seeking to voluntarily terminate your contract. Your employment with the company prior to your voluntary termination was in fact continuous, with uninterrupted payment of salary, commission and other benefits such as stock option vesting. Your statement that you were paid "half payment" is simply untrue as your salary remained the same, benefits were uninterrupted and your commission plan was calculated exactly the same as prior to the acquisition (indeed for most of the time by the same finance personnel using exactly the same systems as pre-acquisition).

Further, you did not suffer a "Constructive Termination" within the meaning of Section 2(f)(i) of the Plan. As you are aware, it is the company's position that you did not suffer a substantial reduction in your duties or responsibilities in effect immediately prior to the effective date of the Change in Control. It remains the company's conclusion that rather than suffer a "Constructive Termination" you sought to avoid your employment duties whilst engaging with the company solely to establish a position for compensation in the Dutch courts. In contrast, the company actively pursued your continued employment by finding an

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

Autonomy

alternative position within the group with the same terms, analogous compensation and growth potential. In contrast, in the post-acquisition period after redundancy review you barely performed your role.

You reference the 7 July 2006 decision of the Cantonal Court in the Netherlands as evidence supporting your position. Section 10 of the Plan clearly states that the Plan is governed by the laws of the State of California. There are of course very substantial differences between Dutch and California employment law, such as the applicable rules and regulations, factors considered by the Cantonal Court and standards of evidence. Thus whilst the Cantonal Court decision has been considered in reaching this decision, it is neither binding on the Company for purposes of the Plan nor persuasive in reaching this decision. It should also be noted that at the Cantonal Court hearing your position was clear that the substance of your petition did not address the Plan.

Your request is also denied as a result of your failure to comply with the last clause of Section 2(f) of the Plan which states the precedent actions required to claim Constructive Termination under Section 2(f). You have not provided the Company with the required written notice, either in substance or in accordance with the notice procedures under Section 15(a).

With regards to Section 3(b)(iv), the Plan is clear that it is within the Company's discretion to deny benefits should you not confirm in writing that you are subject to the Company's Confidentiality Agreement and Non-Compete Agreement. You have not provided any such confirmation. The Proprietary Rights Agreement you reference (in fact the "Employee Inventions and Proprietary Rights Assignment Agreement", dated 9 June 1993) is not equivalent to a confidentiality and non-compete agreement. The Proprietary Rights Agreement is a standard document that governs the rights between the company and its employees with respect to intellectual property generated before and during their employment.[1] A confidentiality agreement protects a much wider scope of key commercial information, and a non-competition agreement of course relates to post-employment competitive obligations. Acknowledgement in writing of these obligations is basic consideration for the receipt of benefits under the Plan, and is integral to the purpose and spirit of the Plan.

Finally, Section 7 provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities, which you have not agreed to.

---

[1] Your employment file does not contain the full text of the agreement, but only the first and last pages, however other agreements entered into at a similar time reflect this position.

Page 2

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com



This notice is provided under Section 11(b) of the Plan within the time periods allotted therein. Under Section 11(b)(3) of the Plan, you are hereby notified that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. Under Section 11(b)(4) of the Plan, you are hereby notified that you have a right to bring a civil action under Section 502(a) of ERISA.

Please address any future correspondence to my attention at the letter on this address.

Sincerely,

Andrew M Kanter
Chief Operating Officer – Autonomy Group of Companies

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com



VIA REGISTERED DELIVERY


29 September 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

**Re:    Letter dated 13 July 2006**

Dear Mr Sluimer:

I write on behalf of Verity, Inc. with regards to your letter dated 13 July 2006. Your letter was addressed to the Vice President, Human Resources of Verity, Inc. That position reported to my office, which has global responsibility for group human resources matters. Jack Landers, the previous Vice President, Human Resources of Verity, Inc., has recently left the company, and as such I have assumed his duties as the Plan Administrator within the meaning of the Change in Control and Severance Benefit Plan (the "Plan"), the topic of your letter.

Your letter dated is a request for review under Section 11(c) of the Plan, and was received by Verity on 1 August 2006. This letter is a notification of decision on review under Section 11(d) of the Plan. Pursuant to Section 11(d), this decision is being provided within 60 days of receipt of your request.

I regret to inform you that upon re-review Verity has confirmed the denial of the application for benefits in whole. The specific reasons follow.

We draw your attention again to Section 3(b)(iii) of the Plan, which provides that an employee offered immediate reemployment is an express exception to the receipt of severance benefits under the Plan. You were offered but rejected such employment, instead seeking to voluntarily terminate your contract. Your employment with the company prior to your voluntary termination was in fact continuous, with uninterrupted payment of salary, commission and other benefits such as stock option vesting. Your statement that you were paid "half payment" is simply untrue as your salary remained the same, benefits were uninterrupted and your commission plan was calculated exactly the same as prior to the acquisition (indeed for most of the time by the same finance personnel using exactly the same systems as pre-acquisition).

Further, you did not suffer a "Constructive Termination" within the meaning of Section 2(f)(i) of the Plan. As you are aware, it is the company's position that you did not suffer a substantial reduction in your duties or responsibilities in effect immediately prior to the effective date of the Change in Control. It remains the company's conclusion that rather than suffer a "Constructive Termination" you sought to avoid your employment duties whilst engaging with the company solely to establish a position for compensation in the Dutch courts. In contrast, the company actively pursued your continued employment by finding an

Page 1

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com



alternative position within the group with the same terms, analogous compensation and growth potential. In contrast, in the post-acquisition period after redundancy review you barely performed your role.

You reference the 7 July 2006 decision of the Cantonal Court in the Netherlands as evidence supporting your position. Section 10 of the Plan clearly states that the Plan is governed by the laws of the State of California. There are of course very substantial differences between Dutch and California employment law, such as the applicable rules and regulations, factors considered by the Cantonal Court and standards of evidence. Thus whilst the Cantonal Court decision has been considered in reaching this decision, it is neither binding on the Company for purposes of the Plan nor persuasive in reaching this decision. It should also be noted that at the Cantonal Court hearing your position was clear that the substance of your petition did not address the Plan.

Your request is also denied as a result of your failure to comply with the last clause of Section 2(f) of the Plan which states the precedent actions required to claim Constructive Termination under Section 2(f). You have not provided the Company with the required written notice, either in substance or in accordance with the notice procedures under Section 15(a).

With regards to Section 3(b)(iv), the Plan is clear that it is within the Company's discretion to deny benefits should you not confirm in writing that you are subject to the Company's Confidentiality Agreement and Non-Compete Agreement. You have not provided any such confirmation. The Proprietary Rights Agreement you reference (in fact the "Employee Inventions and Proprietary Rights Assignment Agreement", dated 9 June 1993) is not equivalent to a confidentiality and non-compete agreement. The Proprietary Rights Agreement is a standard document that governs the rights between the company and its employees with respect to intellectual property generated before and during their employment.[1] A confidentiality agreement protects a much wider scope of key commercial information, and a non-competition agreement of course relates to post-employment competitive obligations. Acknowledgement in writing of these obligations is basic consideration for the receipt of benefits under the Plan, and is integral to the purpose and spirit of the Plan.

Finally, Section 7 provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities, which you have not agreed to.

---

[1] Your employment file does not contain the full text of the agreement, but only the first and last pages, however other agreements entered into at a similar time reflect this position.

Page 2



This notice is provided under Section 11(b) of the Plan within the time periods allotted therein. Under Section 11(b)(3) of the Plan, you are hereby notified that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. Under Section 11(b)(4) of the Plan, you are hereby notified that you have a right to bring a civil action under Section 502(a) of ERISA.

Please address any future correspondence to my attention at the letter on this address.

Sincerely,

Andrew M Kanter
Chief Operating Officer – Autonomy Group of Companies

Page 3

1

**PROOF OF SERVICE**

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3        I am employed in the County of Los Angeles, State of California. I am over the age of 18
and not a party to the within action; my business address is 1888 Century Park East, Suite 1106, Los
4 Angeles, California 90067.

5        On April 22, 2008, I served the foregoing document(s) described as **DECLARATION OF
ANDREW M. KANTER IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
6 UNDER RULE 12(B)(6), OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT OR
PARTIAL SUMMARY JUDGMENT UNDER RULE 56** on the parties in this action by
7 serving:

8 Joseph M. Rimac, Esq.                    Cliff Palefsky, Esq.
William Reilly, Esc.                      Keith Ehrman, Esq.
9 RIMAC & MARTIN                           McGuinn, Hillsman & Palefsky
1051 Divisadero Street                    535 Pacific Avenue
10 San Francisco, CA 94115                 San Francisco, CA 94133

11

( )      **By Envelope**: by placing ( ) the original ( ) a true copy thereof enclosed in sealed
12 envelopes addressed as above and delivering such envelopes:

13 ( )     **By Mail:** As follows: I am "readily familiar" with this firm's practice of collection and
processing correspondence for mailing. Under that practice it would be deposited with the U.S.
14 postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the
ordinary course of business. I am aware that on motion of the party served, service is presumed
15 invalid if postal cancellation date or postage meter date is more than one day after date of deposit for
mailing in affidavit.
16
( )      **By Personal Service:** I delivered such envelope by hand to the offices of the addressee(s).
17
( )      **By Federal Express:** I caused the envelope(s) to be delivered to the Federal Express office
18 for delivery on the next-business-day basis to the offices of the addressee(s).

19 ( X )   **By Electronic Filing:** Based upon my training and experience with electronic filing in the
federal courts, it is my understanding that a copy of this Document, upon its submission to the Court,
20 will be electronically served on the addressees.

21        Executed on April 22, 2008 at Los Angeles, California.

22 ( )     **STATE**  I declare under penalty of perjury under the laws of the State of California that the
above is true and correct.
23
(X)      **FEDERAL**  I declare that I am employed in the office of a member of the bar of this court at
24 whose direction the service was made.

25

26                                         /s/
                                    Susan Reimers
27

28

24

NOTICE OF MOTION AND MOTION TO DISMISS