RIMAC & MARTIN
A Professional Corporation
JOSEPH M. RIMAC – CSBN 72381
WILLIAM REILLY – CSBN 177550
1051 Divisadero Street
San Francisco, CA 94115
Telephone: (415) 561-8440
Facsimile:  (415) 561-8430

MCGUINN, HILLSMAN & PALEFSKY
CLIFF PALEFSKY (State Bar No. 77683)
KEITH EHRMAN (State Bar No. 106985)
535 Pacific Ave.
San Francisco, CA 94133
Telephone: (415) 421-9292
Facsimile: (415) 403-0202

Attorneys for Plaintiff
HUGO SLUIMER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

*E-FILING*

| | |
|---|---|
| HUGO SLUIMER, | ) |
| Plaintiff, | ) CASE NO.  C 081220 SI |
| | ) |
| v. | ) **DECLARATION OF WILLIAM REILLY** |
| | ) **IN SUPPORT OF PLAINTIFF'S** |
| VERITY, INC., a corporation, and THE | ) **MOTION FOR SUMMARY JUDGMENT** |
| VERITY INC. CHANGE IN CONTROL AND | ) **OR IN THE ALTERNATIVE PARTIAL** |
| SEVERANCE BENEFIT PLAN, | ) **SUMMARY JUDGMENT** |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

1    I, William Reilly, declare as follows:

2

3    1.    I am an attorney at law, duly licensed and admitted to practice before the courts in

4    the State of California, and I am associated with the law firm of Rimac & Martin, attorneys of

5    record for plaintiff HUGO SLUIMER. ("American").  I have personal knowledge of the facts set

6    forth in this declaration, and if called as a witness I could competently testify thereto.

7    2.    Attached hereto as Exhibit A is a true and correct copy of my correspondence

8    between October 12, 2007 and November 12, 2007 to and from defendants and the attachments

9    thereto.

10    3.    Attached hereto as Exhibit B is true and correct copy of the translation certificate

11    form ASTA-USA Translation Services, Inc., a professional document translation company,

12    which attests that the language translation completed by ASTA-USA's certified professional

13    translators, represents, to the best of our judgment, an accurate and correct interpretation of the

14    terminology/content of the source document(s).  The remaining documents attached hereto as

15    Exhibits each bear the translation certificate stamp.

16    4.    Attached hereto as Exhibit C is a true and correct copy of Mr. Sluimer's initial

17    filing in the Dutch Court translated to English.  The original Dutch document is attached to the

18    Declaration of Jacob Van Der Pijl at Exhibit A, HS-0124-133.

19    5.    Attached hereto as Exhibit D is a true and correct copy of the defendants' initial

20    filing in the Dutch Court translated to English.  The original Dutch document is attached to the

21    Declaration of Jacob Van Der Pijl at Exhibit A, HS-0188-210.

22    6.    Attached hereto as Exhibit E is a true and correct copy of Mr. Sluimer's reply

23    filing in the Dutch Court translated to English.  The original Dutch document is attached to the

24    Declaration of Jacob Van Der Pijl at Exhibit A, HS-0313-331.

25    7.    Attached hereto as Exhibit F is a true and correct copy of defendants' reply filing

26    in the Dutch Court translated to English.  The original Dutch document is attached to the

27    Declaration of Jacob Van Der Pijl at Exhibit A, HS-0333-336.

28

**DECLARATION OF WILLIAM REILLY**                     CASE NO.  C
                                    2                 07-2381 SI

8.    Attached hereto as Exhibit G is a true and correct copy of the Clerk's handwritten notes from the May 30, 2006 hearing in the Dutch Court translated to English. The original Dutch document is attached to the Declaration of Jacob Van Der Pijl at Exhibit C.

9.    Attached hereto as Exhibit H is a true and correct copy of the Order issued by the Dutch Court on June 7, 2006 translated to English. The original Dutch document is attached to the Declaration of Jacob Van Der Pijl at Exhibit D.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 13th day of June 2008, at San Francisco, California.

_____
William Reilly

# EXHIBIT A

# RIMAC & MARTIN

*A Professional Corporation*

**Attorneys at Law**

1051 Divisadero Street

San Francisco, CA 94115

WILLIAM REILLY, ESQ.
CA. Bar No. 177550
CO  Bar No. 030819

Telephone (415) 561-8440
Facsimile (415) 561-8430
w_reilly@rimacmartin.com

October 12, 2007

*Via U.S. Mail*

Verity, Inc.
Attn: Vice President Human Resources
Verity, Inc. Change in Control and Severance Benefit Plan - Plan Administrator
894 Ross Drive
Sunnyvale, CA 94089

     Re:   *Hugo Sluimer - Verity, Inc. Change in Control and Severance Benefit Plan*

Dear Plan Administrator:

     We represent Hugo Sluimer.  We are writing to obtain copies of documents pursuant to Employee Retirement Income Security Act of 1974, §§ 3(16)(A), 502( c)).  Please provide us with copies of:

1. Documents governing the operation the Verity, Inc. Change in Control and Severance Benefit Plan ("the Plan") for the years 2005, 2006 and 2007;
2. The annual report for the years 2005, 2006 and 2007;
3. The summary plan description;
4. The Plan's annual Financial Report for the years 2005, 2006 and 2007;
5. All documents related the Board's authorizing any person or committe to administer the Plan for the years 2005, 2006 and 2007;
6. The Rules and Procedures established by the Plan Administrator for the years 2005, 2006 and 2007;
7. A complete copy of the Plan's and/or Verity's claim file pertaining to Hugo Sluimer;
8. A complete copy of all other documentation (whether maintained in hard copy or computer medium) pertaining to or referring to Mr. Sluimer's severance benefit claim, whether or not it is deemed to be part of the "claim file;"
9. A copy of all internal rules, guidelines, protocols, or other similar criteria which were relied upon to make any decision related Mr. Sluimer's severance benefit benefits;
10. A copy of the curriculum vitae of each individual whose advice was obtained, in connection with Mr. Sluimer's severance benefit claim, without regard to whether the advice was relied upon in making decisions regarding the claim;
11. Each document which was submitted, considered, or generated in the course of

HS-0086

Plan Administrator
October 12, 2007
Page 2

making all decisions related to Mr. Sluimer's severance benefits, without regard to whether they were relied upon in the decision, including but not limited to Verity's claim manual(s);

12.    All documents which constitute a statement of policy or guidance with respect to claim determinations for severance benefit claimants, without regard to whether such documents were relied upon in making the determination on Mr. Sluimer's severance benefit claim;

13.    All documents which demonstrate the Plan's and/or Verity's processes and safeguards designed to ensure and to verify that severance benefit claims determinations are made in accordance with the terms of the Plan, and that those terms have been applied consistently with respect to similarly situated claimants.

If any documents specified above are withheld, a list of each document being withheld and a complete explanation of the basis upon which each document is being withheld.

Thank you for your attention to this matter.

With kind regards,

William Reilly
for Rimac & Martin, P.C.
Counsel for American Airlines, Inc.

WBR/kp

HS-0087



Autonomy

BY FAX (+1 415 561 8430)

29 October 2007

William Reilly, Esq.
Rimac & Martin
1051 Divisadero Street
San Francisico, CA 94115
USA

Dear Mr. Reilly,

**Re:    Hugo Sluimer**

I write with regards to your letter dated 12 October 2007 to Verity, Inc. sent to our old office location, which was received in our new office on 25 October 2007.

First, as noted in my letter dated 22 March 2007 (and clearly implied in my letter dated 28 September 2006), all correspondence in regards to Mr Sluimer and the Verity, Inc. Change in Control and Severance Benefit Plan should be directed to my attention at the address below.

We are reviewing your letter and will reply as soon as reasonably practicable.

The company of course has an obligation to keep employee matters confidential. Accordingly prior to release of any of Mr Sluimer's confidential employment materials we must request evidence that you have been appointed as Mr Sluimer's representative. Please can you forward written evidence of appointment to my attention. In this regards we note that the signature on your letter highlights that you are "Counsel for American Airlines, Inc." which has no relationship to Verity or Mr Sluimer's employment as far as we are aware.

Sincerely,

Andrew M Kanter
Company Secretary

Page 1

Autonomy, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0088

Oct 30 2007 10:36AM AUTONOMY INC                    415 243 9984                    p.1



**Autonomy, Inc.**
1 Market Street
Spear Tower, 19th Floor
San Francisco, CA 94105
Phone 415/243-9955
Fax 415/243-9984

# Fax

| To: | William Reilly, Rimac & Martin | From: | on behalf of Andrew Kanter |
|---|---|---|---|
| **Fax:** | 415 561 8430 | **Pages:** | 2   including this cover page |
| **Phone:** | 415 561 8440 | **Date:** | October 30, 2007 |
| **Re:** | Hugo Sluimer | **CC:** | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

This transmission is intended only for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If the reader of this transmission is not the named recipient or an agent or employee responsible for delivering this transmission to the intended recipient, you are hereby informed that any distribution, dissemination, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately at the telephone number above and return the transmission in its entirety to us by mail at the address above.  Thank you.

HS-0089

# RIMAC & MARTIN

*A Professional Corporation*
Attorneys at Law
1051 Divisadero Street
San Francisco, CA 94115

WILLIAM REILLY, ESQ.
CA. Bar No. 177550
CO  Bar No. 030819

Telephone (415) 561-8440
Facsimile  (415) 561-8430
*w_reilly@rimacmartin.com*

1 November 2007

*Via Facsimile & U.S. Mail*

Andrew M. Kanter
Autonomy - Company Secretary
Cambridge Business Park
Cowley Road
Cambridge CB4 0WZ, U.K.
Facsimile # 44 (0) 1223 448 001

Re:    *Hugo Sluimer - Verity, Inc. Change in Control and Severance Benefit Plan*

Dear Mr. Kanter:

Thank you for your letter of 30 October 2007.

As a courtesy to you, I have included an email from Mr. Sluimer confirming our representation.  As you know, since the Plan Administrator has not yet produced the documents that we requested in our letter of 12 October 2007, we have not yet received the 22 March 2007 letter cited to in your letter of 30 October 2007.  We look forward to the receipt of that document and the other documents that we requested within the time frames provided by the Employee Retirement Income Security Act of 1974, §§ 3(16)(A), 502( c)).

Do not hesitate to contact me for any reason.

With kind regards,

William Reilly
for Rimac & Martin, P.C.

WBR/kp

Enc.

**William Reilly**

| | |
|---|---|
| From: | Hugo Sluimer [hugosluimer@gmail.com] |
| Sent: | Thursday, November 01, 2007 7:40 AM |
| To: | William Reilly; |
| Subject: | Confirmation |

### To whom it might concern

I hereby confirm that I have appointed Mr. William Reilly from Rimac & Martin, P.C to represent me in the case re. the Change in Control and Severance Benefit Plan against Verity, Inc.

Sincerely yours,

Hugo Sluimer

1

HS-0091

# RIMAC & MARTIN

*A PROFESSIONAL CORPORATION*
ATTORNEYS AT LAW
1051 Divisadero Street
San Francisco, CA 94115
TELEPHONE: (415) 561-8440

## FAX: (415) 561-8430

# TELECOPIER TRANSMISSION SHEET

**FACSIMILE NUMBER:**     **44 0 1223 448 001**
**(415) 243-9984**

**DATE:**     November 1, 2007

**TO:**     **Andrew M. Kanter**
Autonomy

**FROM:**     **William Reilly**

**MATTER:**     *Hugo Sluimer*

**COMMENT:**

TOTAL NUMBER OF PAGES (including this one):     **3**

IF THIS TRANSMISSION IS NOT COMPLETE, PLEASE CALL RIMAC & MARTIN AT (415) 561-8440

*THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW, IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*

HS-0092

TRANSMISSION VERIFICATION REPORT

```
TIME  : 11/01/2007 17:10
NAME  : RIMAC MARTIN
FAX   : 415-561-8442
TEL   :
SER.# : BROH6J515538
```

```
DATE,TIME            11/01  17:10
FAX NO./NAME         011441223448001
DURATION             00:00:25
PAGE(S)              03
RESULT               OK
MODE                 STANDARD
                     ECM
```

HS-0093

TRANSMISSION VERIFICATION REPORT

```
TIME   : 11/01/2007 17:13
NAME   : RIMAC MARTIN
FAX    : 415-561-8430
TEL    :
SER.# : BROH6J515539
```

```
DATE,TIME              11/01  17:12
FAX NO./NAME           2439904
DURATION               00:00:23
PAGE(S)                03
RESULT                 OK
MODE                   STANDARD
                       ECM
```

HS-0094



VIA HAND-DELIVERY

12 November 2007

William Reilly, Esq.
Rimac & Martin
1051 Divisadero Street
San Francisco, CA 94115

Re:    Letter dated 12 October 2007 to Vice President of Human Resources

Dear Mr. Reilly:

As the Plan Administrator, I write to respond to your October 12, 2007 letter. Preliminarily, I object to providing requested information:1) outside ERISA's boundary pursuant to 29 U.S.C. § 1132(c) and 2) information protected against disclosure under any doctrine or privilege, including without limitation the attorney-client privilege, work-product doctrine and/or any right to privacy.

Enclosed herewith are: 1) Verity Inc.'s Change in Control and Severance Benefit Plan (with Exhibit A thereto); and 2) correspondence to Hugo Sluimer of 6 July 2006, 3 August 2006, 28 September 2006 and 22 March 2007.

Sincerely,

Andrew M. Kanter
Plan Administrator

NOV 1 2 2007

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0095



# VERITY, INC.

## CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

### SECTION 1. INTRODUCTION.

The Verity, Inc. Change in Control and Severance Benefit Plan (the *"Plan"*) is hereby established effective April 6, 2005 (the *"Effective Date"*). The purpose of the Plan is to provide for the payment of severance benefits to certain eligible employees of Verity, Inc. and its wholly owned subsidiaries (the *"Company"*) in the event that such employees are subject to qualifying employment terminations in connection with a Change in Control. This Plan shall supersede any severance benefit plan, policy or practice previously maintained by the Company, other than an individually negotiated contract or agreement with the Company relating to severance or change in control benefits that is in effect on an employee's termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan. This document also is the Summary Plan Description for the Plan.

### SECTION 2. DEFINITIONS.

For purposes of the Plan, the following terms are defined as follows:

(a)    *"Base Salary"* means the Participant's annual base pay (excluding incentive pay, premium pay, commissions, overtime, bonuses and other forms of variable compensation), at the rate in effect during the last regularly scheduled payroll period immediately preceding the date of the Participant's Covered Termination.

(b)    *"Board"* means the Board of Directors of Verity, Inc.

(c)    *"Change in Control"* means one of the following events or a series of more than one of the following events that are related, wherein the stockholders of the Company immediately before the transaction do not retain immediately after the transaction, in substantially the same proportions as their ownership of shares of the Company's voting stock immediately before the transaction, direct or indirect beneficial ownership of more than fifty percent (50%) of the total combined voting power of the outstanding voting stock of the Company, the resulting entity in a merger or, in the case of an asset sale, the corporation or corporations to which the assets of the Company were transferred (the "Transferee Corporation(s)"), as the case may be:

(i)    the direct or indirect sale or exchange in a single or series of related transactions by the stockholders of the Company of more than fifty percent (50%) of the voting stock of the Company;

(ii)    a merger or consolidation in which the Company is a party;

1.

HS-0096



(iii)     the sale, exchange, or transfer of all or substantially all of the assets of the Company; or

(iv)     a liquidation or dissolution of the Company.

For purposes of this Section 2(c), indirect beneficial ownership shall include, without limitation, an interest resulting from ownership of the voting stock of one or more corporations, which as a result of the transaction, own the Company, the resulting entity or the Transferee Corporation(s), as the case may be, either directly or through one or more subsidiary corporations. The Board shall have the right to determine whether multiple sales or exchanges of the voting stock of the Company or more than one of the following events are related, and its determination shall be final, binding and conclusive.

(d)     *"Code"* means the Internal Revenue Code of 1986, as amended.

(e)     *"Company"* means Verity, Inc. and its wholly owned subsidiaries or, following a Change in Control, the surviving entity resulting from such transaction.

(f)     *"Constructive Termination"* means a voluntary termination of employment by a Participant after one of the following is undertaken without the Participant's express written consent:

(i)     a substantial reduction in the Participant's duties or responsibilities (and not simply a change in title or reporting relationships) in effect immediately prior to the effective date of the Change in Control; *provided, however,* that it shall not be a "Constructive Termination" if, following the effective date of the Change in Control, either (a) the Company is retained as a separate legal entity or business unit and the Participant holds the same position in such legal entity or business unit as the Participant held before such effective date, or (b) the Participant holds a position with duties and responsibilities comparable (though not necessarily identical, in view of the relative sizes of the Company and the entity involved in the Change in Control) to the duties and responsibilities of the Participant prior to the effective date of the Change in Control;

(ii)     a reduction in the Participant's base salary (except for salary decreases generally applicable to the Company's other similarly situated employees);

(iii)     a change in the Participant's business location of more than 20 miles from the business location prior to such change, except for required travel for the Company's business to an extent substantially consistent with Participant's prior business travel obligations;

(iv)     a material breach by the Company of any provisions of the Plan or any enforceable written agreement between the Company and the Participant; or

(v)     any failure by the Company to obtain assumption of the Plan by any successor or assign of the Company.

2.

HS-0097

# Verity™

Notwithstanding the foregoing, a voluntary termination shall not be deemed a Constructive Termination unless (x) the Participant provides the Company with written notice (the "Constructive Termination Notice") that the Participant believes that an event described in this Section 2(f) has occurred, (y) the Constructive Termination Notice is given within three (3) months of the date the event occurred, and (z) the Company does not rescind or cure the conduct giving rise to the event described in this Section 2(f) within fifteen (15) days of receipt by the Company of the Constructive Termination Notice.

(g)      *"Covered Termination"* means an Involuntary Termination Without Cause or a Constructive Termination, either of which occurs within one (1) month prior to or within eighteen (18) months following the effective date of a Change in Control. Termination of employment of a Participant due to death or disability shall not constitute a Covered Termination unless a voluntary termination of employment by the Participant immediately prior to the Participant's death or disability would have qualified as a Constructive Termination.

(h)      *"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

(i)      *"Involuntary Termination Without Cause"* means an involuntary termination of employment by the Company other than for one of the following reasons:

(i)      the Participant's violation of any material provision of the Company's standard agreement relating to proprietary rights;

(ii)      the Participant participates in any act of theft or dishonesty; or

(iii)      the Participant participates in any immoral or illegal act which has had or could reasonably be expected to have or had a detrimental effect on the business or reputation of the Company; or

(iv)      any material failure by the Participant to use reasonable efforts to perform reasonably requested tasks after written notice and a reasonable opportunity to comply with such notice.

(j)      *"Participant"* means an individual who is employed by the Company as its Executive Chairman of the Board, Chief Executive Officer, as a senior vice president, or as a vice president (other than any individual who is a vice president on sales commission, as determined by the Company in its sole discretion); *provided, however,* that if the Board shall make an affirmative determination that an employee serving in any such capacity shall not be a Participant, then such employee shall not be deemed a Participant. The determination of whether an employee is a Participant shall be made by the Company, in its sole discretion, and such determination shall be binding and conclusive on all persons.

(k)      *"Participation Notice"* means the latest notice delivered by the Company to a Participant informing the employee that the employee is a Participant in the Plan, substantially in the form of **Exhibit A** hereto.

3.

HS-0098

Verity

(l)    *"Plan Administrator"* means the Board or any committee duly authorized by the Board to administer the Plan. The Plan Administrator may, but is not required to be, the Compensation Committee of the Board. The Board may at any time administer the Plan, in whole or in part, notwithstanding that the Board has previously appointed a committee to act as the Plan Administrator.

## SECTION 3. ELIGIBILITY FOR BENEFITS.

(a)    **General Rules.** Subject to the provisions set forth in this Section and Section 7, in the event of a Covered Termination, the Company will provide the severance benefits described in Section 4 of the Plan to the affected Participant. Promptly upon an employee becoming a Participant, the Company shall deliver to the Participant a Participation Notice.

(b)    **Exceptions to Benefit Entitlement.** An employee, including an employee who otherwise is a Participant, will not receive benefits under the Plan (or will receive reduced benefits under the Plan) in the following circumstances, as determined by the Company in its sole discretion:

(i)    The employee has executed an individually negotiated employment contract or agreement with the Company relating to severance or change in control benefits that is in effect on his or her termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan.

(ii)    The employee voluntarily terminates employment with the Company in order to accept employment with another entity that is controlled (directly or indirectly) by the Company or is otherwise an affiliate of the Company.

(iii)    The employee is offered immediate reemployment by a successor to the Company or by a purchaser of its assets, as the case may be, following a change in ownership of the Company or a sale of all or substantially all the assets of a division or business unit of the Company. For purposes of the foregoing, "immediate reemployment" means that the employee's employment with the successor to the Company or the purchaser of its assets, as the case may be, results in uninterrupted employment such that the employee does not suffer a lapse in pay as a result of the change in ownership of the Company or the sale of its assets.

(iv)    The employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non-Compete Agreement.

(c)    **Termination of Benefits.** A Participant's right to receive the payment of benefits under this Plan shall terminate immediately if, at any time prior to or during the period for which the Participant is receiving benefits hereunder, the Participant, without the prior written approval of the Company:

4.

HS-0099



     (i)     willfully breaches a material provision of the Participant's proprietary information or confidentiality agreement with the Company, as referenced in Section 3(b)(iv);

     (ii)     owns, manages, operates, joins, controls or participates in the ownership, management, operation or control of, is employed by or connected in any manner with, any person, enterprise or entity which is engaged in any business competitive with that of the Company; *provided, however,* that such restriction will not apply to any passive investment representing an interest of less than two percent (2%) of an outstanding class of publicly-traded securities of any corporation or other entity or enterprise;

     (iii)     encourages or solicits any of the Company's then current employees to leave the Company's employ for any reason or interferes in any other manner with employment relationships at the time existing between the Company and its then current employees; or

     (iv)     induces any of the Company's then current clients, customers, suppliers, vendors, distributors, licensors, licensees or other third party to terminate their existing business relationship with the Company or interferes in any other manner with any existing business relationship between the Company and any then current client, customer, supplier, vendor, distributor, licensor, licensee or other third party.

SECTION 4. AMOUNT OF BENEFITS.

     (a)     **Cash Severance Benefits.** Each Participant who incurs a Covered Termination and was employed by the Company at the position or level set forth below within one (1) month immediately prior to such Covered Termination shall be entitled to receive a cash severance benefit equal to the number of months of Base Salary set forth below. Any cash severance benefits provided under this Section 4(a) shall be paid pursuant to the provisions of Section 5.

| Position or Level | Amount of Cash Severance Benefit |
| --- | --- |
| Executive Chairman of the Board | 24 months |
| Chief Executive Officer | 24 months |
| Senior Vice President | 18 months |
| Vice President (Except Vice Presidents on sales commissions) | 12 months |

     (b)     **Accelerated Stock Award Vesting and Extended Exercisability of Stock Options.** If a Participant incurs a Covered Termination, then effective as of the date of the Participant's Covered Termination, (i) the vesting and exercisability of all outstanding options to purchase the Company's common stock that are held by the Participant on such date shall be accelerated in full, and (ii) any reacquisition or repurchase rights held by the Company in respect

Verity, Inc.    894 Ross Drive  Sunnyvale, CA 94089    t. 408.541.1500    f. 408.541.1600    www.verity.com

HS-0100



of common stock issued pursuant to any other stock award granted to the Participant by the Company shall lapse.

In addition, the post-termination of employment exercise period of any outstanding option held by the Participant on the date of his or her Covered Termination shall be extended, if necessary, such that the post-termination of employment exercise period shall not terminate prior to the later of (i) the date twelve (12) months after the effective date of the Covered Termination or (ii) the post-termination exercise period provided for in such option; *provided, however,* that such option shall not be exercisable after the expiration of its maximum term; *provided, further, however,* that in the event that any extended exercisability of an option pursuant to this Section 4(b) would adversely affect a Participant's option or other stock award (including, without limitation, its status as an incentive stock option under Section 422 of the Code or result in an option that would not otherwise be deemed to be a nonqualified deferred compensation plan or arrangement for the purposes of Section 409A of the Code to be deemed to be such a nonqualified deferred compensation plan or arrangement), such extended exercisability shall be deemed null and void unless the affected Participant consents in writing to such extended exercisability within thirty (30) days after becoming a Participant in the Plan.

(c)    **Continued Medical Benefits.**  If a Participant incurs a Covered Termination and the Participant was enrolled in a health, dental, or vision plan sponsored by the Company immediately prior to such Covered Termination, the Participant may be eligible to continue coverage under such health, dental, or vision plan (or to convert to an individual policy), at the time of the Participant's termination of employment, under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").  The Company will notify the Participant of any such right to continue such coverage at the time of termination pursuant to COBRA.  No provision of this Plan will affect the continuation coverage rules under COBRA, except that the Company's payment, if any, of applicable insurance premiums will be credited as payment by the Participant for purposes of the Participant's payment required under COBRA.  Therefore, the period during which a Participant may elect to continue the Company's health, dental, or vision plan coverage at his or her own expense under COBRA, the length of time during which COBRA coverage will be made available to the Participant, and all other rights and obligations of the Participant under COBRA (except the obligation to pay insurance premiums that the Company pays, if any) will be applied in the same manner that such rules would apply in the absence of this Plan.

If a Participant timely elects continued coverage under COBRA, the Company shall pay the full amount of the Participant's COBRA premiums on behalf of the Participant for the Participant's continued coverage under the Company's health, dental and vision plans, including coverage for the Participant's eligible dependents, during the number of months of Base Salary in respect of which the amount paid to the Participant under Section 4(a) was calculated (the "Severance Period"); *provided, however,* that if the Severance Period exceeds the length of time that the Participant is entitled to coverage under COBRA (including any additional period under analogous provisions of state law), the resulting or acquiring entity or Transferee Corporation involved in the Change in Control, as applicable, shall be required to provide health, dental and vision insurance coverage for the Participant and his or her eligible dependents for any portion of the Severance Period that exceeds the length of time that the Participant is entitled to coverage

6.

HS-0101

Verity

under COBRA (including any additional period under analogous provisions of state law), at a level of coverage that is substantially similar to the continued coverage that the Participant and his or her eligible dependents received under the Company's health, dental and vision plans; *provided, further, however,* that no such premium payments (or any other payments for medical, dental or vision coverage by the Company) shall be made following the Participant's death or the effective date of the Participant's coverage by a medical, dental or vision insurance plan of a subsequent employer. Each Participant shall be required to notify the Company immediately if the Participant becomes covered by a medical, dental or vision insurance plan of a subsequent employer. Upon the conclusion of such period of insurance premium payments made by the Company, the Participant will be responsible for the entire payment of premiums required under COBRA for the duration of the COBRA period.

For purposes of this Section 4(c), (i) references to COBRA shall be deemed to refer also to analogous provisions of state law and (ii) any applicable insurance premiums that are paid by the Company shall not include any amounts payable by the Participant under an Internal Revenue Code Section 125 health care reimbursement plan, which amounts, if any, are the sole responsibility of the Participant.

(d)    **Other Employee Benefits.**  All other benefits (such as life insurance, disability coverage, and 401(k) plan coverage) shall terminate as of the Participant's termination date (except to the extent that a conversion privilege may be available thereunder).

(e)    **Additional Benefits.**  Notwithstanding the foregoing, the Company may, in its sole discretion, provide benefits in addition to those pursuant to Sections 4(a), 4(b) and 4(c) to Participants or employees who are not Participants ("Non-Participants") chosen by the Company, in its sole discretion, and the provision of any such benefits to a Participant or a Non-Participant shall in no way obligate the Company to provide such benefits to any other Participant or to any other Non-Participant, even if similarly situated. If benefits under the Plan are provided to a Non-Participant, references in the Plan to "Participant"(with the exception of Sections 4(a), 4(b) and 4(c)) shall be deemed to refer to such Non- Participants.

SECTION 5. TIME AND FORM OF SEVERANCE PAYMENTS.

(a)    **General Rules.**  Subject to Section 5(b), any cash severance benefit provided under Section 4(a) shall be paid in installments pursuant to the Company's regularly scheduled payroll periods commencing as soon as practicable following the effective date of a Participant's Covered Termination and shall be subject to all applicable withholding for federal, state and local taxes. In the event of a Participant's death prior to receiving all installment payments of his or her cash severance benefit under Section 4(a), any remaining installment payments shall be made to the Participant's estate on the same payment schedule as would have occurred absent the Participant's death. In no event shall payment of any Plan benefit be made prior to the effective date of the Participant's Covered Termination or prior to the effective date of the release described in Section 7(a).

(b)    **Application of Section 409A.**  In the event that any cash severance benefit provided under Section 4(a) or continued medical benefit under Section 4(c) shall fail to satisfy

7.

HS-0102



the distribution requirement of Section 409A(a)(2)(A) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, the payment of such benefit shall be accelerated to the minimum extent necessary so that the benefit is not subject to the provisions of Section 409A(a)(1) of the Code. (The payment schedule as revised after the application of the preceding sentence shall be referred to as the *"Revised Payment Schedule."*) In the event the payment of benefits pursuant to the Revised Payment Schedule would be subject to Section 409A(a)(1) of the Code, the payment of such benefits shall not be paid pursuant to the Revised Payment Schedule and instead the payment of such benefits shall be delayed to the minimum extent necessary so that such benefits are not subject to the provisions of Section 409A(a)(1) of the Code. The Board may attach conditions to or adjust the amounts paid pursuant to this Section 5(b) to preserve, as closely as possible, the economic consequences that would have applied in the absence of this Section 5(b); *provided, however,* that no such condition or adjustment shall result in the payments being subject to Section 409A(a)(1) of the Code.

SECTION 6.  REEMPLOYMENT.

In the event of a Participant's reemployment by the Company during the period of time in respect of which severance benefits pursuant to Section 4(a) or 4(e) have been paid, the Company, in its sole and absolute discretion, may require such Participant to repay to the Company all or a portion of such severance benefits as a condition of reemployment.

SECTION 7.  LIMITATIONS ON BENEFITS.

(a)  **Release.**  In order to be eligible to receive benefits under the Plan, a Participant also must execute a general waiver and release in substantially the form attached hereto as Exhibit B, Exhibit C or Exhibit D, as appropriate, and such release must become effective in accordance with its terms.  For purposes of the preceding sentence, with respect to any outstanding option held by the Participant, the receipt of benefits shall be deemed to be the exercise of such option pursuant to the extended exercisability of such option under Section 4(b), rather than the acceleration or extension of such option's exercisability. The Company, in its sole discretion, may modify the form of the required release to comply with applicable law and shall determine the form of the required release, which may be incorporated into a termination agreement or other agreement with the Participant.

(b)  **Certain Reductions.**  The Company, in its sole discretion, shall have the authority to reduce a Participant's severance benefits, in whole or in part, by any other severance benefits, pay in lieu of notice, or other similar benefits payable to the Participant by the Company that become payable in connection with the Participant's termination of employment pursuant to (i) any applicable legal requirement, including, without limitation, the Worker Adjustment and Retraining Notification Act (the "WARN Act"), (ii) a written employment or severance agreement with the Company, or (iii) any Company policy or practice providing for the Participant to remain on the payroll for a limited period of time after being given notice of the termination of the Participant's employment.  The benefits provided under this Plan are intended to satisfy, in whole or in part, any and all statutory obligations and other contractual obligations of the Company that may arise out of a Participant's termination of employment, and

8.

HS-0103

# Verity

the Plan Administrator shall so construe and implement the terms of the Plan. The Company's decision to apply such reductions to the severance benefits of one Participant and the amount of such reductions shall in no way obligate the Company to apply the same reductions in the same amounts to the severance benefits of any other Participant, even if similarly situated. In the Company's sole discretion, such reductions may be applied on a retroactive basis, with severance benefits previously paid being recharacterized as payments pursuant to the Company's statutory or other contractual obligations.

(c)    **Mitigation.** Except as otherwise specifically provided herein, a Participant shall not be required to mitigate damages or the amount of any payment provided under this Plan by seeking other employment or otherwise, nor shall the amount of any payment provided for under this Plan be reduced by any compensation earned by a Participant as a result of employment by another employer or any retirement benefits received by such Participant after the date of the Participant's termination of employment with the Company.

(d)    **Non-Duplication of Benefits.** Except as otherwise specifically provided for herein, no Participant is eligible to receive benefits under this Plan or pursuant to other contractual obligations more than one time. This Plan is designed to provide certain severance pay and change in control benefits to Participants pursuant to the terms and conditions set forth in this Plan. The payments pursuant to this Plan are in addition to, and not in lieu of, any unpaid salary, bonuses or benefits to which a Participant may be entitled for the period ending with the Participant's Covered Termination.

(e)    **Indebtedness of Participants.** If a Participant is indebted to the Company on the effective date of his or her Covered Termination, the Company reserves the right to offset any severance payments under the Plan by the amount of such indebtedness.

SECTION 8. RIGHT TO INTERPRET PLAN; AMENDMENT AND TERMINATION.

(a)    **Exclusive Discretion.** The Plan Administrator shall have the exclusive discretion and authority to establish rules, forms, and procedures for the administration of the Plan and to construe and interpret the Plan and to decide any and all questions of fact, interpretation, definition, computation or administration arising in connection with the operation of the Plan, including, but not limited to, the eligibility to participate in the Plan and amount of benefits paid under the Plan. The rules, interpretations, computations and other actions of the Plan Administrator shall be binding and conclusive on all persons.

(b)    **Amendment or Termination.** The Company reserves the right to amend or terminate this Plan or the benefits provided hereunder at any time; *provided, however,* that no such amendment or termination shall occur following (i) the date one (1) month prior to a Change in Control or (ii) a Covered Termination as to any Participant who would be adversely affected by such amendment or termination unless such Participant consents in writing to such amendment or termination. Any action amending or terminating the Plan shall be in writing and executed by a duly authorized officer of the Company. Unless otherwise required by law, no approval of the shareholders of the Company shall be required for any amendment or termination

9.

HS-0104



including any amendment that increases the benefits provided under any option or other stock award.

## SECTION 9. NO IMPLIED EMPLOYMENT CONTRACT.

The Plan shall not be deemed (i) to give any employee or other person any right to be retained in the employ of the Company or (ii) to interfere with the right of the Company to discharge any employee or other person at any time, with or without cause, which right is hereby reserved.

## SECTION 10.    LEGAL CONSTRUCTION.

This Plan shall be governed by and construed under the laws of the State of California (without regard to principles of conflict of laws), except to the extent preempted by ERISA.

## SECTION 11. CLAIMS, INQUIRIES AND APPEALS.

(a)    **Applications for Benefits and Inquiries.**  Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Plan Administrator in writing by an applicant (or his or her authorized representative).  The Plan Administrator is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

(b)    **Denial of Claims.**  In the event that any application for benefits is denied in whole or in part, the Plan Administrator must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial.  Any electronic notice will comply with the regulations of the U.S. Department of Labor.  The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(1)    the specific reason or reasons for the denial;

(2)    references to the specific Plan provisions upon which the denial is based;

(3)    a description of any additional information or material that the Plan Administrator needs to complete the review and an explanation of why such information or material is necessary; and

(4)    an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under Section 502(a) of

10.

HS-0105



ERISA following a denial on review of the claim, as described in Section 11(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Plan Administrator receives the application, unless special circumstances require an extension of time, in which case, the Plan Administrator has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the application.

(c)     **Request for a Review.** Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Plan Administrator within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his or her representative) shall have the opportunity to submit (or the Plan Administrator may require the applicant to submit) written comments, documents, records, and other information relating to his or her claim. The applicant (or his or her representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his or her representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d)     **Decision on Review.** The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the review. The Plan Administrator will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Plan Administrator confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

HS-0106

Verity™

(1)    the specific reason or reasons for the denial;

(2)    references to the specific Plan provisions upon which the denial is based;

(3)    a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim; and

(4)    a statement of the applicant's right to bring a civil action under Section 502(a) of ERISA.

(e)    **Rules and Procedures.**    The Plan Administrator will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Plan Administrator may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

(f)    **Exhaustion of Remedies.**    No legal action for benefits under the Plan may be brought until the applicant (i) has submitted a written application for benefits in accordance with the procedures described by Section 11(a) above, (ii) has been notified by the Plan Administrator that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 11(c) above, and (iv) has been notified that the Plan Administrator has denied the appeal. Notwithstanding the foregoing, if the Plan Administrator does not respond to an applicant's claim or appeal within the relevant time limits specified in this Section 11, the applicant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

SECTION 12.  BASIS OF PAYMENTS TO AND FROM PLAN.

All benefits under the Plan shall be paid by the Company. The Plan shall be unfunded, and benefits hereunder shall be paid only from the general assets of the Company.

SECTION 13.  OTHER PLAN INFORMATION.

(a)    Employer and Plan Identification Numbers.    The Employer Identification Number assigned to the Company (which is the "Plan Sponsor" as that term is used in ERISA) by the Internal Revenue Service is 77-0182779. The Plan Number assigned to the Plan by the Plan Sponsor pursuant to the instructions of the Internal Revenue Service is 520.

(b)    **Ending Date for Plan's Fiscal Year.**    The date of the end of the fiscal year for the purpose of maintaining the Plan's records is May 31.

12.

HS-0107



(c)    **Agent for the Service of Legal Process.**  The agent for the service of legal process with respect to the Plan is:

> Verity, Inc.
> Attn:  Vice President, Human Resources
> 894 Ross Drive
> Sunnyvale, CA 94089

(d)    **Plan Sponsor and Administrator.**  The "Plan Sponsor" and the "Plan Administrator" of the Plan is:

> Verity, Inc.
> Attn:  Vice President, Human Resources
> 894 Ross Drive
> Sunnyvale, CA 94089

The Plan Sponsor's and Plan Administrator's telephone number is (408) 541-1500.  The Plan Administrator is the named fiduciary charged with the responsibility for administering the Plan.

**SECTION 14.  STATEMENT OF ERISA RIGHTS.**

Participants in this Plan (which is a welfare benefit plan sponsored by Verity, Inc.) are entitled to certain rights and protections under ERISA.  If you are a Participant, you are considered a participant in the Plan for the purposes of this Section 14 and, under ERISA, you are entitled to:

**Receive Information About Your Plan and Benefits**

(a)    Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites, all documents governing the Plan and a copy of the latest annual report (Form 5500 Series), if applicable, filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration;

(b)    Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan and copies of the latest annual report (Form 5500 Series), if applicable, and an updated (as necessary) Summary Plan Description.  The Administrator may make a reasonable charge for the copies; and

(c)    Receive a summary of the Plan's annual financial report, if applicable.  The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

**Prudent Actions By Plan Fiduciaries**

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who op--

13.

HS-0108



Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a Plan benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a Plan benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan, if applicable, and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court.

If you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Assistance With Your Questions**

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

**SECTION 15.    GENERAL PROVISIONS.**

(a)    **Notices.** Any notice, demand or request required or permitted to be given by either the Company or a Participant pursuant to the terms of this Plan shall be in writing and shall be deemed given when delivered personally or deposited in the U.S. mail, First Class with postage prepaid, and addressed to the parties, in the case of the Company, at the address set forth in Section 11(a) and, in the case of a Participant, at the address as set forth in the Company's

14.

HS-0109



employment file maintained for the Participant as previously furnished by the Participant or such other address as a party may request by notifying the other in writing.

(b)     **Transfer and Assignment.**  The rights and obligations of a Participant under this Plan may not be transferred or assigned without the prior written consent of the Company.  This Plan shall be binding upon any surviving entity resulting from a Change in Control and upon any other person who is a successor by merger, acquisition, consolidation or otherwise to the business formerly carried on by the Company without regard to whether or not such person or entity actively assumes the obligations hereunder.

(c)     **Waiver.**  Any Party's failure to enforce any provision or provisions of this Plan shall not in any way be construed as a waiver of any such provision or provisions, nor prevent any Party from thereafter enforcing each and every other provision of this Plan.  The rights granted the Parties herein are cumulative and shall not constitute a waiver of any Party's right to assert all other legal remedies available to it under the circumstances.

(d)     **Severability.**  Should any provision of this Plan be declared or determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

(e)     **Section Headings.**  Section headings in this Plan are included for convenience of reference only and shall not be considered part of this Plan for any other purpose.

## SECTION 16.  EXECUTION.

To record the adoption of the Plan as set forth herein, Verity, Inc. has caused its duly authorized officer to execute the same as of the Effective Date.

VERITY, INC.

**ssprings**
Digitally signed by ssprings
DNC CN = ssprings, O = US, L = Sunnyvale
HO, S = California, O = Verity, Inc., OU = MIS
Reason: I am approving this document
Date: 2005.04.18 16:33:47 -07'00'

By: _____

Steven Springsteel

Title:  SVP Finance / Administration & CFO

15.

HS-0110

VERITY, INC.

CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

PARTICIPATION NOTICE

To: Hugo Sluimer

Date: May 4, 2005

Verity, Inc. (the *"Company"*) has adopted the Verity, Inc. Change in Control and Severance Benefit Plan (the *"Plan"*). The Company is providing you with this Participation Notice to inform you that, given your position at the Company, you qualify as a participant in the Plan. A copy of the Plan document, which also constitutes a summary plan description, is attached to this Participation Notice. The terms and conditions of your participation in the Plan are as set forth in the Plan, and in the event of any conflict between this Participation Notice and the Plan, the terms of the Plan shall prevail except with respect to the cash severance, which you have declined as set forth below. Subject to the provisions of the Plan, the details of your Plan benefits, as described in Section 4 of the Plan (except with respect to the cash severance, which you have declined), are as follows:

**Cash Severance Benefit:** You have declined to accept any cash severance benefit under the Plan. Consequently, you will be entitled to no cash severance benefit under the terms of the Plan, and any cash benefit to which you shall be entitled shall be determined under Dutch law without reference to the Plan.

**Accelerated Vesting of Options:** Full.

**Extended Exercisability of Options:** Later of 12 months or the post-termination exercise period of the option; provided, however, that such extended exercisability shall not extend beyond the term of the option.

**Continued medical benefits:** _____18_____ months, or such earlier date as you shall secure subsequent employment that shall provide you with similar medical benefits.

Please retain a copy of this Participation Notice, along with the Plan document, for your records.

VERITY, INC.

By: _____
       STEVEN R. SPRINGSTEEL
Its: _____
       SENIOR VP AND CFO

524052 v1/HN

## ACKNOWLEDGEMENT

The undersigned Participant hereby acknowledges receipt of the foregoing Participation Notice. In the event the undersigned holds outstanding stock options as of the date of this Participation Notice, the undersigned hereby:

    ☒    accepts

    ☐    rejects

the extended exercisability provisions for such stock options set forth above.* The undersigned acknowledges that the undersigned has been advised to obtain tax and financial advice regarding the consequences of this election including the effect, if any, on the status of the stock options for tax purposes under Sections 409A and 422 of the Internal Revenue Code.

_May 4. 06_

—————————————————————

Print name    _HUGO SLUIMER_

\*    Please check one box; failure to check a box will be deemed a rejection of the extended exercisability provisions as they relate to such stock options.

524052 v1/HN

HS-0112



VIA EMAIL AND REGISTERED DELIVERY

23 March 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genêts
MC 98000 MONACO

**Re:    Notice of Cessation of Redundancy Proceedings and Appointment as Senior Vice President, EMEA and APAC Operations for Neurodynamics**

Dear Hugo:

I refer to the letter dated 29 December 2005 from Verity GB Limited warning you of the possibility of redundancy due to the acquisition and reorganisation of the Verity Group and our subsequent discussions.

As discussed on 22 March 2006 by phone, following extensive management meetings and review of all of the group's post-merger positions, I regret to inform you that your position as Senior Vice President, EMEA and APAC Operations will lapse. However as discussed, I am very pleased to inform you that based on our internal consultations we have a found a suitable alternative opportunity within the group.

As you may know, Neurodynamics now forms a part of Virage, a division of Autonomy. Virage is Autonomy's leading provider of rich media communication and content management software. The two suites of technology, together with the core Autonomy technology with which you're familiar, offer a highly sophisticated security solution applicable for security, defence, legal and manufacturing markets worldwide, key sectors for historic Verity sales. The Neurodynamics product range is marketed under the Virage Security and Surveillance brand.

Other participants in the market include Verint, which is a billion dollar company. Autonomy senior management has reviewed the Verint offering and believes the Neurodynamics products are extremely competitive and in many cases lead the market.

This division is one of the fastest growing in the group and capitalizes on immediate market needs, with strong growth forecast across Europe and APAC. This role is specifically suitable for you, combining your existing responsibilities with a different business unit, allowing us to best utilise your leadership and management qualities.

Your compensation in the aggregate will be unchanged. Your salary will remain the same, and your commission plan will be restructured so that you are eligible for analogous benefits upon commensurate growth of the unit.

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0113



In this role you will work directly with David Humphries, Managing Director of the Neurodynamics division, and [jointly] report to the [group CEO/Mr. Humphries]. As the division is based in Cambridge you will be expected to attend the offices on a regular basis, although this should comport with your previous role which required significant travel to the UK and as your time is virtually all assigned to Verity GB Limited.

Please feel free to contact me to discuss this new assignment. We sincerely thank you for your patience and understanding during this transitional period which we hope will be as smooth as possible.

Sincerely,

Andrew M Kanter
Company Secretary

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0114



VIA EMAIL AND REGISTERED DELIVERY

3 May 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genêts
MC 98000 MONACO

Re:    Fax dated 1 May 2006 to Mr Jack Landers

Dear Hugo:

I write on behalf of Verity, Inc. I refer to the fax dated 1 May 2006 which was addressed to Mr. Jack Landers. Mr. Landers has forwarded this document to me as you are currently in a legal dispute with Verity, Inc. regarding your employment and thus I am responsible for all communications.

On the basis of the terms of the Change in Control and Severance Benefit Plan (the "Plan"), we do not consider you to be entitled to the accelerated vesting of options and continued medical benefits. Firstly, in Section 3(b)(iii), an employee offered immediate reemployment is an express exception to severance benefits described in the Plan Entitlement Section 3(b)(iv). In any event your employment has been continuous, with continued payment of salary, commission and other benefits such as stock option vesting. Secondly, section 3(b)(iv) provides that an employee will not receive benefits under the Plan if the employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non Compete Agreement, which we have not received. Thirdly, Section 7 further provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities. In view of the pending litigation between yourself and the Company, obviously this criterion has not been fulfilled thereby making you ineligible for the stated benefits.

I reiterate my request of 27 April 2006 that as this is now a legal matter, any matters relating to employment process and continued employment must be directed to me, or to our attorneys, Mr. J. de Roos and Mr. M. Ritmeester (P.O. Box 7113, 1007 JC Amsterdam ,The Netherlands). Any contact with other employees within Autonomy relating to your employment will not be accepted.

Sincerely,

Andrew M Kanter
Company Secretary

Page 1

HS-0115



Autonomy

VIA REGISTERED DELIVERY

6 July 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

Re:    Fax dated 1 May 2006 to Mr Jack Landers

Dear Mr Sluimer:

I write on behalf of Verity, Inc. and further to my letter dated 3 May 2006.

Your letter dated 1 May 2006 seeks additional information related to the terms of the Change in Control and Severance Benefit Plan (the "Plan") ("can you confirm to me...?")  As such it does not constitute an application within the meaning of the Plan.

Notwithstanding the foregoing, to the extent that your letter is deemed to be an application for benefits, we hereby notify pursuant to Section 11(b)(1) and (2) of the Plan you that your application is denied in whole.  Firstly, in Section 3(b)(iii), an employee offered immediate reemployment is an express exception to the receipt of severance benefits under.  You have been offered such employment, and your employment has been continuous with payment of salary, commission and other benefits such as stock option vesting.  You have not suffered a "Constructive Termination" within the meaning of Section 2(f) the Plan.  Also section 3(b)(iv) provides that an employee will not receive benefits under the Plan if the employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non Compete Agreement.  Finally, Section 7 provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities.

This notice is provided under Section 11(b) of the Plan within the time periods allotted therein.  Under Section 11(b)(4) of the Plan, you are hereby notified that you are permitted to request a review of this notice.  You may do so by submitting a request for a review directly to me within sixty (60) days of the date of this letter.  Your request must be submitted in writing and shall be addressed to:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089
USA

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that you feel are pertinent.  You (or your representative)

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0116



shall have the opportunity to submit (or the Plan Administrator may require you to submit) written comments, documents, records, and other information relating to your claim. You (or your representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. The review shall take into account all comments, documents, records and other information submitted by you (or your representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, as set forth in the Plan. You have a right to bring a civil action under Section 502(a) of ERISA following a denial on review of any claim.

Sincerely,


Andrew M Kanter
Company Secretary

Page 2

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0117

Autonomy

VIA REGISTERED DELIVERY

29 September 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

Re:    Letter dated 13 July 2006

Dear Mr Sluimer:

I write on behalf of Verity, Inc. with regards to your letter dated 13 July 2006. Your letter was addressed to the Vice President, Human Resources of Verity, Inc. That position reported to my office, which has global responsibility for group human resources matters. Jack Landers, the previous Vice President, Human Resources of Verity, Inc., has recently left the company, and as such I have assumed his duties as the Plan Administrator within the meaning of the Change in Control and Severance Benefit Plan (the "Plan"), the topic of your letter.

Your letter dated is a request for review under Section 11(c) of the Plan, and was received by Verity on 1 August 2006. This letter is a notification of decision on review under Section 11(d) of the Plan. Pursuant to Section 11(d), this decision is being provided within 60 days of receipt of your request.

I regret to inform you that upon re-review Verity has confirmed the denial of the application for benefits in whole. The specific reasons follow.

We draw your attention again to Section 3(b)(iii) of the Plan, which provides that an employee offered immediate reemployment is an express exception to the receipt of severance benefits under the Plan. You were offered but rejected such employment, instead seeking to voluntarily terminate your contract. Your employment with the company prior to your voluntary termination was in fact continuous, with uninterrupted payment of salary, commission and other benefits such as stock option vesting. Your statement that you were paid "half payment" is simply untrue as your salary remained the same, benefits were uninterrupted and your commission plan was calculated exactly the same as prior to the acquisition (indeed for most of the time by the same finance personnel using exactly the same systems as pre-acquisition).

Further, you did not suffer a "Constructive Termination" within the meaning of Section 2(f)(i) of the Plan. As you are aware, it is the company's position that you did not suffer a substantial reduction in your duties or responsibilities in effect immediately prior to the effective date of the Change in Control. It remains the company's conclusion that rather than suffer a "Constructive Termination" you sought to avoid your employment duties whilst engaging with the company solely to establish a position for compensation in the Dutch courts. In contrast, the company actively pursued your continued employment by finding an

Page 1

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0118

Autonomy

alternative position within the group with the same terms, analogous compensation and growth potential. In contrast, in the post-acquisition period after redundancy review you barely performed your role.

You reference the 7 July 2006 decision of the Cantonal Court in the Netherlands as evidence supporting your position. Section 10 of the Plan clearly states that the Plan is governed by the laws of the State of California. There are of course very substantial differences between Dutch and California employment law, such as the applicable rules and regulations, factors considered by the Cantonal Court and standards of evidence. Thus whilst the Cantonal Court decision has been considered in reaching this decision, it is neither binding on the Company for purposes of the Plan nor persuasive in reaching this decision. It should also be noted that at the Cantonal Court hearing your position was clear that the substance of your petition did not address the Plan.

Your request is also denied as a result of your failure to comply with the last clause of Section 2(f) of the Plan which states the precedent actions required to claim Constructive Termination under Section 2(f). You have not provided the Company with the required written notice, either in substance or in accordance with the notice procedures under Section 15(a).

With regards to Section 3(b)(iv), the Plan is clear that it is within the Company's discretion to deny benefits should you not confirm in writing that you are subject to the Company's Confidentiality Agreement and Non-Compete Agreement. You have not provided any such confirmation. The Proprietary Rights Agreement you reference (in fact the "Employee Inventions and Proprietary Rights Assignment Agreement", dated 9 June 1993) is not equivalent to a confidentiality and non-compete agreement. The Proprietary Rights Agreement is a standard document that governs the rights between the company and its employees with respect to intellectual property generated before and during their employment.[1] A confidentiality agreement protects a much wider scope of key commercial information, and a non-competition agreement of course relates to post-employment competitive obligations. Acknowledgement in writing of these obligations is basic consideration for the receipt of benefits under the Plan, and is integral to the purpose and spirit of the Plan.

Finally, Section 7 provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities, which you have not agreed to.

---

[1] Your employment file does not contain the full text of the agreement, but only the first and last pages, however other agreements entered into at a similar time reflect this position.

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0119

Autonomy

This notice is provided under Section 11(b) of the Plan within the time periods allotted therein. Under Section 11(b)(3) of the Plan, you are hereby notified that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. Under Section 11(b)(4) of the Plan, you are hereby notified that you have a right to bring a civil action under Section 502(a) of ERISA.

Please address any future correspondence to my attention at the letter on this address.

Sincerely,

Andrew M Kanter
Chief Operating Officer – Autonomy Group of Companies

Page 3

HS-0120

Autonomy

VIA REGISTERED DELIVERY

3 August 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

Re:    Letter dated 13 July 2006 to Mr Jack Landers

Dear Mr Sluimer:

I write on behalf of Verity, Inc.

On 1 August 2006 Jack Landers received your letter dated 13 July 2006 appealing a decision under the Change in Control and Severance Benefit Plan (the "Plan").

In accordance with Section 11(d) of the Plan a response will be provided within 60 days of receipt.

Sincerely,

Andrew M Kanter
Company Secretary

Page 1

HS-0121



Autonomy

VIA REGISTERED DELIVERY

22 March 2007

Hugo Sluimer
Rose de France Bloc C Appt. 2-3
17, Boulevard de Suisse
MC 98000 Monaco

Re:    Letter dated 27 February 2007

Dear Mr Sluimer:

I write on behalf of Verity, Inc. with regards to your letter dated 27 February 2007, which was received in hard copy on 7 March 2007.

As noted in my most recent letter, I have assumed the duties as the Plan Administrator within the meaning of the Change in Control and Severance Benefit Plan (the "Plan"), the topic of your letter. Accordingly please address all correspondence to my attention by hard copy only to the address on this letter. Electronic copies may be caught in spam filters and thus should not be relied upon.

First, the notification of decision on review was sent within the terms of the Plan. Section 11(d) states that the Plan Administrator will "act on each request for review within sixty (60) days after receipt of the request." Your request was received by Verity on 1 August 2006, and thus the response was within the required 60 days. The letter was dispatched to the address "set forth in the Company's employment file" for you in accordance with Section 15(a). I understand that you changed address around the time the letter was sent, however no update was received as required under Section 15(a).

We note your arguments disagreeing with the decision on review. Each of these matters have been covered in previous correspondence. Without repeating these arguments, we note for the record that we respectfully disagree with your conclusions. One new point merits addressing: you state that it is common practice to enter into the Company's Confidentiality Agreement and Non-Compete Agreement as required by the Plan as part of a final "Separation Agreement" between the Company and the employee. In fact the Company has never done so under the Plan – in each case the Company has required all documents in advance of receiving benefits. There have been no "settlements" under the Plan. The Plan is clear that entering into such an agreement and signing a general waiver and release are predicate acts, which you have not done.

Per your request, enclosed please find a copy of Autonomy's most recently published annual report, together with a copy of Autonomy's most recently published financial results. Please let me know should you require any specific other Plan documents.

Page 1

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0122



Autonomy would of course consider any settlement proposal should you wish to make one. You are also free to pursue what you believe to be your rights under the Plan, however the company is prepared to vigorously defend its position.

Sincerely,

Andrew M Kanter
Company Secretary

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0123

# EXHIBIT B



**ASTA-USA Translation Services, Inc.**
6030 El Tordo, Suite A - Box 462, Rancho Santa Fe, California 92067-0462 USA
Tel.: 858.756-7156  |  Fax.: 858.756-7155  |  www.asta-usa.com  |
www.LegalTranslationSolutions.com

## CERTIFIED TRANSLATION

*Documents Translated For:*

| LAST NAME: McLoughlin | FIRST NAME: Teresa | MIDDLE NAME: |
|---|---|---|
| COMPANY: McGuinn, Hillsman & Palefsky | DIVISION: | |

*List of Materials, Documents, Forms, Transcripts, Licenses, etc., translated.*

| |
|---|
| Counter Plea Dated May 23, 2006; Plead Notes on Hearing dated May 30, 2006; Petition ex article 7:685 BW; Verbal Case on May 30 2006 regarding are 7:685 BW; Notes of the Proceedings; Ordinance Case #466781 |
| |
| |

| Source Language(s): | Dutch |
|---|---|
| Target Languages: | English |

**SAN DIEGO, CALIFORNIA**

WITH REFERENCE TO THE ABOVE MENTIONED MATERIALS/DOCUMENTS, we at ASTA-USA Translation Services, Inc., a professional document translation company, attest that the language translation completed by ASTA-USA's certified professional translators, represents, to the best of our judgment, an accurate and correct interpretation of the terminology/content of the source document(s). **This is to certify the correctness of the translation only.** We do not guarantee that the original is a genuine document or that the statements contained in the original document(s) are true.

IN WITNESS WHEREOF, ASTA-USA Translation Services, Incorporated has caused the Certificate to be signed by its duly authorized officer(s).

By: _____          Date:   June 5 2008

Alain J Roy, President          _____

A copy of the translated version is attached to this statement of certification.



**The National Association of
Judiciary Interpreters & Translators**

ASTA-USA Translation Services, Incorporated – Member #7031
*A Member in Good Standing*



F-C1206

# EXHIBIT C

DINGEMANS                       D

**PETITION ex article 7:685 BW**

To the cantonal judge in Utrecht
District Court Utrecht, sector canton – location Utrecht

Respectfully informs:

1.    Mr. **HUGO SLUIMER**, hereinafter to be called "Sluimer", resident in Monaco,
      and for this cause choosing domicile in (1016 DV) Amsterdam on
      Keizersgracht 221, at the offices of DingemansVanderKind Lawyers, where
      lawyer attorney Mr. X van der Pijl acts as his delegate with the right of
      substitution.

2.    This petition serves to the dissolution of the labor agreement between
      Sluimer and the private limited company **VERITY BENELUX B.V.**
      located in De Meern, and with offices located in (3439 NG) Nieuwegein,
      on Coltbaan 31.

      Relevant information about Sluimer

3.    As far as relevant, the personal information regarding Sluimer is the
      following:
      Date of employment   : June 1, 1990;
      Date of birth        : June 19, 1953;
      Position             : Senior Vice President;
      Gross monthly salary  : € 45,076 (including holiday pay and other structural
      salary components)

4.    The respondent is established in De Meern. Therefore you, the Honorable
      Judge, are authorized to take cognizance of this petition.

5.    This petition is based on important reasons like the change of conditions
      which are of such a nature that the labor agreement must reasonably
      terminate immediately or after a short time. The following will serve as an
      explanation.

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 5, 2008 www.asta-usa.com*



**HS-0360**

<u>Facts</u>

6.    Sluimer was employed by Verity Inc., an American search technology
      supplier, as the Sales Manager Benelux, on June 1, 1990 (labor agreement,
      <u>annex 1)</u>. Shortly after, all the activities, including the labor agreement
      between Sluimer and Verity Inc., were transferred to Verity Benelux B.V.,
      whereupon Sluimer became its employee and also its statutory manager for a
      long time.

7.    As of April 1, 2003, Sluimer, who in the meanwhile had been appointed Senior
      Vice President, was sent to the United Kingdom. To accomplish this purpose,
      Verity Benelux B.V. concluded an *"assignment agreement"* with its English
      Sister Company Verity GB Ltd (<u>annex 2</u>). The assignment abroad was first
      agreed upon for a period of five years. As soon as the assignment would
      terminate, all the determinations of the labor agreement, which had been set
      aside because of the assignment abroad, would again become valid, as
      determined in article 3.4 of the *assignment agreement.*

8.    The average gross monthly salary that Sluimer received during the last three
      years was € 45,076. Sluimer received a portion of his salary in the United
      Kingdom and a portion in The Netherlands. A substantial and structural
      portion of his income was related to commissions and bonuses. To support
      the above mentioned average amount, an overview of the salary received
      during the last three calendar years is being submitted as <u>annex 3</u>.

9.    In 2005, a *Change in Control and Severance Benefit Plan* (hereinafter called
      "the Plan") was drafted, for the event that Verity would be taken over. The
      Plan is being submitted as <u>annex 4</u> and it provides for a termination regulation
      for participants in the *Change in Control.* Sluimer agreed with the Plan and for
      this purpose he signed the *Participation Notice* (<u>annex 5</u>), however, in the
      *Participation Notice* the parties agreed that, instead of the payment
      settlement of the Plan, Sluimer would be entitled to a payment according to
      the Dutch law.  For the rest the Plan was declared to apply in all parts. The
      plan applies to Verity Inc. and all its 100% subsidiaries, including Verity
      Benelux BV.

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 5, 2008 www.asta-usa.com*



10.    On December 29, 2005 Verity Inc, including all its subsidiaries (among which was Verity Benelux BV) was incorporated by Autonomy, a British search engine supplier. About 3 pages regarding the incorporation are being submitted from the Autonomy website as <u>annex 6</u>. Verity's incorporation by Autonomy has the consequence of a *"Change in Control"*, and therefore the Plan has become effective.

11.    Immediately after the incorporation, Sluimer was set on non-active status. Autonomy informed Sluimer that he had to take a dismissal into consideration; see the letter from Autonomy of the beginning of January 2006, which was pre-dated to December 29, 2005, which might have been done on purpose or not on purpose, (<u>annex 7</u>). To both Sluimer's subordinates and his business associates, Autonomy directly said: *"Hugo is out".* In other words, both internally and externally it was (unconditionally) communicated that Sluimer would leave. Just this reason was enough to make Sluimer's position completely impossible, both within the organization and towards his business partners.
Moreover, Sluimer was left in uncertainty for a long time about the way in which and when his dismissal would take place, despite the clear agreements in the Plan and the *participation notice* on the matter. At the end of March 2006, Sluimer was offered a job, apparently in order to prevent having to pay a termination remuneration to Sluimer.

12.    In Sluimer's opinion, the labor agreement must be terminated according to the Plan as a consequence of the *Change in Control.*
Besides the *Change of Control*, there is also a disrupted working relationship, based on which Sluimer is of the opinion that the labor agreement must be resolved. The disrupted relationship is due to the treatment which Sluimer suffered after Verity's incorporation by Autonomy. According to Sluimer the employer did not behave in a professional way.

13.    In relation to Verity's incorporation by Autonomy, the defendant will also be referred to as "Verity/Autonomy".

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 5, 2008 www.asta-usa.com*



DINGEMANS                          D

The Plan

14.  Section 2 of the Plan gives a definition for "change in control". The following is
     postulated:

     *"DEFINITIONS*
     *For purposes of the Plan, the following terms are defined as follows:*

     *(...)*
     *(c) "Change in Control"* *means one of the following events or a series of*
     *more than one of the following events that are related, wherein the*
     *stockholders of the Company immediately before the transaction do not*
     *retain immediately after the transaction, in substantially the same proportions*
     *as their ownership of shares of the Company's voting stock immediately*
     *before the transaction, direct or indirect beneficial ownership of more than*
     *fifty percent (50%) of the total combined voting power of the outstanding*
     *voting stock of the Company, the resulting entity in a merger or, in the case*
     *of an asset sale, the corporation or corporations to which the assets of the*
     *Company were transferred (the "Transferee Corporation(s)") as the case may*
     *be.*
     | | |
     | --- | --- |
     | *(i)* | *The direct or indirect sale or exchange in a single or series of* |
     | | *related transactions by the stockholders of the Company of more* |
     | | *than fifty percent (50%) of the voting stock of the Company;* |
     | *(ii)* | *A merger or consolidation in which the Company is a party* |
     | *(iii)* | *The sale, exchange, or transfer of all or substantially all of the* |
     | | *assets of the Company; or* |
     | *(iv)* | *A liquidation or dissolution of the Company."* |

15.  Verity's incorporation by Autonomy qualifies as a *"Change in*
     *Control,* since the situation described in section 2 under c (i) applies.
     Based on the Plan, Sluimer is entitled to a termination remuneration and
     he should be allowed a faster exercise of the options on the shares.

16.  As to the termination remuneration, in the *participation notice* the parties
     agreed that, in deviation from the Plan, Sluimer is entitled to a termination
     remuneration according to the Dutch law.

     Because the *participation notice* says:

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 5, 2008 www.asta-usa.com*



*"Cash severance benefit; you have declined to accept any cash severance benefit under the Plan. Consequently, you will be entitled to no cash severance benefit under the terms of the Plan and any cash benefits to which you shall be entitled, shall be determined under Dutch law without reference to the Plan.*
*Accelerated Vesting of Options: Full*
*Extended Exercisability of Options: Later of 12 months of the post-termination exercise period of the option; provided, however, that such extended exercisability shall not extend beyond the term of the option.*
*Continued medical benefits: ___ 18_____ months, or such earlier date as you shall secure subsequent employment that shall provide you with similar medical benefits."*

17. The background for this was that, based on the Plan, Sluimer was entitled to the payment of 18 monthly salaries, but based on the Dutch law, and according to his age (52 years) and seniority (16 years), he would be entitled to a higher compensation according to the cantonal judge's formula. Therefore, at that time, he and also some of his colleagues chose to refuse the termination remuneration based on the Plan, and he agreed with Verity that in case of a *"Change of Control"* he would be entitled to a termination remuneration based on the Dutch law. With Sluimer's colleagues a termination regulation was agreed upon on the same basis, where the cantonal judge's formula was used (with the application of the correction factor C=1), as from the agreements.

18. The parties therefore agreed that Sluimer is entitled to a termination remuneration according to the Dutch law. Hence article 7:685 paragraph 8 CC applies and the Recommendations of the Cantonal Judges Circle are the basic principle. According to Sluimer's age and seniority, 23 weighted years of employment (24 weighted years of employment in case of a termination date of July 1st of this current year, or later).

Verity/Autonomy's position

19. According to Verity/Autonomy the English law should apply to the present situation, because Verity Benelux B.V. lent Sluimer to Verity GB Ltd. According to Sluimer this is incorrect. The

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 5, 2008 www.asta-usa.com*



**HS-0364**

*Participation Notice* (<u>annex 5</u>) does not leave any doubt as to the applicable law for the determination of the termination remuneration, namely the Dutch law. At that time, the Dutch law was explicitly declared as the one to be applied also with regards to the "assignment agreement".

20. Verity/Autonomy takes the position, or at least gives the impression to do so, that Sluimer was offered an immediate employment, according to *Section 3 (b) (iii)* of the Plan. This position is wrong. Here there is not an *"immediate reemployment"* as described in the Plan. Only after having been held on a string for three months, Sluimer received a letter dated March 23, 2006 (<u>annex 8</u>) in which he was apparently appointed as the Neurodynamics Senior Vice President. Neurodynamics is a subpart of Virage, a division of Autonomy. According to Sluimer the appointment can only be viewed as an attempt to prevent the payment according to the Dutch law. There is therefore no such thing as an *"uninterrupted employment"*. Since Sluimer had already been inactive for over three months. According to the Plan there is only an *"immediate reemployment"* if the following is the result: an *"uninterrupted employment such that the employee does not suffer a lapse in pay as a result of the change in ownership of the Company or the sale of its assets."*

21. In this case, however, there is a decrease in payment as a consequence of the fact that Verity was taken over. During the months of January, February and March 2006, Verity/Autonomy respectively paid € 8,842, € 18,043 and €15,900 less than usual. The reason behind this (Sluimer does not know the reason), probably is that he was not being granted the entire commission. According to Sluimer this cannot be borne by him (see High Council March 21, 2003, JAR 2003/91, Van der Gulik/Vissers & Partners). It is on Verity/Autonomy's account that Sluimer is not put in the position of realizing his normal results, as this was consistently the case during the last five years. Moreover, these incomes are of a structural kind. Up to today, Verity/Autonomy keeps rejecting Sluimer's rights to his normal average salary.

22. The position which is now being offered to Sluimer is absolutely incomparable with the position covered by him until the incorporation. In

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 5, 2008 www.asta-usa.com*



HS-0365

his role at Verity, Sluimer had the responsibility over a revenue of about 50 millions USD and he was leading a team of more than 100 employees.

23.   The position offered to Sluimer by Verity/Autonomy at Neurodynamics has substantially smaller interests and responsibilities. The revenue is only about 5 million USD and there are about 15 employees, the majority of who are technical employees who report to somebody else. Moreover, it involves a very specialized unit in a complex market niche which, all in all, must be considered as a *"start up"*. The activities which must be carried out are definitely not an Autonomy core business.

24.   Moreover, it has become clear to Sluimer that no strategy or business plan and no job description are available yet, so that, according to Sluimer, Autonomy's offer to work for Neurodynamics has been gratuitous and aims at avoiding the payment of a termination remuneration. Since Verity/Autonomy declared that it insisted on Sluimer taking on the new job and that if Sluimer would refuse, there would be consequences, Sluimer accepted the working activities related to the new job but under explicit protest. Whereas, earlier on, Verity/Autonomy had said that Sluimer had to start working as fast as possible, subsequently it appeared that because of the involved party's busy schedule it did not go as fast at all. Eventually, two weeks after having communicated, with objections, to be willing to take on the job, Sluimer was invited for a meeting at the main office in Cambridge.

Breach of trust

25.   The trust between Sluimer and Autonomy was seriously breached because of Autonomy's conduct. First of all because Sluimer was set on non-active status directly after the incorporation. Afterwards, it appeared that both the employees and business customers were informed by Autonomy, that Sluimer had been dismissed. Business partners were contacted behind his back with the communication that, for the time being, they should not purchase any Verity products because of the approaching incorporation of Verity by Autonomy. Without informing Sluimer or talking to him about it, organizational changes were also made in his team.

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 5, 2008 www.asta-usa.com*



26. Almost immediately after setting Sluimer on non-active status, his e-mail access was blocked and he was given a pre-dated letter in which it was confirmed to him that he had to stay on non-active status until further notice.

27. Only some weeks later, Autonomy contacted Sluimer and invited him to a meeting on January 24, 2006. During this meeting, in which occasion, by the way, Sluimer had to wait for 50 minutes for Autonomy's COO, he was informed that there would probably be no comparable position for him.

28. Autonomy's COO, Mr. A. Kanter, asked Sluimer to make a proposal for a termination remuneration. Sluimer refused to do that, even after Mr. Kanter's insistence. In response, Kanter informed him that the cantonal right formula would not apply but the English law would apply. Subsequently, Kanter promised Sluimer to inform him in writing the week after. Kanter, however, never kept his promise. Therefore, on February 9, 2006 Sluimer sent an e-mail to Mr. Kanter (<u>annex 9</u>). Only with the e-mails dated February 22, 2006 (<u>annex 10a en b</u>) did he hear back from him. Among other things, Kanter wrote to Sluimer that he denied having said that Autonomy would not offer Sluimer a position. He declared that a position was "under review". Kanter's report about the meeting in London, in his e-mail dated 22 February 2006, is incorrect. During the meeting, Kanter actually spoke about the termination of the labor agreement. Even more, he even read a concept exit letter to Sluimer, stating that Autonomy did not have an equal job for Sluimer.

29. Sluimer replied to Kanter's message by e-mail on March 1, 2006 (<u>annex 11</u>). He did that by adding his comments in red on Kanter's e-mail. Unfortunately, Sluimer's observations cannot be discerned in the black and white text of annex 11.

30. After that Sluimer again did not hear anything from Autonomy for three weeks. Only with the letter dated March 23, 2006 did Autonomy offer Sluimer the above mentioned position at Neurodynamics. As described above, this position can absolutely not be compared with the position covered by Sluimer at Verity before and this proposal was only made in order to avoid the payment of a remuneration for the termination. For Sluimer, all these circumstances are a reason for not believing in any further collaboration. For him, the relationship is seriously damaged, to such an extent that the labor agreement must be terminated. The fact that Autonomy deliberately stopped the payment of the options exercised by Sluimer is also noteworthy. On, or around, last February 22, Sluimer exercised these options. Despite Autonomy's various promises to do so, its returns (about € 425,000) have still

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 5, 2008 www.asta-usa.com*



**HS-0367**

not been paid. This is all the more painful because the fiscal year in the United Kingdom ended on last April 5 and because it is conceivable that exercising his option rights now will fall in the most recent fiscal year, which for Sluimer would be disadvantageous because he might not fall in the low tariff of the last fiscal year. Sluimer also informed Autonomy about this, but this did not lead to a faster payment. Autonomy absolutely refuses any responsibility for the damage caused by this and the payment of interests.

<u>Legitimate remuneration</u>

31.    The conclusion of the above is that both the *change in control* and the breach of trust must lead to the termination of the labor agreement.

32.    Having seen the circumstances described above, Sluimer is asking for the dissolution of the labor agreement within the earliest deadline. He is of the opinion that by terminating the labor agreement he should be paid a fair remuneration. He is also of the opinion that this must take place according to the cantonal judge formula and that a correction factor of C=1.5 would be legitimate because of the careless treatment he underwent. The remuneration would therefore be equal to € 1,555,122 gross

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 5, 2008 www.asta-usa.com*



D

REASON WHY:

It would please You, Honorable Judge, to terminate the agreement between the parties as soon as possible, upon allowance to Sluimer of the remuneration mentioned above in item 32.


Amsterdam, April 18, 2006

Gemachtigde

The
delegate

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 5, 2008 www.asta-usa.com*



**EXHIBIT D**

# NautaDutilh

Post box 7113
1007 IC Amsterdam
Strawinskylaan 1999
1077 XV Amsterdam
Tel: +31 20 717 10 00
Fax +31 20 717 11 11

Amsterdam, May 23, 2006

J .A. de Roos
Tel +31 20 7171890
Fax + 31 20 71 71 338
jochem.deroos@nautadmilh.com

The registrar of the
District Court in Utrecht
sector canton, location Utrecht
Post box 16006
3500 DA UTRECHT
**Fax: 030 22 33 842**

Honorable Mr. /Mrs.

<u>JdR/mr/50068579b01 – Autonomy/Sluimer</u>
**Your reference: 466781 EJ VERZ 06-1375**

Herewith, I'm sending you a duplicate copy of the counter-plea of the above
mentioned case for which you will receive the reproductions by courier
tomorrow, for the hearing on May 30, at 3.15 pm.

I will send a copy of this fax to Mr. J. van der Pijl. Tomorrow, I will also send
the reproductions to Mr. Van der Pijl by courier.

Kind regards,

NautaDutilh N.V.
J.A. de Roos

NautaDulith N.V. is established in Rotterdam and is registered in the register for companies with
number 24338323. All services and (other) activities are carried out because of a commission contract with
NautaDulith N. V. The general conditions of NautaDulith N.V. apply to the agreement. Among other things,
these general conditions contain a limitation of liability, they are lodged at the Registry of the District Court of
Rotterdam, they can be viewed at www.Nautadulith.com and will be sent for free upon request.
ABN AMRO Bank 46.69.93293, Fortis Bank 64.21.43.218, POSTBANK 50296; on the name of the Foundation
Beheer Derdengelden Advocatuur Nautadulith



*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

NautaDutilh

Amsterdam, May 23, 2006

COUNTER PLEA according to article 7:685 CC AND ALSO A REQUEST FOR THE TERMINATION OF THE AGREEMENT according to article 7:685 CC

The District Court in Utrecht
Sector canton - location Utrecht

Respectfully informs:

The limited liability company **VERITY BENELUX B.V.,**
Hereinafter to be called: "verity/Autonomy", established in De Meern, with its offices located in (3439 NG) Nieuwegein on the Coltbaan 31, for this case choosing its domicile in Amsterdam, on the Strawinskylaan 1999 (Post box 7113, 1007 JC), at the offices of NautaDutilh N.V. , of which lawyer and attorney Mr.. M. Ritmeester and Mr. J.A de Roos are chosen as the delegates with the right of substitution.

1.   Verity/Autonomy has read and understood the petition submitted in April 2006 by Mr. **HUGO SLUIMER,** hereinafter to be called "Sluimer", living in Monaco and for this case choosing domicile in (1016 DV) Amsterdam at the Keziersgracht 223, at the offices of the lawyers DingermansVanderKind for which lawyer and attorney Mr. Van der Pijl is acting as the delegate.



2.   Verity/Autonomy wants to object to Sluimer's petition and to this purpose it brings forward the following.

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

HS-0371

Summary

3.   Sluimer based his request for the termination of the labor agreement on
     important reasons like the change of circumstances, which are of such a
     kind to justify the termination of the labor agreement. In his statement of
     reasons, Sluimer seemed to be of the opinion that he is entitled to a
     remuneration based on (a) the Verity Inc., Change in Control and
     Severance Benefit Plan (the "Plan"), annex 4 of the petition. According to
     Sluimer, the remuneration should be calculated on the basis of the Dutch
     law, independently from whether the labor agreement was actually
     terminated or not (and it is not). Moreover, Sluimer seems to be of the
     opinion that he is entitled to a compensation based on (b) a breach of trust,
     which according to Sluimer is to blame Verity/Autonomy, and which,
     based on article 7.685 CC, would entitle him to a compensation.
     Verity/Autonomy denies everything Sluimer stated and observed in his
     petition, in as far as Verity/Autonomy does not explicitly acknowledge it.

4    Verity/Autonomy will show and explain that Sluimer's statements are
     not true. The arguments based on the Plan are not relevant and the
     insinuations that the breach of trust is due to Verity/Autonomy are
     incorrect. The breach of trust between Verity/Autonomy and Sluimer are
     completely due to Sluimer.

**The facts**

5.   Verity/Autonomy is of the opinion that, after Verity's incorporation by
     Autonomy, Sluimer did everything to create a situation which would bring
     him in a high remuneration and that he did not want to work anymore.
     Sluimer did this by (i) trying to make believe that Verity/Autonomy had
     said that there was no alternative job for Sluimer and by pushing for a
     dissolution and (ii) when, against his plans, Verity/Autonomy did offer an
     alternative position to Sluimer, he did not give this job a chance and
     immediately refused it. On the contrary, Verity/Autonomy looked for a
     suitable alternative position for Sluimer, with the same labor conditions
     and career opportunities, from the beginning. Instead of collaborating in
     this process, and even before being informed about the possible
     redundancy of his previous job, Sluimer did everything to be "paid to
     leave" by Verity/Autonomy.

6.   Therefore, it is not Verity/Autonomy who did not offer Sluimer a suitable,
     alternative position, but Sluimer who simply does not want to work
     anymore. Sluimer stated multiple times that he was tired and did not want
     to work anymore. Even before receiving the letter about the redundancy of
     his function, even worse, even before Verity's incorporation by Autonomy
     was completed, on December 28, 2006 Sluimer sent an e-mail to Mr.

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

HS-0372

Weenink ("Weenink") in which Sluimer gave clear expression to his personal objectives: Sluimer did not want to work anymore and he wanted to receive a high remuneration (**annex 1**). Sluimer hoped that Weenink could arrange a termination of the labor agreement with a high remuneration. Sluimer wrote the following:

*'Herewith some basic inputs from my customer, I count on your 'deal' making experience.*

As arguments supporting the reason why it would be better for Autonomy/Verity to terminate the labor agreement (which Weenink could cite), Sluimer wrote:

*'-Buying me out will be borne by the reorganization, in the long run they will have to get rid of me anyhow and then it will be at the expense of the operational costs*

and

*'-According to the protection of the Dutch labor law, the exit amounts cannot be avoided, therefore I will not accept less.'*

7.   In this mail Sluimer also stated the real reason for which he wanted to terminate the labor agreement. He wrote:

*'-I have been working for 32 years, of which 62 quarters at Verity, obviously I'm tired.*

In a telephone conversation with Mr. Kanter ("Kanter"), Autonomy's COO, on April 4, 2006 Sluimer also admitted that, seeing his age, he did not see any chances in the new job. Upon Kanter's suggestion that this showed that Sluimer had already taken his decision that he would refuse to keep working for Verity/Autonomy, Sluimer said that that was true (**annex 2**). Therefore, it is not Verity/Autonomy who should be blamed for a breach of trust but Sluimer.

8.   Furthermore, Sluimer stated that he was sent to the United Kingdom starting from April 1, 2003. This is true, but Verity/Autonomy would like to point out that this transfer took place only upon Sluimer's insisting. An agreement between Sluimer and the English tax authority, namely, ensures that Sluimer can limit the payment of taxes to a minimum (**annex 3**). In short, the agreement comes down to the fact that Sluimer must only pay five percent of the salary received in England. As to the (small) part of the salary that Sluimer receives in the Netherlands, he must only pay taxes for the days that he actually stayed in the Netherlands. Sluimer limited the days spent in the Netherlands (17 days during the last three years) to a

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

CERTIFIED
ASTA-USA
INCORPORATED
TRANSLATION

HS-0373

minimum, because the remaining of the time he lives in Monaco. That in the years to come Sluimer would like to keep living in Monaco appears from the two apartments he recently purchased there.

9.    In his petition, Sluimer declared that Verity/Autonomy is of the opinion that the English law applies to his working contract. This is not correct. Seeing the above mentioned tax regulation, Verity/Autonomy, however, has its questions regarding the applicability of the Dutch law, since Sluimer basically does not pay any taxes in the Netherlands. Verity/Autonomy is of the opinion that Sluimer would like to take advantage of two sides, whenever it suits him. In the Netherlands, he pays very limited taxes and premiums, but he wants to make use of the more advantageous rules regarding the termination of the employment in the Netherlands. That Verity/Autonomy left the applicable law an open question – and, therefore, it did not say that the English law should apply- appears from the e-mail correspondence between Sluimer and Andrew Kanter ("Kanter"), Verity/Autonomy's COO. On April 10, 2006 Kanter wrote the following **(annex 4a)**

*'I therefore do not comment on the calculations to be made in such a case or the applicable law'.*

Since Sluimer insisted in saying that Verity/Autonomy stated that the English law should apply, on April 11 2006, Kanter confirmed again that Verity/Autonomy was leaving the question about the applicable law open **(annex 4b)**

*'As noted in my email below, I do not comment on whether Dutch law is applicable.'*

**The reasons why Sluimer has been treated correctly**

10.   In his petition, Sluimer stated that, for a long time, he was left in uncertainty about the way and the time in which his dismissal would take place, in spite of the clear agreements in the "Change in Control Plan" and "Participation Notice". Sluimer is of the opinion that the job offered at the end of March, was exclusively done to avoid having to pay the remuneration for the termination. All Sluimer's statements in item 11 are incorrect. Verity/Autonomy will prove this by covering what took place from the first letter dated December 29, 2005, in chronological order.

11.   Verity's incorporation by Autonomy was concluded on December 29, 2005. On this date, an evaluation of the re-organization was started which consisted of two stages (which together hereinafter will be called the "consultation period"). (i) All the positions were evaluated on the basis of whether the job had become redundant and (ii) subsequently, in case of the redundancy of the position an alternative was looked for inside the

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

CERTIFIED
ASTA-USA
INCORPORATED
TRANSLATION

HS-0374

NautaDutilh

company. The employees, whose job would possibly become redundant, were informed as soon as possible. In the first two lines of Verity/Autonomy's first letter to Sluimer, dated December 29, 2005 (annex 7 of the petition), Verity/Autonomy explained Verity's incorporation. In the third line Verity/Autonomy wrote

*'The company is committed to avoiding the termination of your employments by reason of redundancy if it can do so. To this end we invite you to a consultation meeting on January 11, 2006 to discuss your position, the transaction and consult with your regarding any suitable alternative positions within the Company during the consultation period.'*

12. Moreover, Verity/Autonomy would like to point out that the letter dated December 29, 2005 was not pre-dated. This letter was sent on the same day as it was dated, that is December 29, 2005. Since Verity/Autonomy was basically closed for 20 days during the Christmas and New Year period and the mail was also delayed during this period, Sluimer only received the letter some days later.

13. Verity/Autonomy's management met multiple times in order to discuss alternative positions. This happened both during informal consultations as in formal meetings. During the consultation period, Verity/Autonomy applied itself to find a suitable, alternative, equal job for Sluimer. Because of Sluimer's position Verity/Autonomy was very interested in keeping him. During this time, which was meant to find an alternative position in consultation with Sluimer, Sluimer preserved all his labor conditions, including the payment of his salary, commissions and option rights. In total, during the consultation period Sluimer received a compensation of more than EUR 500,000.

14. That during this consultation period Sluimer was not being kept informed and that he was only offered a job at the end of the month, is also incorrect. On February 22, March 3 and March 20, 2006 (**annex 5a, b and c**) Sluimer was informed of the process around finding an alternative job for him. Moreover, in the period in between, Verity/Autonomy and Sluimer were regularly in touch about matters which were related to it. Verity/Autonomy does therefore not understand what Sluimer based his position on, that he was not kept informed during the consultation period.

15. By the way, during this period, Sluimer was not just set on non-active status, as stated by him. Since Sluimer's former position had become redundant because of the organization, during the consultation period he simply could not carry out his job. In the letter dated December 29, 2005 (annex 7 of the petition) it therefore says:

*'During the consultation period you will not be required to attend the*



*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

company offices, however, you will be afforded reasonable access should it
be required to conduct required company business'

16.  In conclusion, it must be highlighted that it was Sluimer who did not want
to collaborate in finding an alternative job. Sluimer distorted
Verity/Autonomy's words in order to support his idea that a job did not
exist. Therefore, on January 6, 2006 he sent an e-mail **(annex 6),** where he
wrote:

> '...After you called me yesterday to inform me that there is no similar
> position for me available at Autonomy...'

Kanter answered on the same day **(annex 7)**

> 'In your phone call yesterday I said that your position may be at risk of
> redundancy because of a number of structural elements of the new
> company. I asked whether in light of this risk you had any ideas what
> might be a suitable alternative position, and since this was the case
> perhaps it was best to discuss whether a suitable settlement could be
> reached quickly.

Four days later, on January 10, 2006, in an e-mail to Kanter, Sluimer
repeated again that according to Verity/Autonomy there were no alternative
positions **(annex 8).** Sluimer simply did as if this had not just been
contradicted. Sluimer wrote in the following way:

> 'In the letter of December 29, 2005, a consultation meeting on January
> 11, 2006 is mentioned. I assume that, based on the telephone call we had,
> that this meeting lost its values, since you are of the opinion that in my
> case no alternative position can be identified.'

Since Verity/Autonomy actually wanted to find an alternative position for
Sluimer and also wanted to make this clear to Sluimer, Kanter sent him
another e-mail on the same day **(annex 9),** which read:

> 'The 11 January 2006 consultation meeting mentioned in the letter is not
> "lost value"...
> .. ..I must also point out again (as I did in the attached email, to which I
> have not yet received a response) that I did not state that it was my opinion
> that no alternative position can be identified'

17.  Seeing the above, it is clear that Sluimer made his own conclusions
regarding the letter dated December 29, 2005: Sluimer did not want to
stay at Verity/Autonomy and he was only trying to receive the highest
remuneration possible, in whichever way possible. This was also evident
from his position in the e-mail dated December 28 to Weenink (annex 1).

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

**Change in Control Plan**

18.   In item 12 and further on in the petition, Sluimer was of the opinion that, as
a consequence of the "change in control", the labor agreement must be
terminated with the relevant remuneration. Autonomy incorporated Verity
and therefore also the Dutch subsidiary, Verity Benelux B.V. Therefore,
Sluimer stated that a transition, or a change of control, took place. After
this, Sluimer stated that his position became redundant as a consequence
of the change of control. According to Sluimer, the Plan and the
termination remuneration described in it apply to him. Below,
Verity/Autonomy will explain why the labor agreement does not have to be
terminated (with a remuneration for Sluimer) based on the Plan, because (i)
Sluimer did not comply with the required documentation to be entitled to any
determination of the Plan, (ii) the exception of an "immediate reemployment"
took place, which makes that the determinations in the Plan do not apply and
(iii) because the Plan only entitles to a remuneration if the Corporation
terminates the employment and not when the employee asks for the
Termination.

19   (i) **Sluimer did not comply with the formal requirements of the
Plan**

Sluimer did not comply with the requirements of the Plan so that the Plan
does not apply to him. This is stated in the Plan (annex 4 of the petition)

*'SECTION 3. Eligibility for Benefits*

*(b)   Exception to Benefit Entitlement. An employee, including an
employee who otherwise is a Participant, will not receive benefits under
the Plan (or will receive reduced benefits under the Plan) in the
following circumstances, as determined by the Company in its sole
discretion:*

*(iv)*

*the employee does not confirm in writing that he or she shall be subject to
the Company's Confidentiality Agreement and Non Compete Agreement'*
Verity/Autonomy never received the above confirmation of the
confidentiality agreement and non compete agreement from Sluimer.
Therefore Sluimer is also not entitled to any determination of the Plan,
including the remuneration in case of termination of the employment.
Moreover, it is Verity/Autonomy that can determine when the above
mentioned circumstance takes place *(as determined by the Company in its
sole discretion'.*



*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

HS-0377

20.     In addition, Sluimer did not comply with the required procedure of Section
        11 of the Plan, Claims, Inquiries and Appeals. This chapter contains the
        procedural steps to be taken for a request based on the Plan.  In Section 11
        (f) it says:

        *'No legal action for benefits under the Plan may be brought until the
        applicant has (i) submitted a written applicant for benefits in accordance
        with the procedures described in Section 11(a) above. (ii) Has been notified
        by the Plan Administrator that the application is denied. (iii) Has filed a
        written request for a review of the application in accordance with the
        appeal procedure described in Section 11 ( c) above and (iv) has been
        notified that the Plan Administrator has denied the appeal.*

21.     Sluimer, however, only started to follow the above mentioned procedure
        after having started this dissolution procedure **(annex 10)**. Even if Sluimer
        had not followed the procedures of the Plan, Kanter still answered his
        request on May 3, 2006 **(annex 11).** The procedure was not implemented at
        the right time and it was also not completed. Therefore, Sluimer cannot
        appeal on any determination of the Plan. Apart from that, it must be
        pointed out that the Plan is ruled by the law of California and must also be
        explained accordingly.

22.     (ii) **"Immediate Reemployment"**
        In addition to the above mentioned reason, Sluimer is not entitled to a
        remuneration because an "immediate reemployment" took place. In fact, in
        the same Section 3 of the Plan it says that an employee is not entitled to
        any remuneration if:

        *'(ii) The employee is offered immediate reemployment by a successor
        to the Company or by a purchaser of its assets,  as the case may be,
        following a change in ownership of the Company or a sale of all or
        substantially all the assets of a division or business unit of the Company.'*

        Subsequently, the meaning of immediate reemployment is explained:

        *'For purposes of the foregoing. "immediate reemployment" means that
        the employee's employment with the successor to the Company or the
        purchase of its assets, as the case may be, results in uninterrupted
        employment such that the employee does not suffer a lapse in pay as a
        result of the change in ownership of the Company or the sale of its
        assets.'*

23.     The definition of immediate reemployment given in the Plan is that there
        cannot be an interruption of salary payment for the employee. Sluimer did
        not experience any interruption of his salary (and bonuses). Neither during
        the consultation period nor in his new position. Even more, during the last
        five months Sluimer received 142,000 Euros in salaries and bonuses. If the

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

HS-0378

*Nauta Dutilh*

exercised options are added to this, the amount will even be equal to 500,000 Euros. The exception of Section 3 (b) (III) can therefore not apply and, based on the Plan, Sluimer is not entitled to the termination of the labor agreement, and even less to the allowance of a remuneration.

24.    Very interestingly, Sluimer stated that no immediate reemployment took place because, according to him, he was held on the line for three months, and he was only appointed to Senior Vice President of Neurodynamics with the letter of March 23, 2006. As already explained above, Sluimer statements are not correct. A period between the positions is not a valid element for the determination of whether there is an immediate reemployment or not. The definition of immediate reemployment must be applied in the way it is given in the Plan.
This definition in the Plan clearly states that the only important element is whether, after the change in control, there is an interruption of the payment of the salary (which is not the case). Also being set on non-active, which according to Sluimer would impede an immediate reemployment, is not included in the definition used by the Plan.
That there was no '*holding on the line*' appears from item 10 up and including 17 of the petition. In addition, the question of whether this exception takes place based on the same Plan, must only be answered by Verity/Autonomy: '*as determined by the Company in its sole discretion*'.

25.    In item 21 Sluimer, admitted that during the consultation period he was paid his salary as usual. However, he stated that he presumed that he had not received the entire bonus. In reality the commissions assigned to Sluimer were based on exactly the same accounts as before, which were calculated automatically according to Verity's system which was already in place. Moreover, these were executed by the finance controller of Verity Benelux B. V. In this calculation, the commission was based on the performances of the regional team. In his petition, Sluimer did not mention that in the areas over which he had responsibility, significant smaller results were reached during the last year and particularly since August 2005. This decrease also took place in countries like France, Germany and Japan, and they were not related to Verity's incorporation at all. In countries which were not under Sluimer's responsibility, like America, Canada and countries in Southern America, however, the results of the same department were positive. The consequence was that Sluimer's commission for this period was lower, but not because of any deductions by Verity/Autonomy.

26.    (iii) **No dissolution by the Company**
In conclusion Verity/Autonomy wants to point out the following about the Plan. In the Plan and the relevant Participation Notice, it only states that a remuneration must be paid if the company terminates an employment after a change in control. In Sluimer's case this would mean a remuneration under the Dutch law. In his case, the company, however, did not terminate the employment. Sluimer was offered an alternative position, which had the same labor conditions as the previous position. Separate from the fact that

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

NautaDutilh

the plan does not apply to Sluimer because of the exceptions treated in items (i) and (ii), for Sluimer there will be no remuneration for the termination based on the Plan. On the contrary to what was claimed by Sluimer, the parties did not agree on Sluimer being entitled to a termination remuneration according to the Dutch law. This right would only exist in case Verity/Autonomy had terminated the employment (and Sluimer had complied with the required conditions of the documentation). In reality, it was not Verity/Autonomy but it was Sluimer asking for the dissolution of the employment.

27. Moreover, Sluimer stated that his colleagues received a remuneration for the termination based on the plan and according to the Dutch law. This is also not correct. None of Sluimer's colleagues, whom the Plan could apply to, received a remuneration for the termination based on the Plan. Only one colleague was in a situation which can be compared to Sluimer's. However, a confidential termination agreement was found with him, without any reference to the Plan.

**Comparable position**

28. In item 24 of his petition, Sluimer stated that no strategy and business plan and no job description were available for the position of Senior Vice President of Neurodynamics, wherefore the offer to start working for Neurodynamics was "gratuitous". Moreover, Sluimer stated that the reason why the position was offered was solely in order to avoid the payment of the termination remuneration. In conclusion, Sluimer also declared that Verity/Autonomy was willing to work on giving shape to Sluimer's position at Neurodynamics only after some time had gone by. Verity/Autonomy is surprised that Sluimer took these positions. In order to give a clear image of what happened in reality, after Sluimer was offered the position of Senior Vice President of Neurodynamics, Verity/Autonomy will chronologically list the facts below.

29. After various management consultations and meetings held between December 2005 and March 2006, which were needed to come to a decision, on March 22, 2006 Kanter called Sluimer in order to inform him about the position that Verity/Autonomy had found for him, the job of Senior Vice President of Neurodynamics. During this conversation, Kanter briefly explained what the Neurodynamics department consisted of and why, in his opinion, Sluimer was fit for this position. In this conversation Kanter mentioned that Sluimer's labor conditions would be the same as for the previous job and that his commission plan would be adjusted in order to put him in a position to earn the same commission. Kanter concluded the conversation with the request to call the head of the department in order to further discuss the tasks related to the job. A summary of this conversation, made by Kanter immediately after the telephone conversation, is attached as **annex 12**.



*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

HS-0380

30.  A day later, on March 23, 2006 Sluimer received from Kanter a confirmation of his new position within Neurodynamics (annex 8 of the petition). At the end of the conversation, Kanter invited Sluimer to contact him in order to further discuss the job, if Sluimer felt he needed it. In the accompanying e-mail to this letter, Sluimer was asked to contact David Humphrey ("Humphrey"), the Managing Director of Neurodynamics **(annex 13)**.

31.  On Friday March 24, 2006 a short telephone conversation between Humphrey and Sluimer took place. Humphrey explained to Sluimer the broad lines of what his role was going to be within Neurodynamics and the department's plans for the near future. Immediately after the weekend, on Monday March 28, 2006, Humphrey invited Sluimer for a meeting in America during a fair which was very important for Neurodynamics, which was going to take place a week later. The purpose of this meeting was to discuss business matters and Sluimer's job more in detail **(annex 14)**.

32.  Sluimer, however, did not react to this invitation. Therefore, on March 30, 2006 Kanter sent him an e-mail in which he asked Sluimer whether he had already contacted Humphrey to receive more details about his job **(annex 15)**. Moreover, Kanter asked Sluimer to act quickly, because of the fast market growth. The next day, on March 31, 2006, Humphrey confirmed by e-mail that he had still not heard from Sluimer **(annex 16)**.

33.  Later on the same day, on March 31, 2006, all of a sudden Sluimer sent an e-mail to Kanter in which he wrote that he was not satisfied with the conversation with Humphrey **(annex 17)**. In this e-mail, Sluimer took the position that there was no *'business / strategy / job specification'* and that according to Humphrey he (Sluimer) must report to him (Humphrey). According to Sluimer the previous agreements were different. Moreover, Sluimer took the position that he did not want to go to the important fair in America and already at that time expressed that he was not planning on taking on the job.

34.  The same day, Kanter replied to Sluimer's disappointing message by e-mail **(annex 18)**. In this e-mail, Kanter expressed his hope that Sluimer's decision was not based on the very short communication which had taken place about his job and the Neurodynamics department.

     *'However I would hope that any decision is made based on more than our 10 minute phone call and the short communication you has with David Humphries, which you have described as inadequate.'*

35.  On April 1, 2006 (a day later), Humphrey asked Sluimer by e-mail whether he could call him about the meeting in America **(annex 19)**. Up to that moment Humphrey had still not heard from Sluimer. Sluimer answered to this e-mail on the following day (April 2, 2006), by sending a

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

HS-0381

*Nauta**Dutilh***

slightly revised version of the e-mail he had sent to Kanter on March 31, 2006, also to Humphrey **(annex 20)**. Surprised by Sluimer's e-mail, Humphrey sent an e-mail to Kanter in which he wrote that the information on which Sluimer based his job refusal did by no means originate from him (Humphrey) **(annex 21)**.

36. A day later, on April 3, 2006, Sluimer sent an e-mail to Kanter in which he again confirmed his position **(annex 22)**. Sluimer had not been ready to make any efforts for the creation of a new job which was fitting for him or even to talk about it. It was clear that Sluimer did not want it, despite of all Verity/Autonomy's efforts. In this e-mail he did not wish to have any further discussions.

   *'The offered position does not seem to be appropriate at all and I fail to see whether further talkings with you could really alter this situation'*

   Sluimer concluded by saying that he basically only wanted money and that is why he threatened legal steps.

   *'Especially I'd like to discuss with you on how we can avoid legal steps in this matter from my side. Be sure that I give preference to solve this matter amicably, but of course I need your cooperation for that.'*

37. On April 4, 2006 Kanter replied by e-mail **(annex 23)**, and, again, he tried to convince Sluimer to at least give the new job a shot.

   *'I'm very surprised by your message. Below you complain that the position is not appropriate and that there is nothing to discuss. I note that the total discussions amount to our 10 minute phone call and your short call with David Humphrey. Neither I nor David discussed a business plan. You and I did discuss a job description. In any event, we have made ourselves available to help to continue to educate you, but neither of us have received inquiries. As noted in our call and in my letter, your compensation remains the same and this is one of the fastest growing, most exciting parts of our business. To be frank, the lack of inquiry has been unusual'.*

38. Later on that day, another phone conversation took place between Kanter and Sluimer. In this phone conversation Sluimer repeated that he wanted to reach a termination agreement. Kanter answered that Sluimer had to make a proposal. On Friday April 7, 2006 Sluimer came with a proposal **(annex 24)** based on a neutral compensation according to the cantonal right formula. Immediately after the weekend, on Monday April 10, Kanter replied to the proposal by e-mail **(annex 25)**. In the e-mail, Kanter wrote that he was still disappointed that Sluimer had refused the offered position on the basis of such little information and conversations. Further, Kanter wrote that factor one (C=1) could only be applied if Verity/Autonomy

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

could not find a fitting position for him and that, therefore, it had to ask for the termination of the contract. This, however, was not the case. For this reason, Kanter informed him that Verity/Autonomy could not accept the proposal and that, therefore, Verity/Autonomy expected Sluimer to continue his job within Neurodynamics.

39.  While Sluimer refused to put any efforts into his new job, Verity/Autonomy kept trying to help him.  So, on April 10, 2006, Kanter sent an e-mail to Sluimer with additional information about the market in which Neurodynamics operates (**annex 26**). Upon Verity/Autonomy's insistence, another conversation took place between Rachel Haverfield (legal counsel Europe), Humphrey and Sluimer, on April 18. That Sluimer was not at all interested in making any efforts is evident from the minutes he took of the meeting (**annex 27**). In his reply to these minutes, Humphrey wrote to Sluimer that he was disappointed about the negative interpretation of the meeting (**annex 28**). As a clarification, Humphrey added notes in square brackets to the minutes for Verity/Autonomy (annex 27).

40.  On April 24, 2006 Kanter complied with Sluimer's request in the meeting dated April 18, 2006 and he sent him an extended description of his role and responsibilities within Neurodynamics (**annex 29**). In this e-mail Kanter also explained that, up to that day, Verity/Autonomy had worked without a business plan in all departments and sub-departments, and that this had been a very successful method. Moreover, Kanter also mentioned that if Sluimer needed it, drafting a business plan was within his authority. To this purpose, Kanter also offered his and Humphrey's help.

41.  A day later (April 25, 2006), Kanter received an e-mail from Sluimer in which Sluimer informed him that he did not want any additional information and that he also did not want to talk about his job (**annex 30**). Moreover, Sluimer stated that he had started a new procedure. Again a day later, (April 26, 2006), Verity/Autonomy received this petition for the dissolution of the labor agreement from the court.

42.  Sluimer declared that he did not like his job, within a month from when it was offered to him (annex 17). Sluimer refused any offer to talk about the job. Even worse, Sluimer did not even make an effort to make suggestions about the changes he wanted. In this way, Verity/Autonomy was not set in a position to change the job according to Sluimer's wishes.
Sluimer avoided all kind of negotiations. Everything is pointing to the fact that Sluimer had already refused any newly offered job in his head, even before it was offered to him. Sluimer only wanted to see money and not a new job; this is very clear from the above. To Autonomy/Verity's advantage this testifies of very bad employee's behavior.

43.  From the moment he presented his petition, Sluimer still did not pick up his new job, despite the repeated requests to do so. Despite the direct requests,

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

Sluimer refused to visit the big fair in America and since the April 18, 2006
meeting, he did not contact Humphrey or any other colleague at
Neurodynamics, nor did he contact anybody else within Verity/Autonomy
about his job. On April 18, 2006 Sluimer's new business e-mail account
became active. This, however, was rarely used and only for personal
purposes **(annex 31)**.

44.     Sluimer was of the opinion that the offered position was not comparable with
        his previous job. Sluimer stated that as Senior Vice President of EMEA &
        APAC Operations of Verity, he had a revenue responsibility of about 50
        million USD, whereas as Senior Vice President of Neurodynamics this would
        be about 5 million USD. The comparison made by Sluimer modifies the
        reality. Actually, the Neurodynamics department was ahead in generating
        comparable license profits like Sluimer's former department used to do. For
        this purpose, it is important to divide EMEA & APAC Operations into three
        different parts, which are (i) Software License, (ii) Support contracts and
        (iii) Consulting services. Of these three parts, only the Software license
        department generates a profit. The Neurodynamics department is heading to
        the conclusion of new contracts with new customers, which are of the same
        level as those concluded by Sluimer in his former position during the last
        years. Up to now, the Neurodynamics revenue is indeed lower, but the
        profit is significantly higher.

45.     These digits and goals were confirmed in an e-mail which Mr. Hussain
        ("Hussain"), Chief Financial Officer of the Autonomy Group, sent on April
        27, 2006 **(annex 32)**. Therefore, Neurodynamics is of great value for
        Verity/Autonomy. For Autonomy, it is an absolute core section that is
        strongly integrated with Autonomy's other technology and that led to a
        couple of the largest contracts of the last years. The deals that were
        concluded lately and that are described in Sushovan's e-mail dated April 28,
        2006, again confirm how important Neurodynamics is within
        Verity/Autonomy and how fast it is growing **(annex 33)**.

46      Furthermore, Sluimer is of the opinion that the offered position cannot be
        compared because Neurodynamics has about 15 employees, whereas
        EMEA & APAC Operations had more than 100. Sluimer, however, did not
        mention that his performances were exclusively measured according to the
        incomes and not the number of employees. Also the comparison of the
        number of employees in itself does not apply. No more than 68 employees
        worked in the EMEA & APAC Operations department and no more hiring
        was allowed. On the contrary, in the Neurodynamics department the number
        of employees is quickly increasing. In fact, Neurodynamics' staff increase
        with two additional salesmen, two additional software developers, a sales
        developer and a Senior VP of Global Operations was already authorized at
        the beginning of the year.

47.     Sluimer was of the opinion that the position was not equal because the



*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

HS-0384

*Nauta**Dutilh***

revenue and the number of employees were not the same. This reasoning
does not render justice to the offered position. As intended Senior Vice
President of Neurodynamics, Sluimer was supposed to manage one of
Verity/Autonomy's fastest growing departments. One of Verity/Autonomy's
highest profit percentages was generated, with a group that, up till now, is
relatively small. Therefore, Verity/Autonomy was of the opinion that the
important job of Senior Vice President had to be covered by an employee
specializing in business development, who could manage the enormous
growth process of this department. Sluimer personally pointed out how he
had been the one making Verity grow from nothing to a million euro
company outside of America (**annex 34).** That is why the company offered
this position to Sluimer, who had many years of experience in the area of
management and who always worked in a satisfactory way. Apart from that,
the labor conditions, including the salary and commission were going to be
the same as the function which Sluimer had covered at EMEA &
AP AC Operations

**Breach of trust**

48.    In his petition, Sluimer expressed his opinion that besides the change in
control there was also a breach of trust between him and Verity/Autonomy
(due to Verity/Autonomy) which should lead to the termination of the
employment. For Verity/Autonomy, however, it is not clear at all why
Sluimer was of the opinion that there was a breach of trust.
Sluimer explained this by stating that he had somehow been treated badly
during the process, in which, on the contrary, an alternative job had been
found for him. A solution which could not be found for some of Sluimer's
colleagues. Among other things, the reasons mentioned by Sluimer are that
he was set on non-active and that his colleagues and business relations were
told that he was fired. Sluimer, however, was not simply set on inactive as
stated by him. Since his previous job had become redundant because of the
reorganization, during the Consultation period he simply could not carry out
his job. During this period, which was meant to find an alternative position,
Sluimer also kept his labor conditions. In item 10 up to and including 17,
Verity/Autonomy made it clear that the process it had followed with regards
to Sluimer had been very meticulous. Apart from that, the management did
everything in its power to stop the unfair rumor that the labor agreement
with Sluimer would be terminated. In this respect, see the e-mails attached
as **annex 35a up to and including 35g.** Moreover, Sluimer stated that
organizational changes took place in his team. It is true that organizational
changes took place. The results of August up to November 2003 where so
negative, that, after Verity's incorporation at the end of December 2005,
Verity/Autonomy felt compelled to make some changes. However, it is not
clear to Verity/Autonomy why this should lead to a breach of trust.

49    Moreover, Sluimer postulated that, after he had been sent the letter dated
December 29, 2005, he had to wait for some weeks before being contacted

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

by Verity/Autonomy. Sluimer's postulation is wrong again. In fact, already on January 5, 2006 Kanter contacted Sluimer by means of a telephone call and the day after, on January 6, 2006, there was an e-mail exchange which confirmed this telephone conversation (annex 7). Therefore, Verity/Autonomy does not understand why Sluimer tried to give the impression that there were several weeks between the letter and the conversation. Moreover, Sluimer claimed that once he was contacted, he was told that no comparable position would be available for him. In January 2006, Sluimer had already tried several times to make believe that Verity/Autonomy had said this. Every single time Verity/Autonomy, however, resolutely denied that this had ever been its intention and also that it had ever stated this in front of Sluimer (item 16 and annex 7).

50.  In item 27 and 28 of the petition, Sluimer raised that, at the end of January, Verity/Autonomy had asked Sluimer to make a proposal for the termination of the employment. Verity/Autonomy never made such a request. However, on January 10, 2006, after having taken the same position that he did not like the job he had been offered, Sluimer wrote in an e-mail to Kanter (**annex 36**):

> .. 'I would prefer it if you could make a proposal for an amicable settlement'.

51.  Also in item 28, Sluimer tried to give the wrong image of the contact with Verity/Autonomy. He declared that he had only received a reply to his February 9, 2006 e-mail, on February 22, 2006. This is not correct. The week before, on February 16, 2006, Kanter informed Sluimer that at that moment he was traveling and that he would reply to his e-mail later on

(**annex 37**). On February 22, 2006, Kanter replied to Sluimer's e-mail dated February 9, 2006 with two e-mails (annex 10a and 10b of the petition), in which he referred to the meeting dated January 24, 2006. Annex 10a of the petition is Sluimer's reply to the part of the fourth e-mail regarding the "open part" of the meeting. In his e-mail, Kanter confirmed again that Verity/Autonomy was still trying to find an alternative job and that he had never said that this position was not there. In annex 10b of the petition, Kanter expressed his dissatisfaction about the fact that Sluimer ignored the expression "without prejudice" which had been discussed during the meeting and about which Sluimer had declared to understand the meaning. Moreover, Kanter wrote that in principle he was open to discuss other alternative solutions, but not if Sluimer would consciously keep infringing the agreements of confidentiality. That Sluimer did not attach much value to agreements appears from Sluimer's reply sent on March 2, 2006 on this subject (**annex 38**), which, among other things, said:

> 'I fail to see why you would make a distinction between open correspondence and 'without prejudice'.

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*



HS-0386

NautaDutilh

52. Sluimer is of the opinion that during the January 24, 2006 conversations he had been read an 'exit letter'. This is not correct. During this meeting Kanter only applied the script which had been drafted before the meeting (**annex 38**). This script was used in order to make sure that all the parts of a fair consultation process would have been treated. Verity/Autonomy, therefore, does not understand why Sluimer asserted this.

53. In conclusion, Sluimer pointed out that Verity/Autonomy caused a breach of trust by not paying its options in a timely manner. Sluimer exercised his options at the end of February, thanks to which he collected about 430,000 Euros (gross). Since then he also exercised options for a value of 68,000 Euros. Before the sale of Verity to Verity/Autonomy, these Verity options were "under water" and for this reason they could not be exercised. Through Verity's incorporation not only Sluimer's options became exercisable, but also those of many of Sluimer's colleagues. During the months of January up and including March, Verity/Autonomy had to process a total of ten times as many options as during the previous quarter. Logically the financial administration and the juridical department could not process them all at once and they had to sift out a number of unique tax cases. Therefore, the payment of the options of many employees – including Sluimer – took place in the salary payment of April. Why Sluimer is of the opinion that this caused a breach of trust, is completely unclear to Verity/Autonomy.

### Lack of trust of Verity/Autonomy

54. In the meanwhile, Verity/Autonomy is also of the opinion that there is no more trust in a successful collaboration. However, this breach is due to Sluimer's behavior. Starting from the moment in which Verity/Autonomy told Sluimer that Verity/Autonomy was looking for an alternative position, Sluimer sabotaged the discussion and pushed it in the direction that there was no alternative job, which would justify the termination of his employment. Sluimer took various wrong positions which he expressed as truths, whereas Verity/Autonomy contradicted them at different times. An example is that Sluimer tried to force it on Verity/Autonomy that they would not find an alternative position for him. However, Verity/Autonomy found an alternative, suitable job for Sluimer. For Sluimer this seemed a disappointment, because in this way he would not get a remuneration. Sluimer was never open to a new position, nor did he try to accept it. Even before the incorporation was concluded, he expressed his wish to stop working upon the payment of a substantial remuneration (annex 1). Moreover, Sluimer never made any adjustments proposals for his job and he was never interested in negotiations. From the beginning, Verity/Autonomy made efforts to find a suitable position with the same payment, and it also tried to make the transition to the new job as smooth as possible for Sluimer. That Sluimer refused the position without any discussions and negotiations and immediately tried to go for the extreme solution – the termination of the employment – made it so that



*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*

Verity/Autonomy lost all its confidence in Sluimer.

Conclusion

55.   Therefore, there is reason to dissolve the labor agreement between the
      parties because of serious motives which are the change of circumstances.
      Now that Sluimer has himself to blame completely for the situation which
      has arisen, there is no room at all for a remuneration at Verity/Autonomy's
      expense. An employee who wants to leave his employer can simply resign.
      Probably, the only reason why Sluimer did not do this was because he
      wanted financial advantages. This choice is his and should not be borne by
      Verity/Autonomy.


REASON WHY: the cantonal judge is kindly requested to dissolve the labor
agreement without a compensation, with the sentence of Sluimer to pay the
expenses of the proceedings.

Amsterdam, May 23, 2006




                                                          **The delegate**






*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*


HS-0388

# EXHIBIT E

District Court Utrecht, Sector Canton – location Utrecht
Hearing dated May 30, 2006 at 3:15 pm Reference:
466781 EJ VERZ 06-1375

**PLEAD NOTES by Mr. J. Van der Pijl**

regarding

Mr. <u>H. SLUIMER</u>
Hereinafter to be called: "Sluimer"
Living in Monaco
The plaintiff's
delegate Mr. J. van der Pijl in Amsterdam

against

The limited liability company <u>**VERITY BENELUX B.V.**</u>
Hereinafter to be called: "Verity"
Established in Amsterdam
The respondent
delegate Mr. J.A. de Roos in Amsterdam

Honorable Mr./Mrs.;

| | |
|---|---|
| I. | Introduction |
| II. | Sluimer's old job at Verity |
| III. | Verity's incorporation by Autonomy |
| IV. | 2005 exit agreements |
| V. | Sluimer's position in relation to the incorporation |
| VI. | January/February/March 2006 developments |
| VII. | Salary level |
| VIII. | Sluimer's fiscal position |
| IX. | Other job |
| X. | Change in control |

*Dutch > English Certified Translation by: ASTA-USA*
*Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



XI.     Basis and remuneration
XII.    Collaboration
XIII.   Final conclusion

<u>I Introduction</u>

1.     Sluimer is presented by Autonomy as somebody who from the
       beginning had only one objective: receiving a redundancy
       remuneration which was as high as possible. For convenience's
       sake, Autonomy forgot an important fact: as a consequence of
       Verity's incorporation by Autonomy, Sluimer's job had become
       redundant. His working activities were taken over by Mr.
       Sushovan Hussain with immediate effect. Obviously, Sluimer
       cannot be blamed for this; this is Autonomy's (apparently
       deliberate) policy decision.

2.     Subsequently, Sluimer was seriously concerned about the way in
       which Autonomy would settle the various matters. I will come back
       to this later on. How justified these concerns were, appeared
       during the following months. Autonomy did everything to avoid the
       payment of the redundancy remuneration, by eventually offering him
       a created and previously non-existing position, which was not
       suitable.

<u>II Sluimer's old job at Verity</u>

3.     I will start with the situation before the incorporation. Sluimer
       raised up a large organization by working extremely hard for over
       15 years. He worked an average of 80 hours weeks, spread
       over six and sometimes seven days. He calls this: working in "the
       fast lane", for which, by the way, he was well rewarded.
       Eventually, Sluimer led the organization over the entire world. His
       region, EMEA/APAC, included the regions of Europe, the Middle
       East, Asia and the so called Asian-Pacific Region. In other words,
       the entire world with the exception of North, Center and South-
       America. In all these regions there were employees who, directly or
       indirectly, reported to Sluimer.

4.     Because of this reason, as it appears from the Verity Inc. extract
       from the register of companies in the Netherlands (annex 13),
       Sluimer was authorized to act on behalf of this listed controlling
       company from the United States, already since 1993. Companies
       were established in many other countries for which Sluimer was

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



the statutory director. That Sluimer accomplished a lot and always
worked in an excellent way is clear and, among other things, it
appears from the commissions/bonuses he realized. This is
actually not disputed by Autonomy. Autonomy speaks about this
employee as having an excellent service record.

<u>III The incorporation</u>

5.    As a consequence of Verity's incorporation by Autonomy,
Sluimer's job became redundant. All his tasks were taken over by
Autonomy's CFO, Mr. Sushovan Hussain. There was no discussion
about this. This was completely clear from the beginning. So clear,
that Verity/Autonomy never communicated this formally to Sluimer.
In item 11 of the petition, Autonomy also spoke about the so
called "consultation period", which in its opinion consists of two
stages:
  (i)  The stage in which it was to be evaluated whether the job
actually needed to become redundant and (subsequently),
  (ii) The stage in which, in case of job redundancy, alternative
jobs were looked for inside the company. According to Autonomy,
this period started on December 29, 2005; however, at the same
time, Autonomy postulated in item 15, that Sluimer had already
been set on inactive status with the letter dated December 29,
2005, "since Sluimer's former job had become redundant because
of this reorganization". In other words, Autonomy also
acknowledged that on December 29, at the beginning of the
consultation period this was a completely clear matter of fact,
about which there was no doubt at all. In this particular case,
stage 1 would have been skipped.

<u>IV 2005 exit agreements</u>

6.    In his opinion, the redundancy of Sluimer's position was "all in the
game". An incorporation of Verity was going to happen, either by
Autonomy or by a Competitor. For this reason, in 2005, Verity's
plenary management concluded the so called Change in Control
agreement. A separate agreement was concluded on this subject,
precisely in order to avoid any misunderstandings of the
redundancy regulations. Nothing was wrong with this; it is a usual
practice for top managers, not only in the US but also in the
Netherlands to provide for redundancy regulations, for example in
case of changes in control.

7.    Also the Dutch members of the management, Sluimer and Mr.
Weenink, were offered to be part of the plan. However, they chose
the Dutch rules to apply for the determination of the amount of the
dismissal remuneration instead of the strict rules of the plan.

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June*
*05, 2008*
*www.asta-usa.com*



According to the rules of the plan, Sluimer and Weenink would have namely been entitled to remunerations of 18 and 12 months respectively, based on their jobs.

Seeing the length of their employment and, in Mr. Sluimer's case also his age, the application of the cantonal judge formula would be more advantageous and with the increase of the years this would lead to a higher remuneration. Sluimer and Weenink basically looked after their own interest by having the cantonal judge formula also apply to them, instead of a lower contractual remuneration.

8.   In the meanwhile, redundancy regulations had been taken both with the CEO, Mr. Bettencourt and CFO, Mr. Springsteel as well as Mr. Weenink. Sluimer denounces that in all the three cases an agreement was found in accordance with the Change in Control plan or, even more, that its balance was actually higher. Mr. Springsteel explicitly confirmed this to him, and it is hard for him to imagine that Mr. Weenink did not leave with a remuneration based on the cantonal judge formula (C=1).

9.   The parties will therefore agree that – generally speaking – this case concerns a Change in Control situation, in conformity to the definition given in the plan in Section 2 under c. I will also come back to this later on.

### V Sluimer's position in relation to the incorporation

10.   As recalled, in the Fall 2005, it was completely clear to Sluimer (and to Verity/Autonomy) that his job would become redundant. How could Sluimer know it with such certainty?
   a.   Sluimer knew that his position would be taken by Sushovan Hussain. This was known by everybody.
   b.   Sluimer was the only Verity Executive who was never invited to participate in the incorporation and integration meetings between Autonomy and Verity executives which took place in November and December 2005.
   c.   Sluimer was not invited to the meeting in Miami, which was organized for all the sales and marketing departments, including all the executives. Sluimer referred to this in annex 15, where middle December 2005, he corresponded with others about this meeting.

11.   During the months preceding the incorporation there was a lot of "rustling" between the Verity's Sales Teams on one side and Autonomy on the other. Autonomy considered itself free to start contacting Verity's customers, which led to a lot of agitation among Verity's employees.

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



12. This caused a certain enmity and in Sluimer's individual case it was clear that he would not be included, which was later confirmed by the decision on December 29, 2005.

13. Even if Sluimer had the clear agreements which he had taken based on the Change in Control plan at his disposition at the end of December he still became concerned about his position. Was Autonomy going to make it hard for him?

14. When he heard that his mate Weenink, the financial man of Sluimer's Verity region, told him that on December 29, 2005 he was going to have a meeting with Autonomy to talk about the redundancy regulations of the Verity Benelux BV employees, including Sluimer, it was logical for Sluimer and Weenink to prepare themselves for it (Weenink apparently also did it for himself). Sluimer sent this mail only because he was concerned about the way in which Autonomy would handle his job's redundancy as a consequence of the incorporation.

15. That Sluimer's confidential e-mail to Weenink was brought to the trial is characteristic of the method used by Autonomy. This e-mail was never rendered available to Autonomy's representatives by Sluimer or Weenink. In the meanwhile Weenink was gone, and apparently this was taken out of his mailbox without him (or Sluimer) knowing about it. A method which was also used later on for Sluimer's Virage mail, without him knowing it.

VI January, February, March 2006 developments

16. Immediately after January 2006 everything still pointed to Sluimer's departure.
   Sluimer mentioned the following facts as examples:
   a. Sluimer's so called "Direct Reports" were told by his successor: "Hugo is out". One of Sluimer's employees was willing to confirm this in the form of an e-mail (annex 16).
   b. Also various other internal and external relations assumed that Sluimer had left without receiving this communication by Sluimer himself (Autonomy did not allow Sluimer to inform his colleagues or his external relations in a normal way), Sluimer refers to Autonomy's annex 35a and further of the objection, where Sluimer holds against Autonomy that this was by far not the only response, but that this was only a selection.
   c. Moreover, on January 5, 2006 Sluimer was called by Mr. Kanter, who informed him that most probably Autonomy could not offer an equal position.
   d. Some hours after this telephone conversation with Mr.

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



HS-0393

Kanter, his e-mail was shut off and the incoming e-mails were forwarded to his successor, Mr. Sushovan Hussain. This was done without any consultation with Sluimer.

e. Also on January 24, 2006, Sluimer was informed by Kanter: "Your role is directly affected by the consultation and there is a significant likelihood that your position will become redundant". In that conversation Kanter again explained to Sluimer that the employees reporting to him, like the sales support, training, consulting, marketing etc. were centralized at Autonomy and that Sushovan Hussain led the sales in his region and that he would keep doing so.

f. Because of the proportions of Sluimer's responsibilities in his old Verity position and the fact that Autonomy was a smaller organization than Verity, it did not seem likely that a fitting alternative could be found for Sluimer, now that Sushovan Hussain had been chosen. In all cases the preference was given to the Autonomy's executive above the Verity's executive in all the company's core tasks like the general, financial and sales management. As examples, Sluimer mentioned the CEO, CIO and CFO positions. In all the cases their tasks were transferred to Autonomy employees. Neither in the Board nor at the Executive Officer's level immediately under it, was any room made for Sluimer, which, seeing the above, didn't surprise Sluimer.

17. During this period, Sluimer was never offered an opportunity or asked to collaborate in finding a job which was fitting. His job had been taken away from him, without him having the possibility to keep in contact with his relations and employees.

18. In this procedure, Mr. Kanter "claimed" that the extensive management meetings took place in order to look for a new job for him. Sluimer does not know anything about this, neither was he involved in this.
He verified these things with the Senior Vice President of Human Resources (Worldwide) Jack Landers and with Mr. Anthony Bettencourt, the former Verity CEO. Was his position ever discussed in meetings of any kind, before or after the incorporation? The answer to this was:
No. With whom did the conversations take place? Sluimer does not know; in any case not with Sluimer or with the colleagues that he knew.

19. During the conversation on January 24, 2006, of which Sluimer, took handwritten minutes and for which he produced a short report in the shape of a word document (annex 17), a benevolent

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



settlement was discussed. In that conversation Kanter indicated that according to his lawyers in the Netherlands, the Dutch law would not apply to the labor relationship and that, according to the British law, he could claim a redundancy regulation of a maximum of a few months (he called them "pennies"). During the conversation, Sluimer was also asked to do a proposal for a settlement, but after the suspension of the meeting, when Sluimer called his lawyer, Sluimer chose not to personally do a proposal at that time. The reason for this (seeing Kanter's disposition, also upon his lawyer's advice and the fact that Sluimer basically wanted to claim the compensation according to the Dutch cantonal judge formula) was that making a proposal at that moment was not very meaningful.

20,   During the following weeks the parties consulted each other often. Partially they conferred about the stage of that consultation (both when it was a formal and an informal meeting and open correspondence" or "without prejudice" proposals were made), but Autonomy did not seem prepared to make any proposal. However, Sluimer was again asked to make a proposal, which he did on April 7, 2006. He simply proposed to settle the matters with the payment using the formula of the neutral cantonal judge (dissolution as of April 30, 2006). This proposal was refused.

VII Salary level

21.   In the meanwhile it was clear that Sluimer was not receiving the usual commission. Autonomy chose to pay Sluimer commissions/bonuses based on the revenue of Verity's products. For more than one reason this was unfair. First of all, Sluimer did not influence the revenue anymore, because he had been put on inactive status. Secondly, the market had already been informed that the Verity products would be replaced by Autonomy products. Because of this customers and potential customer obviously did not invest anymore in Verity products, knowing that the continuity was at risk. The third reason was that a large number of Sluimer's very professional Verity employees left. Sluimer mentioned the General Managers in Australia/New Zealand, Southern Europe, the United Kingdom/Ireland and a large number of other sales consultants and marketing managers. It was a matter of fact that in four months' time Sluimer received more than € 50,000 less in salaries and bonus payments, compared to the normal average of the preceding months.

21.   Referring to the jurisdiction postulated in the petition in a similar case the employer is obligated to remit the entire salary. Sluimer felt that he was put under pressure, also for this reason. It

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



involved large amounts.

VIII Sluimer's fiscal position

23.   The same applied to Sluimer's fiscal position. For some years he had mainly fallen under the English (income) tax law and only partially under the Dutch tax regime. As an inhabitant of Monaco, he enjoyed a special position based on which, in the United Kingdom, he would (only) pay 5% of his income taxes, on balance about 2%. In February 2006, like the others, he had the acquired right to exercise options, which he did. Exactly because of his special fiscal position, for him it was important that the payment and the liquidation would take place before the end of the British fiscal year (that is, before April 2006). Sluimer also referred to annex 3 of Autonomy, which shows that Verity/Autonomy was informed about the termination of the 5% regulation.

24.   While the settlement usually takes one to three weeks, Sluimer had consciously already exercised his options on February 22, 2006. He did not trust that Autonomy would conclude everything in due time and he chose to be on the safe side, at least that's what he thought. He was deceived. Sluimer insisted multiple times to be paid. He understood that his colleagues had received their money weeks before. Despite his more and more pressing requests, Sluimer, however, did not receive anything. Eventually this even led to an e-mail dated March 29, 2006 in which he stated that he did not see any other possibility than holding Autonomy liable for the damage he would suffer. This damage cannot be estimated. The payment took place only at the end of April 2006, upon a deduction of 40% for taxes (instead of 5% in conformity with the regulation). If Sluimer could still correct this, it could only be done after the end of the fiscal year 2006, that is, in April 2007. Separate from the large uncertainty, this goes together with a substantial loss of interests. This was made even worse because the payment was also noted on the April 2006 salary specification making it an additional indication for the British tax authorities that the payment took place in a different fiscal year, for which the special tariff did not apply.

25.   Moreover, considering the suggestion that he wanted to avoid the tax obligations, Sluimer felt compelled to take the tax assessments for the years 2001, 2002, and 2003 to the proceedings (annexes 20 a-c). From here it appeared that he paid high amounts of taxes for the years he lived in the Netherlands. Moreover, he also paid taxes in Germany and in the United Kingdom, as a

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



HS-0396

consequence of a so called salary split. In 2005, he still paid a considerable amount to the tax Authorities in the Netherlands. Sluimer acted with complete integrity and completely according to all the relevant fiscal laws. Therefore, he should not have been accused of wanting to take advantage of multiple systems. Also with regards to the dismissal protection, it simply applies that an agreement had already been concluded between the Parties (Sluimer and Verity) in 2005. On this occasion, the Dutch dismissal law was declared to be the applicable one. The Dutch law was also declared applicable in the assignment agreement of 2003 (annex 2, article 7).

<u>IX Another job</u>

26. Eventually, Autonomy assigned Sluimer another job at a subsidiary (so not with Autonomy!). "Offered" is not the correct word; Sluimer was not asked whether he considered the job fitting and if he wanted to agree with it. Without any pre-consultation he was told: "this is the job, contact Mr. Humphrey; good luck". By the way, Mr. Humphrey's name was spelled wrongly by Mr. Kanter, both in his mail and in his letter, which shows that Mr. Kanter and Mr. Humphrey had not been in contact a lot. Mr. Kanter did not even know his name, which fits the picture of the first telephone conversation which took place between Sluimer and Mr. Humphrey: The latter reacted somewhat surprised; he had been called by Mr. Kanter with the communication that he had found a 'good one' for him.

27. Only the job's title and salary were comparable (as to the bonuses and similar things, Autonomy did not make any concrete proposals, even if they are an important part, about 50%, of the remuneration). Sluimer pointed out (again) that in the most favorable case, it would involve an annual revenue of 3 million GBP. There were about 15 employees (when Humphrey started about 10 years ago, there were already 7). Virage operates in a sluggish, very specialized/complex market; it does not have any commercial employees; according to Mr. Humphrey, the revenue prognosis for this quarter was 200,000 GBP. In a short-mail message from Sushovan Hussain this was bloated, but it was not supported by factual data.

28. Below follows Sushovan Hussain's prognosis in short: a number of critical observations are on it. Why would they give estimated "revenues" for 2005; probably because the actual revenues were less. An estimated value of $ 300,000 is also given for the first quarter of 2006, whereas in reality the actual "revenues" were lower. Moreover, Mr. Humphrey personally told Sluimer that a

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



revenue of $ 350,000 was expected for the second quarter. Let's say that this would be realized; in the event of a revenue of $ 300,000 during the first quarter, the revenue for the entire year 2006 would be: $ 1.3 million in total. Moreover, the large projects for which Sushovan Hussain made a prognosis did not only include the Neurodynamics /Virage software component, but it also partially included the revenue realized for other entities within the Autonomy group. Therefore, it would have to be divided/split. Moreover, the so called "pipeline expectations" were quite optimistic. Not much value can therefore be given to the information in Sushovan Hussain's short e-mail.

29.  It clearly was a substantial decrease of responsibilities. Sluimer's job would exclusively be related to selling, instead of management in the more general meaning. Not only would he report to the CEO, but also to Virage's General Manager. So, two reporting lines, the most important of which was to the General Manager, who, by the way, was of the opinion that Sluimer had only to report to him. It must be recalled that in his former job at Verity, he managed about 8 general managers! This shows that the job they laid on him was of much smaller importance. The element of managing employees was barely included (at the utmost some salesmen who must still be recruited; the majority of the employees were technicians who would directly report to Humphrey).

30.  Autonomy seemed to assert that the job would be fitting, because Sluimer wrote that about 15.5 years ago he had built up Verity "from scratch". However, this is an unfair comparison. Even if the newly offered job was equal to the job that Sluimer occupied 15 years ago - when he was in his thirties - obviously now, this cannot anymore be considered fitting. Sluimer draws the parallel with the customary definition of a suitable job; a suitable job includes working activities which cover the employee's knowledge, education and experience. Sluimer's knowledge and experience obviously increased to an extreme extent during the last 15 years, and this is the core point. During all this time, Sluimer grew up into a very senior role.

31.  The situation can be compared to a manager of a brand like for example BMW, who over many years set up an organization in a large number of countries and who, after BMW's incorporation by Mercedes, would be asked to start a new small club within Mercedes, producing specific exhausts. A small club which was only recently incorporated and which, as a stranger, must receive a spot within Mercedes' organization.

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



HS-0398

<u>X Change in Control</u>

32. As to Sluimer appealing to the Change in Control, Sluimer had already explained that the situation was completely within the definition of a Change in Control according to the plan. This, for example, is also confirmed by the fact that the former CFO, Mr. Springsteel, also left Autonomy based on the Change in Control plan. Last Friday, Sluimer called Mr. Springsteel, who appealed to the plan's action only after settling various matters regarding the "confidentiality". Sluimer was obviously prepared to sign the confidentiality agreement; by the way, this agreement was already part of his labor agreement. With regards to the non-compete agreement, in Springsteel's case a specific relation clause had been agreed upon. Also regarding this item, Sluimer was prepared to sign the relevant documents upon the first request,

33. It was for this reason that Sluimer concluded his letter to the involved Plan Administrator, with the communication that if more information would be needed, he could be called about it. With this letter he wanted to implement the plan's action. His fax dated May 1, 2006 did not receive a reply from the Plan Administrator, but from Mr. Kanter who took over the case.

34. Sluimer repeated that Mr. Springsteel had also not been able to sign these agreements beforehand, but that he simply did it at the end of the procedure. It is typical for Autonomy to hide behind these formalities.

35. I will go into more depth about the plan and its applicability.

36. As already said, there was a so called Change in Control and Severance Benefit Plan and the parties didn't agree about in how far this applied to the assignment of a termination remuneration for Sluimer. I would like to explain this step by step.

<u>Step 1.</u>
The plan applies to Sluimer and Verity Benelux B.V., now that the last mentioned company is a Verity Inc. full subsidiary and that a participation notice was signed by both parties. Sluimer brought this to the trial as annexes 4 and 5. The parties agree on this.

<u>Step 2.</u>
According to the definition of Section 2 under (c), there was a "Change in Control" in a case like the present one. The parties agree on this.

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



HS-0399

Step 3.

In the definitions of Section 2, in (g), a Covered Termination is defined. We talk about a Covered Termination, <u>unless</u> there is an involuntary termination without reason by the employer <u>or</u> if there is a so called Constructive Termination. In this case there is no so called involuntary termination without reason for the employer, but a Constructive Termination. According to the definition in f (Section 2), this is the case if there is a voluntary termination of the labor agreement by an employee (participant) in a certain number of cases. One of those cases (defined under f sub (i)) is when there is a "substantial reduction in duties or responsibilities". From the above it shows that this is the case. The same applies to the place where the working activities are carried out, which is defined in article f under (iii); since the place where the duties will be carried out will no longer be the same. 95% of the time it will be in the United Kingdom. In short, for two reasons this is a Covered Termination.

In brief, differently from what is claimed by Autonomy, the Change in Control Plan can also apply <u>if the employee takes the initiative for the termination</u> and not only <u>if the employer</u> proceeds to the termination. Moreover, it must be said that in this procedure also Autonomy/Verity are requesting a dissolution, so that this argument does also not apply for another reason: Autonomy is also requesting the dissolution of the labor agreement.

Step 4

Section 3 of the Plan, under a, defines that in case of a Covered Termination (including a Constructive Termination) the redundancy regulation will become applicable. Here is the case.

Step 5

According to section 3 under b there are exceptions to these claims on remuneration. In short they are four;

(i) If an employee made an individual agreement about the termination;

(ii) If the employee voluntarily terminates the labor agreement with the employer in order to accept a labor agreement with another subsidiary company in the group, which is controlled by the employer.

(iii) If the employee is immediately offered another job by a legal successor of Verity.

(iv) If the employee does not confirm in writing that he will submit to the "confidentiality agreement" and the "non compete agreement".

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



To start with, in order to evaluate whether any of these exceptions apply, it must be considered that the header of the clause has an extremely unreasonable core determination, because it is always the employer who could influence the applicability of this regulation to his own discretion "as determined by the company in its sole discretion". According to the Dutch law, this is an unreasonable stipulation and because of lack of knowledge, Sluimer assumed that this was also the case according to the law of the state of California.

Both parties agree on the fact that the exceptions in (i) and (ii) are not applicable. The exception in (iv) only means that the employee must send a confirmation in writing that he will comply with the confidentiality agreement and the non-compete agreement. Sluimer was prepared to do that.

The exception in (iii) means that Verity/Autonomy (so, not another entity (for this purpose see sub (ii)!!) should offer a new position. This was not the case.

Virage is a separate company and not the incorporating party of the fusion, which actually is Autonomy Plc. Moreover, no direct re-employment was offered after January 6 of this year. Immediate means immediate and employment means a job. In this case this did not happen, not even with regards to the (somewhat bizarre) definition of "immediate reemployment". First of all, this regulation is not applicable because Virage cannot be identified with Verity/Autonomy. Moreover, the job cannot be identified as "uninterrupted", because there was a lapse (decline/decadence according to the Van Dale dictionary) and as indicated by Sluimer in his petition, he underwent a decline in income. The fact that during the same period options were exercised is obviously completely separate from this. This right is not at all related to whether the labor agreement continues or does not continue and, for example, it can still be widely exercised after the termination of the labor agreement. The incomes deriving from the exercise of the option rights can therefore not be included in this. Once these are set aside, there is definitely a lapse of income.

In short, the plan applies and Sluimer rightfully claims the payment of the agreed remunerations. To the excess, Sluimer also added that according to the so called participation notice, it is a matter of fact that the remuneration applies independently from the remaining working of the plan. The Dutch law simply applies and explicitly not the plan with regards to the question of whether a severance payment is owed. Also for this reason, Sluimer

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



HS-0401

rightfully claimed the payment of a remuneration in conformity to the cantonal right formula. The entire previous discussion is actually pretty arbitrary, mainly when it concerns the amount of the remuneration owed for the dissolution.

37.    However you look at it, the cantonal judge must always apply article 7:685 BW (that is, the cantonal judge formula).

38,    To explain it better. <u>Either</u> the plan applies, in which case the remuneration should be assigned according to the Dutch law; <u>or</u> the plan does not apply, also in this case and according to Sluimer's request, the regulation of article 7:685 should be applied, including the reasonable remuneration of paragraph 8 of that article and the cantonal judge formula that is based on this.

39.    Apart from that, however, this discussion is important in order to be vested and exercise the option rights and to continue the payment of contributions for the health insurance expenses.

<u>XI Basis and remuneration</u>

40.    In this procedure Sluimer asked for the dissolution based on important reasons, following the meaning of article 7:685 BW. Verity/Autonomy does not (or not anymore) declare that the Dutch law applies. This means that article 7:685 BW applies to the working relationship.

41.    Moreover, this means that a reasonable remuneration can be granted. Sluimer referred to the Change in Control plan, which explains how to calculate a remuneration. He is of the opinion that based on this plan, but also on the changes in situation, he would be entitled to appeal to a reasonable remuneration. In this procedure, moreover, Sluimer does not claim the application of the Change in Control plan, but, as already said, he claims the dissolution with the allowance of a reasonable remuneration. If the judge agrees with Autonomy that the Change in Control regulation does not apply in this specific situation, then a normal evaluation of the termination of this labor agreement based on article 7:685 BW should take place.

42.    If the Change in Control does not apply, this obviously does not mean that no remuneration is owed. In that case, separate from the Change in Control regulation, in this particular circumstance the current situation and the question of whether a fitting function was imposed upon him must be looked at. Also in that case a remuneration would be justified and seen the special circumstances, it must be a remuneration with the application of

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



the correction factor C=1.5. The relationship between the Autonomy Management and Sluimer is very new and probably no loyalty or trust relationship was built between them yet. But the way in which Sluimer has been treated during the last months witnesses of a bad employer's behavior. Sluimer had either to be considered for a redundancy regulation in a decent way, or – if Verity was really of the opinion that there was another suitable job, it should have looked for another job in agreement with Sluimer and in a thorough and professional way. By not doing this, it behaved in an unjust way and this must lead to the allowance of the requested remuneration; Sluimer took good note of the fact that the amount of the salary and the other actual data related to his employment were not disputed by Verity/Autonomy, so that the cantonal judge could make his evaluations.

### XII Collaboration

43.   Sluimer evaluated the "offered" position very well. Telephone conversations with Mr. Humphrey and Kanter took place immediately and respectively on March 23 and 24. Mr. Sluimer studied Autonomy's website, called colleague General Managers (among others Victor Cohen, Peter den Haan, Gerhard Hiller, Mike Mooney) in order to get information about Neurodynamics activities. Most of them actually knew Neurodynamics only by name. Mr. Den Haan, Sluimer's Technical Director at Verity, investigated it for Sluimer and this has been discussed in an elaborate way.

44.   Originally, Mr. Humphrey offered to organize a two days meeting in Cambridge in order to inform Sluimer. Some days before the planned meeting, this was reduced to one day ("Let's have a long, intensive day in the office"). Autonomy organized the travel plan. This, combined with the fact that Sluimer had to wait for the various interlocutors for a long time, made that on April 18 only one meeting took place which lasted 1 hour and 20 minutes. Sluimer made a report about it.

45.   The second meeting, planned in Rome on April 20, was cancelled because the flight ticket was "prohibitively expensive, without Sluimer being informed beforehand. It is impossible for Autonomy to keep saying that it did everything to introduce Sluimer.

### XIII Final conclusions

46.   In fact, the matter can be brought back to the core question: Is the imposed job suitable? This is not the case. A Senior Vice

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*



President is responsible for the entire operation (all the functions, he is responsible for profit and loss etc.), whereas Sluimer keeps operating under that name, but in fact he is responsible for the sales. Among other things, he must report to the General Manager, whereas in the past he personally managed a large number of General Managers. Autonomy did not involve Sluimer at all in looking for another suitable job, but kept him out of everything from the beginning on. The fact that he received two or three short e-mails, which communicated that they were working on it, offers an absolutely insufficient counter-balance in this relation.

47.    In addition to this, exactly in this ICT sector where the rhythm and dynamics are extremely high, an absence of more than three months without being in contact with the business relationships can destroy those relationships.

48.    For all the above reasons, Sluimer can only postulate that he was not offered a suitable job and that the labor agreement must be dissolved upon allowance of the requested remuneration; in addition Sluimer indicates that upon calculating the remuneration it has not been taken in consideration that, within some weeks, Sluimer will be 53 years old, so that the application of the cantonal judge formula will lead to a higher remuneration. Sluimer asks the cantonal judge to also take this in consideration.

The delegate

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc. June 05, 2008*
*www.asta-usa.com*

# EXHIBIT F

NautaDutilh

50068579 _____

District Court in Utrecht

Sector Canton

Hearing of: May 30 2006 at 3:15 pm

Role number: 466781 EJ VERZ 06-1375

## NOTES OF THE PROCEEDINGS

of Mr. J.A. de Roos and Mr. M. Ritmeester

Regarding:

Verity Benelux B.V.

Established in de Meern,

The defendant,

Lawyer: Mr. J .A. de Roos

Solicitor: Mr. M Ritmeester

Against:

H. Sluimer

Living in Monaco

Petitioner,

Lawyer and attorney: Mr. van der Pijl

Mr. Sluimer submitted his petition for the dissolution of his labor agreement with Verity Benelux B.V. Hereinafter I will talk about the petitioner "Sluimer" and the defendant "Verity/Autonomy", since Verity Benelux B.V. was taken over by Autonomy on December 29, 2005. Sluimer based his request for the dissolution on a change in circumstances. To be entitled to a remuneration he is of the opinion that he can derive a primary right from the Verity Inc. Change in Control and Severance Benefit Plan, which was attached to the petition as annex 4. Additionally, Sluimer is of the opinion that there was a breach of trust, which in his opinion is due to Autonomy. According to Sluimer, both these reasons would justify a remuneration with a correction factor C=1.5. In his petition Sluimer discusses various important facts and circumstances, which are extensively treated in the counter-plea. Now I will only go over the events in short and at the end I will elaborate on Sluimer's postulation.

2.      On December 29, 2005, Verity, Sluimer's former employer, was taken



*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 05, 2008 www.asta-usa.com*

**HS-0405**

*NautaDutilh*

over by Autonomy. At Verity, Sluimer had covered the position of Senior
Vice President of Sales Operations for the EMEA&APAC regions. Because of
the incorporation this function became redundant. Immediately after the
incorporation, Verity/Autonomy communicated this possible redundancy
to Sluimer. At the same time, it promised to do its best to find an
alternative comparable job for Sluimer. Moreover, Verity/Autonomy
explicitly informed all managers that *"Hugo"* was not *"out"* at all. This is
stated in annex 35(a) up to and including (g) of the counter plea In annex
16 of the counter plea, a former Verity/Autonomy employee, Spencer
Young stated that Verity/Autonomy's CFO, Mr. Hussain, had said that
Sluimer was not working for the corporation anymore; this is incorrect.
Mr. Hussain confirmed to Kanter that he never
said these words. Additionally, Verity/Autonomy pointed out how
Spencer Young transferred to Verity/Autonomy's competitor and that for
that reason he is in conflict with Verity/Autonomy about the competition
clause.

3.    In March 2006, Verity/Autonomy was able to communicate to Sluimer
      that a suitable job had been found: Senior Vice President of
      NeuroDynamics.
      The NeuroDynamics Department is one of the fastest growing within
      Verity/Autonomy and therefore it needed to be managed by an
      experienced man. Verity/Autonomy was of the opinion that, because of his
      background, Sluimer was very fit for this job. Moreover, this job offered
      the same labor conditions, including the salary and commission; it even
      offered better career opportunities. During the period in which
      Verity/Autonomy had been looking for this new job, Sluimer received his
      complete salary, including all the possibilities to exercise his commissions
      and options.

4.    Sluimer had hoped for a completely different ending. Sluimer actually
      does not want to work at all anymore and therefore he would like to be
      able to leave Verity/Autonomy with a substantial financial remuneration.
      Even before the incorporation had been completed, Sluimer already wrote
      an e-mail to one of the people involved in Verity's incorporation, Mr.
      Weenink, where he declared that after so many years of working he was
      tired; in this e-mail, which only reached Verity/Autonomy in May, he
      brought forward various arguments in order to convince
      Verity/Autonomy to buy him out. This e-mail was attached as annex 1 to
      the counter-plea.

5.    Since the beginning, Verity/Autonomy did not want to terminate the
      labor agreement with Sluimer but wanted to find an alternative job for
      Sluimer, because of his experience. Sluimer realized he was losing his
      dismissal remuneration and decided to push Verity/Autonomy in the
      direction he wanted to have them. So, he tried multiple times to do as if
      Verity/Autonomy had said that Verity/Autonomy was of the opinion that
      there was no alternative job that was fitting. Every time Verity/Autonomy
      clearly answered by saying that they actually were of the opinion that an
      alternative job was available and that they would keep looking for it full
      of confidence. During this period Sluimer also expressed by e-mail, his
      preference for a termination regulation with a remuneration.

*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 05, 2008 www.asta-usa.com*



*Nauta**Dutilh*

This is reported in annex 36. Up to that moment Verity/Autonomy had just started to find a new suitable job. It kept searching and was successful.

6. In March 2006, Sluimer was offered a new job and therefore he had to start working. Since Sluimer did not want to work, he decided that the job he had been offered was not suitable, but he did not bring up even one good reason for this. Based on a ten minute telephone conversation with the NeuroDynamics Managing Director, Sluimer refused the offered job; he also refused to talk about his position and the possible adjustments. Instead of this, Sluimer asked again for a termination regulation, and this time he began threatening judicial steps. This can be read in annex 22.

7. Verity/Autonomy is of the opinion that Sluimer's position is not acceptable. According to Verity/Autonomy, Sluimer consciously sabotaged the "another job" discussion. All Verity/Autonomy attempts to do so, were refused without additional explanations or discussions. It is Sluimer's choice that he does not want to work anymore. However, it is not Verity/Autonomy who has to suffer for it. Verity/Autonomy did everything to find a suitable alternative job for Sluimer and was successful in doing so. Nevertheless, Sluimer tried to paint himself as the victim, but he is not a victim at all. In reality, after the incorporation Sluimer was given a suitable alternative job. Additionally, he did not have a decrease of his salary and because of the incorporation his options produced him about 500,000 Euros.

8. Because of Sluimer's attitude, Verity/Autonomy is of the opinion that there is a breach of trust, which is completely to due to Sluimer. Before the incorporation, Sluimer had already indicated that he was "done" and that he wanted to stop working. After the incorporation Sluimer did everything to obtain the remuneration for the termination. First Sluimer tried to do as if Verity/Autonomy had said that there were no alternative jobs. Once they did find a job, Sluimer refused it without giving it a chance. Without consultation or negotiations, Sluimer directly went for the extreme means, the termination of the employment.
By doing this he changed the matters of fact and raised lies. It is remarkable, that even the position he took in his petition, among other things, did not correspond with what is stated in the annexes he personally brought to the proceedings. So, from the notes that Sluimer took personally after a meeting with Kanter and which were attached as annex 17, it appeared that Kanter had actually said that he would look for an alternative job. This means that Kanter had not said that such a job would probably not be available, as Sluimer stated in item 27 of his petition.

9. This made that Verity/Autonomy lost all the confidence in Sluimer. Therefore, there is reason to dissolve the labor agreement between the parties, because of serious reasons which are the change of circumstances. Now that Sluimer has to completely blame himself for the situation which has arisen, there is no room at all for a remuneration at Verity/Autonomy's expense.



*Dutch > English Certified Translation by: ASTA-USA Translation Services, Inc.*
*June 05, 2008 www.asta-usa.com*

HS-0407

# EXHIBIT G

Verbal case May 30, 2006 at 3:15 pm
Regarding art. 7:685 BW

Cantonal Judge Mrs. G.C. V. Gelein
Registrar Mr. Jongerius


Petitioner: Mr. H. Sluimer; ip
Delegate: Mr. J. van der Pijl, ip
And others
Respondent: Verity Benelux B.V.    Kanter (managing director)
Delegate: Mrs. M. Ritmeester, ip    Haverfield (legal Deputy)
Delegate: Mr. J.A. de Roos, ip


Vd Pijl: Petition
Ritmeester: Colleague de Roos read the plea. Meeting 04-18-06. This showed Sluimer's
double position. The request for dissolution was presented on 04-18-06. Sluimer did not
mention this. Sluimer did not take any action to obtain additional information. The
meeting in Miami: Sluimer did not need to go there. It was clear that Sluimer's job had
become redundant. The objective was to find a fitting job. We don't need to talk anymore
about which law applies. We always wanted to make sure that Sluimer would not lose out
on his income. It did not have anything to do with the revenue. Fiscal position. Verity
always collaborated on fiscal advantages, however, it was always upon Sluimer's request.
Many options could be exercised upon the incorporation.

Ritmeester: Ultimately the Dutch law applies, but the formalities have not been taken in
consideration. Now Sluimer wants to sign the {o.v.k ???} It doesn't sound credible. The
plan did not apply because Sluimer did not comply with the conditions. Sluimer was a
good employer for the client and therefore he wanted to keep him.

Cant. judge: Does the plan also apply upon the employee's request?
Ritmeester: The plan does not apply, so there is little to be said about it.
Cant. Judge: The old job was also a managing position. Is the new job only sales?
Kanter: The old and the new job are the same. The CEO will always be the boss.
Cant. Judge: I understand that Sluimer is saying that he will have to start something up
again?
Ritmeester: Neurodynamics is a company which already has opportunities
Cant. Judge: Shouldn't the employer offer a job and inform the employee?
Ritmeester: The client found a job. This must be followed by meetings about how the job
must be filled. Sluimer did not collaborate.
Sluimer: I'm being painted as a money-grubber. All kinds of things are being suggested.
There was no exact position. I didn't want to just wait.
v.d. Pijl: ??? request. Sluimer already indicated on 04-11-06 that the job was not fitting
for him

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc.*
*June 05, 2008 www.asta-usa.com*



**HS-0408**

v.d. Pijl: Sluimer did not have a double agenda. Sluimer was the Senior Vice President of everything, not only for Sales. After the incorporation Hussein took over Sluimer's job.
Kanter: Eventually the jobs are almost the same. Raise the sales digits. Recruit staff.
Sluimer: Everything was reported to me. I had the responsibility.
Kanter: In my opinion this is all related to sales. I regret not having spoken with Sluimer more often.
Sluimer: Autonomy's revenue (66%) comes from America. I do not influence that.
Cantonal judge: Did you speak about a solution?
v.d.Pijl: We spoke a little about it
Ritmeester: I'm ready to talk more.
Cant. Judge: The job has become redundant. The employer's area of risk. Was Sluimer offered a suitable job? I don't think so. Not at the same level. I don't see a reason for C=1.5. A job redundancy is the case. In my opinion C=1. A factor 24.
10 min. recess.
After the recess
Ritmeester: No agreement yet. Maybe tomorrow. If you don't hear anything then we would like the decision. It is a shame that the discussion with Sluimer about the contents of the job could not take place.
v.d.Pijl: Can the deadline be Friday?
Cant. Judge: That is fine with me.
v.d.Pijl: If a sentence must be pronounced then only a sentence about the termination and not about the other matters.
Cant. Judge. In the case of a sentence, it will take place on July 5 or 6. So at the latest on 06-13-06

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc.*
*June 05, 2008 www.asta-usa.com*



HS-0409

# EXHIBIT H

# Ordinance

**DISTRICT COURT IN UTRECHT**

Sector canton

Location Utrecht

Case number: 466781 EJ VERZ 06-1375

Ordinance dated June 7, 2006

Regarding

**HUGO SLUIMER,**
Living in Monaco
Hereinafter to be called Sluimer,
Appealing party,
Delegate Mr. J. van der Pijl lawyer in Amsterdam,

Against:

The limited liability company **VERITY BENELUX** B.V.
Established in De Meern and with offices in Nieuwegein,
Also to be called Verity,
Responding party,
Delegates: Mr. M. Ritmeester and Mr. I .A. de Roos, lawyers in Amsterdam.


Progress of the procedure

On April 19, 2006 Sluimer presented a petition.
Verity presented a counter-plea.
The appeal was handled during the hearings of May 30, 2006. These were recorded in the minutes.
The decision was taken thereafter.


The motivation

The following facts have been established in this case.
a.  Sluimer, born on June 19, 1953, was hired as Sales Manager Benelux, on June 1, 1990, by Verity Inc., an American supplier of search technology. Short after that Verity Inc.'s activities, including the labor agreement between Sluimer and Verity Inc, were incorporated by Verity.
b.  Lately, based on an 'assignment agreement' Sluimer had been active for Verity GB Ltd in the position of Senior Vice President, EMEA and APAC Operations. His region, EMEA/APAC included the regions of Europe, Middle-East, Asia and the so called Asian-Pacific Region. Sluimer was responsible for revenue of 50 million USD and managed a team of more than 100 employees.
c.  His last gross salary was € 45,076,000 a month, including holiday allowance and other structural salary components.

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*



**HS-0410**

Case 3:08-cv~01220-SI    Document 7    Filed 04/22/2008    Page 54 of 70

Case number: 466781 EJ VERZ 06-1375                                                        Page 2

---

   d.  On December 29, 2005 Verity Inc. and all its subsidiaries (including Verity) were
        incorporated by Autonomy, a British search engine supplier.
   e.  Through this take over, (among other things) Sluimer's job became redundant.
        All his tasks were taken over by Autonomy's CFO, Mr. Sushovan Hussain. After the last
        mentioned date, Sluimer did not carry out his duties anymore.
   f.  At the end of March 2006, Sluimer was informed that a suitable position had been found
        for him inside Neurodynamics, a company under Verity/Autonomy's control.
   g.  Subsequently, Sluimer carried out working activities for Neurodynamics, but did not
        accept the specified job.

2.

Sluimer requested the dissolution of the labor agreement with Verity because of changes in the
circumstances. He considered the job that was offered to him within Neurodynamics as non-
suitable. Moreover, he postulated that in the meanwhile a breach of trust had arisen between
the parties and that this was due to Verity. After his job had become redundant because of
Verity's incorporation by Autonomy and after he had been set on inactive status, the
relationship between the parties was seriously damaged because of Verity's behavior. Sluimer
asked the cantonal judge to receive a remuneration at Verity's expense and according to the
cantonal judge formula with C-factor 1.5.

3

Verity was not against the resolution of the labor agreement. Like Sluimer it was of the
opinion that a fruitful collaboration between the parties was no longer an option. According
to Verity this was, however, due to Sluimer. Verity postulated that Sluimer had not been
open at all to a new job, and that because of his wish to receive a substantial dismissal
remuneration, he sabotaged the 'other job' discussion, that Verity had offered him a suitable
alternative job at the level of his previous job and that he unjustly refused that job. For this
reason, it was not of the opinion that a dissolution remuneration was needed.

4.

According to the cantonal judge, the request of dissolution is no way related with a
resignation ban.

5.

Based on what was adduced from both sides, the cantonal judge is of the opinion that, seeing
the kind and the importance of the job offered at Neurodynamics, as well as the number of
employees at Neurodynamics, Sluimer made it sufficiently convincing that from the point of
view of the labor law, the job cannot be considered a suitable alternative job. The fact that
the job would not change Sluimer's labor conditions and that within that job there are/were
possibilities for career, do not influence the aforementioned. As it does not seem that within
Verity's organization a suitable job will become available for Sluimer on a short term and
that in the near future Verity cannot give content to the labor relationship with Sluimer,
according to the cantonal judge it cannot be expected from Sluimer that he continues his
working relationship with Verity. Therefore, the cantonal judge will dissolve the labor
agreement.

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*



Case number, 466781EJ VERZ 06-1375                                    Page 3

6.
For this reason there will be a dissolution of the labor agreement because of
Verity/Autonomy's decision to make Sluimer's job redundant after the December 29, 2005
incorporation, because of the absence of another fitting job for Sluimer at Verity/Autonomy.
Herewith it is confirmed that the reason for the dissolution lies within Verity's area of risk.
Usually, in cases like this, a remuneration calculated with the application of the so called
neutral cantonal judge formula (with C-factor 1) is considered reasonable. In this case, the
cantonal judge does not see a reason to assign a higher remuneration to Sluimer at Verity's
expense than with the application of the remuneration calculated through the application of
the mentioned neutral formula. That after December 29, 2005 irritations have arisen on both
sides and that the relationship between them was damaged, is not considered relevant in this
framework by the cantonal judge, since this derives from the fact that there is no suitable job
for Sluimer at Verity/Autonomy.

7.
Seeing the above, the cantonal judge will determine at Verity's expense that a remuneration
calculated with the application of the neutral cantonal judge formula is owed to Sluimer by
Verity. Sluimer will be offered a deadline within which he can cancel the petition.

Because of the kind of the dispute, the process expenses will be compensated, except if
Sluimer cancels his petition. In that case Sluimer will be sentenced to pay Verity's process
expenses.

Decision

The cantonal judge:

puts Sluimer in the position to cancel his petition at the latest by June 22, 2006;

and if the petition will not be cancelled:

He will dissolve the labor agreement between the parties as of June 23, 2006;

He assigns a remuneration of € 1,081,824.00 gross to Sluimer at the expense of Verity and
condemns Verity to the payment of this remuneration to Sluimer;

He compensates the process expenses in such a way that the parties will bear

their own expenses; and in case the petition will be cancelled in a timely

manner:

he will condemn Sluimer to pay Verity's process expenses, which for the verdict of this
sentence are estimated on € 500.00 for the salary of the delegate.

This sentence is pronounced by Mr. G.C. van Gelein Vitringa-Boudewijnse, cantonal
judge and in the presence of the registrar it was pronounced on June 7, 2006.

*Dutch > English Certified Translation by:*
*ASTA-USA Translation Services, Inc. June 05, 2008 www.asta-usa.com*



**HS-0412**