RIMAC & MARTIN
A Professional Corporation
JOSEPH M. RIMAC – CSBN 72381
WILLIAM REILLY – CSBN 177550
1051 Divisadero Street
San Francisco, CA 94115
Telephone: (415) 561-8440
Facsimile:   (415) 561-8430

MCGUINN, HILLSMAN & PALEFSKY
CLIFF PALEFSKY (State Bar No. 77683)
KEITH EHRMAN (State Bar No. 106985)
535 Pacific Ave.
San Francisco, CA 94133
Telephone: (415) 421-9292
Facsimile: (415) 403-0202

Attorneys for Plaintiff
HUGO SLUIMER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**E-FILING**

| | |
|---|---|
| HUGO SLUIMER,<br><br>                    Plaintiff,<br><br>v.<br><br>VERITY, INC., a corporation, and THE<br>VERITY INC. CHANGE IN CONTROL AND<br>SEVERANCE BENEFIT PLAN,<br><br>                    Defendants. | **CASE NO.  C 081220 SI**<br><br>**DECLARATION OF HUGO SLUIMER** |

I, Hugo Sluimer, hereby declare as follows:

1.      I am the plaintiff in the captioned action.  I have personal knowledge of the facts set forth herein and can testify competently thereto if requested to do so.

2.      On and before December 29, 2005, I was employed as Verity's Senior Vice President for EMEA and APAC Operations, I had responsibility for over 100 reports, including

1  10 country managers.  I was responsible for overseeing operations generating approximately

2  $50,000,000 in revenue (roughly half of VERITY's total worldwide revenue).  I reported directly

3  to VERITY's President/CEO.  I had responsibility for all aspects of VERITY operations outside

4  of the Americas, including responsibility for sales, marketing, finance, administration, technical

5  operations, and oversight of consultants.

6      3.      Attached hereto as Exhibit A is true and correct copy of the VERITY INC.

7  CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN (the "Plan") and my

8  Participation Notice that I received on or after April 6, 2005.  I have reviewed Mr. Kanter's

9  Declaration in support of the defendants' motion to dismiss.  Plan Pages numbered 18-23, which

10  included Exhibit B RELEASE AGREEMENT, Exhibit C RELEASE AGREEMENT and Exhibit

11  D RELEASE AGREEMENT, attached to the Kanter Declaration were not provided to me when

12  the Plan was issued or during my claim.

13      4.      Attached hereto as Exhibit B are true and correct copies of all of the

14  correspondence and emails between me and the defendants regarding my employment and

15  benefits from December 29, 2005 through March 22, 2007 that I possess.

16      5.      Attached hereto as Exhibit C are true and correct copies of my Stock Option

17  Agreement, Notices of Grant of Stock Options and Closing Statement.

18      6.      Attached hereto as Exhibit D are true and correct copies of premiums that I paid

19  for my continued medical benefits for the 18 months after my employment with Verity was

20  terminated in June 2006.  The total cost for the 18 months of continued medical benefits was

21  €3,873.30.

22      7.      In January 2006, Andrew Kanter instructed me to cease performing work at

23  Verity. During this period, I continued to receive a pay check.  However, I was paid significantly

24  less than the monthly pay that I received over the past three years.  From 2003-2005, my average

25  monthly pay was € 45,076 .  Had I received my average monthly pay during these three months

26  in 2006, I would have received additional pay of € 8,842 for the month of January 2006, € 18,043

27  for the month of February 2006 and €15,900 for the month of March 2006.  In 2006, I was

28  informed that my monthly pay was based on commissions which were based upon the then

1   an agreement. I assumed that all necessary documents would be forwarded to me by the Plan

2   Administrator and that I would execute those documents upon confirmation of the award of Plan

3   benefits. That is why on May 1, 2006, I wrote to the Plan Administrator and stated that I believed

4   I was entitled to Plan Benefits and wrote "[i]f you need more information, please do not hesitate

5   to call me." No one, including but not limited to Mr. Kanter, ever stated or suggested to me that

6   I would be paid the Plan benefits if I did execute a Confidentiality Agreement and/or Non

7   Compete Agreement.

8        11.    I was always willing to execute a waiver and release generally releasing the

9   Company from any and all claims and liabilities. I repeatedly confirmed so in writing by way of

10   emails and the documents that I filed in the Dutch Court. No one, including but not limited to

11   Mr. Kanter, ever provided me with Exhibit B RELEASE AGREEMENT, Exhibit C RELEASE

12   AGREEMENT and/or Exhibit D RELEASE AGREEMENT. No one, including but not limited

13   to Mr. Kanter, ever informed me that my claim would be denied if I did not execute a Release,

14   nor did I ever refuse to execute a Release. I assumed that all necessary documents would be

15   forwarded to me by the Plan Administrator and that I would execute those documents upon

16   confirmation of the award of Plan benefits. That is why on May 1, 2006, I wrote to the Plan

17   Administrator and stated that I believed he was entitled to Plan Benefits and wrote "[i]f you need

18   more information, please do not hesitate to call me." No one, including but not limited to Mr.

19   Kanter, ever stated or suggested to me that I would be paid the Plan benefits if I did execute a

20   Release.

21        I declare under penalty of perjury under the laws of the United States that the foregoing is

22   true and correct.

23   Executed this *12* th day of June 2008, at Monaco.

24

25

26

27                           Hugo Sluimer

28

---

**DECLARATION OF HUGO SLUIMER**       4       CASE NO. C 07-2381 SI

# EXHIBIT A



## VERITY, INC.

## CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

### SECTION 1. INTRODUCTION.

The Verity, Inc. Change in Control and Severance Benefit Plan (the *"Plan"*) is hereby established effective April 6, 2005 (the *"Effective Date"*). The purpose of the Plan is to provide for the payment of severance benefits to certain eligible employees of Verity, Inc. and its wholly owned subsidiaries (the *"Company"*) in the event that such employees are subject to qualifying employment terminations in connection with a Change in Control. This Plan shall supersede any severance benefit plan, policy or practice previously maintained by the Company, other than an individually negotiated contract or agreement with the Company relating to severance or change in control benefits that is in effect on an employee's termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does *not* entirely eliminate benefits under this Plan. This document also is the Summary Plan Description for the Plan.

### SECTION 2. DEFINITIONS.

For purposes of the Plan, the following terms are defined as follows:

(a)     *"Base Salary"* means the Participant's annual base pay (excluding incentive pay, premium pay, commissions, overtime, bonuses and other forms of variable compensation), at the rate in effect during the last regularly scheduled payroll period immediately preceding the date of the Participant's Covered Termination.

(b)     *"Board"* means the Board of Directors of Verity, Inc.

(c)     *"Change in Control"* means one of the following events or a series of more than one of the following events that are related, wherein the stockholders of the Company immediately before the transaction do not retain immediately after the transaction, in substantially the same proportions as their ownership of shares of the Company's voting stock immediately before the transaction, direct or indirect beneficial ownership of more than fifty percent (50%) of the total combined voting power of the outstanding voting stock of the Company, the resulting entity in a merger or, in the case of an asset sale, the corporation or corporations to which the assets of the Company were transferred (the "Transferee Corporation(s)"), as the case may be:

(i)     the direct or indirect sale or exchange in a single or series of related transactions by the stockholders of the Company of more than fifty percent (50%) of the voting stock of the Company;

(ii)     a merger or consolidation in which the Company is a party;

Verity, Inc.     894 Ross Drive   Sunnyvale, CA 94089     t. 408.541.1500    f. 408.541.1600    www.verity.com

HS-0001

# Verity

(iii)    the sale, exchange, or transfer of all or substantially all of the assets of the Company; or

(iv)    a liquidation or dissolution of the Company.

For purposes of this Section 2(c), indirect beneficial ownership shall include, without limitation, an interest resulting from ownership of the voting stock of one or more corporations, which as a result of the transaction, own the Company, the resulting entity or the Transferee Corporation(s), as the case may be, either directly or through one or more subsidiary corporations.  The Board shall have the right to determine whether multiple sales or exchanges of the voting stock of the Company or more than one of the following events are related, and its determination shall be final, binding and conclusive.

(d)    *"Code"* means the Internal Revenue Code of 1986, as amended.

(e)    *"Company"* means Verity, Inc. and its wholly owned subsidiaries or, following a Change in Control, the surviving entity resulting from such transaction.

(f)    *"Constructive Termination"* means a voluntary termination of employment by a Participant after one of the following is undertaken without the Participant's express written consent:

(i)    a substantial reduction in the Participant's duties or responsibilities (and not simply a change in title or reporting relationships) in effect immediately prior to the effective date of the Change in Control; *provided, however,* that it shall not be a "Constructive Termination" if, following the effective date of the Change in Control, either (a) the Company is retained as a separate legal entity or business unit and the Participant holds the same position in such legal entity or business unit as the Participant held before such effective date, or (b) the Participant holds a position with duties and responsibilities comparable (though not necessarily identical, in view of the relative sizes of the Company and the entity involved in the Change in Control) to the duties and responsibilities of the Participant prior to the effective date of the Change in Control;

(ii)    a reduction in the Participant's base salary (except for salary decreases generally applicable to the Company's other similarly situated employees);

(iii)    a change in the Participant's business location of more than 20 miles from the business location prior to such change, except for required travel for the Company's business to an extent substantially consistent with Participant's prior business travel obligations;

(iv)    a material breach by the Company of any provisions of the Plan or any enforceable written agreement between the Company and the Participant; or

(v)    any failure by the Company to obtain assumption of the Plan by any successor or assign of the Company.

HS-0002



Notwithstanding the foregoing, a voluntary termination shall not be deemed a Constructive Termination unless (x) the Participant provides the Company with written notice (the "Constructive Termination Notice") that the Participant believes that an event described in this Section 2(f) has occurred, (y) the Constructive Termination Notice is given within three (3) months of the date the event occurred, and (z) the Company does not rescind or cure the conduct giving rise to the event described in this Section 2(f) within fifteen (15) days of receipt by the Company of the Constructive Termination Notice.

(g)    *"Covered Termination"* means an Involuntary Termination Without Cause or a Constructive Termination, either of which occurs within one (1) month prior to or within eighteen (18) months following the effective date of a Change in Control. Termination of employment of a Participant due to death or disability shall not constitute a Covered Termination unless a voluntary termination of employment by the Participant immediately prior to the Participant's death or disability would have qualified as a Constructive Termination.

(h)    *"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

(i)    *"Involuntary Termination Without Cause"* means an involuntary termination of employment by the Company other than for one of the following reasons:

(i)    the Participant's violation of any material provision of the Company's standard agreement relating to proprietary rights;

(ii)   the Participant participates in any act of theft or dishonesty; or

(iii)  the Participant participates in any immoral or illegal act which has had or could reasonably be expected to have or had a detrimental effect on the business or reputation of the Company; or

(iv)   any material failure by the Participant to use reasonable efforts to perform reasonably requested tasks after written notice and a reasonable opportunity to comply with such notice.

(j)    *"Participant"* means an individual who is employed by the Company as its Executive Chairman of the Board, Chief Executive Officer, as a senior vice president, or as a vice president (other than any individual who is a vice president on sales commission, as determined by the Company in its sole discretion); *provided, however,* that if the Board shall make an affirmative determination that an employee serving in any such capacity shall not be a Participant, then such employee shall not be deemed a Participant. The determination of whether an employee is a Participant shall be made by the Company, in its sole discretion, and such determination shall be binding and conclusive on all persons.

(k)    *"Participation Notice"* means the latest notice delivered by the Company to a Participant informing the employee that the employee is a Participant in the Plan, substantially in the form of **Exhibit A** hereto.

HS-0003



(l)    *"Plan Administrator"* means the Board or any committee duly authorized by the Board to administer the Plan. The Plan Administrator may, but is not required to be, the Compensation Committee of the Board. The Board may at any time administer the Plan, in whole or in part, notwithstanding that the Board has previously appointed a committee to act as the Plan Administrator.

## SECTION 3.  ELIGIBILITY FOR BENEFITS.

(a)    **General Rules.** Subject to the provisions set forth in this Section and Section 7, in the event of a Covered Termination, the Company will provide the severance benefits described in Section 4 of the Plan to the affected Participant. Promptly upon an employee becoming a Participant, the Company shall deliver to the Participant a Participation Notice.

(b)    **Exceptions to Benefit Entitlement.** An employee, including an employee who otherwise is a Participant, will not receive benefits under the Plan (or will receive reduced benefits under the Plan) in the following circumstances, as determined by the Company in its sole discretion:

(i)    The employee has executed an individually negotiated employment contract or agreement with the Company relating to severance or change in control benefits that is in effect on his or her termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan.

(ii)    The employee voluntarily terminates employment with the Company in order to accept employment with another entity that is controlled (directly or indirectly) by the Company or is otherwise an affiliate of the Company.

(iii)    The employee is offered immediate reemployment by a successor to the Company or by a purchaser of its assets, as the case may be, following a change in ownership of the Company or a sale of all or substantially all the assets of a division or business unit of the Company. For purposes of the foregoing, "immediate reemployment" means that the employee's employment with the successor to the Company or the purchaser of its assets, as the case may be, results in uninterrupted employment such that the employee does not suffer a lapse in pay as a result of the change in ownership of the Company or the sale of its assets.

(iv)    The employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non-Compete Agreement.

(c)    **Termination of Benefits.** A Participant's right to receive the payment of benefits under this Plan shall terminate immediately if, at any time prior to or during the period for which the Participant is receiving benefits hereunder, the Participant, without the prior written approval of the Company:

HS-0004



(i)   willfully breaches a material provision of the Participant's proprietary information or confidentiality agreement with the Company, as referenced in Section 3(b)(iv);

(ii)   owns, manages, operates, joins, controls or participates in the ownership, management, operation or control of, is employed by or connected in any manner with, any person, enterprise or entity which is engaged in any business competitive with that of the Company; *provided, however,* that such restriction will not apply to any passive investment representing an interest of less than two percent (2%) of an outstanding class of publicly-traded securities of any corporation or other entity or enterprise;

(iii)   encourages or solicits any of the Company's then current employees to leave the Company's employ for any reason or interferes in any other manner with employment relationships at the time existing between the Company and its then current employees; or

(iv)   induces any of the Company's then current clients, customers, suppliers, vendors, distributors, licensors, licensees or other third party to terminate their existing business relationship with the Company or interferes in any other manner with any existing business relationship between the Company and any then current client, customer, supplier, vendor, distributor, licensor, licensee or other third party.

## SECTION 4.  AMOUNT OF BENEFITS.

(a)   **Cash Severance Benefits.**  Each Participant who incurs a Covered Termination and was employed by the Company at the position or level set forth below within one (1) month immediately prior to such Covered Termination shall be entitled to receive a cash severance benefit equal to the number of months of Base Salary set forth below.  Any cash severance benefits provided under this Section 4(a) shall be paid pursuant to the provisions of Section 5.

| Position or Level | Amount of Cash Severance Benefit |
|---|---|
| Executive Chairman of the Board | 24 months |
| Chief Executive Officer | 24 months |
| Senior Vice President | 24 months |
| Vice President (Except Vice Presidents on sales commissions) | 18 months |
| | 12 months |

(b)   **Accelerated Stock Award Vesting and Extended Exercisability of Stock Options.**  If a Participant incurs a Covered Termination, then effective as of the date of the Participant's Covered Termination, (i) the vesting and exercisability of all outstanding options to purchase the Company's common stock that are held by the Participant on such date shall be accelerated in full, and (ii) any reacquisition or repurchase rights held by the Company in respect

HS-0005



of common stock issued pursuant to any other stock award granted to the Participant by the Company shall lapse.

In addition, the post-termination of employment exercise period of any outstanding option held by the Participant on the date of his or her Covered Termination shall be extended, if necessary, such that the post-termination of employment exercise period shall not terminate prior to the later of (i) the date twelve (12) months after the effective date of the Covered Termination or (ii) the post-termination exercise period provided for in such option; *provided, however,* that such option shall not be exercisable after the expiration of its maximum term; *provided, further,* however, that in the event that any extended exercisability of an option pursuant to this Section 4(b) would adversely affect a Participant's option or other stock award (including, without limitation, its status as an incentive stock option under Section 422 of the Code or result in an option that would not otherwise be deemed to be a nonqualified deferred compensation plan or arrangement for the purposes of Section 409A of the Code to be deemed to be such a nonqualified deferred compensation plan or arrangement), such extended exercisability shall be deemed null and void unless the affected Participant consents in writing to such extended exercisability within thirty (30) days after becoming a Participant in the Plan.

(c)    **Continued Medical Benefits.** If a Participant incurs a Covered Termination and the Participant was enrolled in a health, dental, or vision plan sponsored by the Company immediately prior to such Covered Termination, the Participant may be eligible to continue coverage under such health, dental, or vision plan (or to convert to an individual policy), at the time of the Participant's termination of employment, under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The Company will notify the Participant of any such right to continue such coverage at the time of termination pursuant to COBRA. No provision of this Plan will affect the continuation coverage rules under COBRA, except that the Company's payment, if any, of applicable insurance premiums will be credited as payment by the Participant for purposes of the Participant's payment required under COBRA. Therefore, the period during which a Participant may elect to continue the Company's health, dental, or vision plan coverage at his or her own expense under COBRA, the length of time during which COBRA coverage will be made available to the Participant, and all other rights and obligations of the Participant under COBRA (except the obligation to pay insurance premiums that the Company pays, if any) will be applied in the same manner that such rules would apply in the absence of this Plan.

If a Participant timely elects continued coverage under COBRA, the Company shall pay the full amount of the Participant's COBRA premiums on behalf of the Participant for the Participant's continued coverage under the Company's health, dental and vision plans, including coverage for the Participant's eligible dependents, during the number of months of Base Salary in respect of which the amount paid to the Participant under Section 4(a) was calculated (the "Severance Period"); *provided, however,* that if the Severance Period exceeds the length of time that the Participant is entitled to coverage under COBRA (including any additional period under analogous provisions of state law), the resulting or acquiring entity or Transferee Corporation involved in the Change in Control, as applicable, shall be required to provide health, dental and vision insurance coverage for the Participant and his or her eligible dependents for any portion of the Severance Period that exceeds the length of time that the Participant is entitled to coverage

HS-0006



under COBRA (including any additional period under analogous provisions of state law), at a level of coverage that is substantially similar to the continued coverage that the Participant and his or her eligible dependents received under the Company's health, dental and vision plans; *provided, further, however,* that no such premium payments (or any other payments for medical, dental or vision coverage by the Company) shall be made following the Participant's death or the effective date of the Participant's coverage by a medical, dental or vision insurance plan of a subsequent employer. Each Participant shall be required to notify the Company immediately if the Participant becomes covered by a medical, dental or vision insurance plan of a subsequent employer. Upon the conclusion of such period of insurance premium payments made by the Company, the Participant will be responsible for the entire payment of premiums required under COBRA for the duration of the COBRA period.

For purposes of this Section 4(c), (i) references to COBRA shall be deemed to refer also to analogous provisions of state law and (ii) any applicable insurance premiums that are paid by the Company shall not include any amounts payable by the Participant under an Internal Revenue Code Section 125 health care reimbursement plan, which amounts, if any, are the sole responsibility of the Participant.

(d)    **Other Employee Benefits.**  All other benefits (such as life insurance, disability coverage, and 401(k) plan coverage) shall terminate as of the Participant's termination date (except to the extent that a conversion privilege may be available thereunder).

(e)    **Additional Benefits.**  Notwithstanding the foregoing, the Company may, in its sole discretion, provide benefits in addition to those pursuant to Sections 4(a), 4(b) and 4(c) to Participants or employees who are not Participants ("Non-Participants") chosen by the Company, in its sole discretion, and the provision of any such benefits to a Participant or a Non-Participant shall in no way obligate the Company to provide such benefits to any other Participant or to any other Non-Participant, even if similarly situated.  If benefits under the Plan are provided to a Non-Participant, references in the Plan to "Participant"(with the exception of Sections 4(a), 4(b) and 4(c)) shall be deemed to refer to such Non- Participants.

## SECTION 5.  TIME AND FORM OF SEVERANCE PAYMENTS.

(a)    **General Rules.**  Subject to Section 5(b), any cash severance benefit provided under Section 4(a) shall be paid in installments pursuant to the Company's regularly scheduled payroll periods commencing as soon as practicable following the effective date of a Participant's Covered Termination and shall be subject to all applicable withholding for federal, state and local taxes. In the event of a Participant's death prior to receiving all installment payments of his or her cash severance benefit under Section 4(a), any remaining installment payments shall be made to the Participant's estate on the same payment schedule as would have occurred absent the Participant's death.  In no event shall payment of any Plan benefit be made prior to the effective date of the Participant's Covered Termination or prior to the effective date of the release described in Section 7(a).

(b)    **Application of Section 409A.**  In the event that any cash severance benefit provided under Section 4(a) or continued medical benefit under Section 4(c) shall fail to satisfy

7.

HS-0007



the distribution requirement of Section 409A(a)(2)(A) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, the payment of such benefit shall be accelerated to the minimum extent necessary so that the benefit is not subject to the provisions of Section 409A(a)(1) of the Code. (The payment schedule as revised after the application of the preceding sentence shall be referred to as the *"Revised Payment Schedule."*) In the event the payment of benefits pursuant to the Revised Payment Schedule would be subject to Section 409A(a)(1) of the Code, the payment of such benefits shall not be paid pursuant to the Revised Payment Schedule and instead the payment of such benefits shall be delayed to the minimum extent necessary so that such benefits are not subject to the provisions of Section 409A(a)(1) of the Code. The Board may attach conditions to or adjust the amounts paid pursuant to this Section 5(b) to preserve, as closely as possible, the economic consequences that would have applied in the absence of this Section 5(b); *provided, however*, that no such condition or adjustment shall result in the payments being subject to Section 409A(a)(1) of the Code.

SECTION 6. REEMPLOYMENT.

In the event of a Participant's reemployment by the Company during the period of time in respect of which severance benefits pursuant to Section 4(a) or 4(e) have been paid, the Company, in its sole and absolute discretion, may require such Participant to repay to the Company all or a portion of such severance benefits as a condition of reemployment.

SECTION 7. LIMITATIONS ON BENEFITS.

(a)     **Release.** In order to be eligible to receive benefits under the Plan, a Participant also must execute a general waiver and release in substantially the form attached hereto as Exhibit B, Exhibit C or Exhibit D, as appropriate, and such release must become effective in accordance with its terms.    For purposes of the preceding sentence, with respect to any outstanding option held by the Participant, the receipt of benefits shall be deemed to be the exercise of such option pursuant to the extended exercisability of such option under Section 4(b), rather than the acceleration or extension of such option's exercisability. The Company, in its sole discretion, may modify the form of the required release to comply with applicable law and shall determine the form of the required release, which may be incorporated into a termination agreement or other agreement with the Participant.

(b)     **Certain Reductions.** The Company, in its sole discretion, shall have the authority to reduce a Participant's severance benefits, in whole or in part, by any other severance benefits, pay in lieu of notice, or other similar benefits payable to the Participant by the Company that become payable in connection with the Participant's termination of employment pursuant to (i) any applicable legal requirement, including, without limitation, the Worker Adjustment and Retraining Notification Act (the "WARN Act"), (ii) a written employment or severance agreement with the Company, or (iii) any Company policy or practice providing for the Participant to remain on the payroll for a limited period of time after being given notice of the termination of the Participant's employment. The benefits provided under this Plan are intended to satisfy, in whole or in part, any and all statutory obligations and other contractual obligations of the Company that may arise out of a Participant's termination of employment, and

Verity, Inc.    894 Ross Drive  Sunnyvale, CA 94089    t. 408.541.1500    f. 408.541.1600    www.verity.com

HS-0008

Verity™

the Plan Administrator shall so construe and implement the terms of the Plan. The Company's decision to apply such reductions to the severance benefits of one Participant and the amount of such reductions shall in no way obligate the Company to apply the same reductions in the same amounts to the severance benefits of any other Participant, even if similarly situated. In the Company's sole discretion, such reductions may be applied on a retroactive basis, with severance benefits previously paid being recharacterized as payments pursuant to the Company's statutory or other contractual obligations.

(c)    **Mitigation.** Except as otherwise specifically provided herein, a Participant shall not be required to mitigate damages or the amount of any payment provided under this Plan by seeking other employment or otherwise, nor shall the amount of any payment provided for under this Plan be reduced by any compensation earned by a Participant as a result of employment by another employer or any retirement benefits received by such Participant after the date of the Participant's termination of employment with the Company.

(d)    **Non-Duplication of Benefits.** Except as otherwise specifically provided for herein, no Participant is eligible to receive benefits under this Plan or pursuant to other contractual obligations more than one time. This Plan is designed to provide certain severance pay and change in control benefits to Participants pursuant to the terms and conditions set forth in this Plan. The payments pursuant to this Plan are in addition to, and not in lieu of, any unpaid salary, bonuses or benefits to which a Participant may be entitled for the period ending with the Participant's Covered Termination.

(e)    **Indebtedness of Participants.** If a Participant is indebted to the Company on the effective date of his or her Covered Termination, the Company reserves the right to offset any severance payments under the Plan by the amount of such indebtedness.

SECTION 8. RIGHT TO INTERPRET PLAN; AMENDMENT AND TERMINATION.

(a)    **Exclusive Discretion.** The Plan Administrator shall have the exclusive discretion and authority to establish rules, forms, and procedures for the administration of the Plan and to construe and interpret the Plan and to decide any and all questions of fact, interpretation, definition, computation or administration arising in connection with the operation of the Plan, including, but not limited to, the eligibility to participate in the Plan and amount of benefits paid under the Plan. The rules, interpretations, computations and other actions of the Plan Administrator shall be binding and conclusive on all persons.

(b)    **Amendment or Termination.** The Company reserves the right to amend or terminate this Plan or the benefits provided hereunder at any time; *provided, however,* that no such amendment or termination shall occur following (i) the date one (1) month prior to a Change in Control or (ii) a Covered Termination as to any Participant who would be adversely affected by such amendment or termination unless such Participant consents in writing to such amendment or termination. Any action amending or terminating the Plan shall be in writing and executed by a duly authorized officer of the Company. Unless otherwise required by law, no approval of the shareholders of the Company shall be required for any amendment or termination

9.

HS-0009



including any amendment that increases the benefits provided under any option or other stock award.

### SECTION 9. NO IMPLIED EMPLOYMENT CONTRACT.

The Plan shall not be deemed (i) to give any employee or other person any right to be retained in the employ of the Company or (ii) to interfere with the right of the Company to discharge any employee or other person at any time, with or without cause, which right is hereby reserved.

### SECTION 10.    LEGAL CONSTRUCTION.

This Plan shall be governed by and construed under the laws of the State of California (without regard to principles of conflict of laws), except to the extent preempted by ERISA.

### SECTION 11. CLAIMS, INQUIRIES AND APPEALS.

(a)    **Applications for Benefits and Inquiries.**  Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Plan Administrator in writing by an applicant (or his or her authorized representative).  The Plan Administrator is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

(b)    **Denial of Claims.**  In the event that any application for benefits is denied in whole or in part, the Plan Administrator must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial.  Any electronic notice will comply with the regulations of the U.S. Department of Labor.  The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(1)    the specific reason or reasons for the denial;

(2)    references to the specific Plan provisions upon which the denial is based;

(3)    a description of any additional information or material that the Plan Administrator needs to complete the review and an explanation of why such information or material is necessary; and

(4)    an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under Section 502(a) of

10.

HS-0010



ERISA following a denial on review of the claim, as described in Section 11(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Plan Administrator receives the application, unless special circumstances require an extension of time, in which case, the Plan Administrator has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the application.

(c)    **Request for a Review.**  Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Plan Administrator within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Verity, Inc.
Attn:  Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his or her representative) shall have the opportunity to submit (or the Plan Administrator may require the applicant to submit) written comments, documents, records, and other information relating to his or her claim. The applicant (or his or her representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his or her representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d)    **Decision on Review.**  The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the review. The Plan Administrator will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Plan Administrator confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

HS-0011



(1)    the specific reason or reasons for the denial;

(2)    references to the specific Plan provisions upon which the denial is based;

(3)    a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim; and

(4)    a statement of the applicant's right to bring a civil action under Section 502(a) of ERISA.

(e)    **Rules and Procedures.**  The Plan Administrator will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims.  The Plan Administrator may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

(f)    **Exhaustion of Remedies.**  No legal action for benefits under the Plan may be brought until the applicant (i) has submitted a written application for benefits in accordance with the procedures described by Section 11(a) above, (ii) has been notified by the Plan Administrator that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 11(c) above, and (iv) has been notified that the Plan Administrator has denied the appeal. Notwithstanding the foregoing, if the Plan Administrator does not respond to an applicant's claim or appeal within the relevant time limits specified in this Section 11, the applicant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

**SECTION 12.  BASIS OF PAYMENTS TO AND FROM PLAN.**

All benefits under the Plan shall be paid by the Company.  The Plan shall be unfunded, and benefits hereunder shall be paid only from the general assets of the Company.

**SECTION 13.  OTHER PLAN INFORMATION.**

(a)    **Employer and Plan Identification Numbers.**  The Employer Identification Number assigned to the Company (which is the "Plan Sponsor" as that term is used in ERISA) by the Internal Revenue Service is 77-0182779.  The Plan Number assigned to the Plan by the Plan Sponsor pursuant to the instructions of the Internal Revenue Service is 520.

(b)    **Ending Date for Plan's Fiscal Year.**  The date of the end of the fiscal year for the purpose of maintaining the Plan's records is May 31.

HS-0012



(c)    Agent for the Service of Legal Process.   The agent for the service of legal process with respect to the Plan is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA. 94089

(d)    **Plan Sponsor and Administrator.**   The "Plan Sponsor" and the "Plan Administrator" of the Plan is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA. 94089

The Plan Sponsor's and Plan Administrator's telephone number is (408) 541-1500.  The Plan Administrator is the named fiduciary charged with the responsibility for administering the Plan.

SECTION 14.  STATEMENT OF ERISA RIGHTS.

Participants in this Plan (which is a welfare benefit plan sponsored by Verity, Inc.) are entitled to certain rights and protections under ERISA.  If you are a Participant, you are considered a participant in the Plan for the purposes of this Section 14 and, under ERISA, you are entitled to:

**Receive Information About Your Plan and Benefits**

(a)    Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites, all documents governing the Plan and a copy of the latest annual report (Form 5500 Series), if applicable, filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration;

(b)    Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan and copies of the latest annual report (Form 5500 Series), if applicable, and an updated (as necessary) Summary Plan Description.  The Administrator may make a reasonable charge for the copies; and

(c)    Receive a summary of the Plan's annual financial report, if applicable.  The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

**Prudent Actions By Plan Fiduciaries**

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who op‒

13.

HS-0012a

Verity

Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a Plan benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a Plan benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan, if applicable, and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court.

If you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Assistance With Your Questions**

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

**SECTION 15. GENERAL PROVISIONS.**

(a) **Notices.** Any notice, demand or request required or permitted to be given by either the Company or a Participant pursuant to the terms of this Plan shall be in writing and shall be deemed given when delivered personally or deposited in the U.S. mail, First Class with postage prepaid, and addressed to the parties, in the case of the Company, at the address set forth in Section 11(a) and, in the case of a Participant, at the address as set forth in the Company's

14.

HS-0013



employment file maintained for the Participant as previously furnished by the Participant or such other address as a party may request by notifying the other in writing.

**(b)     Transfer and Assignment.**  The rights and obligations of a Participant under this Plan may not be transferred or assigned without the prior written consent of the Company. This Plan shall be binding upon any surviving entity resulting from a Change in Control and upon any other person who is a successor by merger, acquisition, consolidation or otherwise to the business formerly carried on by the Company without regard to whether or not such person or entity actively assumes the obligations hereunder.

**(c)     Waiver.**  Any Party's failure to enforce any provision or provisions of this Plan shall not in any way be construed as a waiver of any such provision or provisions, nor prevent any Party from thereafter enforcing each and every other provision of this Plan. The rights granted the Parties herein are cumulative and shall not constitute a waiver of any Party's right to assert all other legal remedies available to it under the circumstances.

**(d)     Severability.**  Should any provision of this Plan be declared or determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

**(e)     Section Headings.**  Section headings in this Plan are included for convenience of reference only and shall not be considered part of this Plan for any other purpose.

## SECTION 16.  EXECUTION.

To record the adoption of the Plan as set forth herein, Verity, Inc. has caused its duly authorized officer to execute the same as of the Effective Date.

VERITY, INC.

By: _ssprings_

Steven Springsteel

Title: SVP Finance / Administration & CFO

Verity, Inc. · 894 Ross Drive Sunnyvale, CA 94089     t. 408.541.1500     f. 408.541.1600     www.verity.com

HS-0014

VERITY, INC.

CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

PARTICIPATION NOTICE

To: Hugo Sleimer

Date: May 4, 2005

Verity, Inc. (the "Company") has adopted the Verity, Inc. Change in Control and Severance Benefit Plan (the "Plan"). The Company is providing you with this Participation Notice to inform you that, given your position at the Company, you qualify as a participant in the Plan. A copy of the Plan document, which also constitutes a summary plan description, is attached to this Participation Notice. The terms and conditions of your participation in the Plan are as set forth in the Plan, and in the event of any conflict between this Participation Notice and the Plan, the terms of the Plan shall prevail except with respect to the cash severance, which you have declined as set forth below. Subject to the provisions of the Plan, the details of your Plan benefits, as described in Section 4 of the Plan (except with respect to the cash severance, which you have declined), are as follows:

Cash Severance Benefit: You have declined to accept any cash severance benefit under the Plan. Consequently, you will be entitled to no cash severance benefit under the terms of the Plan, and any cash benefit to which you shall be entitled shall be determined under Dutch law without reference to the Plan.

Accelerated Vesting of Options: Full.

Extended Exercisability of Options: Later of 12 months or the post-termination exercise period of the option; provided, however, that such extended exercisability shall not extend beyond the term of the option.

Continued medical benefits: _____18_____ months, or such earlier date as you shall secure subsequent employment that shall provide you with similar medical benefits.

Please retain a copy of this Participation Notice, along with the Plan document, for your records.

VERITY, INC.

ssprings

By: _____

Its: _____

524052 v150F

## ACKNOWLEDGEMENT

The undersigned Participant hereby acknowledges receipt of the foregoing Participation Notice. In the event the undersigned holds outstanding stock options as of the date of this Participation Notice, the undersigned hereby:

☒ accepts
☐ rejects

the extended exercisability provisions for such stock options set forth above.* The undersigned acknowledges that the undersigned has been advised to obtain tax and financial advice regarding the consequences of this election including the effect, if any, on the status of the stock options for tax purposes under Sections 409A and 422 of the Internal Revenue Code.

_____     May 4, 2006

Print name    HUGO SLUIMER

\*    Please check one box; failure to check a box will be deemed a rejection of the extended exercisability provisions as they relate to such stock options.

524052 v1/HN

HS-0016

**EXHIBIT B**

29 December 2005

VIA FEDEX DELIVERY

Hugo Sluimer
c/o Verity GB Limited
The Pavillions
Kiln Park Business Centre
Kiln Lane
Epsom KT17 1JG

Re:    Warning of Possible Redundancy – Acquisition of Verity, Inc. by Autonomy
       Corporation plc

Dear Hugo:

As you are aware, Verity, Inc., the ultimate parent company of Verity GB Ltd (the "**Company**") has entered into an agreement to be acquired by Autonomy Corporation plc. A copy of the announcement of the transaction was recently forwarded to you. The acquisition will strengthen the future of the Verity group of companies as the combined group of companies will have substantially increased scale and diversified revenue streams, enabling the combined group to provide a significantly enhanced product offering to both companies' clients, whilst continuing to lead innovation in the industry.

The acquisition is transformational for the Verity group of companies as Verity will become a subsidiary of Autonomy Corporation plc and will, therefore, no longer maintain many of the functions that are required of an independent US-based public company. As a result, it is currently anticipated that there may be a number of redundancies throughout the Verity group and within the Company. As the requirement for the Company's branch to remain open has diminished, as has the requirement for employees to perform your job, we are, therefore, writing to warn you that your position has been identified as at risk of redundancy.

The Company is committed to avoiding terminating your employment by reason of redundancy if it can do so. To this end we invite you to a consultation meeting on January 11, 2006 to discuss your position, the transaction and consult with your regarding any suitable alternative positions within the Company during he consultation period. You will have an opportunity to discuss this further at a second consultation meeting. If, however, a suitable alternative position is not identified, the Company may proceed to terminate your employment by reason of redundancy. During the consultation period you will not be required to attend the companies offices, however you will be afforded reasonable access should it be required to conduct required company business. 12 weeks notice is hereby given in accordance with the applicable Regulations and will run concurrently with the consultation period. Please note, however, that notice may be withdrawn at any time depending on the results of the consultation.
so..

UK

**HS-0017**

---------- Forwarded message ----------
From: **Hugo Sluimer** <hugosluimer@gmail.com>
Date: 6 jan 2006 22:36
Subject: Re: New e-mail address/next action(s)
To: Andrew Kanter <andrewk@autonomy.com>

Thx for your prompt response and explanation Andy. Indeed I've received the letter today (it was delivered by DHL and given to the concierge of my apartment, probably yesterday..).
About the e-mail, all I can say is that one of your colleagues instructed Verity, Inc.'s IT manager to unplug me and to route my mails to Sushovan, obviously not very professional and polite since no one informed me.

I'll consult my lawyer and come back to you asap.

Wish you a great, relaxing (you must be quite busy nowadays).

Hugo

2006/1/6, Andrew Kanter <andrewk@autonomy.com>:
> Dear Hugo,
>
> I was not aware that you were having email problems.
>
> Further to our conversation yesterday, I can confirm that you were sent yesterday for delivery today a notice of possible redundancy. I attached a copy of the original letter to this email for your convenience.
>
> There is one point I must clarify from your message below.
>
> In our phone call yesterday I said that your position may be at risk of redundancy because of a number of structural elements of the new company. I asked whether in light of this risk you had any ideas of what might be a suitable alternative position within the company. You said that you did not believe there was an alternative position, and since this was the case perhaps it best to discuss whether a suitable settlement could be reached quickly.
>
> The next steps of the proper procedure are outlined in the letter.
>
> Best regards,
>
> Andrew Kanter
> Chief Operating Officer
> Autonomy
>
> _____
>
> **From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
> **Sent:** 06 January 2006 08:57
> **To:** andrewk@autonomy.com

HS-0018

**Subject:** New e-mail address/next action(s)

Andrew,
You are probably aware that I am unplugged (this happend just a few hours, without any notice.., after you called me yesterday to inform me that there is no similar position for me available in Autonomy).
In case you want to reach me, please use this address.

When can I expect the next step/action and what will it be?

Cheers,

Hugo

HS-0019

**REDUNDANCY POINTS TO BE MADE DURING**
**THE FIRST CONSULTATION MEETING 24/01/06**

**3:00PM HUGO SLUIMER –**
**SENIOR VICE PRESIDENT EUROPE AND APAC OPERATIONS**

(a)   Explain the purpose of this initial meeting is to:

(i)   explain what is going on;

(ii)   discuss how this might affect him;

(iii)   enable him to comment on the proposals and their effect, at an early stage;

(iv)   consider what alternative employment may be available within the group.

(i)   explain to the employee what is going on;

- *Autonomy Corporation plc has completed the purchase of Verity Inc which has a number of duplicated functions and offices.*

- *Because of the acquisition, the Verity's K2 software is being integrated into Autonomy's IDOL platform and sold as a single product under the Autonomy trade marks, business name and licensing structure.*

- *As a result, many of the head office/administrative functions currently undertaken by the Autonomy and Verity groups are duplicative, and so are being consolidated into a single, central operation in the UK at Autonomy's head office. The functions affected include operations, office administration, legal, finance (including local booking of revenues and billing), HR and marketing.*

- *This consolidation is required in order to integrate both companies into a single organisation, with a single product, a single sales team and single order processing system, which will remove unnecessary costs that are the direct result of the duplication caused by the merger and therefore maintain competitiveness of the group.*

(ii)   discuss how this might affect him;

- *No firm decisions have yet been taken*

- *Your role is directly affected by the consolidation and there is a significant likelihood that your position will become redundant because:*

   *Operations oversight - Order processing and operations will be moved to Cambridge. This makes sense because after integration, the software will be sold by the UK entity (and not the local companies) and shipped from the UK.*

   *Finance Admin - The finance administration of the combined group shall, as a result, be consolidated and be run solely from Autonomy's head office in Cambridge UK, where Autonomy already has an existing finance team. Since the financial business will be done under the IFRS accounting principles, the*

HS-0020

*finance functions will be performed by employees who are familiar with these principles and qualified in the UK.*

*Sales oversight - With respect to oversight of sales, Autonomy already has an existing team that oversees presales and sales team in Cambridge.*

*Business Development - Since the focus on marketing will be in the UK and furthermore worldwide marketing shall be initiated from the UK, the marketing business will thus be transferred to Cambridge.*

(iii)    consideration of alternative employment that may be available within the group.

-   *Autonomy has undertaken a review, in conjunction with Verity management, both prior to and post-acquisition, to determine the existing and on-going needs of the combined group to determine whether there are any suitable alternative roles of a similar level of seniority available. Each officer responsible for a business area (finance, marketing, operations, technical and sales) have been contacted to determine open opportunities and we will continue to do so throughout the process. Unfortunately, at this stage, we do not have any suitable positions available to offer you*

-   *We are continuing to look for alternatives to redundancy.*

(iv)    Ask the employee if they have any comment on the points that have been made. Allow sufficient time for the employee to respond to and comment on the points.

(b)    Discuss the financial consequences.

-   *You will be entitled to your statutory severance amount and a three month notice period plus an adjusted amount if you agree to sign a release and waiver of any and all actions against the company. If you are made redundant, you will be paid in lieu and not required to work out notice.*

-   ***IF the employee wishes to discuss a settlement:*** Unless the employee wishes to do so, it would be advisable not to go into too much detail at this meeting - limit the discussion to principles rather than exact numbers.

    -   *We are not authorised to give specific figures in this meeting, but would encourage you to chat to us about them informally after the meeting.*

(c)    Ask the employee again whether he has any comments or questions.

(d)    Explain to the employee that he should go away and consider the points raised at the meeting and we would appreciate a response, after which, if no suitable alternatives to redundancy arise which are acceptable to the employee, a letter of dismissal will be sent. But feel free to contact us at any time in the meantime to discuss.

(e)    Stress that no final decision has been taken and that the employee is not being given notice to terminate employment.

(f)    Conclude the meeting by saying that the announcement/reorganisation must have come as a shock. The employee should go away and consider the various points that have been discussed and if appropriate speak to his family.

Prod. 358

```
From: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 14:02
To: 'Rachel Haverfield'
Subject: FW: Europe RIF
```

```
------------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 08 January 2006 10:43
To: 'Jack Landers'
Subject: FW: Europe RIF
```

Jack,

I sent the message below to Anthony on Friday.  Can I ask of you as well that any communication you get from Hugo be forwarded to me.  It's easier to get this process wrong than right and we're committed to the proper process.

Best regards,

--Andy

```
------------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 06 January 2006 18:35
To: 'Anthony Bettencourt'
Subject: Europe RIF
```

Dear Anthony,

It appears we're at the end of the difficult stage of the transition and on to the much more interesting bits.  I'm sure you find this as much a relief as I do.

As I'm sure you're aware, the process in Europe takes much longer so we'll continue to work through the procedures over the next few weeks.  One matter that may come to your attention is any final determination on Hugo.  We have to follow the formal process required by law, and I've sent him the requisite letter and spoken with him.  Unfortunately I fear that Hugo may already be positioning against the company as he's sent me an email which is simply not true.

In any event I urge to pass back to me any communications or matters that may come up with Hugo.  The legals are complicated enough so that it's easy to let a small mistake become fatal.  We are committed to running a fair, open and honest procedure with Hugo but need to keep the channel formalized.

Wishing you the best and looking forward to seeing you next week.

Best regards,

--Andy

HS-0022

--------- Forwarded message ---------
From: **Andrew Kanter** <andrewk@autonomy.com>
Date: 10 jan. 2006 20:00
Subject: RE: Settlement
To: Hugo Sluimer <hugosluimer@gmail.com>

Dear Hugo,

I write with regards to your message below.

The 11 January 2006 consultation meeting mentioned in the letter is not "lost value" but rather is an integral part of the consultation process relating to a possible redundancy, which we need to discuss.  If you wish to reschedule this meeting we can seek alternative dates.

I also must point out again (as I did in the attached email, to which I have not received a response) that I did not state that it was my opinion that no alternative position can be identified.  Rather in our phone discussion I mentioned that your position may be at risk of redundancy because of a number of structural elements of the new company.  I asked whether in light of this risk you had any ideas of what might be a suitable alternative position within the company.  You said that you did not believe there was an alternative position, and since this was the case perhaps it best to discuss whether a suitable settlement could be reached quickly.

Please let me know whether you wish to rearrange the consultation meeting.

Best regards,

Andrew Kanter
Autonomy

_____

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 10 January 2006 16:03
**To:** Andrew Kanter
**Subject:** Settlement


Dear Andrew,

In the letter of December 29, 2005, a consultation meeting on January 11, 2006 is mentioned. I assume that, based on the telcall we had, that this meeting lost its value, since you are of the opinion that in my case no alternative position can be identified.
In that case I would prefer it if you could make a proposal for an amicable settlement. Subsequently I will seek legal advice and let me inform to what extent I should agree on the (conditions of) termination of my employment contract. In this respect it should be pointed out in advance, that Dutch Law is applicable.
Furthermore I expect you to be informed about the arrangements that were made concerning my participation in Verity's Change in Control and Severence Benefit Plan.

Please call me if questions arise.

Best regards,

HS-0023

Hugo Sluimer

————— Doorgestuurd bericht ———————
From: "Andrew Kanter" <andrewk@autonomy.com>
To: "'Hugo Sluimer'" <hugosluimer@gmail.com >
Date: Fri, 6 Jan 2006 17:13:43 -0000
Subject: RE: New e-mail address/next action(s)
Dear Hugo,

I was not aware that you were having email problems.

Further to our conversation yesterday, I can confirm that you were sent yesterday for delivery today a notice
of possible redundancy. I attached a copy of the original letter to this email for your convenience.

There is one point I must clarify from your message below.

In our phone call yesterday I said that your position may be at risk of redundancy because of a number of
structural elements of the new company. I asked whether in light of this risk you had any ideas of what might
be a suitable alternative position within the company. You said that you did not believe there was an
alternative position, and since this was the case perhaps it best to discuss whether a suitable settlement
could be reached quickly.

The next steps of the proper procedure are outlined in the letter.

Best regards,

Andrew Kanter
Chief Operating Officer
Autonomy

———————————————————————————————————————————————

From: Hugo Sluimer [mailto:hugosluimer@gmail.com]
Sent: 06 January 2006 08:57
To: andrewk@autonomy.com
Subject: New e-mail address/next action(s)

Andrew,
You are probably aware that I am unplugged (this happend just a few hours, without any notice.., after you
called me yesterday to inform me that there is no similar position for me available in Autonomy).
In case you want to reach me, please use this address.

When can I expect the next step/action and what will it be?

Cheers,

Hugo

HS-0024

From: **Spencer Young** <scyoung21@hotmail.com>
Date: 24 feb. 2006 16:49
Subject: Confirmation of Conversation
To: hugosluimer@gmail.com

Dear Hugo,

On Friday 6th January at 10AM, at Autonomy's London offices in Arlington Street, I had a meeting with Sushovan Hussain, CFO, where he informed me that "Hugo will no longer be working for the company".

He did not elaborate on the statement nor did I question him further.

Hope this clarifies,

Regards

**Spencer**

HS-0025

---------- Forwarded message ----------
From: **Hugo Sluimer** <hugosluimer@gmail.com>
Date: 9 feb 2006 12:49
Subject: Official letter
To: Andrew Kanter <andrewk@autonomy.com>

Dear Andrew,
Please find my letter enclosed.

Thx
Hugo

HS-0026

Dear Andrew,

First of all I would like to sincerely congratulate you and the rest of the Autonomy team with the stellar FY05 results!

I would like to come back to our meeting in London, on Jan. 24 last. During the formal part of the meeting you've read the text of a legal document to me, stating that Autonomy couldn't offer me an equal position (compared to the position I had at Verity, Inc.). As a result, both parties agreed to consider an exit. Although you pushed me firmly to propose Autonomy an exit fee during the meeting (I even asked instant advice, during a time out, per telephone from my lawyer), I informed you that we believe that an offer from my side would not be appropriate and that we expected Autonomy to propose an exit fee to me.
When I asked you for a printed version of the legal document, referred to above, you told me that it needed some cleansing and that I could expect to receive the final document per post, the week after the meeting.
Now at this very moment in time I am confused, because I haven't heard anything.

For the record, I listed some chronological facts that occurred during and after the acquisition:
- Various meetings between Autonomy and Verity Executives took place and I was the only Exec who was never invited to participate.
- Prior the acquisition, Verity prospects and clients were contacted (by Autonomy telemarketing and field sales personnel) and advised not to deal with Verity anymore to avoid the risk of de-investments in "obsolete Verity technology".
- Without any involvement/communication by/to me, Autonomy made organisational changes to my teams.
- My direct reports were told that "Hugo is out".
- The channel that I managed directly (e.g. in Korea, Japan, Singapore, Denmark, etc.) were told that "Hugo is out".
- Only on Jan. 5 last, I received a call from Andrew Kanter, who informed me that Autonomy couldn't offer me an equal position in the new organisation.
- A few hours after the tel call from Andrew, my e-mail was shut off and routed to Sushovan Hussain (Autonomy's CFO). I was very confused and disappointed not to have received any notice and what's even worse, I lost the professional opportunity to inform all my business contacts who I work with for many, many years.
- On Jan. 6 last, I received a potential redundancy letter, dated Dec. 29, 2005! The letter also informed me to be on half pay, per that date.
- On Jan. 24 last, we had a brief meeting (as referred to above).

Andrew, I trust that you do understand that uncertainty and ignorance is not easy to accept for someone like me who built Verity, Inc. from scratch, during 15 1/2 years, outside the USA to a revenue level exceeding 50 mill. USD (about half the size of Autonomy's FY05 turnover).
So please let's communicate, conclude and resolve this situation.

I look forward to your reply and remain,

with kind regards,

Hugo Sluimer

HS-0027

---------- Forwarded message ----------
From: **Andrew Kanter** <andrewk@autonomy.com>
Date: 22 feb 2006 22:00
Subject: Open Correspondence
To: Hugo Sluimer <hugosluimer@gmail.com>

Dear Mr Sluimer,

As you know we are continuing the integration process, which I'm sure you'll appreciate is difficult. As we continue that process we continue to review individual positions and whether there are any redundancies across the group.

When we met in London on 24 January 2006 this is what we discussed during our meeting. I did not state that Autonomy could not offer you an equal position, but rather that the position was under review and that there was a likelihood that your position will become redundant. I agreed to get back to you with a written decision as soon as any had been made. I did not refuse you a copy of my notes.

As you know the integration process is a difficult process where strategic decisions need to made. Officers of Autonomy met with group-level officers of Verity in December 2005 to discuss the future strategy of Verity. This meeting did not include regional executives like yourself, with the exception of Mike Mooney and Jack Landers who were recommended for promotion to group level roles. During the integration there were isolated instances of over-eager sales personnel seeking to short-term sales who contacted customers, but these were stopped when discovered. There was no group policy as you seem to imply to steer existing Verity customers to Autonomy, as indeed this would have been a breach of antitrust legislation. At a group level certain synergies were required by the transaction, and these decisions were made by your senior officers within their discretion. Managers within the European operations were informed that your position is under review and that no final decision has been made, as is the case.

I did not inform you during our call on 5 January that Autonomy would not offer you an equal position. I have clarified this twice by email in open correspondence, which you have received. To the best of my knowledge you have not had any reduction in any benefits during the consultation period.

We are continuing to review the position and hope to continue consultations shortly.

Best regards,

Andrew Kanter
Autonomy

---------- Forwarded message ----------
From: **Hugo Sluimer** <hugosluimer@gmail.com>
Date: 1 mrt. 2006 10:21
Subject: Reply to your mail of Feb 22 last
To: Andrew Kanter <andrewk@autonomy.com>

    Dear Mr. Kanter,
    Thanks for your e-mail reply to my letter, send to you on Feb. 9 last.
    Please find my comments interspersed in red into your e-mail below.

    Best regards,

    Hugo Sluimer


    ---------- Forwarded message ----------
    From: **Andrew Kanter** < andrewk@autonomy.com>
    Date: 22-feb-2006 22:00
    Subject: Open Correspondence
    To: Hugo Sluimer < hugosluimer@gmail.com>


    Dear Mr Sluimer,

    As you know we are continuing the integration process, which I'm sure you'll appreciate is difficult.  As we continue that process we continue to review individual positions and whether there are any redundancies across the group.

    When we met in London on 24 January 2006 this is what we discussed during our meeting.  I did not state that Autonomy could not offer you an equal position, but rather that the position was under review and that there was a likelihood that your position will become redundant. I like to remind you that you read the draft exit letter during the formal part of the meeting, stating that Autonomy couldn't offer me an equal position. That's why you started asking/pushing me to suggest an exit fee, after you've read the letter. Because of your persistence, I called my lawyer (time out during our meeting) to find out if this would be appropriate and as you know he suggested negative.  I agreed to get back to you with a written decision as soon as any had been made. I like to remind you that you indicated that I could expect the letter the week after our meeting . I did not refuse you a copy of my notes. Since you couldn't give me a final version of the letter that you read to me, I asked for a copy of the draft letter, which you refused.

    As you know the integration process is a difficult process where strategic decisions need to made. Officers of Autonomy met with group-level officers of Verity in December 2005 to discuss the future strategy of Verity   This meeting did not include regional executives like yourself, (I disagree, all direct report to Verity's CEO/President Anthony Bettencourt were there, except me. Mike Mooney was my peer, running 'the Americas')  with the exception of Mike Mooney and Jack Landers who were recommended for promotion to group level roles   During the integration there were isolated instances (incorrect, I have significant proof in writing, even e-mails from surprised Verity clients, that this happened structural across my region, in APAC as well as in Europe. Autonomy contacted strategic accounts like Israeli Aircraft Industries in Israel, Air France in France, various Verity partners across Europe  I even have a written statement from Mike Lynch that the reported incidents were old/prior acquisition announcement, but I can prove that that was not the case)  of over-eager sales personnel

HS-0029

seeking to short-term sales who contacted customers, but these were stopped when discovered There was no group policy as you seem to imply to steer existing Verity customers to Autonomy, as indeed this would have been a breach of antitrust legislation.   At a group level certain synergies were required by the transaction, and these decisions were made by your senior officers within their discretion.   Managers within the European operations were informed that your position is under review and that no final decision has been made, as is the case. No, my people and partners were told that I am out: "Hugo will no longer be working for the company". I do also have such proof in written form

I did not inform you during our call on 5 January that Autonomy would not offer you an equal position   I have clarified this twice by email in open correspondence, which you have received.   To the best of my knowledge you have not had any reduction in any benefits during the consultation period. Incorrect, in Feb. 06 I got paid GBP 18k, although my average last 12 months payment was GBP 31k-32k

We are continuing to review the position and hope to continue consultations shortly.

Best regards,

Andrew Kanter
Autonomy

HS-0030

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 03 March 2006 18:32
**To:** Andrew Kanter
**Subject:** Re: Verity

I'll wait and see (as I am doing since two months), it's getting cruel..

2006/3/3, Andrew Kanter <andrewk@autonomy.com>:

Dear Mr Sluimer,

Management will shortly be meeting to discuss the results of the review of redundancies and alternatives within the group.  I expect to be able to revert with the next stage next week.

Best regards,

Andrew Kanter
Autonomy

HS-0031

2006/3/20, Andrew Kanter <andrewk@autonomy.com>:

Dear Mr Sluimer,

Following the recent management meetings we have completed our business review. I'd like to schedule a call to discuss the results of this review and the risk of redundancy on your position. Whilst a meeting is always better, unfortunately I'll be travelling over the next few days. We'd of course like to share these results, which are positive, as soon as possible.

Please can you let me know availability on Tuesday or Wednesday.

Best regards,

Andrew Kanter
Autonomy

02/05/2006

HS-0032

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** 22 March 2006 15:33
**To:** andrewk@autonomy.com
**Subject:** Notes to File

Notes of phone call with Hugo Sluimer on 22 March 2006 at approximately 17:45 Beijing time.

- We have completed our review of his position following the completion of the acquisition of Verity and the subsequent merger of the two companies' operations.
- We have completed the review at a recent management meeting in California with all group-level managers.
- Regret to inform that following the review the role of SVP EMEA and APAC operations within Verity has lapsed
- However I was happy to report that we believe we have found an alternative, comparable role
- The same of SVP EMEA and APAC operations is available for the company's Neurodunamics division
- The division is rapidly growing, with the potential for some of the largest deals in the company
- The division needs senior sales leadership across Europe and growth in Asia
- Hence same role
- Compensation will remain the same, although we will adjust compensation plans to enable Hugo the ability to hit the same commission number for commensurate growth
- Will be working with David Humphires, MD of the Neurodynamics division
- Per Hugo's question, it is not yet decided whether he will report to Dave or they will jointly report to the group CEO
- The division is based in cambridge so will need to be there to meet with Dave

02/05/2006

---------- Forwarded message ----------
From: **Andrew Kanter** < andrewk@autonomy.com>
Date: 23-mrt-2006 3:16
Subject: Letter
To: Hugo Sluimer <hugosluimer@gmail.com >

Dear Mr Sluimer,

As discussed yesterday, attached please find a letter confirming the details of our conversation.

Please can you contact David Humphries, Managing Director of the Neurodynamics division, at either dh@neurodynamics.com or on +44 1223 448 000.

With the anticipated growth for this division and in this sector of the market, this is an extremely exciting position and I look forward to working with you.

Best regards,

Andrew Kanter
Autonomy

HS-0034



Autonomy

<u>VIA EMAIL AND REGISTERED DELIVERY</u>

23 March 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genêts
MC 98000 MONACO

**Re:    Notice of Cessation of Redundancy Proceedings and Appointment as Senior Vice President, EMEA and APAC Operations for Neurodynamics**

Dear Hugo:

I refer to the letter dated 29 December 2005 from Verity GB Limited warning you of the possibility of redundancy due to the acquisition and reorganisation of the Verity Group and our subsequent discussions.

As discussed on 22 March 2006 by phone, following extensive management meetings and review of all of the group's post-merger positions, I regret to inform you that your position as Senior Vice President, EMEA and APAC Operations will lapse. However as discussed, I am very pleased to inform you that based on our internal consultations we have a found a suitable alternative opportunity within the group.

As you may know, Neurodynamics now forms a part of Virage, a division of Autonomy. Virage is Autonomy's leading provider of rich media communication and content management software.  The two suites of technology, together with the core Autonomy technology with which you're familiar, offer a highly sophisticated security solution applicable for security, defence, legal and manufacturing markets worldwide, key sectors for historic Verity sales.  The Neurodynamics product range is marketed under the Virage Security and Surveillance brand.

Other participants in the market include Verint, which is a billion dollar company.  Autonomy senior management has reviewed the Verint offering and believes the Neurodynamics products are extremely competitive and in many cases lead the market.

This division is one of the fastest growing in the group and capitalizes on immediate market needs, with strong growth forecast across Europe and APAC.  This role is specifically suitable for you, combining your existing responsibilities with a different business unit, allowing us to best utilise your leadership and management qualities.

Your compensation in the aggregate will be unchanged.  Your salary will remain the same, and your commission plan will be restructured so that you are eligible for analogous benefits upon commensurate growth of the unit.

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0035



In this role you will work directly with David Humphires, Managing Director of the Neurodynamics division, and [jointly] report to the [group CEO/Mr. Humphries]. As the division is based in Cambridge you will be expected to attend the offices on a regular basis, although this should comport with your previous role which required significant travel to the UK and as your time is virtually all assigned to Verity GB Limited.

Please feel free to contact me to discuss this new assignment. We sincerely thank you for your patience and understanding during this transitional period which we hope will be as smooth as possible.

Sincerely,

Andrew M Kanter
Company Secretary

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000. Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0036

---------- Forwarded message ----------
From: **Hugo Sluimer** <hugosluimer@gmail.com>
Date: 31 mrt 2006 09:29
Subject: My reply to Andrew K re. the job offer
To: Ivo Boudrie <ivo@dvdk.nl>, Job van der Pijl <Job@dvdk.nl>

FYI

---------- Forwarded message ----------
From: **Hugo Sluimer** <hugosluimer@gmail.com>
Date: 31-mrt-2006 10:28
Subject: Re: Neurodynamics
To: Andrew Kanter <andrewk@autonomy.com>

Dear Mr. Kanter,

As per your suggestion to let me find out more details about the proposed position, I've contacted David
Humphries last Friday.
In my phone call with Mr. Humphries I tried to figure out what kind of position exactly has been offered to
me, but that was impossible since I understood that there is no business plan/strategy/job specification or
whatsoever and that you had called Mr. Humphries shortly before you offered me the position, and
communicated "I've a good guy for you, his name is Hugo Sluimer, it would be great if he could work for you",
which was a little bit surprising for Mr. Humphries as well as me. It was also conflicting with your letter to hear
from Mr. Humphries that he expected me to report to him. Although we had a pleasant talk, in general I can
only say that he was confused and not prepared at all.

I plan to come back to you by the beginning of next week. From that perspective it wouldn't be fair at all to
give you the impression that I will accept the position or that I can participate in the event next week.

I'll keep you informed.

Best regards,

Hugo Sluimer


2006/3/30, Andrew Kanter <andrewk@autonomy.com>:
> Dear Hugo,
>
> It has been a week since we discussed your new role with the Neurodynamics division of the Autonomy
> group. I understand however that as of today you have not yet commenced substantive interaction with the
> division's managing director. Given the opportunity available and the pace of growth in the market it is of
> course critical to avoid delay. Can I please have an update on developments, particulary related to next
> week's key trade show in the US.
>
> Best regards,
>
> Andrew Kanter
> Chief Operating Officer
> Autonomy

HS-0037

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** 31 March 2006 17:01
**To:** 'Hugo Sluimer'
**Subject:** RE: Neurodynamics

Dear Mr Sluimer,

If I understand correctly you are considering whether you wish to continue with Autonomy, which is of course within your discretion.  However I would hope that any decision is made based on more than our 10 minute phonecall and the short communication you have had with David Humphries, which you have described as inadequate.  In any event I look forward to hearing you on Monday.

Best regards,

Andrew Kanter
Autonomy

HS-0038

Subject:
Author:        "Hugo Sluimer" <hugosluimer@gmail.com>
Date:          2nd April 2006 7:03:14 pm

Hi Dave,

In our phone call last week I tried to figure out what kind of position exactly is
offered to me, because Andrew Kanter couldn't tell. I understood that there is no
business plan/strategy/job specification or whatsoever and that you had been called
shortly before by Andrew, who communicated "I've a good guy for you, his name is Hugo
Sluimer, it would be great if he could work for you", which was a little bit
surprising for you.

I plan to come back on this issue with Andrew by the beginning of this week.
From that perspective it wouldn't be fair at all to give you the impression that I
will accept the position or that I can meet you within the next days or so. Dave,
please don't misunderstand me, I appreciate your cooperativeness, but I am sure you'll
understand as well that I want to work this out with Andrew first.

I'll keep you informed.

Hugo

HS-0039

---------- Forwarded message ----------
From: **Andrew Kanter** < andrewk@autonomy.com>
Date: 4-apr-2006 11:03
Subject: RE: Our telcall
To: Hugo Sluimer <hugosluimer@gmail.com >

Dear Mr Sluimer,

First, our records do not indicate that your message below was received by our servers. This is the first that I've seen of it.

I'm very surprised by your message. Below you complain that the position is not appropriate and that there is nothing to discuss. I note that the total discussions amount to our 10 minute phone call and your short call with David Humphrey. Neither I nor David discussed a business plan. You and I did discuss a job description. In any event, we have made ourselves available to help to continue to educate you, but neither of us have received inquiries. As noted in our call and in my letter, your compensation remains the same and this is one of the fastest growing, most exciting parts of our business. To be frank, the lack of inquiry has been unusual.

I am available at any time to discuss this or any other matter, and am always open to any suggestions.

Best regards,

Andrew Kanter
Autonomy

---

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 04 April 2006 07:59
**To:** Andrew Kanter
**Subject:** Our telcall

Dear Mr. Kanter,
Please let me know what time would be convenient for you today or tomorrow.

Best regards,

Hugo Sluimer

---------- Forwarded message ----------
From: **Hugo Sluimer** < hugosluimer@gmail.com>
Date: 3-apr-2006 13:54
Subject: Proposed position
To: Andrew Kanter < andrewk@autonomy.com >

Dear Mr Kanter,

The offered position does not seem to be appropriate at all and I fail to see whether further talkings with you could really alter this situation. The job is definitely very different from what I

HS-0040

did before and still nobody has been able to present to me a business plan/strategy/job description etc. Moreover Autonomy's way of acting towards me, not only concerning payment of options, but also the way communication with my people an my relations took place, has significantly affected me.

I shall call you tomorrow to discuss how you and I should proceed in this. Especially I'd like to discuss with you on how we could avoid legal steps in this matter from my side. Be sure that I give preference to solve this matter amicably, but of course I need your cooperation for that.

Best regards,

Hugo Sluimer

2006/4/10, Andrew Kanter <andrewk@autonomy.com>:

Dear Mr Sluimer,

Thank you very much for your proposal. Whilst I appreciate your initiative, I unfortunately do not believe it is the basis for discussions. Accordingly you need to recommence your duties in your new position.

Last week you emailed me that you wished to discuss a settlement. On Tuesday we had a phone conversation regarding your future role and a possible settlement. Admittedly at the outset of the call we disagreed regarding your position. I said that it appeared as if you had made up your mind, which I found surprising given the lack of discussion between you and Autonomy executives on the matter. We discussed some of your impressions, but the bottom line was that your mind was made up.

This is of course disappointing as we have located an alternative role within the company with the same compensation package. If as you stated you believe the role to be too challenging, then we are of course willing to discuss a settlement as you requested.

However your proposal below is on the basis that the company has concluded that your employment is redundant, that there is no alternative role, and that your employment is to be terminated. This is of course not the case. I therefore do not comment on the calculations to be made in such a case or the applicable law. Whilst your calculations may be correct, they are irrelevant to Autonomy's position.

As noted during our conversations and correspondence, an alternative role has been found for you on the same compensation basis, and you are required to commence work forthwith. If you summarily reject this position, then the company will have no choice but to act as if you are abandoning your position.

At the end of the day we are disappointed that you have made up your mind not to continue in a senior capacity with Autonomy, with a similar compensation package and a great opportunity in the market. You are of course free to follow any course you choose.

As discussed during our last call, if you would like to make a proposal that is reasonable and reflects the interests of both parties I would be happy to consider it, and I'm sure we can reach a conclusion rapdily. Unfortunately the  proposal below does not fall into the category.

Finally, with regards to option payments, I believe finance has already confirmed to you that payment will be made in the next payroll run. Therefore I don't understand your reference to "probably" will take place. On our call I agreed to speak with finance as to whether they could accelerate payment to before the normal payroll period. You called me the next day and noted that if payment could not be received soon, that you would like any subsequent payments to be noted as being for the March payroll. I have spoken with finance and they are not in a position to accelerate payroll. Further they have raised questions as to whether you are seeking to participate in a tax avoidance scheme by moving payments between payroll periods.

I look forward to seeing you this week in Cambridge in your new position.


Best regards,

Andrew Kanter
Autonomy

HS-0042

Rad 26

From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 10 April 2006 10:37
To: 'Hugo Sluimer'
Cc: 'David Humphrey'
Subject: Competition Background

Dear Hugo,

Below is some recent competitive intelligence pulled together on other vendors in the
Neurodynamics security space.  This portion of the market is a very fragmented market,
with no company having the resources of Autonomy.
Useful to our competitive position, many of the vendors are in the "general security"
business and are manufacturers of cameras and ip gear.  You may want to look at:

http://www.dvtel.com/  This is a full service company that has both hardware and
software.

http://www.infinova.net/  Another vendor offering hardware and software.
More of a focus on manufacturing and hardware.

http://www.ipix.com/  A public company with a lot of information available.

http://www.objectvideo.com  Most likely the direct competitor on a software software
basis.  They go to market with partners and are oem'd by Verint.

It is also worth considering some of these companies for acqustion purposes, and we'd
welcome any feedback.  However it does seem that the companies that would give
Autonomy more of a revenue boost in this space bring the baggage of commodity cameras
and IP switches.

In terms of sales channels, ObjectVideo provides a hit list of partners and oem's.

I trust this is helpful.

Best regards,

--Andy

HS-0043

---------- Forwarded message ----------
From: **Andrew Kanter** < andrewk@autonomy.com>
Date: 11-apr-2006 15:28
Subject: RE: Severance Benefit Proposal
To: Hugo Sluimer <hugosluimer@gmail.com>

Dear Mr Sluimer,

As noted in my email below, I do not comment on whether Dutch law is applicable.  What I do state is that your employment has not been terminated, and thus any proposal for severance based on redundancy is not appropriate.

Please contact David Humphrey re your first meeting this week.  Clare March in Cambridge will book flights for you.  We will need to review the commission plan to reflect adjusted targets given the change of role.

Finall, with regards to the settlement proposal, at our initial meeting you requested to have a without prejudice discussion to discuss settlement.  In your email last week you requested to have a settlement discussion "on how we could avoid legal steps in this matter from my side."  In each conversation I said that we'd be happy to consider any proposal.  Your proposal followed.

Best regards,

Andrew Kanter
Autonomy

---

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 11 April 2006 13:25
**To:** Andrew Kanter

**Subject:** Re: Severance Benefit Proposal

Dear Mr. Kanter,

First of all I must emphasize that it has been you (and not me) who asked twice to do a proposal for a severance package.

As you also know, my severance benefit shall be determined under Dutch law (vide the Change in Control and Severance Benefits Plan). That is why I fail to see why I should halter on my proposal.

In fact I draw up the following conclusions:

1. I will ask a Dutch lawyer to give me advice on how to act right now; I suppose a petition should be filed in which I ask for rescission of my employment contract. I will come back on this issue later;

2. Since you insist on the starting in the offered position, I will do so for the

HS-0044

time being (explicitly under protest). Please inform me about the exact expectations from your side.

3. In the past period I did not received proper payment. I would like to have your confirmation that the payments overdue (€ 8.842, € 18.043 and € 15.900, concerning the first three months of 2006) shall be paid this month. I clearly cannot held responsible for the fact that during my deactivation targets have not been made.

I suggest I leave it at that for now.

Kind regards,


Hugo Sluimer


2006/4/10, Andrew Kanter <andrewk@autonomy.com>:
Dear Mr Sluimer,

Thank you very much for your proposal. Whilst I appreciate your initiative, I unfortunately do not believe it is the basis for discussions. Accordingly you need to recommence your duties in your new position.

Last week you emailed me that you wished to discuss a settlement. On Tuesday we had a phone conversation regarding your future role and a possible settlement. Admittedly at the outset of the call we disagreed regarding your position. I said that it appeared as if you had made up your mind, which I found surprising given the lack of discussion between you and Autonomy executives on the matter. We discussed some of your impressions, but the bottom line was that your mind was made up.

This is of course disappointing as we have located an alternative role within the company with the same compensation package. If as you stated you believe the role to be too challenging, then we are of course willing to discuss a settlement as you requested.

However your proposal below is on the basis that the company has concluded that your employment is redundant, that there is no alternative role, and that your employment is to be terminated. This is of course not the case. I therefore do not comment on the calculations to be made in such a case or the applicable law. Whilst your calculations may be correct, they are irrelevant to Autonomy's position.

As noted during our conversations and correspondence, an alternative role has been found for you on the same compensation basis, and you are required to commence work forthwith. If you summarily reject this position, then the company will have no choice but to act as if you are abandoning your position.

At the end of the day we are disappointed that you have made up your mind not to continue in a senior capacity with Autonomy, with a similar compensation package and a great opportunity in the market. You are of course free to follow any course you choose.

As discussed during our last call, if you would like to make a proposal that is reasonable and reflects the interests of both parties I would be happy to consider it, and I'm sure we can reach a conclusion rapdily. Unfortunately the proposal below does not fall into the category.

Finally, with regards to option payments, I believe finance has already confirmed to you that payment will be made in the next payroll run. Therefore I don't understand your reference to "probably" will take place. On our call I agreed to speak with finance as to whether they could accelerate payment to before the normal payroll period. You called me the next day and noted that if payment could not be received soon, that you would like any subsequent payments to be noted as being for the March payroll. I have spoken with finance and they are not in a position to accelerate payroll. Further they have raised questions as to whether you are seeking to participate in a tax avoidance scheme by moving payments between payroll

periods.

I look forward to seeing you this week in Cambridge in your new position.

Best regards,

Andrew Kanter
Autonomy

---

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 07 April 2006 15:14
**To:** Andrew Kanter
**Subject:** Severance Benefit Proposal


Dear mr. Kanter,

Following to our telephone conversation of last Tuesday, in which you asked me to do a proposal to solve this matter in an amicable way, I now can inform you as follows.

As you know my redundancy package in the Change in Control Plan has to be determined in accordance with Dutch Law, i.e. the so called Kantonrechterformule ("Cantonal Judge formula"). I am sure your attorneys can explain to you the way this Dutch formula works. Moreover I understood that with Eric Weenink a settlement in accordance with this formula was reached as well; therefore I may consider you already to be familiar with this formula.

In my case I am - in case of termination of the employment contract by the end of this month - , entitled to payment of 23 (months) times EUR 45.076 gross (which is my base salary and average commission per month in the last 3 years).

This means that I am prepared to agree with a package if the following items are part of it:
- Termination as per 30 April 2006;
- I will be exempted from my duties, payment of my salary c.a. will be paid as has been customary during my employment for Verity;
- Payment of EUR 1.036.748,-- gross (I shall seek advice about the way this should be paid out to me tax-friendly);
- Supplementary payments (the delta between my ave EUR 45.076 salary and the actual payments) of my Jan, Feb 06 and March 06 (resp. 8.842, 18.043 and 15.900 ) plus 45.076 for April, this makes EUR 87.861 in total.
- The Change in Control plan is applicable, especially, but not only concerning immediate vesting of my options and the employer's contribution of health insurance;
- Completion of the employment contract takes places before 1 May 2006, Dutch law is applicable;
- A reasonable contribution for legal costs;
- Finalization of the settlement takes place with the attorneys; I reserve the right to bring in (minor) points after consultation my attorney.

If this proposal is not accepted and the District Court in Holland has to decide in this case, I will use the possibility that Dutch law provides me with, to ask for a severance package with a multiplication factor of 1.5, due to the way I am treated by Autonomy. If this is the case, termination will not take place earlier than 1 July 2006. Furthermore the severance payment increases due to the fact that I shall be 53 years old by then. From my point of view this is

HS-0046

why my proposal is in fact a considerable step towards Autonomy/Verity. I take it that you'll appreciate this.

Another important (and definitely urgent) issue is the payment of exercised options. You told me this week to take immediate action on that. But still no payment took place. I can not live with the fact that payment "probably" will take place this month. Reception of this payment is unconditionally required before I can agree on termination of my employment contract.

I will look forward to your reaction and remain with kind regards,

Hugo Sluimer

HS-0047

---------- Forwarded message ----------
From: **Hugo Sluimer** < hugosluimer@gmail.com>
Date: 24-apr-2006 17:02
Subject: Re: Email
To: dh@virage.com

DEAR DAVE,
THANKS FOR YOUR REACTION ON APRIL 23RD TO MY MAIL OF APRIL 20TH.
I DON'T WANT TO START A 'YES OR NO' MAIL EXCHANGE, SO I WANT TO KEEP MY FEEDBACK TO
YOUR MAIL VERY BRIEF.
AS YOU KNOW THERE WAS NOT MUCH TIME FOR DIALOGUE, SINCE THE MEETING LASTED ONLY
1 HOUR AND 20 MINUTES. I JUST WROTE DOWN WHAT I HEARD, THIS HAS NOTHING TO DO WITH
A NEGATIVE INTERPRETATION OF OUR MEETING. YOU AND RACHEL, WHO ONLY ATTENDED
ABOUT 1 HOUR, WILL HAVE NOTICED THAT I ALWAYS RESTATED STATEMENTS AND/OR ASKED
FOR CONFIRMATION WHEN THINGS WERE NOT IMMEDIATELY CLEAR TO ME.

WRT THE E-MAIL FOR ROME, THE E-MAIL WAS SEND TO YOU AND RACHEL ON THE 19TH
(REMEMBER, I SEND YOU A COPY OF THIS MAIL ON THE 21ST). OFCOURSE I GLADLY ACCEPT
YOUR APOLOGIES AND ALSO HOPE THAT THESE ISSUES WILL NOT ACCUR AGAIN.

BEST REGARDS,

HUGO

From: **David Humphrey** < dh@virage.com >
Date: 23-apr-2006 0:05
Subject: Email
To: hugosluimer@gmail.com
Cc: Rachel Haverfield < rhaverfield@autonomy.com>

Dear Hugo,
Thanks for your email of yesterday.
First of all I would like to express my disappointment at your very negative interpretation of our meeting and
the Virage Security and Surveillance business, given that you did not directly raise any such concerns at
the meeting itself thereby giving us opportunity to potentially address them.

As I mentioned in my email of last evening, I am afraid I did not receive any email from you yesterday and
had asked April to follow up with you directly regarding flights. Apparently she left a voicemail for you,
asking you to see if flights booked from your end were cheaper, as booking them from the UK was
prohibitively expensive. I understand that after following up with you yesterday, you explained that you had

not received the voicemail, which explains the confusion. We apologise for the confusion and hope that, going forward, these issues will not occur again. If you need any further information on the travel policies, please contact April.

I have made some amendments to your minutes which I have included in square brackets below on the basis of my notes. Rachel has also provided some comments to me to clarify some of issues raised. Andy Kanter will get back to you separately with respect to your comments on a clearer delineation of role and any additional formalities required with respect to your contract. In the interim, if you need any additional information on the operations of VSS, do not hesitate to contact me.


Regards
David Humphrey


**From:** Hugo Sluimer [ mailto:hugosluimer@gmail.com]
**Sent:** 20 April 2006 14:02
**To:** dh@virage.com
**Cc:** rhaverfield@autonomy.com
**Subject:** Our meeting minutes
Dear David,
First of all, I would like to thank you for the meeting (although very brief) we've had on April 18th last. I'll hereby send you my meeting notes (feel free to comment and/or to add info and send me your feedback asap). Neurodynamics was bought by A. in Sept. 05 (before it was just one of the companies where Mike Lynch has a major share in). The acquisition was done to make the A. business more transparent, ensure compliancy and to streamline the A. organisation. **[Autonomy Comment: In fact, A bought Neurodynamics because it saw the enormous growth potential in the business, as well as the potential combination of Neurodynamics products with the Autonomy suite which could only improve the A bottom line.]** Neurodynamics doesn't exist anymore (this change was made per Jan 2006) **[Autonomy Comment: Neurodynamics Limited as a company, doesn't actively trade anymore, although the brand/domain/trademarks/goodwill still exist and have been assigned to AS]** and was renamed 'Virage Security & Surveillance' (VSS). Strange that I have been recently appointed as Sr. VP of Neurodynamics... **[Autonomy Comment: According to Andy Kanter ("AK"), the letter notifying you of your appointment as Senior VP of Neurodynamics was issued prior to the rebranding of the division as Virage Security and Surveillance, which has only happened very recently. The role is the same, and should not therefore cause any surprise to you.]** VSS is part of 'Autonomy Systems Ltd.' (AS), a wholly owned division of the A. Group Plc. A. has the intention to add other business units to AS (VSS is now the only one), like the Cardiff business unit (previous acquired from Verity). **[Autonomy Comment: In January 2006, a corporate rationalisation was undertaken where the assets of the various UK subsidiaries were transferred to ASL. VSS is not the only business unit currently. The assets of other Autonomy Corporation plc subsidiaries were also transferred. Additional entities will be included (such as Verity GB) as part of the integration of the Verity group into the Autonomy group, strengthening the AS product line and, hence, market profile etc. ]**

VSS' major competitors are Nice, Verint and Vigeland **[Autonomy Comment: Vigilant]**. VSS has about 15 employees **[ Autonomy Comment: based in the UK, while Virage as a whole has staff]**, working in 3 offices (Boston, San Francisco and Cambridge), all technical employees **[Autonomy Comment: not sure where you got this from?]** . Although VSS also ships very specialised hardware, the preferred business model is to work with hardware partners and to just ship some complementary hardware, but mainly software. Potential and current partners include Orban, **[Autonomy Comment: should be Norbain and PCOpen]** (who produce for Honeywell, Toshiba and others) and NKF. So the idea is to grow into an OEM sales model, where HW/solution vendors embed VSS' solutions into their solution. **[Autonomy Comment: Various business model options are currently being discussed – it has not been definitively determined which one is preferred or would be better than another.]**

We discussed potential reasons for the 'slow take-off' of Neurodynamics/VSS and concluded that obvious excuses are lack of scale/size and business attitude (eg sales, marketing, etc). All the sales representatives (so far 6 **[Autonomy Comment: I'm not sure where you got this figure from?]** in total) failed (you indicated to believe that they were simply to junior to sell such complex/specialised solutions **[ Autonomy Comment: this is not historically correct, in that we weren't targeting that market previously – it is the case now, as we are now looking to sell to a more complex/specialized market]**). Also the

HS-0049

Commercial Manager resigned recently. You even mentioned that VSS are "in a little cottage industry". [Autonomy Comment: What was, in fact, described here is that, to date, as a business unit, my team and I have been left to undertake the business largely autonomously, with no separate marketing/ admin/ development departments. This has made the growth of the company more difficult than if it had had dedicated resources which, by joining Autonomy, it now has. This was merely an example of the potential perception some customers might have had with respect to our previous business model, ie, how can such a small company be producing world leading solutions? Therefore, the combination with Autonomy will enable us to counteract this perception]. Being now under the wings of the A. Group, you see a prosperous future. The show last week in the USA delivered 300 [ Autonomy Comment: 250] leads (although your weighed judgement is that it delivered 2 excellent [Autonomy Comment: by excellent, I mean almost guaranteed] qualified potential projects and [Autonomy Comment: around 30] 3 very good potential projects). [Autonomy Comment: What I said was that out of the 250 there were 150 workable leads, but there were 5 excellent and 30 good leads as described above. The number of excellent leads does not suggest there is no potential among the others and any developments in the future would be based on your performance]. Most of the business so far was made "by accident" [The reference to 'accidental' sales was to sales in places other than in the UK, and only in so far as there has been no dedicated Virage S&S sales or distribution channel in those markets] : A. field sales (mainly in Italy and the USA) develops leads, you 'parachute in' and close the business. [ Autonomy Comment: This is how business has been run to date. No suggestion that this is the opetimum solution.]

Your direct report line is to Mike Lynch only, although there is also some involvement from [ Autonomy Comment: Pete Menell, the CTO of Autonomy] A. Kanter [ Autonomy Comment: almost none, except in circumstances such as this where legal/operational input required at a high level] and S. Houssain. Mike never gave you directives, but has opinions. [Autonomy Comment: No — Mike Lynch, as the founder of Neurodynamics and the lead inventor, obviously has input from time to time. On a day-to-day basis, however, he is not involved. Large expenditures (for eg, ☐70,000 for a trade show in Japan) would need to be approved by Mike.] There is no business plan or whatsoever [Autonomy Comment: No - as I repeatedly explained, the business plan is in the process of being developed but will need to be discussed/worked on to complete and implement. The appointment of a Senior VP of Global Operations is obviously an integral element in determining and developing the direction of the business]. My role, responsibility, reporting structure, etc. has to be defined, in fact we have to start from scratch. [ Autonomy Comment: As AK is in charge of the procedural aspects to your employment, the purpose of the meeting was to give you information on the business and ascertain your views as to where you see yourself best fitting in. AK will revert to you separately on the legal delineation of your role and any legal formalities but, in the interim, any input from you, or requests for additional information, are encouraged]. Furthermore an assignment agreement with my employer Verity Benelux still has to be drawn up, just like this has been the case for the past years. [Autonomy Comment: Each of Verity GB, Verity Benelux and VSS are all under the same group control, so this should not be a hindrance to you taking up your role. We can deal with any procedural issues and formalities relating to your appointment in due course. AK dealing with this]. You have a plan in your head and that is to focus almost all your efforts on the USA, simply because that's where you believe the market is. [Autonomy Comment: It was reiterated several times in the meeting that any focus on the US is simply a function of me and my team not having had time to look anywhere else. As discussed, the US is the easiest target as they speak the same language, we have distribution channels, sales and field services there and the leads already exist. Furthermore, this reiterates the need for someone who has contacts and experience in mainland Europe and APAC where we have not had the time/resources to develop business. If you have a specific issue/problem with the US focus, your input would be appreciated].

Selling in Asia will be extremely hard, if not impossible, because the product is not Internationalised or Localised. [Autonomy Comment: If this is the case, this was not raised at the meeting. As we discussed, we have not, to date, actively sought customers in Asia so I cannot comment on this. On the contrary, we did discuss how one of your historic partners in Korea is desperate to sign up! This is a business plan issue as above.]

The A. Group has now assigned a part time marketing resource. [Autonomy Comment: As was reiterated by Mike Lynch in your brief discussions with him, in addition to the Virage Marketing Manager who also heads up European marketing for other products, a dedicated security and surveillance marketing person has also been appointed].

HS-0050

Although the preferred sales model should be to leverage from the A. field sales force, there is hardly interaction (other than with Italy and the USA). **[Autonomy Comment: To date this is the case but, as I repeatedly suggested, this is because of limited time resources. That is the very point of needing new people on board to sell the product and where your role is seen as most obviously beneficial]** . My potential role in VSS is not clear to you, "A. Kanter told me that you're good in Europe", so we really need to get things sought out, starting from the basics. **[Autonomy Comment: Broadly your role is to grow the business, which I understand was your previously role at Verity. Indeed the specifics need to be discussed, which was one of the purposes of the meeting. I understand you operated largely autonomously in your role at Verity. The role here is intended to be analogous.]** . From the historical VSS business volume, you estimate that 50% comes from the Gov. market and 50% from commercial markets. **[ Autonomy Comment: Correct — however, by number of deals, the volumes are 80% commercial, 20% government].**

Since the time was over (unfortunately I needed to catch my flight, which was booked by A.'s travel dept.) I checked with you if we would meet (according to plan) coming Thursday, in Rome which you confirmed. I indicated that no travel arrangements were made (although I requested A.'s travel department) and you and Rachel promised to take action right away.

Surprisingly I never heard back (see my yesterday's e-mail). **[ Autonomy Comment: As discussed above, no email was received yesterday. Flights came out at □800 which was disproportionately expensive for the meeting's purpose, so April Jones left you voicemail asking you to try and book flights from your end so they would come out cheaper. When she checked in with you yesterday, she was told you don't have voicemail, even though she rechecked the number she had called. I believe that April explained the travel policy and that, in future, if someone doesn't revert to you about your travel arrangements this should alert you that there is some problem with the process and to contact us.]**

David, although I recommenced my activities under protest **[ Autonomy Comment: I was unaware this was the case and something that is obviously within AK's remit, rather than mine]**, which is not an ideal situation for you, I still think we should handle this as professional as possible. **[Autonomy Comment: Noted — Perhaps the first step is for AK to revert to you on the legal delineation of your role. However, with respect to the operational content, your role is to develop the VSS business. Any feedback as to how you see yourself best being utilised in this respect would be strongly encouraged.]** Can you inform me on how to proceed in this matter? Please share your opinion on this issue with me, preferably on the shortest term.

Best regards,
Hugo

```
David Humphrey
Managing Director
Virage
Security & Surveillance

Tel: +44 (0) 1223 488 540
Mob: +44 (0) 7775 764 988
www.virage.com
```

HS-0051

---------- Forwarded message ----------
From: **Andrew Kanter** <andrewk@autonomy.com>
Date: 24 apr. 2006 12:14
Subject: Role
To: Hugo Sluimer <hugosluimer@gmail.com>

Dear Hugo,

I refer to your meeting on 18 April with David Humphrey and Rachel Haverfield.

On the basis of this email, I understand you are seeking a more concrete description of your role and responsibilities.

As you know, your title will be Senior Vice President, EMEA and APAC Operations for Neurodynamics, which has recently been rebranded as Virage Security and Surveillance (VSS). For the avoidance of doubt, we can resend you our original letter with the new brand name or simply issue you a side letter describing the rebranding, if this is required.

The role is intended to mirror the responsibilities you had in your previous role, where you were seconded to Verity GB Ltd as Senior Vice President, EMEA and APAC Operations, but on a global scale for the VSS product range (and Autonomy software should it be included as part of the solution). As per your previous role, you will be required to devote 95% of your time to the UK and will be responsible for VSS sales activities and development in Europe, Middle East, Africa, Asia Pacific region and potentially other jurisdictions where opportunities are available, such as the US, which is to be determined by you and David Humphreys going forward. We see your management role at Verity to be directly relevant in this role, albeit it a division which is growing, rather than one that has seen the end of its growth cycle.

You will report to Mike Lynch, CEO of the Autonomy group, and day-to-day working with David who is the head of the division. In accordance with Autonomy policy, there are certain other approval lines required to be fulfilled with respect to budgets and expenditure where you will be answerable to the board members.

As each of the relevant parties involved in your employment agreement are under common control, procuring payment of salary and signatures will not be a problem. Thus you will continue being paid in the method and via the payrolls you are currently paid through. We can fulfill any legal formalities with respect to your new role in due course, none of which are an impediment to you fulfilling your role at this stage.

Rachel has pointed out one matter in your email with which I disagree. There is no major impediment to the VSS business moving forward related to a "proper" business plan. Autonomy's success to date has been achieved without one. However if you would like to prepare one this is well within your remit. Please let David or myself know what additional information and resources you require to do so.

Best regards,

Andrew Kanter
Autonomy

HS-0053

---------- Forwarded message ----------
From: **Andrew Kanter** <andrewk@autonomy.com>
Date: 27 apr 2006 10:21
Subject: RE: Role
To: Hugo Sluimer <hugosluimer@gmail.com>

Dear Hugo,

I'm not sure I understand why you have sent this email. It is not clear whether this message is repeating your previously stated position, or whether you are stating that you have not been provided with a description of your position. If it is the latter, I refer you to my email of 24 April 2006 with details regarding your role.

However I must confess that I am also somewhat distressed by your comment below that you are fully unaware of what is expected of you and that you require instructions. You have served for a number of years as a senior executive of a software company responsible for sales, and earn hundreds of thousands of dollars in this position. The ultimate goal for the Neurodynamics division is exactly the same as your previous role - sales of software. It is therefore distressing to find that to perform any role you require specific instructions. It has been nearly a month since this position was made available to you and it appears that nothing has been accomplished. This is disappointing given your experience and remuneration.

There should be no need to dole out specific tasks to you. Your division though does need to report its forecasted sales for Q2 immediately, forecast for the remainder of the year, any required hires to achieve that goal, marketing spend, etc., for approval.

Finally, I note your comment below regarding a competent judge. We have received legal papers this morning. As this is now a legal matter, any matters relating to employment process and continued employment must be directed for my attention alone.

I look forward to your commencing progress in your role.

Best regards,

Andrew Kanter
Chief Operating Officer
Autonomy

---

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 25 April 2006 17:08
**To:** Andrew Kanter
**Subject:** Role

Andrew,

The alternative position that Autonomy offered to me is just not comparable at all to my former job with Verity. Efforts to make me believe otherwise are pretty pointless and meanwhile I am sure the opposite goes for you as well.

I suggest we'll leave the decision in this matter to the competent judge.

HS-0054

Although it is very difficult for me, I will in the meantime do what I can to perform sufficient in my current (non-suitable) position. Repeating questions to me what additional information etc. I require doesn't help, by the way. I am fully unaware of what Mike Lynch and you are exactly expecting me to do. Instructions would be helpful.

Best regards,

Hugo

From: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 15:07
To: 'Rachel Haverfield'
Subject: FW: sluimer since april 24.

hasn't used his work email for any work since at least 24 april, as far as we
can tell.

seems mainly to be with an electronics company (netto24.ch), home cinema company
(tqs.nl), bank (abnamro) and a wine company (avinos-wein.de).
alexanderf@autonomy.com is a systems admin person.


--------------------------------------------------------------------------
From: Matt Dunn [mailto:matthewd@autonomy.com]
Sent: 19 May 2006 15:03
To: andrewk@autonomy.com
Subject: sluimer since april 24.

Tue 2006-04-25 14:47:33: From: alexanderf@autonomy.com; Recipient:
hsluimer@virage.com;

Tue 2006-04-25 14:49:03: From: hsluimer@virage.com; Recipient:
hsluimer@virage.com;

Tue 2006-04-25 14:50:03: From: alexanderf@autonomy.com; Recipient:
hsluimer@virage.com;

Fri 2006-04-28 18:33:57: From: dh@virage.com; Recipient: hsluimer@virage.com

Wed 2006-05-03 22:13:42: From: hsluimer@virage.com; Recipient:
info@avinos-wein.de;

Fri 2006-05-12 09:03:35: From: hsluimer@virage.com; Recipient:
esther.osnabrug@mc.abnamro.com

Fri 2006-05-12 09:06:25: From: esther.osnabrug@mc.abnamro.com; Recipient:
hsluimer@virage.com;

Fri 2006-05-12 16:29:30: From: esther.osnabrug@mc.abnamro.com; Recipient:
hsluimer@virage.com;

Thu 2006-05-18 16:26:22: From:hsluimer@virage.com; Recipient: thuisbios@tqs.nl

Fri 2006-05-19 07:35:52: From: info@netto24.ch; Recipient: hsluimer@virage.com

Fri 2006-05-19 07:45:22: From: thuisbios@tqs.nl; Recipient: hsluimer@virage.com

Verity, Inc
Attn. Vice President Human Resources
894 Ross Drive
Sunnyvale CA  94089
California, USA


Date: May 1st, 2006


Dear mr. Jack Landers,

Being a participant in Verity's Change in Control and Severance Benefits Plan
(the Plan), I draw your attention to the following.

In my opinion the acquisition of Verity by Autonomy results in a Change in
Control according to the Plan. This leads to the conclusion, that, according to
the applicable Participation Notice, I am entitled to not only cash severance
benefits, but also to accelerated vesting of options and continued medical
benefits.

Can you confirm to me that I am entitled to the accelerated vesting of option:
and continued medical benefits?

If you need more information, please do not hesitate to call me.

Kind regards,

Hugo Sluimer

Apt. Le Millefiori, 27F
1, rue des Genets
MC 98000 Monte Carlo
MONACO

HS-0057

Autonomy

VIA EMAIL AND REGISTERED DELIVERY

3 May 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genêts
MC 98000 MONACO

Re:    Fax dated 1 May 2006 to Mr Jack Landers

Dear Hugo:

I write on behalf of Verity, Inc. I refer to the fax dated 1 May 2006 which was addressed to Mr. Jack Landers. Mr. Landers has forwarded this document to me as you are currently in a legal dispute with Verity, Inc. regarding your employment and thus I am responsible for all communications.

On the basis of the terms of the Change in Control and Severance Benefit Plan (the "Plan"), we do not consider you to be entitled to the accelerated vesting of options and continued medical benefits. Firstly, in Section 3(b)(iii), an employee offered immediate reemployment is an express exception to severance benefits described in the Plan Entitlement Section 3(b)(iv). In any event your employment has been continuous, with continued payment of salary, commission and other benefits such as stock option vesting. Secondly, section 3(b)(iv) provides that an employee will not receive benefits under the Plan if the employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non Compete Agreement, which we have not received. Thirdly, Section 7 further provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities. In view of the pending litigation between yourself and the Company, obviously this criterion has not been fulfilled thereby making you ineligible for the stated benefits.

I reiterate my request of 27 April 2006 that as this is now a legal matter, any matters relating to employment process and continued employment must be directed to me, or to our attorneys, Mr. J. de Roos and Mr. M. Ritmeester (P.O. Box 7113, 1007 JC Amsterdam ,The Netherlands). Any contact with other employees within Autonomy relating to your employment will not be accepted.

Sincerely,

Andrew M Kanter
Company Secretary

Page 1

HS-0058

Autonomy

VIA REGISTERED DELIVERY

6 July 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

Re:    Fax dated 1 May 2006 to Mr Jack Landers

Dear Mr Sluimer:

I write on behalf of Verity, Inc. and further to my letter dated 3 May 2006.

Your letter dated 1 May 2006 seeks additional information related to the terms of the Change in Control and Severance Benefit Plan (the "Plan") ("can you confirm to me...?") As such it does not constitute an application within the meaning of the Plan.

Notwithstanding the foregoing, to the extent that your letter is deemed to be an application for benefits, we hereby notify pursuant to Section 11(b)(1) and (2) of the Plan you that your application is denied in whole. Firstly, in Section 3(b)(iii), an employee offered immediate reemployment is an express exception to the receipt of severance benefits under. You have been offered such employment, and your employment has been continuous with payment of salary, commission and other benefits such as stock option vesting. You have not suffered a "Constructive Termination" within the meaning of Section 2(f) the Plan. Also section 3(b)(iv) provides that an employee will not receive benefits under the Plan if the employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non Compete Agreement. Finally, Section 7 provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities.

This notice is provided under Section 11(b) of the Plan within the time periods allotted therein. Under Section 11(b)(4) of the Plan, you are hereby notified that you are permitted to request a review of this notice. You may do so by submitting a request for a review directly to me within sixty (60) days of the date of this letter. Your request must be submitted in writing and shall be addressed to:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089
USA

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that you feel are pertinent. You (or your representative)

Page 1

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0059

Autonomy

shall have the opportunity to submit (or the Plan Administrator may require you to submit) written comments, documents, records, and other information relating to your claim. You (or your representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. The review shall take into account all comments, documents, records and other information submitted by you (or your representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, as set forth in the Plan. You have a right to bring a civil action under Section 502(a) of ERISA following a denial on review of any claim.

Sincerely,

Andrew M Kanter
Company Secretary

HS-0060

VIA EMAIL AND REGISTERED DELIVERY

13 July 2006

Verity, Inc.
Attn. Vice President, Human Resources
894 Ross Drive
Sunnyvale CA 94089
California, USA

**Re: Request for review**

Dear Mrs/Mr,
With reference to your letters dated 3 May 2006 and 6 July 2006, I hereby confirm that
my letter dated 1 May 2006 was mend to be an application for benefits under the Change
in Control and Severance Benefit Plan (the "Plan"), so in case this was not clear to you, I
hereby repeat my application for benefits under the Plan.

In accordance to section 11 (c) of the Plan, I hereby request review, based on the
following grounds:
1. as you are aware, the Cantonal Court in The Netherlands ruled on 7 July 2006 that
   the offered position by Verity/Autonomy (Sr. VP Neurodynamics), is not
   comparable with the prior position the Participant hold at Verity, Inc. Therefore I
   claim, per section 2 (f) "Constructive Termination" (i) due to a substantial
   reduction in the Participant's duties and responsibilities.
2. I disagree with your opinion that I was offered immediate reemployment, per
   section 3 (b) (iii) of the Plan. I was given half payment during a 3 months period
   (3 months in the software industry are comparable with at least 1 year in a
   traditional industry), so the offered reemployment was by far not immediate. I
   also believe that Verity/Autonomy's call for section 3 (b) (iii) under the Plan is
   not relevant, simply because a comparable position was never offered, so
   "Constructive Termination" applies.
3. I also disagree with Verity/Autonomy's other arguments (referring to 3 (b) (iv)
   and section 7), to not consider me entitled to the benefits under the Plan, because I
   signed a "Proprietary Rights" Agreement when I joined Verity, Inc. (this
   agreement is comparable with Autonomy's "Confidentiality Agreement"). What's
   even more important is that such arguments have nothing to do with the
   core/spirit of the Plan. It is common business practice (as performed by
   Verity/Autonomy in other settlements under the Plan with former Verity
   Executives) that such 'sub-agreements' are part of a final 'Separation Agreement'
   between Verity/Autonomy and the Participant.

Sincerely,

Hugo Sluimer



**FICHE DE DÉPÔT D'UN RECOMMANDÉ INTERNATIONAL**

LA POSTE

Cadres réservés à La Poste

| 98000 | MONTE CARLO | | |
| CRBT | 00139 | Prix | PR   17H |
| | | 4.90EUR | Date de dépôt 13/07/06 |

RK 25 964 512 5 FR

Étiquette entière à détacher et à coller par le guichetier au recto de l'envoi Recommandé International

Destinataire :

Localité :

Pays (en français) :

Expéditeur :

517

**HS-0062**

---------- Forwarded message ----------
From: **Hugo Sluimer** <hugosluimer@gmail.com>
Date: 13 jul. 2006 10:10
Subject: Request for review
To: Rachel Haverfield <rhaverfield@autonomy.com>


Dear Mrs. Haverfield, Rachel,
Please find my request letter enclosed.

Kind regards,

Hugo Sluimer

HS-0063

---------- Forwarded message ----------
From: **Hugo Sluimer** < hugosluimer@gmail.com>
Date: 5 sep. 2006 10:44
Subject: Change of address
To: Rachel Haverfield < rhaverfield@autonomy.com>



My new address will be per Oct 1st:

Rose de France Bloc C Appt. 2-3 17, Boulevard de Suisse MC 98000 Monaco

Hugo Sluimer

HS-0064

Autonomy

VIA REGISTERED DELIVERY

29 September 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

RESENDING TO:

ROSE DE FRANCE BLOC C      APT 2·3
17 BOULEVARD DE SUISSE
MC 98000  MONACO

Re:    Letter dated 13 July 2006

Dear Mr Sluimer:

I write on behalf of Verity, Inc. with regards to your letter dated 13 July 2006. Your letter was addressed to the Vice President, Human Resources of Verity, Inc. That position reported to my office, which has global responsibility for group human resources matters. Jack Landers, the previous Vice President, Human Resources of Verity, Inc., has recently left the company, and as such I have assumed his duties as the Plan Administrator within the meaning of the Change in Control and Severance Benefit Plan (the "Plan"), the topic of your letter.

Your letter dated is a request for review under Section 11(c) of the Plan, and was received by Verity on 1 August 2006. This letter is a notification of decision on review under Section 11(d) of the Plan. Pursuant to Section 11(d), this decision is being provided within 60 days of receipt of your request.

I regret to inform you that upon re-review Verity has confirmed the denial of the application for benefits in whole. The specific reasons follow.

We draw your attention again to Section 3(b)(iii) of the Plan, which provides that an employee offered immediate reemployment is an express exception to the receipt of severance benefits under the Plan. You were offered but rejected such employment, instead seeking to voluntarily terminate your contract. Your employment with the company prior to your voluntary termination was in fact continuous, with uninterrupted payment of salary, commission and other benefits such as stock option vesting. Your statement that you were paid "half payment" is simply untrue as your salary remained the same, benefits were uninterrupted and your commission plan was calculated exactly the same as prior to the acquisition (indeed for most of the time by the same finance personnel using exactly the same systems as pre-acquisition).

Further, you did not suffer a "Constructive Termination" within the meaning of Section 2(f)(i) of the Plan. As you are aware, it is the company's position that you did not suffer a substantial reduction in your duties or responsibilities in effect immediately prior to the effective date of the Change in Control. It remains the company's conclusion that rather than suffer a "Constructive Termination" you sought to avoid your employment duties whilst engaging with the company solely to establish a position for compensation in the Dutch courts. In contrast, the company actively pursued your continued employment by finding an

Page 1

HS-0065

Autonomy

alternative position within the group with the same terms, analogous compensation and growth potential. In contrast, in the post-acquisition period after redundancy review you barely performed your role.

You reference the 7 July 2006 decision of the Cantonal Court in the Netherlands as evidence supporting your position. Section 10 of the Plan clearly states that the Plan is governed by the laws of the State of California. There are of course very substantial differences between Dutch and California employment law, such as the applicable rules and regulations, factors considered by the Cantonal Court and standards of evidence. Thus whilst the Cantonal Court decision has been considered in reaching this decision, it is neither binding on the Company for purposes of the Plan nor persuasive in reaching this decision. It should also be noted that at the Cantonal Court hearing your position was clear that the substance of your petition did not address the Plan.

Your request is also denied as a result of your failure to comply with the last clause of Section 2(f) of the Plan which states the precedent actions required to claim Constructive Termination under Section 2(f). You have not provided the Company with the required written notice, either in substance or in accordance with the notice procedures under Section 15(a). *Had it eg 13/3 reclaimed p*

With regards to Section 3(b)(iv), the Plan is clear that it is within the Company's discretion to deny benefits should you not confirm in writing that you are subject to the Company's Confidentiality Agreement and Non-Compete Agreement. You have not provided any such confirmation. The Proprietary Rights Agreement you reference (in fact the "Employee Inventions and Proprietary Rights Assignment Agreement", dated 9 June 1993) is not equivalent to a confidentiality and non-compete agreement. The Proprietary Rights Agreement is a standard document that governs the rights between the company and its employees with respect to intellectual property generated before and during their employment.[1] A confidentiality agreement protects a much wider scope of key commercial information, and a non-competition agreement of course relates to post-employment competitive obligations. Acknowledgement in writing of these obligations is basic consideration for the receipt of benefits under the Plan, and is integral to the purpose and spirit of the Plan.

Finally, Section 7 provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities, which you have not agreed to.

*I will no problem*

---

[1] Your employment file does not contain the full text of the agreement, but only the first and last pages, however other agreements entered into at a similar time reflect this position.

Page 2

HS-0066

Autonomy

This notice is provided under Section 11(b) of the Plan within the time periods allotted therein. Under Section 11(b)(3) of the Plan, you are hereby notified that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. Under Section 11(b)(4) of the Plan, you are hereby notified that you have a right to bring a civil action under Section 502(a) of ERISA.

Please address any future correspondence to my attention at the letter on this address.

Sincerely,

Andrew M Kanter
Chief Operating Officer — Autonomy Group of Companies

HS-0067

VIA EMAIL AND REGISTERED DELIVERY

27 February 2007

Verity, Inc.
Attn. Vice President, Human Resources
894 Ross Drive
Sunnyvale CA 94089
California, USA

**Re: Settlement/Rights enforcement**

Dear Mrs/Mr,
With reference to your letter dated 29 September 2007, I hereby respond.
First of all I received your letter after the deadline according the Plan expired (the Plan says 60 days after receipt, and I received your letter on October 26, 2006).
It seems to be clear that Verity/Autonomy and I are in disagreement:

1. according to the ruling of the Cantonal Court in The Netherlands ruled on 7 July 2006, the offered position by Verity/Autonomy (Sr. VP Neurodynamics), is not comparable with the prior position the Participant hold at Verity, Inc. Therefore I claim, per section 2 (f) "Constructive Termination" (i) due to a substantial reduction in the Participant's duties and responsibilities.

2. I disagree with your opinion that I was offered immediate reemployment, per section 3 (b) (iii) of the Plan. I was given half payment during a 3 months period (3 months in the software industry are comparable with at least 1 year in a traditional industry), so the offered reemployment was by far not immediate. I also believe that Verity/Autonomy's call for section 3 (b) (iii) under the Plan is not relevant, simply because a comparable position was never offered, so "Constructive Termination" applies.
The term 'half payment' was a language issue/ misunderstanding, sorry about that, I intended to say 'on half-pay', in my dictionary it means a situation where a person is given a non active status (still on the payroll, but asked to 'wait and see' at home.

3. I disagree with your statement to not have been compliant with Sections 2(f) and 15(a), please review the previous correspondence we've had.

4. I also disagree with Verity/Autonomy's other arguments (referring to 3 (b) (iv) and section 7), to not consider me entitled to the benefits under the Plan, because I signed a "Proprietary Rights" Agreement when I joined Verity, Inc. (this agreement is comparable with Autonomy's "Confidentiality Agreement"). What's even more important is that such arguments have nothing to do with the core/spirit of the Plan. It is common business practice (as performed by Verity/Autonomy in other settlements under the Plan with former Verity Executives) that such 'sub-agreements' are part of a final 'Separation Agreement' between Verity/Autonomy and the Participant.

HS-0068

A rough calculation learns that today's value/gain of my 'non vested' stock (cancelled stock options after 23 June, 2006) would be about 811,000 USD.
I would like to offer Verity/Autonomy to settle and get this issue of the table. Please let me know if you are interested.
FYI: I have contacted the U.S. Department of Labor and various specialized Attorneys about my rights under the Plan and all believe that I should enforce my rights because all believe that Verity/Autonomy incorrectly denied my request for benefits.

In case we don't settle, I would like to enforce my rights.
First of all I would like to receive the latest annual report from the Plan, or other applicable copies of Plan documents, per Section 13, 'Enforce your Rights'.
I will file suit, probably in a Federal court.

Sincerely,

Hugo Sluimer



Autonomy

VIA REGISTERED DELIVERY

22 March 2007

Hugo Sluimer
Rose de France Bloc C Appt. 2-3
17, Boulevard de Suisse
MC 98000 Monaco

Re:    **Letter dated 27 February 2007**

Dear Mr Sluimer:

I write on behalf of Verity, Inc. with regards to your letter dated 27 February 2007, which was received in hard copy on 7 March 2007.

As noted in my most recent letter, I have assumed the duties as the Plan Administrator within the meaning of the Change in Control and Severance Benefit Plan (the "Plan"), the topic of your letter. Accordingly please address all correspondence to my attention by hard copy only to the address on this letter. Electronic copies may be caught in spam filters and thus should not be relied upon.

First, the notification of decision on review was sent within the terms of the Plan. Section 11(d) states that the Plan Administrator will "act on each request for review within sixty (60) days after receipt of the request." Your request was received by Verity on 1 August 2006, and thus the response was within the required 60 days. The letter was dispatched to the address "set forth in the Company's employment file" for you in accordance with Section 15(a). I understand that you changed address around the time the letter was sent, however no update was received as required under Section 15(a).

We note your arguments disagreeing with the decision on review. Each of these matters have been covered in previous correspondence. Without repeating these arguments, we note for the record that we respectfully disagree with your conclusions. One new point merits addressing: you state that it is common practice to enter into the Company's Confidentiality Agreement and Non-Compete Agreement as required by the Plan as part of a final "Separation Agreement" between the Company and the employee. In fact the Company has never done so under the Plan – in each case the Company has required all documents in advance of receiving benefits. There have been no "settlements" under the Plan. The Plan is clear that entering into such an agreement and signing a general waiver and release are predicate acts, which you have not done.

Per your request, enclosed please find a copy of Autonomy's most recently published annual report, together with a copy of Autonomy's most recently published financial results. Please let me know should you require any specific other Plan documents.

Page 1

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0070

Autonomy

Autonomy would of course consider any settlement proposal should you wish to make one. You are also free to pursue what you believe to be your rights under the Plan, however the company is prepared to vigorously defend its position.

Sincerely,

Andrew M Kanter
Company Secretary

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0071

# EXHIBIT C

# VERITY, INC.

## NONSTATUTORY STOCK OPTION AGREEMENT

THIS NONSTATUTORY STOCK OPTION AGREEMENT (the "Option Agreement") is made and entered into as of the date stated on the **Notice of Grant of Stock Option** which incorporates this Option Agreement by reference, by and between Verity, Inc. and the person named on the **Notice of Grant of Stock Option** (the "Optionee").

The Company has granted to the Optionee an option to purchase certain shares of Stock, upon the terms and conditions set forth in this Option Agreement and the Notice of Grant of Stock Option (the "**Option**").

1.    **Definitions and Construction**.

    1.1    *Definitions*. Whenever used herein, the following terms shall have their respective meanings set forth below:

        (a)    "**Board**" means the Board of Directors of the Company. If one or more Committees have been appointed by the Board to administer the Plan, "Board" also means such Committee(s).

        (b)    "**Code**" means the Internal Revenue Code of 1986, as amended, and any applicable regulations promulgated thereunder.

        (c)    "**Committee**" means the Compensation Committee or other committee of the Board duly appointed to administer the Plan and having such powers as shall be specified by the Board. Unless the powers of the Committee have been specifically limited, the Committee shall have all of the powers of the Board granted herein, including, without limitation, the power to amend or terminate the Plan at any time, subject to the terms of the Plan and any applicable limitations imposed by law.

        (d)    "**Company**" means Verity, Inc., a Delaware corporation, or any successor corporation thereto.

        (e)    "**Consultant**" means any person, including an advisor, engaged by a Participating Company to render services other than as an Employee or a Director.

        (f)    "**Director**" means a member of the Board or of the board of directors of any other Participating Company.

        (g)    "**Disability**" means the permanent and total disability of the Optionee within the meaning of Section 22(e)(3) of the Code.

        (h)    "**Employee**" means any person treated as an employee (including an officer or a Director who is also treated as an employee) in the records of a Participating Company; provided, however, that neither service as a Director nor payment of a director's fee shall be sufficient to constitute employment for purposes of the Plan.

HS-0072

(i)    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(j)    "**Exercise Price**" means the price stated in the **Notice of Grant of Stock Option** that is to be paid per share of Stock issued under this Option, as adjusted from time to time pursuant to Section 9.

(k)    "**Fair Market Value**" means, as of any date, the value of a share of stock or other property as determined by the Board, in its sole discretion, or by the Company, in its sole discretion, if such determination is expressly allocated to the Company herein.

(l)    "**Initial Exercise Date**" means, as applicable, either the Initial Vesting Date as stated in the **Notice of Grant of Stock Option**, or if this Option is granted to an Employee eligible for overtime pay (as determined under the Fair Labor Standards Act of 1938, as amended), then the later of the Initial Vesting Date and six (6) months after the Date of Grant set forth in the **Notice of Grant of Stock Option**.

(m)    "**Number of Option Shares**" means the number of shares of Stock that is stated on the **Notice of Grant of Stock Option** as initially being subject to this Option, as adjusted from time to time pursuant to Section 9.

(n)    "**Option Expiration Date**" means the date eight (8) years after the Date of Option Grant.

(o)    "**Parent Corporation**" means any present or future "parent corporation" of the Company, as defined in Section 424(e) of the Code.

(p)    "**Participating Company**" means the Company or any Parent Corporation or Subsidiary Corporation.

(q)    "**Participating Company Group**" means, at any point in time, all corporations collectively, each of which is then a Participating Company.

(r)    "**Plan**" means the Verity, Inc. 1996 Nonstatutory Stock Option Plan.

(s)    "**Securities Act**" means the Securities Act of 1933, as amended.

(t)    "**Service**" means the Optionee's employment or service with the Participating Company Group, whether in the capacity of an Employee, a Director or a Consultant. The Optionee's Service shall not be deemed to have terminated merely because of a change in the capacity in which the Optionee renders Service to the Participating Company Group or a change in the Participating Company for which the Optionee renders such Service, provided that there is no interruption or termination of the Optionee's Service. The Optionee's Service shall be deemed to have terminated either upon an actual termination of Service or upon the corporation for which the Optionee performs Service ceasing to be a Participating Company. Subject to the foregoing, the Company, in its sole discretion, shall determine whether the Optionee's Service has terminated and the effective date of such termination.

HS-0073

(u)    "**Stock**" means the common stock, $0.001 par value, of the Company, as adjusted from time to time in accordance with Section 4.2 of the Plan.

(v)    "**Subsidiary Corporation**" means any present or future "subsidiary corporation" of the Company, as defined in Section 424(f) of the Code.

1.2    *Construction.* Captions and titles contained herein are for convenience only and shall not affect the meaning or interpretation of any provision of this Option Agreement. Except when otherwise indicated by the context, the singular shall include the plural, the plural shall include the singular and the term "or" shall include the conjunctive as well as the disjunctive.

2.    <u>Tax Consequences.</u> This Option is intended to be a nonstatutory stock option and shall not be treated as an "incentive stock option" (within the meaning of Section 422(b) of the Code). Taxation of a nonstatutory stock option is discussed in the prospectus for the Plan.

3.    <u>Administration.</u> All questions of interpretation concerning this Option Agreement shall be determined by the Board, including any duly appointed Committee of the Board. All determinations by the Board shall be final and binding upon all persons having an interest in the Option. Any officer of a Participating Company shall have the authority to act on behalf of the Company with respect to any matter, right, obligation, or election which is the responsibility of or which is allocated to the Company herein, provided the officer has apparent authority with respect to such matter, right, obligation, or election.

4.    <u>Exercise of the Option.</u>

4.1    *Right to Exercise.* Except as otherwise provided herein, the Option shall be exercisable on and after the Initial Exercise Date and prior to the termination of the Option (as provided in Section 6) in an amount not to exceed a percentage of the Number of Option Shares that is equal to the Vested Percentage on the date of exercise for such amount less the number of shares previously acquired upon exercise of the Option.

4.2    *Method of Exercise.* Exercise of the Option shall be by written notice to the Company which must state the election to exercise the Option, the number of whole shares of Stock for which the Option is being exercised and such other representations and agreements as to the Optionee's investment intent with respect to such shares as may be required pursuant to the provisions of this Option Agreement. The written notice must be signed by the Optionee and must be delivered in person, by certified or registered mail, return receipt requested, by confirmed facsimile transmission, or by such other means as the Company may permit, to the Chief Financial Officer of the Company, or other authorized representative of the Participating Company Group, prior to the termination of the Option as set forth in Section 6, accompanied by (i) full payment of the aggregate Exercise Price for the number of shares of Stock being purchased and (ii) an executed copy, if required by the Company, of any representation and/or warranty referenced below. The Option shall be deemed to be exercised upon receipt by the Company of such written notice, the aggregate Exercise Price, and, if required by the Company, such executed agreements.

4.3    *Payment of Exercise Price.*

(a)    **Forms of Consideration Authorized.** Except as otherwise provided below, payment of the aggregate Exercise Price for the number of shares of Stock for which the

HS-0074

Option is being exercised shall be made (i) in cash, by check, or cash equivalent, (ii) by tender to the Company of whole shares of Stock owned by the Optionee having a Fair Market Value (as determined by the Company, without regard to any restrictions on transferability applicable to such stock by reason of federal or state securities laws or agreements with an underwriter for the Company) not less than the aggregate Exercise Price, (iii) by means of a Cashless Exercise, as defined in Section 4.3(c), (iv) in the Company's sole discretion at the time the Option is exercised, by cash for a portion of the aggregate Exercise Price not less than the par value of the shares being acquired and the Optionee's promissory note for the balance of the aggregate Exercise Price, or (v) by any combination of the foregoing.

      (b)    **Tender of Stock.** Notwithstanding the foregoing, the Option may not be exercised by tender to the Company of shares of Stock to the extent such tender of Stock would constitute a violation of the provisions of any law, regulation or agreement restricting the redemption of the Company's stock. The Option may not be exercised by tender to the Company of shares of Stock unless such shares either have been owned by the Optionee for more than six (6) months or were not acquired, directly or indirectly, from the Company.

      (c)    **Cashless Exercise.** A "**Cashless Exercise**" means the assignment in a form acceptable to the Company of the proceeds of a sale or loan with respect to some or all of the shares of Stock acquired upon the exercise of the Option pursuant to a program or procedure approved by the Company (including, without limitation, through an exercise complying with the provisions of Regulation T as promulgated from time to time by the Board of Governors of the Federal Reserve System). The Company reserves, at any and all times, the right, in the Company's sole and absolute discretion, to decline to approve or terminate any such program or procedure.

      (d)    **Payment by Promissory Note.** No promissory note shall be permitted if an exercise of the Option using a promissory note would be a violation of any law. Unless otherwise specified by the Board at the time the Option is granted, the promissory note permitted in clause (iv) of Section 4.3(a) shall be for not more than ninety percent (90%) of the aggregate Exercise Price of the shares of Stock being purchased and shall be a full recourse note in a form satisfactory to the Company, with principal payable four (4) years after the date the Option is exercised. Interest on the principal balance of the promissory note shall be payable in annual installments at an interest rate no less than that necessary to both avoid imputed interest pursuant to all applicable sections of the Code and avoid requiring the Company's outside auditors to alter the accounting treatment of the Option. Such recourse promissory note shall be secured by the shares of Stock acquired pursuant to the then current form of security agreement as approved by the Company. At any time the Company is subject to the regulations promulgated by the Board of Governors of the Federal Reserve System or any other governmental entity affecting the extension of credit in connection with the Company's securities, any promissory note shall comply with such applicable regulations, and the Optionee shall pay the unpaid principal and accrued interest, if any, to the extent necessary to comply with such applicable regulations. Except as the Company in its sole discretion shall determine, the Optionee shall pay the unpaid principal balance of the promissory note and any accrued interest thereon upon termination of the Optionee's Service with the Participating Company Group for any reason, with or without cause.

    4.4    *Tax Withholding.* At the time the Option is exercised, in whole or in part, or at any time thereafter as requested by the Company, the Optionee hereby authorizes withholding from payroll and any other amounts payable to the Optionee, and otherwise agrees to make

HS-0075

adequate provision for (including by means of a Cashless Exercise to the extent permitted by the Company), any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Participating Company Group, if any, which arise in connection with the Option, including, without limitation, obligations arising upon (i) the exercise, in whole or in part, of the Option, (ii) the transfer, in whole or in part, of any shares acquired upon exercise of the Option, (iii) the operation of any law or regulation providing for the imputation of interest, or (iv) the lapsing of any restriction with respect to any shares acquired upon exercise of the Option. The Optionee is cautioned that the Option is not exercisable unless the tax withholding obligations of the Participating Company Group are satisfied. Accordingly, the Optionee may not be able to exercise the Option when desired even though the Option is vested, and the Company shall have no obligation to issue a certificate for such shares or release such shares from any escrow provided for herein.

      4.5    *Certificate Registration.*  Except in the event the Exercise Price is paid by means of a Cashless Exercise, the certificate for the shares as to which the Option is exercised shall be registered in the name of the Optionee, or, if applicable, in the names of the heirs of the Optionee.

      4.6    *Restrictions on Grant of the Option and Issuance of Shares.*  The grant of the Option and the issuance of shares of Stock upon exercise of the Option shall be subject to compliance with all applicable requirements of federal, state or foreign law with respect to such securities. The Option may not be exercised if the issuance of shares of Stock upon exercise would constitute a violation of any applicable federal, state or foreign securities laws or other law or regulations or the requirements of any stock exchange or market system upon which the Stock may then be listed. In addition, the Option may not be exercised unless (i) a registration statement under the Securities Act shall at the time of exercise of the Option be in effect with respect to the shares issuable upon exercise of the Option or (ii) in the opinion of legal counsel to the Company, the shares issuable upon exercise of the Option may be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act. THE OPTIONEE IS CAUTIONED THAT THE OPTION MAY NOT BE EXERCISED UNLESS THE FOREGOING CONDITIONS ARE SATISFIED. ACCORDINGLY, THE OPTIONEE MAY NOT BE ABLE TO EXERCISE THE OPTION WHEN DESIRED EVEN THOUGH THE OPTION IS VESTED. The inability of the Company to obtain from any regulatory body having jurisdiction the authority, if any, deemed by the Company's legal counsel to be necessary to the lawful issuance and sale of any shares subject to the Option shall relieve the Company of any liability in respect of the failure to issue or sell such shares as to which such requisite authority shall not have been obtained. As a condition to the exercise of the Option, the Company may require the Optionee to satisfy any qualifications that may be necessary or appropriate, to evidence compliance with any applicable law or regulation and to make any representation or warranty with respect thereto as may be requested by the Company.

      4.7    *Fractional Shares.*  The Company shall not be required to issue fractional shares upon the exercise of the Option.

      5.    **Nontransferability of the Option.**  The Option may be exercised during the lifetime of the Optionee only by the Optionee or the Optionee's guardian or legal representative and may not be assigned or transferred in any manner except by will or by the laws of descent and distribution. Following the death of the Optionee, the Option, to the extent provided in Section 7, may be

HS-0076

exercised by the Optionee's legal representative or by any person empowered to do so under the deceased Optionee's will or under the then applicable laws of descent and distribution.

6.    **Termination of the Option.**  The Option shall terminate and may no longer be exercised on the first to occur of (a) the Option Expiration Date, (b) the last date for exercising the Option following termination of the Optionee's Service as described in Section 7, or (c) a Transfer of Control to the extent provided in Section 8.

7.    **Effect of Termination of Service.**

7.1    *Option Exercisability.*

(a)    **Disability.**  If the Optionee's Service with the Participating Company Group is terminated because of the Disability of the Optionee, the Option, to the extent unexercised and exercisable on the date on which the Optionee's Service terminated, may be exercised by the Optionee (or the Optionee's guardian or legal representative) at any time prior to the expiration of six (6) months after the date on which the Optionee's Service terminated, but in any event no later than the Option Expiration Date.

(b)    **Death.**  If the Optionee's Service with the Participating Company Group is terminated because of the death of the Optionee, the Option, to the extent unexercised and exercisable on the date on which the Optionee's Service terminated, may be exercised by the Optionee (or the Optionee's legal representative, or other person who acquired the right to exercise the Option by reason of the Optionee's death) at any time prior to the expiration of six (6) months after the date on which the Optionee's Service terminated, but in any event no later than the Option Expiration Date.  The Optionee's Service shall be deemed to have terminated on account of death if the Optionee dies within one (1) month after the Optionee's termination of Service.

(c)    **Other Termination of Service.**  If the Optionee's Service with the Participating Company Group terminates for any reason, except Disability or death, the Option, to the extent unexercised and exercisable by the Optionee on the date on which the Optionee's Service terminated, may be exercised by the Optionee within twelve (12) months (or such other longer period of time as determined by the Board, in its sole discretion) after the date on which the Optionee's Service terminated, but in any event no later than the Option Expiration Date.

7.2    *Additional Limitations on Option Exercise.*  Except as the Company and the Optionee otherwise agree, exercise of the Option pursuant to Section 7.1 following termination of the Optionee's Service may not be made by delivery of a promissory note as provided in Section 4.3(a).

7.3    *Extension if Exercise Prevented by Law.*  Notwithstanding the foregoing, if the exercise of the Option within the applicable time periods set forth in Section 7.1 is prevented by the provisions of Section 4.6, the Option shall remain in effect and exercisable so that the aggregate period of time that the Option is to be exercisable as provided under the applicable provision of Section 7.1 (determined by reference to the cause of termination of the Optionee's Service with the Participating Company Group), but in no event later than the Option Expiration Date.

7.4    *Extension if Optionee Subject to Section 16(b).*  Notwithstanding the foregoing, if a sale within the applicable time periods set forth in Section 7.1 of shares acquired

HS-0077

upon the exercise of the Option would subject the Optionee to suit under Section 16(b) of the Exchange Act, the Option shall remain exercisable until the earliest to occur of (i) the tenth (10th) day following the date on which a sale of such shares by the Optionee would no longer be subject to such suit, (ii) the one hundred and ninetieth (190th) day after the Optionee's termination of Service, or (iii) the Option Expiration Date.

7.5    *Leave of Absence.* For purposes of Section 7.1, the Optionee's Service with the Participating Company Group shall not be deemed to terminate if the Optionee takes any military leave, sick leave, or other bona fide leave of absence approved by the Company of ninety (90) days or less. In the event of a leave of absence in excess of ninety (90) days, the Optionee's Service shall be deemed to terminate on the ninety-first (91st) day of such leave unless the Optionee's right to reemployment with the Participating Company Group remains guaranteed by statute or contract. Notwithstanding the foregoing, unless otherwise designated by the Company (or required by law), a leave of absence shall not be treated as Service for purposes of determining the Optionee's Vested Percentage.

8.    **Transfer of Control.**

8.1    *Definitions.*

(a)    An "**Ownership Change Event**" shall be deemed to have occurred if any of the following occurs with respect to the Company:

(i)    the direct or indirect sale or exchange in a single or series of related transactions by the stockholders of the Company of more than fifty percent (50%) of the voting stock of the Company;

(ii)    a merger or consolidation in which the Company is a party;

(iii)    the sale, exchange, or transfer of all or substantially all of the assets of the Company; or

(iv)    a liquidation or dissolution of the Company.

(b)    A "**Transfer of Control**" shall mean an Ownership Change Event or a series of related Ownership Change Events (collectively, the "**Transaction**") wherein the stockholders of the Company immediately before the Transaction do not retain immediately after the Transaction, in substantially the same proportions as their ownership of shares of the Company's voting stock immediately before the Transaction, direct or indirect beneficial ownership of more than fifty percent (50%) of the total combined voting power of the outstanding voting stock of the Company or the corporation or corporations to which the assets of the Company were transferred (the "**Transferee Corporation(s)**"), as the case may be. For purposes of the preceding sentence, indirect beneficial ownership shall include, without limitation, an interest resulting from ownership of the voting stock of one or more corporations which, as a result of the Transaction, own the Company or the Transferee Corporation(s), as the case may be, either directly or through one or more subsidiary corporations. The Board shall have the right to determine whether multiple sales or exchanges of the voting stock of the Company or multiple Ownership Change Events are related, and its determination shall be final, binding and conclusive.

HS-0078

(c)    *Effect of Transfer of Control on Option.*  In the event of a Transfer of Control, the surviving, continuing, successor, or purchasing corporation or parent corporation thereof, as the case may be (the "**Acquiring Corporation**"), may either assume the Company's rights and obligations under the Option or substitute for the Option a substantially equivalent option for the Acquiring Corporation's stock.  The Option shall terminate and cease to be outstanding effective as of the date of the Transfer of Control to the extent that the Option is neither assumed or substituted for by the Acquiring Corporation in connection with the Transfer of Control nor exercised as of the date of the Transfer of Control.  Notwithstanding the foregoing, shares acquired upon exercise of the Option prior to the date of the Transfer of Control and any consideration received pursuant to the Transfer of Control with respect to such shares shall continue to be subject to all applicable provisions of this Option Agreement except as otherwise provided herein. Furthermore, notwithstanding the foregoing, if the corporation the stock of which is subject to the Option immediately prior to an Ownership Change Event described in Section 8.1 (a)(i) constituting a Transfer of Control is the surviving or continuing corporation and immediately after such Ownership Change Event less than fifty percent (50%) of the total combined voting power of its voting stock is held by another corporation or by other corporations that are members of an affiliated group within the meaning of Section 1504(a) of the Code without regard to the provisions of Section 1504(b) of the Code, the Option shall not terminate unless the Board otherwise provides in its sole discretion.

9.    **Adjustments for Changes in Capital Structure.**  In the event of any stock dividend, stock split, reverse stock split, recapitalization, combination, reclassification, or similar change in the capital structure of the Company, appropriate adjustments shall be made in the number, Exercise Price and class of shares of stock subject to the Option.  If a majority of the shares which are of the same class as the shares that are subject to the Option are exchanged for, converted into, or otherwise become (whether or not pursuant to an Ownership Change Event) shares of another corporation (the "**New Shares**"), the Board may unilaterally amend the Option to provide that the Option is exercisable for New Shares.  In the event of any such amendment, the Number of Option Shares and the Exercise Price shall be adjusted in a fair and equitable manner, as determined by the Board, in its sole discretion.  Notwithstanding the foregoing, any fractional share resulting from an adjustment pursuant to this Section 9 shall be rounded up or down to the nearest whole number, as determined by the Board, and in no event may the Exercise Price be decreased to an amount less than the par value, if any, of the stock subject to the Option.

The adjustments determined by the Board pursuant to this Section 9 shall be final, binding and conclusive.

10.    **Rights as a Stockholder, Employee or Consultant.**  The Optionee shall have no rights as a stockholder with respect to any shares covered by the Option until the date of the issuance of a certificate for the shares for which the Option has been exercised (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company).  No adjustment shall be made for dividends, distributions or other rights for which the record date is prior to the date such certificate is issued, except as provided in Section 9 Nothing in this Option Agreement shall confer upon the Optionee any right to continue in the Service of a Participating Company or interfere in any way with any right of the Participating Company Group to terminate the Optionee's Service as an Employee or Consultant, as the case may be, at any time.

HS-0079

11.    **Legends.** The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing shares of stock subject to the provisions of this Option Agreement. The Optionee shall, at the request of the Company, promptly present to the Company any and all certificates representing shares acquired pursuant to the Option in the possession of the Optionee in order to carry out the provisions of this Section.

12.    **Binding Effect.** Subject to the restrictions on transfer set forth herein, this Option Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns.

13.    **Termination or Amendment.** The Board may terminate or amend the Plan or the Option at any time; provided, however, that except as provided in Section 8.2 in connection with a Transfer of Control, no such termination or amendment may adversely affect the Option or any unexercised portion hereof without the consent of the Optionee unless such termination or amendment is necessary to comply with any applicable law or government regulation. No amendment or addition to this Option Agreement shall be effective unless in writing.

14.    **Integrated Agreement.** This Option Agreement constitutes the entire understanding and agreement of the Optionee and the Participating Company Group with respect to the subject matter contained herein and there are no agreements, understandings, restrictions, representations, or warranties among the Optionee and the Participating Company Group with respect to such subject matter other than those as set forth or provided for herein. To the extent contemplated herein, the provisions of this Option Agreement shall survive any exercise of the Option and shall remain in full force and effect.

15.    **Applicable Law.** This Option Agreement shall be governed by the laws of the State of California as such laws are applied to agreements between California residents entered into and to be performed entirely within the State of California.

16.    **Review and Interpretation.** The Optionee represents that the Optionee is familiar with the terms and provisions of this Option Agreement and hereby accepts the Option subject to all of the terms and provisions thereof. The Optionee hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Board upon any questions arising under this Option Agreement.

HS-0080

**Notice of Grant of Stock Options
and Option Agreement**

Verity, Inc.
ID: 77-0182779
894 Ross Drive
Sunnyvale, CA 94089



Hugo Sluimer
App. Le Millefiori, 27F
1, rue des Genêts
MONACO, MC 98000

| | |
|---|---|
| Option Number: | 00008513 |
| Plan: | 96NS |
| ID: | 4098 |

Effective 9/13/2005, you have been granted a(n) Non-Qualified Stock Option to buy 45,000 shares of Verity, Inc. (the Company) stock at $10.4000 per share.

The total option price of the shares granted is $468,000.00.

Shares in each period will become fully vested on the date shown.

| Shares | Vest Type | Full Vest | Expiration |
|---|---|---|---|
| 45,000 | Monthly | 9/13/2006 | 9/13/2008 |

By your signature and the Company's signature below, you and the Company agree that these options are granted under and governed by the terms and conditions of the Company's Stock Option Plan as amended and the Option Agreement, all of which are attached and made a part of this document.

_____
Verity, Inc.

9/13/05
_____
Date

_____
Hugo Sluimer

_____
Date

Date: 11/29/2005
Time: 3:24:14PM

**Notice of Grant of Stock Option
and Option Agreement**

Verity, Inc.
ID: 77-0182779
894 Ross Drive
Sunnyvale, CA 94089



| | | | |
|---|---|---|---|
| Hugo Sluimer | | Option Number: | 00006885 |
| App. Le Milleflori, 27F | | Plan: | 96NS |
| 1, rue des Genêts | | | |
| MONACO, MC 98000 | | ID: | 4098 |

Effective 10/10/2003, you have been granted a(n) Non-Qualified Stock Option to buy 60,000 shares of Verity, Inc. (the Company) stock at $14.6900 per share.

The total option price of the shares granted is $881,400.00.

Shares in each period will become fully vested on the date shown. Initial Vesting Date is 11/10/2003.

| Shares | Vest Type | Full Vest | Expiration |
|---|---|---|---|
| 60,000 | Monthly | 10/10/2007 | 10/10/2011 |

By your signature and the Company's signature below, you and the Company agree that these options are granted under and governed by the terms and conditions of the Company's Stock Option Plan as amended and the Option Agreement, all of which are attached and made a part of this document.

| | | |
|---|---|---|
| _____ | | _____ |
| Verity, Inc. | | Date |
| | | |
| _____ | | _____ |
| Hugo Sluimer | | Date |

Date:  10/31/2003
Time:  2:02:34PM

**HS-0082**

Verity, Inc
ID: 77-0182779
894 Ross Drive
Sunnyvale, CA 94089

Termination date:    23-Jun-06

Sluimer, Hugo
hsluimer@verity.com
ID    4098

**Exercisable Options**

| Number | Grant Date | Plan/Type | Price | Shares Granted | Shares Exercised | Shares Exercised | Vesting End Date | Cancel'n date |
|--------|-----------|-----------|-------|---------------|-----------------|-----------------|-----------------|---------------|
| 00008513 | 9/13/2005 | 96NS/NQ | $5.13 | 91276 | 53245 | 15,212 | 23-Jun-06 | 23-Jul-06 |
| 00006885 | 10/10/2003 | 96NS/NQ | $7.25 | 121702 | 78598 | 2,536 | 23-Jun-06 | 23-Jul-06 |
| 00008061 | 8/30/2004 | 96NS/NQ | $5.63 | 97361 | 40567 | 2,028 | 23-Jun-06 | 23-Jul-06 |

<u>Note</u>
All share and exercise price information gives effect to the conversion from Verity to Autonomy shares

HS-0083

# EXHIBIT D



**Nationale-Nederlanden**

ZORGVERZEKERING

# Polisblad

| Datum van afgifte | Cliëntnummer |
|---|---|
| 3 december 2005 | 3185441 |

| Naam verzekerde | Geslacht | Geboortedatum | | Burger Service Nummer |
|---|---|---|---|---|
| H Sluimer | Man | 19-06-1953 | | 073633835 |

### Hoofdverzekering

| Polisnr. | Naam / dekking | Voorwaarden | Eigen risico | Ingangs-datum | Eind-datum | Premie per jaar |
|---|---|---|---|---|---|---|
| 5.768.084 | Garant Basis Internationaal | 99N061,120N061 | € 0,00 | 01-01-06 | | € 1.634,28 |

### Aanvullende verzekering(en)

| Polisnr. | Naam / dekking | Voorwaarden | Eigen risico | Ingangs-datum | Eind-datum | Premie per jaar |
|---|---|---|---|---|---|---|
| 5.768.085 | Extra Garant Top Int. | 99N061,123N061 | nvt | 01-01-06 | | € 556,32 |
| | Zorgservicebureau | 130N061 | nvt | 01-01-06 | | € 0,00 |
| | | | | | | € 2.190,60 |

Dit polisblad vervangt eerder afgegeven polisbladen.

Nationale-Nederlanden Zorgverzekering

Risicodrager voor de zorgverzekering is ONVZ Ziektekostenverzekeraar N.V. (handelsregister Utrecht: 30135168) en voor de aanvullende verzekeringen ONVZ Aanvullende Verzekering N.V. (handelsregister Utrecht: 30209308), beide gevestigd te Houten.
Postbus 465, 3990 GG Houten. Telefoon: 030-63 96 321, Fax: 030-63 51 422. E-mail: info@nnzorgverzekeringen.nl

Polisblad

9841-0510

HS-0084



**ONVZ**
zorgverzekeraar

## Premietabel 2007 - ONVZ Zorgplan Internationaal

### ONVZ Basisfit Internationaal

*Maandpremies*

| leeftijd | premie |
|----------|--------|
| kind | 61,00 |
| 18-29 | 88,00 |
| 30-44 | 121,00 |
| 45-49 | 136,00 |
| 50-54 | 172,00 |
| 55-59 | 217,00 |
| 60-64 | 279,00 |
| 65-69 | 303,00 |
| 70->> | 356,00 |

*Kortingen op de maandpremie bij een eigen risico*

| | eigen risico per verzekerde per jaar | | | | | |
|---|---|---|---|---|---|---|
| | € 0 | € 100 | € 200 | € 300 | € 400 | € 500 |
| 0 t/m 17 jaar | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 | 0,00 |
| 18 jaar en ouder | 0,00 | 8,00 | 14,00 | 18,00 | 22,00 | 26,00 |

### ONVZ Internationaal Aanvullende Verzekeringen

| | Module | | | |
|---|---|---|---|---|
| | Extrafit | Benfit | Optifit | Topfit |
| 0 t/m 17 jaar | 7,00 | 12,60 | 20,40 | 29,80 |
| 18 jaar en ouder | 13,90 | 25,20 | 40,70 | 59,50 |

### Tandfit

| | A | B | C |
|---|---|---|---|
| 18 jaar en ouder | 12,00 | 23,00 | 31,00 |

### ONVZ Privé Zorgpakket

| | Privé Kamer |
|---|---|
| 18 jaar en ouder | 20,00 |

### ONVZ ZorgConsulent

| | |
|---|---|
| 18 jaar en ouder | Gratis in 2007 |

### Betalingstermijnkorting en toeslag

- Bij afsluiting van het Privé Zorgpakket ontvangt u 50% korting op die premie tot 1 januari 2008.
- Bij betaling per jaar geldt 3% korting op de maandpremie. Bij betaling per halfjaar bedraagt de korting 2% en bij betaling per kwartaal bedraagt deze 1%.
- Indien u geen Basisfit International afsluit betaalt u op de aanvullende verzekering(en) en de Tandfit een toeslag van 5%.
- Verzekerden woonachtig in Nederland krijgen een korting van 20% m.u.v. het Privé Zorgpakket.
- Verzekerden woonachtig in het buitenland betalen geen toeslag van 50% op het Privé Zorgpakket.
- Verzekerden woonachtig in het buitenland kunnen te maken krijgen met een parafiscale heffing.

### Kinderpremie

- Voor maximaal 2 kinderen t/m 17 jaar hoeft premie betaald te worden.

(Bovenstaande maandpremies staan vermeld in euro's.)

Risicodraagster voor de zorgverzekering is ONVZ Ziektekostenverzekeraar N.V. (handelsregister Utrecht: 30135166, AFM-nr. 12000633) en voor de aanvullende verzekeringen ONVZ Aanvullende Verzekering N.V. (handelsregister Utrecht: 30209308, AFM-nr. 12001024), beide gevestigd te Houten. Postbus 392, 3990 GD Houten. Telefoon: 030  539 62 22. Fax: 030  635 12 75. Internet: www.onvz.nl

*Premietabel - ONVZ Zorgplan Internationaal*

P1_BIPS_06

HS-0085