1  RIMAC & MARTIN
   A Professional Corporation
2  JOSEPH M. RIMAC – CSBN 72381
   WILLIAM REILLY – CSBN 177550
3  1051 Divisadero Street
   San Francisco, CA 94115
4  Telephone: (415) 561-8440
   Facsimile:  (415) 561-8430
5
6  MCGUINN, HILLSMAN & PALEFSKY
   CLIFF PALEFSKY (State Bar No. 77683)
7  KEITH EHRMAN (State Bar No. 106985)
   535 Pacific Ave.
8  San Francisco, CA 94133
   Telephone: (415) 421-9292
9  Facsimile: (415) 403-0202

10 Attorneys for Plaintiff
   HUGO SLUIMER

11

12                IN THE UNITED STATES DISTRICT COURT

13              FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15                                          ***E-FILING***

16

17 HUGO SLUIMER,                    )
                                    )   CASE NO.  C 081220 SI
18            Plaintiff,            )
                                    )   DECLARATION OF JACOB VAN DER
19 v.                               )   PIJL
                                    )
20 VERITY, INC., a corporation, and THE )
   VERITY INC. CHANGE IN CONTROL AND )
21 SEVERANCE BENEFIT PLAN,          )
                                    )
22            Defendants.           )
                                    )
23 _____ )

24

25

26

27

28

DECLARATION OF JACOB VAN DER PIJL                    CASE NO.  C 07-2381 SI

I, Jacob van der Pijl, hereby declare as follows:

1.    I am an attorney at law, duly licensed and admitted to practice in the Netherlands. I have personal knowledge of the facts set forth in this declaration, and if called as a witness in this matter I could testify competently thereto.

2.    I represented Hugo Sluimer in a Dutch Court proceeding seeking to recover cash severance benefits from his employer Verity, Inc.

3.    On or about April 18, 2006, I filed a petition on Mr. Sluimer's behalf in the Dutch Court. Attached hereto as Exhibit A is a true and correct copy of that petition and the other documents that were presented to the Court by Mr. Sluimer and Verity in that action.

4.    Attached hereto as Exhibit B are true and correct copies of 2005 organization charts for Mr. Sluimer's position with Verity and Mr. Sluimer's business card that was presented to the Court at the 30 May 2006 hearing in the Dutch Court.

5.    Attached hereto as Exhibit C is a true and correct copy of the Clerk's handwritten notes from the May 30, 2006 hearing in the Dutch Court.

6.    Attached hereto as Exhibit D is a true and correct copy of Order issued by the Dutch Court on June 7, 2006.

7.    Both Mr. Sluimer and Andrew Kanter attended and were present for the entire May 30, 2006 hearing in the Dutch Court. Mr. Kanter appeared as Verity, Inc.'s representative and answered the Court's questions on behalf of Verity.

8.    During the May 30, 2006 hearing, the Court questioned Mr. Sluimer and Mr. Kanter regarding the nature of the two jobs and whether they were comparable. Mr. Sluimer explained to the Court his job duties in both jobs and described why they were not comparable. Further, Mr. Sluimer explained that he suffered a lapse in pay. Mr. Kanter spoke in support of the defendants' arguments that they had offered Mr. Sluimer a comparable alternative position and that they were not required to pay Mr. Sluimer any additional compensation because they offered Mr. Sluimer immediate reemployment.

9.    Verity was provided with all written materials submitted to the Court by Mr.

1  Sluimer, including materials describing how the two jobs were not comparable.

2       10.    Mr. Kanter was present as the company's representative during the Court hearing;

3  saw all of the evidence and materials submitted by Mr. Sluimer and his counsel at the hearing.

4

5       I declare under penalty of perjury under the laws of the United States that the foregoing is

6  true and correct.

7

8       Executed this 8th day of June 2008, at Amsterdam, Netherlands.

9

10

11

12                                    Jacob van der Pijl

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# DINGEMANS                    D

**VERZOEKSCHRIFT ex artikel 7:685 BW**

Aan de kantonrechter te Utrecht
Rechtbank Utrecht, sector kanton – locatie Utrecht

Geeft eerbiedig te kennen:

1.  De heer **HUGO SLUIMER**, hierna te noemen "Sluimer", woonachtig te
    Monaco, te dezer zake woonplaats kiezende te (1016 DV) Amsterdam aan de
    Keizersgracht 221, ten kantore van DingemansVanderKind advocaten van
    wie de advocaat en procureur mr. J. van der Pijl als gemachtigde optreedt
    met het recht van substitutie.

2.  Dit verzoek strekt tot ontbinding van de arbeidsovereenkomst tussen
    Sluimer en de vennootschap met beperkte aansprakelijkheid **VERITY
    BENELUX B.V.** gevestigd te De Meern, kantoorhoudend te (3439 NG)
    Nieuwegein aan de Coltbaan 31.

    Relevante gegevens Sluimer

3.  De persoonlijke gegevens betreffende Sluimer zijn, voor zover relevant:
    datum indiensttreding : 1 juni 1990;
    geboortedatum         : 19 juni 1953;
    functie               : Senior Vice President;
    bruto maandsalaris    : € 45.076 (inclusief vakantiebijslag en overige
    structurele looncomponenten)

4.  Verweerder is gevestigd te De Meern. Derhalve bent U EA bevoegd van dit
    verzoek kennis te nemen.

5.  Dit verzoekschrift is gebaseerd op gewichtige redenen zijnde veranderingen
    in de omstandigheden, welke van dien aard zijn, dat de
    arbeidsovereenkomst billijkheidshalve dadelijk of na korte tijd behoort te
    eindigen. Ter toelichting dient het volgende.

# DINGEMANS                    D

### Feiten

6.  Sluimer is per 1 juni 1990 bij Verity Inc., een Amerikaans leverancier van
    zoektechnologie, in dienst getreden als Sales Manager Benelux
    (arbeidsovereenkomst, produktie 1). Kort daarop zijn de activiteiten,
    waaronder de arbeidsovereenkomst tussen Sluimer en Verity Inc.,
    ondergebracht in Verity Benelux B.V., waarvan Sluimer vervolgens
    werknemer werd en waarvan hij ook lange tijd statutair bestuurder is
    geweest.

7.  Vanaf 1 april 2003 is Sluimer, inmiddels was hij benoemd tot Senior Vice
    President, uitgezonden geweest naar het Verenigd Koninkrijk. Daartoe is
    Verity Benelux B.V. destijds met de Engelse zuster Verity GB Ltd een
    "assignment agreement" (produktie 2) aangegaan. De uitzending is in
    beginsel overeengekomen voor een periode van vijf jaar. Zodra de
    uitzending zou eindigen, zouden alle bepalingen van de
    arbeidsovereenkomst, voor zover die opzij gezet zouden zijn door de
    uitzending, volledig herleven, zo volgt uit artikel 3.4 van de *assignment
    agreement*.

8.  Het gemiddelde bruto maandsalaris dat Sluimer heeft ontvangen de laatste
    drie jaar bedraagt € 45.076. Sluimer ontvangt een deel van zijn salaris in het
    Verenigd Koninkrijk en deels in Nederland. Een substantieel en structureel
    deel van zijn inkomsten betreft commissies en bonussen. Ter onderbouwing
    van voornoemd gemiddelde bedrag worden als produktie 3 een overzicht van
    ontvangen salaris in de laatste drie kalenderjaren overgelegd.

9.  In 2005 is bij Verity een *Change in Control and Severance Benefit Plan*
    (hierna: "het Plan") opgesteld voor het geval Verity overgenomen zou
    worden. Het Plan wordt als produktie 4 overgelegd en voorziet in een
    beeindigingsregeling voor participanten bij een *Change in Control*. Sluimer is
    akkoord gegaan met het Plan en heeft daarvoor een *Participation Notice*
    (produktie 5) getekend, zij het dat partijen in de *Participation Notice*
    overeengekomen zijn dat Sluimer in plaats van de betaalregeling onder het
    Plan, gerechtigd is op een betaling naar Nederlands recht. Voor het overige
    is het Plan onverminderd van toepassing verklaard. Het plan is van
    toepassing op Verity Inc. en al haar 100% dochterondernemingen,
    waaronder Verity Benelux BV.

HS-0125

# DINGEMANS                    D

10. Op 29 december 2005 is Verity Inc, inclusief alle dochterondernemingen (waaronder Verity Benelux BV) overgenomen door Autonomy, een Britse zoekmachineleverancier. Als productie 6 wordt een 3-tal pagina's van de website van Autonomy overgelegd terzake de overname. De overname van Verity door Autonomy heeft een *"Change in Control"* tot gevolg, als gevolg waarvan het Plan in werking is getreden.

11. Direct na de overname is Sluimer op non-actief gezet. Autonomy heeft Sluimer medegedeeld dat hij rekening zou moeten houden met een ontslag. Zie de brief van Autonomy van begin januari 2006, al dan niet bewust geantedateerd op 29 december 2005 (productie 7). Aan zowel de ondergeschikten van Sluimer als aan zijn zakenpartners is direct al door Autonomy gezegd: *"Hugo is out"*. Met andere woorden, zowel intern als extern werd (onvoorwaardelijk) gecommuniceerd dat Sluimer zou vertrekken. Reeds daardoor is de positie van Sluimer volledig onmogelijk gemaakt, zowel binnen de organisatie als naar zijn zakenpartners toe. Sluimer is daarop bovendien geruime tijd in onzekerheid gelaten over de wijze wanneer en waarop zijn ontslag gestalte zou krijgen, ondanks de heidere afspraken daarover in het Plan en de *participation notice*. Eind maart 2006 is Sluimer alsnog een baan aangeboden, kennelijk om te voorkomen dat aan Sluimer een beëindigingsvergoeding zou moeten worden betaald.

12. Naar mening van Sluimer dient als gevolg van de *Change in Control* overeenkomstig het Plan de arbeidsovereenkomst beëindigd te worden. Naast de *Change of Control* is er sprake van een verstoorde arbeidsverhouding op grond waarvan Sluimer meent dat de arbeidsovereenkomst dient te worden ontbonden. De verstoorde verhouding is te wijten aan de behandeling die Sluimer ten deel is gevallen na de overname van Verity door Autonomy. Naar mening van Sluimer is sprake van slecht werkgeverschap.

13. In verband met de overname van Verity door Autonomy wordt verweerster hierna ook als "Verity/Autonomy" aangeduid.

3

HS-0126

# DINGEMANS · D

HS-0127

<u>Het Plan</u>

14. Uit het Plan, section 2, volgt de definitie van een "change in control". Gesteld wordt:

"*DEFINITIONS*
*For purposes of the Plan, the following terms are defined as follows:*

*(...)*
*(c) "Change in Control"* *means one of the following events or a series of more than one of the following events that are related, wherein the stockholders of the Company immediately before the transaction do not retain immediately after the transaction, in substantially the same proportions as their ownership of shares of the Company's voting stock immediately before the transaction, direct or indirect beneficial ownership of more than fifty percent (50%) of the total combined voting power of the outstanding voting stock of the Company, the resulting entity in a merger or, in the case of an asset sale, the corporation or corporations to which the assets of the Company were transferred (the "Transferee Corporation(s)") as the case may be.*

*(i)      the direct or indirect sale or exchange in a single or series of related transactions by the stockholders of the Company of more than fifty percent (50%) of the voting stock of the Company;*
*(ii)     a merger or consolidation in which the Company is a party*
*(iii) the sale, exchange, or transfer of all or substantially all of the assets of the Company; or*
*(iv)    a liquidation or dissolution of the Company."*

15. De overname van Verity door Autonomy kwalificeert als een "*Change in Control*, nu sprake is van de situatie als omschreven in sectie 2 onder c (i). Op grond van het Plan heeft Sluimer recht op een beëindigingsvergoeding en verkrijgt hij het recht op een versnelde uitoefening van de opties op aandelen.

16. Terzake de beëindigingsvergoeding zijn partijen in de *participation notice* overeengekomen dat Sluimer in afwijking van het Plan recht heeft op een beëindigingsvergoeding naar Nederlands recht.

In de *participation notice* is immers opgenomen:

4

# DINGEMANS                D

> *"Cash severance benefit: you have declined to accept any cash severance benefit under the Plan. Consequently, you will be entitled to no cash severance benefit under the terms of the Plan and any cash benefits to which you shall be entitled, shall be determined under Dutch law without reference to the Plan.*
> ***Accelerated Vesting of Options:*** *Full*
> ***Extended Exercisability of Options:*** *Later of 12 months of the post-termination exercise period of the option; provided, however, that such extended exercisability shall not extend beyond the term of the option.*
> ***Continued medical benefits:*** _____ 18 _____ *months, or such earlier date as you shall secure subsequent employment that shall provide you with similar medical benefits."*

17.    Achtergrond daarbij was dat Sluimer op grond van het Plan recht zou hebben op 18 maandsalarissen, maar op grond van het Nederlandse recht, gelet op zijn leeftijd (52 jaar) en anciënniteit (16 jaar), volgens de kantonrechtersformule aanspraak zou kunnen maken op een hogere vergoeding. Daarom heeft hij, en zo ook enkele collega's, destijds gekozen om afstand te doen van de beëindigingsvergoeding op grond van het Plan, en is hij met Verity overeengekomen dat hij ingeval van *"Change of Control"* recht zou hebben op een beëindigingsvergoeding gebaseerd op het Nederlandse recht. Met collega's van Sluimer is overigens op dezelfde grond een beëindigingsregeling getroffen, waarbij volgens afspraak de kantonrechtersformule is gehanteerd (met toepassing van correctiefactor C=1).

18.    Partijen zijn dus overeengekomen, dat Sluimer gerechtigd is tot een beëindigingsvergoeding naar Nederlands recht. Aldus is artikel 7:685 lid 8 BW van toepassing en zijn aldus de Aanbevelingen van de Kring van Kantonrechters uitgangspunt. Gelet op de leeftijd en anciënniteit van Sluimer dient dan gerekend te worden met 23 gewogen dienstjaren (24 gewogen dienstjaren bij een ontbindingsdatum van 1 juli a.s. of later).

Standpunt Verity/Autonomy

19.    Naar mening van Verity/Autonomy zou Engels recht van toepassing zijn op de onderhavige situatie, omdat Verity Benelux B.V. Sluimer zou hebben uitgeleend aan Verity GB Ltd. Naar de mening van Sluimer is dit onjuist. De

5

HS-0128

# DINGEMANS                                D

*Participation Notice* (<u>productie 5</u>) laat geen misverstand bestaan over het recht dat van toepassing is om de beëindigingsvergoeding vast te stellen, namelijk het Nederlandse recht. Ook op de "assignment agreement" is indertijd uitdrukkelijk Nederlands recht van toepassing verklaard.

20.  Verity/Autonomy stelt zich voorts op het standpunt, althans die indruk wordt gewekt, dat Sluimer ex *Section 3 (b) (iii)* van het Plan onmiddellijke tewerkstelling is aangeboden. Dat standpunt is onjuist. Het betreft hier immers geen "*immediate reemployment*" zoals omschreven in het Plan. Eerst na drie maanden aan het lijntje te zijn gehouden, heeft Sluimer een brief ontvangen, gedateerd 23 maart 2006 (<u>productie 8</u>) waarin hij benoemd zou zijn als Senior Vice President van Neurodynamics. Neurodynamics is een onderdeel van Virage, een divisie van Autonomy. Naar de mening van Sluimer kan de benoeming niet anders worden gezien dan als een poging om het betalen van een vergoeding naar Nederlands recht te voorkomen. Van "*uninterrupted employment*" is ook geen sprake. Immers, Sluimer staat al ruim drie maanden op non-actief. Volgens het Plan is ten slotte slechts sprake van "*immediate reemployment*" als een en ander resulteert in "*uninterrupted employment such that the employee does not suffer a lapse in pay as a result of the change in ownership of the Company or the sale of its assets.*"

21.  In deze is er wel degelijk sprake van een terugval in betaling als gevolg van het feit dat Verity in andere handen is overgegaan. In de maanden januari, februari en maart 2006 heeft Verity/Autonomy respectievelijk € 8.842, € 18.043 en € 15.900 minder betaald dan normaal. Vermoedelijk is de achterliggende reden (Sluimer weet dat niet), dat hem niet zijn volledige commissie is toegekend. Naar het oordeel van Sluimer kan dat echter niet voor zijn rekening komen (zie ook Hoge Raad 21 maart 2003, JAR 2003/91, Van der Gulik/Vissers & Partners). Het komt voor rekening van Verity/Autonomy dat Sluimer niet in de gelegenheid is gesteld zijn normale resultaten te behalen, zoals dat in de afgelopen 5 jaar consequent wel het geval is geweest. Deze inkomsten hebben bovendien een structureel karakter. Verity/Autonomy reageert tot heden afwijzend op de aanspraken van Sluimer op zijn normale gemiddelde salaris.

22.  De positie die Sluimer nu wordt aangeboden is overigens volstrekt onvergelijkbaar met de positie die hij tot aan de overname heeft bekleed. In

HS-0129

# DINGEMANS                          D

zijn rol bij Verity had Sluimer een omzetverantwoordelijkheid van zo'n 50
miljoen USD en leidde hij een team van meer dan 100 medewerkers.

23.    De positie die Verity/Autonomy Sluimer aangeboden heeft bij Neurodynamics
kent aanmerkelijk kleinere belangen en verantwoordelijkheden Zo wordt
ongeveer 5 miljoen USD omgezet en zijn er zo'n 15 medewerkers, waarvan
verreweg de meesten technische medewerkers zijn, die rapporteren aan een
ander. Het betreft bovendien een zeer gespecialiseerde unit in een complexe
niche markt die welbeschouwd als "*start up*" moet worden beschouwd. De
activiteiten die verricht worden zijn bovendien volstrekt geen core business
voor Autonomy.

24.    Voorts is het Sluimer duidelijk geworden dat er nog geen enkele strategie en
businessplan en geen functiebeschrijving voorhanden is, zodat het aanbod
van Autonomy te gaan werken bij Neurodynamics, wat Sluimer betreft
gratuit is geweest en is gericht op het voorkomen van het betalen van een
beëindigingsvergoeding. Omdat Verity/Autonomy aangaf erop te staan dat
Sluimer de nieuwe functie aanvaarde en aan een weigering zijdens Sluimer
consequenties te verbinden, heeft Sluimer - onder uitdrukkelijk protest – de
bij de nieuwe functie behorende werkzaamheden aangevat. Waar
Verity/Autonomy eerder had aangegeven dat Sluimer zo snel mogelijk aan
de slag moest, bleek vervolgens wegens het drukke programma van de
betrokkene dat het zo'n vaart niet liep. Uiteindelijk werd Sluimer zo'n twee
weken, nadat hij had aangeven onder protest de werkzaamheden te willen
aanvatten, op het hoofdkantoor in Cambridge verwacht.

### Vertrouwensbreuk

25.    Het vertrouwen tussen Sluimer en Autonomy is ernstig verstoord geraakt
door de handelwijze van Autonomy. In de eerste plaats omdat Sluimer direct
na de overname op non-actief is gesteld. Achteraf is Sluimer gebleken, dat
zowel medewerkers als zakelijke klanten door Autonomy zijn ingelicht, dat
Sluimer zou zijn ontslagen. Achter zijn rug om zijn tevens zakelijke partners
benaderd door Autonomy met de mededeling dat men vooralsnog geen
Verity-producten meer zou moeten kopen met het oog op de naderende
overname door Autonomy van Verity. Zonder Sluimer te informeren of
daarover met hem te spreken zijn bovendien organisatorische wijzigingen
doorgevoerd in zijn team.

7

HS-0130

# DINGEMANS                              D

26. Vrijwel direct nadat Sluimer op non-actief is gesteld, is hij afgesloten van de e-mail en ontving hij een geantedateerde brief waarin hem werd bevestigd tot nader order op non-actief te staan.

27. Eerst enige weken later heeft Autonomy contact opgenomen met Sluimer en heeft hem uitgenodigd voor een bespreking op 24 januari 2006. Tijdens deze bespreking, waarbij Sluimer overigens 50 minuten moest wachten op de COO van Autonomy, werd hem medegedeeld dat er waarschijnlijk geen vergelijkbare positie voor hem zou zijn.

28. De COO van Autonomy, de heer A. Kanter, heeft toen Sluimer gevraagd een voorstel te doen voor een beëindigingsvergoeding. Sluimer heeft dat geweigerd, ook na aandringen door de heer Kanter. Daarop heeft Kanter medegedeeld dat niet de kantonrechtersformule van toepassing zou zijn, maar het Engelse recht. Daaropvolgend heeft Kanter Sluimer toegezegd dat hij Sluimer de week daarop schriftelijk zou informeren. Kanter heeft zich echter niet aan zijn belofte gehouden. Op 9 februari 2006 heeft Sluimer daarom een e-mail aan de heer Kanter gestuurd (productie 9). Eerst bij e-mails van 22 februari 2006 (productie 10a en b) heeft hij weer wat van zich laten horen. Kanter schrijft Sluimer onder andere dat hij ontkent gezegd te hebben dat Autonomy Sluimer geen positie zou kunnen bieden. Hij stelt dat een positie "under review" was. De weergave van Kanter van de bespreking te Londen in zijn e-mail van 22 februari 2006 is onjuist. Zo heeft Kanter tijdens de bespreking wel degelijk gesproken over een beëindiging van de arbeidsovereenkomst. Sterker, hij heeft Sluimer een concept exit letter voorgelezen, stellende dat Autonomy geen gelijke functie had voor Sluimer.

29. Sluimer heeft bij e-mail van 1 maart 2006 (productie 11) gereageerd op het bericht van Kanter. Hij heeft dat gedaan door in de e-mail van Kanter zijn opmerkingen roodgekleurd in te voegen. De opmerkingen van Sluimer zijn helaas niet goed te onderscheiden in de zwart-wit tekst van productie 11.

30. Daarop heeft Sluimer weer drie weken niets vernomen van Autonomy. Eerst bij brief van 23 maart 2006 heeft Autonomy Sluimer de bovenomschreven positie bij Neurodynamics aangeboden. Die positie is, zoals hierboven omschreven, volstrekt onvergelijkbaar met de positie die Sluimer voorheen heeft vervuld bij Verity en is dit voorstel slechts gedaan om onder het betalen van een beëindigingsvergoeding uit te komen. Al deze omstandigheden zijn voor Sluimer aanleiding geen vertrouwen meer te

HS-0131

# DINGEMANS                    D

hebben in verdere samenwerking. De verhoudingen zijn wat hem betreft ernstig verstoord geraakt, zodanig dat de arbeidsovereenkomst moet eindigen. Evenzeer tekenend is het feit dat Autonomy welbewust uitbetaling van door Sluimer uitgeoefende opties tegenhoudt. Op of omstreeks 22 februari jl. heeft Sluimer deze opties uitgeoefend. De opbrengst ervan (circa € 425.000) is nog steeds niet uitbetaald, ondanks diverse toezeggingen van de kant van Autonomy. Dit klemt des te meer, nu het fiscale jaar in het Verenigd Koninkrijk op 5 april jl. eindigde en het nu denkbaar is, dat de uitoefening van de optierechten in het meest recente belastingjaar komt te vallen, hetgeen voor Sluimer zeer ongunstig zou kunnen zijn, omdat hij dan mogelijk niet meer onder het lage tarief valt van het vorige fiscale jaar. Sluimer heeft Autonomy hier ook van op de hoogte gebracht, maar tot snellere betaling heeft dit niet geleid. Iedere aansprakelijkheid voor de hiermee gepaard gaande schade of voor uitbetaling van rente wordt resoluut door Autonomy van de hand gewezen.

<u>Billijke vergoeding</u>

31. Conclusie van bovenstaande is dat zowel de *change in control* als de vertrouwensbreuk dient te leiden tot ontbinding van de arbeidsovereenkomst.

32. Gelet op de omstandigheden zoals hierboven omschreven vraagt Sluimer thans ontbinding van de arbeidsovereenkomst op de kortst mogelijke termijn. Hij is van mening dat bij beëindiging van de arbeidsovereenkomst een hem een billijke vergoeding zou moeten worden toegekend. Hij is van mening dat daarbij aansluiting gezocht dient te worden bij de kantonrechtersformule en dat, gelet op de onzorgvuldige behandeling die hem ten deel gevallen is, een correctiefactor gelijk aan C=1,5 billijk zou zijn. De vergoeding bedraagt dan € 1.555.122 bruto.

HS-0132

# DINGEMANS                    D

**REDENEN WAAROM:**

het U EA behage de arbeidsovereenkomst tussen partijen te ontbinden op de
kortst mogelijk termijn, onder toekenning aan Sluimer van de hierboven in
punt 32 genoemde vergoeding.

Amsterdam, 18 april 2006



Gemachtigde

10

HS-0133

Productie 1

HS-0134

# V E R I T Y

May 11, 1990

Mr. Hugo Sluimer
Boterbloemweide 51
3448 HZ Woerden
the Netherlands

Dear Hugo:

Verity, Inc. is pleased to offer you the position of Sales Manager, Benelux, reporting to Paulus Karskens, with a starting salary of 150,000 Guilders annually. I will further recommend to the Board of Directors that you be granted an option to purchase 25,000 shares of Common Stock under the Company's incentive stock option plan so you may share in the result of the Company's success.

Although your purchase price must be set by the Board of Directors at their next regular meeting, traditionally the price of stock for start-up companies reflects the opportunity which exists to build value as the company grows.

This letter constitutes an offer of employment with Verity and is contingent upon your signing a proprietary information agreement. Your employment with Verity is for no specified term and may be terminated by you or Verity with eight weeks written notice at any time.

Hugo, I believe that Verity is destined to be the leader in information retrieval software products and that you can be a significant contributor to our success, while mutually benefitting from the challenges of growing an exciting new company.

We would like to hear from you by May 18, 1990, with a start-date contingent upon acceptance no later than June 15, 1990.

Best Regards,

Gary Ketelsen
Vice President, Worldwide Sales

I accept this offer of employment with Verity, Inc.

_____          _____
Name                                 Date

Verity, Inc.

1550 Plymouth

Mountain View

California

94043-1230

415 960-7600

Fax 415 960-7698



VERITY CONFIDENTIAL

## FY1991 Sales Compensation Plan Summary
## (June 1990 through May 1991)

**Date:**   May 4, 1990

**Employee:**   Hugo Sluimer

**Position:**  Sales Manager, Benelux

**Salary:**  $75,000 US (150,000 Guilders)

**Stock Options:**  25,000 shares

**Draw:**  $1500 (3000 Guilders)/ month for 6 months recoverable against commissions and bonuses

**Car Allowance:**  $1000 (2000 Guilders)/month lease (includes petrol)

**Effective Date:**  June 1st, 1990

**License Quota:** $600k US ($100k--June 1990 thru Nov 1990,  $500k-- Dec 1990 thru May 1991)

**Services Quota:** $40k US

**Vacation:**  23 days paid holiday

**Other benefits:**  Health insurance, disability insurance , and life insurance will be paid for by the company
All reasonable travel, entertainment, phone and other business expenses will be reimbursed by Verity

HS-0136

<u>Incentive Plan</u>

<u>Bonus incentive plan:</u>

**Quota achievement (June 1990 thru Nov 1990)—$3000 US**
**Quota achievement (Dec 1990 thru May 1991)—$4000 US**

<u>License Commission Plan:</u>

| <u>Cum. License sales</u> | <u>Commission Rate</u> |
|---|---|
| **(June 1990 thru Nov 1990)** | |
| $0k to $100k | 7.0% |
| $100k to $150k | 10.0% |
| greater than $150k | 13.0% |
| **(Dec 1990 thru May 1991)** | |
| 0% to 100% Quota | 7.0%   (Note: These commission rates |
| 100% to 125% | 10.0%    are based on YTD performance |
| greater than 125% | 13.0%    for the  year since June 1990) |

Note:  50% commission paid on Booking and 50% commission paid on sale/shipment of product.   Bookings can only be accumulated 6 months prior to shipment.  Sales commission is based on time of booking.

**Service Revenue Commission Rate:** 3.0%

HS-0137

Productie 2

HS-0138



# ASSIGNMENT AGREEMENT

**The Undersigned**

1    **Verity Benelux B.V.**, a company with limited liability incorporated under the laws of the Netherlands, having its registered office in (3439 NG) Nieuwegein at Coltbaan 31, the Netherlands, duly represented in this matter by its European Controller, Mr E. Weenink and hereinafter referred to as "Verity Benelux";

2    **Verity GB Ltd.**, having its registered office at: The Pavilions ,Kiln Park Business Ctr.,Kiln Lane, Epsom KT17 1JG, UK duly represented in this matter by its director, Mr S.R. Springsteel and hereinafter referred to as the "Company";

and

3    **Mr H. Sluimer**, born on 19 June 1953, having his residence at Le Millefiori Apartment 528 A 27th Fl, Monte Carlo, Monaco, hereinafter referred to as "Mr Sluimer";

hereinafter individually referred to as the "Party" and jointly referred to as the "Parties";

**Whereas:**

-    Mr Sluimer has been employed by Verity Benelux since 15 June 1990 on the basis of an employment agreement for an indefinite period of time (hereinafter referred to as the "Employment Agreement"). Mr Sluimer currently holds the position of Sr Vice President, EMEA and APAC Operations

-    Verity Benelux wishes to send Mr Sluimer on an international assignment to the United Kingdom;

-    The company wishes to make use of the services of Mr Sluimer during the international assignment;

-    the Company is one of the affiliated companies of the Verity Group;

(1)

HS-0139



**Hereby enter into an agreement of assignment subject to the following conditions:**

**Article 1 -    Position**

1.1    Mr Sluimer shall be assigned to the Company in the United Kingdom as of 01 April 2003. In the position of Sr Vice President, EMEA and APAC Operations, Mr Sluimer will be responsible for Verity's sales activities in Europe, the Middle East, Africa and the Asia-Pacific region and he will report to Anthony Bettencourt, CEO Verity Inc. Mr Sluimer will also be responsible for the  integration  of the recently acquired  Inktomi UK Operations with the Verity EMEA and APAC Operation and the future sales activities for this product in his territory.

**Article 2 -    Rights and obligations**

2.1    Under the Employment Agreement with Verity Benelux, Mr Sluimer's current total gross annual salary amounts to Euro 232 000,=- inclusive of holiday allowance, where applicable, but exclusive of his commissions earned under his annual commission plan .

2.2    During the assignment the employment conditions as set out in the Employment Agreement will in general remain applicable. Additional conditions for the assignment are laid down in this Agreement. In case of a conflict between the conditions if the Employment Agreement and this Agreement the latter will prevail.

2.3    It is estimated that Mr Sluimer will be spending approximately 95% of his working time for the benefit of the Company. For the part of Mr Sluimer's salary relating to his working time for the benefit of Verity Benelux, withholding of Dutch wage tax and social security premiums will take place.

2.4    The Company shall pay the total gross annual salary *Euro 232 000,=* during the assignment period, as well as all earned commission under his annual commission plan and  all related statutory taxes pursuant to the assignment of Mr Sluimer to the Company.

(2)

**HS-0140**



## Article 3 - Term and termination of assignment

3.1   The Agreement shall commence on 1 April 2003 and is entered into for a period of 5 years.

3.2   Either Party may terminate the Agreement by giving written notification to the other Parties as of the end of a calendar month, thereby observing a notice period of 2 months.

3.3   In addition each Party may terminate the Agreement with immediate effect:

   a) If the other Party breaches the provisions of the Agreement in such a way that the terminating Party cannot be reasonable expected to continue the Agreement, whilst the relevant default is not remedied within 14 days of the notice of default having been sent, all of this without prejudice to the terminating Party's right to claim full damages;

   b) If either Party is declared bankrupt, is granted a (temporary) suspension of payments, enters into an arrangement with its creditors, is liquidated or ceases to carry on its business;

3.4   Upon termination of this Agreement, the provisions contained in the Employment Agreement will again become fully active.

## Article 4 - Performance of the Services

4.1   Verity Benelux warrants that Mr Sluimer shall devote all the requisite time, effort and expertise in performing to the best of his abilities. Mr Sluimer shall faithfully execute the instructions given to him from time to time by the competent corporate body of the Company. Mr. Sluimer shall act in accordance with the applicable law and/or the articles of association of the Company.

4.2   The Company may give instructions to Mr Sluimer during the period of assignment. Mr Sluimer shall duly observe all the internal rules that apply at the location where the Services are to be performed.

(3)



**Article 5 -   Liability and indemnity**

5.1    The Company shall be liable for all losses and damages if the Company or Mr Sluimer breaches any obligations under the Agreement.

5.2    The Company shall indemnify and hold Verity Benelux harmless from and against any and all third-party claims in relation to or arising from the services provided by Mr Sluimer during his international assignment.

**Article 6 -   Termination**

6.1    The Employment Agreement and Assignment Letter are inextricably linked. Termination of the Employment Agreement will result in the automatic termination of this Agreement. In such an event Mr. Sluimer shall only invoke his rights under Dutch law.

6.2    In the event that Mr. Sluimer invokes any right of continuation of the Employment Agreement or the Assignment Letter under the laws of the United Kingdom or any other applicable law, without prejudice to the first paragraph of article 6.1 Mr Sluimer shall be held fully liable to Verity Benelux and the Company for all costs, interest, damages and losses which result from the continuation of the Employment Agreement or the Assignment Letter.

6.3    The termination of this Agreement gives Mr Sluimer no right to any compensation or redundancy payment.

(4)

HS-0142



6.4    In the event that Mr Sluimer has any right to compensation or redundancy payment under Dutch law as a result of termination of the Employment Agreement and within the calculation of this compensation or redundancy payment account is taken of (i) the simultaneous termination of this Agreement and the fact that (ii) the compensation or the redundancy payment is based on all Mr Sluimer's activities for Verity Benelux and the Company and therefore based on the total remuneration as mentioned in article 2.4 of this Agreement, Mr Sluimer has no right to any other compensation.

6.5    Where Mr Sluimer may have any right to compensation based on the laws of the United Kingdom or any other applicable law, he shall not claim such compensation from Verity Benelux and the Company.

6.6    If Mr Sluimer does have a valid claim to compensation or redundancy payments, despite his waiver of such rights under articles 6.3, 6.4 and 6.5 of this Agreement, he shall be held fully liable to Verity Benelux and the Company to pay all costs, interests, damages and losses. In the event that Verity Benelux has to pay any compensation or redundancy payment to Mr Sluimer, Verity Benelux has the right to reduce the amount of such payment by any compensation or redundancy payment, damages or losses, which the Company has to pay.

**Article 7 -    Applicable law**

7.1    Any amendments or additions to this Agreement shall be in writing and signed by all Parties.

7.2    Should any provision of this Agreement be or become invalid, the validity of the other provisions shall not thereby be affected.

7.3    This Agreement and any possible amendments thereof, shall be governed exclusively by the laws of the Netherlands.

7.4    Any dispute, which may arise from the Agreement, shall be submitted in the first instance to the competent court in the Netherlands.

(5)

HS-0143



Thus agreed and signed in threefold.

Verity Benelux B.V.
Name: E.M. Weenink
Title:   Director
Time:
Place:

Verity GB Ltd.
Name: S. R. Springsteel
Title Director
Time:
Place:

Mr Hugo Sluimer
Time:
Place:

(6)

HS-0144

Productie 3

HS-0145

hugo sluimer salary information

Euro

| fiscal | year | base | comm | car | total without car |
|---|---|---|---|---|---|
| | 2005 | 236567 | 269508 | 27147 | 506075 |
| | 2004 | 239850 | 270642 | 18229 | 510492 |
| | 2003 | 223021 | 383141 | 9390 | 606162 |

current OTE
| base salary | 240000 |
|---|---|
| comm | 220000 |
| total | 460000 |

start date                     june-1990

number of years employed                     15,5

dob      june 1953

| | years | factor | severance |
|---|---|---|---|
| 1990-1992 <40 | 3 | 1 | 3 |
| 1993-2002 40-50 | 10 | 1,5 | 15 |
| 2003-2005 >50 | 2,5 | 2 | 5 |

total number of months                     23

| average salary based on | salary | severance |
|---|---|---|
| 3 years | 45076 | 1036744 |
| 2 years | 42357 | 974210 |
| 1 year | 42173 | 969977 |
| ote | 38333 | 881667 |

HS-0146

Productie 4

HS-0147



## VERITY, INC.

### CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

**SECTION 1. INTRODUCTION.**

The Verity, Inc. Change in Control and Severance Benefit Plan (the *"Plan"*) is hereby established effective April 6, 2005 (the *"Effective Date"*). The purpose of the Plan is to provide for the payment of severance benefits to certain eligible employees of Verity, Inc. and its wholly owned subsidiaries (the *"Company"*) in the event that such employees are subject to qualifying employment terminations in connection with a Change in Control. This Plan shall supersede any severance benefit plan, policy or practice previously maintained by the Company, other than an individually negotiated contract or agreement with the Company relating to severance or change in control benefits that is in effect on an employee's termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan. This document also is the Summary Plan Description for the Plan.

**SECTION 2. DEFINITIONS.**

For purposes of the Plan, the following terms are defined as follows:

(a)    *"Base Salary"* means the Participant's annual base pay (excluding incentive pay, premium pay, commissions, overtime, bonuses and other forms of variable compensation), at the rate in effect during the last regularly scheduled payroll period immediately preceding the date of the Participant's Covered Termination.

(b)    *"Board"* means the Board of Directors of Verity, Inc.

(c)    *"Change in Control"* means one of the following events or a series of more than one of the following events that are related, wherein the stockholders of the Company immediately before the transaction do not retain immediately after the transaction, in substantially the same proportions as their ownership of shares of the Company's voting stock immediately before the transaction, direct or indirect beneficial ownership of more than fifty percent (50%) of the total combined voting power of the outstanding voting stock of the Company, the resulting entity in a merger or, in the case of an asset sale, the corporation or corporations to which the assets of the Company were transferred (the "Transferee Corporation(s)", as the case may be:

(i)    the direct or indirect sale or exchange in a single or series of related transactions by the stockholders of the Company of more than fifty percent (50%) of the voting stock of the Company;

(ii)    a merger or consolidation in which the Company is a party;

HS-0148

# Verity

     (iii)    the sale, exchange, or transfer of all or substantially all of the assets of the Company; or

     (iv)    a liquidation or dissolution of the Company.

For purposes of this Section 2(c), indirect beneficial ownership shall include, without limitation, an interest resulting from ownership of the voting stock of one or more corporations, which as a result of the transaction, own the Company, the resulting entity or the Transferee Corporation(s), as the case may be, either directly or through one or more subsidiary corporations. The Board shall have the right to determine whether multiple sales or exchanges of the voting stock of the Company or more than one of the following events are related, and its determination shall be final, binding and conclusive.

     (d)    *"Code"* means the Internal Revenue Code of 1986, as amended.

     (e)    *"Company"* means Verity, Inc. and its wholly owned subsidiaries or, following a Change in Control, the surviving entity resulting from such transaction.

     (f)    *"Constructive Termination"* means a voluntary termination of employment by a Participant after one of the following is undertaken without the Participant's express written consent:

     (i)    a substantial reduction in the Participant's duties or responsibilities (and not simply a change in title or reporting relationships) in effect immediately prior to the effective date of the Change in Control; *provided, however,* that it shall not be a "Constructive Termination" if, following the effective date of the Change in Control, either (a) the Company is retained as a separate legal entity or business unit and the Participant holds the same position in such legal entity or business unit as the Participant held before such effective date, or (b) the Participant holds a position with duties and responsibilities comparable (though not necessarily identical, in view of the relative sizes of the Company and the entity involved in the Change in Control) to the duties and responsibilities of the Participant prior to the effective date of the Change in Control;

     (ii)    a reduction in the Participant's base salary (except for salary decreases generally applicable to the Company's other similarly situated employees);

     (iii)    a change in the Participant's business location of more than 20 miles from the business location prior to such change, except for required travel for the Company's business to an extent substantially consistent with Participant's prior business travel obligations;

     (iv)    a material breach by the Company of any provisions of the Plan or any enforceable written agreement between the Company and the Participant; or

     (v)    any failure by the Company to obtain assumption of the Plan by any successor or assign of the Company.

2.

HS-0149



Notwithstanding the foregoing, a voluntary termination shall not be deemed a Constructive Termination unless (x) the Participant provides the Company with written notice (the "Constructive Termination Notice") that the Participant believes that an event described in this Section 2(f) has occurred, (y) the Constructive Termination Notice is given within three (3) months of the date the event occurred, and (z) the Company does not rescind or cure the conduct giving rise to the event described in this Section 2(f) within fifteen (15) days of receipt by the Company of the Constructive Termination Notice.

(g)     "*Covered Termination*" means an Involuntary Termination Without Cause or a Constructive Termination, either of which occurs within one (1) month prior to or within eighteen (18) months following the effective date of a Change in Control. Termination of employment of a Participant due to death or disability shall not constitute a Covered Termination unless a voluntary termination of employment by the Participant immediately prior to the Participant's death or disability would have qualified as a Constructive Termination.

(h)     "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

(i)     "*Involuntary Termination Without Cause*" means an involuntary termination of employment by the Company other than for one of the following reasons:

(i)     the Participant's violation of any material provision of the Company's standard agreement relating to proprietary rights;

(ii)     the Participant participates in any act of theft or dishonesty; or

(iii)     the Participant participates in any immoral or illegal act which has had or could reasonably be expected to have or had a detrimental effect on the business or reputation of the Company; or

(iv)     any material failure by the Participant to use reasonable efforts to perform reasonably requested tasks after written notice and a reasonable opportunity to comply with such notice.

(j)     "*Participant*" means an individual who is employed by the Company as its Executive Chairman of the Board, Chief Executive Officer, as a senior vice president, or as a vice president (other than any individual who is a vice president on sales commission, as determined by the Company in its sole discretion); *provided, however,* that if the Board shall make an affirmative determination that an employee serving in any such capacity shall not be a Participant, then such employee shall not be deemed a Participant. The determination of whether an employee is a Participant shall be made by the Company, in its sole discretion, and such determination shall be binding and conclusive on all persons.

(k)     "*Participation Notice*" means the latest notice delivered by the Company to a Participant informing the employee that the employee is a Participant in the Plan, substantially in the form of **Exhibit A** hereto.

HS-0150



**(l)** *"Plan Administrator"* means the Board or any committee duly authorized by the Board to administer the Plan. The Plan Administrator may, but is not required to be, the Compensation Committee of the Board. The Board may at any time administer the Plan, in whole or in part, notwithstanding that the Board has previously appointed a committee to act as the Plan Administrator.

## SECTION 3. ELIGIBILITY FOR BENEFITS.

**(a)** **General Rules.** Subject to the provisions set forth in this Section and Section 7, in the event of a Covered Termination, the Company will provide the severance benefits described in Section 4 of the Plan to the affected Participant. Promptly upon an employee becoming a Participant, the Company shall deliver to the Participant a Participation Notice.

**(b)** **Exceptions to Benefit Entitlement.** An employee, including an employee who otherwise is a Participant, will not receive benefits under the Plan (or will receive reduced benefits under the Plan) in the following circumstances, as determined by the Company in its sole discretion:

**(i)** The employee has executed an individually negotiated employment contract or agreement with the Company relating to severance or change in control benefits that is in effect on his or her termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan.

**(ii)** The employee voluntarily terminates employment with the Company in order to accept employment with another entity that is controlled (directly or indirectly) by the Company or is otherwise an affiliate of the Company.

**(iii)** The employee is offered immediate reemployment by a successor to the Company or by a purchaser of its assets, as the case may be, following a change in ownership of the Company or a sale of all or substantially all the assets of a division or business unit of the Company. For purposes of the foregoing, "immediate reemployment" means that the employee's employment with the successor to the Company or the purchaser of its assets, as the case may be, results in uninterrupted employment such that the employee does not suffer a lapse in pay as a result of the change in ownership of the Company or the sale of its assets.

**(iv)** The employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non-Compete Agreement.

**(c)** **Termination of Benefits.** A Participant's right to receive the payment of benefits under this Plan shall terminate immediately if, at any time prior to or during the period for which the Participant is receiving benefits hereunder, the Participant, without the prior written approval of the Company:

HS-0151



(i) willfully breaches a material provision of the Participant's proprietary information or confidentiality agreement with the Company, as referenced in Section 3(b)(iv);

(ii) owns, manages, operates, joins, controls or participates in the ownership, management, operation or control of, is employed by or connected in any manner with, any person, enterprise or entity which is engaged in any business competitive with that of the Company; *provided, however,* that such restriction will not apply to any passive investment representing an interest of less than two percent (2%) of an outstanding class of publicly-traded securities of any corporation or other entity or enterprise;

(iii) encourages or solicits any of the Company's then current employees to leave the Company's employ for any reason or interferes in any other manner with employment relationships at the time existing between the Company and its then current employees; or

(iv) induces any of the Company's then current clients, customers, suppliers, vendors, distributors, licensors, licensees or other third party to terminate their existing business relationship with the Company or interferes in any other manner with any existing business relationship between the Company and any then current client, customer, supplier, vendor, distributor, licensor, licensee or other third party.

SECTION 4. AMOUNT OF BENEFITS.

(a) **Cash Severance Benefits.** Each Participant who incurs a Covered Termination and was employed by the Company at the position or level set forth below immediately prior to such Covered Termination shall be entitled to receive a cash severance benefit equal to the number of months of Base Salary set forth below. Any cash severance benefits provided under this Section 4(a) shall be paid pursuant to the provisions of Section 5.

| Position or Level | Amount of Cash Severance Benefit |
|---|---|
| Executive Chairman of the Board | 24 months |
| Chief Executive Officer | 24 months |
| Senior Vice President | 18 months |
| Vice President (Except Vice Presidents on sales commissions) | 12 months |

(b) **Accelerated Stock Award Vesting and Extended Exercisability of Stock Options.** If a Participant incurs a Covered Termination, then effective as of the date of the Participant's Covered Termination, (i) the vesting and exercisability of all outstanding options to purchase the Company's common stock that are held by the Participant on such date shall be accelerated in full, and (ii) any reacquisition or repurchase rights held by the Company in respect

HS-0152



of common stock issued pursuant to any other stock award granted to the Participant by the Company shall lapse.

In addition, the post-termination of employment exercise period of any outstanding option held by the Participant on the date of his or her Covered Termination shall be extended, if necessary, such that the post-termination of employment exercise period shall not terminate prior to the later of (i) the date twelve (12) months after the effective date of the Covered Termination or (ii) the post-termination exercise period provided for in such option; *provided, however,* that such option shall not be exercisable after the expiration of its maximum term; *provided, further,* *however,* that in the event that any extended exercisability of an option pursuant to this Section 4(b) would adversely affect a Participant's option or other stock award (including, without limitation, its status as an incentive stock option under Section 422 of the Code or result in an option that would not otherwise be deemed to be a nonqualified deferred compensation plan or arrangement for the purposes of Section 409A of the Code to be deemed to be such a nonqualified deferred compensation plan or arrangement), such extended exercisability shall be deemed null and void unless the affected Participant consents in writing to such extended exercisability within thirty (30) days after becoming a Participant in the Plan.

(c)     **Continued Medical Benefits**. If a Participant incurs a Covered Termination and the Participant was enrolled in a health, dental, or vision plan sponsored by the Company immediately prior to such Covered Termination, the Participant may be eligible to continue coverage under such health, dental, or vision plan (or to convert to an individual policy), at the time of the Participant's termination of employment, under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The Company will notify the Participant of any such right to continue such coverage at the time of termination pursuant to COBRA. No provision of this Plan will affect the continuation coverage rules under COBRA, except that the Company's payment, if any, of applicable insurance premiums will be credited as payment by the Participant for purposes of the Participant's payment required under COBRA. Therefore, the period during which a Participant may elect to continue the Company's health, dental, or vision plan coverage at his or her own expense under COBRA, the length of time during which COBRA coverage will be made available to the Participant, and all other rights and obligations of the Participant under COBRA (except the obligation to pay insurance premiums that the Company pays, if any) will be applied in the same manner that such rules would apply in the absence of this Plan.

If a Participant timely elects continued coverage under COBRA, the Company shall pay the full amount of the Participant's COBRA premiums on behalf of the Participant for the Participant's continued coverage under the Company's health, dental and vision plans, including coverage for the Participant's eligible dependents, during the number of months of Base Salary in respect of which the amount paid to the Participant under Section 4(a) was calculated (the "Severance Period"); *provided, however,* that if the Severance Period exceeds the length of time that the Participant is entitled to coverage under COBRA (including any additional period under analogous provisions of state law), the resulting or acquiring entity or Transferee Corporation involved in the Change in Control, as applicable, shall be required to provide health, dental and vision insurance coverage for the Participant and his or her eligible dependents for any portion of the Severance Period that exceeds the length of time that the Participant is entitled to coverage

HS-0153



under COBRA (including any additional period under analogous provisions of state law), at a level of coverage that is substantially similar to the continued coverage that the Participant and his or her eligible dependents received under the Company's health, dental and vision plans; *provided, further, however,* that no such premium payments (or any other payments for medical, dental or vision coverage by the Company) shall be made following the Participant's death or the effective date of the Participant's coverage by a medical, dental or vision insurance plan of a subsequent employer. Each Participant shall be required to notify the Company immediately if the Participant becomes covered by a medical, dental or vision insurance plan of a subsequent employer. Upon the conclusion of such period of insurance premium payments made by the Company, the Participant will be responsible for the entire payment of premiums required under COBRA for the duration of the COBRA period.

For purposes of this Section 4(c), (i) references to COBRA shall be deemed to refer also to analogous provisions of state law and (ii) any applicable insurance premiums that are paid by the Company shall not include any amounts payable by the Participant under an Internal Revenue Code Section 125 health care reimbursement plan, which amounts, if any, are the sole responsibility of the Participant.

(d)     **Other Employee Benefits.**  All other benefits (such as life insurance, disability coverage, and 401(k) plan coverage) shall terminate as of the Participant's termination date (except to the extent that a conversion privilege may be available thereunder).

(e)     **Additional Benefits.**  Notwithstanding the foregoing, the Company may, in its sole discretion, provide benefits in addition to those pursuant to Sections 4(a), 4(b) and 4(c) to Participants or employees who are not Participants ("Non-Participants") chosen by the Company, in its sole discretion, and the provision of any such benefits to a Participant or a Non-Participant shall in no way obligate the Company to provide such benefits to any other Participant or to any other Non-Participant, even if similarly situated.  If benefits under the Plan are provided to a Non-Participant, references in the Plan to "Participant"(with the exception of Sections 4(a), 4(b) and 4(c)) shall be deemed to refer to such Non- Participants.

SECTION 5.  TIME AND FORM OF SEVERANCE PAYMENTS.

(a)     **General Rules.**  Subject to Section 5(b), any cash severance benefit provided under Section 4(a) shall be paid in installments pursuant to the Company's regularly scheduled payroll periods commencing as soon as practicable following the effective date of a Participant's Covered Termination and shall be subject to all applicable withholding for federal, state and local taxes. In the event of a Participant's death prior to receiving all installment payments of his or her cash severance benefit under Section 4(a), any remaining installment payments shall be made to the Participant's estate on the same payment schedule as would have occurred absent the Participant's death. In no event shall payment of any Plan benefit be made prior to the effective date of the Participant's Covered Termination or prior to the effective date of the release described in Section 7(a).

(b)     **Application of Section 409A.**  In the event that any cash severance benefit provided under Section 4(a) or continued medical benefit under Section 4(c) shall fail to satisfy

7.

HS-0154



the distribution requirement of Section 409A(a)(2)(A) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, the payment of such benefit shall be accelerated to the minimum extent necessary so that the benefit is not subject to the provisions of Section 409A(a)(1) of the Code. (The payment schedule as revised after the application of the preceding sentence shall be referred to as the *"Revised Payment Schedule."*) In the event the payment of benefits pursuant to the Revised Payment Schedule would be subject to Section 409A(a)(1) of the Code, the payment of such benefits shall not be paid pursuant to the Revised Payment Schedule and instead the payment of such benefits shall be delayed to the minimum extent necessary so that such benefits are not subject to the provisions of Section 409A(a)(1) of the Code. The Board may attach conditions to or adjust the amounts paid pursuant to this Section 5(b) to preserve, as closely as possible, the economic consequences that would have applied in the absence of this Section 5(b); *provided, however*, that no such condition or adjustment shall result in the payments being subject to Section 409A(a)(1) of the Code.

## SECTION 6. REEMPLOYMENT.

In the event of a Participant's reemployment by the Company during the period of time in respect of which severance benefits pursuant to Section 4(a) or 4(e) have been paid, the Company, in its sole and absolute discretion, may require such Participant to repay to the Company all or a portion of such severance benefits as a condition of reemployment.

## SECTION 7. LIMITATIONS ON BENEFITS.

(a)    **Release.** In order to be eligible to receive benefits under the Plan, a Participant also must execute a general waiver and release in substantially the form attached hereto as Exhibit B, Exhibit C or Exhibit D, as appropriate, and such release must become effective in accordance with its terms. For purposes of the preceding sentence, with respect to any outstanding option held by the Participant, the receipt of benefits shall be deemed to be the exercise of such option pursuant to the extended exercisability of such option under Section 4(b), rather than the acceleration or extension of such option's exercisability. The Company, in its sole discretion, may modify the form of the required release to comply with applicable law and shall determine the form of the required release, which may be incorporated into a termination agreement or other agreement with the Participant.

(b)    **Certain Reductions.** The Company, in its sole discretion, shall have the authority to reduce a Participant's severance benefits, in whole or in part, by any other severance benefits, pay in lieu of notice, or other similar benefits payable to the Participant by the Company that become payable in connection with the Participant's termination of employment pursuant to (i) any applicable legal requirement, including, without limitation, the Worker Adjustment and Retraining Notification Act (the "WARN Act"), (ii) a written employment or severance agreement with the Company, or (iii) any Company policy or practice providing for the Participant to remain on the payroll for a limited period of time after being given notice of the termination of the Participant's employment. The benefits provided under this Plan are intended to satisfy, in whole or in part, any and all statutory obligations and other contractual obligations of the Company that may arise out of a Participant's termination of employment, and

8.

HS-0155



the Plan Administrator shall so construe and implement the terms of the Plan. The Company's decision to apply such reductions to the severance benefits of one Participant and the amount of such reductions shall in no way obligate the Company to apply the same reductions in the same amounts to the severance benefits of any other Participant, even if similarly situated. In the Company's sole discretion, such reductions may be applied on a retroactive basis, with severance benefits previously paid being recharacterized as payments pursuant to the Company's statutory or other contractual obligations.

(c)     **Mitigation.** Except as otherwise specifically provided herein, a Participant shall not be required to mitigate damages or the amount of any payment provided under this Plan by seeking other employment or otherwise, nor shall the amount of any payment provided for under this Plan be reduced by any compensation earned by a Participant as a result of employment by another employer or any retirement benefits received by such Participant after the date of the Participant's termination of employment with the Company.

(d)     **Non-Duplication of Benefits.** Except as otherwise specifically provided for herein, no Participant is eligible to receive benefits under this Plan or pursuant to other contractual obligations more than one time. This Plan is designed to provide certain severance pay and change in control benefits to Participants pursuant to the terms and conditions set forth in this Plan. The payments pursuant to this Plan are in addition to, and not in lieu of, any unpaid salary, bonuses or benefits to which a Participant may be entitled for the period ending with the Participant's Covered Termination.

(e)     **Indebtedness of Participants.** If a Participant is indebted to the Company on the effective date of his or her Covered Termination, the Company reserves the right to offset any severance payments under the Plan by the amount of such indebtedness.

SECTION 8. RIGHT TO INTERPRET PLAN; AMENDMENT AND TERMINATION.

(a)     **Exclusive Discretion.** The Plan Administrator shall have the exclusive discretion and authority to establish rules, forms, and procedures for the administration of the Plan and to construe and interpret the Plan and to decide any and all questions of fact, interpretation, definition, computation or administration arising in connection with the operation of the Plan, including, but not limited to, the eligibility to participate in the Plan and amount of benefits paid under the Plan. The rules, interpretations, computations and other actions of the Plan Administrator shall be binding and conclusive on all persons.

(b)     **Amendment or Termination.** The Company reserves the right to amend or terminate this Plan or the benefits provided hereunder at any time; *provided, however,* that no such amendment or termination shall occur following (i) the date one (1) month prior to a Change in Control or (ii) a Covered Termination as to any Participant who would be adversely affected by such amendment or termination unless such Participant consents in writing to such amendment or termination. Any action amending or terminating the Plan shall be in writing and executed by a duly authorized officer of the Company. Unless otherwise required by law, no approval of the shareholders of the Company shall be required for any amendment or termination

9.

HS-0156



including any amendment that increases the benefits provided under any option or other stock award.

## SECTION 9.   NO IMPLIED EMPLOYMENT CONTRACT.

The Plan shall not be deemed (i) to give any employee or other person any right to be retained in the employ of the Company or (ii) to interfere with the right of the Company to discharge any employee or other person at any time, with or without cause, which right is hereby reserved.

## SECTION 10.     LEGAL CONSTRUCTION.

This Plan shall be governed by and construed under the laws of the State of California (without regard to principles of conflict of laws), except to the extent preempted by ERISA.

## SECTION 11.   CLAIMS, INQUIRIES AND APPEALS.

(a)     **Applications for Benefits and Inquiries.**   Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Plan Administrator in writing by an applicant (or his or her authorized representative).  The Plan Administrator is:

Verity, Inc.
Attn:  Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

(b)     **Denial of Claims.**   In the event that any application for benefits is denied in whole or in part, the Plan Administrator must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial.  Any electronic notice will comply with the regulations of the U.S. Department of Labor.  The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(1)     the specific reason or reasons for the denial;

(2)     references to the specific Plan provisions upon which the denial is based;

(3)     a description of any additional information or material that the Plan Administrator needs to complete the review and an explanation of why such information or material is necessary; and

(4)     an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under Section 502(a) of

10.

HS-0157



ERISA following a denial on review of the claim, as described in Section 11(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Plan Administrator receives the application, unless special circumstances require an extension of time, in which case, the Plan Administrator has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the application.

(c)  **Request for a Review.** Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Plan Administrator within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his or her representative) shall have the opportunity to submit (or the Plan Administrator may require the applicant to submit) written comments, documents, records, and other information relating to his or her claim. The applicant (or his or her representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his or her representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d)  **Decision on Review.** The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the review. The Plan Administrator will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Plan Administrator confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

11.

HS-0158



(1)    the specific reason or reasons for the denial;

(2)    references to the specific Plan provisions upon which the denial is based;

(3)    a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim; and

(4)    a statement of the applicant's right to bring a civil action under Section 502(a) of ERISA.

(e)    **Rules and Procedures.** The Plan Administrator will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Plan Administrator may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

(f)    **Exhaustion of Remedies.** No legal action for benefits under the Plan may be brought until the applicant (i) has submitted a written application for benefits in accordance with the procedures described by Section 11(a) above, (ii) has been notified by the Plan Administrator that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 11(c) above, and (iv) has been notified that the Plan Administrator has denied the appeal. Notwithstanding the foregoing, if the Plan Administrator does not respond to an applicant's claim or appeal within the relevant time limits specified in this Section 11, the applicant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

## SECTION 12. BASIS OF PAYMENTS TO AND FROM PLAN.

All benefits under the Plan shall be paid by the Company. The Plan shall be unfunded, and benefits hereunder shall be paid only from the general assets of the Company.

## SECTION 13. OTHER PLAN INFORMATION.

(a)    **Employer and Plan Identification Numbers.** The Employer Identification Number assigned to the Company (which is the "Plan Sponsor" as that term is used in ERISA) by the Internal Revenue Service is 77-0182779. The Plan Number assigned to the Plan by the Plan Sponsor pursuant to the instructions of the Internal Revenue Service is 520.

(b)    **Ending Date for Plan's Fiscal Year.** The date of the end of the fiscal year for the purpose of maintaining the Plan's records is May 31.

HS-0159



Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a Plan benefit or exercising your rights under ERISA.

### Enforce Your Rights

If your claim for a Plan benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan, and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court.

If you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

### Assistance With Your Questions

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## SECTION 15.   GENERAL PROVISIONS.

(a)    Notices.   Any notice, demand or request required or permitted to be given by either the Company or a Participant pursuant to the terms of this Plan shall be in writing and shall be deemed given when delivered personally or deposited in the U.S. mail, First Class with postage prepaid, and addressed to the parties, in the case of the Company, at the address set forth in Section 11(a) and, in the case of a Participant, at the address as set forth in the Company's

14.

HS-0160



employment file maintained for the Participant as previously furnished by the Participant or such other address as a party may request by notifying the other in writing.

(b)    **Transfer and Assignment.** The rights and obligations of a Participant under this Plan may not be transferred or assigned without the prior written consent of the Company. This Plan shall be binding upon any surviving entity resulting from a Change in Control and upon any other person who is a successor by merger, acquisition, consolidation or otherwise to the business formerly carried on by the Company without regard to whether or not such person or entity actively assumes the obligations hereunder.

(c)    **Waiver.** Any Party's failure to enforce any provision or provisions of this Plan shall not in any way be construed as a waiver of any such provision or provisions, nor prevent any Party from thereafter enforcing each and every other provision of this Plan. The rights granted the Parties herein are cumulative and shall not constitute a waiver of any Party's right to assert all other legal remedies available to it under the circumstances.

(d)    **Severability.** Should any provision of this Plan be declared or determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

(e)    **Section Headings.** Section headings in this Plan are included for convenience of reference only and shall not be considered part of this Plan for any other purpose.

## SECTION 16.  EXECUTION.

To record the adoption of the Plan as set forth herein, Verity, Inc. has caused its duly authorized officer to execute the same as of the Effective Date.

VERITY, INC.

By: _ssprings_ _____

Digitally signed by ssprings
DN: CN = ssprings, C = US, L = Sunnyvale
MS, S = California, O = Verity, Inc., OU = MIS
Reason: I am approving this document
Date: 2005.04.15 16:57:55 -07'00'

Steven Springsteel

Title: SVP Finance / Administration & CFO

Verity, Inc.    894 Ross Drive  Sunnyvale, CA 94089    t. 408.541.1500    f. 408.541.1600    www.verity.com

HS-0161



EXHIBIT A

## VERITY, INC.

### CHANGE IN CONTROL AND SEVERENCE BENEFIT PLAN

### PARTICIPATION NOTICE

To: Eric Weenink

Date: April 18, 2005

Verity, Inc. (the "*Company*") has adopted the Verity, Inc. Change in Control and Severance Benefit Plan (the "*Plan*"). The Company is providing you with this Participation Notice to inform you that, given your position at the Company, you qualify as a participant in the Plan. A copy of the Plan document, which also constitutes a summary plan description, is attached to this Participation Notice. The terms and conditions of your participation in the Plan are as set forth in the Plan, and in the event of any conflict between this Participation Notice and the Plan, the terms of the Plan shall prevail. Subject to the provisions of the Plan, the details of your Plan benefits, as described in Section 4 of the Plan, are as follows:

**Cash Severance Benefit:** 12 months.

**Accelerated Vesting of Options:** Full.

**Extended Exercisability of Options:** Later of 12 months or the post-termination exercise period of the option; provided, however, that such extended exercisability shall not extend beyond the term of the option.

**Continued medical benefits:** 12 months, or such earlier date as you shall secure subsequent employment that shall provide you with similar medical benefits.

Please retain a copy of this Participation Notice, along with the Plan document, for your records.

VERITY, INC.

By:  ssprings  
Digitally signed by ssprings  
DN: CN = ssprings, C = US, L = Sunnyvale HQ, S = California, O = Verity, Inc., OU = MIS  
=Reason: I am approving this document  
Date: 2005.04.18 16:56:16 -07'00'  

_____  
Steven Springsteel

Title: SVP Finance / Administration & CFO

HS-0162

# Verity™

## ACKNOWLEDGEMENT

The undersigned Participant hereby acknowledges receipt of the foregoing Participation Notice. In the event the undersigned holds outstanding stock options as of the date of this Participation Notice, the undersigned hereby:

☐     accepts
☐     rejects

the extended exercisability provisions for such stock options set forth above.* The undersigned acknowledges that the undersigned has been advised to obtain tax and financial advice regarding the consequences of this election including the effect, if any, on the status of the stock options for tax purposes under Sections 409A and 422 of the Internal Revenue Code.

**EMPLOYEE**

Signature:_____

Print Name:_____

Date:_____

\*    Please check one box; failure to check a box will be deemed a rejection of the extended exercisability provisions as they relate to such stock options.

17.

HS-0163

**Productie 5**

HS-0164

VERITY, INC.

CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

PARTICIPATION NOTICE

To: Hugo Sleimer

Date: May 4, 2005

Verity, Inc. (the "*Company*"), has adopted the Verity, Inc. Change in Control and Severance Benefit Plan (the "*Plan*"). The Company is providing you with this Participation Notice to inform you that, given your position at the Company, you qualify as a participant in the Plan. A copy of the Plan document, which also constitutes a summary plan description, is attached to this Participation Notice. The terms and conditions of your participation in the Plan are as set forth in the Plan, and in the event of any conflict between this Participation Notice and the Plan, the terms of the Plan shall prevail except with respect to the cash severance, which you have declined as set forth below. Subject to the provisions of the Plan, the details of your Plan benefits, as described in Section 4 of the Plan (except with respect to the cash severance, which you have declined), are as follows:

**Cash Severance Benefit**: You have declined to accept any cash severance benefit under the Plan. Consequently, you will be entitled to no cash severance benefit under the terms of the Plan, and any cash benefit to which you shall be entitled shall be determined under Dutch law without reference to the Plan.

Accelerated Vesting of Options: Full.

Extended Exercisability of Options:   Later of 12 months or the post-termination exercise period of the option; provided, however, that such extended exercisability shall not extend beyond the term of the option.

Continued medical benefits:   _____18_____ months, or such earlier date as you shall secure subsequent employment that shall provide you with similar medical benefits.

Please retain a copy of this Participation Notice, along with the Plan document, for your records.

VERITY, INC.

ssprings

By: _____

Its: _____

HS-0165

ACKNOWLEDGEMENT

The undersigned Participant hereby acknowledges receipt of the foregoing Participation Notice. In the event the undersigned holds outstanding stock options as of the date of this Participation Notice, the undersigned hereby:

☒    accepts

☐    rejects

the extended exercisability provisions for such stock options set forth above.* The undersigned acknowledges that the undersigned has been advised to obtain tax and financial advice regarding the consequences of this election including the effect, if any, on the status of the stock options for tax purposes under Sections 409A and 422 of the Internal Revenue Code.

_____

_____
H. Skumore
Print name

* Please check one box; failure to check a box will be deemed a rejection of the extended exercisability provisions as they relate to such stock options.

HS-0166

Productie 6

HS-0167



| Autonomy | Technology | Products | ROI & Benefits | Business Solutions | Services | Customers | OEMs | Partr |

## Autonomy Acquires Verity

In December 2005 Autonomy completed the acquisition of Verity, Inc. The combined company is the acknowledged industry leader, with nearly 1,000 employees and more than 16,000 customers around the world. Throughout 2005 and into 2006 Autonomy has extended this leadership position through a successful integration process and key new and repeat customer wins.



- Autonomy Downloads
- Request Information
- Video Case Studies

**Peter Rasmussen, Danske Bank -** "The biggest challenge in the information society is the fact that we are drowning in information. With Autonomy, we can save time...



Read the official press release that details Autonomy's acquisition of Verity.



Learn how Autonomy and Verity customers, investors and partners will benefit from the compelling combination of technology leadership and customer-facing strengths in sales, support and professional services.



Autonomy is committed to working with Verity partners as they are critical to providing an expanded range of solutions to meet customers' specialized business needs.



Autonomy protects and extends customers' investments in the K2 product portfolio including the ongoing development and support of K2, KeyView, Federator, Publisher, Extractor and Profiler. The next release of K2 is version 7 which offers significant benefits including massive improvements in scalability, performance and security. K2 v7 will be available at no additional charge to customers who are current with their support and maintenance contracts. **Select the Roadmap Whitepaper link to start downloading the pdf.**



Verity Product Roadmap Webinar. (Requires webex client)





Autonomy has **Several Seminars, Customer Events** and **Tradeshow Appearances** planned for 2006. Check the Events section on Autonomy.com frequently to view new events.



Autonomy acquired Verity, Inc., a leading provider of business search and process management software, on December 29 th, 2005. The combination of the two companies creates a larger, stronger organization with a wider global presence to better meet the growing requirements of our customers.





Autonomy is committed to the continued development of Cardiff's Adaptive BPM and Content Capture products. Learn about Cardiff's plans for future releases of their flagship products, TeleForm and LiquidOffice.



Cardiff, an Autonomy Group company, is a leading provider of adaptive business process management (BPM) and content capture solutions. Cardiff enables organizations to capture data from electronic and paper sources and adapt to existing processes by managing structured, exception and people-driven actions. Cardiff serves 8,000 customers worldwide across all industries.



Autonomy is committed to the continued support, enhancement and development of Ultraseek. Learn about plans for the next release of Ultraseek.



A pure, downloadable search engine that was built specifically for business, Ultraseek excels at generating highly relevant results that are meaningful to the role of the user and relevant to the business problem at hand. More than 3,500 organizations, from Fortune 500 companies to small businesses, take advantage of Ultraseek for their business search needs.

## Verity Acquisition Press and Analyst Quotes

*"Autonomy will become the gorilla of search"*
Delphi
Monday, April 11, 2005

*"Autonomy may indeed set a new standard as the go-to vendor for enterprise navigation, search, and retrieval."*
AMR
Authors: Jim Murphy, William McNeill
Thursday, November 10, 2005

*"With the increasing interest in the NSR market, the move may be perfectly timed - as customers are likely to run up against the limitations of newer entrants into the enterprise market."*
AMR
Authors: Jim Murphy, William McNeill

Thursday, November 10, 2005

*"With combined revenue of $227m in the past year and a joint 16,000-strong customer base, the enlarged Autonomy...will have the scale to keep up with market demands for search technology for handling rapidly growing volumes of unstructured data, whether in the form of voice, text or video."*

Computer Business Review

Author: CBR Staff Writer

Monday, November 07, 2005

*"Autonomy is being tipped for international superstardom"*

Business Weekly

*"For several years Autonomy and Verity have been the two dominant players within the enterprise search market...This acquisition will send ripples around the information management software world. "*

OVUM

Author: Angela Ashenden

*"Certainly this merger will create waves in the search market. Autonomy's acquisition of Verity must give pause to other players in the enterprise search software market."*

IDC

Author: Susan Feldman

Thursday, November 17, 2005

[home]   [sitemap]   [legal disclaimer]   [privacy policy]   [e-mail Autonomy]   [e-mail webmaster]

Productie 7

HS-0171

29 December 2005

VIA FEDEX DELIVERY

Hugo Sluimer
c/o Verity GB Limited
The Pavillions
Kiln Park Business Centre
Kiln Lane
Epsom KT17 1JG

Re:    Warning of Possible Redundancy – Acquisition of Verity, Inc. by Autonomy
       Corporation plc

Dear Hugo:

As you are aware, Verity, Inc., the ultimate parent company of Verity GB Ltd (the "Company") has entered into an agreement to be acquired by Autonomy Corporation plc. A copy of the announcement of the transaction was recently forwarded to you. The acquisition will strengthen the future of the Verity group of companies as the combined group of companies will have substantially increased scale and diversified revenue streams, enabling the combined group to provide a significantly enhanced product offering to both companies' clients, whilst continuing to lead innovation in the industry.

The acquisition is transformational for the Verity group of companies as Verity will become a subsidiary of Autonomy Corporation plc and will, therefore, no longer maintain many of the functions that are required of an independent US-based public company. As a result, it is currently anticipated that there may be a number of redundancies throughout the Verity group and within the Company. As the requirement for the Company's branch to remain open has diminished, as has the requirement for employees to perform your job, we are, therefore, writing to warn you that your position has been identified as at risk of redundancy.

The Company is committed to avoiding terminating your employment by reason of redundancy if it can do so. To this end we invite you to a consultation meeting on January 11, 2006 to discuss your position, the transaction and consult with your regarding any suitable alternative positions within the Company during he consultation period. You will have an opportunity to discuss this further at a second consultation meeting. If, however, a suitable alternative position is not identified, the Company may proceed to terminate your employment by reason of redundancy. During the consultation period you will not be required to attend the companies offices, however you will be afforded reasonable access should it be required to conduct required company business. 12 weeks notice is hereby given in accordance with the applicable Regulations and will run concurrently with the consultation period. Please note, however, that notice may be withdrawn at any time depending on the results of the consultation.
so..

UK

HS-0172

Please feel free to contact Erik Wecnink at any time prior to the meeting should you wish to discuss the transaction or any of its anticipated impact.

Sincerely,

Verity GB Ltd

HS-0173

Productie 8

HS-0174



VIA EMAIL AND REGISTERED DELIVERY

23 March 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genêts
MC 98000 MONACO

Re:    Notice of Cessation of Redundancy Proceedings and Appointment as Senior
       Vice President, EMEA and APAC Operations for Neurodynamics

Dear Hugo:

I refer to the letter dated 29 December 2005 from Verity GB Limited warning you of the possibility of redundancy due to the acquisition and reorganisation of the Verity Group and our subsequent discussions.

As discussed on 22 March 2006 by phone, following extensive management meetings and review of all of the group's post-merger positions, I regret to inform you that your position as Senior Vice President, EMEA and APAC Operations will lapse. However as discussed, I am very pleased to inform you that based on our internal consultations we have a found a suitable alternative opportunity within the group.

As you may know, Neurodynamics now forms a part of Virage, a division of Autonomy. Virage is Autonomy's leading provider of rich media communication and content management software. The two suites of technology, together with the core Autonomy technology with which you're familiar, offer a highly sophisticated security solution applicable for security, defence, legal and manufacturing markets worldwide, key sectors for historic Verity sales. The Neurodynamics product range is marketed under the Virage Security and Surveillance brand.

Other participants in the market include Verint, which is a billion dollar company. Autonomy senior management has reviewed the Verint offering and believes the Neurodynamics products are extremely competitive and in many cases lead the market.

This division is one of the fastest growing in the group and capitalizes on immediate market needs, with strong growth forecast across Europe and APAC. This role is specifically suitable for you, combining your existing responsibilities with a different business unit, allowing us to best utilise your leadership and management qualities.

Your compensation in the aggregate will be unchanged. Your salary will remain the same, and your commission plan will be restructured so that you are eligible for analogous benefits upon commensurate growth of the unit.

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0175



In this role you will work directly with David Humphires, Managing Director of the Neurodynamics division, and [jointly] report to the [group CEO/Mr. Humphries]. As the division is based in Cambridge you will be expected to attend the offices on a regular basis, although this should comport with your previous role which required significant travel to the UK and as your time is virtually all assigned to Verity GB Limited.

Please feel free to contact me to discuss this new assignment. We sincerely thank you for your patience and understanding during this transitional period which we hope will be as smooth as possible.

Sincerely,

Andrew M Kanter
Company Secretary

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0176

Productie 9

HS-0177

---------- Forwarded message ----------
From: **Hugo Sluimer** <hugosluimer@gmail.com >
Date: 9-feb-2006 12:49
Subject: Official letter
To: Andrew Kanter <andrewk@autonomy.com>

Dear Andrew,
Please find my letter enclosed.


Thx
Hugo

HS-0178

Dear Andrew,

First of all I would like to sincerely congratulate you and the rest of the Autonomy team with the stellar FY05 results!

I would like to come back to our meeting in London, on Jan. 24 last. During the formal part of the meeting you've read the text of a legal document to me, stating that Autonomy couldn't offer me an equal position (compared to the position I had at Verity, Inc.). As a result, both parties agreed to consider an exit. Although you pushed me firmly to propose Autonomy an exit fee during the meeting (I even asked instant advice, during a time out, per telephone from my lawyer), I informed you that we believe that an offer from my side would not be appropriate and that we expected Autonomy to propose an exit fee to me.
When I asked you for a printed version of the legal document, referred to above, you told me that it needed some cleansing and that I could expect to receive the final document per post, the week after the meeting.
Now at this very moment in time I am confused, because I haven't heard anything.

For the record, I listed some chronological facts that occurred during and after the acquisition:
- Various meetings between Autonomy and Verity Executives took place and I was the only Exec who was never invited to participate.
- Prior the acquisition, Verity prospects and clients were contacted (by Autonomy telemarketing and field sales personnel) and advised not to deal with Verity anymore to avoid the risk of de-investments in "obsolete Verity technology".
- Without any involvement/communication by/to me, Autonomy made organisational changes to my teams.
- My direct reports were told that "Hugo is out".
- The channel that I managed directly (e.g. in Korea, Japan, Singapore, Denmark, etc.) were told that "Hugo is out".
- Only on Jan. 5 last, I received a call from Andrew Kanter, who informed me that Autonomy couldn't offer me an equal position in the new organisation.
- A few hours after the tel call from Andrew, my e-mail was shut off and routed to Sushovan Hussain (Autonomy's CFO). I was very confused and disappointed not to have received any notice and what's even worse, I lost the professional opportunity to inform all my business contacts who I work with for many, many years.
- On Jan. 6 last, I received a potential redundancy letter, dated Dec. 29, 2005! The letter also informed me to be on half pay, per that date.
- On Jan. 24 last, we had a brief meeting (as referred to above).

Andrew, I trust that you do understand that uncertainty and ignorance is not easy to accept for someone like me who built Verity, Inc. from scratch, during 15 1/2 years, outside the USA to a revenue level exceeding 50 mill. USD (about half the size of Autonomy's FY05 turnover).
So please let's communicate, conclude and resolve this situation.

I look forward to your reply and remain,

with kind regards,

Hugo Sluimer

HS-0179

Productie 10a

HS-0180

---------- Forwarded message ----------
From: **Andrew Kanter** <andrewk@autonomy.com>
Date: 22-feb-2006 22:00
Subject: Open Correspondence
To: Hugo Sluimer <hugosluimer@gmail.com>

Dear Mr Sluimer,

As you know we are continuing the integration process, which I'm sure you'll appreciate is difficult. As we continue that process we continue to review individual positions and whether there are any redundancies across the group.

When we met in London on 24 January 2006 this is what we discussed during our meeting. I did not state that Autonomy could not offer you an equal position, but rather that the position was under review and that there was a likelihood that your position will become redundant. I agreed to get back to you with a written decision as soon as any had been made. I did not refuse you a copy of my notes.

As you know the integration process is a difficult process where strategic decisions need to made. Officers of Autonomy met with group-level officers of Verity in December 2005 to discuss the future strategy of Verity. This meeting did not include regional executives like yourself, with the exception of Mike Mooney and Jack Landers who were recommended for promotion to group level roles. During the integration there were isolated instances of over-eager sales personnel seeking to short-term sales who contacted customers, but these were stopped when discovered. There was no group policy as you seem to imply to steer existing Verity customers to Autonomy, as indeed this would have been a breach of antitrust legislation. At a group level certain synergies were required by the transaction, and these decisions were made by your senior officers within their discretion. Managers within the European operations were informed that your position is under review and that no final decision has been made, as is the case.

I did not inform you during our call on 5 January that Autonomy would not offer you an equal position. I have clarified this twice by email in open correspondence, which you have received. To the best of my knowledge you have not had any reduction in any benefits during the consultation period.

We are continuing to review the position and hope to continue consultations shortly.

Best regards,

Andrew Kanter
Autonomy

HS-0181

Productie 10b

HS-0182

---------- Forwarded message ----------
From: **Andrew Kanter** <andrewk@autonomy.com>
Date: 22-feb-2006 22:00
Subject: WITHOUT PREJUDICE
To: Hugo Sluimer <hugosluimer@gmail.com>

Dear Mr Sluimer,

This note is written without prejudice as was the basis of our meeting in London on 24 January 2006. At that meeting my notes reflect that you requested the meeting be without prejudice, and I confirmed that you understood the meaning of designating the meeting as such.   Accordingly as your letter references the without prejudice portion of our meeting your letter is part and parcel of the without prejudice proceedings, as is this note.  I have sent a separate email regarding the open portion of that meeting and open correspondence.

As we continue the review of your position we of course remain open to a without prejudice dialog, but will need confirmation from you that you wish to have those conversations under that rubric.

Please can you confirm by return whether you wish to continue a without prejudice dialog and that you have taken advice as to the nature of such a dialog.

Best regards,

Andrew Kanter
Autonomy

HS-0183

Productie 11

HS-0184

---------- Forwarded message ----------
From: **Hugo Sluimer** < hugosluimer@gmail.com>
Date: 1-mrt-2006 9:21
Subject: Reply to your mail of Feb 22 last
To: Andrew Kanter <andrewk@autonomy.com>

Dear Mr. Kanter,

Thanks for your e-mail reply to my letter, send to you on Feb. 9 last.

Please find my comments interspersed in red into your e-mail below.


Best regards,


Hugo Sluimer


---------- Forwarded message ----------
From: **Andrew Kanter** < andrewk@autonomy.com>
Date: 22-feb-2006 22:00
Subject: Open Correspondence
To: Hugo Sluimer < hugosluimer@gmail.com>


Dear Mr Sluimer,


As you know we are continuing the integration process, which I'm sure you'll appreciate is difficult. As we continue that process we continue to review individual positions and whether there are any redundancies across the group.


When we met in London on 24 January 2006 this is what we discussed during our meeting. I did not state that Autonomy could not offer you an equal position, but rather that the position was under review and that there was a likelihood that your position will become redundant. I like to remind you that you read the draft exit letter during the formal part of the meeting, stating that Autonomy couldn't offer me an equal position. That's why you started asking/pushing me to suggest an exit fee, after you've read the letter. Because of your persistence, I called my lawyer (time out during our meeting) to find out if this would be appropriate and as you know he suggested negative. I agreed to get back to you with a written decision as soon as any had been made. I like to remind you that you indicated that I could expect the letter the week after our meeting . I did not refuse you a copy of my notes. Since you couldn't give me a final version of the letter that you read to me, I asked for a copy of the draft letter, which you refused.


As you know the integration process is a difficult process where strategic decisions need to made. Officers of Autonomy met with group-level officers of Verity in December 2005 to discuss the future strategy of Verity.  This meeting did not include regional executives like yourself, (I disagree, all direct report to Verity's CEO/President Anthony Bettencourt were

there, except me. Mike Mooney was my peer, running 'the Americas') with the exception of Mike Mooney and Jack Landers who were recommended for promotion to group level roles. During the integration there were isolated instances (incorrect, I have significant proof in writing, even e-mails from surprised Verity clients, that this happened structural across my region, in APAC as well as in Europe. Autonomy contacted strategic accounts like Israeli Aircraft Industries in Israel, Air France in France, various Verity partners across Europe. I even have a written statement from Mike Lynch that the reported incidents were old/prior acquisition announcement, but I can prove that that was not the case) of over-eager sales personnel seeking to short-term sales who contacted customers, but these were stopped when discovered.   There was no group policy as you seem to imply to steer existing Verity customers to Autonomy, as indeed this would have been a breach of antitrust legislation.   At a group level certain synergies were required by the transaction, and these decisions were made by your senior officers within their discretion.   Managers within the European operations were informed that your position is under review and that no final decision has been made, as is the case. No, my people and partners were told that I am out: "Hugo will no longer be working for the company". I do also have such proof in written form.


I did not inform you during our call on 5 January that Autonomy would not offer you an equal position.  I have clarified this twice by email in open correspondence, which you have received.  To the best of my knowledge you have not had any reduction in any benefits during the consultation period. Incorrect, in Feb. 06 I got paid GBP 18k, although my average last 12 months payment was GBP 31k-32k.


We are continuing to review the position and hope to continue consultations shortly.


Best regards,


Andrew Kanter
Autonomy

HS-0186

HS-0187

23-MEI-06  18:16    Van-Nauta Dutilh    +31 20 7171338    +31-20-7171338    T-533    P.02/24    F-043

# NautaDutilh

Postbus 7113
1007 JC Amsterdam
Strawinskylaan 1999
1077 XV Amsterdam
T +31 20 717 10 00
F +31 20 717 11 11

J.A. de Roos
T + 31 20 71 71 890
F + 31 20 71 71 338
jochem.deroos@nautadutilh.com

Amsterdam, 23 mei 2006

De griffier van de
Rechtbank te Utrecht
sector kanton, locatie Utrecht
Postbus 16008
3500 DA UTRECHT
**fax: 030 22 33 842**

Edelachtbare heer, vrouwe,

JdR/mr/50068579b01 - Autonomy/Slumer
**Uw kenmerk: 466781 EJ VERZ 06-1375**

Hierbij zend ik u in tweevoud het verweerschrift in bovengenoemde zaak, waar-
van ik u de producties morgen per koerier doe toekomen, voor de zitting van 30
mei a.s. te 15.15 uur.

Kopie van deze fax zend ik naar mr. J. van der Pijl. Ik zal mr Van der Pijl mor-
gen tevens de producties per koerier doen toekomen.

Met vriendelijke groet,

NautaDutilh N.V.
J.A. de Roos

Amsterdam
Brussel
Londen
Luxemburg
New York
Rotterdam

NautaDutilh N.V. is gevestigd te Rotterdam en ingeschreven in het handelsregister onder nummer 24338323
Alle diensten en (andere) werkzaamheden worden verricht uit hoofde van een overeenkomst tot opdracht met
NautaDutilh N.V. Op de overeenkomst zijn van toepassing de algemene voorwaarden van NautaDutilh N.V.
Deze algemene voorwaarden bevatten onder meer een beperking van aansprakelijkheid, zijn gedeponeerd ter
griffie van de Rechtbank te Rotterdam, zijn in te zien op www.nautadutilh.com en worden op verzoek kosteloos
toegezonden
ABN AMRO Bank 46.69.93.293, Fortis Bank 64 21 43 218, Postbank 50296; ten name van Stichting Beheer
Derdengelden Advocatuur NautaDutilh

50068579 AMS C 418550 / 1

HS-0188

+31 20 7171338       ● NautaDutilh

1

Amsterdam, 23 mei 2006

**VERWEERSCHRIFT** ex artikel 7:685 BW TEVENS VERZOEK TOT
ONTBINDING VAN DE ARBEIDSOVEREENKOMST ex artikel 7:685 BW

Rechtbank Utrecht
sector kanton – locatie Utrecht

Geeft eerbieding te kennen·

De vennootschap met beperkte aansprakelijkheid **VERITY BENELUX B.V.**,
hierna te noemen: "Verity/Autonomy", gevestigd te De Meern, kantoorhoudende
te (3439 NG) Nieuwegein aan de Coltbaan 31, te dezer zake woonplaats kiezende
te Amsterdam aan de Strawinskylaan 1999 (Postbus 7113, 1007 JC), ten kantore
van NautaDutilh N.V., van wie de advocaat en procureur mr. M. Ritmeester en
mr. J.A de Roos door haar tot gemachtigden worden gesteld met het recht van
substitutie.

1.  Verity/Autonomy heeft kennisgenomen van het verzoekschrift dat de heer
    **HUGO SLUIMER**, hierna te noemen: "Sluimer", woonachtig te Monaco,
    te dezer zake woonplaats kiezende te (1016 DV) Amsterdam aan de Kei-
    zersgracht 221, ten kantore van DingemansVanderKind advocaten van wie
    de advocaat en procureur mr. Van der Pijl als gemachtigde optreedt, heeft
    ingediend in april 2006.

2.  Verity/Autonomy wenst zich tegen het verzoek van Sluimer te verweren en
    voert daartoe het volgende aan.

50068579 AMS C 410536 / 19

HS-0189

23-MEI-06 18:17   Van-Nauta Dutilh                    +31-20-7171338        T-593  P.04/24  F-643
+31 20 7171338

Nauta*Dutilh*

2

**Samenvatting**

3.    Sluimer heeft zijn verzoek tot ontbinding van de arbeidsovereenkomst
gebaseerd op gewichtige redenen zijnde verandering in omstandigheden,
welke van dien aard zijn, dat de arbeidsovereenkomst behoort te eindigen.
In de toelichting daarop lijkt Sluimer te menen dat hij recht heeft op een
vergoeding op grond van (a) het Verity Inc., Change in Control and Seve-
rance Benefit Plan (the "Plan"), productie 4 bij het verzoekschrift. De ver-
goeding zou volgens Sluimer moeten worden berekend op grond van Ne-
derlands recht, ongeacht of zijn arbeidsovereenkomst daadwerkelijk is be-
eindigd (wat het niet is). Sluimer lijkt voorts te menen dat hij recht heeft op
een vergoeding op grond van (b) een vertrouwensbreuk, die volgens Slui-
mer te wijten is aan Verity/Autonomy, welke hem op grond van artikel
7.685 BW een vergoeding zou moeten doen toekomen. Verity/Autonomy
ontkent al hetgeen Sluimer in haar verzoekschrift heeft gesteld en heeft op-
gemerkt, voor zover zij één en ander hierna niet uitdrukkelijk erkent.

4     Verity/Autonomy zal hieronder gemotiveerd aantonen dat van hetgeen
Sluimer stelt, geen sprake is. De argumenten gebaseerd op het Plan zijn
niet relevant en de aantijgingen dat de vertrouwensbreuk te wijten zou zijn
aan Verity/Autonomy, zijn onjuist. De vertrouwensbreuk tussen Veri-
ty/Autonomy en Sluimer is immers in het geheel aan Sluimer te wijten.

**Feiten**

5.    Verity/Autonomy is van mening dat Sluimer na en al voor de overname
van Verity door Autonomy alles in het werk heeft gezet om een positie te
creëren die hem een hoge vergoeding zou opleveren en dat hij niet meer
wilde werken. Sluimer heeft dit gedaan door (i) te proberen het Veri-
ty/Autonomy in de mond te leggen dat zij van mening was dat er geen al-
ternatieve functie voor Sluimer zou bestaan en aan te dringen op een ont-
binding, en (ii) toen Verity/Autonomy Sluimer, tegen zijn eigen plannen in,
wel een alternatieve functie had aangeboden, deze functie geen enkele kans
te geven en direct af te wijzen. Verity/Autonomy heeft daarentegen vanaf
het begin gezocht naar een geschikte alternatieve positie voor Sluimer, met
dezelfde arbeidsvoorwaarden en groeimogelijkheden. In plaats van mee te
werken aan dit proces, heeft Sluimer al voordat hij ook maar bericht had
ontvangen over het mogelijke verval van zijn vroegere functie, alles in het

HS-0190

werk gesteld om door Verity/Autonomy te worden "uitgekocht".

6.  Het is aldus niet Verity/Autonomy die Sluimer geen geschikte, alternatie-
ve, functie heeft geboden, maar Sluimer die eenvoudigweg niet meer wenst
te werken Meerdere keren heeft Sluimer aangegeven dat hij moe is en niet
wenste mee te werken. Nog voordat Sluimer de brief had ontvangen over
het mogelijke vervallen van zijn functie, sterker nog, nog voordat de over-
name van Verity door Autonomy rond was, heeft Sluimer op 28 december
2006 een e-mail gezonden aan de heer Weenink ("Weenink") waarin Slui-
mer duidelijk blijk geeft van zijn bedoelingen: Sluimer wilde niet meer
werken en hij wenste een hoge vergoeding te ontvangen (**productie 1**).
Sluimer hoopte dat Weenink voor hem een beëindiging van de arbeids-
overeenkomst kon regelen, met een hoge vergoeding. Zo schrijft Sluimer:

*'Hierbij nog wat basic input van mijn kant, ik reken op jouw 'dealmaking'
evaring:'*

Als argumenten (die Weenink zou kunnen aanvoeren) waarom Autono-
my/Verity beter de arbeidsovereenkomst kan beëindigen, schrijft Slui-
mer.

*'-Mij nu afkopen gaat ten laste van reorg. kosten, op termijn moeten ze
toch van mij af en dan gaat het ten koste van operationele kosten '*

en

*'-Overeenkomstig de bescherming van het NL arbeidsrecht kan men niet om
de exit bedragen heen, ik accepteer dan ook niet minder.'*

7.  In deze mail heeft Sluimer ook de werkelijke reden waarom hij de arbeids-
overeenkomst wil beëindigen gegeven. Hij schrijft:

*'-ik werk reeds 32 jaar, waarvan 62 kwartalen bij Verity, natuurlijk ben ik
'op'.'*

In een telefoongesprek met de heer Kanter ("Kanter"), de COO van Auto-
nomy, op 4 april 2006 heeft Sluimer eveneens toegegeven dat hij door zijn
leeftijd geen mogelijkheden ziet in de nieuwe functie. Op de suggestie van
Kanter dat hieruit bleek dat Sluimer zijn beslissing reeds genomen had dat

50068579 AMS C 410536 / 19

hij zou weigeren te blijven werken bij Verity/Autonomy, zei Sluimer dat dat waar zou zijn (**productie 2**). Het is aldus niet Verity/Autonomy die voor een vertrouwensbreuk heeft gezorgd, maar Sluimer zelf.

8.  Sluimer stelt voorts dat hij vanaf 1 april 2003 uitgezonden naar het Verenigd Koninkrijk. Dat is op zich juist, maar Verity/Autonomy wenst te verduidelijken dat deze uitzending uitsluitend op Sluimer's eigen aandringen heeft plaatsgevonden. Een afspraak tussen Sluimer en de Engelse belastingdienst zorgt er namelijk voor dat Sluimer het betalen van loonbelastingen tot een minimum kan beperken (**productie 3**). De afspraak houdt, kort gezegd, in dat Sluimer slechts vijf procent over zijn vanuit Engeland ontvangen salaris dient te betalen. Over het (kleine) deel van het salaris dat Sluimer vanuit Nederland ontvangt, dient hij slechts belasting te betalen gedurende de dagen dat hij ook daadwerkelijk in Nederland verblijft. De in Nederland doorgebrachte dagen (17 dagen in de afgelopen drie jaar) zijn dan ook de afgelopen jaren door Sluimer tot een minimum beperkt, aangezien hij verder in Monaco woont. Dat Sluimer de komende jaren in Monaco wenst te blijven wonen, blijkt wel uit de twee appartementen die hij daar onlangs gekocht heeft.

9.  Sluimer stelt in zijn verzoekschrift dat Verity/Autonomy van mening is dat Engels recht van toepassing zou zijn op zijn arbeidsrelatie. Dit is niet juist. Wel heeft Verity/Autonomy gezien de bovenstaande belastingregeling vraagtekens gezet bij het van toepassing zijn van Nederlands recht. Sluimer betaalt immers vrijwel geen belasting in Nederland. Verity/Autonomy is van mening dat Sluimer van twee walletjes probeert te eten, wanneer het hem maar uitkomt. Hij betaalt maar zeer beperkt belasting en premies in Nederland, maar wenst wel gebruik te maken van de voor hem gunstige regels aangaande ontslag in Nederland. Dat Verity/Autonomy overigens het toepasselijke recht in het midden heeft gelaten – en dus niet heeft gezegd dat Engels recht van toepassing is – blijkt wel uit e-mail correspondentie tussen Sluimer en Andrew Kanter ("Kanter"), de COO van Verity/Autonomy. Zo schrijft Kanter op 10 april 2006 (**productie 4a**)

*'I therefore do not comment on the calculations to be made in such a case or the applicable law'.*

Omdat Sluimer steeds Verity/Autonomy in de mond wil leggen dat zij van mening is dat Engels recht van toepassing is, bevestigt Kanter op 11 april

HS-0192

23-MEI-06  18:17    Van-Nauta Dutilh            +31-20-7171338    T-533  P.07/24  F-643

+31 20 7171338    ●    NautaDutilh

5

2006 nogmaals dat Verity/Autonomy het toepasselijke recht in het midden laat **(productie 4b)**

*'As noted in my email below, I do not comment on whether Dutch law is applicable.'*

**Waarom juist is gehandeld ten opzichte van Sluimer**

10. Sluimer stelt in zijn verzoekschrift dat hij geruime tijd in onzekerheid is gelaten over de wijze waarop en wanneer zijn ontslag gestalte zal krijgen, ondanks de heldere afspraken daarover in het "Change in Control Plan" en de "Participation Notice". Sluimer meent dat de aangeboden baan eind maart, uitsluitend zou zijn gedaan om te voorkomen dat een beëindigingsvergoeding zou moeten worden betaald. Al hetgeen Sluimer stelt in punt 11 is onjuist. Verity/Autonomy zal dit aantonen door hieronder chronologisch uiteen te zetten wat er heeft plaatsgevonden vanaf de eerste brief van 29 december 2005.

11. De overname van Verity door Autonomy is op 29 december 2005 afgerond. Op deze datum is een reorganisatie beoordeling gestart, welke uit twee stadia bestond (samen verder, "consultation period"). (i) Alle functies zijn beoordeeld op de vraag of de functie wellicht zou moeten komen te vervallen, en (ii) vervolgens werd er, in geval van verval van functie, gezocht naar alternatieve functie binnen het bedrijf. De werknemers waarvan de positie mogelijk zou komen te vervallen, zijn zo snel mogelijk hiervan op de hoogte gesteld. In de eerste brief van Verity/Autonomy aan Sluimer van 29 december 2005 (productie 7 verzoekschrift) heeft Verity/Autonomy in de eerste twee alinea's de overname van Verity door Autonomy toegelicht. In de derde alinea schrijft Verity/Autonomy:

*The company is committed to avoiding termination of your employment by reason of redundancy if it can do so. To this end we invite you to a consultation meeting on January 11, 2006 to discuss your position, the transaction and consult with your regarding any suitable alternative positions within the Company during (t)he consultation period.'*

12. Overigens wenst Verity/Autonomy nog op te merken dat de brief van 29 december 2005 niet geantedateerd is. Deze brief is verzonden op dezelfde datum als dat de brief is gedateerd, te weten 29 december 2005. Aangezien

HS-0193

+31 20 7171338                  NautaDutilh

6

Verity/Autonomy gedurende de kerst en oud en nieuw periode zo goed als
dicht was en de post in deze tijd eveneens vertraging op heeft gelopen,
heeft Sluimer de brief pas een aantal dagen later ontvangen.

13.    Het management van Verity/Autonomy is meerdere malen bijeengekomen
om de alternatieve functies te bespreken. Dit zowel tijdens informele be-
raadslagingen als formele bijeenkomsten. Verity/Autonomy heeft zich ge-
durende de consultation period ingezet om een geschikte alternatieve, ge-
lijkwaardige, functie te vinden voor Sluimer. Juist gezien Sluimer's staat
van dienst was er Verity/Autonomy veel aan gelegen om Sluimer te be-
houden. Gedurende deze periode, bedoeld om in overleg met Sluimer een
alternatieve functie te vinden, behield Sluimer dan ook al zijn arbeids-
voorwaarden, waaronder doorbetaling van zijn salaris, commissies en op-
tierechten. In totaal heeft Sluimer gedurende de consultation period een
vergoeding ontvangen van meer dan EUR 500.000.

14.    Dat Sluimer gedurende deze consultation period niet op de hoogte werd
gehouden en pas eind maart alsnog een baan kreeg aangeboden is eveneens
niet juist. Op 22 februari, 3 maart en 20 maart 2006 (**productie 5a, b en c**)
is Sluimer op de hoogte gehouden van het proces rondom het vinden van
een alternatieve functie. Daarnaast is er in de tussenliggende periode gere-
geld contact geweest tussen Verity/Autonomy en Sluimer over zaken die
daaromheen speelden. Verity/Autonomy begrijpt dan ook niet waar Slui-
mer het standpunt op baseert dat hij niet op de hoogte is gehouden gedu-
rende de consultation period.

15.    Gedurende deze periode is Sluimer overigens niet zomaar op non actief
gezet, zoals hij stelt. Aangezien de voormalige functie van Sluimer door de
reorganisatie was vervallen, kon hij gedurende the consultation period deze
functie eenvoudig weg niet meer uit oefenen. In de brief van 29 december
2005 (productie 7 verzoekschrift) staat dan ook.

*During the consultation period you will not be required to attend the com-*
*pany offices, however you will be afforded reasonable access should it be*
*required to conduct required company business '*

16.    Tot slot dient opgemerkt te worden dat het Sluimer was die niet wenste
mee te werken aan het vinden van een alternatieve functie. Sluimer ver-
draaide de woorden van Verity/Autonomy om zijn gedachte, dat deze func-

50068579 AMS C 410536 / 19

HS-0194

tie niet zou bestaan, kracht bij te zetten. Zo stuurde Sluimer op 6 januari
2006 een e-mail (productie 6), waarin hij schrijft:

*'...after you called me yesterday to inform me that there is no similar posi-
tion for me available at Autonomy...'*

Kanter antwoordde hier dezelfde dag nog op (productie 7):

*'In our phone call yesterday I said that your position may be at risk of re-
dundancy because of a number of structural elements of the new company.
I asked whether in light of this risk you had any ideas what might be a suit-
able alternative position in the company. You said that you did not believe
there was an alternative position, and since this was the case perhaps it
was best to discuss whether a suitable settlement could be reached quickly.*

Vier dagen later, op 10 januari 2006, heeft Sluimer nogmaals in een e-mail
aan Kanter herhaald dat er volgens Verity/Autonomy geen alternatieve
functie zou zijn (productie 8). Sluimer doet doodleuk alsof dit niet zo juist
is tegengesproken. Zo schrijft Sluimer.

*'In the letter of December 29, 2005, a consultation meeting on January 11,
2006 is mentioned. I assume that, based on the tellcall we had, that this
meeting lost its value, since you are of the opinion that in my case no alter-
native position can be identified'*

Aangezien Verity/Autonomy juist wel een alternatieve functie voor Slui-
mer wenste te vinden, en dit ook aan Sluimer duidelijk wilde maken, zond
Kanter hem dezelfde dag nogmaals een e-mail terug (productie 9 ) waarin
staat:

*'The 11 January 2006 consultation meeting mentioned in the letter is not
"lost value"...
.. I must also point out again (as I did in the attached email, to which I ha-
ve not yet received a response) that I did not state that is was my opinion
that no alternative position can be identified'*

17.    Het is gezien het bovenstaande duidelijk dat Sluimer zijn eigen conclusies
heeft getrokken voor de brief van 29 december 2005: Sluimer had er geen
behoefte aan om bij Verity/Autonomy te blijven en hij probeerde uitslui-

+31 20 7171338

*NautaDutilh*

8

tend een zo hoog mogelijke vergoeding te krijgen, op wat voor manier dan
ook. Dit bleek overigens ook al uit zijn opstelling in de e-mail van 28 de-
cember aan Weenink (productie 1).

### Change in Control Plan

18.    In punt 12 en verder bij verzoekschrift meent Sluimer dat als gevolg van de
"change in control", de arbeidsovereenkomst beëindigd dient te worden
met een daarbij behorende vergoeding. Autonomy heeft Verity overgeno-
men en dus ook haar Nederlandse dochter, Verity Benelux B.V. Daarom
stelt Sluimer dat er sprake is van een overgang; ofwel een change of con-
trol. Sluimer stelt daarna dat zijn positie als gevolg van de change of con-
trol is vervallen. Volgens Sluimer is het Plan op hem van toepassing als-
mede de daarin opgenomen beëindigingsvergoeding. Verity/Autonomy zal
hieronder motiveren dat de arbeidsovereenkomst niet dient te worden be-
eindigd (met een vergoeding voor Sluimer) op grond van het Plan, omdat
(i) Sluimer niet heeft voldaan aan de vereiste documentatie om aanspraak
te kunnen maken op enige bepaling uit het Plan, (ii) er sprake is van de uit-
zondering van "immediate reemployment", waardoor de bepalingen in het
Plan niet opgaan en (iii) omdat het Plan slechts voorziet in een vergoeding
in het geval de Vennootschap tot beëindiging van het dienstverband over-
gaat, niet wanneer de werknemer beëindiging verzoekt.

19.    (i) **Sluimer heeft niet voldaan aan de formele vereisten van het Plan**
Sluimer heeft niet voldaan aan de vereisten van het Plan zodat dat Plan niet
op hem van toepassing is. Zo staat in het Plan (productie 4 verzoekschrift)

*'SECTION 3. Eligibility For Benefits*

    *(b)    Exceptions to Benefit Entitlement. An employee, including an
employee who otherwise is a Participant, will not receive benefits under
the Plan (or will receive reduced benefits under the Plan) in the following
circumstances, as determined by the Company in its sole discretion:*

*(iv)*

*the employee does not confirm in writing that he or she shall be subject to
the Company's Confidentiality Agreement and Non Compete Agreement'*

50068579 AMS C 410536 / 19

+31 20 7171338    *NautaDutilh*

9

Verity/Autonomy heeft de bovenstaande bevestiging van de confidentiality agreement en non compete agreement nooit van Sluimer ontvangen. Derhalve kan Sluimer ook geen aanspraak maken op enige bepaling in het Plan, waaronder een vergoeding bij beeindiging van het dienstverband. Het is overigens dan nog steeds aan Verity/Autonomy om te bepalen of bovengenoemde uitzondering zich voordoet ('*as determined by the Company in its sole discretion*').

20.  Daarnaast heeft Sluimer niet voldaan aan de vereiste procedure van Section 11 van het Plan, Claims, Inquiries and Appeals. In dit hoofdstuk staan de te nemen procedurele stappen voor een aanvraag op grond van het Plan. In Section 11(f) staat:

'*No legal action for benefits under the Plan may be brought until the applicant has (i) submitted a written applicant for benefits in accordance with the procedures described in Section 11(a) above, (ii) has been notified by the Plan Administrator that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 11(c) above, and (iv) has been notified that the Plan Administrator has denied the appeal.*'

21.  Sluimer is echter pas begonnen de bovenstaande procedure te volgen nadat hij deze ontbindingsprocedure was begonnen (**productie 10**). Ondanks dat Sluimer de procedures van het Plan niet gevolgd had, heeft Kanter zijn verzoek alsnog beantwoord op 3 mei 2006 (**productie 11**). De procedure is niet uitgevoerd op het juiste moment en ook niet voltooid. Sluimer kan derhalve geen beroep doen op enige bepaling uit het Plan. Overigens dient opgemerkt te worden dat het Plan beheerst wordt door het recht van Californië en ook dienovereenkomstig moet worden uitgelegd.

22.  (ii) "**Immediate Reemployment**"
Naast de bovenstaande reden, maakt Sluimer eveneens geen aanspraak op een vergoeding omdat er sprake is van "immediate reemployment". In het Plan staat immers in dezelfde Section 3, dat een werknemer geen aanspraak kan maken op enige vergoeding in het geval:

'*(iii)    The employee is offered immediate reemployment by a successor to the Company or by a purchaser of its assets, as the case may be, following a change in ownership of the Company or a sale of all or substantially*

*ull the assets of a division or business unit of the Company.'*

Vervolgens wordt uitgelegd wat er onder deze immediate reemployment wordt verstaan:

*'For purposes of the foregoing, "immediate reemployment" means that the employee's employment with the successor to the Company or the pur-chaser of its assets, as the case may be, results in uninterrupted employ-ment such that the employee does not suffer a lapse in pay as a result of the change in ownership of the Company or the sale of its assets.'*

23. De definitie die het Plan geeft aan immediate reemployment, is dat er geen verval van loon mag zijn voor de werknemer. Sluimer heeft geen verval in salaris (en bonussen) gekend. Niet gedurende de consultation period, en ook niet in zijn nieuwe functie. Sterker nog, Sluimer heeft de afgelopen vijf maanden EUR 142.000 ontvangen aan salaris en bonussen. Indien de uit-geoefende opties daarbij worden opgeteld, komt dit bedrag zelfs uit op EUR 500.000. De uitzondering van Section 3 (b) (iii) is dan ook niet van toepassing en Sluimer heeft op grond van het Plan geen recht op beëindi-ging van de arbeidsovereenkomst, laat staan onder de toekenning van een vergoeding.

24. Sluimer stelt eigenaardig genoeg dat er geen sprake zou zijn van immediate reemployment omdat hij drie maanden aan het lijntje zou zijn gehouden, en pas bij de brief van 23 maart 2006 benoemd is als Senior Vice President of Neurodynamics. Hetgeen Sluimer stelt is – zoals hierboven al gesteld – niet juist. Een periode tussen de functies is immers geen element in de vraag of er sprake is van immediate reemployment. De definitie van immediate re-employment dient te worden gevolgd, zoals deze in het Plan is gegeven. Deze definitie in het Plan stelt duidelijk dat enkel van belang is of er na de change in control verval is in loon (wat niet het geval is). Ook het op non-actief staan, waarvan Sluimer meent dat dit immediate reemployment in de weg staat, is geen onderdeel van de door het Plan gehanteerde definitie. Dat er overigens helemaal geen sprake is van een *'aan het lijntje'* houden, blijkt wel uit punt 10 tot en met 17 van dit verweerschrift. Daarbij komt nog dat de vraag of deze uitzondering zich voordoet op grond van hetzelfde Plan uitsluitend door Verity/Autonomy dient te worden beantwoord: *'as de-termined by the Company in its sole discretion'.*

50068579 AMS C 410536 / 19

HS-0198

25.    In punt 21 erkent Sluimer dat hij gedurende de consultation period zijn
salaris gewoon doorbetaald heeft gekregen. Echter, hij stelt dat hij ver-
moedt niet zijn volledige bonus te hebben ontvangen. In werkelijkheid zijn
de aan Sluimer toegekende commissies gebaseerd op precies dezelfde be-
rekeningen als voorheen, welke automatisch zijn berekend volgens het
reeds bestaande Verity systeem. Deze zijn overigens door de finance con-
troller van Verity Benelux B.V. uitgevoerd. In deze berekening is de com-
missie gebaseerd op de prestaties van het regionale team. Sluimer vermeldt
in zijn verzoekschrift niet dat in de afgelopen jaren, met name sinds augus-
tus 2005, op het gebieden waar Sluimer verantwoordelijk voor was, sub-
stantieel mindere resultaten zijn bereikt. Deze daling vond ook plaats in
landen als Frankrijk, Duitsland en Japan, die niets met de overname van
Verity te maken hadden. In landen die niet onder de verantwoordelijkheid
van Sluimer vielen, zoals Amerika, Canada en landen in Zuid-Amerika,
waren de cijfers van dezelfde afdeling wel positief. Gevolg hiervan was dat
de commissie van Sluimer over deze periode lager was, maar niet door
enige inhouding van Verity/Autonomy.

26.    **(iii) Geen ontbinding door Vennootschap**
Tot slot merkt Verity/Autonomy over het Plan nog het volgende op. In het
Plan en de daarbij behorende Participation Notice is uitsluitend opgenomen
dat in het geval de vennootschap na een change in control overgaat tot be-
eindiging van het dienstverband, een vergoeding betaald dient te worden.
In het geval van Sluimer zou dit een vergoeding zijn onder Nederlands
recht. In zijn geval is echter door de vennootschap niet overgegaan tot be-
eindiging van het dienstverband. Sluimer heeft een alternatieve functie
aangeboden gekregen, welke gelijke arbeidsvoorwaarden biedt als zijn
voormalige functie. Los van het feit dat het Plan gezien de in punt (i) en (ii)
behandelde uitzonderingen niet van toepassing is op Sluimer, is er van een
beëindigingsvergoeding voor Sluimer op grond van het Plan geen sprake.
Partijen zijn, in tegenstelling tot hetgeen Sluimer beweert, uitdrukkelijk
niet overeengekomen dat Sluimer gerechtigd is tot een beëindigingvergoe-
ding naar Nederlands recht. Dit recht zou slechts kunnen bestaan in het ge-
val Verity/Autonomy tot een beëindiging van het dienstverband was over-
gegaan (en Sluimer aan de vereiste voorwaarden van documentatie had
voldaan). In werkelijkheid heeft niet Verity/Autonomy, maar is het Sluimer
die een ontbinding van het dienstverband verzoekt.

HS-0199

+31 20 7171338

## NautaDutilh

12

27.    Sluimer stelt voorts dat zijn collega's wel op grond van het Plan een beëindigingsvergoeding hebben ontvangen naar Nederlands recht. Ook dit is niet juist. Geen van de collega's van Sluimer, die in aanmerking kwamen voor het Plan, hebben op grond van het Plan een beëindigingsvergoeding ontvangen. Slechts een collega zat in een situatie die te vergelijken is met die van Sluimer. Met hem is echter een vertrouwelijke beëindigingsovereenkomst getroffen, zonder dat het Plan daar iets mee te maken heeft gehad.

### Vergelijkbare functie

28.    In punt 24 van zijn verzoekschrift stelt Sluimer dat er voor de functie van Senior Vice President of Neurodynamics geen strategie en businessplan en geen functiebeschrijving voor handen zijn, waardoor het aanbod te gaan werken bij Neurodynamics "gratuit" zou zijn geweest. Verder stelt Sluimer dat de aangeboden functie slechts gericht is geweest op het voorkomen van het betalen van een beëindigingsvergoeding. Tot slot stelt Sluimer ook nog dat Verity/Autonomy pas na verloop van tijd werk wilde maken van de invulling van de functie van Sluimer bij Neurodynamics. Het verbaast Verity/Autonomy dat Sluimer deze stellingen inneemt. Om een duidelijk beeld geven van wat er daadwerkelijk is gebeurd na het aanbieden van de functie van Senior Vice President of Neurodynamics, zal Verity/Autonomy hieronder de gang van zaken chronologische uiteenzetten.

29.    Na verschillende beraadslagingen en bijeenkomsten van het management tussen december 2005 en maart 2006 om tot een besluit te komen, heeft Kanter op 22 maart 2006 Sluimer gebeld om hem op de hoogte te stellen van de functie die Verity/Autonomy voor hem had gevonden, de functie van Senior Vice President of Neurodynamics. Kanter heeft in dit gesprek kort uitgelegd wat de Afdeling Neurodynamics inhoudt en waarom volgens hem Sluimer geschikt is voor deze functie. In dit gesprek heeft Kanter vermeld dat de arbeidsvoorwaarden voor Sluimer in deze functie gelijk zijn aan zijn vorige functie en dat zijn commission plan zou worden aangepast om hem in staat te stellen dezelfde commissie te verdienen. Kanter sloot het gesprek af met het verzoek het hoofd van de afdeling te bellen om de inhoud van de functie verder te bespreken. Een samenvatting van dit gesprek, gemaakt door Kanter direct na het telefoongesprek, wordt overgelegd als **productie 12**.

HS-0200

**Nauta**Dutilh

13

30.  Een dag later, op 23 maart 2006, heeft Sluimer van Kanter een bevestiging
     ontvangen van zijn nieuwe functie binnen Neurodynamics (productie 8 van
     het verzoekschrift). Kanter heeft Sluimer tot slot uitgenodigd om contact
     met hem op te nemen om de functie verder te bespreken, indien Sluimer
     daar behoefte aan had. In de begeleidende e-mail bij deze brief werd Slui-
     mer verzocht contact op te nemen met David Humphrey ("Humphrey"),
     Managing Director of Neurodynamics **(productie 13)**.

31.  Op vrijdag 24 maart 2006 is er vervolgens een kort telefonisch contact
     tussen Humphrey en Sluimer geweest. Humphrey legde Sluimer in dit ge-
     sprek in hoofdlijnen uit wat zijn rol ging worden binnen Neurodynamics en
     wat er met de afdeling staat te gebeuren. Direct na het weekend, op maan-
     dag 28 maart 2006, heeft Humphrey Sluimer uitgenodigd om elkaar de
     week daarna in Amerika te ontmoeten om, tijdens een voor Neurodynamics
     erg belangrijke beurs, de zaken, en de functie van Sluimer, uitgebreider te
     bespreken **(productie 14)**.

32.  Sluimer reageerde echter niet op deze uitnodiging. Op 30 maart 2006 heeft
     Kanter hem daarom een e-mail gezonden waarin hij Sluimer vraagt waar-
     om hij nog geen uitgebreid contact heeft gehad met Humphrey over zijn
     functie **(productie 15)**. Kanter heeft verder Sluimer verzocht, gezien de
     snelle groei van de markt, snel aan de slag te gaan. De volgende dag, 31
     maart 2006, heeft Humphrey in een e-mail bevestigd dat hij nog steeds
     niets van Sluimer heeft gehoord **(productie 16)**

33.  Later op dezelfde dag, 31 maart 2006, heeft Sluimer opeens een e-mail aan
     Kanter gezonden waarin hij schrijft dat hij niet tevreden was over het ge-
     sprek met Humphrey **(productie 17)**. Sluimer stelde zich in deze e-mail op
     het standpunt dat er geen *'business plan/strategy/job specification'* was en
     dat hij (Sluimer) volgens Humphrey aan hem (Humphrey) moet rapporte-
     ren. Dit was volgens Sluimer anders afgesproken. Sluimer stelde zich ver-
     der op het standpunt dat hij niet naar de belangrijke beurs in Amerika
     wenste te gaan en hij gaf toen al aan dat hij niet van plan was de aangebo-
     den functie te accepteren.

34   Dezelfde dag nog reageerde Kanter op dit teleurstellende bericht van Slui-
     mer in een e-mail **(productie 18)** Kanter uitte in deze e-mail de hoop dat
     de beslissing van Sluimer in ieder geval niet gebaseerd was op de erg korte
     communicatie die er tot op dat moment over zijn functie en de afdeling

HS-0201

+31 20 7171338        NautaDutilh

14

Neurodynamics had plaatsgevonden

*'However I would hope that any decision is made based on more than our 10 minute phonecall and the short communication you has with David Humphries, which you have described as inadequate.'*

35    Op 1 april 2006 (een dag later) heeft Humphrey in een e-mail aan Sluimer verzocht of Sluimer hem kan bellen over de ontmoeting in Amerika (**productie 19**). Humphrey heeft tot op dat moment immers nog steeds niets gehoord van Sluimer. Sluimer beantwoorde deze e-mail de volgende dag (2 april 2006) door een ietwat aangepaste versie van de e-mail van 31 maart 2006 aan Kanter, ook aan Humphrey te sturen (**productie 20**). Verrast door de inhoud van de e-mail van Sluimer, heeft Humphrey een e-mail gezonden aan Kanter waarin hij schrijft dat de informatie, waar Sluimer een beroep op doet en zijn afwijzing van de functie op baseerde, helemaal niet van hem (Humphrey) afkomstig is (**productie 21**).

36    Een dag later, op 3 april 2006, heeft Sluimer een e-mail aan Kanter gezonden waarin zijn instelling nogmaals werd bevestigd (**productie 22**). Sluimer is niet bereid geweest om enige energie te steken in het creëren van een nieuwe passende functie voor hem of om daar gesprekken over aan te gaan. Sluimer wil duidelijk zelf niet, ondanks alle inspanningen van Verity/Autonomy. Hij wenste in deze e-mail geen verdere gesprekken aan te gaan.

*'The offered position does not seem to be appropriate at all and I fail to see whether further talkings with you could really alter this situation.'*

Sluimer sluit af met te zeggen dat hij eigenlijk gewoon geld wil hebben, en dreigde derhalve met juridische stappen.

*'Especially I'd like to discuss with you on how we can avoid legal steps in this matter from my side. Be sure that I give preference to solve this matter amicably, but of course I need your cooperation for that.'*

37    Op 4 april 2006 heeft Kanter in een e-mail (**productie 23**) gereageerd, waarin hij nogmaals heeft geprobeerd Sluimer over te halen de aangeboden functie op zijn minst een kans te geven.

50068579 AMS C 410536 / 19

+31 20 7171338 ● *Nauta*Dutilh

15

*'I'm very surprised by your message. Below you complain that the position is not appropriate and that there is nothing to discuss. I note that the total discussions amount to our 10 minute phone call and your short call with David Humphrey. Neither I nor David discussed a business plan. You and I did discuss a job description. In any event, we have made ourselves available to help to continue to educate you, but neither of us have received inquiries. As noted in our call and in my letter, your compensation remains the same and this is one of the fastest growing, most exciting parts of our business. To be frank, the lack of inquiry has been unusual.'*

38.    Later die dag heeft er nog een telefoongesprek plaatsgevonden tussen Kanter en Sluimer. In dit telefoongesprek herhaalde Sluimer dat hij tot een beëindigingsregeling wenste te komen. Kanter heeft hierop gezegd dat Sluimer dan maar een voorstel moest doen. Op vrijdag 7 april 2006 is Sluimer vervolgens met een voorstel gekomen (**productie 24**), gebaseerd op een neutrale vergoeding volgens de kantonrechtersformule. Direct na het weekend, op maandag 10 april, heeft Kanter in een e-mail op dit voorstel geantwoord (**productie 25**). Kanter schreef in deze mail dat hij nog steeds teleurgesteld is dat Sluimer op basis van zo weinig informatie en gesprekken de aangeboden functie naast hem heeft neergelegd. Voorts schreef Kanter dat van een factor één (C=1) slechts sprake kan zijn in het geval Verity/Autonomy geen passende functie voor hem kon vinden en derhalve een ontbinding zou verzoeken. Dat is echter niet het geval. Kanter meldde daarom dat Verity/Autonomy het voorstel niet kan accepteren en dat Verity/Autonomy derhalve verwacht dat Sluimer zijn functie binnen Neurodynamics zou voortzetten.

39.    Terwijl Sluimer weigerde om zich in te zetten voor zijn nieuwe functie, bleef Verity/Autonomy proberen hem te helpen. Zo zond Kanter op 10 april 2006 een e-mail aan Sluimer met extra informatie over de markt waarin Neurodynamics zich in begeeft (**productie 26**). Op aandringen van Verity/Autonomy vond er op 18 april vervolgens een gesprek plaats tussen Rachel Haverfield (legal counsel Europe), Humphrey en Sluimer. Dat Sluimer geen enkele behoefte had om ook maar enige inzet te tonen blijkt wel weer uit de notulen die hij heeft gemaakt van de vergadering (**productie 27**). In antwoord op deze notulen schreef Humphrey aan Sluimer teleurgesteld te zijn in zijn negatieve interpretatie van de vergadering (**productie 28**). Ter verduidelijking heeft Humphrey in de notulen de opmerkingen van

50068579 AMS C 410536 / 19

HS-0203

NautaDutilh

16

Verity/Autonomy tussen vierkante haken geplaatst (productie 27).

40    Op 24 april 2006 heeft Kanter gehoor gegeven aan het verzoek van Sluimer
in de vergadering van 18 april 2006, en heeft hij hem een uitgebreide be-
schrijving van zijn rol en verantwoordelijkheden binnen Neurodynamics
gezonden (productie 29). In deze e-mail heeft Kanter tevens uitgelegd dat
Verity/Autonomy het tot op heden in elke afdeling en sub-afdeling zonder
businessplan heeft gedaan, en daarmee grote successen heeft geboekt. Kan-
ter vermeldde daarbij ook dat indien Sluimer er behoefte aan heeft, het op-
stellen van een businessplan binnen zijn bevoegdheden ligt. Kanter heeft
bovendien hiervoor de hulp van zichzelf en Humphrey aangeboden.

41    Een dag later (25 april 2006) heeft Kanter van Sluimer een e-mail ontvan-
gen waarin Sluimer te kennen heeft gegeven geen extra informatie te wil-
len en ook niet te willen praten over zijn functie (productie 30). Sluimer
gaf verder aan een procedure te zijn gestart. Weer een dag later (26 april
2006) ontving Verity/Autonomy dit verzoekschrift tot ontbinding van de
arbeidsovereenkomst van de rechtbank.

42.    Binnen een maand nadat hem een nieuwe functie is aangeboden, heeft Slui-
mer aldus aangegeven dat deze hem niet zint (productie 17). Sluimer heeft
elk aanbod voor gesprekken over de functie naast zich neergelegd. Sterker
nog, Sluimer heeft niet eens de moeite genomen om de door hem gewenste
veranderingen aan te geven. Verity/Autonomy is daardoor niet in de gele-
genheid gesteld om de functie aan te passen aan de wensen van Sluimer.
Sluimer heeft elke vorm van onderhandeling gemeden. Alles wijst er dan
ook op dat Sluimer een nieuw aangeboden functie – welke dan ook – in
zijn hoofd reeds geweigerd had voordat deze werd aangeboden. Sluimer
wenste, die conclusie is uit het bovenstaande wel te trekken, alleen geld
zien en geen andere functie. Dat getuigt naar het oordeel van Auto-
nomy/Verity van zeer slecht werknemerschap.

43.    Sinds het indienen van het verzoekschrift, heeft Sluimer nog altijd zijn
nieuwe functie niet opgepakt, ondanks de herhaaldelijke verzoeken om
zulks te doen. Ondanks directe verzoeken heeft Sluimer geweigerd de grote
beurs in Amerika te bezoeken en heeft hij sinds de bijeenkomst van 18
april 2006 geen contact gezocht of afgesproken met Humphrey of een van
de andere collega's van Neurodynics, noch heeft hij met iemand anders
binnen Verity/Autonomy contact gehad over zijn functie. Op 18 april 2006

HS-0204

+31 20 7171338

*NautaDutilh*

17

heeft is het nieuwe zakelijk e-mail account van Sluimer in werking getre-
den. Deze is echter zelden gebruikt, en iedere keer voor persoonlijke doel-
einden (productie 31).

44.     Sluimer meent dat de aangeboden functie onvergelijkbaar is met zijn vroe-
        gere functie. Sluimer geeft daarvoor als reden dat hij als Senior Vice Presi-
        dent of EMEA & APAC Operations of Verity een omzetverantwoordelijk-
        heid had van zo'n USD 50 miljoen, terwijl dat als Senior Vice President of
        Neurodynamics zo'n USD 5 miljoen zou zijn. De vergelijking die Sluimer
        maakt vertekent de werkelijkheid. In werkelijkheid ligt de afdeling Neuro-
        dynamics voor op zijn streven om vergelijkbare licentie opbrengsten te ge-
        neren als bij de voormalige afdeling van Sluimer.  Het is hierbij belangrijk
        EMEA & APAC Operations te onderscheiden in drie verschillende delen,
        te weten (i) Software Licence, (ii) Support contracts en (iii) Consulting ser-
        vices. Van deze drie onderdelen genereert alleen de afdeling Software li-
        cence winst.  De Neurodynamics afdeling ligt op koers om nieuwe contrac-
        ten te sluiten met nieuwe klanten, op hetzelfde niveau als Sluimer de afge-
        lopen jaren in zijn vorige functie heeft gedaan. De omzet van Neurodyna-
        mics, is weliswaar tot nu toe lager, maar de winst is beduidend hoger.

45.     Deze cijfers en doelstelling worden bevestigd in een e-mail die de heer
        Hussain ("Hussain"), Chief Financial Officer of the Autonomy Group, op
        27 april 2006 heeft gestuurd (productie 32). Derhalve is Neurodynamics
        voor Verity/Autonomy van enorme waarde. Zij is voor Autonomy een een
        absoluut kern onderdeel, welke sterk geïntegreerd is met de andere techno-
        logie van Autonomy en voor een paar van de grootste contracten van de
        afgelopen jaren heeft gezorgd.  De onlangs gesloten deals beschreven in de
        e-mail van Sushovan van 28 april 2006, bevestigen nog eens hoe belangrijk
        Neurodynamics is binnen Verity/Autonomy en hoe snel zij groeit (produc-
        tie 33).

46      Voorts meent Sluimer dat de aangeboden positie onvergelijkbaar is omdat
        er bij Neurodynamics zo'n 15 medewerkers zijn, terwijl dat er bij EMEA &
        APAC Operations meer dan 100 waren. Sluimer vermeldt daarbij echter
        niet dat zijn eigen prestaties uitsluitend werden gemeten naar inkomsten,
        niet hoeveelheid werknemers. Ook de vergelijking van de hoeveelheid
        werknemers zelf gaat echter niet op. Op de afdeling EMEA & APAC Ope-
        rations werken immers niet meer dan 68 medewerkers en was er een aan-
        name-stop  Op de afdeling Neurodynamics neemt het aantal werknemers

23-MEI-06  18:19   Van-Nauta Dutilh           +31-20-7171338      T-639  P.20/24  F-843

+31 20 7171338

*Nauta Dutilh*

18

juist snel toe. Zo is begin dit jaar al toestemming gegeven om Neurody-
namics uit te breiden met twee extra verkopers, twee software ontwikke-
laars, een verkoop ontwikkelaar en een Senior VP of Global Operations.

47.  Sluimer meent aldus dat er geen sprake is van een gelijke functie omdat de
     omzet en het aantal medewerkers niet gelijk is. Deze redenering doet wei-
     nig tot geen recht aan de aangeboden positie. Als beoogd Senior Vice Pre-
     sident of Neurodynamics zou Sluimer leiding geven aan één van de snelst
     groeiende afdelingen van Verity/Autonomy. Met een tot nu toe relatief
     kleine groep wordt een van de hoogste winstpercentages van Veri-
     ty/Autonomy gegenereerd. Verity/Autonomy is derhalve van mening dat
     de belangrijke functie van Senior Vice President ingevuld diende te worden
     met een zeer ervaren kracht in business development, die het enorme
     groeiproces van deze afdeling zou kunnen leiden. Sluimer zelf heeft opge-
     merkt dat hij degene is die Verity buiten Amerika heeft doen groeien van
     niets tot een miljoenenbedrijf **(productie 34)**. Derhalve heeft zij de functie
     aangeboden aan Sluimer, die jarenlange ervaring heeft op het gebied van
     leidinggeven en altijd naar tevredenheid heeft gefunctioneerd. De arbeids-
     voorwaarden, waaronder zowel het salaris als de commissie, zijn overigens
     bij deze functie precies gelijk aan de functie die Sluimer bij EMEA &
     APAC Operations had.

**Vertrouwensbreuk**

48.  Sluimer meent in zijn verzoekschrift dat er naast de change in control spra-
     ke is van een vertrouwensbreuk tussen hemzelf en Verity/Autonomy (door
     toedoen van Verity/Autonomy) die tot beëindiging van het dienstverband
     zou moeten leiden. Het is Verity/Autonomy echter in het geheel niet duide-
     lijk waarom Sluimer zelf meent dat er sprake is van een vertrouwensbreuk.
     Sluimer motiveert dit door te stellen dat hij op één of andere manier ver-
     keerd is behandeld in het proces waarin voor hem juist een alternatieve
     functie is gevonden. Een uitkomst waar enkele andere collega's van Slui-
     mer niet mee konden worden verblijd. De redenen die Sluimer noemt hou-
     den onder meer in dat hij op non-actief is gesteld en zijn medewerkers en
     zakelijke klanten zijn geïnformeerd dat hij ontslagen zou zijn. Sluimer is
     echter niet zomaar op non actief gezet, zoals hij stelt. Aangezien de voor-
     malige functie van Sluimer door de reorganisatie was vervallen, kon hij
     gedurende de consultation period deze functie eenvoudig weg niet meer uit
     oefenen. Gedurende deze periode, bedoeld om in overleg met Sluimer een

HS-0206

*NautaDutilh*

19

alternatieve functie te vinden, behield Sluimer dan ook al zijn arbeids-
voorwaarden. In punt 10 tot en met 17 heeft Verity/Autonomy duidelijk
gemaakt dat het proces dat zij heeft gevolgd met betrekking tot Sluimer een
zorgvuldige is geweest. Verder heeft het management juist alles in het
werk gezet om het onterechte gerucht, dat de arbeidsovereenkomst met
Sluimer zou worden beëindigd, de kop zou worden ingedrukt. Zie hiervoor
de e-mails die zijn overgelegd als **productie 35a tot en met 35g**. Verder
stelt Sluimer dat er organisatorische wijzigingen hebben plaatsgevonden in
zijn team. Het is juist dat er organisatorische wijzigingen hebben plaats-
vonden. Immers, de cijfers van augustus en november 2005 waren dusda-
nig slecht dat Verity/Autonomy zich na de overname van Verity eind de-
cember 2005 genoodzaakt zag enige wijzigingen door te voeren. Waarom
dit echter zou moeten leiden tot een vertrouwensbreuk is Verity/Autonomy
niet duidelijk.

49    Sluimer stelt voorts dat hij, nadat hem de brief is gestuurd op 29 december
2005, enkele weken heeft moeten wachten op contact van de zijde van
Verity/Autonomy. Hetgeen Sluimer stelt is wederom niet juist. Immers, op
5 januari 2006 heeft Kanter al contact gezocht en gehad met Sluimer via
een telefoongesprek en de dag daarna, 6 januari 2006, is er e-mail contact
geweest over en weer waarin dit telefoongesprek ook nog eens wordt be-
vestigd (productie 7). Het is Verity/Autonomy dan ook niet duidelijk waar-
om Sluimer de schijn probeert te wekken dat er enkele weken tussen de
brief en contact heeft gelegen. Sluimer stelt vervolgens dat hem tijdens het
contact gezegd zou zijn dat er waarschijnlijk geen vergelijkbare functie
voor hem zou zijn. In januari 2006 probeerde Sluimer dit Verity/Autonomy
ook al meerdere malen in de mond te leggen. Verity/Autonomy heeft het
echter elke keer resoluut tegengesproken dat zij dit ooit van mening is ge-
weest, laat staan het heeft geuit tegenover Sluimer (punt 16 en productie 7).

50.   In punt 27 en 28 van zijn verzoekschrift stelt Sluimer dat Verity/Autonomy
eind januari aan Sluimer had gevraagd een voorstel te doen tot beëindiging
van het dienstverband. Verity/Autonomy heeft op geen enkel moment een
dergelijk verzoek gedaan. Echter, al op 10 januari 2006 schrijft Sluimer in
een e-mail aan Kanter, nadat hij zelf de stelling had ingenomen dat de aan-
geboden functie hem niet beviel (**productie 36**):

   *..'I would prefer it if you could make a proposal for an amicable settle-*

HS-0207

+31 20 7171338

**Nau**ta**Dutilh**

20

*ment.'*

51. Ook in punt 28 tracht Sluimer een onjuist beeld neer te zetten van het con-
tact met Verity/Autonomy. Hij stelt dat hij op zijn e-mail van 9 februari
2006 aan Kanter pas weer iets heeft gehoord op 22 februari 2006. Dit is
niet juist. De week ervoor, op 16 februari 2006 heeft Kanter aan Sluimer
bericht dat hij op dat moment op reis was en derhalve later op zijn e-mail
terug moest komen **(productie 37)**. Op 22 februari 2006 reageerde Kanter
met twee e-mails (productie 10a en 10b van het verzoekschrift) op de e-
mail van Sluimer van 9 februari 2006, waarin hij refereert aan de vergade-
ring van 24 januari 2006. Productie 10a van het verzoekschrift is een reac-
tie van Sluimer op het gedeelte van de e-mail dat een "open gedeelte" van
de vergadering betreft. Kanter heeft hierin nogmaals bevestigd dat Veri-
ty/Autonomy nog bezig is met het zoeken naar een alternatieve functie en
nooit heeft gezegd dat deze functie niet bestaat. In productie 10b van het
verzoekschrift uitte Kanter zijn ongenoegen over het feit dat Sluimer de in
de vergadering afgesproken "without prejudice", waarvan Sluimer had ver-
klaard te begrijpen wat dat inhield, aan zijn laars lapt. Kanter schreef ver-
der dat hij in principe openstaat voor gesprekken over alternatieve oplos-
singen, maar niet als Sluimer bewust de afspraken over geheimhouding zou
blijven overtreden. Dat Sluimer echter geen enkele waarde hechtte aan af-
spraken blijkt te meer uit de reactie die Sluimer op 2 maart 2006 stuurt
over deze kwestie **(productie 38)**, waarin onder meer staat

*'I fail to see why you would make a distinction between open correspon-
dence and 'without prejudice'.*

52. Sluimer meent dat hem tijdens de besprekingen op 24 januari 2006 een
"exit letter" zou zijn voorgelezen. Dit is niet juist. Kanter heeft tijdens deze
bijeenkomst zich uitsluitend aan het script gehouden dat voor deze bijeen-
komst gemaakt was **(productie 38)**. Dit script werd gehanteerd om zeker te
stellen dat alle onderdelen van een eerlijk consultation proces zouden wor-
den behandeld. Verity/Autonomy tast dan ook in het duister omtrent de
reden waarom Sluimer zulks beweert.

53. Tot slot merkt Sluimer nog op dat Verity/Autonomy voor een vertrou-
wensbreuk heeft gezorgd door zijn opties niet bijtijds uit te betalen. Slui-
mer heeft eind februari zijn opties uitgeoefend, waardoor hij ongeveerd
EUR 430.000 (bruto) heeft opgestreken. Sindsdien heeft hij nog opties met

## NautaDutilh

21

een waarde van EUR 68.000 uitgeoefend. Voor de verkoop van Verity aan
Verity/Autonomy stonden deze Verity opties "onder water", waardoor zij
niet uitgeoefend konden worden. Door de overname van Verity werden
niet alleen de opties van Sluimer opeens uitoefenbaar, maar ook die van
een heleboel collega's van Sluimer. In totaal diende Verity/Autonomy in de
maanden januari tot en met maart ongeveer tien maal zoveel opties uitoe-
feningen te verwerken dan in het kwartaal daarvoor. Logischerwijs kon de
financiële administratie en juridische afdeling dit enorme aantal niet in een
keer verwerken en zij dienden een aantal unieke belastinggevallen uit te
zoeken. De uitbetaling van de opties heeft daarom voor een heleboel me-
dewerkers – waaronder Sluimer – in de salarisronde van april plaatsgevon-
den. Waarom Sluimer van mening is dat dit een vertrouwensbreuk ople-
vert, is Verity/Autonomy in het geheel niet duidelijk.

### Gebrek aan vertrouwen Verity/Autonomy

54    Verity/Autonomy is inmiddels ook van mening dat er geen vertrouwen
meer is voor een succesvolle samenwerking. Echter, deze breuk is geheel
te wijten aan het gedrag van Sluimer. Vanaf het moment dat Veri-
ty/Autonomy aan Sluimer heeft verteld dat Verity/Autonomy op zoek was
naar een alternatieve functie, heeft Sluimer de discussie gesaboteerd en in
de richting geduwd dat er geen alternatieve functie zou zijn, welke een be-
ëindiging van het dienstverband zou rechtvaardigen. Sluimer heeft ver-
schillende onjuiste stellingen ingenomen welke hij heeft geuit als waarhe-
den, terwijl Verity/Autonomy deze op verschillende momenten heeft te-
gengesproken. Een voorbeeld hiervan is dat Sluimer het Verity/Autonomy
probeerde op te dringen dat zij geen passende alternatieve functie zou kun-
nen vinden voor hem. Echter, Verity/Autonomy heeft een alternatieve, pas-
sende, functie voor Sluimer gevonden. Voor Sluimer lijkt dit een teleurstel-
ling te zijn aangezien hij zo een vergoeding zou mislopen. Sluimer heeft
geen moment opengestaan voor een nieuwe functie, laat staan deze heeft
geprobeerd te accepteren. Zelfs al voordat de overname rond was heeft hij
zijn wens geuit te stoppen met werken tegen een flinke vergoeding (pro-
ductie 1). Sluimer heeft ook nooit enige aanpassingen voorgesteld in zijn
functie en heeft geen onderhandelingen hierover willen voeren. Veri-
ty/Autonomy heeft zich vanaf het begin ingezet om een passende functie te
vinden, met een gelijke beloning, en zij heeft vervolgens getracht de over-
gang naar deze functie voor Sluimer zo soepel mogelijk te maken. Dat
Sluimer zonder overleg en onderhandeling de functie weigert en direct

HS-0209

+31 20 7171338              **Nauta**Dutilh

22

grijpt naar het uiterste middel – beëindiging van het dienstverband – zorgt
er voor dat Verity/Autonomy elk vertrouwen in Sluimer heeft verloren.

### Conclusie

55.   Er is dan ook reden de arbeidsovereenkomst tussen partijen te ontbinden,
      vanwege gewichtige redenen, zijnde veranderingen in de omstandigheden.
      Nu Sluimer de ontstane situatie geheel aan zichzelf heeft te wijten, is er
      voor toekenning van enige vergoeding ten laste van Verity/Autonomy geen
      ruimte. Een werknemer die weg wil bij een werkgever mag gewoon opzeg-
      gen. Sluimer heeft dat vermoedelijk slechts niet gedaan om er financieel
      beter van te worden. Deze keuze is de zijne en dient niet voor rekening van
      Verity/Autonomy te komen.

REDENEN WAAROM: het de kantonrechter behage om de verzochte ontbinding
van de arbeidsovereenkomst te ontbinden zonder vergoeding, met veroordeling
van Sluimer in de kosten van het geding.

Amsterdam, 23 mei 2006

Gemachtigde

HS-0210

P R O D U C T I E 1

HS-0211

**From:** Hugo Sluimer
**Sent:** woensdag 28 december 2005 9:06
**To:** Eric Weenink
**Subject:** Exit..

Eric,
Veel succes morgen!

Hierbij nog wat basic input van mijn kant, ik reken op jouw 'dealmaking' ervaring:
-Mij nu afkopen gaat ten laste van reorg. kosten, op termijn moeten ze toch van mij af en dan gaat het ten koste van operationele kosten.
-Ik werk reeds 32 jaar, waarvan 62 kwartalen bij Verity, natuurlijk ben ik 'op'.
-Indien men zich niet exact houdt aan de Change of Control condities, heb ik het recht op een exit, het is niet goed om een organisatie om de persoon te bouwen, een exit geeft hen de mogelijkheid die org. neer te zetten die men het best acht.
-Overeenkomstig de bescherming van het NL arbeidsrecht kan men niet om de exit bedragen heen, ik accepteer dan ook niets minder.
-Etc.

Bedankt!

Hugo

HS-0212

P R O D U C T I E 2

HS-0213

Trad. 2

From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 04 April 2006 18:16
To: andrewk@autonomy.com
Subject: Note to File

Note to file of phone conversation with Hugo Sluimer beginning at approx. 17:00 on 4 April 2006 with phone call from HS.

- After introductions, HS said the role uncovered by Autonomy was not comprarable for a number of reasons, as confirmed by David Humprey (DH).
- AK said that he could not comment on what DH had said as he was not on the call, but that we fundamentally disagreed as to whether the role was suitable or HS was suited for the role.
- HS repeated that the role was not comparable and that he was not happy. HS said he had bought two apartments in Monaco and repairs were expensive. HS was upset that he had not yet received proceeds of an options sale and that he was not being treated equally. HS said he did not believe he can live in this company's cultire of "fakeness" (specific word used). HS said he was not motivated and wanted to look at the change in control document.
- AK commented that there was a backlog of options exercises that had now been cleared. AK said he had been told by finance that payment was to be made in the normal April payroll. AK noted that in Q1 2006 Autonomy had handled roughly 10 times the number of options exercises (hundreds more) than in the previous quarter and thus there was a backlog. AK said he would be happy to speak with finance to see if payment could be accelerated outside normal payroll timing.
- HS said that he had a major issue with payroll taxes as if it was not paid now then he may have to pay more, ie there were financial consequences.
- AK said he did not understand as presumably any tax arrangement was based on the facts, and as long as the facts remained the same then the tax position should remain the same.
- HS said that he had signoff from C&L that only 5% was payable to the UK and in fact had paid too much.
- AK commented that he can not give tax advice but that the underlying facts would drive the tax withholding.
- HS said that his age he could not see the opportunity for Neurodynamics. He said that if he was younger it might be more obvious. But that he was not able to travel the world any more, that he thought the product was secondary to Autonomy and that the market is tough. He said he did his own research, and those people said that the Autonomy sales force was in fact not available as part of the Neurodynamics sales process.
- AK said he could not see how HS had reached this conclusion based on 10 minute call with AK, a one page letter and a short call with DH. Ak repeated that it was obvious that we disagreed and we were now discussing the details of the disagreement. However the key was that HS appeared to have his mind made up.
- HS said "that is true", and noted the role was not similar.
- AK said again that it was clear we disagreed so wasn't sure why we continued to discuss the details. AK asked HS what he wanted to do.
- HS said he would like to work on an exit plan.
- AK said he was happy to consider any reasonable offer.
- HS said that under Dutch law a multiple of months times total pay times years was the correct calculation.
- AK said he understood how Dutch law worked, however it was not clear that Dutch law was applicable as hsi time was assigned to the UK and his compensation plan is governed by UK law.

HS-0214

<u>P R O D U C T I E 3</u>

HS-0215



**Verity**

Verity GB Ltd.
The Pavilions
Kiln Park Business Centre
Kiln Lane, Epsom
Surrey KT17 1JG
telephone +44 (0)1372 747 076
facsimile  +44 (0)1372 747 071

H M Inspector of Taxes
Bradford Beckside TSO
Selectapost 14
Centenary Court
1st Blaise Way
Bradford

Date 26 march 2004

Your ref: 073/ V 283

Dear Sir

**Mr. H. Sluimer – NI: TN190653 M**

Please note that our above named employee is regarded as not resident and not ordinarily resident in the UK, however he is paid via the UK payroll. Mr Sluimer expects to spend approximately 95 % of his time each year working outside the UK.

Since our employee is regarded as not resident in the UK, the proportion of his total remuneration which relates to overseas duties will not be subjected to United Kingdom tax.  Therefore, in accordance with Section 203D, ICTA 1988 we should be grateful if you would arrange for authority to be given to Verity GB limited to operate PAYE on only 5% of his total emoluments with effect from 06-04-2004 for a period of 2 years.

We should be grateful if you would respond to us as soon as possible at the following address:

Verity GB Ltd
The pavilions
Kiln Park Business Centre
Kiln Park, Epsom
Surrey, KT17 1JG

Yours faithfully
Verity GB Ltd

E.M. Weenink
Director

www.verity.com    rep-uk@verity.com    regd. no. 4031841

**HS-0216**

 Inland Revenue

Bradford Beckside TSO

Centenary Court
1 St Blaise Way
Bradford
BD1 4YE

RECEIVED
2 2 APR 2004

Verity
The Pavillion
Kiln Lane
Epsom
Surrey
KT17 1JG

Tel  01274 205537
Monday to Friday 8.30 to 17.00

Fax  01274 205393

www.inlandrevenue.gov.uk

**Date**       20 April 2004
**Our Ref**    073/V283/1ZB/05
**Your Ref**
**NI Number**  67N24286

Dear Sirs

**H Sluimer**

Thank you for your letter dated 26 March 2004.

In accordance with Section 203D Income and Corporation Taxes Act 1988, I direct that
PAYE should be operated on 5% of any payments made to H Sluimer of Verity GB Ltd for
the two years ended 5 April 2006

Yours faithfully

**Mr S M Newsome**
Revenue Executive

Information is available in large print, audio tape and Braille formats.
Type Talk service prefix number – 18001

Area Director John Swallow

  

HS-0217

P R O D U C T I E 4a

HS-0218

2006/4/10, Andrew Kanter <<u>andrewk@autonomy.com</u>>:

Dear Mr Sluimer,

Thank you very much for your proposal. Whilst I appreciate your initiative, I unfortunately do not believe it is the basis for discussions. Accordingly you need to recommence your duties in your new position.

Last week you emailed me that you wished to discuss a settlement. On Tuesday we had a phone conversation regarding your future role and a possible settlement. Admittedly at the outset of the call we disagreed regarding your position. I said that it appeared as if you had made up your mind, which I found surprising given the lack of discussion between you and Autonomy executives on the matter. We discussed some of your impressions, but the bottom line was that your mind was made up.

This is of course disappointing as we have located an alternative role within the company with the same compensation package. If as you stated you believe the role to be too challenging, then we are of course willing to discuss a settlement as you requested.

However your proposal below is on the basis that the company has concluded that your employment is redundant, that there is no alternative role, and that your employment is to be terminated. This is of course not the case. <u>I therefore do not comment on the calculations to be made in such a case or the applicable law.</u> Whilst your calculations may be correct, they are irrelevant to Autonomy's position.

As noted during our conversations and correspondence, an alternative role has been found for you on the same compensation basis, and you are required to commence work forthwith. If you summarily reject this position, then the company will have no choice but to act as if you are abandoning your position.

At the end of the day we are disappointed that you have made up your mind not to continue in a senior capacity with Autonomy, with a similar compensation package and a great opportunity in the market. You are of course free to follow any course you choose.

As discussed during our last call, if you would like to make a proposal that is reasonable and reflects the interests of both parties I would be happy to consider it, and I'm sure we can reach a conclusion rapidly. Unfortunately the proposal below does not fall into the category.

Finally, with regards to option payments, I believe finance has already confirmed to you that payment will be made in the next payroll run. Therefore I don't understand your reference to "probably" will take place. On our call I agreed to speak with finance as to whether they could accelerate payment to before the normal payroll period. You called me the next day and noted that if payment could not be received soon, that you would like any subsequent payments to be noted as being for the March payroll. I have spoken with finance and they are not in a position to accelerate payroll. Further they have raised questions as to whether you are seeking to participate in a tax avoidance scheme by moving payments between payroll periods.

I look forward to seeing you this week in Cambridge in your new position.

Best regards,

Andrew Kanter
Autonomy

HS-0219

P R O D U C T I E 4b

HS-0220

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** April 2006 14:28
**To:** 'Hugo Sluimer'
**Subject:** RE: Severance Benefit Proposal

Dear Mr Sluimer,

As noted in my email below, I do not comment on whether Dutch law is applicable.  What I do state is that your employment has not been terminated, and thus any proposal for severance based on redundancy is not appropriate.

Please contact David Humphrey re your first meeting this week.  Clare March in Cambridge will book flights for you.  We will need to review the commission plan to reflect adjusted targets given the change of role.

Finall, with regards to the settlement proposal, at our initial meeting you requested to have a without prejudice discussion to discuss settlement.  In your email last week you requested to have a settlement discussion "on how we could avoid legal steps in this matter from my side."  In each conversation I said that we'd be happy to consider any proposal.  Your proposal followed.

Best regards,

Andrew Kanter
Autonomy

HS-0221

P R O D U C T I E  5a

HS-0222

2006/3/20, Andrew Kanter <andrewk@autonomy.com>:

Dear Mr Sluimer,

Following the recent management meetings we have completed our business review. I'd like to schedule a call to discuss the results of this review and the risk of redundancy on your position. Whilst a meeting is always better, unfortunately I'll be travelling over the next few days. We'd of course like to share these results, which are positive, as soon as possible.

Please can you let me know availability on Tuesday or Wednesday.

Best regards,

Andrew Kanter
Autonomy

02/05/2006

P R O D U C T I E  5b

HS-0224

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 03 March 2006 18:32
**To:** Andrew Kanter
**Subject:** Re: Verity

I'll wait and see (as I am doing since two months), it's getting cruel..

2006/3/3, Andrew Kanter <andrewk@autonomy.com>:

> Dear Mr Sluimer,
>
> Management will shortly be meeting to discuss the results of the review of redundancies and alternatives within the group.  I expect to be able to revert with the next stage next week.
>
>
> Best regards,
>
> Andrew Kanter
> Autonomy

HS-0225

P R O D U C T I E 5c

HS-0226

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** 22 February 2006 21:00
**To:** 'Hugo Sluimer'
**Subject:** Open Correspondence

Dear Mr Sluimer,

As you know we are continuing the integration process, which I'm sure you'll appreciate is difficult. As we continue that process we continue to review individual positions and whether there are any redundancies across the group.

When we met in London on 24 January 2006 this is what we discussed during our meeting. I did not state that Autonomy could not offer you an equal position, but rather that the position was under review and that there was a likelihood that your position will become redundant. I agreed to get back to you with a written decision as soon as any had been made. I did not refuse you a copy of my notes.

As you know the integration process is a difficult process where strategic decisions need to made. Officers of Autonomy met with group-level officers of Verity in December 2005 to discuss the future strategy of Verity. This meeting did not include regional executives like yourself, with the exception of Mike Mooney and Jack Landers who were recommended for promotion to group level roles. During the integration there were isolated instances of over-eager sales personnel seeking to short-term sales who contacted customers, but these were stopped when discovered. There was no group policy as you seem to imply to steer existing Verity customers to Autonomy, as indeed this would have been a breach of antitrust legislation. At a group level certain synergies were required by the transaction, and these decisions were made by your senior officers within their discretion. Managers within the European operations were informed that your position is under review and that no final decision has been made, as is the case.

I did not inform you during our call on 5 January that Autonomy would not offer you an equal position. I have clarified this twice by email in open correspondence, which you have received. To the best of my knowledge you have not had any reduction in any benefits during the consultation period.

We are continuing to review the position and hope to continue consultations shortly.

Best regards,

Andrew Kanter
Autonomy

**HS-0227**

P R O D U C T I E 6

HS-0228

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 06 January 2006 08:57
**To:** andrewk@autonomy.com
**Subject:** New e-mail address/next action(s)

Andrew,
You are probably aware that I am unplugged (this happend just a few hours, without any notice.., after you called me yesterday to inform me that there is no similar position for me available in Autonomy).
In case you want to reach me, please use this address.

When can I expect the next step/action and what will it be?

Cheers,

Hugo

23-05-06

HS-0229

<u>P R O D U C T I E 7</u>

HS-0230

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** 06 January 2006 17:14
**To:** 'Hugo Sluimer'
**Subject:** RE: New e-mail address/next action(s)

Dear Hugo,

I was not aware that you were having email problems.

Further to our conversation yesterday, I can confirm that you were sent yesterday for delivery today a notice of possible redundancy. I attached a copy of the original letter to this email for your convenience.

There is one point I must clarify from your message below.

In our phone call yesterday I said that your position may be at risk of redundancy because of a number of structural elements of the new company. I asked whether in light of this risk you had any ideas of what might be a suitable alternative position within the company. You said that you did not believe there was an alternative position, and since this was the case perhaps it best to discuss whether a suitable settlement could be reached quickly.

The next steps of the proper procedure are outlined in the letter.

Best regards,

Andrew Kanter
Chief Operating Officer
Autonomy

HS-0231

<u>P R O D U C T I E 8</u>

HS-0232

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 10 January 2006 16:03
**To:** Andrew Kanter
**Subject:** Settlement

Dear Andrew,

In the letter of December 29, 2005, a consultation meeting on January 11, 2006 is mentioned. I assume that, based on the telcall we had, that this meeting lost its value, since you are of the opinion that in my case no alternative position can be identified.
In that case I would prefer it if you could make a proposal for an amicable settlement. Subsequently I will seek legal advice and let me inform to what extent I should agree on the (conditions of) termination of my employment contract. In this respect it should be pointed out in advance, that Dutch Law is applicable.
Furthermore I expect you to be informed about the arrangements that were made concerning my participation in Verity's Change in Control and Severance Benefit Plan.

Please call me if questions arise.

Best regards,

Hugo Sluimer

HS-0233

P R O D U C T I E 9

HS-0234

Proof 9

2006/1/10, Andrew Kanter <andrewk@autonomy.com>:

Dear Hugo,

I write with regards to your message below.

The 11 January 2006 consultation meeting mentioned in the letter is not "lost value" but rather is an integral part of the consultation process relating to a possible redundancy, which we need to discuss. If you wish to reschedule this meeting we can seek alternative dates.

I also must point out again (as I did in the attached email, to which I have not received a response) that I did not state that it was my opinion that no alternative position can be identified. Rather in our phone discussion I mentioned that your position may be at risk of redundancy because of a number of structural elements of the new company. I asked whether in light of this risk you had any ideas of what might be a suitable alternative position within the company. You said that you did not believe there was an alternative position, and since this was the case perhaps it best to discuss whether a suitable settlement could be reached quickly.

Please let me know whether you wish to rearrange the consultation meeting.

Best regards,

Andrew Kanter
Autonomy

HS-0235

<u>P R O D U C T I E 10</u>

HS-0236

Prod. 10

01 MEI 2006 06:56P                    0037797775795                    pagina 1

| COMPANY | : | VERITY, INC. |
| ATT. | : | MR. JACK LANDERS |
| FAX NUMBER | : | +1 408 541 1600 |
| FROM | : | HUGO SLUIMER |
| DATE | : | MAY 1ST, 2006 |
| RE | : | CHANGE IN CONTROL |
| # PAGES | : | 2 |

Dear Jack,

Please find my request wrt the Change in Control enclosed.
I've also send this letter per registered mail.

I trust to hear from you soon and remain,

With kind regards,

Hugo

HS-0237

Verity, Inc
Attn. Vice President Human Resources
894 Ross Drive
Sunnyvale CA  94089
California, USA


Date: May 1st, 2006

Dear mr. Jack Landers,

Being a participant in Verity's Change in Control and Severance Benefits Plan
(the Plan), I draw your attention to the following.

In my opinion the acquisition of Verity by Autonomy results in a Change in
Control according to the Plan. This leads to the conclusion, that, according to
the applicable Participation Notice, I am entitled to not only cash severance
benefits, but also to accelerated vesting of options and continued medical
benefits.

Can you confirm to me that I am entitled to the accelerated vesting of options
and continued medical benefits?

If you need more information, please do not hesitate to call me.

Kind regards,

Hugo Sluimer

Apt. Le Millefiori, 27F
1, rue des Genets
MC 98000 Monte Carlo
MONACO

HS-0238

P R O D U C T I E 11

HS-0239



Autonomy

VIA EMAIL AND REGISTERED DELIVERY

3 May 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genêts
MC 98000 MONACO

Re:     Fax dated 1 May 2006 to Mr Jack Landers

Dear Hugo:

I write on behalf of Verity, Inc. I refer to the fax dated 1 May 2006 which was addressed to Mr. Jack Landers. Mr. Landers has forwarded this document to me as you are currently in a legal dispute with Verity, Inc. regarding your employment and thus I am responsible for all communications.

On the basis of the terms of the Change in Control and Severance Benefit Plan (the "Plan"), we do not consider you to be entitled to the accelerated vesting of options and continued medical benefits. Firstly, in Section 3(b)(iii), an employee offered immediate reemployment is an express exception to severance benefits described in the Plan Entitlement Section 3(b)(iv). In any event your employment has been continuous, with continued payment of salary, commission and other benefits such as stock option vesting. Secondly, section 3(b)(iv) provides that an employee will not receive benefits under the Plan if the employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non Compete Agreement, which we have not received. Thirdly, Section 7 further provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities. In view of the pending litigation between yourself and the Company, obviously this criterion has not been fulfilled thereby making you ineligible for the stated benefits.

I reiterate my request of 27 April 2006 that as this is now a legal matter, any matters relating to employment process and continued employment must be directed to me, or to our attorneys, Mr. J. de Roos and Mr. M. Ritmeester (P.O. Box 7113, 1007 JC Amsterdam ,The Netherlands). Any contact with other employees within Autonomy relating to your employment will not be accepted.

Sincerely,

A. Ka

Andrew M Kanter
Company Secretary

Page 1

HS-0240

P R O D U C T I E 12

HS-0241

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** 22 March 2006 15:33
**To:** andrewk@autonomy.com
**Subject:** Notes to File

Notes of phone call with Hugo Sluimer on 22 March 2006 at approximately 17:45 Beijing time.

- We have completed our review of his position following the completion of the acquisition of Verity and the subsequent merger of the two companies' operations.
- We have completed the review at a recent management meeting in California with all group-level managers.
- Regret to inform that following the review the role of SVP EMEA and APAC operations within Verity has lapsed
- However I was happy to report that we believe we have found an alternative, comparable role
- The same of SVP EMEA and APAC operations is available for the company's Neurodunamics division
- The division is rapidly growing, with the potential for some of the largest deals in the company
- The division needs senior sales leadership across Europe and growth in Asia
- Hence same role
- Compensation will remain the same, although we will adjust compensation plans to enable Hugo the ability to hit the same commission number for commensurate growth
- Will be working with David Humphires, MD of the Neurodynamics division
- Per Hugo's question, it is not yet decided whether he will report to Dave or they will jointly report to the group CEO
- The division is based in cambridge so will need to be there to meet with Dave

02/05/2006

HS-0242

P R O D U C T I E 13

HS-0243

From: Andrew Kanter < andrewk@autonomy.com>
Date: 23-mrt-2006 3:16
Subject: Letter
To: Hugo Sluimer <hugosluimer@gmail.com >

Dear Mr Sluimer,

As discussed yesterday, attached please find a letter confirming the details of our conversation.

Please can you contact David Humphries, Managing Director of the Neurodynamics division, at either dh@neurodynamics.com or on +44 1223 448 000.

With the anticipated growth for this division and in this sector of the market, this is an extremely exciting position and I look forward to working with you.

Best regards,

Andrew Kanter
Autonomy

HS-0244

**P R O D U C T I E** 14

HS-0245

**From:** David Humphrey [mailto:dave@neurodynamics.com]
**Sent:** 28 March 2006 10:12
**To:** 'Hugo Sluimer'
**Subject:** Meeting

Hi Hugo,

How was your weekend?

Next week we are exhibiting Wed-Fri at ISC West Las Vegas.  I thought it might be useful if we could meet up there to move things forward for the start of Q2.

Dave

HS-0246

<u>P R O D U C T I E 15</u>

HS-0247

2006/3/30, Andrew Kanter <andrewk@autonomy.com>:

Dear Hugo,

It has been a week since we discussed your new role with the Neurodynamics division of the Autonomy group. I understand however that as of today you have not yet commenced substantive interaction with the division's managing director. Given the opportunity available and the pace of growth in the market it is of course critical to avoid delay. Can I please have an update on developments, particuarly related to next week's key trade show in the US.

Best regards,

Andrew Kanter
Chief Operating Officer
Autonomy

02/05/2006

<u>P R O D U C T I E 16</u>

HS-0249

From: David Humphrey [mailto:dh@neurodynamics.com]
Sent: 31 March 2006 07:52
To: andrewk@autonomy.com
Subject: Hugo update

Hi Andy

I have heard nothing from Hugo since we spoke last Friday.  He has not replied to my
email re the US trade show.

David Humphrey

1

HS-0250

P R O D U C T I E 17

HS-0251

Prod. 17

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 31 March 2006 09:28
**To:** Andrew Kanter
**Subject:** Re: Neurodynamics

Dear Mr. Kanter,

As per your suggestion to let me find out more details about the proposed position, I've contacted David Humphries last Friday.
In my phone call with Mr. Humphries I tried to figure out what kind of position exactly has been offered to me, but that was impossible since I understood that there is no business plan/strategy/job specification or whatsoever and that you had called Mr. Humphries shortly before you offered me the position, and communicated "I've a good guy for you, his name is Hugo Sluimer, it would be great if he could work for you", which was a little bit surprising for Mr. Humphries as well as me. It was also conflicting with your letter to hear from Mr. Humphries that he expected me to report to him. Although we had a pleasant talk, in general I can only say that he was confused and not prepared at all.

I plan to come back to you by the beginning of next week. From that perspective it wouldn't be fair at all to give you the impression that I will accept the position or that I can participate in the event next week.

I'll keep you informed.

Best regards,

Hugo Sluimer

**HS-0252**

P R O D U C T I E 18

HS-0253

Prod. 18

**From:** Andrew Kanter [mailto:andrewk@autonomy.com]
**Sent:** 31 March 2006 17:01
**To:** 'Hugo Sluimer'
**Subject:** RE: Neurodynamics

Dear Mr Sluimer,

If I understand correctly you are considering whether you wish to continue with Autonomy, which is of course within your discretion.  However I would hope that any decision is made based on more than our 10 minute phonecall and the short communication you have had with David Humphries, which you have described as inadequate.  in any event I look forward to hearing you on Monday.

Best regards,

Andrew Kanter
Autonomy

HS-0254

P R O D U C T I E 19

HS-0255

2006/4/1, David Humphrey, Monsieur Document 24-3
>
>  Hi Hugo,
>
> Can you call me on Monday please with reference to my previous email.
> We need to get things kick started for Q2.
>
> Thanks
>
> Dave
>
>
> *David Humphrey
> Managing Director
> Neurodynamics
> Cambridge Business Park
> Cowley Road
> Cambridge CB4 0WZ
> United Kingdom
>
> Tel: +44 (0)1223 488540

1

HS-0256

<u>**P R O D U C T I E 20**</u>

HS-0257

```
Subject:    Re: Telcall                                   Proof 20
Author:     "Hugo Sluimer" <hugosluimer@gmail.com>
Date:       2nd April 2006 7:03:14 pm
```

Hi, Dave

In our phone call last week I tried to figure out what kind of position exactly is offered to me, because Andrew Kanter couldn't tell. I understood that there is no business plan/strategy/job specification or whatsoever and that you had been called shortly before by Andrew, who communicated "I've a good guy for you, his name is Hugo Sluimer, it would be great if he could work for you", which was a little bit surprising for you.

I plan to come back on this issue with Andrew by the beginning of this week. From that perspective it wouldn't be fair at all to give you the impression that I will accept the position or that I can meet you within the next days or so. Dave, please don't misunderstand me, I appreciate your cooperativeness, but I am sure you'll understand as well that I want to work this out with Andrew first.

I'll keep you informed.

Hugo

HS-0258

**P R O D U C T I E 21**

HS-0259

Sent: 02 April 2006 23:04
To: andrewk@autonomy.com
Subject: Fwd: Re: Telcall

Hi Andy
Just got this. He did not get any of that information he mentions from me

David Humphrey

Apologies for the briefness of this PDA sent email.

HS-0260

P R O D U C T I E 22

HS-0261

From: Hugo Sluimer < hugosluimer@gmail.com>
Date: 3-apr-2006 13:54
Subject: Proposed position
To: Andrew Kanter <andrewk@autonomy.com >


Dear Mr Kanter,

The offered position does not seem to be appropriate at all and I fail to see whether further talkings with you could really alter this situation. The job is definitely very different from what I did before and still nobody has been able to present to me a business plan/strategy/job description etc. Moreover Autonomy's way of acting towards me, not only concerning payment of options, but also the way communication with my people an my relations took place, has significantly affected me.

I shall call you tomorrow to discuss how you and I should proceed in this. Especially I'd like to discuss with you on how we could avoid legal steps in this matter from my side. Be sure that I give preference to solve this matter amicably, but of course I need your cooperation for that.

Best regards,

Hugo Sluimer

HS-0262

P R O D U C T I E 23

HS-0263

2006/4/4, Andrew Kanter <andrewk@autonomy.com>:

Dear Mr Sluimer,

First, our records do not indicate that your message below was received by our servers. This is the first that I've seen of it.

I'm very surprised by your message. Below you complain that the position is not appropriate and that there is nothing to discuss. I note that the total discussions amount to our 10 minute phone call and your short call with David Humphrey. Neither I nor David discussed a business plan. You and I did discuss a job description. In any event, we have made ourselves available to help to continue to educate you, but neither of us have received inquiries. As noted in our call and in my letter, your compensation remains the same and this is one of the fastest growing, most exciting parts of our business. To be frank, the lack of inquiry has been unusual.

I am available at any time to discuss this or any other matter, and am always open to any suggestions.

Best regards,

Andrew Kanter
Autonomy

P R O D U C T I E 24

HS-0265

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 07 April 2006 15:14
**To:** Andrew Kanter
**Subject:** Severance Benefit Proposal

Dear mr. Kanter,

Following to our telephone conversation of last Tuesday, in which you asked me to do a proposal to solve this matter in an amicable way, I now can inform you as follows.

As you know my redundancy package in the Change in Control Plan has to be determined in accordance with Dutch Law, i.e. the so called Kantonrechterformule ("Cantonal Judge formula"). I am sure your attorneys can explain to you the way this Dutch formula works. Moreover I understood that with Eric Weenink a settlement in accordance with this formula was reached as well; therefore I may consider you already to be familiar with this formula.

In my case I am - in case of termination of the employment contract by the end of this month - , entitled to payment of 23 (months) times EUR 45.076 gross (which is my base salary and average commission per month in the last 3 years).

This means that I am prepared to agree with a package if the following items are part of it:
- Termination as per 30 April 2006;
- I will be exempted from my duties, payment of my salary c.a. will be paid as has been customary during my employment for Verity;
- Payment of EUR 1.036.748,-- gross (I shall seek advice about the way this should be paid out to me tax-friendly);
-Supplementary payments (the delta between my ave EUR 45.076 salary and the actual payments) of my Jan, Feb 06 and March 06 (resp. 8.842, 18.043 and 15.900 ) plus 45.076 for April, this makes EUR 87.861 in total.
- The Change in Control plan is applicable, especially, but not only concerning immediate vesting of my options and the employer's contribution of health insurance;
- Completion of the employment contract takes places before 1 May 2006, Dutch law is applicable;
- A reasonable contribution for legal costs;
- Finalization of the settlement takes place with the attorneys; I reserve the right to bring in (minor) points after consultation my attorney.

If this proposal is not accepted and the District Court in Holland has to decide in this case, I will use the possibility that Dutch law provides me with, to ask for a severance package with a multiplication factor of 1.5, due to the way I am treated by Autonomy. If this is the case, termination will not take place earlier than 1 July 2006. Furthermore the severance payment increases due to the fact that I shall be 53 years old by then. From my point of view this is why my proposal is in fact a considerable step towards Autonomy/Verity. I take it that you'll appreciate this.

Another important (and definitely urgent) issue is the payment of exercised options. You told me this week to take immediate action on that. But still no payment took place. I can not live with the fact that payment "probably" will take place this month. Reception of this payment is unconditionally required before I can agree on termination of my employment contract.

I will look forward to your reaction and remain with kind regards,

Hugo Sluimer

HS-0266

<u>**P R O D U C T I E 25**</u>

**HS-0267**

2006/4/10, Andrew Kanter <andrewk@autonomy.com>:

Dear Mr Sluimer,

Thank you very much for your proposal. Whilst I appreciate your initiative, I unfortunately do not believe it is the basis for discussions. Accordingly you need to recommence your duties in your new position.

Last week you emailed me that you wished to discuss a settlement. On Tuesday we had a phone conversation regarding your future role and a possible settlement. Admittedly at the outset of the call we disagreed regarding your position. I said that it appeared as if you had made up your mind, which I found surprising given the lack of discussion between you and Autonomy executives on the matter. We discussed some of your impressions, but the bottom line was that your mind was made up.

This is of course disappointing as we have located an alternative role within the company with the same compensation package. If as you stated you believe the role to be too challenging, then we are of course willing to discuss a settlement as you requested.

However your proposal below is on the basis that the company has concluded that your employment is redundant, that there is no alternative role, and that your employment is to be terminated. This is of course not the case. I therefore do not comment on the calculations to be made in such a case or the applicable law. Whilst your calculations may be correct, they are irrelevant to Autonomy's position.

As noted during our conversations and correspondence, an alternative role has been found for you on the same compensation basis, and you are required to commence work forthwith. If you summarily reject this position, then the company will have no choice but to act as if you are abandoning your position.

At the end of the day we are disappointed that you have made up your mind not to continue in a senior capacity with Autonomy, with a similar compensation package and a great opportunity in the market. You are of course free to follow any course you choose.

As discussed during our last call, if you would like to make a proposal that is reasonable and reflects the interests of both parties I would be happy to consider it, and I'm sure we can reach a conclusion rapdily. Unfortunately the proposal below does not fall into the category.

Finally, with regards to option payments, I believe finance has already confirmed to you that payment will be made in the next payroll run. Therefore I don't understand your reference to "probably" will take place. On our call I agreed to speak with finance as to whether they could accelerate payment to before the normal payroll period. You called me the next day and noted that if payment could not be received soon, that you would like any subsequent payments to be noted as being for the March payroll. I have spoken with finance and they are not in a position to accelerate payroll. Further they have raised questions as to whether you are seeking to participate in a tax avoidance scheme by moving payments between payroll periods.

I look forward to seeing you this week in Cambridge in your new position.

HS-0268

PRODUCTIE 26

From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 10 April 2006 10:37
To: 'Hugo Sluimer'
Cc: 'David Humphrey'
Subject: Competition Background

Dear Hugo,

Below is some recent competitive intelligence pulled together on other vendors in the Neurodynamics security space. This portion of the market is a very fragmented market, with no company having the resources of Autonomy.
Useful to our competitive position, many of the vendors are in the "general security" business and are manufacturers of cameras and ip gear. You may want to look at:

http://www.dvtel.com/  This is a full service company that has both hardware and software.

http://www.infinova.net/  Another vendor offering hardware and software.
More of a focus on manufacturing and hardware.

http://www.ipix.com/  A public company with a lot of information available.

http://www.objectvideo.com  Most likely the direct competitor on a software software basis. They go to market with partners and are oem'd by Verint.

It is also worth considering some of these companies for acqusition purposes, and we'd welcome any feedback. However it does seem that the companies that would give Autonomy more of a revenue boost in this space bring the baggage of commodity cameras and IP switches.

In terms of sales channels, ObjectVideo provides a hit list of partners and oem's.

I trust this is helpful.

Best regards,

--Andy

HS-0270

P R O D U C T I E 27

HS-0271

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 20 April 2006 14:02
**To:** dh@virage.com
**Cc:** rhaverfield@autonomy.com
**Subject:** Our meeting minutes

Dear David,

First of all, I would like to thank you for the meeting (although very brief) we've had on April 18th last. I'll hereby send you my meeting notes (feel free to comment and/or to add info and send me your feedback asap). Neurodynamics was bought by A. in Sept. 05 (before it was just one of the companies where Mike Lynch has a major share in). The acquisition was done to make the A. business more transparent, ensure compliancy and to streamline the A. organisation. [Autonomy Comment: In fact, A bought Neurodynamics because it saw the enormous growth potential in the business, as well as the potential combination of Neurodynamics products with the Autonomy suite which could only improve the A bottom line.] Neurodynamics doesn't exist anymore (this change was made per Jan 2006) [Autonomy Comment: Neurodynamics Limited as a company, doesn't actively trade anymore, although the brand/domain/trademarks/goodwill still exist and have been assigned to AS] and was renamed 'Virage Security & Surveillance' (VSS). Strange that I have been recently appointed as Sr. VP of Neurodynamics... [Autonomy Comment: According to Andy Kanter ("AK"), the letter notifying you of your appointment as Senior VP of Neurodynamics was issued prior to the rebranding of the division as Virage Security and Surveillance, which has only happened very recently. The role is the same, and should not therefore cause any surprise to you.] VSS is part of 'Autonomy Systems Ltd.' (AS), a wholly owned division of the A. Group Plc. A. has the intention to add other business units to AS (VSS is now the only one), like the Cardiff business unit (previous acquired from Verity). [Autonomy Comment: In January 2006, a corporate rationalisation was undertaken where the assets of the various UK subsidiaries were transferred to ASL. VSS is not the only business unit currently. The assets of other Autonomy Corporation plc subsidiaries were also transferred. Additional entities will be included (such as Verity GB) as part of

HS-0272

focus almost all your efforts on the USA, simply because that's where you believe the market is. [Autonomy Comment: It was reiterated several times in the meeting that any focus on the US is simply a function of me and my team not having had time to look anywhere else. As discussed, the US is the easiest target as they speak the same language, we have distribution channels, sales and field services there and the leads already exist. Furthermore, this reiterates the need for someone who has contacts and experience in mainland Europe and APAC where we have not had the time/resources to develop business. If you have a specific issue/problem with the US focus, your input would be appreciated].

Selling in Asia will be extremely hard, if not impossible, because the product is not Internationalised or Localised. [Autonomy Comment: If this is the case, this was not raised at the meeting. As we discussed, we have not, to date, actively sought customers in Asia so I cannot comment on this. On the contrary, we did discuss how one of your historic partners in Korea is desperate to sign up! This is a business plan issue as above.]

The A. Group has now assigned a part time marketing resource. [Autonomy Comment: As was reiterated by Mike Lynch in your brief discussions with him, in addition to the Virage Marketing Manager who also heads up European marketing for other products, a dedicated security and surveillance marketing person has also been appointed].

Although the preferred sales model should be to leverage from the A. field sales force, there is hardly interaction (other than with Italy and the USA). [Autonomy Comment: To date this is the case but, as I repeatedly suggested, this is because of limited time resources. That is the very point of needing new people on board to sell the product and where your role is seen as most obviously beneficial]. My potential role in VSS is not clear to you, "A. Kanter told me that you're good in Europe", so we really need to get things sought out, starting from the basics. [Autonomy Comment: Broadly your role is to grow the business, which I understand was your previously role at Verity. Indeed the specifics need to be discussed, which was one of the purposes of the meeting. I understand you operated largely autonomously in your role at Verity. The role here is intended to be analogous.]. From the historical VSS business volume, you estimate that 50% comes from the Gov. market and 50% from commercial markets. [Autonomy Comment: Correct — however, by number of deals, the volumes are 80% commercial, 20% government].

Since the time was over (unfortunately I needed to catch my flight, which was booked by A.'s travel dept.) I checked with you if we would meet (according to plan) coming Thursday, in Rome which you confirmed. I indicated that no travel arrangements were made (although I requested A.'s travel department) and you and Rachel promised to take action right away.

Surprisingly I never heard back (see my yesterday's e-mail). [Autonomy Comment: As discussed above, no email was received yesterday. Flights came out at £800 which was disproportionately expensive for the meeting's purpose, so April Jones left you voicemail asking you to try and book flights from your end so they would come out cheaper. When she checked in with you yesterday, she was told you don't have voicemail, even though she rechecked the number she had called. I believe that April explained the travel policy and that, in future, if someone doesn't revert to you about your travel arrangements this should alert you that there is some problem with the process and to contact us.]

David, although I recommenced my activities under protest [Autonomy Comment: I was unaware this was the case and something that is obviously within AK's remit, rather than mine], which is not an ideal situation for you, I still think we should handle this as professional as possible. [Autonomy Comment: Noted — Perhaps the first step is for AK to revert to you on the legal delineation of your role. However, with respect to the operational content, your role is to develop the VSS business. Any feedback as to how you see yourself best being utilised in this respect would be strongly encouraged.] Can you inform me on how to proceed in this matter? Please share your opinion on this issue with me, preferably on the shortest term.

Best regards,
Hugo

David Humphrey
Managing Director

HS-0273

P R O D U C T I E 28

HS-0274

| From: | David Humphrey [dh@virage.com] |
|-------|-------------------------------|
| Sent: | zondag 23 april 2006 0:05 |
| To: | hugosluimer@gmail.com |
| Cc: | 'Rachel Haverfield' |
| Subject: | Email |

Dear Hugo,

Thanks for your email of yesterday.
First of all I would like to express my disappointment at your very negative interpretation of our meeting and the Virage Security and Surveillance business, given that you did not directly raise any such concerns at the meeting itself thereby giving us opportunity to potentially address them.

As I mentioned in my email of last evening, I am afraid I did not receive any email from you yesterday and had asked April to follow up with you directly regarding flights. Apparently she left a voicemail for you, asking you to see if flights booked from your end were cheaper, as booking them from the UK was prohibitively expensive. I understand that after following up with you yesterday, you explained that you had not received the voicemail, which explains the confusion. We apologise for the confusion and hope that, going forward, these issues will not occur again. If you need any further information on the travel policies, please contact April.

I have made some amendments to your minutes which I have included in square brackets below on the basis of my notes. Rachel has also provided some comments to me to clarify some of issues raised. Andy Kanter will get back to you separately with respect to your comments on a clearer delineation of role and any additional formalities required with respect to your contract. In the interim, if you need any additional information on the operations of VSS, do not hesitate to contact me.

Regards
David Humphrey

HS-0275

P R O D U C T I E 29

HS-0276

From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 24 April 2006 11:15
To: 'Hugo Sluimer'
Subject: Role

Dear Hugo,

I refer to your meeting on 18 April with David Humphrey and Rachel Haverfield.

On the basis of this email, I understand you are seeking a more concrete description of your role and responsibilities.

As you know, your title will be Senior Vice President, EMEA and APAC Operations for Neurodynamics, which has recently been rebranded as Virage Security and Surveillance (VSS). For the avoidance of doubt, we can resend you our original letter with the new brand name or simply issue you a side letter describing the rebranding, if this is required.

The role is intended to mirror the responsibilities you had in your previous role, where you were seconded to Verity GB Ltd as Senior Vice President, EMEA and APAC Operations, but on a global scale for the VSS product range (and Autonomy software should it be included as part of the solution). As per your previous role, you will be required to devote 95% of your time to the UK and will be responsible for VSS sales activities and development in Europe, Middle East, Africa, Asia Pacific region and potentially other jurisdictions where opportunities are available, such as the US, which is to be determined by you and David Humphreys going forward. We see your management role at Verity to be directly relevant in this role, albeit it a division which is growing, rather than one that has seen the end of its growth cycle.

You will report to Mike Lynch, CEO of the Autonomy group, and day-to-day working with David who is the head of the division. In accordance with Autonomy policy, there are certain other approval lines required to be fulfilled with respect to budgets and expenditure where you will be answerable to the board members.

As each of the relevant parties involved in your employment agreement are under common control, procuring payment of salary and signatures will not be a problem. Thus you will continue being paid in the method and via the payrolls you are currently paid through. We can fulfill any legal formalities with respect to your new role in due course, none of which are an impediment to you fulfilling your role at this stage.

Rachel has pointed out one matter in your email with which I disagree. There is no major impediment to the VSS business moving forward related to a "proper" business plan. Autonomy's success to date has been achieved without one. However if you would like to prepare one this is well within your remit. Please let David or myself know what additional information and resources you require to do so.

Best regards,

Andrew Kanter
Autonomy

HS-0277

**P R O D U C T I E 30**

HS-0278

From: Hugo Sluimer [mailto:hugosluimer@gmail.com]
Sent: 25 April 2006 17:08
To: Andrew Kanter
Subject: Role

Andrew,

The alternative position that Autonomy offered to me is just not comparable at all to my former job with Verity. Efforts to make me believe otherwise are pretty pointless and meanwhile I am sure the opposite goes for you as well.

I suggest we'll leave the decision in this matter to the competent judge.

Although it is very difficult for me, I will in the meantime do what I can to perform sufficient in my current (non-suitable) position. Repeating questions to me what additional information etc. I require doesn't help, by the way. I am fully unaware of what Mike Lynch and you are exactly expecting me to do. Instructions would be helpful.

Best regards,

Hugo

HS-0279

P R O D U C T I E 31

HS-0280

From: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 15:07
To: 'Rachel Haverfield'
Subject: FW: sluimer since april 24.

hasn't used his work email for any work since at least 24 april, as far as we
can tell.

seems mainly to be with an electronics company (netto24.ch), home cinema company
(tqs.nl), bank (abnamro) and a wine company (avinos-wein.de).
alexanderf@autonomy.com is a systems admin person.

------------------------------------------------------------------------

From: Matt Dunn [mailto:matthewd@autonomy.com]
Sent: 19 May 2006 15:03
To: andrewk@autonomy.com
Subject: sluimer since april 24.

Tue 2006-04-25 14:47:33: From: alexanderf@autonomy.com; Recipient:
hsluimer@virage.com;

Tue 2006-04-25 14:49:03: From: hsluimer@virage.com; Recipient:
hsluimer@virage.com;

Tue 2006-04-25 14:50:03: From: alexanderf@autonomy.com; Recipient:
hsluimer@virage.com;

Fri 2006-04-28 18:33:57: From: dh@virage.com; Recipient: hsluimer@virage.com

Wed 2006-05-03 22:13:42: From: hsluimer@virage.com; Recipient:
info@avinos-wein.de;

Fri 2006-05-12 09:03:35: From: hsluimer@virage.com; Recipient:
esther.osnabrug@mc.abnamro.com

Fri 2006-05-12 09:06:25: From: esther.osnabrug@mc.abnamro.com; Recipient:
hsluimer@virage.com;

Fri 2006-05-12 16:29:30: From: esther.osnabrug@mc.abnamro.com; Recipient:
hsluimer@virage.com;

Thu 2006-05-18 16:26:22: From:hsluimer@virage.com; Recipient: thuisbios@tqs.nl

Fri 2006-05-19 07:35:52: From: info@netto24.ch; Recipient: hsluimer@virage.com

Fri 2006-05-19 07:45:22: From: thuisbios@tqs.nl; Recipient: hsluimer@virage.com

HS-0281

P R O D U C T I E 32

HS-0282

Prod. 32

**From:** Sushovan [mailto:sushovanh@autonomy.com]
**Sent:** 27 April 2006 16:14
**To:** Andrew Kanter
**Subject:** neurodynamics

the neurodynamics business is delivering significant amounts of revenue and, with the combination of Virage, is set to dominate the Security & Surveillance software market.

Estimated revenues:
2005 Q1 Italy E0.9M - Skyset ($1.2M) + existing business $150K - total licence $1.35m
    Q2 Italy Quadrics allocated $1M + existing $100K
    Q3 $500k
    Q4 $2.8M

Total 2005 $5.75M licence estimated plus 15% maintenance = $6.61m

2006 Q1 - estimated at $300K
Pipeline:
- DTI infrastructure $2M
- Italian rollout $5M
- Selex $2M
- Sogei roll out $1M
- Sundry $2M

Total estmated for 2006 $12M licence or $14M with maintenance. This does not include leads from the recent trade show in the US.

REgards
Sushovan

P R O D U C T I E 33

HS-0284

| From: | Sushovan [sushovanh@autonomy.com] |
|---|---|
| Sent: | dinsdag 2 mei 2006 16:41 |
| To: | rachelh@autonomy.com |
| Cc: | Andrew Kanter |
| Subject: | Fw: neurodynamics |

Rachel - you raised the point that Neurodynamics does not have all of this revenue recognised in its statutory accounts. This is because other Autonomy companies have made the sales and there is an allocation between various companies. However the exact amount fo ND sales is what I have noted below.

Regards
Sushovan
----- Original Message -----
From: Sushovan
To: Andrew Kanter
Sent: Friday, April 28, 2006 8:16 AM
Subject: Re: neurodynamics

yes that is correct - the simple reason is that now that we have integrated virage and neurodynamics, we have the software to sell into an extremely hot area.

In addition to what I have noted as to the pipeline, we have 2 major European initiatives that kicked off last month - one with the DTI to provide security software for the UK govt and one funded by the European Parliament through Finmecanica of Italy. Both will be keeping our technical teams busy for the next few years.

By the way we just closed a $250k deal with the govt opf kazakstan yesterday - so we desperately need more sales people.

> ---- Original Message -----
> From: Andrew Kanter
> To: 'Sushovan'
> Sent: Friday, April 28, 2006 2:01 AM
> Subject: RE: neurodynamics
>
> So the pipeline for license alone is about as big as the entire European Verity new license revenue from last year?

HS-0285

<u>P R O D U C T I E 34</u>

HS-0286

Prod. 34

Dear Andrew,

First of all I would like to sincerely congratulate you and the rest of the Autonomy team with the stellar FY05 results!

I would like to come back to our meeting in London, on Jan. 24 last. During the formal part of the meeting you've read the text of a legal document to me, stating that Autonomy couldn't offer me an equal position (compared to the position I had at Verity, Inc.). As a result, both parties agreed to consider an exit. Although you pushed me firmly to propose Autonomy an exit fee during the meeting (I even asked instant advice, during a time out, per telephone from my lawyer), I informed you that we believe that an offer from my side would not be appropriate and that we expected Autonomy to propose an exit fee to me.
When I asked you for a printed version of the legal document, referred to above, you told me that it needed some cleansing and that I could expect to receive the final document per post, the week after the meeting.
Now at this very moment in time I am confused, because I haven't heard anything.

For the record, I listed some chronological facts that occurred during and after the acquisition:
- Various meetings between Autonomy and Verity Executives took place and I was the only Exec who was never invited to participate.
- Prior the acquisition, Verity prospects and clients were contacted (by Autonomy telemarketing and field sales personnel) and advised not to deal with Verity anymore to avoid the risk of de-investments in "obsolete Verity technology".
- Without any involvement/communication by/to me, Autonomy made organisational changes to my teams.
- My direct reports were told that "Hugo is out".
- The channel that I managed directly (e.g. in Korea, Japan, Singapore, Denmark, etc.) were told that "Hugo is out".
- Only on Jan. 5 last, I received a call from Andrew Kanter, who informed me that Autonomy couldn't offer me an equal position in the new organisation.
- A few hours after the tel call from Andrew, my e-mail was shut off and routed to Sushovan Hussain (Autonomy's CFO). I was very confused and disappointed not to have received any notice and what's even worse, I lost the professional opportunity to inform all my business contacts who I work with for many, many years.
- On Jan. 6 last, I received a potential redundancy letter, dated Dec. 29, 2005! The letter also informed me to be on half pay, per that date.
- On Jan. 24 last, we had a brief meeting (as referred to above).

Andrew, I trust that you do understand that uncertainty and ignorance is not easy to accept for someone like me who built Verity, Inc. from scratch, during 15 1/2 years, outside the USA to a revenue level exceeding 50 mill. USD (about half the size of Autonomy's FY05 turnover).
So please let's communicate, conclude and resolve this situation.

I look forward to your reply and remain,

with kind regards,

Hugo Sluimer

HS-0287

P R O D U C T I E 35a

HS-0288

Prod. 352

From: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 14:02
To: 'Rachel Haverfield'
Subject: FW: Europe RIF

--------------------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 06 January 2006 18:35
To: 'Anthony Bettencourt'
Subject: Europe RIF

Dear Anthony,

It appears we're at the end of the difficult stage of the transition and on to the much more interesting bits. I'm sure you find this as much a relief as I do.

As I'm sure you're aware, the process in Europe takes much longer so we'll continue to work through the procedures over the next few weeks. One matter that may come to your attention is any final determination on Hugo. We have to follow the formal process required by law, and I've sent him the requisite letter and spoken with him. Unfortunately I fear that Hugo may already be positioning against the company as he's sent me an email which is simply not true.

In any event I urge to pass back to me any communications or matters that may come up with Hugo. The legals are complicated enough so that it's easy to let a small mistake become fatal. We are committed to running a fair, open and honest procedure with Hugo but need to keep the channel formalized.

Wishing you the best and looking forward to seeing you next week.

Best regards,

--Andy

HS-0289

<u>P R O D U C T I E 35b</u>

HS-0290

ExitFrom: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 14:07
To: 'Rachel Haverfield'
Subject: FW: Exit

------------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 09 January 2006 12:44
To: 'Sushovan'
Subject: RE: Exit

since i'm the bad guy you should get on the phone with hugo asap.  remember that
it is currently a consultation period and that nothing definitve has been
decided, despite what hugo is telling people.

------------------------------------------------------------------------
From: Sushovan [mailto:sushovanh@autonomy.com]
Sent: 09 January 2006 12:42
To: Andrew Kanter
Subject: Fw: Exit

interesting that Matrix doesn't have the signed partner contract - do you have
anyhting?
----- Original Message -----
From: Noa Shimoni
To: Hugo Sluimer (E-mail)
Sent: Monday, January 09, 2006 12:34 PM
Subject: Exit

Hi Hugo,

I was sorry to hear that you are leaving. It has been a pleasure working with
you for all these years.

I wanted to ask regarding the deals that are still in process. Do we have to
start the entire process again or did you discuss these with the person that
will be working with us?


Also, we need the signed contract. We haven't received the contract signed by
Verity and we need it here.

Please advise,

Regards,


Noa

Noa Shimoni

Vendor Relations Manager

Matrix IT Software Products Division

Office: 972- 9- 9598766

HS-0291

<u>P R O D U C T I E 35c</u>

HS-0292

Prod. 35C

From: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 14:07
To: 'Rachel Haverfield'
Subject: FW: Stouffer Egan

--------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 10 January 2006 11:35
To: 'Kazuyuki Maeba'
CC: 'stouffere@us.autonomy.com'
Subject: Stouffer Egan

Maeba-san,

With this email I'd like to introduce you to Stouffer Egan.  Stouffer Egan is
Autonomy's group Chief Strategy Officer and reports directly to Mike Lynch,
Autonomy's CEO.  Stouffer was previously the CEO of Autonomy's US operations,
responsible for all sales across the region.

Stouffer will be filling the role that Hugo Sluimer previously filled for you,
ie he will be your primary reporting manager.  We are currently in a
consultation period with Hugo about his possible redundancy with the company.

Stouffer's contact details are as follows:

e: stouffere@us.autonomy.com
p: +1 415 243 9955

I am of course available at any time for any questions and any help that I may
be able to provide.  However given Stouffer's sales focus he will be able to
provide you with the most help.

I would like to meet with your team in Miami, together with Stouffer and Mike
Lynch.  When we are in Miami we can schedule the time.

Best regards,

--Andy

HS-0293

P R O D U C T I E 35d

HS-0294

From: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 14:12
To: 'Rachel Haverfield'
Subject: FW: employee outstanding issues, February salary


------------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 14 February 2006 01:07
To: 'Eric Weenink'; 'Rachel Haverfield'
Subject: RE: employee outstanding issues, February salary

UK

James Mason - I'll check with UK finance.  Not sure why you didn't receive the
final docs.

Spencer Young - Last day is 18 March.  Can you send me and Sushovan the
commission statement.

Hugo Sluimer - We are still reviewing the position and looking for alternatives.
Can you send me and Sushovan the commission statement.

Daniel Heck - We're checking with the lawyer regarding whether we can terminate
as Daniel has filed an action.  I believe the answer is yes and last day will be
Feb 15th.

For the three Dutch leavers, all is continuing for now with their departure on
March 1.  We have sent out from the lawyers the final financial position.  I'll
let you know if any accept.

Regards,

--Andy


------------------------------------------------------------------------
From: Eric Weenink [mailto:eweenink@autonomy.com]
Sent: 13 February 2006 10:35
To: Andrew Kanter; Rachel Haverfield
Subject: employee outstanding issues, February salary


Rachel, Andy


just to make sure I do not miss anything here is the list of items and what I
believe the current status is or where I am having questions:

UK

james mason, last day february 4th,  we are waiting for paperwork regarding the
package

Spencer young,  not sure what his last day will be, also should we pay his
commission over January as usual ( ukp 608 )

Hugo Sluimer,  Not sure what the status is on him, should we pay his commission
over January as usual ( ukp  3417 )


Germany

HS-0295

Exhibit K.txt

daniel heck , last day feb 15 ?  any news on any package if any , and can we
terminate his employment per february 15th ?

Netherlands:

any news on the 3 leavers as per March 1, i.e. van egdom, de jong or barroso

thanks

eric

HS-0296

<u>P R O D U C T I E</u> 35e

HS-0297

Prod. 35e

From: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 14:02
To: 'Rachel Haverfield'
Subject: FW: who looks after Verity Asia activities/employees?


-----Original Message-----
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 08 January 2006 10:43
To: 'Peter den Haan'
Subject: RE: who looks after Verity Asia activities/employees?

Hi Peter,

Can I ask if any specific queries come in that you forward them to me?

I'm guessing that some of this is out of date.  I've spoken with the head of
Japan, China, Germany, Benelux, France and the UK personally.  Scandinavia falls
under Spencer's remit now.  Middle East/South Africa haven't changed at all -
they're still with the individuals responsible in the French office.  Emmanuel
is meeting all on Monday.  Malaysia is in touch with our team in Singapore.
Australia is an issue as Steve Cottrell is leaving.
Steve Gibson and I have been trading emails but keep missing each other on the
phone.  We have agreed no matter what to speak in Miami.

One technical matter - Hugo has not been fired, but rather his role is at risk
of redundancy.  We're currently in a consultation period with him.

What are the specific matters that have been raised?  If you can forward these
to me I'll be able to more effectively address each.

Best regards,

--Andy

-----Original Message-----
From: Peter den Haan [mailto:pdhaan@verity.com]
Sent: 07 January 2006 17:06
To: andrewk@autonomy.com
Subject: who looks after Verity Asia activities/employees?
Importance: High

Hi Andrew,

I understand that Hugo has been laid off.

Who is now looking after the customers, partners, sales activities, and the
Verity employees, that Hugo was handling?
Asia/Australia, Middle-East, Scandinavia, South-Africa.

I'm guessing no one may have been informed until now, they are noting that Hugo
is removed. Causing the obvious confusion, mixed expectations, etc. I now get
all these questions, etc.

When will something be done on this subject?
It is really important given the customer activities, long customer history,
knowledge and culture aspects, significant competitive challenges involved.
(please do not underestimate this).

Regards,

Peter

(PS. I am in the US)

HS-0298

P R O D U C T I E 35f

HS-0299

Prod 35p

From: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 14:02
To: 'Rachel Haverfield'
Subject: FW: Europe RIF

--------------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 08 January 2006 10:43
To: 'Jack Landers'
Subject: FW: Europe RIF

Jack,

I sent the message below to Anthony on Friday.  Can I ask of you as well that
any communication you get from Hugo be forwarded to me.  It's easier to get this
process wrong than right and we're committed to the proper process.

Best regards,

--Andy

--------------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 06 January 2006 18:35
To: 'Anthony Bettencourt'
Subject: Europe RIF

Dear Anthony,

It appears we're at the end of the difficult stage of the transition and on to
the much more interesting bits.  I'm sure you find this as much a relief as I
do.

As I'm sure you're aware, the process in Europe takes much longer so we'll
continue to work through the procedures over the next few weeks.  One matter
that may come to your attention is any final determination on Hugo.  We have to
follow the formal process required by law, and I've sent him the requisite
letter and spoken with him.  Unfortunately I fear that Hugo may already be
positioning against the company as he's sent me an email which is simply not
true.

In any event I urge to pass back to me any communications or matters that may
come up with Hugo.  The legals are complicated enough so that it's easy to let a
small mistake become fatal.  We are committed to running a fair, open and honest
procedure with Hugo but need to keep the channel formalized.

Wishing you the best and looking forward to seeing you next week.

Best regards,

--Andy

HS-0300

P R O D U C T I E 35g

Prod 35g

From: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 14:07
To: 'Rachel Haverfield'
Subject: FW: Stouffer Egan

--------------------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 10 January 2006 11:37
To: 'dsutherl@verity.com'; 'Steve Gibson'
Subject: Stouffer Egan

Dear Darren and Steve,

With this email I'd like to introduce you to Stouffer Egan.  Stouffer Egan is
Autonomy's group Chief Strategy Officer and reports directly to Mike Lynch,
Autonomy's CEO.  Stouffer was previously the CEO of Autonomy's US operations,
responsible for all sales across the region.

Stouffer will be filling the role that Hugo Sluimer previously filled for you,
ie he will be your primary, top-level reporting manager.  We are currently in a
consultation period with Hugo about his possible redundancy with the company.

Stouffer's contact details are as follows:

e: stouffere@us.autonomy.com
p: +1 415 243 9955

I am of course available at any time for any questions and any help that I may
be able to provide.  However given Stouffer's sales focus he will be able to
provide you with the most help.

Best regards,

--Andy

HS-0302

<u>P R O D U C T I E 36</u>

HS-0303

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 10 January 2006 16:03
**To:** Andrew Kanter
**Subject:** Settlement

Dear Andrew,

In the letter of December 29, 2005, a consultation meeting on January 11, 2006 is mentioned. I assume that, based on the telcall we had, that this meeting lost its value, since you are of the opinion that in my case no alternative position can be identified.
In that case I would prefer it if you could make a proposal for an amicable settlement.
Subsequently I will seek legal advice and let me inform to what extent I should agree on the (conditions of) termination of my employment contract. In this respect it should be pointed out in advance, that Dutch Law is applicable.
Furthermore I expect you to be informed about the arrangements that were made concerning my participation in Verity's Change in Control and Severance Benefit Plan.

Please call me if questions arise.

Best regards,

Hugo Sluimer

P R O D U C T I E 37

HS-0305

Prod. 35

2006/2/16, Andrew Kanter <andrewk@autonomy.com>:
Dear Mr Sluimer,

I am currently travelling but will endeavour to respond on Thursday.

Sincerely,

Andrew Kanter
Autonomy

HS-0306

<u>P R O D U C T I E 38</u>

HS-0307

Prod. 38

**From:** Hugo Sluimer [mailto:hugosluimer@gmail.com]
**Sent:** 02 March 2006 15:36
**To:** Andrew Kanter
**Subject:** Re: Reply to your mail of Feb 22 last

Dear Mr. Kanter,
I fail to see why you make a distinction between open correspondence and 'without prejudice'. In our meeting in January we only spoke of a formal and an informal part of the meeting. To put it briefly, there is nothing to hide in my opinion. I wait for you reply.

Best regards,

Hugo Sluimer

HS-0308

P R O D U C T I E 39

HS-0309

Prod 39

REDUNDANCY POINTS TO BE MADE DURING
THE FIRST CONSULTATION MEETING 24/01/06

3:00PM HUGO SLUIMER –
SENIOR VICE PRESIDENT EUROPE AND APAC OPERATIONS

(a)    Explain the purpose of this initial meeting is to:

(i)    explain what is going on;

(ii)    discuss how this might affect him;

(iii)    enable him to comment on the proposals and their effect, at an early stage;

(iv)    consider what alternative employment may be available within the group.

(i)    explain to the employee what is going on;

- *Autonomy Corporation plc has completed the purchase of Verity Inc which has a number of duplicated functions and offices.*

- *Because of the acquisition, the Verity's K2 software is being integrated into Autonomy's IDOL platform and sold as a single product under the Autonomy trade marks, business name and licensing structure.*

- *As a result, many of the head office/administrative functions currently undertaken by the Autonomy and Verity groups are duplicative, and so are being consolidated into a single, central operation in the UK at Autonomy's head office. The functions affected include operations, office administration, legal, finance (including local booking of revenues and billing), HR and marketing.*

- *This consolidation is required in order to integrate both companies into a single organisation, with a single product, a single sales team and single order processing system, which will remove unnecessary costs that are the direct result of the duplication caused by the merger and therefore maintain competitiveness of the group.*

(ii)    discuss how this might affect him;

- *No firm decisions have yet been taken*

- *Your role is directly affected by the consolidation and there is a significant likelihood that your position will become redundant because:*

    *Operations oversight - Order processing and operations will be moved to Cambridge. This makes sense because after integration, the software will be sold by the UK entity (and not the local companies) and shipped from the UK.*

    *Finance Admin - The finance administration of the combined group shall, as a result, be consolidated and be run solely from Autonomy's head office in Cambridge UK, where Autonomy already has an existing finance team. Since the financial business will be done under the IFRS accounting principles, the*

*finance functions will be performed by employees who are familiar with these principles and qualified in the UK.*

*Sales oversight - With respect to oversight of sales, Autonomy already has an existing team that oversees presales and sales team in Cambridge.*

*Business Development - Since the focus on marketing will be in the UK and furthermore worldwide marketing shall be initiated from the UK, the marketing business will thus be transferred to Cambridge.*

(iii)    consideration of alternative employment that may be available within the group.

-   *Autonomy has undertaken a review, in conjunction with Verity management, both prior to and post-acquisition, to determine the existing and on-going needs of the combined group to determine whether there are any suitable alternative roles of a similar level of seniority available. Each officer responsible for a business area (finance, marketing, operations, technical and sales) have been contacted to determine open opportunities and we will continue to do so throughout the process. Unfortunately, at this stage, we do not have any suitable positions available to offer you*

-   *We are continuing to look for alternatives to redundancy.*

(iv)    Ask the employee if they have any comment on the points that have been made. Allow sufficient time for the employee to respond to and comment on the points.

(b)    Discuss the financial consequences.

-   *You will be entitled to your statutory severance amount and a three month notice period plus an adjusted amount if you agree to sign a release and waiver of any and all actions against the company. If you are made redundant, you will be paid in lieu and not required to work out notice.*

-   ***IF the employee wishes to discuss a settlement:*** Unless the employee wishes to do so, it would be advisable not to go into too much detail at this meeting - limit the discussion to principles rather than exact numbers.

-   *We are not authorised to give specific figures in this meeting, but would encourage you to chat to us about them informally after the meeting.*

(c)    Ask the employee again whether he has any comments or questions.

(d)    Explain to the employee that he should go away and consider the points raised at the meeting and we would appreciate a response, after which, if no suitable alternatives to redundancy arise which are acceptable to the employee, a letter of dismissal will be sent. But feel free to contact us at any time in the meantime to discuss.

(e)    Stress that no final decision has been taken and that the employee is not being given notice to terminate employment.

(f)    Conclude the meeting by saying that the announcement/reorganisation must have come as a shock. The employee should go away and consider the various points that have been discussed and if appropriate speak to his family.

HS-0311

HS-0312

# DINGEMANS VAN OVERHILD

Rechtbank Utrecht, sector kanton - locatie Utrecht
Zitting d.d. 30 mei 2006 te 15.15 uur
Kenmerk: 466781 EJ VERZ 06-1375

**PLEITAANTEKENINGEN mr. J. van der Pijl**

inzake

de heer **H. SLUIMER**
hierna te noemen: "Sluimer"
wonende te Monaco
eiser
gemachtigde: mr. J. van der Pijl te Amsterdam

tegen

de besloten vennootschap **VERITY BENELUX B.V.**,
hierna te noemen: "Verity"
gevestigd te Amsterdam
gedaagde
gemachtigde: mr. J.A. de Roos te Amsterdam

---

Edelachtbare vrouwe,

I.     Inleiding
II.    Oude functie Sluimer bij Verity
III.   Overname Verity door Autonomy
IV.    Exit afspraken uit 2005
V.     Positie Sluimer in verband met overname
VI.    Ontwikkelingen januari/februari/maart 2006
VII.   Salarisniveau
VIII.  Fiscale positie Sluimer
IX.    Andere functie
X.     Change in control

HS-0313

# DINGEMANS ⸬⸬⸬⸬⸬ D

XI.    Grondslag en vergoeding
XII.   Goede wil
XIII.  Slotconclusie

### I Inleiding

1.    Sluimer wordt door Autonomy neergezet als iemand die van meet
      af aan maar op een ding uit zou zijn: een zo hoog mogelijke
      afvloeiingsvergoeding. Autonomy vergeet daarbij gemakshalve
      een belangrijk feit: ten gevolge van de overname van Verity door
      Autonomy is de functie van Sluimer komen te vervallen. Zijn
      werkzaamheden zijn met onmiddellijke ingang overgenomen door
      de heer Sushovan Hussain. Daarvan valt Sluimer natuurlijk geen
      verwijt te maken; dit is een (kennelijk welbewuste)
      beleidsbeslissing van Autonomy.

2.    Sluimer maakte zich vervolgens wèl nadrukkelijk ongerust over
      de wijze waarop Autonomy een en ander zou afhandelen. Ik kom
      hier later op terug. Hoe terecht die ongerustheid was, is in de
      maanden er na gebleken. Autonomy heeft er alles aan gedaan om
      onder betaling van een adequate afvloeiingsregeling uit te komen,
      uiteindelijk door hem een gecreëerde, eerder niet bestaande
      functie aan te bieden, die niet passend is.

### II Oude functie Sluimer bij Verity

3.    Ik begin met de situatie vòòr de overname. Sluimer heeft een
      grote organisatie opgezet door ruim 15 jaar lang extreem hard te
      werken. Hij maakte werkweken van gemiddeld 80 uur, verspreid
      over zes en soms zeven dagen. Werken in "the fast lane", noemt
      hij dat, waarvoor hij overigens ook goed is beloond. Sluimer
      stuurde uiteindelijk een organisatie aan over de gehele wereld.
      Zijn regio, EMEA/APAC, betreft de regio Europa, Het Midden-
      Oosten, Azië en de zogenaamde Asian-Pasific Regio. Met andere
      woorden, de gehele wereld met uitzondering van Noord-, Midden
      en Zuid-Amerika. In al deze regio's zijn mensen werkzaam met
      rapportagelijnen richting Sluimer.

4.    Om die reden was Sluimer ook al sinds 1993, zoals blijkt uit het
      uittreksel van Verity Inc., uit het handelsregister in Nederland,

HS-0314

# DINGEMANS D

(productie 13) bevoegd om namens deze beursgenoteerde moedermaatschappij uit de Verenigde Staten op te treden. In tal van andere landen zijn vennootschappen opgericht, waarvan Sluimer de statutair directeur was. Dat Sluimer veel heeft bereikt en altijd voortreffelijk heeft gefunctioneerd is duidelijk en blijkt onder meer uit de gerealiseerde commissies/bonussen. Dit wordt overigens ook niet door Autonomy betwist. Zij spreekt ook over een werknemer met een tot de verbeelding sprekende staat van dienst.

III Overname

5.   Door de overname van Verity door Autonomy is de functie van Sluimer komen te vervallen. Als zijn taken zijn overgenomen door de CFO van Autonomy, de heer Sushovan Hussain. Hierover bestond geen enkele discussie, dit was wel meet af aan volstrekt duidelijk. Zo duidelijk zelfs dat er geen formele communicatie van de kant van Verity/Autonomy richting Sluimer is geweest om hem dit mee te delen. In punt 11 van het verzoekschrift spreekt Autonomy overigens over de zogenaamde "consultation period" die volgens haar uit twee stadia bestaat:

(i)  het stadium waarin wordt beoordeeld of de functie wellicht zou moeten komen te vervallen en (daarna),

(ii)  het stadium waarbinnen, in geval van verval van functie, gezocht wordt naar alternatieve functies binnen het bedrijf. Autonomy stelt dat deze periode op 29 december 2005 is gestart. Tegelijkertijd wordt echter in punt 15 door Autonomy gesteld dat hij in haar brief van 29 december 2005 al op non-actief is gesteld, "aangezien de voormalige functie van Sluimer door deze reorganisatie was vervallen". Met andere woorden, Autonomy erkent zelf ook dat dit op 29 december, bij aanvang van de consultation period een volkomen duidelijk feit was, waarover geen enkele onduidelijkheid kon bestaan. Stadium 1 kon in dit bijzondere geval worden overgeslagen.

IV Exit afspraken uit 2005

6.   Het verval van de positie van Sluimer was wat hem betreft overigens "all in the game". Een overname van Verity zat er al langer aan te komen, of dat nu door Autonomy of een andere

3

HS-0315

# DINGEMANS ⬛⬛⬛⬛⬛⬛ D

concurrent zou gebeuren. Om die reden is er in 2005 door het voltallige management van Verity de zogenaamde Change in Control overeenkomst gesloten. Juist om ieder misverstand over afvloeiingsregelingen te voorkomen werd daaromtrent in een separate overeenkomst voorzien. Hier is niets mis mee; het is gangbare praktijk bij topmanagers, niet alleen in de VS, maar ook in Nederland om te voorzien in afvloeiingsregelingen bij een eventuele wijziging in bijvoorbeeld de zeggenschap.

7.  Ook aan de Nederlanders in het management, Sluimer en de heer Weenink, werd aangeboden deel uit te maken van het plan. Zij gaven er echter de voorkeur aan om de Nederlandse regels voor de bepaling van de hoogte van ontslagvergoedingen van toepassing te laten zijn in plaats van de strikte regels van het plan. Volgens de regels van het plan zouden Sluimer en Weenink namelijk voor vergoedingen ter grootte van respectievelijk 18 en 12 maanden in aanmerking komen, op basis van hun functies. Gezien de lengte van hun dienstverband, en in het geval van de heer Sluimer ook diens leeftijd, zou toepasselijkheid van de kantonrechtersformule beter uitpakken en bovendien bij het klimmen der jaren leiden tot een hogere vergoeding. Wat Sluimer en Weenink gedaan hebben, is opkomen voor hun belang en de kantonrechtersformule ook op hun van toepassing te laten zijn, i.p.v. de lagere contractuele vergoeding.

8.  Inmiddels zijn met zowel de CEO de heer Bettencourt, als de CFO, de heer Springsteel alsook met de heer Weenink afvloeiingsregelingen getroffen. Sluimer houdt het er voor, dat in alle drie de gevallen een regeling is getroffen die strookt met het Change in Control plan of daar per saldo zelfs bovenuit stijgt. Van de heer Springsteel heeft hij daarvan de expliciete bevestiging ontvangen en hij kan zich niet voorstellen dat de heer Weenink niet met een vergoeding op basis van de kantonrechtersformule (C=1) is vertrokken.

9.  Partijen zullen het er dan ook over eens zijn dat hier – in zijn algemeenheid - sprake is van de Change in Control situatie conform de definitie uit het plan in Section 2 onder c. Ook hier kom ik later op terug.

4

HS-0316

# DINGEMANS VAN DER D

### V Positie Sluimer in verband met overname

10. Zoals gememoreerd was het Sluimer (en Verity/Autonomy) in het najaar van 2005 volstrekt duidelijk, dat zijn functie zou komen te vervallen. Hoe wist Sluimer dat dan zo zeker?
    a. Sluimer wist dat zijn functie bezet zou worden door Sushovan Hussain. Dat was algemeen bekend.
    b. Als enige Verity Executive is Sluimer nooit uitgenodigd voor deelname aan overname– en integratiegesprekken tussen executives van Autonomy en Verity die plaatsvonden in november en december 2005.
    c. Sluimer is niet uitgenodigd voor de meeting in Miami, bedoeld voor alle verkoop- en marketingafdelingen, met daarbij alle executives. Sluimer verwijst naar productie 15, waarin medio december 2005 door hem met anderen over deze meeting wordt gecorrespondeerd.

11. In de maanden voordat de overname rond kwam was er ook veel "ruis" tussen de Sales Teams van enerzijds Verity en anderzijds Autonomy. Autonomy achtte zich vrij om al klanten van Verity te benaderen, hetgeen tot grote onrust bij Verity-medewerkers leidde.

12. Dat alles maakte dat er sprake was van enige vijandigheid en bovendien ook in het individuele geval van Sluimer duidelijk was dat hij buiten de boot viel, hetgeen dus ook is bevestigd door de beslissing van 29 december 2005.

13. Weliswaar beschikte Sluimer over de op zichzelf genomen heldere afspraken op grond van het Change in Control plan, maar hij maakte zich eind december 2005 toch zorgen om zijn positie. Autonomy zou toch niet moeilijk gaan doen?

14. Toen hij hoorde dat zijn kompaan Weenink, de financiële man van Sluimer's Verity-regio, vertelde op 29 december 2005 een meeting bij Autonomy te hebben om over de afvloeiingsregelingen van de medewerkers van Verity Benelux BV, waaronder Sluimer, te spreken, was het logisch dat Sluimer en Weenink zich daarop voorbereiden (Weenink deed dat kennelijk ook voor zichzelf). Sluimer stuurde deze mail uitsluitend omdat hij zich zorgen maakte over de wijze waarop Autonomy zou

HS-0317

# DINGEMANS         D

omgaan met het verval van zijn functie ten gevolge van de overname.

15. Dat de vertrouwelijke mail van Sluimer aan Weenink overigens in het geding is gebracht is tekenend voor de methode waarvan Autonomy zich bedient. Deze mail is noch door Sluimer, noch door Weenink aan vertegenwoordigers van Autonomy ter beschikking gesteld. Weenink is inmiddels weg en kennelijk is dit zonder zijn medeweten (of dat van Sluimer) uit zijn mailbox "gevist". Een methode die later ook op de Virage-mail van Sluimer is toegepast, zonder dat hij dat wist.

VI Ontwikkelingen januari, februari, maart 2006

16. Ook direct in januari 2006 wees alles op een vertrek van Sluimer. Ter adstructie noemt Sluimer de volgende feiten:

    a. Aan de zogenaamde "Direct Reports" van Sluimer werd door zijn opvolger verteld: "Hugo is out". Een van Sluimer's medewerkers is bereid geweest dit te bevestigen in de vorm van een e-mail (productie 16).

    b. Ook diverse andere interne en externe relaties verkeerden in de veronderstelling dat Sluimer was vertrokken, zonder dat zij deze mededeling van Sluimer zelf hebben ontvangen (Sluimer werd immers door Autonomy niet op normale wijze in de gelegenheid gesteld om zijn medewerkers en zijn externe relaties te informeren). Sluimer verwijst naar de producties 35a e.v. van Autonomy bij haar verweerschrift, waarbij Sluimer het er voor houdt dat dit lang niet de enige reacties zijn geweest, maar dat het hier een selectie betreft.

    c. Voorts werd Sluimer op 5 januari 2006 gebeld door de heer Kanter die hem informeerde dat Autonomy zeer waarschijnlijk geen gelijkwaardige positie kon bieden.

    d. Enkele uren na dit telefoongesprek met de heer Kanter werd zijn e-mail afgesloten en werden zijn inkomende e-mailberichten doorgesluisd naar zijn opvolger, de heer Sushovan Hussain. Alles zonder enig overleg.

    e. Ook op 24 januari 2006 werd Sluimer door Kanter meegedeeld "your role is directly affected by the consultation and there is a significant likelihood that your position will become redundant". Kanter legt in dat

6

# DINGEMANS                    D

gesprek nogmaals aan Sluimer uit dat de medewerkers
die aan hem rapporteerden, zoals verkoopondersteuning,
opleiding, consulting, marketing enz. bij Autonomy zijn
gecentraliseerd en dat Sushovan Hussain de verkoop in
zijn regio leidt en dit zal blijven doen.

f.  Gezien de omvang van de verantwoordelijkheden van
Sluimer in zijn oude Verity functie en het feit dat
Autonomy een kleinere organisatie is dan Verity, lag het
ook niet voor de hand, nu de keuze op de heer Sushovan
Hussain was gevallen, dat er voor Sluimer een passend
alternatief gevonden kon worden. De voorkeur werd, als
het ging om kerntaken van de onderneming zoals
algemeen, financieel en sales management, in vrijwel alle
gevallen gegeven aan de Autonomy-executive boven die
van Verity. Als voorbeeld noemt Sluimer de posities van
de CEO, de CIO en de CFO. In alle gevallen zijn hun taken
overgedragen aan Autonomy medewerkers. In de Board,
noch op het direct daaronder liggende niveau van de
Executive Officers, is bij Autonomy een plek voor Sluimer
ingeruimd, hetgeen Sluimer gezien het voorgaande
overigens niet heeft verrast.

17.  Sluimer is in deze periode nooit een kans gegeven of anderszins
gevraagd om mee te werken aan het vinden van een passende
functie. Zijn functie is hem ontnomen, zonder dat hij contact
daarover kon onderhouden met relaties en medewerkers.

18.  In deze procedure "claimt" de heer Kanter dat de extensive
management meetings" zouden hebben plaatsgevonden bij het
zoeken naar een nieuwe functie voor hem. Sluimer is daar in het
geheel niets van bekend, laat staan dat hij daarbij betrokken is.
Hij heeft een en ander geverifieerd bij de Senior Vice President
Human Resources (Worldwide) Jack Landers en bij de heer
Anthony Bettencourt, de voormalige CEO van Verity. Was zijn
positie ooit ter discussie is gebracht in bijeenkomsten, voor of na
de overname, van welke aard ook? Het antwoord daarop was:
nee. Met wie vonden de gesprekken dan plaats? Sluimer zou het
niet weten; in ieder geval niet met Sluimer zelf of met hem
bekende collega's.

7

# DINGEMANS                    D

19. In het gesprek van 24 januari 2006, waarvan Sluimer
    handgeschreven handtekeningen heeft gemaakt en waarvan hij
    tevens in de vorm van een worddocument een kort verslagje
    heeft geproduceerd (productie 17), is voorts gesproken over een
    minnelijke regeling. In dat gesprek heeft Kanter aangegeven dat
    volgens zijn advocaten in Nederland geen Nederlands recht op de
    arbeidsverhouding van toepassing was en dat hij volgens het
    Britse recht op hooguit een afvloeiingsregeling van enkele
    maanden aanspraak zou kunnen maken ("pennies" noemde hij
    dat). In het gesprek is Sluimer vervolgens gevraagd om een
    voorstel voor een regeling te doen, maar na een schorsing van de
    bijeenkomst, waarin Sluimer zijn advocaat heeft gebeld, koos
    Sluimer er voor om op dat moment niet zelf met een voorstel te
    komen. De reden was dat (gezien de opstelling van de heer
    Kanter, mede op advies van diens advocaten, en het feit dat
    Sluimer in feite aanspraak wilde maken op de vergoeding volgens
    de Nederlandse kantonrechtersformule), het doen van een
    voorstel op dat moment nog niet erg zinvol.

20. In die daaropvolgende weken is door partijen nog regelmatig
    overleg gevoerd. Deels ging dat over de status van dat overleg
    (was dat nu een formele of een informele bijeenkomst geweest en
    waren er voorstellen gedaan in de vorm van "open
    correspondence" of "without prejudice"), maar Autonomy bleek
    niet bereid tot het doen van enig voorstel. Wel is opnieuw aan
    Sluimer gevraagd een voorstel te doen hetgeen hij deed op 7 april
    2006. Hij heeft toen eenvoudigweg voorgesteld de zaken af te
    doen tegen betaling van de neutrale kantonrechtersformule
    (ontbinding per 30 april 2006). Dit voorstel is van de hand
    gewezen.

    VII Salarisniveau

21. In de tussentijd was duidelijk dat Sluimer niet zijn gebruikelijke
    commissie ontving. Autonomy heeft er voor gekozen om Sluimer
    commissie/bonus te betalen op basis van de omzet van Verity
    producten. Dat is om meerdere redenen unfair. In de eerste
    plaats had Sluimer gezien zijn op non-actiefstelling geen invloed
    meer op de omvang van deze omzet. In de tweede plaats was de
    markt reeds geïnformeerd dat de Verity producten zouden worden
    vervangen door Autonomy producten. Daardoor gingen klanten

HS-0320

# DINGEMANS D

en potentiële klanten natuurlijk niet meer investeren in Verity producten, wetende dat de continuïteit gevaar zou lopen. In de derde plaats zijn een groot aantal zeer professionele Verity medewerkers van Sluimer vertrokken. Sluimer noemt de General Managers in Australië/Nieuw-Zeeland, Zuid-Europa, Verenigd Koninkrijk/Ierland en nog een flink aantal andere sales consultants en marketing managers. Feit is dat Sluimer qua maandelijkse salaris en bonusbetalingen in vier maanden tijd ruim € 50.000 minder heeft ontvangen dan normaal gemiddeld in de maanden ervoor.

22. Onder verwijzing naar de in het verzoekschrift gestelde jurisprudentie rust echter op een werkgever in zo'n situatie onverkort de verplichting om het volledige salaris c.a. te voldoen. Ook hierdoor voelde Sluimer zich onder druk gezet. Het ging om aanzienlijke bedragen.

VIII Fiscale positie Sluimer

23. Datzelfde geldt voor de fiscale positie van Sluimer. Sinds enkele jaren valt hij hoofdzakelijk onder het Engelse belastingrecht (inkomstenbelasting) en nog slechts gedeeltelijk onder het Nederlandse belastingregime. Hij geniet een bijzondere positie, als inwoner van Monaco, op grond waarvan hij in het Verenigd Koninkrijk (slechts) over 5% van zijn inkomen belasting hoeft af te dragen, per saldo zo'n 2%. In februari 2006 had hij, net als anderen, het verworven recht om opties uit te oefenen, hetgeen hij heeft gedaan. Juist gezien die bijzondere fiscale positie was het voor hem belangrijk, dat vóór het einde van het Britse fiscale jaar (dat wil zeggen vóór 6 april 2006) de betaling en de afwikkeling zou hebben plaatsgevonden. Sluimer verwijst ook naar productie 3 van Autonomy, waaruit blijkt dat Verity/Autonomy op de hoogte was van het aflopen van de 5%-regeling.

24. Terwijl afwikkeling in de regel een week of drie in beslag neemt, heeft Sluimer welbewust al op 22 februari 2006 de opties uitgeoefend. Hij was er niet gerust op was dat Autonomy een en ander tijdig zou afhandelen en koos, zo dacht hij, het zekere voor het onzekere. Hij kwam hier bedrogen uit. Sluimer heeft diverse malen op betaling aangedrongen. Van collega's begreep hij dat

9

# DINGEMANS          D

deze al weken eerder hun geld hadden ontvangen. Sluimer ontving echter niets, ondanks zijn steeds dringendere verzoeken, die uiteindelijk zelfs hebben geleid tot een e-mail op 29 maart 2006 waarin hij geen andere mogelijkheid zag dan Autonomy aansprakelijk te houden voor schade die hij zou leiden. Deze schade is inmiddels niet meer denkbeeldig. Betaling heeft pas eind april 2006 plaatsgevonden onder inhouding van 40% belasting (in plaats van conform de 5%-regeling). Als Sluimer dit al kan corrigeren, dan kan pas na afloop van het fiscaal jaar 2006, dat wil zeggen in april 2007. Los van de grote onzekerheid, gaat dit gepaard met een aanzienlijk renteverlies. Dit wordt nog eens versterkt doordat de betaling ook genoteerd is op de salarisspecificatie over april 2006, zodat dit een extra indicatie voor de Britse belastingautoriteiten kan zijn dat de betaling in een ander fiscaal jaar heeft plaatsgevonden, waarop het bijzondere tarief niet van toepassing is.

25.  Overigens voelt Sluimer zich genoodzaakt, gezien de suggestie dat hij onder zijn belastingverplichtingen wil uitkomen, om de aanslagen over de jaren 2001, 2002 en 2003 in het geding te brengen (producties 20 a-c). Hieruit blijkt dat hij in aanzienlijke mate belasting heeft betaald over de jaren dat hij in Nederland woonde. Daarnaast betaalde hij overigens ook in Duitsland en het Verenigd Koninkrijk belasting, ten gevolge van een zgn salary-split. In 2005 nog is er ook nog een aanzienlijke som aan de fiscus in Nederland afgedragen. Sluimer handelt volstrekt integer en volkomen in overeenstemming met alle relevante fiscale wetgeving. Het gaat dan niet aan om hem te verwijten van verschillende walletjes te willen eten. Ook ten aanzien van de ontslagbescherming geldt eenvoudigweg dat al in 2005 tussen partijen (Sluimer en Verity) een overeenkomst is gesloten waarin het Nederlandse ontslagrecht van toepassing is verklaard. Ook is Nederlands recht van toepassing verklaard in de assignment agreement van 2003 (productie 2, artikel 7).

IX Andere functie

26.  Uiteindelijk heeft Autonomy Sluimer een andere functie toebedeeld bij een dochteronderneming (dus niet bij Autonomy zelf!). Aangeboden is niet het goede woord; Sluimer is niet gevraagd of hij de functie passend vond en er mee wilde

HS-0322

# DINGEMANS                    D

instemmen. Zonder enig vooroverleg is gezegd: "dit is de functie, neem maar contact op met de heer Humphrey; succes er mee". De naam van de heer Humphrey is overigens door de heer Kanter verkeerd geschreven, zowel in zijn mail als in zijn brief, hetgeen er op wijst, dat er niet veel contact tussen de heren Kanter en Humphrey heeft plaatsgevonden. De heer Kanter kende zijn naam niet eens, hetgeen past in het beeld, dat uit het eerste telefoongesprek tussen Sluimer en de heer Humphrey plaatsvond: laatstgenoemde reageerde wat verrast en was gebeld door de heer Kanter met de mededeling, dat hij een 'goeie' voor hem had.

27. De functie is slechts vergelijkbaar qua titel en qua salaris (waarbij over bonussen e.d. door Autonomy nog geen concrete voorstellen zijn gedaan, hoewel dat een belangrijk deel, zo'n 50% van de beloning uitmaakt). Sluimer wijst er (nogmaals) op dat het in het gunstigste geval slechts om een jaaromzet van 3 miljoen GBP gaat. Er is sprake van een 15-tal medewerkers (bij het aantreden van Humphrey ca. 10 jaar geleden waren dat er al 7). Virage opereert in een moeizame, zeer gespecialeerde/complexe markt, heeft geen commerciële medewerkers, de omzetprognose voor dit kwartaal is, aldus de heer Humphrey, 200.000 GBP. Dit wordt nu in een e-mailberichtje van Sushovan Hussain opgeblazen, doch niet met feitelijke gegevens onderbouwd.

28. Nog kort de "prognose" van Sushovan Hussain: een aantal kritische opmerkingen daarover. Waarom geeft men voor 2005 geschatte "revenues" op; waarschijnlijk omdat de daadwerkelijke inkomsten lager zijn geweest. Ook voor het eerste kwartaal van 2005 wordt een geschat bedrag ad $ 300.000 opgegeven, terwijl in de praktijk de daadwerkelijke "revenues" lager zijn geweest. Verder heeft de heer Humphrey zelf tegen Sluimer gezegd dat over kwartaal 2 $ 350.000 omzet zou zijn verwacht. Stel dat dit zou worden gerealiseerd, dat is, geëxtrapoleerd de omzet in het volledige jaar 2006, bij een omzet van $ 300.000 in het eerste kwartaal: $ 1,3 miljoen in totaal. Verder is het zo dat de grote projecten die Sushovan Hussain prognotiseert, niet slechts een Neurodynamic/Virage software component bevatte, maar deels ook omzet voor andere entiteiten binnen de Autonomy groep zal realiseren. Dit zal tot een verdeling/split moeten leiden. Verder zijn de zogenaamde "pipeline verwachting" wel erg optimistisch. Aan de informatie in het e-mailtje van Sushovan Hussain kan dan

11

# DINGEMANS · · · · · · · D

ook niet te veel waarde worden toegekend.

29.   Het is duidelijk een substantiële reductie in
       verantwoordelijkheden. De functie van Sluimer heeft uitsluitend
       betrekking op verkoop in plaats van op management in meer
       algemene zin. Hij rapporteert niet alleen meer aan de CEO, maar
       ook aan de General Manager van Virage. Twee rapportagelijnen
       dus, waarvan de belangrijkste aan een General Manager, die
       overigens zelf in de veronderstelling verkeerde dat er door
       Sluimer alleen aan hem moest worden gerapporteerd. Bedacht
       moet daarbij worden, dat hij in zijn vorige functie bij Verity zo'n 8
       general managers aanstuurde! Het geeft aan, dat het gewicht van
       de opgelegde functie veel lichter is. Er zit nauwelijks meer het
       element in van het aansturen van medewerkers (hooguit een paar
       nog te recruteren verkopers; het merendeel van de medewerkers
       zijn technici die rechtstreeks onder de heer Humphrey vallen).

30.   Autonomy lijkt te betogen dat de functie wel passend is, omdat
       Sluimer zelf ook al geschreven heeft dat hij Verity 15,5 jaar
       geleden "from scratch" heeft opgebouwd. Dat is echter een
       onjuiste parallel. Zelfs al zou de nu aangeboden functie
       gelijkwaardig zijn aan de functie die Sluimer, als dertiger, 15 jaar
       geleden vervulde, dan nog kan dat nu natuurlijk niet meer als
       passend worden aangemerkt. Sluimer trekt de parallel met de
       definitie van passende arbeid die gangbaar is; passende arbeid
       omvat werkzaamheden die aansluiten op de kennis, opleiding en
       ervaring van een medewerker. De kennis en ervaring van Sluimer
       is natuurlijk in extreme mate toegenomen in 15 jaar en dit is dan
       ook precies het kernpunt. Sluimer is in al die tijd gegroeid naar
       een zeer seniore rol.

31.   De situatie doet denken aan een directeur van bijvoorbeeld een
       merk als BMW, die in jaren en jaren tijd in een groot aantal
       landen een organisatie heeft neergezet en na de overname van
       BMW door Mercedes gevraagd wordt een klein, nieuw clubje
       binnen Mercedes, dat specifieke uitlaten produceert, te gaan
       opzetten. Een clubje dat net is overgenomen en als buitenbeentje
       binnen de organisatie van Mercedes een plek moet krijgen.

12

HS-0324

# DINGEMANS ··· D

### X Change in Control

32. Ten aanzien van het inroepen van het Change in Control heeft
Sluimer er al op gewezen, dat er aan de definitie van Change in
Control in de zin van het plan is voldaan. Dat wordt ook bevestigd
door bijvoorbeeld het feit dat de voormalige CFO, de heer
Springsteel eveneens op basis van het Change in Control plan bij
Autonomy is vertrokken. Sluimer heeft afgelopen vrijdag met de
heer Springsteel gebeld, die de werking van het plan heeft
ingeroepen en pas bij de afwikkeling van een en ander de
"confidentiality". Sluimer is uiteraard bereid om de confidentiality
agreement te tekenen; een dergelijke overeenkomst maakt
overigens al deel uit van zijn arbeidsovereenkomst. Ten aanzien
van een non-compete agreement is in het geval van Springsteel
een specifiek relatiebeding overeengekomen. Ook op dat punt is
Sluimer bereid om op eerste afroep de betreffende documenten te
tekenen.

33. Om die reden heeft Sluimer zijn brief aan de betrokken Plan
Administrator ook afgesloten met de mededeling dat als er meer
informatie noodzakelijk was, hij daarover gebeld zou kunnen
worden. Hij heeft met deze brief de tenuitvoerlegging van het
plan in werking willen stellen. Op zijn fax van 1 mei 2006 is
vervolgens niet door de Plan Administrator gereageerd, maar door
de heer Kanter die de afhandeling overnam.

34. Sluimer herhaalt dat ook de heer Springsteel niet op voorhand
deze overeenkomsten heeft kunnen tekenen, maar dat pas aan
het eind van de procedure heeft gedaan. Het is tekenend voor de
opstelling van Autonomy dat men zich achter deze formaliteiten
wil verschuilen.

35. Ik ga nu iets dieper in op het plan en de toepasselijkheid ervan.

36. Zoals gezegd is er een zogenaamd Change in Control and
Severance Benefit Plan en partijen zijn verdeeld over de vraag in
hoeverre dit nu van toepassing is bij de toekenning van een
beëindigingsvergoeding aan Sluimer. Graag licht ik een en ander
stapsgewijs nader toe.

13

HS-0325

# DINGEMANS     D

### Stap 1

Het plan is van toepassing op Sluimer en Verity Benelux B.V., nu
laatstgenoemde vennootschap een volle dochter van Verity Inc. is
en een zogenaamde participation notice door beide partijen is
ondertekend. Dit is door Sluimer als productie 4 en 5 in het
geding gebracht. Hierover zijn partijen het eens.

### Stap 2

Krachtens de definitie van Section 2 onder (c) is sprake van een
"Change in Control" in een geval als het onderhavige. Ook
hierover zijn partijen het eens.

### Stap 3

In de definities van Section 2 is onder (g) gedefinieerd wat een
Covered Termination is. Van een Covered Termination is sprake,
hetzij als er sprake is van een onvrijwillige beëindiging zonder
reden door de werkgever, hetzij als er sprake is van een
zogenaamde Constructive Termination. Er is hier geen sprake van
een zogenaamde onvrijwillige beëindiging zonder reden door de
werkgever, maar wel van een Constructive Termination. Dit is
krachtens de definitie onder f (Section 2) het geval indien er
sprake is van een vrijwillige beëindiging van de
arbeidsovereenkomst door een werknemer (participant) in een
bepaald aantal gevallen. Een van die gevallen (gedefinieerd onder
f sub (i)) is sprake als er gesproken wordt van een "substantial
reduction in duties or responsabilities". Uit het voorgaande vloeit
voort dat daarvan in dit geval sprake is. Hetzelfde geldt voor de
plaats waar de werkzaamheden worden verricht; gedefinieerd in
artikel f onder (iii) nu de plaats voor de werkzaamheden worden
verricht niet meer dezelfde zal zijn. Het wordt 95% van de tijd
het Verenigd Koninkrijk. Kortom, om twee redenen is dit een
Covered Termination.

Kortom, anders dan Autonomy stelt, kan het Change in Control plan ook van
toepassing zijn in het geval de werknemer het initiatief voor de beëindiging
neemt en niet slechts indien de werkgever tot beëindiging overgaat. Daarbij is
ook nog eens aangetekend dat in deze procedure nu juist ook Autonomy/Verity
om ontbinding verzoekt, zodat dat argument ook om een andere reden niet
opgaat: ook Autonomy verzoekt om ontbinding van de arbeidsovereenkomst.

14

HS-0326

# DINGEMANS ~~WARNSVELD~~ D

### Stap 4

In Section 3 onder a van het Plan is weergegeven dat in geval van een Covered Termination (waaronder een Constructive Termination) de afvloeiingsregeling van toepassing wordt. Dat is hier dus het geval.

### Stap 5

Krachtens sectie 3 onder b zijn er uitzonderingen op deze aanspraken op vergoedingen. Kort samengevat zijn dit er vier:
(i) Als een werknemer een individueel uitonderhandelde afspraak over de beëindiging heeft gemaakt;
(ii) Als een werknemer vrijwillig de arbeidsovereenkomst bij de werkgever beëindigt om een arbeidsovereenkomst met een andere dochteronderneming in de groep te aanvaarden, die door de werkgever wordt gecontroleerd.
(iii) Als de werknemer bij een rechtsopvolger van Verity of een verkrijger van de aandelen onmiddellijk ander werk wordt aangeboden.
(iv) Als de werknemer niet schriftelijk bevestigt dat hij zich zal onderwerpen aan de "confidentiality agreement" en de "non compete agreement".

Om te beoordelen of van deze uitzonderingen sprake is dient om te beginnen bedacht te worden, dat het beding in de aanhef een uiterst onredelijke kernbepaling kent, nu het altijd de werkgever is die naar eigen goeddunken de toepasselijkheid van deze regeling zou kunnen beïnvloeden: "as determined by the company in it's sole discretion". Naar Nederlands recht is dit een onredelijk beding en bij gebrek aan wetenschap stelt Sluimer, dat dit ook naar het recht van de staat Californië het geval is.

De uitzonderingen onder (i) en (ii) zijn, daar zijn beide partijen het over eens, niet van toepassing. Uitzondering onder (iv) stelt slechts vast dat er nog een schriftelijke bevestiging moet volgen dat de werknemer zich aan de geheimhoudings en concurrentieverklaring houdt. Daartoe is Sluimer bereid.

De uitzondering onder (iii) houdt in dat door Verity/Autonomy (en dus niet door een andere entiteit (zie daarvoor sub (ii)!!) een nieuwe baan moet worden aangeboden. Dit is niet het geval.

15

HS-0327

# DINGEMANS          D

Virage is een aparte vennootschap en niet de overnemende partij
bij de fusie, dat is namelijk Autonomy Plc. Er is bovendien geen
directe re-employement aangeboden na 6 januari jl. Immediate
betekent onmiddellijk en employment betekent baan. Daarvan is
in casu dus geen sprake, zelfs niet met de (wat bizarre) definitie
van de term "immediate reemployment". Ten eerste is deze
regeling dus al niet van toepassing, omdat Virage niet
vereenzelvigd kan worden met Verity/Autonomy. Bovendien kan
de baan toch moeilijk als een "uninterrupted" worden
aangemerkt, zeker niet nu er sprake is geweest van een lapse
(achteruitgang/verval volgens de Van Dale) omdat, zoals Sluimer
heeft aangegeven in het verzoekschrift, hij een achteruitgang in
inkomen heeft ondergaan. Het feit dat er in dezelfde periode
opties zijn uitgeoefend staat daar uiteraard geheel los van. Dit is
een recht dat geen verband houdt met het al dan niet continueren
van de arbeidsovereenkomst en dat bijvoorbeeld ook ruimschoots
na beëindiging van een arbeidsovereenkomst nog kan worden
uitgeoefend. De inkomsten uit het uitoefenen van de optierechten
kunnen hier dan ook niet worden meegerekend. Als deze terzijde
worden gesteld is, onbetwist, sprake van een achteruitgang
(lapse) in inkomen.

Kortom, het plan is van toepassing en Sluimer maakt terecht
aanspraak op uitbetaling van de overeengekomen vergoedingen.
Ten overvloede voegt Sluimer hier nog aan toe dat krachtens de
zogenaamde participation notice vaststaat dat de vergoeding
ongeacht de resterende werking van het plan, van toepassing is.
Voor de vraag of er een severance payment is verschuldigd geldt
eenvoudigweg het Nederlandse recht en expliciet niet het plan.
Ook om die reden maakt Sluimer terecht aanspraak op uitbetaling
van een vergoeding conform de kantonrechtersformule. Het is
zelfs zo dat de gehele voorgaande discussie betrekkelijk arbitrair
is, voornamelijk voor zover deze betrekking heeft op de hoogte
van een ontbindingsvergoeding.

37. Rechtsom of linksom, de kantonrechter dient altijd artikel 7:685
    BW toe te passen (en dus de kantonrechtersformule).

38. Ter verduidelijking. Ofwel het plan is van toepassing en dan dient
    op basis daarvan krachtens het Nederlands recht de vergoeding
    te worden toegekend. Ofwel het plan is niet van toepassing, ook

16

HS-0328

# DINGEMANS       D

dan dient, conform het verzoek van Sluimer, eveneens de regeling van artikel 7: 685 BW te worden toegepast, inclusief de billijkheidsvergoeding van lid 8 van dat artikel en de daarop gebaseerde kantonrechtersformule.

39.     Overigens is deze discussie wel van belang voor het vesten en uitoefenen van optierechten en de voortzetting van een bijdrage in de ziektekostenverzekering.

XI Grondslag en vergoeding

40.     Sluimer heeft in deze procedure ontbinding verzocht op grond van gewichtige redenen in de zin van artikel 7:685 BW. Verity/Autonomy stelt niet of niet (meer), dat Nederlands recht niet van toepassing is. Dat betekent dat artikel 7:685 BW op de arbeidsrelatie van toepassing is.

41.     Dat betekent voorts dat er een billijke vergoeding kan worden toegekend. Sluimer heeft verwezen naar het Change in Control plan, waarin is aangegeven op welke wijze een vergoeding moet worden bepaald. Hij meent op grond van dit plan, maar ook overigens op een verandering in de omstandigheden, een beroep te kunnen doen op een billijkheidsvergoeding. In deze procedure vordert Sluimer overigens geen nakoming van de verplichting uit het Change in Control plan, maar, als gezegd, ontbinding onder toekenning van een billijkheidsvergoeding. Als de rechter het met Autonomy eens is dat de Change in Control regeling in dit specifieke geval niet van toepassing is, dan resteert een normale beoordeling van de beëindiging van deze arbeidsovereenkomst op grond van artikel 7:685 BW.

42.     Niet toepasselijk zijn van de Change in Control betekent vanzelfsprekend niet, dat er dan gèèn vergoeding is verschuldigd. In dat geval moet, los van de Change in Control regeling, gekeken worden naar de huidige situatie en de vraag of in de gegeven omstandigheden er een passende functie is opgelegd. Ook in dat geval is een vergoeding gerechtvaardigd en gezien de bijzondere omstandigheden een vergoeding met toepassing van correctiefactor C=1,5. Het mag dan zo zijn dat bij het Autonomy Management de relatie met Sluimer pas zeer kort bestaat en er in die zin wellicht nog geen loyaliteit c.q. vertrouwensrelatie is

17

HS-0329

# DINGEMANS                    D

opgebouwd, maar de wijze waarop Sluimer de afgelopen maanden is behandeld getuigt van slecht werkgeverschap. Sluimer had hetzij op een fatsoenlijke manier voor een afvloeiingsregeling in aanmerking moeten worden gebracht, hetzij - indien Verity werkelijk zou vinden dat er passende andere arbeid te vinden is, in overleg met Sluimer en op een grondige en professionele manier in gezamenlijk overleg op zoek moeten gaan naar een andere functie. Door dat niet te doen heeft zij verwijtbaar gehandeld. Dit moet leiden tot toekenning van de gevraagde vergoeding, waarbij Sluimer er goede nota van heeft genomen dat de hoogte van het salaris en overige feitelijke gegevens met betrekking tot het dienstverband niet door Verity/Autonomy zijn betwist; zodat de kantonrechter daarbij de beoordeling vanuit kan gaan.

XII Goede wil

43. Sluimer heeft de "aangeboden" positie zorgvuldig geëvalueerd. Er hebben direct telefoongesprekken met de heer Humphrey en Kanter plaatsgevonden, respectievelijk op 23 en 24 maart. De heer Sluimer heeft studie gemaakt van Autonomy's website, collega General Managers gebeld (onder andere Victor Cohen, Peter den Haan, Gerhard Hiller, Mike Mooney) om te informeren wat Neurodynamics precies deed. De meesten kende Neurodynamics overigens slechts van naam. De heer Den Haan, de Technical Director, van Sluimer in de Verity tijd, heeft een en ander voor Sluimer uitgezocht en dit is uitgebreid besproken.

44. Oorspronkelijk bood de heer Humphrey aan een tweedaagse bijeenkomst in Camebridge te laten plaatsvinden om Sluimer te informeren. Enkele dagen voor de geplande meeting is dit gereduceerd tot één dag ("let's have a long, intensive day in the office"). Autonomy organiseerde het reisschema. Dit in combinatie met het feit dat Sluimer op diverse gesprekspartners ter plaatse lang moest wachten heeft er toe geleid dat er op 18 april slechts één meeting heeft plaatsgevonden die 1 uur en 20 minuten heeft geduurd. Sluimer heeft daarvan een verslag gemaakt.

45. De tweede, in Rome geplande meeting op 20 april verviel, zonder Sluimer vooraf in te lichten, omdat het vliegticket "prohibitively

18

HS-0330

# DINGEMANS                    D

expensive" was. Autonomy kan onmogelijk volhouden dat zij alles heeft gedaan om Sluimer te introduceren.

XIII Slotconclusie

46.    In feite kan de zaak teruggebracht worden tot de kernvraag: is de opgelegde functie passend? Dit is niet het geval. Een Senior Vice President is verantwoordelijk voor de gehele operatie (alle functies, verantwoordelijk voor winst en verlies etc.), terwijl Sluimer weliswaar onder die naam blijft opereren, maar in feite slechts verantwoordelijk is voor de sales. Hij moet onder meer rapporteren aan de General Manager, waar hij in het verleden zelf een groot aantal General Managers aanstuurde. Autonomy heeft Sluimer op geen enkele wijze betrokken bij het zoeken naar een andere passende functie maar hem overal van meet af aan buiten gehouden. Het feit dat hij twee of drie keer een mailtje heeft gekregen met de mededeling dat men er mee bezig was, biedt in dat opzicht volstrekt onvoldoende tegenwicht.

47.    Daar komt bij dat het feit dat juist in deze ICT-sector, waar het tempo en de dynamiek uitzonderlijk hoog is, een afwezigheid van ruim drie maanden zonder contact met relaties dodelijk is.

48.    Om al deze redenen kan Sluimer terecht stellen dat hem geen passende functie is aangeboden en dat de arbeidsovereenkomst door ontbinding dient te eindigen onder toekenning van de gevraagde vergoeding, waarbij Sluimer nog aantekent dat bij de berekeningswijze van de vergoeding geen rekening is gehouden met het feit dat Sluimer over enkele weken 53 jaar oud is, zodat hantering van de kantonrechtersformule tot een hogere vergoeding leidt. Ook daarmee verzoekt Sluimer de kantonrechter rekening te houden.

Gemachtigde

HS-0331

HS-0332

50068579

Rechtbank te Utrecht

Sector kanton

Zitting van: 30 mei 2006 te 15.15 uur

Rolnummer: 466781 EJ VERZ 06-1375

## PLEITAANTEKENINGEN

van mr. J.A. de Roos en mr. M. Ritmeester

inzake:

**Verity Benelux B.V.**
gevestigd te de Meern,
verweerder,
advocaat: mr. J.A. de Roos
procureur: mr. M. Ritmeester

tegen:

**H. Sluimer**
wonende te Monaco,
verzoeker,
advocaat en procureur: mr. Van der Pijl

De heer Sluimer heeft een verzoekschrift ingediend tot ontbinding van zijn arbeidsovereenkomst met Verity Benelux B.V. Ik zal in het vervolg spreken over verzoeker "Sluimer" en verweerder "Verity/Autonomy" aangezien Verity Benelux B.V. op 29 december 2005 is overgenomen door Autonomy. Sluimer heeft zijn verzoek tot ontbinding gebaseerd op een wijziging in omstandigheden. Voor zijn eventuele recht op een vergoeding meent hij primair rechten te kunnen ontlenen aan het Verity Inc. Change in Control and Severance Benefit Plan, welke is overgelegd als productie 4 bij het verzoekschrift. Subsidiair meent Sluimer dat er sprake is van een vertrouwensbreuk, die volgens hem te wijten is aan Autonomy. Beide gronden zouden volgens Sluimer vergoeding met een correctiefactor van C=1,5 rechtvaardigen. Sluimer gaat in zijn verzoekschrift voorbij aan verschillende belangrijke feiten en omstandigheden, welke in het

50068579 AMS C 419285 / 12

NautaDutilh

2

verweerschrift uitgebreid zijn behandeld. Ik zal nu slechts de gebeurtenissen kort nalopen en nog aan het eind ingaan op hetgeen Sluimer heeft gesteld.

2.      Op 29 december 2005 is Verity, de voormalig werkgever van Sluimer, overgenomen door Autonomy. Sluimer vervulde bij Verity de functie van Senior Vice President van Sales Operations voor de EMEA&APAC regio's. Door de overname is deze functie uiteindelijk vervallen. Verity/Autonomy heeft direct na de overname Sluimer dit mogelijke verval van functie meegedeeld. Tevens heeft zij toegezegd dat zij haar uiterste best zou doen een alternatieve vergelijkbare functie voor Sluimer te vinden. Verity/Autonomy heeft overigens uitdrukkelijk aan alle managers laten weten dat *"Hugo"* helemaal niet *"out"* zou zijn. Dit staat in productie 35(a) tot en met (g) van het verweerschrift. Onder productie 16 van het verzoekschrift stelt een oud medewerker van Verity/Autonomy, Spencer Young, dat de CFO van Verity/Autonomy, de heer Hussain, gezegd zou hebben dat Sluimer niet meer bij de vennootschap werkzaam zou zijn. Dit is onjuist. De heer Hussain heeft Kanter bevestigd nooit dergelijke teksten geuit te hebben. Overigens merkt Verity/Autonomy op dat Spencer Young overgestapt is naar de concurrent van Verity/Autonomy en dat hij thans in conflict is met Verity/Autonomy over zijn concurrentiebeding.

3.      In maart 2006 kon Verity/Autonomy Sluimer mededelen dat een geschikte functie gevonden was: Senior Vice President of NeuroDynamics. De afdeling NeuroDynamics is één van de snelst groeiende van Verity/Autonomy en had daarom de leiding nodig van een ervaren man. Verity/Autonomy was van mening dat Sluimer hier, gezien zijn achtergrond, zeer geschikt voor zou zijn. Deze functie biedt verder dezelfde arbeidsvoorwaarden waaronder salaris, commissie en biedt zelfs betere groeimogelijkheden. In de periode dat Verity/Autonomy op zoek is geweest naar deze nieuwe functie heeft Sluimer zijn volledige salaris waaronder alle commissies en optie uitoefenmogelijkheden ontvangen.

4.      Sluimer had gehoopt op een heel andere afloop. Sluimer wil namelijk eigenlijk helemaal niet meer werken en zou dan ook het liefst zien dat hij met een flinke financiële vergoeding bij Verity/Autonomy kan vertrekken. Nog voordat de overname rond was schreef Sluimer al een e-mail aan één van de betrokkene van Verity bij de overname, de heer Weenink, waarin hij schrijft dat hij na zoveel jaar werken "op" is en in deze e-mail, welke pas in mei in handen is gekomen van Verity/Autonomy, reikt hij verschillende argumenten om Verity/Autonomy over te halen hem uit te

HS-0334

●    NautaDutilh

3

kopen. Deze e-mail is overgelegd als productie 1 bij het verweerschrift.

5.   Verity/Autonomy heeft echter vanaf het begin de arbeidsovereenkomst
     met Sluimer niet willen beëindigen en heeft een alternatieve functie voor
     Sluimer willen vinden, mede vanwege zijn ervaring. Sluimer zag zijn
     ontslagvergoeding opgaan in rook en besloot Verity/Autonomy te duwen
     in de richting waar hij ze wil hebben. Zo probeerde hij Verity/Autonomy
     meerdere malen in de mond te leggen dat Verity/Autonomy van mening
     zou zijn dat er geen geschikte alternatieve functie voorhanden is. Elke
     keer heeft Verity/Autonomy hier duidelijk op geantwoord door te zeggen
     zij juist wél van mening is dat een geschikte alternatieve functie mogelijk
     voorhanden zou zijn en dat zij het zoekproces vol vertrouwen zou voort-
     zetten. Ook heeft Sluimer in deze periode in een e-mail wederom zijn
     voorkeur voor een beëindigingsregeling met vergoeding uitgesproken.
     Dit staat in productie 36. Verity/Autonomy was op dat moment nog maar
     pas begonnen met het vinden van een nieuwe geschikte functie. Zij heeft
     dit dan ook voortgezet, met succes.

6.   In maart 2006 is Sluimer een nieuwe functie aangeboden en hij diende
     dan ook aan het werk te gaan. Omdat aan het werk gaan juist hetgeen is
     wat Sluimer niet meer wilde, heeft hij toen besloten dat de functie die
     hem was aangeboden niet geschikt zou zijn zonder daar ook maar één
     goede reden voor aan te voeren. Gebaseerd op één telefoongesprek van
     tien minuten met de Managing Director van NeuroDynamics heeft Slui-
     mer de aangeboden functie afgewezen. Sluimer weigerde daarbij te pra-
     ten over zijn functie en mogelijke aanpassingen daarin. In plaats daarvan
     verzocht Sluimer wederom een beëindigingsregeling, ditmaal onder drei-
     ging van juridische stappen. Dit is na te lezen in productie 22.

7.   Verity/Autonomy is van oordeel dat de houding van Sluimer niet accep-
     tabel is. Volgens Verity/Autonomy heeft Sluimer bewust de "andere
     functie" discussie gesaboteerd. Alle pogingen van Verity/Autonomy hier-
     toe zijn door hem zonder nadere motivering of gesprekken afgewezen.
     Dat Sluimer niet meer wil werken, is zijn keuze. Echter het is niet Veri-
     ty/Autonomy die financieel voor deze keuze moet opdraaien. Veri-
     ty/Autonomy heeft alles in het werk gezet een geschikte alternatieve
     functie voor Sluimer te vinden en is daar ook in geslaagd. Sluimer pro-
     beert zichzelf echter af te schilderen als een slachtoffer, maar is dat hele-
     maal niet. In werkelijkheid heeft Sluimer na de overname een geschikte
     alternatieve functie aangeboden gekregen. Verder heeft hij geen verval
     gehad van loon en zijn door de overname zijn opties boven water geko-
     men die hem ongeveer EUR 500.000 hebben opgeleverd.

HS-0335

⊛    NautaDutilh

4

8.    Door de hele opstelling van Sluimer is Verity/Autonomy van mening dat
er nu toch sprake is van een vertrouwensbreuk, die geheel voor rekening
komt van Sluimer. Voor de overname heeft Sluimer al aangegeven dat hij
"op" zou zijn en wenste te stoppen met werken. Na de overname heeft
Sluimer alles in het werk gezet om een beëindigingsvergoeding te be-
werkstelligen. Sluimer heeft eerst geprobeerd Verity/Autonomy in de
mond te leggen dat er geen alternatieve functie zou bestaan. Toen deze er
wel was heeft Sluimer de functie zonder het een kans te geven, afgewe-
zen. Sluimer grijpt zonder overleg en onderhandeling over de functie di-
rect grijpt naar het uiterste middel, beëindiging van het dienstverband.
Hierbij verdraait hij zaken en stelt hij onwaarheden. Opvallend daarbij is
dat zelfs de stelling name in het verzoekschrift niet in lijn is met de onder
andere door hemzelf in het geding gebrachte producties staat. Zo blijkt uit
de aantekeningen die Sluimer zelf heeft gemaakt na een bijeenkomst met
Kanter, die zijn overgelegd als productie 17, dat Kanter weldegelijk heeft
gezegd te zoeken naar een alternatieve functie. En dus dat Kanter niet
heeft gezegd dat een dergelijke functie waarschijnlijk niet voorhanden
zou zijn, zoals Sluimer beweert in punt 27 van zijn verzoekschrift.

9.    Dit zorgt ervoor dat Verity/Autonomy elk vertrouwen in Sluimer heeft
verloren. Er is dan ook reden de arbeidsovereenkomst tussen partijen te
ontbinden vanwege gewichtige redenen, zijnde verandering in omstan-
digheden. Nu Sluimer de ontstane situatie geheel aan zichzelf te wijten
heeft is er voor toekenning van enige vergoeding ten laste van Veri-
ty/Autonomy geen ruimte.

HS-0336

# EXHIBIT B

# Organisation Verity Europe

## Hugo Smitter - SVP EMEA & APAC

- Eric Weenink - European Controller
- Ron van Houten – Accounting Man.
- Ilonka Meijers – Accounting Ass.
- Eric Tjeerdsma – Accounting Ass.
- Kitty Nederstigt – Maint. renewal
- Roy van Zwieren – Credit & C Admin.
- Bernice Wellsted - Accountant

- Peter den Haan - Technical Director Europe
- Annet Flantua - Order Entry
- Aline Pels - Maintenance Sales Man.
- Gita Bhalla – Order Processing/Support CCapture
- Jorge Barrosso - Legal
- Tbh – Accounting Ass.
- Michel den Braver – revenue recog.

| Territory<br>General manager | France (S Europe)<br>d donnat | Germany (C+E Europe)<br>g hiller | The Netherlands (BLX)<br>v cohen | UK (+Ireland)<br>s young | Ultraseek (UK+Nordic)<br>s young |
|---|---|---|---|---|---|
| Sales | p revol<br>c sautereau<br>j-p favrot<br>s massaria (Italy) | c blank<br>t mertel<br>m mueller | p dupain<br>tbh | m hobson<br>r bentinck<br>m hewison<br>k symons<br>m ravenhill (ch)<br>d smart<br>p candle (ch man.) | m o'donoghue (ch) |
| Pre-sales | p deltenre (pt)<br>s py | h seitz<br>t zoerner | k donau<br>r massuger | c bartlett<br>k starling<br>s adler<br>s mckenna | p ntourntoufis (ch) |
| Teamleader consultant | tbh | | h loggers | g burch | |
| Consultant | j f wassong (pt)<br>s raszewski<br>d botella | o schwering | m voors<br>j verweij<br>v van der lely<br>t peelen | n eschle<br>t greene<br>s ingram | |
| MIS<br>Marketing<br>Office management | f pardieu (pt, Eur HR)<br>m joulageix/mboulais<br>m zamarro | d heck<br>k fleckenstein | m van egdom<br>n de jong<br>s boesveld | j masson<br>a sharp, tbh (telemktg)<br>s branch<br>k lavery | |

Sept 2005

HS-0337

# Organisation International



## Acting Manager: Hugo Sluimer*

| Territory | SRep/manager | Pre-Sales/Cons | Comments |
| --- | --- | --- | --- |
| Australia/NZ | Stephen Cottrell* | Steve Gibson* Martin Smith* | Verity Australia |
| Australia/NZ | Darren Sutherland* | Stuart Meyers* | CCapture/Ultraseek |
| Australia/NZ | Peter Davie | Jim Wills | Relevance (K2), Distributor |
| Australia/NZ | Mark Dowling | | First Hit (Ultraseek), Agent |
| Korea | Joung-Ro Kim | Various | 3Soft, Distributor |
| Japan | Kazuyuki Maeba* | Takashi Kodama* | Verity Japan, NEC, HP |
| Japan | Keiko Takate*, OM | Tsuyoshi Yokohara*/Takahiro Kitazume* | VerityJapan, NEC, HP |
| Japan | Takashi Imai | Steve Rife | Digital Garage (Ultraseek) |
| Japan | Masami Wakayama | Various | Hammock Corp. (CCPA) |
| South Africa | Garth Wittles | Barry Gill | Channel Architects |
| Singapore | Patrick Lee | Christopher Kwok | K2 Associates |
| China | Hao Huang* | Annie Zhang*/Wenhui Zhang* | Verity China |
| China | Xiunan Zhu | | Hongyuang, Distributor |
| Malaysia/APAC | Sean Lee* | Stuart Meyers* | CCapture/Ultraseek |

* Direct employees

HS-0338



EMEA & APAC operations
Organization
Last update 12/15/2004

Verity™

HS-0339

# Organisation EMEA APAC

Verity™



**Hugo Sluimer**

- The Netherlands
  - France
  - United Kingdom
  - Germany
- Japan
  - Australia
- P. Den Haan
  - Malaysia

HS-0340



HS-0341



HS-0342

France

Verity™

**Marketing**
M. Joulageix

**Office Mngt**
M. Zamarro

D. Donnat

**P/S**
D. Komai
J-F. Wassong
S. Raszewski

**Pre-sales**
S. Pichot
S. Py

**Sales**
P. Deltenre
P Revol
C. Sautereau
J.-P. Favrot
S. Massaria - Italy

HS-0343

HS-0344

The Netherlands

**MIS**
M. Van Egdom

**Office Mngt**
A. Oostveen (PT)
S. Boesveld

V. Cohen

**P/S**
H. Loggers
M. Voors
J. Verweij
V. Van der Lely
T. Peelen

**Pre-sales**
K. Donau
R. Massuger

**Sales**
P. Dupain
P. Klaver

Verity™









S. Kshetramade (USA)

R. Grasso (UK)

HS-0347

Sales Organization

Hugo Sluimer

**United Kingdom**
- S. Atkinson
- M. Ravenhill
- M. Hobson
- G. McNeil
- R. Bentinck
- F. Clauson
- G. Devine
- O'Donoghue
- M. Hewison
- R. Kolodynski
- C. Thomson

**The Netherlands**
- V. Cohen
- P. Dupain
- P. Klaver

**Germany**
- G Hiller
- C. Blank
- T. Mertel
- *M. Rottman*

**France**
- D. Donnat
- P. Deltenre
- P. Revol
- C. Sautereau
- J-P. Favrot
- S. Massaria

**Australia**
- S. Cottrell
- D. Sutherland

**Japan**
- K. Maeba

**Malaysia**
- S. Lee

**China**
- H. Huang

HS-0348

Professional Services Organization

Hugo Sluimer

**France**
D. Donnat
- D. Komaï
- J-F. Wassong
- S Raszewski

**Germany**
G. Hiller
- J. Thomas
- O. Schwering
- C.-H. Hofmann
- Martin Smith (AUS)

**The Netherlands**
V. Cohen
- H. Loggers
- M. Voors
- J. Verweij
- V. Van der Lely
- T. Peelen

**United Kingdom**
S. Atkinson
- C. Bartlett
- D. Botella
- G. Burch
- M. Turpin
- P. Taylor

HS-0350



**Hugo Sluimer**

Senior Vice President

EMEA & APAC Operations

direct: +31 (0)30 669 21 24

mobile: +31 (0)6 531 32 612

email: hsluimer@verity.com

Verity, Inc.

Coltbaan 31 3439 NG Nieuwegein The Netherlands

t. +31 (0)30 669 2120   f. +31 (0)30 662 2094   **www.verity.com**

HS-0351

**EXHIBIT C**

mond. behandeling 30 mei 2006 te 15.15 uur

inz. art 7:bos BW

               Kantonr. mr. G.C.u. Gelein

               griffier M.C. Jongerius

Verz: dhr. H. Sluimer  ip

gem: mr. J. van der Pyl  ip

ca.

Verw: Verity Benelux BV>  Kanter (man. dir.)

gem: mr. M. Ribmeester ip    Hauer (idd.  (Legal Dep)

gem: mr. J.A de Roos  ip

v.d. Pyl:  Pleitnota.

Ribmeester: Collega de Roos leest pleitnota voor.

      Meeting 10-4-06. Hieruit blijkt dubbele houding

      v Sluimer. Ontb. verzoek is op 10-4-06 ingediend

      Heeft Sluimer niet gemeld. Sluimer heeft

      geen enkele actie ondernomen om nadere info

      te verkrijgen. Bespreking in Miami was het

      niet nodig dat Sluimer daar naar toe ging.

      Duidelijk was dat functie Sluimer was vervallen

      Doel was andere passende functie te vinden.

      Discussie over wel/niet rechtv. toep. is hoeven wij

      het niet meer over te hebben. Altijd de bedoeling

      geweest dat Sluimer in inkomen niet achteruit

      zou gaan. Had niet te maken met omzet.

      Fiscale positie. Verity heeft altijd meegewerkt

      aan fiscale voordelen. Is altijd wel op verzoek

      v Sluimer geweest. Bij overname zou er veel

      veel opties te worden gedaan

2

Ritmeester: Uiteindelijk is Nederlands recht v toepassing
    maar formaliteiten zijn niet in acht genomen.
    Nu wil Sluimer de ook beheren. Komt niet
    geloofwaardig over. Plan is niet gaan
    werken omdat Sluimer zich niet aan
    voorwaarden heeft gehouden. Client had
    een goede werknemer in Sluimer en wilde
    hem ook behouden.
Ubr: Plan ook geldig bij verzeh werkn?
Ritmeester: Plan heeft geen werking, dus weinig over
    te zeggen.
Ubr: Oude functie ook leiding nieuwe functie alleen
    sales?
Kanter: Oude + nieuwe functie zijn hetzelfde. De CEO
    blijft altijd de baas.
Ubr: Ik begrijp dat Sluimer zegt weer opnieuw iets
    op poten te moeten zetten?
Ritmeester: Neurodynamic is een bedrijf dat al potentie
    heeft.
Ubr: Moet werkg niet functie aanbieden en werkn
    informeren?
Ritmeester: Client heeft functie gevonden. Daarna
    moeten er gesprekken worden gevoerd over
    hoe functie ingevuld moet worden. Sluimer
    heeft daaraan niet meegewerkt.
Sluimer: Wordt afgeschilderd als geldwolf. Er wordt
    van alles gesuggereerd. Er was geen exacte
    positie. Ik wilde niet zitten afwachten.
vd.Pijl: Indien waar d. Op id ob heeft Sluimer al
    aangeg. dat functie niet passend voor hem was

HS-0353

3

v.d.Pijl: Sluimer had geen dubbele agenda. Sluimer
         was Senior Vice President v alles niet
         alleen v.d. sales. Hussein ging bij overname
         de functie van Sluimer overnemen.
Kanter: De functies zijn nagenoeg gelijk uiteindelijk.
        De verkoop cijfers omhoog brengen. Personeel
        aantrekken.
Sluimer: Alles werd aan mij gerapporteerd. Ik had
         de verantwoordelijkheid.
Kanter: Voor mij heeft dit allemaal te maken
        met sales. Ik vind het jammer dat ik
        Sluimer niet vaker heb gesproken.
Sluimer: De omzet (66%) u. Autonomy komt uit
         Amerika. Daar heb ik geen invloed op.
Utr: Heeft u nog gespr over een oplossing?
v.d.Pijl: Hebben wel gepraat.
Ritmeester: wil best nog praten.
Utr: Functie is vervallen Risicosfeer werkg
     Is Sluimer passende functie aangeboden?
     Nu denk ik van niet. Niet u hetzelfde niveau
     C = 1,5 zie ik geen aanleiding. Verval u functie
     gaat het om. Wat mij betreft C = 1. A factor zij.
     Schors even. 10 min.
Na schorsing.
Ritmeester: Nog geen overeenstemming. Misschien morgen.
        Als u niets hoort dan gaarne beschikking.
        Jammer dat het gesprek met Sluimer over
        Inhoud functie niet heeft kunnen plaatsvinden.
v.d.Pijl: Kan te mijn tot vrijdag?
Utr: Wat mij betreft akkoord

HS-0354

4

Pyl: Als er besch moet komen dan alleen beslissing
over de beeïndiging en niet de andere
zaken die spelen.
Ubr: By beschikking zal dat 5 of 6 juli zyn.
~~dan~~ dan uiterlyk 13-6-06

**EXHIBIT D**

# beschikking

RECHTBANK UTRECHT

Sector kanton

Locatie Utrecht

zaaknummer: 466781 EJ VERZ 06-1375

beschikking d.d. 7 juni 2006

inzake

**HUGO SLUIMER,**
wonende te Monaco,
verder ook te noemen Sluimer,
verzoekende partij,
gemachtigde: mr. J. van der Pijl, advocaat te Amsterdam,

tegen:

de besloten vennootschap **VERITY BENELUX B.V.,**
gevestigd te De Meern en kantoorhoudende te Nieuwegein,
verder ook te noemen Verity,
verwerende partij,
gemachtigden: mr. M. Ritmeester en mr. J.A. de Roos, advocaten te Amsterdam.

## Verloop van de procedure

Sluimer heeft op 19 april 2006 een verzoekschrift ingediend.
Verity heeft een verweerschrift ingediend.
Het verzoek is ter zitting van 30 mei 2006 behandeld. Daarvan is aantekening gehouden.
Hierna is uitspraak bepaald.

## Motivering

In deze zaak staan de volgende feiten tussen partijen vast.
a.  Sluimer, geboren op 19 juni 1953, is op 1 juni 1990 als Sales Manager Benelux in dienst
    getreden van Verity Inc., een Amerikaanse leverancier van zoektechnologie. Kort daarop
    zijn de activiteiten van Verity Inc., waaronder de arbeidsovereenkomst tussen Sluimer en
    Verity Inc., ondergebracht in Verity.
b.  Sluimer is laatstelijk op basis van een 'assignment agreement' werkzaam geweest ten
    behoeve van Verity GB Ltd en wel in de functie van Senior Vice President, EMEA en
    APAC Operations. Zijn regio, EMEA/APAC betrof de regio Europa, het Midden-
    Oosten, Azië en de zogeheten Asian-Pacific Regio. Sluimer was verantwoordelijk voor
    een omzet van 50 miljoen USD en leidde een team van meer dan 100 medewerkers.
c.  Het laatstgenoten brutoloon bedraagt € 45.076,00 per maand, inclusief vakantietoeslag
    en overige structurele looncomponenten.

**HS-0356**

Zaaknummer: 466781 EJ VERZ 06-1375                                          blad 2

d.  Op 29 december 2005 is Verity Inc, inclusief al haar dochterondernemingen (waaronder Verity), overgenomen door Autonomy, een Britse zoekmachineleverancier.
e.  Door deze overname is (onder meer) de arbeidsplaats van Sluimer komen te vervallen. Zijn taken zijn overgenomen door Sushovm Hussain, de CFO van Autonomy. Sluimer heeft zijn werkzaamheden na laatstgenoemde datum niet meer verricht.
f.  Eind maart 2006 is aan Sluimer meegedeeld dat er een voor hem geschikte alternatieve functie was gevonden binnen Neurodynamics, een onderneming binnen het gezagsbereik van VerityAutonomy.
g.  Sluimer heeft vervolgens ten behoeve van Neurodynamics werkzaamheden verricht, maar heeft bedoelde functie niet aanvaard.

2.
Sluimer vraagt ontbinding van de arbeidsovereenkomst met Verity wegens veranderingen in de omstandigheden. Hij acht de hem voorgehouden functie binnen Neurodynamics niet passend. Voorts stelt hij dat tussen partijen inmiddels een vertrouwensbreuk is ontstaan en dat zulks aan Verity te wijten is. Nadat zijn arbeidsplaats door de overname van Verity door Autonomy was komen te vervallen en hij op non-actief was gesteld, zijn de verhoudingen tussen partijen door toedoen van Verity ernstig verstoord geraakt. Sluimer verzoekt de kantonrechter om hem ten laste van Verity een vergoeding toe te kennen die is berekend aan de hand van de kantonrechtersformule met C-factor 1.5.

3.
Verity verzet zich niet tegen de ontbinding van de arbeidsovereenkomst. Zij is met Sluimer van mening dat een vruchtbare samenwerking tussen partijen niet meer tot de mogelijkheden behoort. Dit is volgens Verity echter aan Sluimer te wijten. Verity stelt dat Sluimer geen moment heeft opengestaan voor een nieuwe functie, dat hij vanwege zijn wens om met een flinke ontslagvergoeding op te houden met werken de 'andere functie' discussie heeft gesaboteerd, dat Verity hem een passende alternatieve functie op het niveau van zijn vroegere functie heeft aangeboden en dat hij die functie ten onrechte heeft afgewezen. Een ontbindingsvergoeding acht zij dan ook niet op zijn plaats.

4.
De kantonrechter is niet gebleken dat het ontbindingsverzoek verband houdt met enig opzegverbod.

5.
Op grond van hetgeen over en weer is aangevoerd is de kantonrechter van oordeel dat Sluimer voldoende aannemelijk heeft gemaakt dat de aangeboden functie bij Neurodynamics, gelet op de aard en zwaarte van die functie alsmede de omvang van het personeelsbestand van Neurodynamics, vanuit arbeidsrechtelijk oogpunt niet als een voor Sluimer passende alternatieve functie kan worden aangemerkt. De omstandigheid dat die functie geen wijziging zou brengen in de arbeidsvoorwaarden waaronder Sluimer gewoon was te werken en dat er binnen die functie groeimogelijkheden waren/zijn, doet aan het vorenstaande niet af. Nu niet is gebleken dat binnen de organisatie van Verity op korte termijn een passende functie voor Sluimer beschikbaar komt en dat Verity op die wijze in de nabije toekomst aan de arbeidsrelatie met Sluimer inhoud kan geven, kan naar het oordeel van de kantonrechter van Sluimer niet worden verlangd dat hij de arbeidsrelatie met Verity voortzet. De kantonrechter zal de arbeidsovereenkomst daarom ontbinden.

**HS-0357**

Zaaknummer: 466781 EJ VERZ 06-1375                                    blad 3

6.
Aldus is sprake van een ontbinding van de arbeidsovereenkomst vanwege de keuze van
Verity/Autonomy om de arbeidsplaats van Sluimer na de overname per 29 december 2005 te
laten vervallen en vanwege de afwezigheid van een vanwege de passende functie voor Sluimer bij
Verity/Autonomy. Hiermee is gegeven dat de ontbindingsgrond in de risicosfeer van Verity
ligt. In gevallen als het onderhavige wordt in de regel een vergoeding die is berekend met
toepassing van de zogeheten neutrale kantonrechtersformule (met C-factor 1) billijk geacht.
De kantonrechter ziet geen aanleiding om in dit geval ten laste van Verity aan Sluimer een
hogere vergoeding toe te kennen dan een met toepassing van bedoelde neutrale formule
berekende vergoeding. Dat na 29 december 2005 tussen partijen over en weer irritaties zijn
ontstaan en de verhoudingen tussen hen wat verstoord zijn geraakt, acht de kantonrechter in
dit kader niet relevant, nu zulks voortvloeit uit het feit dat er voor Sluimer bij Verity/
Autonomy geen passende arbeidsplaats aanwezig is.

7.
Gelet op het vorenstaande zal de kantonrechter bepalen dat Sluimer ten laste van Verity een
met toepassing van de neutrale kantonrechtersformule berekende vergoeding toekomt.
Aan Sluimer zal een termijn worden gegund het verzoek in te trekken.

8.
De proceskosten zullen gezien de aard van het geschil worden gecompenseerd, behalve
wanneer Sluimer het verzoek intrekt. In dat geval zal Sluimer in de proceskosten van Verity
worden veroordeeld.


Beslissing

De kantonrechter:

stelt Sluimer in de gelegenheid uiterlijk 22 juni 2006 het verzoek in te trekken;

en voor het geval het verzoek niet tijdig wordt ingetrokken:

ontbindt de arbeidsovereenkomst tussen partijen met ingang van 23 juni 2006;

kent aan Sluimer ten laste van Verity een vergoeding toe van € 1.081.824,00 bruto en
veroordeelt Verity tot betaling van deze vergoeding aan Sluimer;

compenseert de proceskosten in die zin, dat partijen de eigen kosten dragen;

en voor het geval het verzoek tijdig wordt ingetrokken:

veroordeelt Sluimer in de proceskosten aan de zijde van Verity, tot de uitspraak van deze
beschikking begroot op € 500,00 aan salaris gemachtigde.


Deze beschikking is gegeven door mr. G.C. van Gelein Vitringa-Boudewijnse,
kantonrechter, en is in aanwezigheid van de griffier in het openbaar uitgesproken op 7 juni
2006.

**HS-0358**

HS-0359