**DOLL AMIR & ELEY LLP**
Gregory Doll (SBN 193205)
Michael M. Amir (SBN 204491)
Ronald St. Marie (SBN 101398)
1888 Century Park East
Suite 1106
Los Angeles, California  90067
Telephone: (310) 557-9100
Facsimile:  (310) 557-9101

Attorneys for Defendants
VERITY, INC., and THE VERITY INC.
CHANGE IN CONTROL AND
SEVERANCE BENEFIT PLAN

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGO SLUIMER<br><br>                    Plaintiff,<br><br>        vs.<br><br>VERITY, INC., a corporation, and THE VERITY INC. CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN,<br><br>                    Defendants. | CASE NO.  CV 08-1220 SI<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' OPPOSITION TO:  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**<br><br>Date:      July 18, 2008<br>Time:     9:00 a.m.<br>Ctrm:     10, 19th Floor |

        Defendants Verity, Inc. and The Verity Inc. Change In Control And Severance Benefit Plan (hereafter "Defendants") hereby request that the Court take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence of the documents described as Exhibits 10.3 and 10.17 of Defendants' May 31, 2005, 10-K filing with the United States' Securities and Exchange Commission ("SEC").  True and correct copies of these Exhibits are attached hereto as **Exhibit A** and **Exhibit B**, respectively.

1    Federal Rule of Evidence 201 allows a court to take judicial notice of, *inter alia,*
2  adjudicative facts "not subject to reasonable dispute in that [they are] . . . capable of accurate and
3  ready determination by resort to sources whose accuracy whose accuracy cannot reasonably be
4  questioned."  Further, Judicial notice may be taken at any stage of the proceeding.  Fed. R. Evid.
5  201(f).  SEC filings are, of course, matters of public record, and courts routinely take judicial
6  notice of SEC filings even if they are not specifically cited in the complaint.  (*See Plevy v.*
7  *Haggerty,* 38 F.Supp.2d 816, 821 (C.D. Cal. 1998) (taking judicial notice of SEC filings, press
8  releases, analysts' reports, news articles, and stock prices); *see also In re Silicon Graphics Inc.*
9  *Sec. Litig.,* 970 F.Supp. 746, 758-59 (N.D. Cal. 1997), *aff'd* 183 F.3d 970, 986 (9th Cir. 1999)
10  (judicially noticing SEC filings was proper).)  Thus, it is proper for this Court to take judicial
11  notice of the information contained therein.

12    The attached Exhibits were presently accessed from the SEC's website at www.sec.gov.
13  From the front page click "search for company filings," from there click "companies and other
14  files."  Type in "Verity" and choose "Verity Inc (DE company)."  The 10-K for May 31, 2005 is
15  on the second page of results (click "next 40").  Defendants' SEC documents may also be
16  accessed by typing "Verity 2005 10-K" on the www.google.com website and clicking through
17  Google's first result of www.secinfo.com.  If one adds the name "Sluimer" to the Google search,
18  there is a hyperlink specifically to Exhibit B.

19    Exhibit A, the Change in Control and Severance Benefit Plan ("The Plan"), is relevant to
20  Defendants' Opposition to Plaintiff's Motion for Summary Judgment because it supports
21  Defendants' argument that The Plan and its participation requirements were open and
22  transparent to all, from the SEC to Defendants' shareholders and prospective investors, and,
23  above all, to Defendants' own employees including Plaintiff Hugo Sluimer ("Plaintiff").

24    Exhibit B, Executive Officer Summary Compensation Sheet, is relevant to Defendants'
25  Opposition to Plaintiff's Motion for Summary Judgment because it openly, transparently, and
26  specifically names Plaintiff and discloses his annual salary and target incentive plan.
27  / / /
28  / / /

WHEREFORE, Defendants respectfully request that the Court take judicial notice of Exhibits 10.3 and 10.17 of Defendants' May 31, 2005 10-K filing with the SEC.

Dated: June 27, 2008                        Respectfully submitted

                                            DOLL AMIR & ELEY


                                            By   _/s/ Gregory L. Doll_____.
                                                Gregory L. Doll
                                            Attorneys for Defendants VERITY, INC., and THE
                                            VERITY INC. CHANGE IN CONTROL AND
                                            SEVERANCE E BENEFIT PLAN

REQUEST FOR JUDICIAL NOTICE

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1888 Century Park East, Suite 1106, Los Angeles, CA 90067.

On June 27, 2008, I served the foregoing document(s) described as **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' OPPOSITION TO: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT** on the parties in this action by serving**:**

Joseph M. Rimac, Esq.                    Cliff Palefsky, Esq.
William Reilly, Esq.                     Keith Ehrman, Esq.
RIMAC & MARTIN                           McGuinn, Hillsman & Palesfsky
1051 Divisadero Street                   535 Pacific Avenue
San Francisco, CA 94115                  San Francisco, CA 94133
F: (415) 561-8430                        F: (415) 403-0202


**( )    By Envelope** - by placing ( ) the original ( ) a true copy thereof enclosed in sealed envelopes addressed as above and delivering such envelopes:

**( )    By Mail:** As follows: I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

**(X)    By Electronic Filing:** Based upon my training and experience with electronic filing in the federal courts, it is my understanding that a copy of this Document, upon its submission to the Court, will be electronically served on the addressees.


Executed on June 27, 2008, at Los Angeles, California.

**( ) STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

**( X ) FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.


                                          _/s/ Susan Reimers_____.
                                          Susan Reimers

# EXHIBIT A

*SEC Info*   Home   Search   My Interests   Help   Sign In   *Please Sign In*

# Verity Inc/DE · 10-K · For 5/31/05 · EX-10.3

**Filed On** 8/12/05 12:51pm ET   ·   **SEC File** 0-26880   ·   **Accession Number** 1193125-5-166562

Find   in this entire Filing.   Show Docs searched ☐ and every "hit". ☐
Help...   *Wildcards:* ? (any letter), * (many).  *Logic:* for Docs: & (and), | (or): for Text: | (anywhere), "(&)" (near).

| As Of | Filer | Filing | As/For/On | Docs:Pgs | Issuer | Agent |
|-------|-------|--------|-----------|----------|--------|-------|
| 8/12/05 | Verity Inc/DE | 10-K | 5/31/05 | 11:212 | | 1193125 |

## Annual Report · Form 10-K
### Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 10-K | Annual Report | HTML | 1,377K |
| 2: EX-10.3 | Change in Control and Severance Benefit Plan | HTML | 118K |
| 3: EX-10.17 | Executive Officer Summary Compensation Sheet | HTML | 19K |
| 4: EX-10.20 | Director Compensation Arrangements | HTML | 8K |
| 5: EX-10.21 | 403 Employee Bonus Plan | HTML | 15K |
| 6: EX-21.1 | Subsidiaries of the Company | HTML | 7K |
| 7: EX-23.1 | Consent of Independent Registered Public Accounting Firm, Kpmg Llp | HTML | 10K |
| 8: EX-23.2 | Consent of Independent Registered Public Accting Firm Pricewaterhousecoopers Llp | HTML | 9K |
| 9: EX-31.1 | Certification of Peo Required Under Rule 13a-14(A) or Rule 15d-14(A) | HTML | 16K |
| 10: EX-31.2 | Certification of Pfo Required Under Rule 13a-14(A) or Rule 15d-14(A) | HTML | 16K |
| 11: EX-32.1 | Certification of Peo and Pfo Required Under Section 1350 | HTML | 11K |

**EX-10.3 · Change in Control and Severance Benefit Plan**

*This is an EDGAR HTML document rendered as filed. [ Alternative Formats ]*

---

**Change in Control and Severance Benefit Plan**

Exhibit 10.3

**VERITY, INC.**

**CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN**

**SECTION 1. INTRODUCTION.**

The Verity, Inc. Change in Control and Severance Benefit Plan (the *"Plan"*) is hereby established effective April 6, 2005 (the *"Effective Date"*). The purpose of the Plan is to provide for the payment of severance benefits to certain eligible employees of Verity, Inc. and its wholly owned subsidiaries (the *"Company"*) in the event that such employees are subject to qualifying employment terminations in connection with a Change in Control. This Plan shall supersede any severance benefit plan, policy or practice previously maintained by the Company, other than an individually negotiated contract or agreement with the Company relating to severance or change in control benefits that is in effect on an employee's termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan. This document also is the Summary Plan Description for the Plan.

**SECTION 2. DEFINITIONS.**

For purposes of the Plan, the following terms are defined as follows:

(a) *"Base Salary"* means the Participant's annual base pay (excluding incentive pay, premium pay, commissions, overtime, bonuses and other forms of variable compensation), at the rate in effect during the last regularly scheduled payroll period immediately preceding the date of the Participant's Covered Termination.

(b) *"Board"* means the Board of Directors of Verity, Inc.

(c) *"Change in Control"* means one of the following events or a series of more than one of the following events that are related, wherein the stockholders of the Company immediately before the transaction do not retain immediately after the transaction, in substantially the same proportions as their ownership of shares of the Company's voting stock immediately before the transaction, direct or indirect beneficial ownership of more than fifty percent (50%) of the total combined voting power of the outstanding voting stock of the Company, the resulting entity in a merger or, in the case of an asset sale, the corporation or corporations to which the assets of the Company were transferred (the *"Transferee Corporation(s)"*), as the case may be:

(i) the direct or indirect sale or exchange in a single or series of related transactions by the stockholders of the Company of more than fifty percent (50%) of the voting stock of the Company;

(ii) a merger or consolidation in which the Company is a party;

1.

(iii) the sale, exchange, or transfer of all or substantially all of the assets of the Company; or

(iv) a liquidation or dissolution of the Company.

For purposes of this Section 2(c), indirect beneficial ownership shall include, without limitation, an interest resulting from ownership of the voting stock of one or more corporations, which as a result of the transaction, own the Company, the resulting entity or the Transferee Corporation(s), as the case may be, either directly or through one or more subsidiary corporations. The Board shall have the right to determine whether multiple sales or exchanges of the voting stock of the Company or more than one of the following events are related, and its determination shall be final, binding and conclusive.

(d) *"Code"* means the Internal Revenue Code of 1986, as amended.

(e) *"Company"* means Verity, Inc. and its wholly owned subsidiaries or, following a Change in Control, the surviving entity resulting from such transaction.

(f) *"Constructive Termination"* means a voluntary termination of employment by a Participant after one of the following is undertaken without the Participant's express written consent:

(i) a substantial reduction in the Participant's duties or responsibilities (and not simply a change in title or reporting relationships) in effect immediately prior to the effective date of the Change in Control; *provided, however,* that it shall not be a *"Constructive Termination"* if, following the effective date of the Change in Control, either (a) the Company is retained as a separate legal entity or business unit and the Participant holds the same position in such legal entity or business unit as the Participant held before such effective date, or (b) the Participant holds a position with duties and responsibilities comparable (though not necessarily identical, in view of the relative sizes of the Company and the entity involved in the Change in Control) to the duties and responsibilities of the Participant prior to the effective date of the Change in Control;

(ii) a reduction in the Participant's base salary (except for salary decreases generally applicable to the Company's other similarly situated employees);

(iii) a change in the Participant's business location of more than 20 miles from the business location prior to such change, except for required travel for the Company's business to an extent substantially consistent with Participant's prior business travel obligations;

(iv) a material breach by the Company of any provisions of the Plan or any enforceable written agreement between the Company and the Participant; or

(v) any failure by the Company to obtain assumption of the Plan by any successor or assign of the Company.

Notwithstanding the foregoing, a voluntary termination shall not be deemed a Constructive Termination unless (x) the Participant provides the Company with written notice (the

2.

"Constructive Termination Notice ") that the Participant believes that an event described in this Section 2(f) has occurred, (y) the Constructive Termination Notice is given within three (3) months of the date the event occurred, and (z) the Company does not rescind or cure the conduct giving rise to the event described in this Section 2(f) within fifteen (15) days of receipt by the Company of the Constructive Termination Notice.

(g) **"Covered Termination"** means an Involuntary Termination Without Cause or a Constructive Termination, either of which occurs within one (1) month prior to or within eighteen (18) months following the effective date of a Change in Control. Termination of employment of a Participant due to death or disability shall not constitute a Covered Termination unless a voluntary termination of employment by the Participant immediately prior to the Participant's death or disability would have qualified as a Constructive Termination.

(h) **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

(i) **"Involuntary Termination Without Cause"** means an involuntary termination of employment by the Company other than for one of the following reasons:

(i) the Participant's violation of any material provision of the Company's standard agreement relating to proprietary rights;

(ii) the Participant participates in any act of theft or dishonesty; or

(iii) the Participant participates in any immoral or illegal act which has had or could reasonably be expected to have or had a detrimental effect on the business or reputation of the Company; or

(iv) any material failure by the Participant to use reasonable efforts to perform reasonably requested tasks after written notice and a reasonable opportunity to comply with such notice.

(j) **"Participant"** means an individual who is employed by the Company as its Executive Chairman of the Board, Chief Executive Officer, as a senior vice president, or as a vice president (other than any individual who is a vice president on sales commission, as determined by the Company in its sole discretion); *provided, however,* that if the Board shall make an affirmative determination that an employee serving in any such capacity shall not be a Participant, then such employee shall not be deemed a Participant. The determination of whether an employee is a Participant shall be made by the Company, in its sole discretion, and such determination shall be binding and conclusive on all persons.

(k) **"Participation Notice"** means the latest notice delivered by the Company to a Participant informing the employee that the employee is a Participant in the Plan, substantially in the form of **Exhibit A** hereto.

(l) **"Plan Administrator"** means the Board or any committee duly authorized by the Board to administer the Plan. The Plan Administrator may, but is not required to be, the Compensation Committee of the Board. The Board may at any time administer the Plan, in whole or in part, notwithstanding that the Board has previously appointed a committee to act as the Plan Administrator.

3.

**SECTION 3. ELIGIBILITY FOR BENEFITS.**

(a) **General Rules.** Subject to the provisions set forth in this Section and Section 7, in the event of a Covered Termination, the Company will provide the severance benefits described in Section 4 of the Plan to the affected Participant. Promptly upon an employee becoming a Participant, the Company shall deliver to the Participant a Participation Notice.

(b) **Exceptions to Benefit Entitlement.** An employee, including an employee who otherwise is a Participant, will not receive benefits under the Plan (or will receive reduced benefits under the Plan) in the following circumstances, as determined by the Company in its sole discretion:

(i) The employee has executed an individually negotiated employment contract or agreement with the Company relating to severance or change in control benefits that is in effect on his or her termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan.

(ii) The employee voluntarily terminates employment with the Company in order to accept employment with another entity that is controlled (directly or indirectly) by the Company or is otherwise an affiliate of the Company.

(iii) The employee is offered immediate reemployment by a successor to the Company or by a purchaser of its assets, as the case may be, following a change in ownership of the Company or a sale of all or substantially all the assets of a division or business unit of the Company. For purposes of the foregoing, *"immediate reemployment"* means that the employee's employment with the successor to the Company or the purchaser of its assets, as the case may be, results in uninterrupted employment such that the employee does not suffer a lapse in pay as a result of the change in ownership of the Company or the sale of its assets.

(iv) The employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non-Compete Agreement.

(c) **Termination of Benefits.** A Participant's right to receive the payment of benefits under this Plan shall terminate immediately if, at any time prior to or during the period for which the Participant is receiving benefits hereunder, the Participant, without the prior written approval of the Company:

(i) willfully breaches a material provision of the Participant's proprietary information or confidentiality agreement with the Company, as referenced in Section 3(b)(iv);

(ii) owns, manages, operates, joins, controls or participates in the ownership, management, operation or control of, is employed by or connected in any manner with, any person, enterprise or entity which is engaged in any business competitive with that of the

4.

Company; *provided, however,* that such restriction will not apply to any passive investment representing an interest of less than two percent (2%) of an outstanding class of publicly-traded securities of any corporation or other entity or enterprise;

      **(iii)** encourages or solicits any of the Company's then current employees to leave the Company's employ for any reason or interferes in any other manner with employment relationships at the time existing between the Company and its then current employees; or

      **(iv)** induces any of the Company's then current clients, customers, suppliers, vendors, distributors, licensors, licensees or other third party to terminate their existing business relationship with the Company or interferes in any other manner with any existing business relationship between the Company and any then current client, customer, supplier, vendor, distributor, licensor, licensee or other third party.

## SECTION 4. AMOUNT OF BENEFITS.

      **(a) Cash Severance Benefits.** Each Participant who incurs a Covered Termination and was employed by the Company at the position or level set forth below within one (1) month immediately prior to such Covered Termination shall be entitled to receive a cash severance benefit equal to the number of months of Base Salary set forth below. Any cash severance benefits provided under this Section 4(a) shall be paid pursuant to the provisions of Section 5.

| Position or Level | Amount of Cash Severance Benefit |
| --- | --- |
| Executive Chairman of the Board | 24 months |
| Chief Executive Officer | 24 months |
| Senior Vice President | 18 months |
| Vice President (Except Vice Presidents on sales commissions) | 12 months |

      **(b) Accelerated Stock Award Vesting and Extended Exercisability of Stock Options.** If a Participant incurs a Covered Termination, then effective as of the date of the Participant's Covered Termination, (i) the vesting and exercisability of all outstanding options to purchase the Company's common stock that are held by the Participant on such date shall be accelerated in full, and (ii) any reacquisition or repurchase rights held by the Company in respect of common stock issued pursuant to any other stock award granted to the Participant by the Company shall lapse.

      In addition, the post-termination of employment exercise period of any outstanding option held by the Participant on the date of his or her Covered Termination shall be extended, if necessary, such that the post-termination of employment exercise period shall not terminate prior to the later of (i) the date twelve (12) months after the effective date of the Covered Termination or (ii) the post-termination exercise period provided for in such option; *provided, however,* that

5.

such option shall not be exercisable after the expiration of its maximum term; *provided, further, however,* that in the event that any extended exercisability of an option pursuant to this Section 4(b) would adversely affect a Participant's option or other stock award (including, without limitation, its status as an incentive stock option under Section 422 of the Code or result in an option that would not otherwise be deemed to be a nonqualified deferred compensation plan or arrangement for the purposes of Section 409A of the Code to be deemed to be such a nonqualified deferred compensation plan or arrangement), such extended exercisability shall be deemed null and void unless the affected Participant consents in writing to such extended exercisability within thirty (30) days after becoming a Participant in the Plan.

(c) **Continued Medical Benefits**. If a Participant incurs a Covered Termination and the Participant was enrolled in a health, dental, or vision plan sponsored by the Company immediately prior to such Covered Termination, the Participant may be eligible to continue coverage under such health, dental, or vision plan (or to convert to an individual policy), at the time of the Participant's termination of employment, under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("*COBRA*"). The Company will notify the Participant of any such right to continue such coverage at the time of termination pursuant to COBRA. No provision of this Plan will affect the continuation coverage rules under COBRA, except that the Company's payment, if any, of applicable insurance premiums will be credited as payment by the Participant for purposes of the Participant's payment required under COBRA. Therefore, the period during which a Participant may elect to continue the Company's health, dental, or vision plan coverage at his or her own expense under COBRA, the length of time during which COBRA coverage will be made available to the Participant, and all other rights and obligations of the Participant under COBRA (except the obligation to pay insurance premiums that the Company pays, if any) will be applied in the same manner that such rules would apply in the absence of this Plan.

If a Participant timely elects continued coverage under COBRA, the Company shall pay the full amount of the Participant's COBRA premiums on behalf of the Participant for the Participant's continued coverage under the Company's health, dental and vision plans, including coverage for the Participant's eligible dependents, during the number of months of Base Salary in respect of which the amount paid to the Participant under Section 4(a) was calculated (the "*Severance Period*"); *provided, however,* that if the Severance Period exceeds the length of time that the Participant is entitled to coverage under COBRA (including any additional period under analogous provisions of state law), the resulting or acquiring entity or Transferee Corporation involved in the Change in Control, as applicable, shall be required to provide health, dental and vision insurance coverage for the Participant and his or her eligible dependents for any portion of the Severance Period that exceeds the length of time that the Participant is entitled to coverage under COBRA (including any additional period under analogous provisions of state law), at a level of coverage that is substantially similar to the continued coverage that the Participant and his or her eligible dependents received under the Company's health, dental and vision plans; *provided, further, however,* that no such premium payments (or any other payments for medical, dental or vision coverage by the Company) shall be made following the Participant's death or the effective date of the Participant's coverage by a medical, dental or vision insurance plan of a subsequent employer. Each Participant shall be required to notify the Company immediately if the Participant becomes covered by a medical, dental or vision insurance plan of a subsequent employer. Upon the conclusion of such period of insurance premium payments made by the Company, the Participant will be responsible for the entire payment of premiums required under COBRA for the duration of the COBRA period.

6.

For purposes of this Section 4(c), (i) references to COBRA shall be deemed to refer also to analogous provisions of state law and (ii) any applicable insurance premiums that are paid by the Company shall not include any amounts payable by the Participant under an Internal Revenue Code Section 125 health care reimbursement plan, which amounts, if any, are the sole responsibility of the Participant.

**(d) Other Employee Benefits.** All other benefits (such as life insurance, disability coverage, and 401(k) plan coverage) shall terminate as of the Participant's termination date (except to the extent that a conversion privilege may be available thereunder).

**(e) Additional Benefits.** Notwithstanding the foregoing, the Company may, in its sole discretion, provide benefits in addition to those pursuant to Sections 4(a), 4(b) and 4(c) to Participants or employees who are not Participants ("*Non-Participants*") chosen by the Company, in its sole discretion, and the provision of any such benefits to a Participant or a Non-Participant shall in no way obligate the Company to provide such benefits to any other Participant or to any other Non-Participant, even if similarly situated. If benefits under the Plan are provided to a Non-Participant, references in the Plan to "*Participant*" (with the exception of Sections 4(a), 4(b) and 4(c)) shall be deemed to refer to such Non- Participants.

**SECTION 5. TIME AND FORM OF SEVERANCE PAYMENTS.**

**(a) General Rules.** Subject to Section 5(b), any cash severance benefit provided under Section 4(a) shall be paid in installments pursuant to the Company's regularly scheduled payroll periods commencing as soon as practicable following the effective date of a Participant's Covered Termination and shall be subject to all applicable withholding for federal, state and local taxes. In the event of a Participant's death prior to receiving all installment payments of his or her cash severance benefit under Section 4(a), any remaining installment payments shall be made to the Participant's estate on the same payment schedule as would have occurred absent the Participant's death. In no event shall payment of any Plan benefit be made prior to the effective date of the Participant's Covered Termination or prior to the effective date of the release described in Section 7(a).

**(b) Application of Section 409A.** In the event that any cash severance benefit provided under Section 4(a) or continued medical benefit under Section 4(c) shall fail to satisfy the distribution requirement of Section 409A(a)(2)(A) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, the payment of such benefit shall be accelerated to the minimum extent necessary so that the benefit is not subject to the provisions of Section 409A(a)(1) of the Code. (The payment schedule as revised after the application of the preceding sentence shall be referred to as the "***Revised Payment Schedule.***") In the event the payment of benefits pursuant to the Revised Payment Schedule would be subject to Section 409A(a)(1) of the Code, the payment of such benefits shall not be paid pursuant to the Revised Payment Schedule and instead the payment of such benefits shall be delayed to the minimum extent necessary so that such benefits are not subject to the provisions of Section 409A(a)(1) of the Code. The Board may attach conditions to or adjust the amounts paid pursuant to this Section 5(b) to preserve, as closely as possible, the economic consequences that would have applied in the absence of this Section 5(b); *provided, however,* that no such condition or adjustment shall result in the payments being subject to Section 409A(a)(1) of the Code.

7.

## SECTION 6. REEMPLOYMENT.

In the event of a Participant's reemployment by the Company during the period of time in respect of which severance benefits pursuant to Section 4(a) or 4(e) have been paid, the Company, in its sole and absolute discretion, may require such Participant to repay to the Company all or a portion of such severance benefits as a condition of reemployment.

## SECTION 7. LIMITATIONS ON BENEFITS.

(a) **Release.** In order to be eligible to receive benefits under the Plan, a Participant also must execute a general waiver and release in substantially the form attached hereto as Exhibit B, Exhibit C or Exhibit D, as appropriate, and such release must become effective in accordance with its terms. For purposes of the preceding sentence, with respect to any outstanding option held by the Participant, the receipt of benefits shall be deemed to be the exercise of such option pursuant to the extended exercisability of such option under Section 4(b), rather than the acceleration or extension of such option's exercisability. The Company, in its sole discretion, may modify the form of the required release to comply with applicable law and shall determine the form of the required release, which may be incorporated into a termination agreement or other agreement with the Participant.

(b) **Certain Reductions.** The Company, in its sole discretion, shall have the authority to reduce a Participant's severance benefits, in whole or in part, by any other severance benefits, pay in lieu of notice, or other similar benefits payable to the Participant by the Company that become payable in connection with the Participant's termination of employment pursuant to (i) any applicable legal requirement, including, without limitation, the Worker Adjustment and Retraining Notification Act (the "*WARN Act*"), (ii) a written employment or severance agreement with the Company, or (iii) any Company policy or practice providing for the Participant to remain on the payroll for a limited period of time after being given notice of the termination of the Participant's employment. The benefits provided under this Plan are intended to satisfy, in whole or in part, any and all statutory obligations and other contractual obligations of the Company that may arise out of a Participant's termination of employment, and the Plan Administrator shall so construe and implement the terms of the Plan. The Company's decision to apply such reductions to the severance benefits of one Participant and the amount of such reductions shall in no way obligate the Company to apply the same reductions in the same amounts to the severance benefits of any other Participant, even if similarly situated. In the Company's sole discretion, such reductions may be applied on a retroactive basis, with severance benefits previously paid being recharacterized as payments pursuant to the Company's statutory or other contractual obligations.

(c) **Mitigation.** Except as otherwise specifically provided herein, a Participant shall not be required to mitigate damages or the amount of any payment provided under this Plan by seeking other employment or otherwise, nor shall the amount of any payment provided for under this Plan be reduced by any compensation earned by a Participant as a result of employment by another employer or any retirement benefits received by such Participant after the date of the Participant's termination of employment with the Company.

8.

**(d) Non-Duplication of Benefits.** Except as otherwise specifically provided for herein, no Participant is eligible to receive benefits under this Plan or pursuant to other contractual obligations more than one time. This Plan is designed to provide certain severance pay and change in control benefits to Participants pursuant to the terms and conditions set forth in this Plan. The payments pursuant to this Plan are in addition to, and not in lieu of, any unpaid salary, bonuses or benefits to which a Participant may be entitled for the period ending with the Participant's Covered Termination.

**(e) Indebtedness of Participants.** If a Participant is indebted to the Company on the effective date of his or her Covered Termination, the Company reserves the right to offset any severance payments under the Plan by the amount of such indebtedness.

### SECTION 8. RIGHT TO INTERPRET PLAN; AMENDMENT AND TERMINATION.

**(a) Exclusive Discretion.** The Plan Administrator shall have the exclusive discretion and authority to establish rules, forms, and procedures for the administration of the Plan and to construe and interpret the Plan and to decide any and all questions of fact, interpretation, definition, computation or administration arising in connection with the operation of the Plan, including, but not limited to, the eligibility to participate in the Plan and amount of benefits paid under the Plan. The rules, interpretations, computations and other actions of the Plan Administrator shall be binding and conclusive on all persons.

**(b) Amendment or Termination.** The Company reserves the right to amend or terminate this Plan or the benefits provided hereunder at any time; *provided, however,* that no such amendment or termination shall occur following (i) the date one (1) month prior to a Change in Control or (ii) a Covered Termination as to any Participant who would be adversely affected by such amendment or termination unless such Participant consents in writing to such amendment or termination. Any action amending or terminating the Plan shall be in writing and executed by a duly authorized officer of the Company. Unless otherwise required by law, no approval of the shareholders of the Company shall be required for any amendment or termination including any amendment that increases the benefits provided under any option or other stock award.

### SECTION 9. NO IMPLIED EMPLOYMENT CONTRACT.

The Plan shall not be deemed (i) to give any employee or other person any right to be retained in the employ of the Company or (ii) to interfere with the right of the Company to discharge any employee or other person at any time, with or without cause, which right is hereby reserved.

### SECTION 10. LEGAL CONSTRUCTION.

This Plan shall be governed by and construed under the laws of the State of California (without regard to principles of conflict of laws), except to the extent preempted by ERISA.

9.

**SECTION 11. CLAIMS, INQUIRIES AND APPEALS.**

(a) **Applications for Benefits and Inquiries.** Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Plan Administrator in writing by an applicant (or his or her authorized representative). The Plan Administrator is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

(b) **Denial of Claims.** In the event that any application for benefits is denied in whole or in part, the Plan Administrator must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor. The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(1) the specific reason or reasons for the denial;

(2) references to the specific Plan provisions upon which the denial is based;

(3) a description of any additional information or material that the Plan Administrator needs to complete the review and an explanation of why such information or material is necessary; and

(4) an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under Section 502(a) of ERISA following a denial on review of the claim, as described in Section 11(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Plan Administrator receives the application, unless special circumstances require an extension of time, in which case, the Plan Administrator has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the application.

(c) **Request for a Review.** Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Plan Administrator within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

10.

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his or her representative) shall have the opportunity to submit (or the Plan Administrator may require the applicant to submit) written comments, documents, records, and other information relating to his or her claim. The applicant (or his or her representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his or her representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

**(d) Decision on Review.** The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the review. The Plan Administrator will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Plan Administrator confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

    (1)    the specific reason or reasons for the denial;

    (2)    references to the specific Plan provisions upon which the denial is based;

    (3)    a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim; and

    (4)    a statement of the applicant's right to bring a civil action under Section 502(a) of ERISA.

**(e) Rules and Procedures.** The Plan Administrator will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Plan Administrator may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

11.

**(f) Exhaustion of Remedies.** No legal action for benefits under the Plan may be brought until the applicant (i) has submitted a written application for benefits in accordance with the procedures described by Section 11(a) above, (ii) has been notified by the Plan Administrator that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 11(c) above, and (iv) has been notified that the Plan Administrator has denied the appeal. Notwithstanding the foregoing, if the Plan Administrator does not respond to an applicant's claim or appeal within the relevant time limits specified in this Section 11, the applicant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

**SECTION 12. BASIS OF PAYMENTS TO AND FROM PLAN.**

All benefits under the Plan shall be paid by the Company. The Plan shall be unfunded, and benefits hereunder shall be paid only from the general assets of the Company.

**SECTION 13. OTHER PLAN INFORMATION.**

**(a) Employer and Plan Identification Numbers.** The Employer Identification Number assigned to the Company (which is the *"Plan Sponsor"* as that term is used in ERISA) by the Internal Revenue Service is 77-0182779. The Plan Number assigned to the Plan by the Plan Sponsor pursuant to the instructions of the Internal Revenue Service is 520.

**(b) Ending Date for Plan's Fiscal Year.** The date of the end of the fiscal year for the purpose of maintaining the Plan's records is May 31.

**(c) Agent for the Service of Legal Process.** The agent for the service of legal process with respect to the Plan is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

**(d) Plan Sponsor and Administrator.** The *"Plan Sponsor"* and the *"Plan Administrator"* of the Plan is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

The Plan Sponsor's and Plan Administrator's telephone number is (408) 541-1500. The Plan Administrator is the named fiduciary charged with the responsibility for administering the Plan.

**SECTION 14. STATEMENT OF ERISA RIGHTS.**

Participants in this Plan (which is a welfare benefit plan sponsored by Verity, Inc.) are entitled to certain rights and protections under ERISA. If you are a Participant, you are

12.

considered a participant in the Plan for the purposes of this Section 14 and, under ERISA, you are entitled to:

**Receive Information About Your Plan and Benefits**

(a) Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites, all documents governing the Plan and a copy of the latest annual report (Form 5500 Series), if applicable, filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration;

(b) Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan and copies of the latest annual report (Form 5500 Series), if applicable, and an updated (as necessary) Summary Plan Description. The Administrator may make a reasonable charge for the copies; and

(c) Receive a summary of the Plan's annual financial report, if applicable. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

**Prudent Actions By Plan Fiduciaries**

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate the Plan, called *"fiduciaries"* of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a Plan benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a Plan benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan, if applicable, and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court.

If you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

13.

**Assistance With Your Questions**

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

**SECTION 15. GENERAL PROVISIONS.**

**(a) Notices.** Any notice, demand or request required or permitted to be given by either the Company or a Participant pursuant to the terms of this Plan shall be in writing and shall be deemed given when delivered personally or deposited in the U.S. mail, First Class with postage prepaid, and addressed to the parties, in the case of the Company, at the address set forth in Section 11(a) and, in the case of a Participant, at the address as set forth in the Company's employment file maintained for the Participant as previously furnished by the Participant or such other address as a party may request by notifying the other in writing.

**(b) Transfer and Assignment.** The rights and obligations of a Participant under this Plan may not be transferred or assigned without the prior written consent of the Company. This Plan shall be binding upon any surviving entity resulting from a Change in Control and upon any other person who is a successor by merger, acquisition, consolidation or otherwise to the business formerly carried on by the Company without regard to whether or not such person or entity actively assumes the obligations hereunder.

**(c) Waiver.** Any Party's failure to enforce any provision or provisions of this Plan shall not in any way be construed as a waiver of any such provision or provisions, nor prevent any Party from thereafter enforcing each and every other provision of this Plan. The rights granted the Parties herein are cumulative and shall not constitute a waiver of any Party's right to assert all other legal remedies available to it under the circumstances.

**(d) Severability.** Should any provision of this Plan be declared or determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

**(e) Section Headings.** Section headings in this Plan are included for convenience of reference only and shall not be considered part of this Plan for any other purpose.

14.

**SECTION 16. EXECUTION.**

To record the adoption of the Plan as set forth herein, Verity, Inc. has caused its duly authorized officer to execute the same as of the Effective Date.

VERITY, INC.

By:    /s/   STEVEN R. SPRINGSTEEL

Title:  Senior Vice President of Finance and Administration and
Chief Financial Officer

15.

EXHIBIT A

VERITY, INC.

CHANGE IN CONTROL AND SEVERENCE BENEFIT PLAN

PARTICIPATION NOTICE

To: _____

Date: _____

Verity, Inc. (the "*Company*") has adopted the Verity, Inc. Change in Control and Severance Benefit Plan (the "*Plan*"). The Company is providing you with this Participation Notice to inform you that, given your position at the Company, you qualify as a participant in the Plan. A copy of the Plan document, which also constitutes a summary plan description, is attached to this Participation Notice. The terms and conditions of your participation in the Plan are as set forth in the Plan, and in the event of any conflict between this Participation Notice and the Plan, the terms of the Plan shall prevail. Subject to the provisions of the Plan, the details of your Plan benefits, as described in Section 4 of the Plan, are as follows:

**Cash Severance Benefit:** ___ months.

**Accelerated Vesting of Options:** Full.

**Extended Exercisability of Options:** Later of 12 months or the post-termination exercise period of the option; provided, however, that such extended exercisability shall not extend beyond the term of the option.

**Continued medical benefits:** ___ months, or such earlier date as you shall secure subsequent employment that shall provide you with similar medical benefits.

Please retain a copy of this Participation Notice, along with the Plan document, for your records.

VERITY, INC.

By: _____

Its: _____

16.

---

**ACKNOWLEDGEMENT**

The undersigned Participant hereby acknowledges receipt of the foregoing Participation Notice. In the event the undersigned holds outstanding stock options as of the date of this Participation Notice, the undersigned hereby:

☐ accepts

☐ rejects

the extended exercisability provisions for such stock options set forth above.* The undersigned acknowledges that the undersigned has been advised to obtain tax and financial advice regarding the consequences of this election including the effect, if any, on the status of the stock options for tax purposes under Sections 409A and 422 of the Internal Revenue Code.

_____

Print name

---

*   Please check one box; failure to check a box will be deemed a rejection of the extended exercisability provisions as they relate to such stock options.

17.

**EXHIBIT B**

**RELEASE AGREEMENT**

**I understand and agree completely to the terms set forth in the Verity, Inc. Change in Control and Severance Benefit Plan (the "*Plan*").**

I understand that this Release, together with the Plan, constitutes the complete, final and exclusive embodiment of the entire agreement between the Company and me with regard to the subject matter hereof. I am not relying on any promise or representation by the Company that is not expressly stated therein. Certain capitalized terms used in this Release are defined in the Plan.

I hereby confirm my obligations under the Company's proprietary information and inventions agreement.

Except as otherwise set forth in this Release, I hereby generally and completely release the Company and its parents, subsidiaries, successors, predecessors, affiliates and assigns, and its and their current and former partners, members, directors, officers, employees, shareholders, agents, attorneys, accountants, insurers, affiliates and assigns, from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring at any time prior to and including the date I sign this Release. This general release includes, but is not limited to: (a) all claims arising out of or in any way related to my employment with the Company or the termination of that employment; (b) all claims related to my compensation or benefits, including salary, bonuses, commissions, vacation pay, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (c) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (d) all tort claims, including claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (e) all federal, state, and local statutory claims, including claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990 (as amended), the federal Age Discrimination in Employment Act (as amended) ("*ADEA*"), the federal Employee Retirement Income Security Act of 1974 (as amended), and the California Fair Employment and Housing Act (as amended); *provided, however,* that nothing in this paragraph shall be construed in any way to release the Company from its obligation to indemnify me pursuant to agreement or applicable law.

I acknowledge that I am knowingly and voluntarily waiving and releasing any rights I may have under the ADEA, and that the consideration given under the Plan for the waiver and release in the preceding paragraph hereof is in addition to anything of value to which I was already entitled. I further acknowledge that I have been advised by this writing, as required by the ADEA, that: (a) my waiver and release do not apply to any rights or claims that may arise after the date I sign this Release; (b) I should consult with an attorney prior to signing this Release (although I may choose voluntarily not do so); (c) I have twenty-one (21) days to consider this Release (although I may choose voluntarily to sign this Release earlier); (d) I have

1.

seven (7) days following the date I sign this Release to revoke the Release by providing written notice to an officer of the Company; and (e) this Release shall not be effective until the date upon which the revocation period has expired, which shall be the eighth day after I sign this Release.

I acknowledge that I have read and understand Section 1542 of the California Civil Code which reads as follows: *"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."* I hereby expressly waive and relinquish all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to my release of any claims hereunder.

I acknowledge that to become effective, I must sign and return this Release to the Company so that it is received not later than twenty-one (21) days following the date it is provided to me.

**EMPLOYEE**

Name: _____

Date: _____

2.

EXHIBIT C

RELEASE AGREEMENT

I understand and agree completely to the terms set forth in the Verity, Inc. Change in Control and Severance Benefit Plan (the *"Plan"*).

I understand that this Release, together with the Plan, constitutes the complete, final and exclusive embodiment of the entire agreement between the Company and me with regard to the subject matter hereof. I am not relying on any promise or representation by the Company that is not expressly stated therein. Certain capitalized terms used in this Release are defined in the Plan.

I hereby confirm my obligations under the Company's proprietary information and inventions agreement.

Except as otherwise set forth in this Release, I hereby generally and completely release the Company and its parents, subsidiaries, successors, predecessors, affiliates and assigns, and its and their current and former partners, members, directors, officers, employees, shareholders, agents, attorneys, accountants, insurers, affiliates and assigns, from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring at any time prior to and including the date I sign this Release. This general release includes, but is not limited to: (a) all claims arising out of or in any way related to my employment with the Company or the termination of that employment; (b) all claims related to my compensation or benefits, including salary, bonuses, commissions, vacation pay, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (c) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (d) all tort claims, including claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (e) all federal, state, and local statutory claims, including claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990 (as amended), the federal Age Discrimination in Employment Act (as amended) (*"ADEA"*), the federal Employee Retirement Income Security Act of 1974 (as amended), and the California Fair Employment and Housing Act (as amended); *provided, however*, that nothing in this paragraph shall be construed in any way to release the Company from its obligation to indemnify me pursuant to agreement or applicable law.

I acknowledge that I am knowingly and voluntarily waiving and releasing any rights I may have under the ADEA, and that the consideration given under the Plan for the waiver and release in the preceding paragraph hereof is in addition to anything of value to which I was already entitled. I further acknowledge that I have been advised by this writing, as required by the ADEA, that: (a) my waiver and release do not apply to any rights or claims that may arise after the date I sign this Release; (b) I should consult with an attorney prior to signing this Release (although I may choose voluntarily not to do so); (c) I have forty-five (45) days to consider this Release (although I may choose voluntarily to sign this Release earlier); (d) I have

1.

seven (7) days following the date I sign this Release to revoke the Release by providing written notice to an office of the Company; (e) this Release shall not be effective until the date upon which the revocation period has expired, which shall be the eighth day after I sign this Release; and (f) I have received with this Release a detailed list of the job titles and ages of all employees who were terminated in this group termination and the ages of all employees of the Company in the same job classification or organizational unit who were not terminated.

I acknowledge that I have read and understand Section 1542 of the California Civil Code which reads as follows: *"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."* I hereby expressly waive and relinquish all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to my release of any claims hereunder.

I acknowledge that to become effective, I must sign and return this Release to the Company so that it is received not later than forty-five (45) days following the date it is provided to me.

EMPLOYEE

Name: _____

Date: _____

2.

**EXHIBIT D**

**RELEASE AGREEMENT**

**I understand and agree completely to the terms set forth in the Verity, Inc. Change in Control and Severance Benefit Plan (the "*Plan*").**

I understand that this Release, together with the Plan, constitutes the complete, final and exclusive embodiment of the entire agreement between the Company and me with regard to the subject matter hereof. I am not relying on any promise or representation by the Company that is not expressly stated therein. Certain capitalized terms used in this Release are defined in the Plan.

I hereby confirm my obligations under the Company's proprietary information and inventions agreement.

Except as otherwise set forth in this Release, I hereby generally and completely release the Company and its parents, subsidiaries, successors, predecessors, affiliates and assigns, and its and their current and former partners, members, directors, officers, employees, shareholders, agents, attorneys, accountants, insurers, affiliates and assigns, from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring at any time prior to and including the date I sign this Release. This general release includes, but is not limited to: (a) all claims arising out of or in any way related to my employment with the Company or the termination of that employment; (b) all claims related to my compensation or benefits, including salary, bonuses, commissions, vacation pay, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership interests in the Company; (c) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (d) all tort claims, including claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (e) all federal, state, and local statutory claims, including claims for discrimination, harassment, retaliation, attorneys' fees, or other claims arising under the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990 (as amended), the federal Age Discrimination in Employment Act (as amended), the federal Employee Retirement Income Security Act of 1974 (as amended), and the California Fair Employment and Housing Act (as amended); *provided, however,* that nothing in this paragraph shall be construed in any way to release the Company from its obligation to indemnify me pursuant to agreement or applicable law.

I acknowledge that I have read and understand Section 1542 of the California Civil Code which reads as follows: "*A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.*" I hereby expressly waive and relinquish all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to my release of any claims hereunder.

1.

I acknowledge that to become effective, I must sign and return this Release to the Company so that it is received not later than fourteen (14) days following the date it is provided to me.

**EMPLOYEE**

Name: _____

Date: _____

2.

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| *This 10-K Filing* | *Date* | *Other Filings* |
|---|---|---|
| | 4/6/05 ▼ | 8-K |
| For The Period Ended | 5/31/05 | |
| Filed On / Filed As Of | 8/12/05 | |
| | | |
| Top | | List All Filings |

---

Filing Submission  -  Alternative Formats (Word / Rich Text, HTML, Plain Text, SGML, XML, et al.)

Copyright © 2008 *Fran Finnegan & Company* All Rights Reserved.
www.secinfo.com - Wed, 25 Jun 2008 16:16:09.3 GMT - *Privacy* - *Help*

# EXHIBIT B

*SEC Info*   Home   Search   My Interests   Help   Sign In   *Please Sign In*

# Verity Inc/DE · 10-K · For 5/31/05 · EX-10.17

**Filed On 8/12/05 12:51pm ET · SEC File 0-26880 · Accession Number 1193125-5-166562**

[ Find ]   in this entire Filing.  ▦ Show  Docs searched  and  every "hit".  ▦

Help... *Wildcards: ? (any letter), * (many).  Logic: for Docs: & (and), | (or); for Text: | (anywhere), "(&)" (near).*

| As Of | Filer | Filing | As/For/On | Docs:Pgs | Issuer | Agent |
|---|---|---|---|---|---|---|
| 8/12/05 | Verity Inc/DE | 10-K | 5/31/05 | 11:212 | | 1193125 |

---

### Annual Report · Form 10-K
### Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 10-K | Annual Report | HTML | 1,377K |
| 2: EX-10.3 | Change in Control and Severance Benefit Plan | HTML | 118K |
| **3: EX-10.17** | **Executive Officer Summary Compensation Sheet** | **HTML** | **19K** |
| 4: EX-10.20 | Director Compensation Arrangements | HTML | 8K |
| 5: EX-10.21 | 403 Employee Bonus Plan | HTML | 15K |
| 6: EX-21.1 | Subsidiaries of the Company | HTML | 7K |
| 7: EX-23.1 | Consent of Independent Registered Public Accounting Firm, Kpmg Llp | HTML | 10K |
| 8: EX-23.2 | Consent of Independent Registered Public Accting Firm Pricewaterhousecoopers Llp | HTML | 9K |
| 9: EX-31.1 | Certification of Peo Required Under Rule 13a-14(A) or Rule 15d-14(A) | HTML | 16K |
| 10: EX-31.2 | Certification of Pfo Required Under Rule 13a-14(A) or Rule 15d-14(A) | HTML | 16K |
| 11: EX-32.1 | Certification of Peo and Pfo Required Under Section 1350 | HTML | 11K |

---

## EX-10.17 · Executive Officer Summary Compensation Sheet

---

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

---

**Executive Officer Summary Compensation Sheet**

Exhibit 10.17

**Executive Officer Summary Compensation Sheet**

Annual Cash Compensation for Senior Executive Officers

The annual cash compensation for Executive Officers of Verity, as of July 31, 2005, was as follows:

| Executive Officer | Annual Base Salary | Target Incentive at Plan |
|---|---|---|
| Gary J. Sbona – Executive Chairman of the Board | $ 52,000 | Not applicable |
| Anthony J. Bettencourt – President and Chief Executive Officer | $500,000 | $  175,000* |
| Steven R. Springsteel – Senior Vice President of Finance and Administration and Chief Financial Officer | $360,000 | $  180,000 |
| Sunil D. Nagdev – Senior Vice President, Professional Services and Technical Support | $265,000 | $  125,000 |
| Michael D. Mooney – Senior Vice President, North American Sales and Business Development | $290,000 | $  175,000 |
| Hugo Sluimer– Senior Vice President, EMEA and APAC Operations | €240,000** | €  220,000** |
| Mark Seamans – Senior Vice President, Research and Development | $283,000 | $  141,500 |
| Nicole Eagan – Senior Vice President of Marketing and Chief Marketing Officer | $275,000 | $  137,500 |

\*     Mr. Bettencourt's fiscal 2006 target incentive bonus, as well as the parameters for assessment of attainment of goals, have not yet been determined.

\*\*    Euro exchange rate as of July 31, 2005 was $1.2129 per €1.

Cash Bonus Arrangements for Executive Officers Other than Chief Executive Officer

The Board of Directors approved the Fiscal 2006 Executive Variable Compensation Plan, as follows:

1. Metrics for determining percentage of goal attainment are weighted as follows:
   a.    1/3 for attainment of Company revenue targets;
   b.    1/3 for attainment of Company operating income targets;
   c.    1/3 for individual MBOs (management objectives).
2. No payout if less than 90% of the goal is reached.
3. For 90% to 100% of goal attainment, target incentive is paid out 50% to 100% on a linear basis based on level of attainment.
4. For 100% to 130% of goal attainment, target incentive is paid out 100% to 200% on a linear basis based on level of attainment, with 200% being a maximum bonus payable.
5. Both quarterly revenue and profit goal thresholds must be attained prior to any bonus funding for that quarter. Additionally, no quarter will be funded for a bonus greater than 100% unless each quarter of the fiscal year achieves the minimum of 90% of Company plan threshold.

1

**Dates Referenced Herein**  *and*  **Documents Incorporated By Reference**

| *This 10-K Filing* | *Date* | *Other Filings* |
|---|---|---|
| | ▼ | |
| For The Period Ended | 5/31/05 | |
| | 7/31/05 | |
| Filed On / Filed As Of | 8/12/05 | |
| Top | | List All Filings |

Filing Submission  -  Alternative Formats (Word / Rich Text, HTML, Plain Text, SGML, XML, et al.)