1   **RIMAC & MARTIN**
    *A Professional Corporation*
2   JOSEPH M. RIMAC – CSBN 72381
    WILLIAM REILLY – CSBN 177550
3   KEVIN G. GILL – CSBN 226819
    1051 Divisadero Street
4   San Francisco, CA 94115
    w_reilly@rimacmartin.com
5   Telephone: (415) 561-8440
    Facsimile:   (415) 561-8430
6
    **MCGUINN, HILLSMAN & PALEFSKY**
7   CLIFF PALEFSKY (State Bar No. 77683)
    KEITH EHRMAN (State Bar No. 106985)
8   535 Pacific Ave.
    San Francisco, CA 94133
9   KAEMHP@aol.com
    Telephone: (415) 421-9292
10  Facsimile: (415) 403-0202

11  Attorneys for Plaintiff
    HUGO SLUIMER

12

13                    **UNITED STATES DISTRICT COURT**

14                    **NORTHERN DISTRICT OF CALIFORNIA**

15

16  HUGO SLUIMER,                          )        *E-FILING*
                                           )
17              Plaintiff,                 )        **CASE NO.  C 08 1220 SI**
                                           )
18  v.                                     )        **PLAINTIFF'S OPPOSITION TO**
                                           )        **DEFENDANTS' MOTION FOR**
19  VERITY, INC., a corporation, and THE VERITY )  **SUMMARY JUDGMENT**
    INC. CHANGE IN CONTROL AND             )
20  SEVERANCE BENEFIT PLAN,                )        Date:   July 18, 2008
                                           )        Time:  9:00 a.m.
21              Defendants.                )        Ctrm:  10, 19th Floor
                                           )
22                                         )        The Honorable Susan Illston
    _____)

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2  I.    INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 1

3        A.    PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . 1

4        B.    BRIEF FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5        C.    SUMMARY OF LEGAL ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6  II.   LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7        A.    THE FACT THAT SLUIMER HAD  NOT SIGNED
              A RELEASE OR OTHER AGREEMENTS IS IRRELEVANT . . . . . . . . . . . . . . 5

8
9              1.    Claim Cannot Be Denied Based Upon Failure to
                    Execute Release/Separation Agreements . . . . . . . . . . . . . . . . . . . . . . . . 5

10             2.    Sluimer Never Refused to Sign The Release or
                    Other Documents, and Defendants Never
11                  Sent Sluimer Any of the Documents to Sign   . . . . . . . . . . . . . . . . . . . . 6

12             3.    Sluimer Is Not Required to Perform Futile Acts . . . . . . . . . . . . . . . . . . 7

13       B.    DEFENDANTS' CLAIM OF "IMMEDIATE
              REEMPLOYMENT" IS FRIVOLOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14
15             1.    If Sluimer's "Immediate Reemployment"
                    Involved a Substantial Reduction in Duties and
                    Responsibilities, a "Constructive Termination" Occurs . . . . . . . . . . . . . . 8

16
17             2.    Sluimer Was Not Offered Immediate
                    Reemployment As Defined by the Plan . . . . . . . . . . . . . . . . . . . . . . . . . 11

18       C.    DEFENDANTS WERE NOTIFIED THAT SLUIMER
              WAS CLAIMING A CONSTRUCTIVE TERMINATION . . . . . . . . . . . . . . . . 12

19
20             1.    Sluimer Notified Defendants That He
                    Had Been Constructively Terminated . . . . . . . . . . . . . . . . . . . . . . . . . . 12

21             2.    Defendants' Proposed "Notice" Dates are Wrong . . . . . . . . . . . . . . . . 15

22             3.    Sluimer's Letter of May 1, 2006 Bars Assertion of Late Notice . . . . . . 16

23       D.    KANTER WAS NOT THE PLAN ADMINISTRATOR . . . . . . . . . . . . . . . . . . 17

24       E.    KANTER WAS BIASED AND HAD A CONFLICT OF INTEREST . . . . . . . 19

25       F.    AN AWARD OF STATUTORY PENALTIES IS WARRANTED . . . . . . . . . . 21

26  IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

27

28

1

# TABLE OF AUTHORITIES

2

## Cases

3   *Arizona Laborers, Teamsters and Cement Masons Local 395 Health and Welfare*
    *Trust Fund v. Conquer Cartage Co.,*
4        753 F.2d 1512 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5   *Blankenship v. Liberty Life Assur. Co.,*
         486 F.3d  620 (9th Cir.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
6
    *Chuck v. Hewlett Packard Co.,*
7        455 F.3d 1026 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

8   *Dishman v. UNUM Life Ins. Co. of America.,*
         269 F.3d 974 (9th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
9
    *Kunin v. Benefit Trust Life Ins. Co.,*
10       910 F.2d 534 (9th Cir.1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11  *Metropolitan Life Ins. Co. v. Glenn,*
         ___ S.Ct. ___, 2008 WL 2444796 (US) (June 19, 2008) . . . . . . . . . . . . . . . . . . . . . . 19, 20
12
    *Saltarelli v. Bob Baker Group Medical Trust,*
13       35 F.3d 382 (9th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

14  *Trustees of Southern Cal. IBEW-NECA Pension Trust Fund v. Flores,*
         519 F.3d 1045 (9th Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15

## Statutes and Rules

16  29 C.F.R. § 2560.503-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17

17

18

19

20

21

22

23

24

25

26

27

28

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT**                    **CASE NO. C 08 1220 SI**

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

### A.    PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff Hugo Sluimer's Opposition to Defendants' Motion for Summary Judgment is being submitted in the context of Plaintiff's own Cross-Motion for Summary Judgment (the "Cross-Motion"), which was filed on June 13, 2006.  Plaintiff's Cross-Motion contains a detailed "Statement of Facts" and a series of declarations and exhibits.  Therefore, in this Opposition, Plaintiff will simply give an abbreviated version of those facts which are relevant to the issues raised in Defendants' Motion for Summary Judgment.  And, rather than submit new declarations, Plaintiff will refer in this Opposition to the declarations and exhibits submitted by Plaintiff along with his Cross-Motion.  Further, to the extent necessary, plaintiff incorporates all of the arguments made in his Cross-Motion herein as if stated in full.

### B.    BRIEF FACTUAL BACKGROUND

For 15 years, Plaintiff Hugo Sluimer ("Sluimer") worked for Defendant Verity, Inc.  In 2005, Sluimer was Verity's Senior Vice President for EMEA and APAC Operations.[1]  In December 2005, Autonomy Corporation acquired Verity and began reviewing which Verity jobs would be deemed "redundant".  *Sluimer Dec.*, Ex. B, HS 017.  In January 2006, Sluimer was told that his job was likely to be found redundant, but that Autonomy was still reviewing matters to see if another "suitable" job could be found for him.  *Id.,* ¶7; Ex. B, HS 017, 020–021, 023, 028, 031, 032.

Under the Verity Change in Control and Severance Benefit Plan ("Plan"), employees who experienced a "covered termination" within 18 months after a Change in Control were entitled to certain Plan benefits.  *Sluimer Dec.*, Ex. A, HS 003 (¶2(g)).  There were two types of  "covered terminations": a termination by the company without cause, or a "constructive termination."  *Id.,* HS 002 (¶2(f)).  A constructive termination included situations in which the employee

---

[1] *Sluimer Dec.*, ¶2.  In this job, Sluimer was responsible for all of Verity's operations outside of the Americas, with more than 100 reports, including 10 country managers.  Sluimer oversaw operations generating $50,000,000 in revenue, and was responsible for all aspects of Verity's operations outside the Americas, including sales, marketing, finance, administration, technical operations and consultants.  *Id.*

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                                    **CASE NO. C 08 1220 SI**

1  experienced a "substantial reduction in duties or responsibilities." *Id.*

2      On March 23, 2006, Sluimer received a letter informing him that the company had found

3  a "suitable" job for him in Autonomy's Nuerodynamics division. *Sluimer Dec.*, Ex. B, HS

4  035–036. The letter did not explain what Sluimer's job duties or responsibilities would be or

5  who he would report to. Sluimer spent the next month communicating with Andrew Kanter and

6  David Humphries in an effort to understand what this "new" job would involve. *Id.,* at ¶9; Ex. B,

7  HS 037–054. Following a meeting with Humphries on April 18th, and after Kanter finally gave

8  Sluimer a written job description on April 24th, Sluimer wrote to Kanter on April 25th and

9  informed him that it was apparent that Autonomy was not going to provide him with a

10  comparable job.[2] *Id.,* at HS 054–055.

11      Sluimer proceeded to take legal action to enforce his rights under the Plan. On April 27,

12  2006, Sluimer served Autonomy with a lawsuit in the Netherlands seeking a cash severance

13  payment, based on the fact that Autonomy had failed to offer him a comparable job following the

14  Change in Control. *Sluimer Dec.*, Ex. B, HS 054; *Reilly Dec.*, Ex. C, HS 360–369; *Pijl Dec.*, Ex.

15  A, HS 124–186. On May 1, 2006, Sluimer sent a letter to the Plan Administrator (Jack Landers,

16  the VP of Human Resources) seeking his other benefits under the Plan, i.e., his accelerated stock

17  vesting and medical benefits. *Sluimer Dec.*, Ex. B, HS 057.

18      During May 2006, Kanter and Autonomy asserted that Sluimer was not entitled to any

19  Plan benefits. First, Kanter wrote to Sluimer on May 3rd and rejected Sluimer's May 1, 2006

20  application for Plan benefits. *Id.*, at HS 058. Kanter made this decision even though: (1) Kanter

21  was <u>not</u> the Plan Administrator; and (2) it was blatantly obvious that the "new" job offered to

22  Sluimer would result in a "substantial reduction" in Sluimer's duties or responsibilities. Second,

23  Kanter and Autonomy opposed Sluimer's claim in the Dutch Court that he was entitled to cash

24  severance benefits. Kanter and Autonomy argued that Sluimer was not entitled to payments

25

26      [2] As described in Plaintiff's Cross-Motion and in the Declaration of Sluimer, Neurodynamics only
27  had 15 employees and only two of those would report directly to Sluimer; Neurodynamics' revenue was only
   about $5,000,000; and Sluimer would only be responsible for the sales function. This was a dramatic
28  reduction in duties and responsibilities from his job at Verity and so constituted a "constructive termination"
   under the Plan. *Sluimer Dec*, ¶¶2, 8.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                    **CASE NO. C 08 1220 SI**

1    under the Plan, since he had been offered "immediate reemployment" in a suitable job and so had

2    not been "terminated."[3]   *Reilly Dec.*, Ex D, HS 370–388; Ex. F, HS 405–407; Ex. G, HS

3    408–409; *Pijl Dec.*, Ex. A, HS 188–311, 333–336; Ex. C, HS 352–355.

4         In early June 2006, following an exchange of written briefs and documentary evidence

5    (*Reilly Dec.*, Exs. C–F), and after a May 30th hearing before the Judge in which Kanter gave

6    testimony against Sluimer (*Reilly Dec.*, Ex. G; *Pijl Dec.*, ¶¶3–10), the Dutch Court rejected

7    Defendants' arguments, found that Sluimer had <u>not</u> been offered a comparable job, and awarded

8    Sluimer a cash severance payment of over € 1,000,000.[4]  *Reilly Dec.*, Ex. H, HS 410–412.

9         Despite the overwhelming evidence presented in the Dutch Court that Sluimer had

10   experienced a substantial reduction in duties or responsibilities and so had been constructively

11   terminated, and despite the Dutch Court's ruling, Kanter <u>again</u> denied Sluimer's claim for Plan

12   benefits on July 6, 2006, stubbornly asserting that Sluimer had been offered "immediate

13   reemployment" and had not been "constructively terminated." *Sluimer Dec*, Ex. B, HS 059–060.

14   Once again, Kanter made the decision on Sluimer's claim for Plan benefits, despite the fact that

15   Kanter was not the Plan Administrator.  Finally, after Sluimer sent a letter to the Plan

16   Administrator on July 13, 2006 asking for a "review" of Kanter's denial, Kanter wrote back to

17   Sluimer on September 29, 2006 and again denied Sluimer's claim. *Id*., at HS 061–062; 065–067.

18   **C.    SUMMARY OF LEGAL ARGUMENTS**

19        In an effort to avoid the payment of ERISA Plan benefits which are clearly due Sluimer,

20   Defendants have raised a handful of frivolous legal arguments.  <u>First</u>, Defendants claim that

21   Sluimer did not sign certain documents which were a "pre-condition" to eligibility under ther

22

23

24         [3]  The "immediate reemployment" argument which Defendants made to the Dutch court under
     Section 3(b)(iii) of the Plan (*Reilly Dec.*, Ex. D, HS 378–379, ¶¶22–25) is the same argument which
     Defendants are making now in their Motion for Summary Judgment.  Similarly, Autonomy argued to the

25   Dutch Court that Sluimer had not signed certain documents required as a "pre-condition" of receiving Plan
     benefits–the same argument Defendants also make here. *Reilly Dec.*, Ex. D, HS 377; *Pijl Dec.*, Ex. A, HS

26   196–197.

27         [4]  In the lawsuit pending before this Court, Sluimer is not seeking any cash severance benefits under
     the Plan, as that issue has been resolved by the Dutch Court.  Rather, Sluimer is seeking the other Plan

28   benefits due to him, which consist of: 1) accelerated stock options and 2) medical benefits.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                              **CASE NO. C 08 1220 SI**

1   Plan, including a Release.  In fact, Defendants never provided these documents to Sluimer to

2   sign, even though Sluimer always said that he <u>would</u> sign such documents if Defendants were

3   going to give him his Plan benefits.  Furthermore, Sluimer was not required to go through the

4   futile gesture of signing these documents, because Defendants consistently told Sluimer that he

5   was <u>not</u> eligible for benefits because there had not been a "covered termination."  Thus,

6   "signing" these documents would have been meaningless.

7       <u>Second</u>, Defendants contend that Sluimer was not eligible for Plan benefits because he

8   was offered "immediate reemployment."  Defendants' argument completely ignores the Plan

9   provision which grants Sluimer Plan benefits if his "new" job involves a substantial reduction in

10  duties or responsibilities.  Obviously, these two provisions must be read together.  Giving

11  someone "immediate reemployment" does not eliminate his right to Plan benefits if the

12  "reemployment" involves a grossly inferior job.  In fact, that is not "reemployment" at all: rather,

13  "reimployment" must mean in the same or a comparable position. Otherwise, the "constructive

14  termination" provision would be meaningless. Furthermore, even if that were not the case, the

15  "immediate reemployment" provision is only applicable if there has been no "lapse in pay."

16  Here, Sluimer suffered a significant diminution in pay.

17      <u>Third</u>, Defendants claim that Sluimer did not notify Defendants that he had been

18  "constructively terminated" within the proper time frame.  In fact, the three month "notice"

19  window began in late April 2006, when Sluimer finally obtained a description of what the job

20  duties and responsibilities would be in the "new" job being offered to him.  On April 25, 2006,

21  May 30, 2006, and again on July 13, 2006, Sluimer informed Defendants in writing that his

22  "new" job involved a substantial reduction in his duties and responsibilities and that he had thus

23  been "constructively terminated" under the Plan.  Thus, Sluimer gave Defendants timely notice.

24  Furthermore, even without this explicit notice, Defendants were fully aware on May 1, 2006 that

25  Sluimer was applying for benefits under the Plan and had a duty to inform him what was

26  necessary to perfect his claim.

27      <u>Fourth</u>, Kanter was not the Plan Administrator and so was not entitled to make decisions

28  with respect to whether Sluimer should or should not receive Plan benefits.  To make matters

- 4 -

1    even worse, Kanter had a clear bias against Sluimer and a *per se* conflict of interest.

2         Finally, with respect to Sluimer's third cause of action, Defendants failed to provide

3    Sluimer with the documentation requested by Sluimer, and so statutory penalties are warranted.

4                              **II.  LEGAL ARGUMENT**

5         Defendants make three principal arguments in connection with their motion for summary

6    judgment.[5]  Each is meritless for multiple reasons.

7    **A.    THE FACT THAT SLUIMER HAD
            NOT SIGNED A RELEASE OR**
8    **       OTHER AGREEMENTS IS IRRELEVANT**

9         Defendants first argue that summary judgment should be granted because Sluimer did not

10   sign a "Release of Claims" and did not "confirm in writing" that he would be subject to certain

11   Confidentiality and Non-Compete Agreements.  Defendants claim that, under the Plan, Sluimer

12   must do these two things as a "condition precedent" of receiving Plan benefits.  There are at least

13   three major flaws with Defendants' argument.

14
                    **1.    Claim Cannot Be Denied Based Upon Failure to
15                         Execute Release/Separation Agreements**

16         Per the terms of the Plan, execution of a general waiver and release, and

17   confirmation that the plan participant was subject the Company's Confidentiality Agreement and

18   Non-Compete Agreement (hereinafter collectively referred to as "Release/Separation

19   Agreements")  needed to be done for the Plan participant to "receive benefits." *Sluimer Dec*, Ex.

20   A, pp. 004, 008. Contrary to the assertions in defendants' motion, execution of said documents

21   was not a condition precedent to participation in the Plan or eligibility for benefits.  *Defendants'*

22   *Mot.* 3:18, 5:8, 9:13, 15:22, 17:18-20:5.  It was a condition precedent to receiving benefits.  The

23   Plan only provides that to "receive benefits" the Release/Separation Agreements must be

24   executed.  Here, the Plan Administrator never determined that Sluimer was eligible to "receive

25   _____

26        [5]  Defendants initially characterize their motion as a motion to dismiss under FRCP12(b)(6), for
     "failure to state a claim".  However, such a motion cannot be based on evidence extrinsic to the Complaint.
27   Here, Defendants base their motion largely on the Declaration of Andrew Kanter and on various letters and
     other documents attached as exhibits to his Declaration.  Thus, on its face, a motion under 12(b)(6) is
28   improper and must be denied.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                                    **CASE NO. C 08 1220 SI**

1  benefits" and, thus, he was never obligated to execute the Release/Separation Agreements per the

2  terms of the Plan.

3      Moreover, the Plan Administrator's denial of Sluimer's claim based upon his purported

4  failure to execute the Release/Separation Agreements establishes that the denial of Sluimer's

5  claim was improper and not authorized by the terms of the Plan.  A refusal to execute the

6  Release/Separation Agreements cannot be an independent reason to deny a claim.  It can only be

7  a reason to withhold otherwise payable benefits, i.e. the Plan participant that submitted a payable

8  claim cannot "receive benefits" until the Release/Separation Agreements are executed.

9      **2.    Sluimer Never Refused to Sign The Release or
            Other Documents, and Defendants Never**

10     **Sent Sluimer Any of the Documents to Sign**

11     Defendants insinuate that Sluimer "refused" to sign the Release/Separation

12 Agreements.  This is simply false.  Sluimer repeatedly informed Defendants that he <u>would</u> sign

13 these documents, but that he understood and expected that Defendants would send him these

14 documents once Defendants had confirmed the award of Plan benefits.[6]

15     The irony of Defendants' "failure to sign" argument is that Defendants <u>never sent</u> Sluimer

16 any of these documents to sign, i.e., Defendants never sent Sluimer a Release or a Confidentiality

17 Agreement or a Non-Compete Agreement.  *Sluimer Dec.*, ¶¶10, 11.  Moreover, on November 12,

18 2007, when Defendants produced "Verity Inc.'s Change in Control and Severance Plan (with

19 Exhibit A thereto)," they did not include copies of the Releases which they now maintain are part

20 of the Plan. Nor did they provide copies of the purported Confidentiality or Non-Compete

21 Agreements, despite requests for those documents. *Reilly Dec.* Ex A, HS-0095-123.

22     Under ERISA, the Plan Administrator was required to provide "[a] description of any

23 additional material or information necessary for the claimant to perfect the claim and an

24 explanation of why such material or information is necessary."  29 C.F.R. § 2560.503-1(g)(iii).

25 Neither the Plan Administrator nor anyone else ever provided copies of the Release/Separation

26

27      [6] *Sluimer Dec*laration, ¶¶10, 11. Sluimer informed Defendants that he would sign these documents
   both in his own correspondence with the company, and in his Dutch Court pleadings. *See*, *Sluimer Dec*, Ex.

28 B, HS 061, 068–069; *Reilly Dec.*, Ex. D, HS 377 (¶19); Ex. E, HS 399, 401 (¶¶32, 33, 34, 36).

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                                    **CASE NO. C 08 1220 SI**

1   Agreements, thus purportedly preventing Sluimer from perfecting his claim.  Since Defendants

2   never gave Sluimer these documents, it is especially brazen for Defendants to now complain that

3   Sluimer "failed" to sign them – especially since he told Defendants that he <u>would</u> sign them.[7]

4       **3.**    <u>**Sluimer Is Not Required to Perform Futile Acts**</u>

5           Even if Sluimer <u>had</u> signed a Release and <u>had</u> confirmed in writing that he would

6   be subject to Verity's Confidentiality and Non-Compete Agreements, <u>Defendants still would not</u>

7   <u>have given him his Plan benefits</u>.  Since April 2006, Defendants have taken the consistent

8   position that Sluimer is not entitled to Plan benefits because he did not suffer a "covered

9   termination."  Defendants have always argued that Sluimer was given "immediate

10  reemployment" following the change in control; that he was given a "comparable" job; and that

11  Sluimer was not "terminated" within the meaning of the Plan.[8]  At no point have Defendants <u>ever</u>

12  stated or suggested that, <u>if</u> Sluimer were to sign these three documents, that Defendants would

13  suddenly grant him his Plan benefits and give him his stock options.  *See*, *Sluimer Dec.*, ¶¶10, 11.

14  To the contrary, Defendants have adamantly denied that Sluimer ever experienced a "covered

15  termination."

16          Under ERISA and basic contract law, Sluimer is not required to tender performance of

17  any obligations if such performance would be futile.  Where one party has effectively repudiated

18

19

20        [7] Defendants apparently assume that Sluimer should have received a "form" Release as an "exhibit" to the Plan in April 2005.  However, the Plan document which Sluimer received from the company in 2005 did not have any of the form Releases attached as exhibits, nor did the Plan document produced in November 2007. *Sluimer Dec*, ¶¶10, 11; *Reilly Dec.* Ex A, HS-0095-123.  Furthermore, no version of the Plan has a Confidential Information Agreement or a Non-Compete Agreement attached to it, even as an exhibit. Kanter Declaration, Exhibit A.

23        To the extent that the "form" Release contained a single sentence which states, "I hereby confirm my obligations under the Company's proprietary information and inventions agreement", and that this was intended to serves as the "confirmation in writing" contemplated by the Plan, then Defendants' failure to provide Sluimer with a Release also constituted a failure to provide him with the "writing" he was supposed to sign regarding the Confidential Information and Non-Compete Agreements.  Kanter Dec., Ex. A, p. 18.

26        [8] This was Kanter's position between April and September 2006; is what Defendants argued to the Dutch Court in May 2006; and is what Defendants still claim today.  *Sluimer Dec*, Ex. B, pp. 035–036; 040–044, 052–053, 058-060, 065–067; Reilly Dec, Ex. D, HS 372–373, 378–385; Ex. F, HS 405–407; Ex. G, HS 408–409; Kanter Dec., ¶¶ 9, 10, 13.

28

- 7 -

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                **CASE NO. C 08 1220 SI**

1   the contract or made it clear that it will not perform its obligations, there is no need for the other

2   party go through the meaningless gesture of performing its own obligations or even offering to

3   perform. *See Dishman v. UNUM Life Ins. Co. of Am.,* 269 F.3d 974, 984-85 (9th Cir.2001).

4   Sluimer's performance of any purported "condition precedent" to receiving Plan benefits is thus

5   excused; it would be meaningless for him to sign a Release when Defendants would still refuse

6   to provide him with Plan benefits.

7       The four cases cited by Defendants simply re-affirm this point.[9]  In each case, the

8   company had found that the claimant entitled to Plan benefits.  The only hold-up to payment of

9   benefits was the employee's refusal to sign the Release which was required by the Plan as a

10  condition of receiving the benefits.  This is in contrast to our case, where the employer has

11  *denied* that Sluimer is entitled to Plan benefits under any circumstances.[10]

12

13  **B.     DEFENDANTS' CLAIM OF "IMMEDIATE
            REEMPLOYMENT" IS FRIVOLOUS**

14      Defendants claim that Sluimer is not eligible for Plan benefits because he was

15  offered "immediate reemployment". There are two major flaws with Defendants' argument.

16          **1.     If Sluimer's "Immediate Reemployment"
                    Involved a Substantial Reduction in Duties and
17                  Responsibilities, a "Constructive Termination" Occurs**

18      The purpose of the Plan is to provide severance benefits to Verity employees who, within

19  18 months after a Change in Control, experience a "covered termination".  *Sluimer Dec*, Ex. A,

20  HS 001, 003 (Sections 1 and 3(a)).  A "covered termination" arises in two situations: 1)  the

21  employee is involuntarily terminated by the company without cause, or 2) the employee is

22  "constructively terminated."  *Id.,* at HS 003 (Section 2(f), (g)).

23

24      [9]  *Lockheed v. Spink* (1996) 517 U.S. 882; *Loskill v. Barnett Banks*, 289 F.3d 734 (11th Cir. 2002);
    *Bender v. Xcel Technology*, 507 F.3d 1161 (8th Cir. 2007); *Harlan v. Sohio Petroleum*, 677 F.Supp. 1021
25  (N.D.Cal. 1988)

26      [10]  Defendants claim that Sluimer could not have signed a Release without waiving his Dutch lawsuit
    claims.  But Sluimer was prepared to sign the proper documents, including a Release. *Sluimer Dec.*, ¶11.
27  Furthermore, the parties had agreed in 2005 that the cash portion of his severance payment would be
    governed by Dutch law rather than by the Plan calculation.  Thus, any Release signed by Sluimer would
28  simply need to address that issue.

- 8 -

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                          **CASE NO. C 08 1220 SI**

1  / / /

2      As discussed in Sluimer's Cross-Motion for Summary Judgment, the "alternative" job

3  offered to Sluimer in 2006 involved a "substantial reduction" in his duties and responsibilities,

4  resulting in a "constructive termination" under Section 2(f)(I).  Because Sluimer experienced a

5  "covered termination," he was entitled to Plan benefits.

6      Defendants argue that Sluimer falls within one of the "exceptions to benefit entitlement."

7  Specifically, Defendants claim that Sluimer was "offered immediate reemployment by a

8  successor to the Company . . . following a change in ownership of the Company."  *Sluimer Dec.*,

9  Ex. A, HS 003 (Section 3(b)(iii)).

10      Defendants' position is that, as long as they continue to employ Sluimer following a

11  Change of Control, Sluimer cannot claim an entitlement to benefits–<u>even if</u> Defendants employ

12  him in a new job that involves a drastic reduction in duties and responsibilities.  In essence,

13  Defendants argue that the Court should look <u>only</u> at Section 3(b)(iii) of the Plan and completely

14  <u>ignore</u> Section 2(f)(I).  Defendants' interpretation of the Plan defies common sense, undermines

15  the obvious purpose of the Plan, and violates every rule of contract interpretation.

16      The reason for the "constructive termination" provision of Section 2(f)(I) is to ensure that

17  employees who have their job duties or responsibilities substantially reduced following a Change

18  in Control receive Plan severance benefits.

19      By contrast, the reason for the "immediate reemployment" exception in Section 3(b)(iii)

20  is obvious. When Company X is acquired by Company Y, it is common that the employees of

21  Company X are "terminated" as a technical matter (since Company X no longer exists), but they

22  immediately morph into employees of Company Y and are transferred to Company Y's payroll,

23  doing the same job without any break in service.  The purpose of the exception in Section

24  3(b)(iii)–"immediate reemployment"--is to make clear that such employees do not become

25  entitled to Plan benefits simply because they were technically "terminated" by Company X.

26      <u>Defendants' proposed interpretation would render Paragraph 2(f)(I) meaningless and</u>

27  <u>irrelevant</u>.  Under Defendants' logic, if the President of Verity had his salary maintained but was

28  then given a job as a janitor at Autonomy following the Change in Control, the President could

1   not claim that he had been constructively terminated, even if he had obviously suffered a

2   substantial reduction in job duties and responsibilities.  According to Defendants, the President

3   had been given "immediate reemployment" with "no lapse in pay", and so the President would

4   not be eligible for Plan benefits!

5         Defendants' proposed interpretation is nonsensical.  Under basic principles of contract

6   interpretation and ERISA, a Court must interpret contract's written terms in context of entire

7   agreement's language, structure, and stated purpose. *Trustees of Southern Cal. IBEW-NECA*

8   *Pension Trust Fund v. Flores*, 519 F.3d 1045, 1047 (9th Cir.2008).  Similarly, "The first choice,

9   when construing a contract is, of course, to give effect to all of its provisions.  Only when that is

10  impossible, should a court choose to apply one clause and ignore another." *Arizona Laborers,*

11  *Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Conquer Cartage*

12  *Co.,* 753 F.2d 1512, 1519 (9th Cir. 1985).  Furthermore, if, after applying the normal principles

13  of contractual construction, the contract is fairly susceptible of two different interpretations,

14  another rule of construction, *contra proferentem*, will be applied, and the interpretation that is

15  most favorable to the party that did not draft the contract will be adopted. *Kunin v. Benefit Trust*

16  *Life Ins. Co.*, 910 F.2d 534, 538-40 (9th Cir.1990); *Blankenship v. Liberty Life Assur. Co*., 486

17  F.3d 620, 625 (9th Cir.2007).

18        This is especially true here because the Plan Administrator did not issue the decision on

19  the claim and exercised no discretion.  Additionally, the doctrine of reasonable expectations

20  applies as a principle of federal common law controlling interpretation of ERISA-governed

21  insurance contracts.  *Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 387 (9th

22  Cir.1994).  Here, as in *Salterelli*, review of the Plan reveals that the Plan "chose to bury" the

23  purported immediate reemployment exclusion. *Id.* at 385. In *Saltarelli*, the 9th Circuit held that

24  because the plan's attempted exclusion was not clear, plain, and conspicuous enough to negate

25  the claimant's objectively reasonable expectations of coverage, it was unenforceable and the plan

26  was liable for the coverage at issue. *Id.* at 387.

27        Applying these principles, the *contra proferentem* and reasonable expectations doctrines,

28  the Court must read the "constructive termination" provision of the Plan in conjunction with the

1   "immediate reemployment" provision, and interpret them <u>together</u> in a way that gives meaning

2   and effect to the constructive termination provision and to the purpose of the Plan. Here, the only

3   "reasonable" interpretation, and the one that carries out the purpose of the Plan, is to give effect

4   to the "constructive termination" provision, rather than to ignore it.  To allow the "immediate

5   reemployment" provision to override the "constructive termination" provision would render the

6   latter provision meaningless.  Rather, in the context of the Plan, "immediate reemployment"

7   means reemployment in the same or a comparable job.  A demotion is <u>not</u> reemployment.

8
9           **2.      Sluimer Was Not Offered Immediate
                      Reemployment As Defined by the Plan**

10          Defendants' argument about "immediate reemployment" is rendered moot by the fact that

11   Sluimer suffered a "constructive termination". However, even apart from this, Section 3(b)(iii) of

12   the Plan does not apply to Sluimer's situation, because "immediate reemployment" is defined to

13   mean "uninterrupted employment such that the employee does not suffer a lapse in pay."[11]

14   Additionally, the Plan requires that the immediate reemployment be offered with the "successor

15   to the Company or the purchaser of its assets."  *Sluimer Dec*, Ex. A, HS 004.

16          After the change in control, Sluimer did not have "uninterrupted employment."  The

17   Dutch Court ruling terminated Sluimer's employment effective June 23, 2006. *Reilly Dec.* Ex. H

18   (Dutch Order) at ¶ 6.  Sluimer was not offered reemployment with the "successor to the

19   Company or the purchaser of its assets" Autonomy.  The offer of employment was with a third

20   party named Neurodynamics, not Autonomy.  *Sluimer Dec.* Ex. A HS-0034-36.

21          Further, Sluimer <u>did</u> suffer a lapse in pay following the Change in Control, as his total

22   compensation for the three month period January 2006 through March 2006 declined by

23   approximately E 42,785 (roughly $64,000 U.S. dollars), compared to his average compensation

24   for a three month period prior to the Change in Control.  *Sluimer Dec*, ¶7.  Indeed, Sluimer's

25   average monthly pay declined by approximately 20% in January 2006; by approximately 40% in

26

27          [11]  A "lapse in pay" means that there was a diminution in Sluimer's compensation.  It does not mean
     that his pay had to completely stop. *See*, Websters's New Universal Unabridged Dictionary (1979) ("lapse"
28   is defined as "a slipping or falling into a lower condition").

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**                                    **CASE NO. C 08 1220 SI**

1  February 2006; and by approximately 35% in March 2006. [12]  Since Sluimer was terminated, was

2  not offered a position with Autonomy, suffered a significant lapse in pay following (and because

3  of) the Change in Control, and was only offered a job that would constitute a clear demotion,

4  Defendants failed to give Sluimer "immediate reemployment" as that term is defined in the Plan.

5
6  **C.     DEFENDANTS WERE NOTIFIED THAT SLUIMER
          WAS CLAIMING A CONSTRUCTIVE TERMINATION**

7         Defendants argue that Sluimer did not notify them in a timely manner that he was

8  claiming a "constructive termination".  Once again, this is meritless.

9         **1.     Sluimer Notified Defendants That He Had Been Constructively Terminated**

10        Section 2(f) of the Plan provides that, if a Plan Participant believes that an event has

11  occurred which would qualify as a "constructive termination", the Plan Participant is to notify the

12  Company of his belief within three months of the event.  In our case, that means that Sluimer

13  had, at a minimum, from <u>April 18, 2006 until July 18, 2006</u> to notify Defendants.  Sluimer gave

14  Defendants written notice during this time period on, including, but not limited to, April 25th,

15  May 30th and on July 13th.

16        On March 23, 2006, Defendants sent Sluimer a letter informing him that his old job at

17  Verity had been made "redundant", but that they wanted to offer him an "alternative" job with

18  Neurodynamics. *Sluimer Dec.*, Ex. B, HS 035–036.   <u>However, the March 23, 2006 letter did not</u>

19  <u>have any description of what this "new" job would involve, nor what Sluimer's actual role or</u>

20  <u>duties would be, nor who he would report to, nor any other of the most basic facts about this</u>

21  <u>proposed job</u>.  *Id.*  And, for the next month, nobody was able to answer Sluimer's questions

22  about this when he inquired.

23

24        [12]  Sluimer's average monthly pay during the three years preceding the Change in Control had been
      E 45,076 per month.  Sluimer's compensation fell short of this monthly average by E 8,842 in January 2006;
25    by E18,043 in February 2006; and by E15,900 in March. *Sluimer Dec*, ¶7.  This decline was a direct result
      of the Change in Control, since Autonomy promptly eliminated any chance for Sluimer to earn meaningful
26    commissions or bonuses.  In January 2006, Autonomy told Sluimer to stop working and thus he no longer
      had any responsibility for sales of the product which generated this non-salary compensation for him.
27    Indeed, Autonomy announced that the product itself was being discontinued. *Id.* This same argument about
      the "lapse in pay"  was presented by Sluimer to the Dutch Court. *Reilly Dec.*, Ex. C, HS 365 (¶¶20–21); Ex.
28    E, HS 395 (¶21).

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT**                                    **CASE NO. C 08 1220 SI**

1    Indeed, when Sluimer subsequently called the person who was potentially going to be his

2    boss (David Humphries) in late March, Humphries seemed "confused" and knew nothing about

3    Sluimer or this job.  All that Humphries knew in late March was that Kanter had just called him

4    and had told him that he had "a good guy for you, his name is Hugo Sluimer, it would be great if

5    he could work for you".  *Sluimer Dec.*, Ex. B, HS 037, 039.  Kanter did not even know at this

6    point who Sluimer was going to report to, much less the details of Sluimer's expected job duties

7    and responsibilities.  *Id.*, at HS 033.

8    By early April, Sluimer had doubts about whether this "new" job was ultimately going to

9    be "comparable" to his old one.  *Id.*, at HS 040–041.  However, Sluimer tried to do due diligence

10   and made repeated efforts during April to get Sluimer and Humphries to explain what this "new"

11   job's responsibilities and duties would entail.  *Id.*, at  ¶9; *Reilly Dec.*, Ex. E, HS 403 (¶¶43–45).

12   Between March 23, 2006 and late April 2006, Sluimer was bounced back and forth

13   between Kanter and Humphries in a futile effort to have someone give him a clear explanation or

14   description of his job duties and responsibilities, the expected plan or strategy for the business

15   and his job, the expected revenue stream, who he would report to, how many employees he

16   would be supervising, etc.  *Sluimer Dec.*, Ex. B, HS 039, 044–045, 048–051.  Kanter encouraged

17   Sluimer to meet with Humphries in order to clarify what the job would entail.  *Id.*, at  HS

18   044–045.   Humphries, in turn, told Sluimer that he would need to work out the job description

19   with Kanter.  *Id.*, at  HS 048–051.

20   On April 18, 2006, Sluimer met for the first time with Humphries, and Sluimer was

21   finally given information about such basics as how many employees Neurodynamics had, the

22   business operations and sales potential for Neurodynamics, and some aspects of what Sluimer's

23   own role might be.  *Sluimer Dec.*, ¶9; Ex. B, HS 048–051.  However, even at this meeting,

24   Humphries was unable and/or unwilling to provide any sort of job description or explain

25   Sluimer's role with any precision or provide any sense of a business plan or strategy.  *Id.*

26   Instead, Humphries again told Sluimer on April 18th that Sluimer's role was not clear to him and

27   that Sluimer should get this sort of information from Kanter.  *Id.*  And, Humphries and Sluimer

28   agreed that they should meet again on April 20th to discuss the job.  *Id.*  However, Defendants

- 13 -

1    promptly cancelled that meeting. *Id.*

2        Finally, in response to Sluimer's request that <u>somebody</u> give him a job description so that

3    he could understand his duties and responsibilities and the scope of his assignment, Kanter sent

4    Sluimer a written job description on April 24, 2006. *Sluimer Dec.*, Ex. B, HS 052–053.

5        On April 25, 2006, in light of his April 18th meeting with Humphries and Kanter's April

6    24th "job description", Sluimer wrote to Kanter and stated that the "new" job was "not

7    comparable at all to my former job with Verity" and that he was not going to accept the job.

8    *Sluimer Dec.*, Ex. B, HS 054–055. By this point, it was clear to Sluimer that the Neurodynamics

9    job would involve a substantial reduction in duties and responsibilities compared to his Verity

10   job. *Id.*, at ¶9. On April 27, 2006, Sluimer served Defendants with his Dutch lawsuit, which

11   provided notice of the constructive termination (*See* Defendants' Mot. 3:13 & 16:18 Where they

12   admit that the Dutch lawsuit proceeded under a "constructive termination theory".[13]  *Id.*, at HS

13   054; *Reilly Dec.*, Ex. C, HS 360–369; *Pijl Dec.* ¶3, Ex. A, HS 124–186. On May 1, 2006,

14   Sluimer wrote a letter to the Plan Administrator seeking payment of his Plan benefits. *Sluimer*

15   *Dec.*, Ex. B, HS 057.

16       In sum, the earliest "event" which could possibly trigger the 90 day "notice" window for a

17   "constructive termination" was the <u>April 18, 2006 meeting between Sluimer and Humphries</u>.[14]

18   Based on this April 18, 2006 "event" date, Sluimer had until <u>July 18, 2006</u> to "notify"

19   Defendants that an event triggering his right to benefits had occurred. In fact, Sluimer notified

20   Defendants three times during this three month period that "constructive termination" had

21   occurred.

22   _____

23       [13] As explained in the Dutch court pleadings filed by Sluimer, between March 23, 2006 and April 18, 2006, Sluimer spent a great deal of time trying to investigate and understand the "new" job and obtain

24   an explanation from Kanter and Humphries about what the job's duties and responsibilities and scope would be, so that he could properly evaluate whether the "offered" position was actually comparable to his old job.

25   *Reilly Dec.*, Ex. E, HS 403 (¶¶43–45). As noted in the Dutch court pleadings, Sluimer had to wait until April 18, 2006 before even getting the chance to meet with Humphries to discuss the job and get some meaningful

26   information about it. *Id.*

27       [14] Alternatively, the April 24, 2006 letter from Kanter would also be a potential "event" triggering the constructive termination. With these two events, Defendants made it clear to Sluimer that his "new" job

28   would involve a substantial reduction in duties and responsibilities.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                    **CASE NO. C 08 1220 SI**

1    First, by letter dated April 25, 2006, Sluimer confirmed the new position was not

2    comparable, and thus did not satisfy the Plan terms.

3    Second, on May 30, 2006, in connection with the Dutch court lawsuit, Sluimer notified

4    Defendants in writing that the "new" Neurodynamics job offered to him was not comparable to

5    his old job; that the new job involved a substantial reduction in his duties and responsibilities;

6    and that he had therefore suffered a "constructive termination" under Section 2(f) of the Plan.

7    *Reilly Dec.*, Ex. E, HS 399–400 (¶36), HS 397–398 (¶¶26–31); *Pijl Dec.*, Ex. A, HS 313–331.

8    Then, on July 13, 2006, Sluimer again notified Defendants in writing that the "new"

9    position which had been offered to him was not comparable to his old job; that the job involved a

10   substantial reduction in his duties and responsibilities; and that he had thus suffered a

11   "constructive termination" per Section 2(f) of the Plan.   *See*, *Sluimer Dec.*, Ex. B, HS 061–063.

12   Having notified Defendants on at least three separate occasions between April 18th and

13   July 18th, Sluimer satisfied any "notice" requirements under the Plan.

14   **2.    Defendants' Proposed "Notice" Dates are Wrong**

15   Defendants argue that Kanter's March 23, 2006 letter to Sluimer should be deemed the

16   "event" which triggers the three month "notice" window.  However, as described above, the

17   March 23rd letter did not explain in any fashion what Sluimer's actual job duties and

18   responsibilities would be.  *Sluimer Dec.*, Ex. B, HS 035–036.  Sluimer spent the next month

19   trying to get an explanation and description from Kanter and Humphries as to what this new job

20   would actually involve, so that Sluimer could understand whether it was truly comparable or

21   whether it would involve a substantial reduction in duties and responsibilities.  *Id.*, at 037–055. [5][1]

22   Furthermore, even if Defendants want to use the March 23, 2006 letter as the "event"

23   which should begin the three month window, Sluimer notified Defendants in writing on April 25,

24   2006 and May 30, 2006 of his "constructive termination" under Section 2(f) of the Plan.  *Reilly*

25   *Dec.*, Ex. E, HS 399–400 (¶36), 397–398 (¶¶26–31); *Pijl Dec.*, Ex. A, HS 325–328.  This

26

27   [15]  Indeed, Kanter kept insisting that the job was comparable, even though he would not provide
28   specifics or a job description until April 24th.   *Sluimer Dec.*, Ex. B, HS 035–036, 040–041, 042, 044,
     052–053, 054.

- 15 -

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                          **CASE NO. C 08 1220 SI**

1   obviously falls within the three month window dating from March 23rd.[16]

2       **3.**     <u>**Sluimer's Letter of May 1, 2006 Bars Assertion of Late Notice**</u>

3       As early as May 1, 2006, Sluimer had written to Autonomy and informed the Company

4   that he believed he was entitled to Plan benefits, which had been triggered by the Change in

5   Control. *Sluimer Dec.*, Ex. B, HS 057.   As of May 1st, Kanter and Autonomy had been advised

6   as to why Sluimer was claiming that he was entitled to Plan benefits.  Indeed, Sluimer had just

7   served his Dutch lawsuit on Defendants in the preceding few days, which laid out Sluimer's

8   position that Defendants had failed to offer him a comparable job following the Change in

9   Control. *Reilly Dec.*, Ex. C, HS 360–369; *Sluimer Dec.*, Ex. B, HS 054.  And, during the weeks

10  leading up to May 1, 2006, Sluimer and Kanter had been discussing whether or not the "new" job

11  at Neurodynamics was comparable, and Sluimer and Kanter had discussed settlement proposals

12  based on their disagreement as to whether or not Sluimer had been "terminated". *Sluimer Dec.*,

13  Ex. B, HS 042, 045, 046, 047.

14      Furthermore, in his May 1st letter to the Plan Administrator, Sluimer specifically stated

15  that, "If you need more information please do not hesitate to call me." *Sluimer Dec.*, Ex. B, HS

16  057.  Thus, if Autonomy was truly unclear about why Sluimer believed he was entitled to Plan

17  benefits, Autonomy had an obligation to contact Sluimer and ask for more information or an

18  explanation as to what the exact basis was for Sluimer's claim.[17]  Under ERISA, the Plan

19  Administrator was required to provide "[a] description of any additional material or information

20

21   [16] Defendants also argue that the 90 day window should have begun on December 29, 2005, when Defendants sent Sluimer a letter notifying him that his job "might" be made redundant.  This is frivolous. Defendants have repeatedly asserted that, until late March 2006, they had made no final decision as to whether Sluimer's job was redundant, and that they continued to evaluate whether there might be an "alternative" job available for Sluimer. *Sluimer Dec.*, Ex. B, HS 17, 23–24, 28, 31, 32; *Reilly Dec.*, Ex. D, HS 374–376 (¶¶11–16); Ex. F, HS 405–406 (¶2). Indeed, Defendants claim that, during the first quarter of 2006, they told Sluimer to wait and see what would happen with his old job and with any potential alternative job they might find.  *Sluimer Dec.*, Ex. B, HS 023–024, 028, 031, 032. Until Sluimer was definitively told that his job was eliminated and there was no new job for him, there would be no logical basis for Sluimer to claim an "event" had occurred triggering constructive termination.

22

23

24

25

26

27   [17]  There is nothing in Section 2(f) of the Plan which says that the employee must use the phrase "constructive termination" when giving notice to the company of his belief that an "event" has occurred entitling him to Plan benefits. Thus, the fact that Sluimer's May 1, 2006 letter does not specifically contain the phrase "constructive termination" is not determinative of anything.

28

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                   **CASE NO. C 08 1220 SI**

1    necessary for the claimant to perfect the claim and an explanation of why such material or

2    information is necessary." 29 C.F.R. § 2560.503-1(g)(iii).

3        Kanter wrote to Sluimer and informed him that his claim was denied on May 3, 2006[18].

4    The May 3, 2006 letter did not comply with 29 C.F.R. § 2560.503-1(g)(iii) because, among other

5    reasons, it did not raise the alleged Constructive Termination Notice requirement and/or explain

6    how it could be cured.  Not only did Kanter fail to ask Sluimer for necessary evidence, he

7    intentionally withheld necessary information and points he deemed to be requirements to perfect

8    a claim in an attempt to sandbag Sluimer's claim.

9        It was not unit July 6, 2006 that Kanter first asserted Sluimer's claim was denied for

10   failure to provide timely written notice of "Constructive Termination."  Even if Sluimer's claim

11   was late, which it was not, the Plan's failure to comply with the regulations tolls the running of

12   the 90 day period to provide notice of constructive termination.  *See Chuck v. Hewlett Packard*

13   *Co.* 455 F.3d 1026, 1033 (9th Cir. 2006).

14   **D.    KANTER WAS NOT THE PLAN ADMINISTRATOR**

15       When Verity created the Plan in April 2005, it gave the Plan Administrator significant

16   powers, duties and responsibilities.[19] *Sluimer Dec.*, Ex. A.  The Plan makes clear that Verity's

17   Vice President of Human Resources was to be the Plan Administrator.[20] *Id.*, at HS 010, 012a

18   _____

19       [18]  Obviously, if Kanter were denying Sluimer's claim, by definition, Sluimer had to have made a

20   claim.

21       [19]  These powers and duties included:  being the "named fiduciary charged with the responsibility
     for administering the Plan" (¶13), and having the "exclusive discretion and authority to...decide any all

22   questions of fact, interpretation...or administration arising in connection with the operation of the Plan,
     including but not limited to, the eligibility to participate in the Plan and the amount of benefits paid under

23   the Plan." (¶8(a)).  Any employee's application for benefits or inquiries about rights under the Plan was to
     be submitted to the Plan Administrator (¶11(a)); the Plan Administrator was responsible for providing the

24   applicant with any notice of denial of an application for benefits and of the reasons for the denial and an
     explanation of the applicant's right of review (¶11(b)); any request for review was to be addressed to the Plan

25   Administrator (¶11(c)); and the Plan Administrator was required to act on any request for review within a
     certain time frame (¶11(d)).  *Sluimer Dec.*, Ex. A.

26

27       [20]  Indeed, the Plan specified that applications for Plan benefits, and requests for a review of benefit
     denials, were both to be addressed to the Verity Vice President of Human Resources, Sunnyvale, California,

28   and that the Plan Administrator was the person to respond to the employee with a decision and explanation
     in both instances.  *Sluimer Dec.*, Ex. A, HS 010–012 (¶¶11(a), 11(b), 11(c), 11(d)).

- 17 -

1  (¶¶11(a), 13(d)).  In April 2005, the Vice President of Human Resources was Jack Landers, and

2  thus Landers was the Plan Administrator.   Landers was the Vice President of Human Resources

3  from April 2005 until his employment with the company ended in late September 2006.  *Ehrman*

4  *Dec.,* Ex. A (Landers Depo, 12:9–13:25; 16:11–15; 18:19–19:11; 31:22–32:19).  During this

5  entire time period from April 2005 until late September 2006, Landers was the Plan

6  Administrator.  *Id.,* at 17:11–18:18; 40:12–19; Ex. 2.  And,  on September 29, 2006, Kanter

7  <u>admitted</u> that Landers had been the Plan Administrator up until late September 2006.[21]

8          As set forth in the Plan guidelines, Sluimer addressed his May 1, 2006 letter seeking Plan

9  benefits to the Verity Vice President of Human Resources, 894 Ross Drive, Sunnyvale,

10  California.  However, Landers never played any role at all in Sluimer's claim.  Ex. A to *Ehrman*

11  *Dec.* (Landers Depo, 23:2–8; 24:11–17; 26:6–27:23; 28:18–29:8).  Instead, on May 3, 2006,

12  Kanter himself wrote to Sluimer and denied him Plan benefits.  On July 6, 2006, Kanter again

13  wrote to Sluimer and again denied his application for benefits.[22]

14           During this May through July 2006 time period, Kanter was not the Plan Administrator;

15  Landers was.[23]  Yet Landers never participated in any aspect of Sluimer's claim for Plan

16  benefits.  Landers was never shown any documentation or given any information regarding

17

18          [21]  *Sluimer Dec.*, Ex. B, HS 065–067.  In the first paragraph of his September 29, 2006 letter to

19  Sluimer, Kanter states that, "Jack Landers, the previous Vice President, Human Resources of Verity, Inc.,
    has recently left the company, and as such I have assumed his duties as Plan Administrator within the

20  meaning of the [Plan]."  Furthermore, Landers testified that, at no time during his employment did anyone
    inform him that he was being relieved of his duties as Plan Administrator, nor did he ever delegate his duties

21  as Plan Administrator to anyone else, nor was he ever told that anyone else had been appointed as Plan
    Administrator. *Ehrman Dec.*, Ex. A (Landers Depo, 19:12–20:11)*.*

22

23          [22]  In neither the May 3rd nor July 6th letters did Kanter claim to be the Plan Administrator.  To the
    contrary, he signed the letter as Autonomy Company Secretary, with his address in Cambridge, England.

24  *Sluimer Dec.*, Ex. B, HS 057–058*;* HS 059–060.  In his July 6, 2006 letter, Kanter also informed Sluimer that
    if he wished to request a "review" of the denial of Plan benefits, Sluimer needed to send his request to the

25  Vice President of Human Resources at Verity's offices at 894 Ross Drive, Sunnyvale, California–which was
    Landers' address.  *Ehrman Dec.*, Ex. A (Landers Depo, 13:7–14; 19:4–11).

26

27          [23]  Kanter admits he took over handling the dispute between Defendants and Sluimer because
    Autonomy policy tries to "limit communications between the company and adverse litigants."  Kanter Dec.,

28  ¶4.  This is hardly a valid excuse for ignoring the Plan's requirements regarding the duties of the Plan
    Administrator.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**                                    **CASE NO. C 08 1220 SI**

1   Sluimer's claim; was never asked for any input as to whether or not Sluimer was entitled to Plan

2   benefits; and was never involved in drafting or reviewing any of the correspondence to Sluimer.[24]

3   *Ehrman Dec.*, Ex. A (Landers Depo, 24:11–27:23; 28:18–29:8, and Exs. 3, 5, 6, 7, 8).

4          In fact, Landers had been ordered by Kanter to stay out of the process.  *Ehrman Dec.*, Ex.

5   A (Landers Depo. 25:11–26:5; 38:9–19).  Thus, Kanter prevented the Plan Administrator from

6   having any role in handling or deciding Sluimer's claim for Plan benefits.[25]

7   **E.     KANTER WAS BIASED AND HAD A CONFLICT OF INTEREST**

8          There is a clear and unmistakable conflict of interest present here.  The Plan is self-

9   funded from the general assets of the Company and the Company serves as the Plan

10  Administrator and Fiduciary. *Sluimer Dec.* Ex A, HS-0010 & 12.  After a Change in Control, the

11  Plan explains that it is binding upon the entity that gains control. *Id.*, at  HS-0014.  Thus, there is

12  an unquestionable conflict of interest because the benefits are paid from the acquiring entity's

13  assets and no separate assets fund the Plan.

14         The Supreme Court has recently held that a clear conflict of interest is creates where an

15  employer administers an ERISA plan, and in doing so, both determines whether an employee is

16  eligible for benefits and pays benefits out of its own pocket, a conflict of interest is created.

17  *Metropolitan Life Ins. Co. v. Glenn*, ___ S.Ct. ___, 2008 WL 2444796 (US), *3 (June 19, 2008).

18  A reviewing court must consider that conflict as a factor in determining whether the plan

19  administrator has abused its discretion in denying benefits, with the significance of the factor

20  depending upon the circumstances of the particular case. *Id*. Where (as here) circumstances

21  suggest a higher likelihood that the conflict of interest affected the benefits decision, it may prove

22  "of great importance." *Id*., at *7-9

23         Autonomy acquired Verity and immediately tried to reduce its costs.  Autonomy's Chief

24  _____

25     [24]   Indeed, Landers cannot recall even seeing the May 1, 2006 letter from Sluimer or the July 13,
    2006 letter from Sluimer, even though those letters were addressed to him. *Ehrman Dec.*, Ex. A (Landers
26  Depo, 25:22–27:23, and Exs. 5, 8)

27     [25]  Similarly, Landers had no involvement at all in the job offer made to Sluimer in March 2006, even
    though as the VP of Human Resources, Landers would normally have significant involvement in that process.
28  *Ehrman Dec.*, Ex. A (Landers Depo, 29:15–30:24; 32:25–33:3).

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT**                                              **CASE NO. C 08 1220 SI**

1   Operating Officer Andrew Kanter's post-merger job was to "remove unnecessary costs that are a

2   direct result of duplication caused by the merger and therefore maintain competitiveness."

3   *Sluimer Dec.* Ex. A HS-0020.  Methods of reducing costs included terminating employees

4   deemed redundant, while not paying benefits due under the Plan.

5          Even apart from the fact that Kanter was not the Plan Administrator, Kanter was an

6   inappropriate choice to act as the decision maker with respect to Sluimer.  Between March 2006

7   and July 2006, Kanter had been personally involved in an ongoing dialogue and dispute with

8   Sluimer over whether or not Kanter had offered Sluimer a "comparable" or "suitable" job, and

9   whether or not Sluimer had been "terminated" under the terms of the Plan.  *Sluimer Dec.*, Ex. B,

10  HS 035–061 (communications between Sluimer and Kanter and Humphries); *Reilly Dec.*, Exs.

11  C–H (Dutch court pleadings).  Furthermore, Kanter was personally engaged in settlement

12  discussions with Sluimer between January 2006 and April 2006 regarding a separation package

13  as an alternative to litigation, and the parties were unable to reach a resolution.  *Sluimer Dec.*, Ex.

14  B, HS 018, 023–024, 026–027, 040–042, 044–047.

15         Kanter himself appeared as the company representative and sole company witness in the

16  Dutch lawsuit at the hearing on May 30, 2006, in order to argue that Sluimer was not entitled to

17  severance benefits under the Plan, and that Kanter had offered Sluimer a suitable alternative job.

18  *Pijl Dec.*, ¶¶7–10; *Reilly Dec.*, Ex. G, HS 408–409.  The Dutch Judge rejected Kanter's

19  arguments and rendered a decision against Defendants on June 7, 2006, finding that Autonomy

20  had not offered Sluimer a comparable job and ordering the company to pay Sluimer more than

21  EE 1,000,000 in cash severance benefits.  *Reilly Dec.*, Ex. H, HS 410–412.   It is safe to assume

22  that Kanter's bias against Sluimer only increased in light of the Dutch Court's ruling.

23         In light of Kanter's personal history and involvement with Sluimer, it is implausible for

24  Kanter to claim in his Declaration that he was not biased against Sluimer in May and July and

25  September 2006 when he made the decision as to whether Sluimer would receive Plan benefits.

26         As a matter of law, Kanter and Autonomy faced a clear conflict of interest.  *Glenn*, 2008

27  WL 2444796 (US), at *3.  Even had Kanter been the Plan Administrator, his interpretation would

28  be suspect.  But hew was not, and Kanter's interpretations of the Plan carry no weight at all.

1    **F.      AN AWARD OF STATUTORY PENALTIES IS WARRANTED**

2         Defendants argue that "no documents were improperly withheld from Sluimer."

3    *Defendants Mot.* 23:6.  As established in Sluimer's Cross-Motion, Plaintiff Sluimer and/or his

4    counsel requested copies of Plan documents, the defendants were required to produce those

5    documents and they failed to produce those documents.  Defendants' failure to produce the

6    required documents has severely prejudiced Plaintiff and this Court.  Accordingly, an award of

7    statutory fees is especially warranted here.

8                                **IV.  CONCLUSION**

9         Based upon the foregoing and Plaintiff's Cross-Motion, Plaintiff respectfully requests that

10   defendants' Motion for Summary Judgment be denied and Plaintiff's Cross-Motion for Summary

11   Judgment granted.

12
                                   Respectfully submitted,

13                                  RIMAC & MARTIN, P.C.

14

15   DATED:  June 27, 2008            By:      /s/ **WILLIAM REILLY**
16                                             WILLIAM REILLY
                                               Attorneys for Plaintiff
17

18

19

20

21

22

23

24

25

26

27

28