**RIMAC & MARTIN**
*A Professional Corporation*
JOSEPH M. RIMAC – CSBN 72381
WILLIAM REILLY – CSBN 177550
KEVIN G. GILL – CSBN 226819
1051 Divisadero Street
San Francisco, CA 94115
w_reilly@rimacmartin.com
Telephone: (415) 561-8440
Facsimile:   (415) 561-8430

**MCGUINN, HILLSMAN & PALEFSKY**
CLIFF PALEFSKY (State Bar No. 77683)
KEITH EHRMAN (State Bar No. 106985)
535 Pacific Ave.
San Francisco, CA 94133
KAEMHP@aol.com
Telephone: (415) 421-9292
Facsimile: (415) 403-0202

Attorneys for Plaintiff
HUGO SLUIMER

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGO SLUIMER,<br><br>          Plaintiff,<br><br>v.<br><br>VERITY, INC., a corporation, and THE VERITY INC. CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN,<br><br>          Defendants. | *E-FILING*<br><br>**CASE NO.  C 08 1220 SI**<br><br>**DECLARATION OF KEITH EHRMAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   July 18, 2008<br>Time:  9:00 a.m.<br>Ctrm:  10, 19th Floor<br><br>The Honorable Susan Illston |

I, Keith Ehrman, declare as follows:

1.     I am an attorney duly licensed to practice in the State of California.  I am one of the attorneys for Plaintiff Hugo Sluimer in this action.  I have personal knowledge of the facts set forth below and could competently testify to those facts if called upon to do so.

1          2.      On June 23, 2008, I took the deposition of Jack Landers in San Francisco.

2  Attached hereto as Exhibit A are true and correct copies of excerpts from the transcript of Mr.

3  Landers' deposition, together with certain exhibits from that deposition.

4          I declare under penalty of perjury that the foregoing is true and correct and that this

5  Declaration was executed in San Francisco, California, on June 26, 2008.

6

7                                        /s/  KEITH EHRMAN
                                         Keith Ehrman
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KEITH EHRMAN IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT          CASE NO.  C 08 1220 SI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

HUGO SLUIMER,                          )
                                       )
            Plaintiff,                 )
                                       )
      vs.                              ) Case No. C 081220 SI
                                       )
VERITY, INC., a corporation,           )
and THE VERITY INC. CHANGE IN          )
CONTROL AND SEVERANCE BENEFIT          )
PLAN,                                  )
                                       )
            Defendants.                )
_____)

DEPOSITION OF

JOHN (JACK) E. LANDERS, JR.

_____

Monday, June 23, 2008

Volume

(Pages 1 - 43)

REPORTED BY:  ANA M. DUB, RMR, CRR, CSR 7445 (01-410560)

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 2

1                     I N D E X
2              INDEX OF EXAMINATIONS
3                                              Page
4    EXAMINATION BY MR. EHRMAN ........................6
5    EXAMINATION BY MR. DOLL .........................33
6    FURTHER EXAMINATION BY MR. EHRMAN ...............40
7
8
9        DEPOSITION EXHIBITS MARKED FOR IDENTIFICATION
10   No.              Description                  Page
11   Exhibit 1     Subpoena in a Civil Case .............10
12   Exhibit 2     Verity, Inc. Change In ...............13
                   Control And Severance
13                 Benefit Plan, Production
                   Nos. HS-0001-16
14
     Exhibit 3     Letter on the Letterhead of ..........15
15                 Autonomy Dated September 29,
                   2006 to Hugo Sluimer from
16                 Andrew M. Kanter, Production
                   Nos. HS-0065-67
17
     Exhibit 4     E-Mail Chain, Latest of Which ........21
18                 is Dated May 19, 2006, to
                   Rachel Haverfield from
19                 Andrew Kanter, Production
                   No. HS-0022
20
     Exhibit 5     Letter Dated May 1, 2006 .............25
21                 to Jack Landers from Hugo
                   Sluimer, Production
22                 No. HS-0057
23   Exhibit 6     Letter on the Letterhead .............26
                   of Autonomy Dated May 3, 2006
24                 to Hugo Sluimer from Andrew
                   M. Kanter, Production
25                 No. HS-0058

JOHN (JACK) E. LANDERS, JR.   June 23, 2008

Page 3

1                    I N D E X   (Cont.)

2

3       DEFENDANTS' EXHIBITS MARKED FOR IDENTIFICATION

4     No.                Description                    Page

5   Exhibit 7     Letter on the Letterhead of ..........27
                  Autonomy Dated July 6, 2006
6                 to Hugo Sluimer from Andrew
                  M. Kanter, Production
7                 Nos. HS-0059-60

8   Exhibit 8     Letter Dated July 13, 2006 ...........27
                  to Verity, Inc., Vice
9                 President of Human Resources
                  from Hugo Sluimer, Production
10                No. HS-0061

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

fb56f942-ab95-4ab0-b259-5db7d238024f

Page 4

1                      A P P E A R A N C E S
2
3    FOR THE PLAINTIFF HUGO SLUIMER:
4         McGUINN, HILLSMAN & PALEFSKY
          BY:  KEITH A. EHRMAN, ATTORNEY AT LAW
5         535 Pacific Avenue
          San Francisco, California  94133
6              Telephone:  (415) 421-9292
               E-mail:  KAEMHP@aol.com
7
     and
8
9         RIMAC MARTIN PC
          BY:  WILLIAM REILLY, ATTORNEY AT LAW
10        1051 Divisadero Street
          San Francisco, California  94115
11             Telephone:  (415) 561-8440
               E-mail:  w_reilly@rimacmartin.com
12
13
14   FOR THE DEFENDANTS VERITY, INC., AND THE VERITY INC.
     CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN:
15
          DOLL AMIR & ELEY LLP
16        BY:  GREGORY L. DOLL, ATTORNEY AT LAW
          1888 Century Park East, Suite 1160
17        Los Angeles, California  90067
               Telephone:  (310) 557-9100
18             E-mail:  gdoll@dollamir.com
19                      --oOo--
20
21
22
23
24
25

fb56f942-ab95-4ab0-b259-5db7d238024f

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                 --oOo--

4   HUGO SLUIMER,                      )
                                       )
5              Plaintiff,              )
                                       )
6        vs.                           )  Case No. C 081220 SI
                                       )
7   VERITY, INC., a corporation,       )
    and THE VERITY INC. CHANGE IN      )
8   CONTROL AND SEVERANCE BENEFIT      )
    PLAN,                              )
9                                      )
               Defendants.             )
10  _____)

11                --oOo--

12       BE IT REMEMBERED that, pursuant to Subpoena,

13  and on Monday, June 23, 2008, commencing at 9:54 a.m.

14  thereof, at the Law Offices of McGuinn, Hillsman &

15  Palefsky, 535 Pacific Avenue, San Francisco, California,

16  before me, Ana M. Dub, a Certified Shorthand Reporter,

17  Registered Merit Reporter, and Certified Realtime

18  Reporter, personally appeared

19            JOHN (JACK) E. LANDERS, JR.

20  _____

21  called as a witness by the Plaintiff Hugo Sluimer, who,

22  having been first duly sworn, was examined and testified

23  as follows:

24                --oOo--

25

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 6

1                    EXAMINATION BY MR. EHRMAN

2          MR. EHRMAN:  Q.  Would you state your name and

3    spell it for the reporter, please.

4          A.    Yes.  It's John E. Landers, Jr.  That's

5    spelled J-o-h-n; middle initial E.; Landers,

6    L-a-n-d-e-r-s; Jr., J-r.

7          Q.    Are you sometimes referred to as Jack?

8          A.    I am, yes.

9          Q.    Have you had your deposition taken before?

10         A.    Yes.

11         Q.    How many times?

12         A.    Twice.

13         Q.    Twice.  Okay.  Well, you're probably familiar

14   with the basics, but let me go over them anyway.

15              You're not represented by counsel today, are

16   you?

17         A.    No.

18         Q.    The court reporter here is taking down

19   everything that is being said in the room.  And after

20   you are finished today, the reporter will type it up

21   into a little transcript booklet, as you've seen before

22   in your other depos, and you'll have a chance to review

23   it.  But obviously, the oath you took you understand is

24   the same oath you would take in a court of law?

25         A.    Yes.

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 7

1      Q.   And so it's important that we get your best,
2  most accurate testimony here today, to the extent you
3  can.

4           Please answer audibly with "yeses" and "noes,"
5  rather than "uh-huhs" or "uh-uhs" or nods or shrugs,
6  because those are hard for the court reporter to
7  interpret.

8           And it's also important that you try to let me
9  finish my question completely before you start
10  answering.  And by the same token, I'll try not to
11  interrupt you and let you finish your answer completely
12  before I ask another question.  And it's for the same
13  reasons.  It's difficult to have a clear record if you
14  have partial questions.  So even if it's transparent
15  where I'm going, if you could wait till I'm done, that
16  would be great.

17           This is not a memory test.  If you don't know
18  the answer to something, let us know that and tell us
19  you don't know or you don't recall.  We're simply trying
20  to get your best recollection here today.

21           If you have an estimate of something, you
22  should give us your best estimate.  If you have an
23  approximate time frame or an approximate date or
24  approximate month that you do recall, then you should
25  let us know that.  If you simply have no idea and just

Page 8

1    have no recollection of something, then just let us

2    know. And please don't guess. If you just don't know,

3    please don't guess, don't speculate. No one wants you

4    to be doing that.

5            This is not a torture session. If you need to

6    get up and take a break, go to the bathroom or get some

7    more coffee or anything, let us know. This is actually

8    going to be, I think, extremely short. So I'm not sure

9    we're going to have to do any breaks, but if you at any

10   time feel like you need one, let me know that.

11           You're not represented by counsel, so it may

12   be a little confusing at times because there may be

13   objections by the lawyers. When I ask a question or

14   Mr. Doll asks a question, somebody else may object for

15   the record. You should just try to focus, if you can,

16   on the question.

17           I don't think there's going to be any

18   questions asked here which are going to involve some

19   kind of privilege that would require you to not answer

20   something, but the lawyers can discuss that.

21           But to the best you can, try to just focus on

22   the question. The objections are made so that at some

23   point in the future a judge may look at the questions

24   and answers here and decide that question was not

25   proper; it shouldn't have been asked. You don't really

Page 9

1    have to worry too much about that here today.

2            And other than that, if anything I ask is not

3    clear, if it's vague or you just don't understand either

4    a time frame or what I'm asking, please let me know and

5    I'll try to clarify it for you.

6        A.    May I ask a clarifying --

7        Q.    Absolutely.

8        A.    -- question now?

9        Q.    Absolutely.

10        A.    When an objection is raised --

11        Q.    Yes.

12        A.    -- should I wait for the objection to be

13    discussed before I respond?

14        Q.    You can play it by ear.  If there's an

15    objection, I think that somebody will probably tell

16    you -- either there may be some discussion, or it may

17    just be there'll be an objection for the record and

18    then --

19        A.    Okay.

20        Q.    -- we'll tell you to go ahead and answer.

21            MR. DOLL:  Can we have a thirty-second

22    sidebar?

23            MR. EHRMAN:  Absolutely.

24            MR. DOLL:  The only potential objection I

25    see --

1          MR. EHRMAN:  Yes.

2          MR. DOLL:  -- on the privilege ground is that

3    Andy Kanter was the general counsel of the company

4    before he became plan administrator.  So if we get into

5    that area, I may assert an objection.  Rather than

6    slowing up your deposition, if you want to discuss that

7    briefly now, how you want to handle it.

8          MR. EHRMAN:  That, I do understand.  I

9    appreciate that.

10          If something comes up that you think was a

11    communication in the context of attorney-client issues

12    as opposed to -- because I know that he had other --

13          MR. DOLL:  Sure.

14          MR. EHRMAN:  -- roles at the company as

15    secretary and COO and so on and head of whatever.  So if

16    you think that there's an issue that really was a

17    communication in his role as counsel or giving advice as

18    legal counsel, then obviously you should raise that and

19    we can talk about it.

20          MR. DOLL:  All right.  Sounds good.

21          MR. EHRMAN:  Okay.  Let me show you or ask the

22    reporter to mark as Exhibit 1 a subpoena.

23          (Whereupon, Deposition Exhibit 1 was marked

24           for identification.)

25          MR. EHRMAN:  Q.  Have you seen that before?

JOHN (JACK) E. LANDERS, JR.   June 23, 2008

Page 11

1        A.    I have seen this before.

2        Q.    Is that the subpoena that was served on you,

3   which is the reason you're here today?

4        A.    Yes, it is.

5        Q.    Mr. Landers, what is your current job?

6        A.    Currently I'm the vice president of human

7   resources for Chordiant Software.

8        Q.    Where is that located?

9        A.    Cupertino, California.

10       Q.    All right.  When did you start working -- or

11  approximately when did you start working at Chordiant?

12       A.    I started working for Chordiant Software the

13  first week of December 2006.

14       Q.    Prior to Chordiant Software, were you employed

15  somewhere else?

16       A.    I was.

17       Q.    Where was that?

18       A.    Thompson Publishing.

19       Q.    What was your position at Thompson Publishing?

20       A.    I was senior director of human resources for

21  the sales and marketing organization.

22       Q.    Do you recall approximately when you began at

23  Thompson Publishing?

24       A.    Very late September of 2006.

25       Q.    Prior to your employment at Thompson, where

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 12

1    were you employed?

2         A.    I was employed at Autonomy.

3         Q.    Whoops.   Excuse me.

4              And did Autonomy acquire at some point another

5    company that you had been working for?

6         A.    They did.

7         Q.    And what company was that?

8         A.    Verity, Inc.

9         Q.    When did you begin working at Verity?

10        A.    I started working at Verity on April 26th,

11   2004.

12        Q.    What was your job title when you began?

13        A.    Vice president of human resources.

14        Q.    And did you maintain the title of

15   vice president, human resources up through the remainder

16   of your employment there?

17        A.    I did.

18        Q.    Roughly when did Autonomy acquire Verity, if

19   you recall?

20        A.    The transaction was completed just before the

21   end of 2005, late December 2005.

22        Q.    All right.   And did you continue with the

23   title vice president of human resources even after the

24   acquisition of Verity by Autonomy?

25        A.    Yes, I did.

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 13

1    Q.    Did Verity still continue to exist as an

2    entity after the acquisition?

3    A.    Yes.

4    Q.    And do you recall roughly when you left your

5    employment with Verity or its successor, Autonomy?

6    A.    It was the latter part of September 2006.

7    Q.    And were you the vice president of human

8    resources?  Was that your title throughout that period

9    of time from the beginning, April of 2004, up until late

10   September 2006?

11   A.    Yes, I was.

12   Q.    All right.  Where were you located?  Where

13   were your offices?

14   A.    I was located in Sunnyvale, California.

15   MR. EHRMAN:  Let me show you -- we'll mark

16   this as 2.

17   (Whereupon, Deposition Exhibit 2 was marked

18   for identification.)

19   MR. EHRMAN:  Q.  By the way, after the

20   acquisition, did you still have responsibility for human

21   resources at Verity?

22   A.    Yes.

23   Q.    But your title -- or you assumed greater

24   responsibilities?

25   A.    Yes.

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 14

1      Q.    All right.  Take a look, if you would, and

2  look through Exhibit 2.  And take as much time as you

3  want.  I don't think you need to read every line, but

4  it's HS-001 to 0016.

5         And just when you've had a chance to look

6  through it, let me know if you have seen this document

7  before.

8      A.    Yes, I've seen it before.

9      Q.    All right.  And can you tell me what it is?

10     A.    It's the Change In Control And Severance Plan

11  for the executives at Verity.

12     Q.    If you look at the very first section, it

13  states that:

14         ". . . the Plan is hereby established

15         effective April 6, 2005."

16         Is that consistent with your recollection that

17  the plan was adopted or put into effect in roughly April

18  of 2005?

19     A.    It's consistent with my recollection, yes.

20     Q.    And you were the vice president of human

21  resources at Verity at the time?

22     A.    Yes.

23     Q.    The next sentence says that:

24         "The purpose of the Plan is to

25         provide for the payment of severance

fb56f942-ab95-4ab0-b259-5db7d238024f

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 15

1          benefits to certain eligible

2          employees of Verity, Inc., and its

3          wholly owned subsidiaries in the

4          event that such employees are subject

5          to qualifying employment terminations

6          in connection with a Change in

7          Control."

8          Do you see that?

9     A.   Yes.

10    Q.   Is that consistent with your understanding of

11   the purpose of this plan?

12    A.   It would be consistent with my understanding

13   of the purpose of this plan.

14    Q.   All right.  Was it your understanding that the

15   acquisition of Verity by Autonomy constituted a change

16   in control, as that term was used in the plan?

17    A.   It's my understanding that it did constitute a

18   change in control, as stated in the plan.

19          MR. EHRMAN:  If we would, let's mark

20   Exhibit 3.

21          (Whereupon, Deposition Exhibit 3 was marked

22           for identification.)

23          MR. EHRMAN:  Q.  If you would take a brief

24   look at this document, which is HS-065 to 067.

25          All right.  During your employment -- this

Page 16

1    appears to be a letter dated September 29th of 2006 from

2    Andrew Kanter to Hugo Sluimer.  Does this help you -- I

3    take it you were not employed at the time this letter

4    was written.  Is that correct?

5        A.    That's correct.

6        Q.    All right.  Does looking at this date help you

7    at all to pin down when you left Verity/Autonomy in

8    September of '06?

9        A.    It helps me come to a fairly close

10   approximation of the date.

11       Q.    Do you have some approximation of roughly how

12   close in time to September 29th of '06 you left the

13   company?

14       A.    Within a week to two weeks prior to that date,

15   I left.

16       Q.    If you look at the first -- I'm sorry.  If you

17   look at the second sentence of the letter, it says -- or

18   who is Andrew Kanter?

19       A.    Who is Andrew Kanter?

20       Q.    Who was Andrew Kanter?

21       A.    Andrew Kanter, for my purposes, was the chief

22   operating officer for Autonomy and my boss.

23       Q.    Okay.  After the change of control in late '05

24   where Autonomy acquired Verity, Mr. Kanter became your

25   boss?

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 17

1      A.    Correct.

2      Q.    And did he remain your boss throughout the

3  rest of your employment with Autonomy/Verity?

4      A.    He did.

5      Q.    And do you know who Hugo Sluimer is?

6      A.    I do.

7      Q.    Who is Mr. Sluimer?

8      A.    Hugo Sluimer was the senior vice president and

9  general manager for Europe, Middle East, and African

10  geography for Verity, Inc.

11      Q.    If you look at the second sentence and read

12  the remainder of this paragraph, it says:

13              "Your letter was addressed to the

14          Vice President, Human Resources of

15          Verity, Inc.  That position reported

16          to my office, which has global

17          responsibility for group human

18          resources matters.  Jack Landers, the

19          previous Vice President, Human

20          Resources of Verity, Inc., has

21          recently left the company, and as

22          such I have assumed his duties as the

23          Plan Administrator within the meaning

24          of the Change in Control and

25          Severance Benefit Plan."

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 18

1          Do you see that?

2     A.    I do.

3     Q.    Is this consistent with your -- was it your

4  understanding that you were the plan administrator of

5  Exhibit 2 during your employment with Verity/Autonomy?

6     A.    Yes, it was my understanding.

7     Q.    And you were the vice president of human

8  resources at the time the Verity Change In Control And

9  Severance Benefit Plan was adopted in April of '05;

10 correct?

11    A.    Correct.

12    Q.    And was it your understanding that you were

13 the plan administrator of that plan from the time it was

14 put into effect in April of '05 up through the time your

15 employment with Verity/Autonomy ended in September of

16 '06?

17    A.    Yes, it was my understanding that I was the

18 administrator.

19    Q.    Let me show you -- if you'd turn to Exhibit 2,

20 if you'd turn to what is HS-010, Section 11 of the plan,

21 in subset (a), 11(a), if you look at the second sentence

22 of that subsection, it says:

23          "The Plan Administrator is Verity,

24          Inc., Attention:  Vice President,

25          Human Resources, 894 Ross Drive,

fb56f942-ab95-4ab0-b259-5db7d238024f

Page 19

1        Sunnyvale, California 94809."

2        Do you see that?

3    A.    I do.

4    Q.    All right.  Throughout -- from April '05 till

5    late September of '06, you were the vice president of

6    human resources of either Verity or Autonomy; correct?

7    A.    Correct.

8    Q.    And throughout that time period of your

9    employment, were you also located at 894 Ross Drive,

10    Sunnyvale, California?

11    A.    I was.

12    Q.    At any time during your employment, from

13    April '05 up until your departure in September of 2006,

14    were you ever informed by a board of directors or by

15    anyone that you had been relieved of your duties as the,

16    quote, plan administrator, closed quote?

17        MR. DOLL:  Objection to the extent it may call

18    for attorney-client communications with Mr. Kanter.

19        MR. EHRMAN:  Q.  You can answer.

20    A.    I don't recall being communicated with with

21    regards to relieving me of my duties as plan

22    administrator at any time during that period.

23    Q.    At any time from April of '05 up through your

24    departure from the company in September of '06, were

25    you -- or did you delegate your duties as, quote, plan

Page 20

1    administrator to anyone else?

2        A.    No, I did not.

3        Q.    At any time from April of '05 through your

4    departure from the company in September of '06, did any

5    board of directors or any other person tell you that

6    someone else had been appointed as the, quote, plan

7    administrator, closed quote, of the plan?

8            MR. DOLL:  Same objection to the extent it

9    calls for attorney-client communications.

10           MR. EHRMAN:  Q.  You can answer.

11       A.    No, I was never told that.

12       Q.    At some point in 2006, did you -- well, you

13   said Mr. -- I'm sorry.  You said Mr. Kanter became your

14   boss as of December of '05 roughly.

15       A.    As of the beginning of the acquisition, yes.

16       Q.    Okay.  At some point in 2006, did you come to

17   an understanding that there was some either dispute or

18   potential dispute with Hugo Sluimer, between Mr. Sluimer

19   potentially and the company?

20           MR. DOLL:  Same objection.

21           THE WITNESS:  I did.

22           MR. EHRMAN:  Q.  All right.  And did

23   Mr. Kanter give you any sort of instructions with

24   respect to how you should handle that dispute?

25           MR. DOLL:  Objection; attorney-client

Page 21

1    communication and instruct him not to answer.

2          MR. EHRMAN:  So you instructed him not to

3    answer that question?

4          MR. DOLL:  Instructed not to answer -- are you

5    asking about how to handle the -- you're talking about

6    the dispute that exists between the company and Mr. --

7          MR. EHRMAN:  Yes.

8          MR. DOLL:  -- Sluimer?

9          All right.  That would be an attorney-client

10   communication.

11         MR. EHRMAN:  Okay.  All right.  Let me show

12   you -- yeah, let me show you what's been marked as --

13   we'll mark this as -- I'm sorry.  Is this 4?

14         (Whereupon, Deposition Exhibit 4 was marked

15          for identification.)

16         MR. EHRMAN:  Greg?

17         MR. DOLL:  I'm ready.  Go on.  I'm sorry.  I

18   apologize.

19         MR. EHRMAN:  I just want to clarify with you.

20   You're not asserting attorney-client privilege as to

21   this document, I assume.

22         MR. DOLL:  No.

23         MR. EHRMAN:  Okay.

24         MR. DOLL:  This document is already in his

25   hands.

fb56f942-ab95-4ab0-b259-5db7d238024f

Page 22

1          MR. EHRMAN:  Right, in the record.

2          MR. DOLL:  Thank you, though.

3          MR. EHRMAN:  No problem.

4      Q.    Okay.  Take a look, if you would, at -- have

5   you had a chance to look at Exhibit 4?

6      A.    Yes, I have.

7      Q.    At the top -- I'm sorry.  The middle e-mail

8   says from Andrew Kanter to Jack Landers, 8th of January

9   2006.  Have you seen that e-mail before?

10     A.    I have.

11     Q.    Did you receive that in January of 2006?

12     A.    Yes.

13     Q.    What was your understanding -- what

14  understanding did you take away from this e-mail from

15  Mr. Kanter?

16     A.    The understanding I took away was that I was

17  to have no communication with Hugo regarding any

18  conflict that he may have with the company on his

19  employment status.

20     Q.    Did you, in fact -- well, did you understand

21  that he wanted you to forward any communications

22  involving Hugo on to him, meaning Mr. Kanter?

23     A.    Yes, I did have that understanding.

24     Q.    To the best of your ability, did you carry out

25  Mr. Kanter's instructions as your boss?

fb56f942-ab95-4ab0-b259-5db7d238024f

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 23

1    A.    To my best recollection, yes.

2    Q.    At some point, do you have -- well, at some

3    point in 2006, did you develop from any source any

4    understanding as to what the -- whether there was, in

5    fact, a dispute going on between Mr. Sluimer and the

6    company?

7    A.    I did come to understand that there was a

8    dispute.

9    Q.    And what did you understand the nature of the

10   dispute was?

11        MR. DOLL:  Again, I'd just caution the witness

12   not to reveal any attorney-client communications

13   involving Andy Kanter.

14        THE WITNESS:  I simply understood, on a very

15   generic level, that Mr. Sluimer disagreed with the

16   company's position relative to his continued employment.

17        MR. EHRMAN:  Q.  All right.  Did you have any

18   understanding as to whether Mr. Sluimer was claiming

19   that he was entitled to benefits under the Change In

20   Control Plan?

21        MR. DOLL:  Same caution.

22        THE WITNESS:  Frankly, I never had a

23   conversation with anybody about that level of detail.

24        MR. EHRMAN:  Q.  So you understood there was

25   some sort of dispute relating to the ending of his

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 24

1  employment, but it wasn't clear to you what the nature

2  of it was?

3      A.   It was not clear to me.

4      Q.   At any time during 2006, did Mr. Kanter or

5  anybody else ever ask for any input or assistance from

6  you in handling or administering the dispute for -- the

7  dispute between Mr. Sluimer and the company?

8          MR. DOLL:  Objection; vague as to "dispute."

9  Are you talking -- could you rephrase that?

10          MR. EHRMAN:  Sure.

11      Q.   Did you understand that Mr. -- I guess I'm

12  trying to understand from your last answer, did you

13  understand that Mr. Sluimer was making some sort of

14  claim or wanted to be paid benefits under the Change In

15  Control Plan?

16      A.   I had a general, very high-level understanding

17  that that was what he wanted, yes.

18      Q.   Okay.  With that understanding, did Mr. Kanter

19  or anybody else during 2006 ever ask you for any input

20  or assistance in making a decision as to whether or not

21  Mr. Sluimer should receive benefits under the plan?

22          MR. DOLL:  Caution the witness as to the

23  attorney-client privilege.

24          THE WITNESS:  To the best of my recollection,

25  I never had such a conversation.

Page 25

1          MR. EHRMAN:  Q.  Okay.  To the best of your

2    recollection, did Mr. Kanter or anyone else ever provide

3    you with any documents or provide you with any

4    information about what the issues were in connection

5    with Mr. Sluimer's belief that he should get plan

6    benefits?

7          MR. DOLL:  Same caution.

8          THE WITNESS:  To the best of my recollection,

9    I was never provided any materials of any sort in that

10   regard.

11         MR. EHRMAN:  Q.  And I take it you played no

12   involvement -- you had no involvement in assisting with

13   the decision by the company about whether or not

14   Mr. Sluimer should or should not receive benefits under

15   the plan?

16      A.   I had no involvement.

17         MR. EHRMAN:  All right.  Let me show you what

18   we'll mark as Exhibit 5.

19              (Whereupon, Deposition Exhibit 5 was marked

20               for identification.)

21         MR. EHRMAN:  Q.  Take your time.

22      Let me go back to your last answer, if you

23   would, about not having involvement.  Was it also your

24   understanding that Mr. Kanter did not want you to have

25   involvement in the resolution of how Mr. Sluimer's claim

Page 26

1    or belief that he should be entitled to benefits should

2    be handled?

3              MR. DOLL:  Same caution.

4              THE WITNESS:  My best recollection is that he

5    did not want me to participate in that process.

6              MR. EHRMAN:  Q.  Take a look, if you would, at

7    Exhibit 5.  And do you have a recollection of receiving

8    this letter at all in 2006?

9         A.    I do not have the recollection.

10             MR. EHRMAN:  If you look at -- well, we'll

11   give you what we'll mark as Exhibit 6.

12             (Whereupon, Deposition Exhibit 6 was marked

13              for identification.)

14             MR. EHRMAN:  Q.  And take your time and take a

15   look at this letter, which is dated May 3rd, 2006, from

16   Mr. Kanter to Mr. Sluimer.

17        A.    Okay.

18        Q.    Have you ever seen this document before?

19        A.    To the best of my recollection, I have not

20   seen it before.

21        Q.    Did you have any input or assistance in

22   helping with the drafting of this letter or the contents

23   of the letter?

24        A.    No.

25             MR. EHRMAN:  Mark this as Exhibit 7, please.

fb56f942-ab95-4ab0-b259-5db7d238024f

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

1          (Whereupon, Deposition Exhibit 7 was marked

2              for identification.)

3          MR. EHRMAN:  Q.  Have you had a chance to

4    review this?

5          A.    I have.

6          Q.    Have you ever seen this document before?

7          A.    Best of my recollection, I have not seen it

8    before.

9          Q.    As of July 2006, your title was still

10    vice president, human resources; is that true?

11          A.    That is true.

12          Q.    And your offices were still located at

13    894 Ross Drive in Sunnyvale?

14          A.    That is true.

15          Q.    Did you have any input or involvement in the

16    drafting of this letter or the contents of the letter?

17          A.    Best of my recollection, no.

18          MR. EHRMAN:  Mark as Exhibit 8, please.

19          (Whereupon, Deposition Exhibit 8 was marked

20              for identification.)

21          MR. EHRMAN:  Q.  Have you seen this document

22    before?

23          A.    To the best of my recollection, no.

24          Q.    Okay.  You were the only vice president of

25    human resources who was located at the 894 Ross Drive,

Page 28

1    Sunnyvale offices; correct?

2    A.    Correct.

3    Q.    Okay.  There's a reference to a court decision

4    in the Netherlands.  Did you have any understanding,

5    while you were -- in this time period, in the summer of

6    2006, spring or summer of 2006, were you aware at all

7    that there was a lawsuit going on in the Netherlands

8    between Mr. Sluimer and the company?

9    MR. DOLL:  Caution not to reveal any

10   attorney-client communications with Mr. Kanter.

11   THE WITNESS:  I was generally aware that there

12   was a legal proceeding going on.

13   MR. EHRMAN:  Q.  Anybody give you any

14   understanding as to the details of what was being

15   claimed by either Mr. Sluimer or the company in

16   connection with that lawsuit?

17   A.    To the best of my recollection, no.

18   Q.    And let me go back just, if you would, to

19   Exhibit 3, which is the September 29th, 2006 letter from

20   Mr. Kanter to Mr. Sluimer.  There you go.

21   A.    Mm-hmm.

22   Q.    You had a chance to look at this earlier;

23   correct?

24   A.    Yes.

25   Q.    All right.  I know that you were not employed

1  at the time it was actually sent on September 29th, but

2  I just want to wrap up.

3        Did you have any role in assisting in the

4  drafting of the content of this letter or any

5  involvement in the decision announced here that

6  Mr. Sluimer's request for review of the denial of his

7  plan benefits should be reconsidered?

8        A.    I had no such involvement.

9        MR. DOLL:  Sorry.  Ms. Court Reporter, was the

10  last Exhibit 8 a July 13 letter?

11        (Discussion off the record.)

12        MR. EHRMAN:  Couple more questions and then

13  we'll take a break and see if we're done and turn it

14  over to Mr. Doll.

15        Q.    Were you aware, while you were employed there,

16  that there had been a job with Neurodynamics offered to

17  Mr. Sluimer in late March of '06?

18        MR. DOLL:  You're obviously free to answer

19  this, just to the extent it doesn't invade on the

20  attorney-client communications.

21        THE WITNESS:  I was aware that there was an

22  offer made to Mr. Sluimer around that, but I didn't know

23  any of the details or any of the facts about that.

24        MR. EHRMAN:  Q.  Okay.  You didn't know any

25  details of what the job actually involved?

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 30

1       A.    I did not.

2       Q.    Okay.  Are job offers made to employees

3  something that normally you as V.P. of HR would be

4  somewhat involved in in the normal course of your

5  duties?

6       A.    In the normal course of my duties, yes.

7       Q.    Okay.  What would your involvement normally be

8  in connection with making job offers to executives?

9       A.    In the normal course of my duties, my job --

10  my responsibility would be to determine that the

11  compensation being offered is consistent with what the

12  market says it should be; that the person's benefits,

13  et cetera, that are being afforded to them or offered to

14  them are consistent with the company's benefits plan;

15  that the terms and conditions of that person's

16  employment, depending on the jurisdiction that they're

17  in, are consistent with that jurisdiction; and that the

18  offer itself is composed and put into the correct format

19  that the company has established as the format for that

20  and conveyed to the individual appropriately.

21       Q.    Were you asked to have any involvement at all

22  in connection with the job offer made to Mr. Sluimer in

23  the March 2006 time frame?

24       A.    I was not.

25       Q.    If you'd take a look at Exhibit 4, which is

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 31

1   the series of e-mails in January -- well, two of them

2   are in January of '06 -- if you look at the -- do you

3   have that?

4        A.   Yes.

5        Q.   The top e-mail says from Andrew Kanter to

6   Rachel Haverfield, and it's dated 19th of May 2006.  Do

7   you see that?

8        A.   Yes.

9        Q.   Do you know who Rachel Haverfield is?

10       A.   I do.

11       Q.   Who is she?

12       A.   She was an attorney employed in Cambridge by

13  Autonomy.

14       Q.   Do you know if she had -- what her specific

15  responsibilities were with the company?

16       A.   I don't know.  I wasn't aware of all of her

17  responsibilities.

18       Q.   Do you know what her reporting relationship

19  was, if any, with respect to Mr. Kanter?

20       A.   I'm not certain what her relationship was, but

21  I believe it was that she reported to him.

22       Q.   I want to go back, if I could, to your

23  departure from Verity/Autonomy in late September of '06.

24            We previously, before the depo began, looked

25  at a calendar which showed that -- indicated that

Page 32

1  September 29th, which was the date of Exhibit 3, that

2  letter that we looked at from Mr. Kanter to Mr. Sluimer,

3  September 29th of '06 was a Friday.

4        If that, in fact, is correct that

5  September 29th of '06 was a Friday, does that help you

6  pin down when you may have had your final day of

7  employment at Verity/Autonomy?

8        A.   It helps me approximately pin it down.

9        Q.   Okay.

10       A.   Yes.

11       Q.   And what date do you think would be the

12  approximate date that you believe you left the company?

13       A.   It was either the 22nd of September, the

14  previous Friday, or the 15th of September, the Friday

15  before that.

16       Q.   Okay.  And so you're confident that the

17  earliest you left would have been September the 15th of

18  '06?

19       A.   I'm fairly confident that's the case, yes.

20            MR. EHRMAN:  Let's take a real quick break,

21  and I think we're about wrapped up.

22            (Recess taken from 10:31 a.m. to 10:35 a.m.)

23            MR. EHRMAN:  All right.  One little question

24  left.

25       Q.   Do you have any understanding as to why you

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 33

1  were not involved in the March '06 job offer that was

2  given to Mr. Sluimer?

3      A.    No, I have no understanding.

4          MR. EHRMAN:  All right.  I think that's it for

5  us.  Thank you.

6          MR. DOLL:  I just have probably five minutes

7  of questions, tops.

8          THE WITNESS:  Okay.

9              EXAMINATION BY MR. DOLL

10         MR. DOLL:  Q.  When did you say you first

11  became plan administrator?

12     A.    Basically, my recollection is that the date

13  that's on the plan, April of '06, is the date that I

14  became the administrator.

15     Q.    And do you remember how you learned you'd be

16  filling that role?

17     A.    My best recollection is that we received the

18  documents and reviewed the documents for the plan from

19  our attorneys, who at that time was Cooley Godward, and

20  that's how I learned about it.

21     Q.    Could you just briefly open up Document No. 2,

22  Exhibit 2, and turn to page HS-0004.  I'm going to ask

23  you a question about the definition at the top of that

24  page.  And it says:

25          "'Plan Administrator' means" --

fb56f942-ab95-4ab0-b259-5db7d238024f

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 34

1          And this is at, looks like, either "L" or "F."

2     I think it's "L."

3               "'Plan Administrator' means the

4               Board or any committee duly

5               authorized by the Board to administer

6               the Plan.  The Plan Administrator

7               may, but is not required to be, the

8               Compensation Committee of the Board.

9               The Board may at any time administer

10              the Plan, in whole or in part,

11              notwithstanding that the Board has

12              previously appointed a committee to

13              act as the Plan Administrator."

14     A.    Right.

15     Q.    Have you, at any time prior to your

16     deposition, read that language, exhibit language?

17     A.    Yes, my best of my recollection, I did, yes.

18     Q.    Can you tell me whether you had an

19     understanding as to whether the board was authorized,

20     under this particular provision, to administer the plan?

21          MR. EHRMAN:  Objection to the extent it calls

22     for a legal conclusion.

23          MR. DOLL:  That's fair enough.

24     Q.    And I'm just asking for your understanding

25     as --

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 35

1      A.    Yeah.  My best understanding, based on not

2  being an attorney, would be that this language does

3  authorize them to be the plan administrator.

4      Q.    And if you could turn to -- I think it's

5  HS-0010, 0010, that is, and if you look at Section 11,

6  which is titled "Claims, Inquiries and Appeals," then it

7  says:

8              "Applications for Benefits and

9              Inquiries.  Any application for

10             benefits, inquiries about the Plan or

11             inquiries about present or future

12             rights under the Plan must be

13             submitted to the Plan Administrator

14             in writing by an applicant (or his or

15             her authorized representative).  The

16             Plan Administrator is . . . ."

17          Then it says:

18             "Verity, Inc., Attention:

19             Vice President, Human Resources."

20          You understood -- is it your understanding

21  that -- well, you understand that Verity, Inc., was a

22  corporation; correct?

23      A.    Correct.

24      Q.    And have you seen sometimes, in the context of

25  communications with a corporation, that a letter will be

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 36

1  written to the corporation but they'll put attention to

2  a certain individual?

3      A.    I have.

4      Q.    Was it your understanding that at all times

5  the vice president of human resources would always be

6  the plan administrator?

7          MR. EHRMAN:  Objection; vague.

8          MR. DOLL:  Q.  Let me ask you, did you have

9  any understanding, in light of the language we read

10  prior about the board being administrator, whether at

11  all times the board was required to have the

12  vice president of human resources be the plan

13  administrator?

14          MR. EHRMAN:  Objection; calls for a legal

15  conclusion.

16          THE WITNESS:  Okay.  Giving an answer that's

17  non-legal or would be, that my understanding was that I

18  was consistently the communication point on all the

19  matters that are referred to here.

20          MR. DOLL:  Q.  And at some point in time you

21  began referring communications to Mr. Kanter with

22  respect to this particular participant, Mr. Sluimer?

23      A.    Correct.

24          MR. REILLY:  Objection; misstates the

25  testimony.

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

1    MR. DOLL:  Q.  Is there anything inaccurate

2    about your prior testimony there?  I didn't mean to

3    mischaracterize anything.

4        A.  Can we go back?

5        Q.  Yeah, please.

6        A.  Yeah, sorry.

7        Q.  At some point in time did Mr. Kanter ask you

8    to forward communications related to Mr. Sluimer

9    directly to him?

10       A.  Yes, he did.

11       Q.  And was that in -- I think it's Exhibit 4,

12   where it says:

13           "Jack, I sent the message below to

14           Anthony on Friday.  Can I ask of you

15           as well that any communication you

16           get from Hugo be forwarded to me."

17           Is that the letter you're referring to?

18       A.  Yes.

19       Q.  So now, in light of your understanding of

20   this, did you believe, if you had a belief, that at some

21   point in time the board was allowed to authorize someone

22   else to serve as plan administrator --

23           MR. EHRMAN:  Objection.

24           MR. DOLL:  Q.  -- in certain instances?

25           MR. EHRMAN:  Objection to the extent it calls

fb56f942-ab95-4ab0-b259-5db7d238024f

Page 38

1    for a legal conclusion.

2            THE WITNESS:  This is going to sound very

3    vague, but to the best of my recollection, I never

4    thought about that issue.

5            MR. DOLL:  Something that lawyers ponder more

6    than the average person.  So I apologize.

7            MR. EHRMAN:  To their detriment.

8            MR. DOLL:  Last area of questions.

9        Q.   Did you -- how many occasions did you

10   administer plan benefits, in other words, respond to

11   queries, give benefits out to people?

12       A.   The best recollection I have of carrying out

13   my role in any way proximate to this particular

14   designation, plan administrator, was when the actual

15   acquisition occurred and a number of executives were

16   leaving the company under the plan and receiving

17   benefits, that I participated in ensuring that the

18   process of getting the transactions completed for them

19   and the payments made occurred.

20       Q.   Okay.  So the acquisition takes place on

21   December 29, '05; is that correct?

22       A.   Roughly, yes.

23       Q.   And were these departing Verity employees pre-

24   or post-acquisition?  Were they walking out the door, so

25   to speak?

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 39

1    A.    My understanding and best recollection is that

2    they were actually leaving coincident with the

3    transaction.

4    Q.    So in or about December of '05?

5    A.    Yes, correct.

6    Q.    Were any of them leaving in January of '06, or

7    was it all back in December of '05?  Do you know?

8    A.    It was all back in December of '05.

9    Q.    Do you recall post-acquisition -- between,

10    let's say, December 29, 2005 and the time that you left

11    in September of '06, do you recall on how many occasions

12    you were asked to administer the plan or were called

13    upon to administer the plan?

14    A.    I recall, to the best of my recollection, that

15    I was never asked during that period to act in regards

16    to that.

17    MR. DOLL:  Okay.  I don't believe I have any

18    additional questions.

19    MR. EHRMAN:  I have one clarification, which

20    is -- I think the very first question you asked had to

21    do with when you believed that you first became the plan

22    administrator.

23    Was that your -- Greg, was that your first

24    question on the record?

25    MR. DOLL:  I don't recall, but it was

JOHN  (JACK)  E.  LANDERS,  JR.    June 23, 2008

1    something along those lines.

2            MR. EHRMAN:  Something like that?

3            Because I think your answer -- I want to

4    clarify because I think the answer you gave was

5    something along the lines of when the plan was adopted

6    in April of '06, which I think -- I want to give you a

7    chance to clarify your testimony is that you probably

8    meant April of '05, which is when the plan went into

9    effect.  But I wanted you to have a chance to clarify

10   that.  So let me ask, to help clean that up.

11           FURTHER EXAMINATION BY MR. EHRMAN

12           MR. EHRMAN:  Q.  What was your understanding

13   as to when you first took on the role of plan

14   administrator with respect to the Verity Change In

15   Control Plan?

16       A.   My best recollection is that I became aware of

17   that upon the receipt of the documents that outline the

18   plan from Cooley Godward in April of '05, as indicated

19   here.

20       Q.   Okay.  Thank you.  Do you have any

21   recollection whether you ever forwarded any documents to

22   Mr. Kanter regarding Mr. Sluimer after receiving this

23   January 8th, 2006 e-mail?

24       A.   I have no recollection.

25           MR. EHRMAN:  I think that's it for us.  Thank

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 41

1    you very much.

2              MR. DOLL:  I think we're done.

3              THE WITNESS:  Thank you.

4              MR. EHRMAN:  Done in record time.  Thank you.

5              THE WITNESS:  All right.

6              (Whereupon, the deposition was adjourned at

7               10:45 a.m.)

8                          --oOo--

9              I declare under penalty of perjury the

10   foregoing is true and correct.  Subscribed at

11   _____, California, this _____ day of

12   _____, 2008.

13                      _____

14                          John (Jack) E. Landers, Jr.

15

16

17

18

19

20

21

22

23

24

25

fb56f942-ab95-4ab0-b259-5db7d238024f

JOHN (JACK) E. LANDERS, JR.    June 23, 2008

Page 42

1                    CERTIFICATE OF REPORTER

2            I, ANA M. DUB, a Certified Shorthand Reporter,

3    hereby certify that the witness in the foregoing

4    deposition was by me duly sworn to tell the truth, the

5    whole truth, and nothing but the truth in the

6    within-entitled cause;

7            That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time and

9    place therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12           That before completion of the deposition,

13   review of the transcript [X] was [ ] was not requested.

14   If requested, any changes made by the deponent (and

15   provided to the reporter) during the period allowed are

16   appended hereto.

17           I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22           DATED:  June 25, 2008.

23           _____

24           ANA M. DUB, RMR, CRR, CSR No. 7445

25

Page 43

June 25, 2008

Jack Landers, Vice President, Human Resources
Chordiant
20400 Stevens Creek Boulevard, Suite 400
Cupertino, CA  95014
Re:  Sluimer v. Verity
Dear Mr. Landers:
Please be advised that the original transcript of your
deposition taken June 23, 2008, in the above-entitled
matter is available for reading and signing.  The
original transcript will be held at the offices of:

Merrill Legal Solutions
135 Main Street, Fourth Floor
San Francisco, CA  94105
(415) 357-4300

for thirty (30) days in accordance with Federal Rules of
Civil Procedure Section 30(e). If you do not sign your
deposition within 30 days, it may be used as fully as
though signed.

If you are represented by counsel in this matter, you
may wish to ask your attorney how to proceed.  If you
are not represented by counsel and wish to review your
transcript, please contact our office for a mutually
convenient appointment to review your deposition.

Thank you for your cooperation in this matter.

Sincerely yours,


Ana M. Dub, RMR, CRR, CSR No. 7445
cc:  Original transcript
     Keith A. Ehrman, Attorney at Law
     William Reilly, Attorney at Law
     Gregory L. Doll, Attorney at Law

Merrill Legal Solutions
(800) 869-9132

AO88  (Rev. 12/07) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT

## Northern District of California

HUGO SLUIMER

**SUBPOENA IN A CIVIL CASE**

V.

VERITY, INC., a corporation, et al.

Case Number:[1] C 081220 SI

TO:

Jack Landers, c/o Chordiant Software, Inc.
20400 Stevens Creek Blvd, 4th Floor, Cupertino

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| McGuinn, Hillsman & Palefsky, 535 Pacific Avenue, San Francisco, CA 94133 | June 23, 2008 at 10:00 a.m. |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| | |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

**EXHIBIT**

1

PENGAD 800-631-6989

AO88  (Rev. 12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
            DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

_____

---

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

**(c) Protecting a Person Subject to a Subpoena.**

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) CONTEMPT.**

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).



## VERITY, INC.

### CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

SECTION 1. INTRODUCTION.

The Verity, Inc. Change in Control and Severance Benefit Plan (the *"Plan"*) is hereby established effective April 6, 2005 (the *"Effective Date"*). The purpose of the Plan is to provide for the payment of severance benefits to certain eligible employees of Verity, Inc. and its wholly owned subsidiaries (the *"Company"*) in the event that such employees are subject to qualifying employment terminations in connection with a Change in Control. This Plan shall supersede any severance benefit plan, policy or practice previously maintained by the Company, other than an individually negotiated contract or agreement with the Company relating to severance or change in control benefits that is in effect on an employee's termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan. This document also is the Summary Plan Description for the Plan.

SECTION 2. DEFINITIONS.

For purposes of the Plan, the following terms are defined as follows:

(a)    *"Base Salary"* means the Participant's annual base pay (excluding incentive pay, premium pay, commissions, overtime, bonuses and other forms of variable compensation), at the rate in effect during the last regularly scheduled payroll period immediately preceding the date of the Participant's Covered Termination.

(b)    *"Board"* means the Board of Directors of Verity, Inc.

(c)    *"Change in Control"* means one of the following events or a series of more than one of the following events that are related, wherein the stockholders of the Company immediately before the transaction do not retain immediately after the transaction, in substantially the same proportions as their ownership of shares of the Company's voting stock immediately before the transaction, direct or indirect beneficial ownership of more than fifty percent (50%) of the total combined voting power of the outstanding voting stock of the Company, the resulting entity in a merger or, in the case of an asset sale, the corporation or corporations to which the assets of the Company were transferred (the "Transferee Corporation(s)"), as the case may be:

(i)    the direct or indirect sale or exchange in a single or series of related transactions by the stockholders of the Company of more than fifty percent (50%) of the voting stock of the Company;

(ii)    a merger or consolidation in which the Company is a party;



EXHIBIT

2

1.

Verity, Inc.    894 Ross Drive  Sunnyvale, CA 94089    t. 408.541.1500    f. 408.541.1600    www.verity.com

HS-0001



(iii)    the sale, exchange, or transfer of all or substantially all of the assets of the Company; or

(iv)    a liquidation or dissolution of the Company.

For purposes of this Section 2(c), indirect beneficial ownership shall include, without limitation, an interest resulting from ownership of the voting stock of one or more corporations, which as a result of the transaction, own the Company, the resulting entity or the Transferee Corporation(s), as the case may be, either directly or through one or more subsidiary corporations. The Board shall have the right to determine whether multiple sales or exchanges of the voting stock of the Company or more than one of the following events are related, and its determination shall be final, binding and conclusive.

(d)    *"Code"* means the Internal Revenue Code of 1986, as amended.

(e)    *"Company"* means Verity, Inc. and its wholly owned subsidiaries or, following a Change in Control, the surviving entity resulting from such transaction.

(f)    *"Constructive Termination"* means a voluntary termination of employment by a Participant after one of the following is undertaken without the Participant's express written consent:

(i)    a substantial reduction in the Participant's duties or responsibilities (and not simply a change in title or reporting relationships) in effect immediately prior to the effective date of the Change in Control; *provided, however,* that it shall not be a "Constructive Termination" if, following the effective date of the Change in Control, either (a) the Company is retained as a separate legal entity or business unit and the Participant holds the same position in such legal entity or business unit as the Participant held before such effective date, or (b) the Participant holds a position with duties and responsibilities comparable (though not necessarily identical, in view of the relative sizes of the Company and the entity involved in the Change in Control) to the duties and responsibilities of the Participant prior to the effective date of the Change in Control;

(ii)    a reduction in the Participant's base salary (except for salary decreases generally applicable to the Company's other similarly situated employees);

(iii)    a change in the Participant's business location of more than 20 miles from the business location prior to such change, except for required travel for the Company's business to an extent substantially consistent with Participant's prior business travel obligations;

(iv)    a material breach by the Company of any provisions of the Plan or any enforceable written agreement between the Company and the Participant; or

(v)    any failure by the Company to obtain assumption of the Plan by any successor or assign of the Company.

2.

Verity, Inc.    894 Ross Drive Sunnyvale, CA 94089    t. 408.541.1500   f. 408.541.1600    www.verity.com

HS-0002



Notwithstanding the foregoing, a voluntary termination shall not be deemed a Constructive Termination unless (x) the Participant provides the Company with written notice (the "Constructive Termination Notice") that the Participant believes that an event described in this Section 2(f) has occurred, (y) the Constructive Termination Notice is given within three (3) months of the date the event occurred, and (z) the Company does not rescind or cure the conduct giving rise to the event described in this Section 2(f) within fifteen (15) days of receipt by the Company of the Constructive Termination Notice.

(g)    *"Covered Termination"* means an Involuntary Termination Without Cause or a Constructive Termination, either of which occurs within one (1) month prior to or within eighteen (18) months following the effective date of a Change in Control. Termination of employment of a Participant due to death or disability shall not constitute a Covered Termination unless a voluntary termination of employment by the Participant immediately prior to the Participant's death or disability would have qualified as a Constructive Termination.

(h)    *"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

(i)    *"Involuntary Termination Without Cause"* means an involuntary termination of employment by the Company other than for one of the following reasons:

(i)    the Participant's violation of any material provision of the Company's standard agreement relating to proprietary rights;

(ii)    the Participant participates in any act of theft or dishonesty; or

(iii)    the Participant participates in any immoral or illegal act which has had or could reasonably be expected to have or had a detrimental effect on the business or reputation of the Company; or

(iv)    any material failure by the Participant to use reasonable efforts to perform reasonably requested tasks after written notice and a reasonable opportunity to comply with such notice.

(j)    *"Participant"* means an individual who is employed by the Company as its Executive Chairman of the Board, Chief Executive Officer, as a senior vice president, or as a vice president (other than any individual who is a vice president on sales commission, as determined by the Company in its sole discretion); *provided, however,* that if the Board shall make an affirmative determination that an employee serving in any such capacity shall not be a Participant, then such employee shall not be deemed a Participant. The determination of whether an employee *is* a Participant shall be made by the Company, in its sole discretion, and such determination shall be binding and conclusive on all persons.

(k)    *"Participation Notice"* means the latest notice delivered by the Company to a Participant informing the employee that the employee is a Participant in the Plan, substantially in the form of **Exhibit A** hereto.

Verity, Inc.    894 Ross Drive Sunnyvale, CA 94089    3.
t. 408.541.1500 · f. 408.541.1600    www.verity.com

HS-0003



(l)    *"Plan Administrator"* means the Board or any committee duly authorized by the Board to administer the Plan. The Plan Administrator may, but is not required to be, the Compensation Committee of the Board. The Board may at any time administer the Plan, in whole or in part, notwithstanding that the Board has previously appointed a committee to act as the Plan Administrator.

SECTION 3. ELIGIBILITY FOR BENEFITS.

(a)    **General Rules.** Subject to the provisions set forth in this Section and Section 7, in the event of a Covered Termination, the Company will provide the severance benefits described in Section 4 of the Plan to the affected Participant. Promptly upon an employee becoming a Participant, the Company shall deliver to the Participant a Participation Notice.

(b)    **Exceptions to Benefit Entitlement.** An employee, including an employee who otherwise is a Participant, will not receive benefits under the Plan (or will receive reduced benefits under the Plan) in the following circumstances, as determined by the Company in its sole discretion:

(i)    The employee has executed an individually negotiated employment contract or agreement with the Company relating to severance or change in control benefits that is in effect on his or her termination date, in which case such employee's severance benefit, if any, shall be governed by the terms of such individually negotiated employment contract or agreement and shall be governed by this Plan only to the extent that the reduction pursuant to Section 7(b) below does not entirely eliminate benefits under this Plan.

(ii)    The employee voluntarily terminates employment with the Company in order to accept employment with another entity that is controlled (directly or indirectly) by the Company or is otherwise an affiliate of the Company.

(iii)    The employee is offered immediate reemployment by a successor to the Company or by a purchaser of its assets, as the case may be, following a change in ownership of the Company or a sale of all or substantially all the assets of a division or business unit of the Company. For purposes of the foregoing, "immediate reemployment" means that the employee's employment with the successor to the Company or the purchaser of its assets, as the case may be, results in uninterrupted employment such that the employee does not suffer a lapse in pay as a result of the change in ownership of the Company or the sale of its assets.

(iv)    The employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non-Compete Agreement.

(c)    **Termination of Benefits.** A Participant's right to receive the payment of benefits under this Plan shall terminate immediately if, at any time prior to or during the period for which the Participant is receiving benefits hereunder, the Participant, without the prior written approval of the Company:

HS-0004



    (i)    willfully breaches a material provision of the Participant's proprietary information or confidentiality agreement with the Company, as referenced in Section 3(b)(iv);

    (ii)    owns, manages, operates, joins, controls or participates in the ownership, management, operation or control of, is employed by or connected in any manner with, any person, enterprise or entity which is engaged in any business competitive with that of the Company; *provided, however,* that such restriction will not apply to any passive investment representing an interest of less than two percent (2%) of an outstanding class of publicly-traded securities of any corporation or other entity or enterprise;

    (iii)    encourages or solicits any of the Company's then current employees to leave the Company's employ for any reason or interferes in any other manner with employment relationships at the time existing between the Company and its then current employees; or

    (iv)    induces any of the Company's then current clients, customers, suppliers, vendors, distributors, licensors, licensees or other third party to terminate their existing business relationship with the Company or interferes in any other manner with any existing business relationship between the Company and any then current client, customer, supplier, vendor, distributor, licensor, licensee or other third party.

SECTION 4. AMOUNT OF BENEFITS.

    (a)    **Cash Severance Benefits.** Each Participant who incurs a Covered Termination and was employed by the Company at the position or level set forth below within one (1) month immediately prior to such Covered Termination shall be entitled to receive a cash severance benefit equal to the number of months of Base Salary set forth below. Any cash severance benefits provided under this Section 4(a) shall be paid pursuant to the provisions of Section 5.

| Position or Level | Amount of Cash Severance Benefit |
|---|---|
| Executive Chairman of the Board | 24 months |
| Chief Executive Officer | 24 months |
| Senior Vice President | 18 months |
| Vice President (Except Vice Presidents on sales commissions) | 12 months |

    (b)    **Accelerated Stock Award Vesting and Extended Exercisability of Stock Options.** If a Participant incurs a Covered Termination, then effective as of the date of the Participant's Covered Termination, (i) the vesting and exercisability of all outstanding options to purchase the Company's common stock that are held by the Participant on such date shall be accelerated in full, and (ii) any reacquisition or repurchase rights held by the Company in respect

HS-0005



of common stock issued pursuant to any other stock award granted to the Participant by the Company shall lapse.

In addition, the post-termination of employment exercise period of any outstanding option held by the Participant on the date of his or her Covered Termination shall be extended, if necessary, such that the post-termination of employment exercise period shall not terminate prior to the later of (i) the date twelve (12) months after the effective date of the Covered Termination or (ii) the post-termination exercise period provided for in such option; *provided, however*, that such option shall not be exercisable after the expiration of its maximum term; *provided, further*, *however*, that in the event that any extended exercisability of an option pursuant to this Section 4(b) would adversely affect a Participant's option or other stock award (including, without limitation, its status as an incentive stock option under Section 422 of the Code or result in an option that would not otherwise be deemed to be a nonqualified deferred compensation plan or arrangement for the purposes of Section 409A of the Code to be deemed to be such a nonqualified deferred compensation plan or arrangement), such extended exercisability shall be deemed null and void unless the affected Participant consents in writing to such extended exercisability within thirty (30) days after becoming a Participant in the Plan.

(c)     **Continued Medical Benefits.** If a Participant incurs a Covered Termination and the Participant was enrolled in a health, dental, or vision plan sponsored by the Company immediately prior to such Covered Termination, the Participant may be eligible to continue coverage under such health, dental, or vision plan (or to convert to an individual policy), at the time of the Participant's termination of employment, under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The Company will notify the Participant of any such right to continue such coverage at the time of termination pursuant to COBRA. No provision of this Plan will affect the continuation coverage rules under COBRA, except that the Company's payment, if any, of applicable insurance premiums will be credited as payment by the Participant for purposes of the Participant's payment required under COBRA. Therefore, the period during which a Participant may elect to continue the Company's health, dental, or vision plan coverage at his or her own expense under COBRA, the length of time during which COBRA coverage will be made available to the Participant, and all other rights and obligations of the Participant under COBRA (except the obligation to pay insurance premiums that the Company pays, if any) will be applied in the same manner that such rules would apply in the absence of this Plan.

If a Participant timely elects continued coverage under COBRA, the Company shall pay the full amount of the Participant's COBRA premiums on behalf of the Participant for the Participant's continued coverage under the Company's health, dental and vision plans, including coverage for the Participant's eligible dependents, during the number of months of Base Salary in respect of which the amount paid to the Participant under Section 4(a) was calculated (the "Severance Period"); *provided, however*, that if the Severance Period exceeds the length of time that the Participant is entitled to coverage under COBRA (including any additional period under analogous provisions of state law), the resulting or acquiring entity or Transferee Corporation involved in the Change in Control, as applicable, shall be required to provide health, dental and vision insurance coverage for the Participant and his or her eligible dependents for any portion of the Severance Period that exceeds the length of time that the Participant is entitled to coverage

HS-0006



under COBRA (including any additional period under analogous provisions of state law), at a level of coverage that is substantially similar to the continued coverage that the Participant and his or her eligible dependents received under the Company's health, dental and vision plans; *provided, further, however,* that no such premium payments (or any other payments for medical, dental or vision coverage by the Company) shall be made following the Participant's death or the effective date of the Participant's coverage by a medical, dental or vision insurance plan of a subsequent employer. Each Participant shall be required to notify the Company immediately if the Participant becomes covered by a medical, dental or vision insurance plan of a subsequent employer. Upon the conclusion of such period of insurance premium payments made by the Company, the Participant will be responsible for the entire payment of premiums required under COBRA for the duration of the COBRA period.

For purposes of this Section 4(c), (i) references to COBRA shall be deemed to refer also to analogous provisions of state law and (ii) any applicable insurance premiums that are paid by the Company shall not include any amounts payable by the Participant under an Internal Revenue Code Section 125 health care reimbursement plan, which amounts, if any, are the sole responsibility of the Participant.

(d)     **Other Employee Benefits.** All other benefits (such as life insurance, disability coverage, and 401(k) plan coverage) shall terminate as of the Participant's termination date (except to the extent that a conversion privilege may be available thereunder).

(e)     **Additional Benefits.** Notwithstanding the foregoing, the Company may, in its sole discretion, provide benefits in addition to those pursuant to Sections 4(a), 4(b) and 4(c) to Participants or employees who are not Participants ("Non-Participants") chosen by the Company, in its sole discretion, and the provision of any such benefits to a Participant or a Non-Participant shall in no way obligate the Company to provide such benefits to any other Participant or to any other Non-Participant, even if similarly situated. If benefits under the Plan are provided to a Non-Participant, references in the Plan to "Participant" (with the exception of Sections 4(a), 4(b) and 4(c)) shall be deemed to refer to such Non- Participants.

SECTION 5.   TIME AND FORM OF SEVERANCE PAYMENTS.

(a)     **General Rules.** Subject to Section 5(b), any cash severance benefit provided under Section 4(a) shall be paid in installments pursuant to the Company's regularly scheduled payroll periods commencing as soon as practicable following the effective date of a Participant's Covered Termination and shall be subject to all applicable withholding for federal, state and local taxes. In the event of a Participant's death prior to receiving all installment payments of his or her cash severance benefit under Section 4(a), any remaining installment payments shall be made to the Participant's estate on the same payment schedule as would have occurred absent the Participant's death. In no event shall payment of any Plan benefit be made prior to the effective date of the Participant's Covered Termination or prior to the effective date of the release described in Section 7(a).

(b)     **Application of Section 409A.** In the event that any cash severance benefit provided under Section 4(a) or continued medical benefit under Section 4(c) shall fail to satisfy

HS-0007



the distribution requirement of Section 409A(a)(2)(A) of the Code as a result of the application of Section 409A(a)(2)(B)(i) of the Code, the payment of such benefit shall be accelerated to the minimum extent necessary so that the benefit is not subject to the provisions of Section 409A(a)(1) of the Code. (The payment schedule as revised after the application of the preceding sentence shall be referred to as the *"Revised Payment Schedule."*) In the event the payment of benefits pursuant to the Revised Payment Schedule would be subject to Section 409A(a)(1) of the Code, the payment of such benefits shall not be paid pursuant to the Revised Payment Schedule and instead the payment of such benefits shall be delayed to the minimum extent necessary so that such benefits are not subject to the provisions of Section 409A(a)(1) of the Code. The Board may attach conditions to or adjust the amounts paid pursuant to this Section 5(b) to preserve, as closely as possible, the economic consequences that would have applied in the absence of this Section 5(b); *provided, however,* that no such condition or adjustment shall result in the payments being subject to Section 409A(a)(1) of the Code.

SECTION 6.  REEMPLOYMENT.

In the event of a Participant's reemployment by the Company during the period of time in respect of which severance benefits pursuant to Section 4(a) or 4(e) have been paid, the Company, in its sole and absolute discretion, may require such Participant to repay to the Company all or a portion of such severance benefits as a condition of reemployment.

SECTION 7.  LIMITATIONS ON BENEFITS.

(a)    **Release.**  In order to be eligible to receive benefits under the Plan, a Participant also must execute a general waiver and release in substantially the form attached hereto as Exhibit B, Exhibit C or Exhibit D, as appropriate, and such release must become effective in accordance with its terms.  For purposes of the preceding sentence, with respect to any outstanding option held by the Participant, the receipt of benefits shall be deemed to be the rather than the acceleration or extension of such option's exercisability. The Company, in its sole discretion, may modify the form of the required release to comply with applicable law and shall determine the form of the required release, which may be incorporated into a termination agreement or other agreement with the Participant.

(b)    **Certain Reductions.**  The Company, in its sole discretion, shall have the authority to reduce a Participant's severance benefits, in whole or in part, by any other severance benefits, pay in lieu of notice, or other similar benefits payable to the Participant by the Company that become payable in connection with the Participant's termination of employment pursuant to (i) any applicable legal requirement, including, without limitation, the Worker Adjustment and Retraining Notification Act (the "WARN Act"), (ii) a written employment or severance agreement with the Company, or (iii) any Company policy or practice providing for the Participant to remain on the payroll for a limited period of time after being given notice of the termination of the Participant's employment.  The benefits provided under this Plan are intended to satisfy, in whole or in part, any and all statutory obligations and other contractual obligations of the Company that may arise out of a Participant's termination of employment, and

8.

Verity, Inc.    894 Ross Drive  Sunnyvale, CA. 94089    t. 408.541.1500    f. 408.541.1600    www.verity.com

HS-0008



the Plan Administrator shall so construe and implement the terms of the Plan. The Company's decision to apply such reductions to the severance benefits of one Participant and the amount of such reductions shall in no way obligate the Company to apply the same reductions in the same amounts to the severance benefits of any other Participant, even if similarly situated. In the Company's sole discretion, such reductions may be applied on a retroactive basis, with severance benefits previously paid being recharacterized as payments pursuant to the Company's statutory or other contractual obligations.

(c)    **Mitigation.** Except as otherwise specifically provided herein, a Participant shall not be required to mitigate damages or the amount of any payment provided under this Plan by seeking other employment or otherwise, nor shall the amount of any payment provided for under this Plan be reduced by any compensation earned by a Participant as a result of employment by another employer or any retirement benefits received by such Participant after the date of the Participant's termination of employment with the Company.

(d)    **Non-Duplication of Benefits.** Except as otherwise specifically provided for herein, no Participant is eligible to receive benefits under this Plan or pursuant to other contractual obligations more than one time. This Plan is designed to provide certain severance pay and change in control benefits to Participants pursuant to the terms and conditions set forth in this Plan. The payments pursuant to this Plan are in addition to, and not in lieu of, any unpaid salary, bonuses or benefits to which a Participant may be entitled for the period ending with the Participant's Covered Termination.

(e)    **Indebtedness of Participants.** If a Participant is indebted to the Company on the effective date of his or her Covered Termination, the Company reserves the right to offset any severance payments under the Plan by the amount of such indebtedness.

SECTION 8.  RIGHT TO INTERPRET PLAN; AMENDMENT AND TERMINATION.

(a)    **Exclusive Discretion.** The Plan Administrator shall have the exclusive discretion and authority to establish rules, forms, and procedures for the administration of the Plan and to construe and interpret the Plan and to decide any and all questions of fact, interpretation, definition, computation or administration arising in connection with the operation of the Plan, including, but not limited to, the eligibility to participate in the Plan and amount of benefits paid under the Plan. The rules, interpretations, computations and other actions of the Plan Administrator shall be binding and conclusive on all persons.

(b)    **Amendment or Termination.** The Company reserves the right to amend or terminate this Plan or the benefits provided hereunder at any time; *provided, however,* that no such amendment or termination shall occur following (i) the date one (1) month prior to a Change in Control or (ii) a Covered Termination as to any Participant who would be adversely affected by such amendment or termination unless such Participant consents in writing to such amendment or termination. Any action amending or terminating the Plan shall be in writing and executed by a duly authorized officer of the Company. Unless otherwise required by law, no approval of the shareholders of the Company shall be required for any amendment or termination

9.

HS-0009



including any amendment that increases the benefits provided under any option or other stock award.

SECTION 9.  NO IMPLIED EMPLOYMENT CONTRACT.

The Plan shall not be deemed (i) to give any employee or other person any right to be retained in the employ of the Company or (ii) to interfere with the right of the Company to discharge any employee or other person at any time, with or without cause, which right is hereby reserved.

SECTION 10.    LEGAL CONSTRUCTION.

This Plan shall be governed by and construed under the laws of the State of California (without regard to principles of conflict of laws), except to the extent preempted by ERISA.

SECTION 11.  CLAIMS, INQUIRIES AND APPEALS.

(a)    **Applications for Benefits and Inquiries.**  Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Plan Administrator in writing by an applicant (or his or her authorized representative).  The Plan Administrator is:

Verity, Inc.<br>
Attn: Vice President, Human Resources<br>
894 Ross Drive<br>
Sunnyvale, CA 94089

(b)    **Denial of Claims.**  In the event that any application for benefits is denied in whole or in part, the Plan Administrator must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial.  Any electronic notice will comply with the regulations of the U.S. Department of Labor.  The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(1)    the specific reason or reasons for the denial;

(2)    references to the specific Plan provisions upon which the denial is based;

(3)    a description of any additional information or material that the Plan Administrator needs to complete the review and an explanation of why such information or material is necessary; and

(4)    an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under Section 502(a) of

HS-0010



ERISA following a denial on review of the claim, as described in Section 11(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Plan Administrator receives the application, unless special circumstances require an extension of time, in which case, the Plan Administrator has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the application.

(c)    Request for a Review. Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Plan Administrator within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his or her representative) shall have the opportunity to submit (or the Plan Administrator may require the applicant to submit) written comments, documents, records, and other information relating to his or her claim. The applicant (or his or her representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his or her representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d)    Decision on Review. The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render its decision on the review. The Plan Administrator will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Plan Administrator confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

11.

HS-0011



    (1)    the specific reason or reasons for the denial;

    (2)    references to the specific Plan provisions upon which the denial is based;

    (3)    a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his or her claim; and

    (4)    a statement of the applicant's right to bring a civil action under Section 502(a) of ERISA.

    (e)    **Rules and Procedures.** The Plan Administrator will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Plan Administrator may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

    (f)    **Exhaustion of Remedies.** No legal action for benefits under the Plan may be brought until the applicant (i) has submitted a written application for benefits in accordance with the procedures described by Section 11(a) above, (ii) has been notified by the Plan Administrator that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 11(c) above, and (iv) has been notified that the Plan Administrator has denied the appeal. Notwithstanding the foregoing, if the Plan Administrator does not respond to an applicant's claim or appeal within the relevant time limits specified in this Section 11, the applicant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

SECTION 12.  BASIS OF PAYMENTS TO AND FROM PLAN.

    All benefits under the Plan shall be paid by the Company. The Plan shall be unfunded, and benefits hereunder shall be paid only from the general assets of the Company.

SECTION 13.  OTHER PLAN INFORMATION.

    (a)    **Employer and Plan Identification Numbers.** The Employer Identification Number assigned to the Company (which is the "Plan Sponsor" as that term is used in ERISA) by the Internal Revenue Service is 77-0182779. The Plan Number assigned to the Plan by the Plan Sponsor pursuant to the instructions of the Internal Revenue Service is 520.

    (b)    **Ending Date for Plan's Fiscal Year.** The date of the end of the fiscal year for the purpose of maintaining the Plan's records is May 31.

HS-0012



(c)    Agent for the Service of Legal Process. The agent for the service of legal process with respect to the Plan is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

(d)    Plan Sponsor and Administrator. The "Plan Sponsor" and the "Plan Administrator" of the Plan is:

Verity, Inc.
Attn: Vice President, Human Resources
894 Ross Drive
Sunnyvale, CA 94089

The Plan Sponsor's and Plan Administrator's telephone number is (408) 541-1500. The Plan Administrator is the named fiduciary charged with the responsibility for administering the Plan.

SECTION 14.  STATEMENT OF ERISA RIGHTS.

Participants in this Plan (which is a welfare benefit plan sponsored by Verity, Inc.) are entitled to certain rights and protections under ERISA. If you are a Participant, you are considered a participant in the Plan for the purposes of this Section 14 and, under ERISA, you are entitled to:

Receive Information About Your Plan and Benefits

(a)    Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites, all documents governing the Plan and a copy of the latest annual report (Form 5500 Series), if applicable, filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration;

(b)    Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan and copies of the latest annual report (Form 5500 Series), if applicable, and an updated (as necessary) Summary Plan Description. The Administrator may make a reasonable charge for the copies; and

(c)    Receive a summary of the Plan's annual financial report, if applicable. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

Prudent Actions By Plan Fiduciaries

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who op⁓

13.

HS-0012a



Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a Plan benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a Plan benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan, if applicable, and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court.

If you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Assistance With Your Questions**

If you have any questions about the Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

**SECTION 15. GENERAL PROVISIONS.**

(a) Notices. Any notice, demand or request required or permitted to be given by either the Company or a Participant pursuant to the terms of this Plan shall be in writing and shall be deemed given when delivered personally or deposited in the U.S. mail, First Class with postage prepaid, and addressed to the parties, in the case of the Company, at the address set forth in Section 11(a) and, in the case of a Participant, at the address as set forth in the Company's

14.

Verity, Inc.    894 Ross Drive Sunnyvale, CA 94089    t. 408.541.1500   f. 408.541.1600    www.verity.com



employment file maintained for the Participant as previously furnished by the Participant or such other address as a party may request by notifying the other in writing.

(b) **Transfer and Assignment.** The rights and obligations of a Participant under this Plan may not be transferred or assigned without the prior written consent of the Company. This Plan shall be binding upon any surviving entity resulting from a Change in Control and upon any other person who is a successor by merger, acquisition, consolidation or otherwise to the business formerly carried on by the Company without regard to whether or not such person or entity actively assumes the obligations hereunder.

(c) **Waiver.** Any Party's failure to enforce any provision or provisions of this Plan shall not in any way be construed as a waiver of any such provision or provisions, nor prevent any Party from thereafter enforcing each and every other provision of this Plan. The rights granted the Parties herein are cumulative and shall not constitute a waiver of any Party's right to assert all other legal remedies available to it under the circumstances.

(d) **Severability.** Should any provision of this Plan be declared or determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

(e) **Section Headings.** Section headings in this Plan are included for convenience of reference only and shall not be considered part of this Plan for any other purpose.

**SECTION 16. EXECUTION.**

To record the adoption of the Plan as set forth herein, Verity, Inc. has caused its duly authorized officer to execute the same as of the Effective Date.

VERITY, INC.

By: __ssprings__

Steven Springsteel

Title: SVP Finance / Administration & CFO

15.

Verity, Inc.   894 Ross Drive  Sunnyvale, CA 94089   t. 408.541.1500   f. 408.541.1600   www.verity.com

HS-0014

VERITY, INC.

CHANGE IN CONTROL AND SEVERANCE BENEFIT PLAN

PARTICIPATION NOTICE

To: Hugo Steiner

Date: May 4, 2005

Verity, Inc. (the "Company") has adopted the Verity, Inc. Change in Control and Severance Benefit Plan (the "Plan"). The Company is providing you with this Participation Notice to inform you that, given your position at the Company, you qualify as a participant in the Plan. A copy of the Plan document, which also constitutes a summary plan description, is attached to this Participation Notice. The terms and conditions of your participation in the Plan are as set forth in the Plan, and in the event of any conflict between this Participation Notice and the Plan, the terms of the Plan shall prevail except with respect to the cash severance, which you have declined as set forth below. Subject to the provisions of the Plan, the details of your Plan benefits, as described in Section 4 of the Plan (except with respect to the cash severance, which you have declined), are as follows:

Cash Severance Benefit: You have declined to accept any cash severance benefit under the Plan. Consequently, you will be entitled to no cash severance benefit under the Plan, and any cash benefit to which you shall be entitled shall be determined under Dutch law without reference to the Plan.

Accelerated Vesting of Options: Full.

Extended Exercisability of Options: Later of 12 months or the post-termination exercise period of the option; provided, however, that such extended exercisability shall not extend beyond the term of the option.

Continued medical benefits: _____18_____ months, or such earlier date as you shall secure subsequent employment that shall provide you with similar medical benefits.

Please retain a copy of this Participation Notice, along with the Plan document, for your records.

VERITY, INC.

ssprings   Digitally signed by ssprings
DN: CN = ssprings, C = US, L =
Sunnyvale HQ, O = California, O =
Verity, Inc., OU = US
Reason: I am approving this document
Date: 2005.05.05 10:XX:XX -07'00'

By: _____

Its: _____

HS-0015

## ACKNOWLEDGEMENT

The undersigned Participant hereby acknowledges receipt of the foregoing Participation Notice. In the event the undersigned holds outstanding stock options as of the date of this Participation Notice, the undersigned hereby:

☒ accepts

☐ rejects

the extended exercisability provisions for such stock options set forth above.* The undersigned acknowledges that the undersigned has been advised to obtain tax and financial advice regarding the consequences of this election including the effect, if any, on the status of the stock options for tax purposes under Sections 409A and 422 of the Internal Revenue Code.

_May 4. 206_

_____
Print name    _HUGO SLUIMEN_

*    Please check one box; failure to check a box will be deemed a rejection of the extended exercisability provisions as they relate to such stock options.

524052 v1/HN

HS-0016

*Autonomy*

VIA REGISTERED DELIVERY

29 September 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

*RESENDING TO:*

*ROSE DE FRANCE BLOC C     APT 2-3*
*17 BOULEVARD DE SUISSE*
*MC 98000 MONACO*

Re:     Letter dated 13 July 2006

Dear Mr Sluimer:

I write on behalf of Verity, Inc. with regards to your letter dated 13 July 2006. Your letter was addressed to the Vice President, Human Resources of Verity, Inc. That position reported to my office, which has global responsibility for group human resources matters. Jack Landers, the previous Vice President, Human Resources of Verity, Inc., has recently left the company, and as such I have assumed his duties as the Plan Administrator within the meaning of the Change in Control and Severance Benefit Plan (the "Plan"), the topic of your letter.

Your letter dated is a request for review under Section 11(c) of the Plan, and was received by Verity on 1 August 2006. This letter is a notification of decision on review under Section 11(d) of the Plan. Pursuant to Section 11(d), this decision is being provided within 60 days of receipt of your request.

I regret to inform you that upon re-review Verity has confirmed the denial of the application for benefits in whole. The specific reasons follow.

We draw your attention again to Section 3(b)(iii) of the Plan, which provides that an employee offered immediate reemployment is an express exception to the receipt of severance benefits under the Plan. You were offered but rejected such employment, instead seeking to voluntarily terminate your contract. Your employment with the company prior to your voluntary termination was in fact continuous, with uninterrupted payment of salary, commission and other benefits such as stock option vesting. Your statement that you were paid "half payment" is simply untrue as your salary remained the same, benefits were uninterrupted and your commission plan was calculated exactly the same as prior to the acquisition (indeed for most of the time by the same finance personnel using exactly the same systems as pre-acquisition).

Further, you did not suffer a "Constructive Termination" within the meaning of Section 2(f)(i) of the Plan. As you are aware, it is the company's position that you did not suffer a substantial reduction in your duties or responsibilities in effect immediately prior to the effective date of the Change in Control. It remains the company's conclusion that rather than suffer a "Constructive Termination" you sought to avoid your employment duties whilst engaging with the company solely to establish a position for compensation in the Dutch courts. In contrast, the company actively pursued your continued employment by finding an

Page 1



EXHIBIT

3

HS-0065

Autonomy

alternative position within the group with the same terms, analogous compensation and growth potential. In contrast, in the post-acquisition period after redundancy review you barely performed your role.

You reference the 7 July 2006 decision of the Cantonal Court in the Netherlands as evidence supporting your position. Section 10 of the Plan clearly states that the Plan is governed by the laws of the State of California. There are of course very substantial differences between Dutch and California employment law, such as the applicable rules and regulations, factors considered by the Cantonal Court and standards of evidence. Thus whilst the Cantonal Court decision has been considered in reaching this decision, it is neither binding on the Company for purposes of the Plan nor persuasive in reaching this decision. It should also be noted that at the Cantonal Court hearing your position was clear that the substance of your petition did not address the Plan.

Your request is also denied as a result of your failure to comply with the last clause of Section 2(f) of the Plan which states the precedent actions required to claim Constructive Termination under Section 2(f). You have not provided the Company with the required written notice, either in substance or in accordance with the notice procedures under Section 15(a). *Had I, or 13/7 performed f*

With regards to Section 3(b)(iv), the Plan is clear that it is within the Company's discretion to deny benefits should you not confirm in writing that you are subject to the Company's Confidentiality Agreement and Non-Compete Agreement. You have not provided any such confirmation. The Proprietary Rights Agreement you reference (in fact the "Employee Inventions and Proprietary Rights Assignment Agreement", dated 9 June 1993) is not equivalent to a confidentiality and non-compete agreement. The Proprietary Rights Agreement is a standard document that governs the rights between the company and its employees with respect to intellectual property generated before and during their employment.[1] A confidentiality agreement protects a much wider scope of key commercial information, and a non-competition agreement of course relates to post-employment competitive obligations. Acknowledgement in writing of these obligations is basic consideration for the receipt of benefits under the Plan, and is integral to the purpose and spirit of the Plan.

Finally, Section 7 provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities, which you have not agreed to.

*I will respond later*

---

[1] Your employment file does not contain the full text of the agreement, but only the first and last pages, however other agreements entered into at a similar time reflect this position.

HS-0066

Autonomy

This notice is provided under Section 11(b) of the Plan within the time periods allotted therein. Under Section 11(b)(3) of the Plan, you are hereby notified that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. Under Section 11(b)(4) of the Plan, you are hereby notified that you have a right to bring a civil action under Section 502(a) of ERISA.

Please address any future correspondence to my attention at the letter on this address.

Sincerely,

Andrew M Kanter
Chief Operating Officer – Autonomy Group of Companies

HS-0067

*Prod 35 P*

From: Andrew Kanter [andrewk@autonomy.com]
Sent: 19 May 2006 14:02
To: 'Rachel Haverfield'
Subject: FW: Europe RIF


--------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 08 January 2006 10:43
To: 'Jack Landers'
Subject: FW: Europe RIF

Jack,

I sent the message below to Anthony on Friday. Can I ask of you as well that
any communication you get from Hugo be forwarded to me. It's easier to get this
process wrong than right and we're committed to the proper process.

Best regards,

--Andy


--------------------------------------------------------------------
From: Andrew Kanter [mailto:andrewk@autonomy.com]
Sent: 06 January 2006 18:35
To: 'Anthony Bettencourt'
Subject: Europe RIF

Dear Anthony,

It appears we're at the end of the difficult stage of the transition and on to
the much more interesting bits. I'm sure you find this as much a relief as I
do.

As I'm sure you're aware, the process in Europe takes much longer so we'll
continue to work through the procedures over the next few weeks. One matter
that may come to your attention is any final determination on Hugo. We have to
follow the formal process required by law, and I've sent him the requisite
letter and spoken with him. Unfortunately I fear that Hugo may already be
positioning against the company as he's sent me an email which is simply not
true.

In any event I urge to pass back to me any communications or matters that may
come up with Hugo. The legals are complicated enough so that it's easy to let a
small mistake become fatal. We are committed to running a fair, open and honest
procedure with Hugo but need to keep the channel formalized.

Wishing you the best and looking forward to seeing you next week.

Best regards,

--Andy

EXHIBIT
4
PENGAD 800-631-6989

HS-0022

Verity, Inc
Attn. Vice President Human Resources
894 Ross Drive
Sunnyvale CA  94089
California, USA

Date: May 1st, 2006

Dear mr. Jack Landers,

Being a participant in Verity's Change in Control and Severance Benefits Plan
(the Plan), I draw your attention to the following.

In my opinion the acquisition of Verity by Autonomy results in a Change in
Control according to the Plan. This leads to the conclusion, that, according to
the applicable Participation Notice, I am entitled to not only cash severance
benefits, but also to accelerated vesting of options and continued medical
benefits.

Can you confirm to me that I am entitled to the accelerated vesting of option
and continued medical benefits?

If you need more information, please do not hesitate to call me.

Kind regards,

Hugo Sluimer

Apt. Le Millefiori, 27F
1, rue des Genets
MC 98000 Monte Carlo
MONACO

EXHIBIT
5

PENGAD 800-631-6989

HS-0057

Autonomy

VIA EMAIL AND REGISTERED DELIVERY

3 May 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genêts
MC 98000 MONACO

Re:    Fax dated 1 May 2006 to Mr Jack Landers

Dear Hugo:

I write on behalf of Verity, Inc. I refer to the fax dated 1 May 2006 which was addressed to Mr. Jack Landers. Mr. Landers has forwarded this document to me as you are currently in a legal dispute with Verity, Inc. regarding your employment and thus I am responsible for all communications.

On the basis of the terms of the Change in Control and Severance Benefit Plan (the "Plan"), we do not consider you to be entitled to the accelerated vesting of options and continued medical benefits. Firstly, in Section 3(b)(iii), an employee offered immediate reemployment is an express exception to severance benefits described in the Plan Entitlement Section 3(b)(iv). In any event your employment has been continuous, with continued payment of salary, commission and other benefits such as stock option vesting. Secondly, section 3(b)(iv) provides that an employee will not receive benefits under the Plan if the employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non Compete Agreement, which we have not received. Thirdly, Section 7 further provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities. In view of the pending litigation between yourself and the Company, obviously this criterion has not been fulfilled thereby making you ineligible for the stated benefits.

I reiterate my request of 27 April 2006 that as this is now a legal matter, any matters relating to employment process and continued employment must be directed to me, or to our attorneys, Mr. J. de Roos and Mr. M. Ritmeester (P.O. Box 7113, 1007 JC Amsterdam ,The Netherlands). Any contact with other employees within Autonomy relating to your employment will not be accepted.

Sincerely,

Andrew M Kanter
Company Secretary



EXHIBIT

6

Page 1

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0058

Autonomy

VIA REGISTERED DELIVERY

6 July 2006

Hugo Sluimer
Le Millefiori
Apartment 27F
1, rue des Genets
MC 98000 Monaco

Re:   Fax dated 1 May 2006 to Mr Jack Landers  / VP HR

Dear Mr Sluimer:

I write on behalf of Verity, Inc. and further to my letter dated 3 May 2006.

Your letter dated 1 May 2006 seeks additional information related to the terms of the Change in Control and Severance Benefit Plan (the "Plan") ("can you confirm to me...?") As such it does not constitute an application within the meaning of the Plan.

Notwithstanding the foregoing, to the extent that your letter is deemed to be an application for benefits, we hereby notify pursuant to Section 11(b)(1) and (2) of the Plan you that your application is denied in whole. Firstly, in Section 3(b)(iii), an employee offered immediate reemployment is an express exception to the receipt of severance benefits under. You have been offered such employment, and your employment has been continuous with payment of salary, commission and other benefits such as stock option vesting. You have not suffered a "Constructive Termination" within the meaning of Section 2(f) the Plan. Also section 3(b)(iv) provides that an employee will not receive benefits under the Plan if the employee does not confirm in writing that he or she shall be subject to the Company's Confidentiality Agreement and Non Compete Agreement. Finally, Section 7 provides that in order to be eligible for benefits under the Plan, the employee must execute a waiver and release generally releasing the Company from any and all claims and liabilities.

This notice is provided under Section 11(b) of the Plan within the time periods allotted therein. Under Section 11(b)(4) of the Plan, you are hereby notified that you are permitted to request a review of this notice. You may do so by submitting a request for a review directly to me within sixty (60) days of the date of this letter. Your request must be submitted in writing and shall be addressed to:

Verity, Inc.<br>
Attn: Vice President, Human Resources<br>
894 Ross Drive<br>
Sunnyvale, CA 94089<br>
USA

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that you feel are pertinent. You (or your representative)

EXHIBIT

7

Autonomy Systems Limited, Cambridge Business Park, Cowley Road, Cambridge CB4 0WZ, U.K.
Phone: +44 (0) 1223 448 000, Fax: +44 (0) 1223 448 001, Email: autonomy@autonomy.com

HS-0059

Autonomy

shall have the opportunity to submit (or the Plan Administrator may require you to submit) written comments, documents, records, and other information relating to your claim. You (or your representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. The review shall take into account all comments, documents, records and other information submitted by you (or your representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination. The Plan Administrator will act on each request for review within sixty (60) days after receipt of the request, as set forth in the Plan. You have a right to bring a civil action under Section 502(a) of ERISA following a denial on review of any claim.

Sincerely,

Andrew M Kanter
Company Secretary

HS-0060

VIA EMAIL AND REGISTERED DELIVERY

13 July 2006

Verity, Inc.
Attn. Vice President, Human Resources
894 Ross Drive
Sunnyvale CA 94089
California, USA

**Re: Request for review**

Dear Mrs/Mr,
With reference to your letters dated 3 May 2006 and 6 July 2006, I hereby confirm that
my letter dated 1 May 2006 was mend to be an application for benefits under the Change
in Control and Severance Benefit Plan (the "Plan"), so in case this was not clear to you, I
hereby repeat my application for benefits under the Plan.

In accordance to section 11 (c) of the Plan, I hereby request review, based on the
following grounds:
1.  as you are aware, the Cantonal Court in The Netherlands ruled on 7 July 2006 that
    the offered position by Verity/Autonomy (Sr. VP Neurodynamics), is not
    comparable with the prior position the Participant hold at Verity, Inc. Therefore I
    claim, per section 2 (f) "Constructive Termination" (i) due to a substantial
    reduction in the Participant's duties and responsibilities.
2.  I disagree with your opinion that I was offered immediate reemployment, per
    section 3 (b) (iii) of the Plan. I was given half payment during a 3 months period
    (3 months in the software industry are comparable with at least 1 year in a
    traditional industry), so the offered reemployment was by far not immediate. I
    also believe that Verity/Autonomy's call for section 3 (b) (iii) under the Plan is
    not relevant, simply because a comparable position was never offered, so
    "Constructive Termination" applies.
3.  I also disagree with Verity/Autonomy's other arguments (referring to 3 (b) (iv)
    and section 7), to not consider me entitled to the benefits under the Plan, because I
    signed a "Proprietary Rights" Agreement when I joined Verity, Inc. (this
    agreement is comparable with Autonomy's "Confidentiality Agreement"). What's
    even more important is that such arguments have nothing to do with the
    core/spirit of the Plan. It is common business practice (as performed by
    Verity/Autonomy in other settlements under the Plan with former Verity
    Executives) that such 'sub-agreements' are part of a final 'Separation Agreement'
    between Verity/Autonomy and the Participant.

Sincerely,

Hugo Sluimer

EXHIBIT
8
PENGAD 800-631-6989

HS-0061